# Exhibit 1

CL/2019-000118

**IN THE BUSINESS AND PROPERTY COURTS
OF ENGLAND AND WALES
~~QUEEN'S~~KING'S⁵ BENCH DIVISION
COMMERCIAL COURT**

**BETWEEN: -**

**THE PUBLIC INSTITUTION FOR SOCIAL SECURITY**

**Claimant**

**- and -**

~~**(1) FAHAD MAZIAD RAJAAN AL RAJAAN**⁵~~
**(1) MUNA AL-RAJAAN AL-WAZZAN⁵**
(Also known as MUNA MOHAMMED ABDULAZIZ AL WAZZAN)⁵
(in her capacity as representative of the estate of Mr Fahad Maziad Rajaan Al Rajaan (deceased))⁵
**(2) MUNA MOHAMMED ABDULAZIZ AL WAZZAN**
(Also known as MUNA AL-RAJAAN AL-WAZZAN)⁵
~~**(3) BANQUE PICTET & CIE SA**⁵~~
~~**(4) PHILIPPE BERTHERAT**⁵~~
**(5) KAMRAN AMOUZEGAR**
**(6) PHOENIX INTERNATIONAL CONSULTANTS SARL**
**(7) ANTOINE NASRALLAH**
~~**(8) PICTET & CIE (EUROPE) SA**⁵~~
~~**(9) PICTET BANK AND TRUST LIMITED**⁵~~
~~**(10) BANK PICTET & CIE (ASIA) LIMITED**⁵~~
~~**(11) MIRABAUD & CIE SA**⁵~~
~~**(12) PIERRE MIRABAUD**⁵~~
~~**(13) THIERRY FAUCHIER-MAGNAN**⁵~~
~~**(14) LUC ARGAND**⁵~~
**(15) MAN GROUP LIMITED (formerly MAN GROUP PLC)**
**(16) MAN STRATEGIC HOLDINGS LIMITED**
**(17) MAN INVESTMENTS LIMITED**
**(18) MAN INVESTMENTS AG**
**(19) MAN INVESTMENTS MIDDLE EAST LIMITED**
**(20) ANTOINE MASSAD**
**(21) MOHAMMEAD EL GHAZZI**
**(22) UNION BANCAIRE PRIVÉE, UBP SA**
**(23) UBP ASSET MANAGEMENT (BERMUDA) LIMITED**
**(24) ANNE ROTMAN DE PICCIOTTO**
**(25) DANIEL DE PICCIOTTO**
**(26) FRANCESCO MOMBELLI**
**(27) ICS INVESTMENT CONSULTING SERVICES SA**
**(28) SINTESI LIMITED**
**(29) METHIS MANAGEMENT LIMITED**
**(30) EFG BANK AG**
**(31) GILLES GUERIN**
**(32) THE ESTATE OF EDGAR DE PICCIOTTO**
**(33) GUY DE PICCIOTTO**
**(34) MARC DE PICCIOTTO**
~~**(35) DANIELE DE PICCIOTTO**~~

[INTRODUCTION AND OVERVIEW][6]

**(36) VP BANK AG**
**(37) VP BANK (SCHWEIZ) AG**
**(38) RENATO GHITTINI**
**(39) ELY MICHEL RUIMY**
**(40) AERIUM FINANCE LIMITED**
**(41) THE PENSÉE FOUNDATION**
**(42) KHALED AL RAJAAN**[6]
**(43) FAWAZ AL RAJAAN**[6]
**(44) FAJER AL RAJAAN (OR AL WAZZAN)**[6]
**(45) FARAH AL RAJAAN**[6]

**Defendants**

---

**RE-[7]RE-[6]RE-[5]RE-[4]RE-[3]RE-[2]AMENDED[1]**
**CONSOLIDATED PARTICULARS OF CLAIM**

---

## A.    INTRODUCTION AND OVERVIEW

1.    By these consolidated proceedings, the Claimant ("**PIFSS**"), which is a public institution authorised by law to operate the State of Kuwait's social security system and pension scheme, claims relief in respect of the unlawful payment by financial institutions and intermediaries of unauthorised secret commissions procured by the First Defendant ("**Mr. Al Rajaan**") its former Director General and other Defendants acting with and assisting him.

2.    Such secret commissions were paid (so far as PIFSS has been able to uncover to date) over an approximate 20 year period between about 1995 and 2015 in a sum presently unknown, but believed to exceed US$ ~~836.8~~ ~~847.7~~ ~~841.2~~ ~~874.2~~ ~~868.2~~[6] 969.8[7] million. They were calculated and paid by reference to an agreed proportion of fees payable in respect of the investment, management, custody, brokerage and administration of PIFSS' assets which tasks had been safeguarded to the financial institutions paying the secret commissions and/or their associated entities ("**Secret Commissions**").

3.    PIFSS has not been able to uncover the full extent of the Secret Commissions. On the information available to it corrupt schemes were operated through and/or with the assistance of the following institutions, their agents and employees and financial intermediaries:

a.    Banque Mirabaud et Cie ~~(see the Eleventh to Fourteenth Defendants)~~[5]

b.    The Man Group (see the Fifteenth to Twentieth Defendants)

2

    c.        Banque Pictet et Cie ~~(see the Third to Fifth Defendants and the Eighth to Tenth Defendants)~~;[5]

    d.        EFG Bank (see the Thirtieth and Thirty First Defendants)

    e.        UBP Bank (see the Twenty Second to Twenty Fifth Defendants and Thirty Second to Thirty Fourth Defendants)

    f.        Financial intermediaries:

        a.        Antoine Nasrallah and his company Phoenix International Consultants SARL ("**Phoenix**") (Sixth and Seventh Defendants);

        b.        Moham~~mea~~d El Ghazzi (Twenty First Defendant);[5]

        c.        Francesco Mombelli and his companies (Twenty Sixth to Twenty Ninth Defendants).

    g.        VP Bank (see the Thirty Sixth to Thirty Eighth Defendants).

    h.        The Aerium Group (see the Thirty Ninth and Fortieth Defendants).

    i.        The Pensée Foundation (see the Forty-First Defendant).

4.        Mr. Al Rajaan ceased to be Director-General of PIFSS in January 2014. From no later than 2014, he became resident in England together with his wife, the Second Defendant ("**Ms Al Wazzan**").  Prior to his death on 6 September 2022,[5] ~~He is subject to~~[5] criminal investigations[5] in Kuwait and Switzerland had been instigated[5].

5.        The balance of this statement of case is structured as follows:

    a.        Section B: Parties;[5]

    b.        Section C: The Unlawful Secret Commissions Schemes;[5]

    c.        Section D: Governing Law of the Defendants' wrongdoing and foreign law;[5]

    d.        Section E: the Mirabaud Scheme;

    e.        Section F: the Man Group Scheme;

    f.        Section G: the Pictet Scheme;[5]

    g.        Section H(1): the Further Nasrallah Scheme;

    ga.        Section H(2): the Nasrallah/Pensée Scheme;

h.      Section I: the UBP Scheme;

i.      Section J(1): the Mombelli Scheme;

i.a.    Section J(2) the VP Banking Assistance Scheme;

ib.     Section J(3): the Aerium Scheme;

j.      Section K: Summary of Al Rajaan and Al Wazzan liability;⁵

k.      Section L: Remedy;⁵

l.      Section M: Interest and Prayer.⁵

## B.   THE PARTIES

**The Claimant**

6.   PIFSS is a Kuwaiti public institution, established by Emiri Order No. 61 of 1976 ("**the 1976 Order**") to administer the social security system and state pension scheme of the State of Kuwait. It has its own legal personality and has power to bring and defend proceedings in its own name. Its primary role is to provide Kuwaiti nationals with insurance for retirement, disability, sickness and death. It is funded by a combination of percentage contributions by employee and employer of employees' salaries and sums from the State Public Treasury.

7.   Pursuant to Articles 5 and 6 of the 1976 Order, PIFSS is managed through a board of directors whose role is to determine its policy, the responsibility for the implementation of which lies (pursuant to Articles 7 and 8(2)) with the Director General.

8.   In order to achieve a return on the contributions which it receives, and so as to fulfil its role, PIFSS operates a dedicated investment division, investing in a variety of domestic and international products across various sectors under the auspices of an investment committee established pursuant to Article 9 of the 1976 Order (the "**Investment Committee**").

9.   Public property in Kuwait is sacrosanct. Its protection is a fundamental part of the social contract between the state of Kuwait and its citizens as reflected in its constitution and specific laws giving effect to that principle. In particular:

a.      Article 17 of Kuwait's constitution provides that "public property is inviolable and its protection is the duty of every citizen".

b. Article 1 of the Public Property Law of 1993 ("**the Public Property Law**") provides that "public property must be respected: protection, support and preservation thereof is a duty of every national".

10. Pursuant to Article 2 of the Public Property Law anything owned by, or under the jurisdiction of PIFSS (as a Public Institution) by virtue of a law, constitutes public property in whatever jurisdiction. PIFSS' assets and all rights in and associated with such assets, including the right to recover unauthorised benefits in the hands of its employees or third parties in whatever jurisdiction arising from transactions concerning its assets, constitute public property.

**The First and Second Defendants and the Al Rajaan Heirs[6]**

11. Mr Al Rajaan was appointed to the position of Director General by decree of Kuwait's Finance Minister and his appointment was renewed every five years. He served as Director General from 14 January 1984 until January 2014 and in that capacity was responsible for implementing PIFSS' policy. As Director General and pursuant to Art 8 of the 1976 Order Mr Al Rajaan represented PIFSS in its dealings with third parties.

12. As Director General of PIFSS Mr Al Rajaan was its most senior manager. Throughout his term of office Mr Al Rajaan sat on the Investment Committee. Mr Al Rajaan sat on that committee and in practice exercised substantial control and/or influence over decisions as to how PIFSS' assets should be invested. Mr Al Rajaan's ability to decide upon investments without material challenge or scrutiny was further enhanced by his establishment from 1987 of a separate sub-committee of the Investment Committee which he chaired and which operated at all material times under his sole control. Following Mr Al Rajaan's death on 6 September 2022, Ms Al Wazzan – the Second Defendant, whose name in Arabic script is منى محمد عبدالعزيز الوزان / فى الرجعان للوزان and who is known, alternatively, by both of the following names: Muna (sometimes written Mona) Al Rajaan Al-Wazzan and Muna (sometimes written Mona) Mohammed Abdulaziz Al Wazzan – was appointed as representative pursuant to CPR 19.8(1)(b).[5]

12A. In addition to PIFSS' claim against the estate, PIFSS claims against Ms. Al Wazzan and the Forty-Second to Forty-Fifth Defendants, who are the late Mr. Al Rajaan's and Ms. Al Wazzan's children, namely Khaled Al Rajaan, Fawaz Al Rajaan, Fajer Al Rajaan (or Al Wazzan) and Farah Al Rajaan ("**the Al Rajaan Heirs**") on the following basis:

a.      If the First Defendant's case that Mr. Al Rajaan was domiciled in Switzerland when he died and/or that the administration of his estate is governed by Swiss law is correct, PIFSS is entitled to and claims against the Al Rajaan Heirs on the basis that they are the statutory heirs of Mr. Al Rajaan as defined in Articles 457 and 462 of the Swiss Civil Code and are jointly and severally liable as successors to the civil liability of Mr. Al Rajaan under Title Seventeen of the Swiss Civil Code, in particular (without limitation) Articles 560, 603 and 639.

b.      Further or alternatively, regardless of whether Mr. Al Rajaan was domiciled in Switzerland when he died (which is not admitted), PIFSS claims against the Al Rajaan Heirs to ensure that it obtains effective remedies in circumstances where:

   a.      Swiss law applies to issues of succession in the case of any Swiss immovables owned by Mr. Al Rajaan at the time of his death and the Al Rajaan Heirs are joined to ensure that PIFSS obtains effective remedies against any such assets.

   b.      If Mr. Al Rajaan was domiciled in England, a Swiss Court would apply English law to issues of succession in the case of any Swiss movables owned by Mr. Al Rajaan at the time of his death, and English law would on the First Defendant's case follow Mr. Al Rajaan's selection of Swiss law in his Will.

   c.      Mr. Al Rajaan held assets in different jurisdictions (including Switzerland) at the time of his death and other jurisdictions may hold that some or all of those assets have become assets of the Al Rajaan Heirs (or some of them) and where an enforceable judgment against those assets in relation to Mr. Al Rajaan's liabilities depends (or may depend) on judgment having been entered against the Al Rajaan Heirs.[6]

13.    The Second Defendant, Ms Al Wazzan, ~~is~~[5] was, until his death,[5] Mr. Al Rajaan's wife. A number of companies were set up in her name through and/or to which Secret Commissions were paid. PIFSS' primary case is that, at all material times in relation to the subject matter of PIFSS' claims, she was Mr. Al Rajaan's nominee.

6

[THE PARTIES][6]

**The Other Defendants[1] (and other relevant parties)[5]**

**Intermediaries**

Mr Nasrallah and the Nasrallah companies

14.     Mr Nasrallah is a Lebanese financial intermediary and the beneficial owner of Phoenix. PIFSS's claim is that he, through Phoenix and other entities which he beneficially owned (including Ozak Services Inc – "**Ozak**")) and together with his son, Nadim Nasrallah,[7] received Secret Commissions as nominee for Mr. Al Rajaan, and was used as a front for paying Secret Commissions to Mr Al Rajaan.

14A.    The Pensée Foundation ("**Pensée**") is a Bahamian foundation which Mr Nasrallah caused to be created in 2013 to receive Secret Commissions for the benefit of Mr Al Rajaan and to conceal his ownership thereof.

Mr El Ghazzi

15.     Mr El Ghazzi is a Lebanese financial intermediary, who has acted or purported to act as a representative of Man Group. PIFSS's claim is that he was used as a front for paying Secret Commissions to Mr Al Rajaan.

Mr Mombelli

16.     Mr Mombelli and/or companies which he owned and controlled (including ICS, Madrina Corporate Inc.– which merged with Sintesi, Atena – which merged with Methis) acted as intermediaries in relation to a number of different investment schemes with financial providers with whom he (or his companies) had business introducer contracts and from whom he (or his companies) received commissions, all or a substantial proportion of which were paid on to Mr Al Rajaan as Secret Commissions.

**The financial institutions and associated parties**

Mirabaud, Mr Mirabaud, Mr Fauchier-Magnan, Mr Luc Argand

17.     Mirabaud & Cie was until 2013 a partnership, the assets and liabilities of which have since that date been assumed by operation of Swiss law by ~~the Eleventh Defendant,~~[5] Mirabaud &

---

[1] Save as otherwise pleaded below, PIFSS adopts the definitions of the parties given in the claim forms pursuant to which these Particulars have been pleaded.

Cie SA ("**Mirabaud**") and references below to Mirabaud include the partnership and Mirabaud as its successor unless necessary to distinguish between them. ~~At all material times, Mirabaud provided investment management and other financial services to PIFSS.~~

18. Mr Mirabaud and Mr Fauchier-Magnan are first cousins and former senior partners of Mirabaud & Cie. Mr Mirabaud was senior partner until 31 December 2009 at which time he was immediately succeeded as senior partner by Mr Fauchier-Magnan. They had continuous oversight and management of the relationship between PIFSS, Mr Al Rajaan and Mirabaud entities.

19. Mr Argand is a Swiss-qualified lawyer and was, until its recent merger with Kellerhals Carrad Geneve SNC, senior partner of De Pfyffer. Mr Argand is an old school friend and close associate of Mr Mirabaud, and a university friend of Mr Fauchier-Magnan, and, at all relevant times, a director of the private bank formerly known as Banque Privee Edmond de Rothschild SA ("**BPER**").

The Man Entities and Mr Massad

20. Man Plc, MIL, MIMEL, MSHL and MIAG are companies forming part of the Man investment group of companies with their corporate seat in England. In particular:

   a. Man Plc, formerly known as ED&F Man Plc was incorporated in England and was listed on the London Stock Exchange in 1994. In 2000 the company divided into two separate businesses, with Man plc focusing exclusively on financial services and ED & F Man (the commodities division) taken private in a management buy-out.

   b. At all material times prior to November 2012, Man plc was registered as company number 02921462 and thereafter was registered as company number 08172396. Company number 02921462 is now known as MSHL. In these particulars, references to Man plc include Man plc and MSHL.

   c. MIL, formerly known as (a) ED&F Man Investment Products Ltd and (b) Man Investment Products Limited, was incorporated in England and at all material times operated Man Plc's asset management division through which all Man investment products were introduced and launched to the market.

   d. MIMEL was concerned in operating Man Group business in the Middle East following its establishment on 22 November 2005.

8

e.   MIAG, formerly known as ED & F Man Management AG and subsequently Man Management AG, was at all material times held out by Man Plc and/or MIL and/or the funds operated by the Man Group in its official documentation as the introducer and marketer of the funds on their behalf.

21.   Mr Massad was the head of MIL's Middle East Region working from regional offices in Bahrain and then Dubai between 1996 and 1 October 2008. He was held out by MIL as the face and directing mind of its business in the Middle East. At least during those periods he had continuous oversight and management of the relationship between PIFSS, Mr Al Rajaan, Mr. El Ghazzi and Man Group entities.

## The Pictet Entities, Mr Bertherat and Mr Amouzegar

22.   The private bank Banque Pictet & Cie was until 2014 a partnership, the assets and liabilities of which have since that date been assumed by operation of Swiss law by Banque Pictet & Cie SA ("**Pictet**"). References below to Pictet include the partnership and Banque Pictet & Cie SA as its successor unless necessary to distinguish between them. At all material times, Pictet provided financial services to PIFSS.

23.   Pictet Europe, Pictet Bahamas and Pictet Asia are firms and companies within the Pictet Group with the seat of their operations, respectively, in Luxembourg, Nassau and Singapore.

24.   Mr Bertherat is a former partner of Pictet & Cie and had continuous oversight and management of the relationship between PIFSS, Mr Al Rajaan, Mr. Nasrallah (and his companies) and Pictet entities.

25.   Mr Amouzegar was from 1997 to 2003 an associate at Pictet & Cie and from 2003 to (at least) 2015 was remunerated by Pictet & Cie as a purported business finder / agent.

## EFG Bank and Mr. Guerin

26.   EFG is a global private banking group with its headquarters in Switzerland. The defendant entity is the successor entity to the entity "Banque Edouard Constant" which merged with EFG Bank in 2004 2003 and which was formerly known until 1997 as "Banque Scandinave Suisse." It was, in relation to the matters stated below, and represented at all material times between 1995 and 2012 by Gilles Guerin. He was a friend of Mr. Nasrallah from about 1976 and of Mr. Al Rajaan from the late 1980s. At all material times Mr. Guerin had oversight

9

[THE PARTIES][6]

and management of the relationship between EFG and Mr. Nasrallah and his companies (including Phoenix and Ozak) and between EFG and Mr. Al Rajaan and his entities (including the Thaxton Foundation, a Liechtenstein Trust "**Thaxton**").

<u>The UBP Entities, the late Edgar de Picciotto, Daniel de Picciotto and Anne de Picciotto</u>

27.    UBP SA is a private bank limited by shares and ultimately owned and controlled by members of the de Picciotto family, including Edgar de Picciotto (now deceased) the founder of UBP SA and at all material times director and Executive Chairman prior to his death in March 2016. His son Daniel de Picciotto and daughter Anne de Picciotto were at all material times directors. PIFSS ~~will~~ claims against the statutory heirs (as defined in Articles 457 and 462 of the Swiss Civil Code) of the late Edgar de Picciotto, namely his children ~~through his heirs: his children~~ – Daniel de Picciotto, Anne de Picciotto, Guy de Picciotto, and Marc de Picciotto ~~and his widow Daniele de Picciotto~~ (referred to below in their capacity of statutory heirs as the "**Picciotto Heirs**").

28.    UBP AM, a wholly owned subsidiary of UBP SA, is an asset management company incorporated in Bermuda through which commissions were paid to Mr. Nasrallah through Phoenix.

<u>The VP Entities</u>

28A.    VP Bank AG is a Liechtenstein-based bank with its headquarters in Vaduz. Its registered A shares are listed on the SIX Swiss Exchange in Zurich. Its registered B shares are not listed. It has a wholly owned subsidiary company VP Bank (Schweiz) AG ("**VP Bank Switzerland**") which has, at all material times, operated as a bank from headquarters in Zurich.

28B.    At all material times VP Bank AG and VP Bank Switzerland operated their businesses through a Board of Directors and a separate Executive Board.

28C.    At all material times Renato Ghittini was a relationship manager at VP Bank Switzerland who had oversight and management of the relationship between VP Bank AG and VP Bank Switzerland and Mr. Al Rajaan and his associated entities/accounts (including those nominally in the name of his wife and son), Mr. Nasrallah and his companies/entities and Mr. Amouzegar and his companies/entities.

28D.    Additionally, Mr. Ghittini was from October 2005 a member of the Executive Board of VP Bank Switzerland. He was promoted to the position of Vice Director with effect from 1 January 2007 until he left VP Bank Switzerland in September 2013.

28E.    In the above capacities and role Mr Ghittini was authorised to act for and represent VP Bank Switzerland in all matters concerning the subject matter of the claims set out below. By reason of his de facto role in managing the relationship between VP Bank AG and the individuals and entities referred to above, and pleaded further in section J(2) below, it is to be inferred that VP Bank AG delegated and authorised the management of its client relationships which are the subject matter of this claim to be carried out by Mr. Ghittini.

The Aerium Defendants

28F.    Ely Michel Ruimy ("**Mr Ruimy**") is the chairman and, together with his brother Franck Ruimy, the joint founder, of the Aerium Group ("**the Aerium Group**"), a European real estate investment manager of which the parent company is Aerium Holdings SA ("**Aerium Holdings**"), which was incorporated in Luxembourg in 2003. The Luxembourg Register of Beneficial Owners records Mr Ruimy as the indirect beneficial owner of 100% of Aerium Holdings as at 6 September 2019 and it is to be inferred from the foregoing that Mr Ruimy was the controller of Aerium Holdings (and thereby the Aerium Group) at all material times.

28G.    Aerium Finance Ltd ("**Aerium Finance**") is a company incorporated in England which at all material times was majority owned and/or controlled by Aerium Holdings and accordingly by Mr Ruimy. Mr Ruimy was a director of Aerium Finance between 5 July 2004 and 9 February 2009 (and subsequently between 21 November 2017 and 10 April 2020).

28H.    At all material times, Mr Ruimy (either alone or together with members of his family) also majority owned and/or controlled the Aeriance Group of companies ("**the Aeriance Group**"), which provided services to the Aerium Group and also managed its own Aeriance funds.

## C.    THE UNLAWFUL SECRET COMMISSION SCHEMES

29.    From a date no later than about 1994 until about 2015 following his ceasing to act as Director General in 2014, in breach of his duties to PIFSS and without PIFSS' knowledge or consent, Mr Al Rajaan arranged for and/or procured Secret Commissions to be paid to him and/or others at his direction and/or parties otherwise connected with him in sums known to date of

11

approximately US$ ~~836.8~~ 847.7 ~~841.2~~ ~~874.2~~ 868.2[6] 969.8[7] million[2].

30. Pending disclosure, PIFSS has identified ~~six~~ ~~seven~~ nine specific schemes. PIFSS sets out particulars of those schemes and of the unauthorised sums received by Mr. Al Rajaan in sections E to J~~(2)~~(3) below. While each Scheme enjoyed its own particular features, in general the schemes, at their core, operated as follows:

   a. Under the control and/or influence of Mr. Al Rajaan, PIFSS made decisions, in Kuwait, to enter into arrangements for the provision of financial services to or for the ultimate benefit of PIFSS and to make investments, the investment capital being typically provided from PIFSS' bank account at the Ahli United Bank in London, of which Mr. Al Rajaan was Chairman at material times.

   b. Fees were payable (including by deduction from PIFSS' investments) by PIFSS on financial services supplied to it or investments which it entered into.

   c. Mr. Al Rajaan procured the banks and investment companies with whom he was dealing on behalf of PIFSS in his capacity as Director General to make Secret Commissions to him equating to an agreed proportion of the relevant fee.

   d. The Secret Commissions were arranged between Mr. Al Rajaan and the relevant partner/executive or intermediary involved in broking the financial service or investment in question and were "fronted" and thus concealed by corrupt intermediaries who purported to contract with the bank or investment company to disguise the payment of Secret Commissions as legitimate retrocessions (rebates), commissions or introduction fees – referred to generically below in this statement of case as "commissions". As Mr. Al Rajaan arranged for and/or influenced PIFSS to enter into further investments, the purported contractual arrangements between the "front" and the relevant entity through which payment of Secret Commissions was made would be varied to accommodate the new "commissionable" investment.

   e. PIFSS believes that on a number of the schemes Mr. Al Rajaan shared the Secret Commissions with the party which "fronted" their payment.

---

[2] For ease of reference, aggregate sums which were originally paid in non-US$ currencies have been converted to US$ in this Re-[7]Re-[6]Re-[5]Re-Re-Re-Amended Consolidated Particulars of Claim (FX rate at the date of payment, or where the precise date or dates of payment are unknown to PIFSS, an average FX rate for an appropriate period). One off transactions are recorded in both original currency and US$ conversion.

f.  To enable ultimately successful payment, without detection or regulatory scrutiny, the payments were routed through a number of offshore bank accounts and in part through corporate and personal accounts held in the name of Ms. Al Wazzan, acting as Mr. Al Rajaan's nominee.

g.  This "routing" was facilitated by banks which were implicated in the corrupt schemes and which acted in concert with Mr. Al Rajaan and the corrupt intermediaries so as to assist Mr. Al Rajaan in (a) the establishment of companies and bank accounts through which to route the funds and (b) actioning and/or permitting payments to be made to (and by) Mr. Al Rajaan and on his behalf without challenge, or scrutiny, which they knew or believed (acting dishonestly and unconscionably) to be Secret Commissions or the traceable proceeds thereof.

3l.  As to the Secret Commissions paid pursuant to the known schemes, sums total[5]ing US$765.7 US$776.6 US$769.7 US$811.3 808.2[6] 910.9[7] million were paid as summarised below (and further particularized in sections E-J(2)(3) below) of which Mr. Al Rajaan received at least US$432.9 US$443.1 US$456.8 US$498.5 512.8[6] 579[7] million:

a.  Under the Mirabaud Scheme, the sum of US$76.9 US$77.0[6] million plus other associated unauthorised benefits of US$2.1 2[6] million;

b.  Under the Man Scheme, the sum of US$156 US$155.2[6] million;

c.  Under the Pictet Scheme, the sum of US$26.7 million;

d.  Under the Mombelli Scheme, the sum of at least US$102.3 104.2 126.3[7] million;

e.  Under the Further Nasrallah scheme, the sum of approximately US$332.1 323.4 320.8[6] 401.3[7] million;

ea.  Under the Nasrallah/Pensée scheme, the sum of approximately US$31.5 million;

f.  Under the UBP Scheme, the sum of c. US$69.6 million.

g.  Under the VP Banking Assistance Scheme, the sum of at least US$10.9 million.

h.  Under the Aerium Scheme, the sum of at least US$10.1 million together with such sums as are claimed pursuant to paragraphs 338BBB1-4 below[6].

Schedules summarising the payments made, so far as known, pursuant to such Schemes, are set out in Appendix 1 -6 7.

32.     Mr. Al Rajaan procured the Secret Commissions through:

a.      His substantial control of and/or influence over the investments which PIFSS made;

b.      The fact that such investments generated fees payable to third parties which could be used as a source of kick-backs to him;

c.      Exploitation of personal relationships with and between individuals with whom he acted in concert, who were prepared to be party to, and/or to commit the entities for whom they worked, to corrupt arrangements.

33.     For the avoidance of doubt, pending disclosure, in relation to the Mombelli scheme, it is alleged that Mr. Mombelli acted as principal in operating his own unlawful scheme.

34.     As to paragraph 32.a:

a.      Mr. Al Rajaan sat on the Investment Committee in his capacity as Director General;

b.      He established (in 1987) and chaired the investment sub-committee,

by reason of which he exercised very substantial influence and/or control over PIFSS' investments.

35.     As to paragraph 32.b, the making by PIFSS of financial investments would typically give rise to some or all of custodian, administration, brokerage, placement, management and performance fees payable to those who provided the relevant services. Such fees provided the source for the payment of Secret Commissions.

36.     As to paragraph 32.c the first Secret Commissions of which PIFSS is aware, in relation to the subject matter of this claim, were procured through exploitation of Mr. Al Rajaan's personal relationship with Mr. Nasrallah who was the intermediary in the payment of commissions under the:

a.      Further Nasrallah Scheme (from 1995);

b.      Pictet Scheme (from 1998);

14

c.      UBP Scheme (from 2003).;

d.      VP Banking Assistance Scheme (from 2006).

37.   It is also to be inferred, from the payment by Man Group in 1998 of the sum of US$1 million to Mr. Nasrallah, through Ozak, that Mr. Nasrallah acted as a "facilitator" in relation to the Man scheme, and that the payment he received through Ozak was in consideration of this role. Under that scheme a further personal contact of Mr. Al Rajaan, Mr. El Ghazzi, acted as the intermediary. It is further to be inferred from the existence of payments to Ozak and Bordertown and Pensée as pleaded below that Mr. Nasrallah acted as an intermediary and/or "facilitator" in relation to the Aerium Scheme, in relation to which it is inferred that Mr. Amouzegar additionally played an intermediary and/or "facilitator" role by reason of the use of entities associated with him as pleaded below.[6]

38.   Mr. Nasrallah was an associate of Mr. Al Rajaan including when the former had worked for Paribas in the 1990s through which bank PIFSS made and held investments at the time. In or about 1994 Mr. Nasrallah left Paribas and incorporated Phoenix. Thereafter, both through Phoenix and Ozak (which Mr. Nasrallah incorporated in 1997), Mr. Nasrallah made substantial payments to Mr. Al Rajaan through corporate accounts held at a number of different banks arising from commissions or Secret Commissions paid by financial institutions on investments.

39.   Mr. Al Rajaan and Mr. Nasrallah shared those commissions pursuant to a (typical but not invariable) 65/35 split agreed pursuant to a gentlemen's agreement. Commissions shared with Mr. Al Rajaan in this way and generated through investments made by PIFSS at all material times thereafter represented all or substantially all of Mr. Nasrallah's commercial interest and those of his companies.

40.   Through his own contacts and with the assistance and co-operation of others, in particular Mr. Nasrallah, Mr. Al Rajaan established and/or fostered personal relationships with the principal partners and/or employees of a number of banks who had an interest in providing financial and investment services to or for the benefit of PIFSS and (at least) banking services to Mr. Al Rajaan personally and where he could exert influence (by reason of his position as Director General of PIFSS) over the relevant relationship partner/employee and bank.

41.   Further as to paragraph 32.c it is to be inferred from the facts and matters particularised

below and from an acknowledgement by VP Bank to this effect, that Mr. Al Rajaan approached banks who would (and did) demonstrate "flexibility" in their approach to regulatory issues, i.e. who were prepared to (and did):

a.   Pay Secret Commissions to Mr. Al Rajaan in return for the promise of investment by PIFSS in products or services in which they and/or their partners and officers were commercially interested; and/or

b.   Open and/or administer accounts held beneficially for Mr. Al Rajaan and any relevant intermediary through which the Secret Commissions were transferred and ultimately paid, taking such steps as were necessary to avoid the regulatory scrutiny under which such companies and transactions would otherwise have come, and which would have caused the corrupt arrangements to have been discovered and stopped.

c.   Conceal matters, in whole or part, from PIFSS and regulators, both at the time of the payments and when enquiries were later made by PIFSS in correspondence.

42.   The partners and/or employees and banks in question were as follows:

a.   In the case of Mirabaud, Mr. Mirabaud and Mr. Fauchier-Magnan;

b.   In the case of Pictet, Mr. Bertherat;

c.   In the case of UBP SA, members of the de Picciotto family in particular Edgar de Picciotto;

d.   In the case of EFG, Mr. Guerin;

e.   In the case of VP Bank, Mr Ghittini.

43.   At all material times both Mr. Al Rajaan and the parties who procured or were responsible for paying Secret Commissions to Mr Al Rajaan acted in concert and knew that:

a.   Mr Al Rajaan was Director General of PIFSS;

b.   In the course of his duties on PIFSS' behalf he exercised control and/or influence over PIFSS' investment decisions and they all knew and intended that the promise and payment of Secret Commissions were in return for his exercising that control

and/or influence in a way which benefited their businesses;

    c.    It was in their commercial interests to secure dealings with PIFSS, directly or indirectly, through Mr. A Rajaan;

    d.    PIFSS was unaware of, and had not authorised, the receipt by Mr Al Rajaan of the Secret Commissions.

44.    The payment and receipt of Secret Commissions gave rise to a conflict of interest between Mr Al Rajaan's duties to PIFSS and his personal interest, as would have been obvious and as was, therefore, known by the parties with whom, on behalf of PIFSS, Mr Al Rajaan was dealing.

45.    The parties who otherwise participated in, assisted with or facilitated the payment and receipt of Secret Commissions and its concealment did so dishonestly and in the knowledge that they were assisting with or facilitating an unlawful scheme; to the extent that the proceeds of such Secret Commissions (or any part of them) were retained by any party, they were knowingly and unconscionably received.

46.    PIFSS does not know the full extent of Mr Al Rajaan's unlawful conduct and its investigations continue. The total cumulative value of PIFSS' investments made and redeemed over the period of his tenure as Director General ran into US$hundreds of billions of dollars. Mr. Al Rajaan is known to have held accounts at a large number of banks which are not defendants to this claim in, amongst other places, Kuwait, Switzerland, the United Kingdom, Bahrain, the USA, the Bahamas, Singapore, Liechtenstein and Lebanon, payments into which are not referred to in this claim. It is to be inferred from this, from the general methodology above and the facts and matters set out below that from at least 1995 onwards, and potentially earlier, Mr Al Rajaan entered into arrangements to receive Secret Commissions in respect of all, or a substantial proportion of, the investments held by PIFSS and in any event, received Secret Commissions and/or unauthorised benefits substantially in excess of the sums particularised above and below.

47.    Mr Al Rajaan, whether personally, or through Ms Al Wazzan and Mr. Nasrallah, acting personally and through companies owned by him, as nominees, alternatively Mr. Al Rajaan, Ms Al Wazzan and Mr. Nasrallah, received further sums which were independent of, and in addition to, the sums referred to in respect of the six seven nine known schemes:

17

a. US$17.3 16.9 8.2 7.7[6] 6.6[7] million paid into accounts held at Mirabaud (see paragraphs 111.e, 111.f and 111.g below).

b. US$53.8 54.6 52.3[6] million into accounts held at Pictet Bahamas (see paragraph 205.d) below.

48. The sums referred to in paragraphs 31 and 47 above total US$ 836.8 847.7 841.2 874.2 868.2[6] 969.8[7] million.

49. It is reasonably to be inferred that they, and any further payments made to Mr. Al Rajaan by or on behalf of financial institutions or intermediaries, were Secret Commissions or the traceable proceeds of Secret Commissions or other unauthorised benefits. Such inference is to be drawn by reason of:

a. the general methodology of the Secret Commission scheme set out above;

b. the similar fact pattern of Secret Commissions as pleaded in relation to and evidenced by the six seven nine known schemes particularised below;

c. the scale of the sums in question, which cannot rationally be explained by the level of lawful remuneration paid to Mr Al Rajaan as a public servant or what is known of his personal circumstances.

50. Aside from any other claim or remedy arising as a result of the payment and receipt of the Secret Commissions, the Secret Commissions and all unauthorised benefits arising out of the transactions which gave rise to the Secret Commissions constituted public property as a matter of Kuwaiti law for which the beneficiaries are required to account to PIFSS and in respect of which PIFSS is entitled to claim disgorgement/restitution to vindicate its proprietary rights in such sums and to follow or trace the benefits or their proceeds accordingly. Further, by their concerted, unlawful and intentional acts designed to damage PIFSS' interests PIFSS has suffered harm (including reputational harm) and[6] loss, in the sum of, at least, the Secret Commissions paid which would otherwise not have been paid and for which all parties are liable.

51. PIFSS expects, and will apply to the Court so far as necessary, to add further details of its claims and to join further defendants following disclosure to enable it to obtain relief in respect of the full extent of the Secret Commissions paid.

18

52.     Further particulars of each of the known Schemes, and of the unlawful acts of the Defendants, are set out in sections E - J(2)(3) below. Those particulars are in each case provided pursuant to the above general scheme which is alleged against all Defendants.

**D.      GOVERNING LAW OF DEFENDANTS' WRONGDOING**

52A.    As to the governing law of PIFSS' claims against Mr Al Rajaan based on breaches of his obligations under the Kuwaiti Civil Service Law (as set out in paragraphs 58 and 59 below); as such obligations arose from and by reason of Mr Al Rajaan's role as an officer (namely as Director General) of PIFSS, a Kuwaiti public institution, and are therefore inextricably bound up with PIFSS' constitution and internal management within its statutory and regulatory framework, Kuwaiti law applies (as the law of the place of PIFSS' establishment) to the exclusion of all other potential governing laws. PIFSS relies on paragraphs 53 to 57 below without prejudice to the foregoing, and, so far as the aforesaid claims are concerned, in the alternative.

53.     As to the governing law of the Defendants' torts and/or delicts, PIFSS' case is that:

    a.      Acts or omissions of defendants prior to 1 May 1996 engage the principles of double actionability;

    b.      Acts or omissions of defendants between 1 May 1996 and 10 January 2009 are governed by the provisions of the Private International Law (Miscellaneous Provisions) Act 1995 ("**PILA 1995**");

    c.      Acts or omissions which take place thereafter are principally governed by the provisions of Article 4 of the Rome II Regulation (No. 864/2007) ("**Rome II Regulation**").

54.     To the extent that PIFSS' claims are for restitutionary and/or proprietary remedies or an account of profits or benefits, its case is as follows:

    a.      Such claims are nevertheless to be characterised, for the purposes of private international law, as claims in tort or delict, such that the analysis in paragraph 53 above applies.

    b.      If, contrary to PIFSS' primary case, any of those claims are properly to be characterised (under private international law) as claims in restitution to reverse

unjust enrichment, the general law is to be applied in respect of the test for the governing law of such claim(s) prior to 11 January 2009 after which the provisions of Article 10 of the Rome II Regulation govern the choice of law.

55. On the basis of the above principles:

a. If, and to the extent that PIFSS' claims arise from acts or omissions prior to 1 May 1996, the claims are actionable both under English law and under the relevant foreign law, being the law of Kuwait;

b. Otherwise, and whether under the provisions of PILA 1995 or the Rome II Regulation, in respect of claims in tort/delict, PIFSS' case is that all claims are governed by the law of Kuwait;

c. If, contrary to PIFSS's primary case, any of the claims which arise are properly to be characterised as being for restitution to reverse unjust enrichment such claims are, in any event, governed by the law of Kuwait.

56. Without prejudice to the above allegations, to the extent that the obligations owed by an agent to his principal are relevant, such obligations are governed by the law regulating the principal/agent relationship. Accordingly:

a. (and in any event) the law governing the relationship between PIFSS and Mr. Al Rajaan is the law of Kuwait;

b. The law governing the relationship between agents and employees of the Swiss Bank defendants is Swiss law.

57. If, and to the extent that the claims (or any of them) are governed by any other system of law and/or if any relevant principle of Kuwaiti law is relevant but has not been pleaded above or below, unless otherwise expressly pleaded, English law applies, alternatively any other system or principle of law is to be taken to be the same as English law.

Kuwaiti Law - The Legal Framework

58. The relevant principles of Kuwaiti law are as follows:

a. The Civil Code (Law No. 67 of 1980 as amended) is the general provision governing civil liability in tort. It is supplemented by the specific laws that provide for specific

wrongful conduct.

b.    Article 227 of the Kuwaiti Civil Code provides for liability where a party commits an act of fault or harm ("illicit act") which causes damage to a victim.

c.    Article 227 is a default provision under which the act of fault or harm can be established by reference to the expected norms of society, a codified civil obligation (including the provisions of the Civil Service Code) or a criminal act. Conduct that gives rise to a criminal act is treated as fault.[6] Proof of such an act, including in the case of an act alleged to constitute a criminal act, is to be assessed on the balance of probabilities.

d.    In respect of the illicit acts relied upon by PIFSS to found civil liability, the hierarchy of wrongdoing in declining order of gravity is as follows:

    a.    Breaches of the Public Property Law;

    b.    Bribery;

    c.    Breach of other specific laws.

e.    By Article 40 of Law, No. 31 of 1970 if the circumstances of the bribery offence give rise to a breach of, and thus an offence under, the Public Property Law the official and the briber are liable for the (more serious) Public Property breach in addition to liability for bribery.

f.    Civil liability is imposed on accessories to a principal's tort pursuant to Article 229 of the Kuwaiti Civil[6] Code which gives rise to joint and several liability as between principal tortfeasor and accessory. In the case of torts constituted in the commission of criminal acts, accessorial liability of parties to the criminal act of the principal actor is established pursuant to Articles 47-4849 of the Penal Code (Law Number 16 of 1960).

g.    Civil liability is additionally imposed on those whose separate torts (within the meaning of Article 227 or otherwise under specific laws, including criminal laws) contribute to common harm, pursuant to Article 228 of the Civil Code which gives rise to joint and several liability as between principal[6] tortfeasors.

h.     Pursuant to Article 240 of the Civil Code Kuwaiti law imposes vicarious liability on a principal <u>pursuant to a guarantee arising at law</u>[6] in respect of harm to a victim caused by that principal's subordinate where the conduct occurred while performing work-related duties or by reason of it<u>, to the full extent that the subordinates are liable</u>[6].

## Specific provisions of foreign law

## Kuwait law

## Mr. Al Rajaan

59.    Pursuant to Article 3 of the Public Property Law and Article 43 of the Penal Code as amended by Law No. 31 of 1970 Mr. Al Rajaan was deemed to be a public employee. Further, in acting as the agent of PIFSS and/or in his role as member of the Investment Committee and Chairman of the sub-committee Mr Al Rajaan owed fiduciary duties to PIFSS pursuant to the Civil Service Law No. 15 of 1979 ("**The Civil Service Law**") (adopted by PIFSS pursuant to board decision No 1/1977) as follows:

a.     Personally to undertake the tasks assigned to him in good faith and efficiently (Article 24(1));

b.     Faithfully and honestly to execute orders issued to him within the bounds of the law, regulations and rules in force (Article 24(3));

c.     To abide by the terms of the law and regulations to preserve State property and, in dispensing funds, to do so while respecting the dictates of honesty and care (Article 24(4)); particular incidents of that obligation were that Mr. Al Rajaan was required to abide by the provisions of the Kuwaiti Penal Code in respect of bribery and the Public Property Law set out below;

d.     To uphold the dignity of his post and conduct himself with due respect (Article 24(5));

e.     Not to have any personal interest in any business, work, tender or contract with any government authority, or to exploit his position for any personal purpose (Article 25).

60.    Article 35 of the Penal Code, as amended by the Law No. 31 of 1970 provided at all material

22

times that it was a criminal offence for Mr. Al Rajaan, as a public employee, to ask for, or accept, for himself or another a promise or gift to do or refrain from doing any act required by his employment.

61. The protected right under the bribery provisions is the preservation of the integrity of public office, the protection of public trust in public institutions and the maintenance of equal treatment under the law. The harm which the proscribed conduct is designed to prevent is the unlawful trading by a public employee of his or her employment authority to further his personal interests or those of others.

62. Article 11 of the Public Property Law provided at all material times that it was a criminal offence for Mr Al Rajaan in his capacity as a public employee with responsibilities to PIFSS in connection with the public funds under his control to negotiate, conclude or agree or enter into a contract with any party within or outside Kuwait in any matter concerning the affairs of PIFSS, such that it will create rights or financial obligations for PIFSS, and intentionally creates those obligations in a manner that causes harm to the interests of PIFSS in consideration of receiving any profit or benefit for himself or for a third party. The protected right under this law is the sanctity of public property and the loyalty of public employees. The harm that the proscribed conduct is designed to prevent is the violation of the sanctity of public funds; unlawful gains and corruption of civil servants and public institutions.

62A. Article 12 of the Public Property Law provided at all material times that it was a criminal offence for Mr Al Rajaan in his capacity as a public employee involved with the management and supervision of the contracts and works of PIFSS to obtain or attempt to obtain for himself or through an intermediary or for a third party, an undisclosed profit or benefit further to his involvement with the same.[6]

62B. Article 2 of the Money Laundering Law No.35 of 2002, and Article 2 of the Money Laundering Law No.106 of 2013 (which was in materially the same terms), provided at all material times that it was a criminal offence for Mr Al Rajaan to transfer or assign property for the purpose of concealing or disguising the unlawful source of that property, or to conceal or disguise the real nature of monies, or their source or location, or the way in which they are disposed of, or its transfer, ownership or rights related thereto, knowing that the property or monies derived from a crime or any act of participation in the same.[6]

23

[GOVERNING LAW OF DEFENDANTS' WRONGDOING]6

**Third parties**

Bribery

63.     Article 11 of the Penal Code provided at all material times that the provisions of the Penal Code (including the bribery offences pleaded above and below) apply to (a) any person who commits a crime in Kuwait; and (b) any person who commits outside Kuwait an act which makes him a perpetrator of, or a partner in, a crime committed in Kuwait (under Articles 47 and 48 ~~and 49~~ of the Penal Code respectively).

64.     Under Article 37 of the Penal Code as amended by Law No. 31 of 1970 it was at all material times an offence for an intermediary to request a promise or a payment as a bribe on behalf of a public employee with the intention of keeping some of it for himself or to use influence (real or alleged) or for obtaining from any government agency works or orders or decisions or licenses or an obligation or any benefit.

65.     Under Article 39 of the Penal Code as amended by Law No. 31 of 1970 it was at all material times an offence for a party (whether the ultimate briber or the intermediary) to offer a payment or promise with the intention of buying the public employee's loyalty in transacting with the agency (PIFSS in this case).

66.     Intention is to be deduced from the circumstances of the case. In the case of intermediaries and those responsible for paying the bribe, proof of intent requires:

   a.     Knowledge that the recipient is a public employee;

   b.     Belief that the subject matter falls within the scope of his public employment;

   c.     Intention to induce the public employee to act so as to promote their own private interest.

Public Property

67.     Article 4 of the Public Property Law provided at all material times for its application to any person who committed outside Kuwait any of the offences provided under that law.

68.     Article 16 of the Public Property Law at all material times provided that (amongst other things) in addition to the sanctions provided for as punishment for crimes specified (including under Articles6 11 and 126) the public employee must be removed from office

24

and the judge must order a refund/<u>repayment</u>[6] (restitution) and a penalty of twice the amount of the benefit.

69.     Article 22 of the Public Property Law at all material times provided that lapse of the criminal case, for any reason whatever, shall not bar the right which is the victim's at all times to claim restitution (re-payment) of the funds which are the subject matter of the offences provided for in Articles[6] 11 <u>and 12</u>[6] (amongst others) and if applicable, compensation; furthermore, the court may order restitution (re-payment) and damages against the heirs and legatees as well as any person who derived any material benefit from the offence, which order will be executory against such persons property in the amount of the benefit derived by each one of them. Pursuant to Articles 2, 11<u>, 12</u>[6] and 22-25 and 28 of the Public Property Law, unauthorised benefits deriving from breach of Articles[6] 11 <u>and/or 12</u>[6] are deemed the property of the public institution (in this case PIFSS) which has the right to follow and trace such benefits and to enforce against such benefits and their proceeds, in the hands of the wrongdoer and third parties (save as against a bona fide purchaser for value).

70.     Article 28 of the Public Property Law at all material times provided that any disposals by the convicted person of property related to offences provided for under the Public Property Law or persons upon whom such property devolved if the intent behind said disposals was to smuggle them or deprive the injured party of any judgment rendered in its favour, shall be null and void, save as against a bona fide purchase for value.

<u>Money laundering</u>[6]

70A.   <u>Further to Article 2 of the Money Laundering Law No.35 of 2002, and Article 2 of the Money Laundering Law No.106 of 2013 (which was in materially the same terms), at all material times it was a criminal offence to transfer or assign property for the purpose of concealing or disguising the unlawful source of that property, or to conceal or disguise the real nature of monies, or their source or location, or the way in which they are disposed of, or its transfer, ownership or rights related thereto, knowing that the property or monies derived or were likely to have derived from a crime or any act of participation in the same.</u>[6]

**Provisions of the Penal Code concerning incitement, participation and accessory liability to criminal offences**

71.     Article 47 of the Penal Code has provided at all material times that a person shall be deemed the perpetrator of a crime if: (1) he commits alone or with others an act that constitutes the

crime or commits one of the acts that forms a component of the crime; (2) he commits acts of assistance during the commission of the crime or is present during the commission of the crime to assist or protect the perpetrator of the crime.

72. Article 48 of the Penal Code has provided at all material times that a person is deemed a partner in crime prior to its commission where: (1) he incites another to commit it and it is committed based on that incitement; (2) he enters into an agreement to commit the crime and it is committed based on that agreement; (3) he assists the perpetrator in any manner in the preparatory steps to a crime with knowledge and the crime is based on that assistance.

Liability of legal persons[6]

72A. Notwithstanding that a legal person would not be directly criminally liable for an offence under the Public Property Law or Law No.31 of 1970 or the Money Laundering Law No.35 of 2002, a legal person is subject to liability on the bases pleaded further below.[6]

72B. Further to paragraph 58.f.-g. above, a legal person is subject to direct civil liability in tort, and tortious fault would be established where individuals whose conduct is attributable to the legal person committed a tort, committed a crime, and/or incited or assisted in the commission of a crime or a tort in accordance with the principles of criminal or civil accessory liability pleaded above.[6]

72C. A legal person has at all material times been vicariously liable for the criminal acts of its subordinates to the full extent that the subordinates are liable on the basis pleaded at paragraph 58.h. above.[6]

72D. Further to paragraph 70A above, Article 2 of the Money Laundering Law No.106 of 2013 expressly extended criminal liability under that provision to corporate persons for all acts attributable to them and taking place after 26 May 2013.[6]

73. Article 49(3) of the Penal Code has provided at all material times that a person is a partner in crime after the commission of the crime if that person knowingly receives for himself or another an unlawful benefit from the commission of the crime.

**Relevant provisions of Swiss Law**

**Liability in tort**

73A The Swiss law of tort is codified in Articles 41-61 of the Swiss Code of Obligations

("**SCO**"). The core principle is set out in Article 41:

*(1) Any person who unlawfully causes loss or damage to another, whether wilfully or negligently, is obliged to provide compensation.*

*(2) A person who wilfully causes loss or damage to another in an immoral manner is likewise obliged to provide compensation.*

73B    Liability in tort pursuant to Article 41 will arise where the following are established:

a.  An act or omission on the part of the defendant;

b.  Damage;

c.  A causal link between the act or omission and the damage;

d.  Requisite unlawfulness; and

e.  Culpability (intention or negligence, the latter being presumed in cases of vicarious liability).

73C    Damage is established where there is an involuntary diminution in the victim's assets by reference to the difference between the value of the claimant's assets after the damaging event and the value of its assets had the damaging act or omission not occurred. Pursuant to Article 42(1) SCO a person claiming to have suffered damage must prove that it occurred. Pursuant to Article 42(2) SCO where the exact value of the damage cannot be quantified, the court shall estimate the value at its discretion in the light of the normal course of events and the steps taken by the person suffering damage. Pursuant to Article 43 SCO the Court will determine the form and extent of compensation provided for the damage with due regard to the circumstances and the degree of culpability.

73D    Causation must be established by satisfying both a "but for" test and a test of foreseeability according to the ordinary course of things and the general experience of life.

73E    Requisite unlawfulness will be established in a claim for economic loss where the defendant has committed a breach of a qualifying protective norm protecting the claimant's interests; this includes but is not limited to a breach of criminal law relating to assets of which the claimant is the victim. Article 115(1) of the Swiss Criminal Procedure Code provides that a person suffers harm from an offence when their rights have been directly violated by the offence. According to the Swiss Federal Supreme Court in ATF 140 IV 155 c. 3.2 this occurs

27

when a person whose rights are directly or indirectly protected by the infringed penal norm have been directly damaged by the offence.

73F    The following laws establish protective norms for the purposes of claims in tort for economic loss:

    a.    Article 158 Swiss Penal Code ("**SPC**") - criminal mismanagement;

    b.    Article 322 *septies* SPC - bribery of a foreign public official;

    c.    Article 305 *bis* SPC - money laundering.

**Joint and Several (Solidary) liability in cases of complicity on the part of multiple defendants**

73G    Pursuant to Article 50(1) SCO:

"*Where two or more persons have together caused damage, whether as instigator, perpetrator or accomplice, they are jointly and severally liable to the person suffering damage*".

Liability as an accomplice will be established where:

    a.    The accomplice's act or omission contributed to the damage; and

    b.    The accomplice acts either together with others or separately to others but with a common aim.

73H    Pursuant to Article 50(3) SCO:

"*Abettors are liable in damages only to the extent that they received a share in the gains or caused damage due to their involvement*".

73I    Responsibility for participation in a Swiss criminal offence committed by another person will be established pursuant to Article 25 of the SPC where a person "*wilfully assists another to commit a felony or a misdemeanour*". This rule applies even where the principal offender has a special duty to the victim not shared by the participant: Article 26 SPC. Article 12(2) SPC provides that a person acts wilfully as soon as he regards the realisation of the act as being possible and accepts this (i.e. acts with wilful blindness as to the consequences of his acts).[6]

[GOVERNING LAW OF DEFENDANTS' WRONGDOING][6]

**Criminal Mismanagement – 158 SPC**

73J  The offence of criminal mismanagement under Article 158 SPC imposes criminal responsibility upon those persons who, placed in a fiduciary position through their duty to manage their principal's property, act in breach of duty and cause loss to their principal. The offence is aggravated where such a person acts with a view to securing an unlawful personal gain:

"*Art. 158 1. Offences against property / Criminal mismanagement*

1.  *Any person who by law, an official order, a legal transaction or authorisation granted to him, has been entrusted with the management of the property of another or the supervision of such management, and in the course of and in breach of his duties causes or permits that other person to sustain financial loss is liable to a custodial sentence not exceeding three years or to a monetary penalty.*

    *…….*

    *If the offender acts with a view to securing an unlawful financial gain for himself or another, a custodial sentence of from one to five years may be imposed.*

2.  *Any person who, with a view to securing an unlawful gain for himself or another, abuses the authority granted to him by statute, an official order or a legal transaction to act on behalf of another and as a result causes that other person to sustain financial loss is liable to a custodial sentence not exceeding five years or to a monetary penalty*".

73K  Accordingly, a person will be a "manager" of property for the purposes of Article 158 where that person:

a.  Is entrusted by law (which includes obligations arising under statutory or codified law), an official order, a legal transaction (which includes a contract of agency or employment) or other authorisation, to manage the property of another or to supervise such management;

b.  Is obliged to manage it in the interests of another, including by concluding contracts for the benefit of the other in order to augment the other's property or supervising the management of the other's assets;

c.  Is invested with a minimum level of independence in her/his decision taking in relation to the property, which requirement would be satisfied in the case of an individual who was one of the governing organs of a legal entity;

29

d.  Owes a duty to protect another's interests; the manager's duty in this respect will be defined by reference to the legal instrument pursuant to which the property is entrusted to the manager; and

e.  The property is non-trivial in value.

73L    The manager will commit a breach of duty contrary to the requirements of Article 158 where [s]he:

a.  Acts in breach of duties of loyalty to act faithfully in the interests of the principal and to account for benefits received in the course of his agency/employment (which under Swiss law are contained in Articles 398 and 400 of the SCO - applicable to agents - and Articles 321(b) and (e) SCO - applicable to employees) by:

   a.  Accepting a bribe and, as a result, adopting an attitude contrary to the interests of the principal; and/or

   b.  Failing to disclose or account to his principal for the receipt of bribes and other secret earnings;

b.  Makes disadvantageous management decisions on behalf of the principal;

c.  Otherwise, whether through act or omission:

   a.  Fails to act in his principal's interests, but, instead, breaches his specific duties to manage and protect the interests of his principal; and/or

   b.  Acts in his own interests in the management of his principal's property, contrary to the interests of his principal.

73M    Financial loss will be established where any of the following is established in relation to the manager's principal:

a.  A reduction in the value of the assets;

b.  An increase in liabilities;

c.  A non-increase in the value of the assets; or

d.  A non-reduction in liabilities.

[GOVERNING LAW OF DEFENDANTS' WRONGDOING][6]

Loss will also be established where assets are endangered such that the act or omission has the effect of reducing their value from an economic point of view.

73N    The loss must be causally linked to the manager's breach of duty. The loss may be caused indirectly through a third party.

73O    In accordance with the principles set out in paragraphs 73M-N above, financial loss will be caused by a manager's breach of duty for the purposes of Article 158 SPC in the event of the receipt by a manager of an undisclosed bribe where the manager fails to account to his principal or pay over the bribe or its value.

73P    Criminal responsibility under Article 158 SPC will also be established in this way if the manager's relationship with the principal is not governed by Swiss law, but by a foreign law as long as that manager was subject to duties under the foreign law analogous to those owed by agents or employees under Swiss law, e.g. as pleaded in paragraph 73L above.

73Q    Criminal liability under Article 158 SPC requires proof of willfulness as provided by Articles 12(1) and 12(2) SPC on the part of the manager in relation to the constitutive elements of the offence.

**Bribery of foreign public official – 322 *septies* SPC**

73R    Pursuant to Article 322 *septies* SPC *(*Bribery of a foreign public official):

*"Any person who offers, promises or gives a member of a judicial or other authority, a public official, an officially-appointed expert, translator or interpreter, an arbitrator, or a member of the armed forces who is acting for a foreign state or international organisation an undue advantage, or gives such an advantage to a third party, in order that the person carries out or fails to carry out an act in connection with his official activities which is contrary to his duties or dependent on his discretion,* [in force since 1 May 2000]

*any person who as a member of a judicial or other authority, a public official, an officially-appointed expert, translator or interpreter, an arbitrator, or a member of the armed forces of a foreign state or of an international organisation demands, secures the promise of, or accepts an undue advantage for himself or for a third party in order that he carries out or fails to carry out an act in connection with his official activity which is contrary to his duty or dependent on his discretion* [in force since 1 July 2006] *is liable to a custodial sentence not exceeding five years or to a monetary penalty."*

Each of the above constituent elements is to be assessed and proved objectively. In addition, proof of willfulness is required, which is to be assessed subjectively.

73S    "Foreign public official" has an autonomous definition: "public official" is defined

according to international standards by reference to a test of whether a person is a "functional public official", namely an individual who performs public duties. The nature and terms of the contract between a public body and an individual is not relevant to the decision whether the individual is to be classed as a public official or not.

**Money Laundering – 305 *bis* SPC**

73T    Pursuant to Article 305 *bis* SPC (Money Laundering):

"*1. Any person who carries out an act that is aimed at frustrating the identification of the origin, the tracing or the forfeiture of assets which he knows or must assume originate from a felony or aggravated tax misdemeanour is liable to a custodial sentence not exceeding three years or to a monetary penalty.*

*......*

*2. In serious cases, the penalty is a custodial sentence not exceeding five years or a monetary penalty. A custodial sentence is combined with a monetary penalty not exceeding 500 daily penalty units.*

*A serious case is constituted, in particular, where the offender:*

a.    *acts as a member of a criminal organisation;*

b.    *acts as a member of a group that has been formed for the purpose of the continued conduct of money laundering activities; or*

c.    *achieves a large turnover or substantial profit through commercial money laundering.*

*3. The offender is also liable to the foregoing penalties where the main offence was committed abroad, provided such an offence is also liable to prosecution at the place of commission.*"

73U    A claim in tort for economic loss based upon the offence of money-laundering will be available where the above elements of the offence are established (together with wilfulness on the part of the perpetrator within the meaning of Article 12(2) SPC) and where the predicate offence referred to in Article 305*bis*(1) SPC was 'directed against' (which requires it to have had a harmful effect on) the victim/claimant's financial interests.

73V    In that event, a civil claim for compensation will be established by the victim of the offence in respect of the damage caused by the predicate offence to the extent of the sums laundered on the alternative bases that:

a.    The relevant "damage" in a claim under Article 41 SCO reflects the damage caused by the predicate crime which the money launderer perpetuates (and is thus regarded

as additionally causing) through concealment of the assets obtained in connection with the predicate crime so thwarting the confiscation of those assets by the relevant authorities. The money launderer is liable to pay compensation to the victim in the sum (and to the extent) of the assets so concealed up to the amount of damage suffered by the victim; and/or

b. The money launderer has, by his acts of concealment, aided and abetted the civil wrong committed by the predicate offender: liability is accordingly established pursuant to Article 50(3) SCO. Damage is established by reference to the damage sustained in connection with the predicate wrong in the amount of the assets concealed and so laundered.

73W    In respect of conduct after 1 October 2003 those Defendants that are corporate entities will incur criminal liability under Article 102(2) SPC for bribery of a foreign public official (within the meaning of Article 322 *septies* SPC) or for money laundering (within the meaning of Article 305 *bis* SPC) if the relevant offence was committed in that entity irrespective of the criminal liability of any individual agent or employee, provided that the entity failed to take all reasonable organisational measures that were required to prevent such an offence. This may in turn ground a civil claim against that corporate Defendant in accordance with paragraphs 73R to 73V above.

## Limitation

73X    Pursuant to Article 60(1) SCO the right to claim damages or satisfaction prescribes three years (one year prior to 1 January 2020) from the date on which the injured party became aware of the loss or damage and of the person liable for it, but in any event ten years after the date on which the loss or damage was caused. However, pursuant to Article 60(2) SCO if the action for damages is derived from an offence for which criminal law envisages a longer limitation period, that longer period also applies to the civil law claim. Claims based on corporate criminal liability for the acts of governing organs of the corporate entity pursuant to Article 55 of the Swiss Civil Code prescribe at the same date as the underlying criminal offence committed by the governing organ.

73Y    Pursuant to Article 97(1)(b) SPC a 15-year limitation period is applicable where an offence carries a custodial sentence of more than three years. Further, pursuant to Article 98, that period begins:

a. On the day on which the offender committed the offence;

b. On the day on which the final act was carried out if the offence consists of a series of acts carried out at different times;

c. On the day on which the criminal conduct ceased if the criminal conduct continues over a period of time.

73Z    The limitation periods identified above will be interrupted:

a. Pursuant to Article 135(2) SCO, by debt enforcement proceedings and submission of a statement of claim or defence to a court.

b. Pursuant to Article 136 SCO, in respect of all those jointly and severally liable for a debt (including damages), where it is interrupted for one person so liable.

**Application of Swiss law**

Criminal Mismanagement – Article 158 SPC

73AA  Mr. Al Rajaan was entrusted with the management or supervision of the management of property in the interests of PIFSS within the meaning of Article 158 SPC pursuant to either law or legal transaction, by reason of the facts and matters pleaded in paragraph 59 above.

73BB  Mr. Al Rajaan breached the duties to which he was subject as pleaded at paragraph 59 above, including in the ways pleaded at paragraph 339 below by reason of the facts and matters summarised in section C above and particularised below.

73CC  By acting in the ways summarised in section C above and particularised below the other Defendants have acted as accomplices to Mr. Al Rajaan's criminal conduct under Article 158 SPC within the meaning of Articles 25 and 26 SPC through their acts (as applicable) of:

a. Promising the payment of Secret Commissions;

b. Paying Secret Commissions;

c. Taking steps to conceal the payment of Secret Commissions.

Article 322 *septies* SPC – *bribery of foreign public official*

73DD  Further, insofar as the Defendants offered or paid Secret Commissions to Mr. Al Rajaan and

34

[GOVERNING LAW OF DEFENDANTS' WRONGDOING][6]

in so far as he accepted and/or received them as summarised in section C above and particularised below, such conduct amounted to the commission of an offence or offences under Article 322 *septies* SPC.

Article 305 *bis* SPC – *money laundering*

73EE  Further, insofar as the Defendants assisted and/or facilitated the payment of Secret Commissions to Mr. Al Rajaan through their acts and omissions in concealing such payments and in so far as Mr Al Rajaan concealed such payments when by reason of the facts and matters pleaded in Section C above and particularised below they either knew or turned a blind eye to the fact that such payments originated from criminal conduct, such conduct amounted to the commission of an offence or offences under Article 305 *bis* SPC.

73FF  Accordingly, and by reason of the facts pleaded in section C above, and particularised in sections E-J(23[6]) below, PIFSS has civil claims under Swiss law against the Defendants founded upon their participation in the above unlawful conduct as follows:

   a.  Pursuant to Articles 41 and 50(1) SCO in connection with the offence of criminal mismanagement.

   b.  Pursuant to Article 41 SCO in connection with the offence of bribing a foreign public official.

   c.  Pursuant to Articles 41 and/or 50(3) SCO in connection with the offence or offences of money laundering.

73GG  Each of the offences referred to above carried (in the circumstances pleaded) custodial sentences of more than three years. Hence civil claims founded upon such criminal conduct were subject to limitation periods of 15 years.

73HH  In the case of each scheme pleaded in sections E to J(23[6]) below the Secret Commissions were promised or paid, and/or Secret Commissions were concealed, pursuant to agreements and arrangements made at the inception of the scheme as particularised in each of those sections, such that the limitation period in respect of PIFSS's civil claims did not begin to run until the day on which the final act was carried out pursuant to each scheme (within the meaning of Article 98(b) SPC) or the day on which the criminal conduct ceased on the facts of each scheme (within the meaning of Article 98(c) SPC) whichever was later.

73II  If or to the extent that any of PIFSS's claims would be time-barred on the application of the

relevant Swiss limitation periods pursuant to the above principles, PIFSS will seek to disapply such limitation periods pursuant to s.2 of the Foreign Limitation Periods Act 1984 on grounds of public policy including that it would cause PIFSS undue hardship were such periods to operate so as to bar any relief on grounds of limitation in circumstances in which the existence of such claims had been concealed from it.

## Banking Obligations

74. The Defendant banks and those who worked for them all owed obligations under Swiss law to exercise due diligence so as to prevent corruption and money-laundering, pursuant to:

   a.   The Swiss Banks' Code of Conduct with regard to the exercise of due diligence;[3]

   b.   The Anti-Money Laundering Act 1997 ("**AMLA**");[4]

   c.   Ordinances on Money Laundering ("**OML**") issued by the Swiss Banking Supervisory Authority - FINMA (formerly, prior to 2009 the Swiss Federal Banking Commission);

   d.   Section 305 (bis and ter) ~~of the Swiss Penal Code~~ SPC;

   e.   Section 322 (septies) (2) ~~of the Swiss Penal Code~~ SPC.

75. Those obligations became more onerous over the time period covered by the events in this action. At all material times, core obligations (codified in Articles 3-9 of the AMLA and subsequently enhanced and amended and explained in the OML) required the Banks to:

   a.   Verify the identity of a contracting party prior to commencing a business relationship on the basis of a conclusive document;

   b.   Identify the beneficial owner of a contracting party;

   c.   Re-verify the identity of a contracting party or beneficial owner during the course of the business relationship should doubts arise as to their identity;

   d.   Identify business relationships bearing special and/or higher risk. Relationships with politically exposed persons ("**PEPs**") are deemed to bear a higher risk and are to be

---

[3] In force since 1977
[4] In force since 1 April 1998

identified and designated as such in the Bank's internal documentation;

e.    Clarify the economic background to a transaction if:

    a.    the transaction or business relationship appears unusual, unless the legality is apparent;

    b.    indications exist that assets originate from a crime;

f.    Establish and retain documents for a period of at least 10 years from the cessation of the business relationship in question;

g.    Report suspicions where there are reasonable grounds to suspect that the assets implicated in a transaction or business relationship originate from a crime (in accordance with the Swiss Penal Code).

76.    ~~Since 1 February 2009, p~~Pursuant to Article 6 of the AMLA ~~(revised)~~ banks have also been required to determine the purpose of the banking relationship. The purpose of a relationship bearing specific or higher risks is to be analysed more thoroughly by conducting additional due diligence.

77.    Further, and at all material times:

a.    Decisions on banking relationships with PEPs, such as Mr. Al Rajaan and Ms. Al Wazzan, were to be taken at a bank's top management level;

b.    The acceptance of any assets derived from criminal activity, including corruption and misuse of public funds, either in Switzerland or abroad, was prohibited[5].

## Liability of Swiss entities for the acts of their officers

78.    At all material times, pursuant to Swiss law principles of authority and attribution (including Article 55 of the Swiss Civil Code) under which a legal entity is liable as principal for the acts and omissions of its formal, factual or apparent governing bodies and pursuant to Article 55 SCO under which an employer is liable for the damage caused by his employees or ancillary staff in the performance of their work unless he proves that he took all due care to avoid a damage of this type or that the damage would have occurred even if all due care had been taken:

---

[5] ~~Pursuant to (a) the issue in 1986 of a statement by the Swiss Federal Banking Commission and (b) the OML.~~

37

    a.    ~~Mirabaud was liable for the acts and omissions of Mr. Mirabaud and Mr. Fauchier-Magnan;~~[5]

    b.    ~~Pictet was liable for the acts and omissions of Mr. Bertherat~~ and Mr Amouzegar;[5]

    c.    UBP SA was liable for the acts and omissions of Mr. Edgar de Picciotto, Mr. Daniel de Picciotto and Ms Anne de Picciotto;

    d.    EFG was liable for the acts and omissions of Mr. Guerin and Mr. Diriberry[7];

    e.    VP Bank was liable for the acts and omissions of Mr. Ghittini;

    f.    Each of those individuals (additionally) remained personally liable for their own acts and omissions.

## E.    THE MIRABAUD SCHEME

79.    On dates unknown between about 1994 and January 1997 Mr. Al Rajaan had discussions with Mirabaud, through Mr. Mirabaud and Mr. Fauchier-Magnan who at all material times had supervision of the relationships between PIFSS and Mirabaud and Mr. Al Rajaan and Mirabaud, with a view to:

    a.    Putting in place an off-shore corporate structure for him personally and beneficially, through which Secret Commissions could be paid and concealed;

    b.    Securing Secret Commissions from Mirabaud in relation to investments which Mr. Al Rajaan would authorise or influence PIFSS to make, and in respect of which Mirabaud and/or its partners would have a commercial interest (directly or through group entities) including by way of management and/or brokerage fees, commissions (as introducer or otherwise) and/or shareholdings.

80.    Pending disclosure:

    a.    The existence and nature of such discussions are to be inferred from the facts and matters set out below.

    b.    In support of the connection between the role performed by Mirabaud for PIFSS and for Mr. Al Rajaan personally and Mirabaud's knowledge of that connection, PIFSS

38

will further rely on Mr. Mirabaud's statement to the Swiss Prosecutor on 11 November 2013, in response to the question whether his initial meetings with Mr. Al Rajaan also involved discussions of the PIFSS funds, that "*[f]or a person of that stature… he and his work are inseparable.*"[6]

   c.    Pursuant to the discussions in paragraph 79 77 and on instructions from Mr. Al Rajaan and by agreement, the steps at paragraphs 81 to 106 below were taken.

81.    Mr. Mirabaud procured the incorporation of two Panamanian companies on Mr. Al Rajaan's behalf by a school friend and long-time business associate, Antoine Richard, principal of the Richard Trust which operated a business (amongst other things) as a corporate fiduciary:

   a.    Overton Group SA ("**Overton**") on 4 January 1995;

   b.    New Market Properties Inc. ("**New Market**") on or around 26 January 1995.

82.    At all material times:

   a.    Mr. Al Rajaan was the beneficial owner of both companies;

   b.    Both companies were legally controlled by Mr. Mirabaud;

   c.    Mr. Richard was appointed to manage the affairs of Overton.

83.    On 26 February 1996, on instructions from Mr. Al Rajaan, Mr. Mirabaud procured Mr. Richard to open an account for Overton at Mirabaud.

84.    In order to further distance Mr. Al Rajaan from the affairs of Overton:

   a.    Mr. Mirabaud was deliberately and falsely identified in the Form A Money-laundering declaration of Overton as the beneficial owner, whereas the true beneficial owner was, as all parties knew, Mr. Al Rajaan, as evidenced by an internal Mirabaud entry to that effect - "*en fait* [in fact] *Mr Al Rajaan*", so exposing Mr. Mirabaud to criminal sanction;

   b.    The Overton account opening form falsely identified the nature of the account as a savings account (*compte epargne*) whereas it was a sweep account;

   c.    That same form failed to identify the true origin of the funds, stating instead, merely

---

[6] albeit that he denied discussing the issue of PIFSS funds at their first meeting.

"Kuwait".

85. By no later than 20 January 1997 Mr. Al Rajaan reached agreement with Mr. Mirabaud and Mr. Fauchier-Magnan as to the payment by Mirabaud of Secret Commissions further to the discussions referred to in paragraph 79 above, as evidenced by: (a) the subsequent payment of Secret Commissions referred to in paragraphs 31.a above and detailed below and (b) Mr. Mirabaud's admission to the Swiss Prosecutor that commissions had been paid to Mr. Al Rajaan as "introducer" of PIFSS' business.

86. On 20 January 1997 Mr. Al Rajaan authorised or influenced PIFSS Mirabaud to open custodian account number 500750 with Mirabaud which subsequently came to hold 12 of PIFSS' investments on which Secret Commissions were paid.

87. On or before 14 January 1997 and acting on Mr. Al Rajaan's further instructions, Mr. Mirabaud and Mr. Fauchier-Magnan had one or more discussions with Mr. Argand, including by telephone. It is be inferred, from the circumstances of the call(s), the e- mail referred to in paragraph 88 below, and the events which followed as pleaded below, that they:

   a. explained to him that they had a client to whom Mirabaud was intending to pay Secret Commissions;

   b. requested that, in order to facilitate such payments without detection, Mr. Argand should establish and act for an off-shore company, held in their personal names, Silvery Bay Investments Limited ("**Silvery Bay**");

   c. requested that he sign on its behalf a purported "Introducer" agreement with Mirabaud's wholly owned Bahamian subsidiary, Galmir Advisory Services Limited ("**Galmir**") as the front for the payment of Secret Commissions by Mirabaud to its client.

88. It is to be inferred that Mr. Argand agreed to the above requests, pursuant to which he caused Silvery Bay to be incorporated in Mauritius on 14 January 1997. By e-mail of 30 January 1997, date-stamped 31 January 1997, Mr. Mirabaud and Mr. Thierry Fauchier-Magnan purported to confirm, but, in fact (it is to be inferred) sanitised, what they had discussed with Mr. Argand orally. They asked him to act for them personally in establishing Silvery Bay, which had, by then already been established, and attached a copy of a purported agreement

between Galmir and Silvery Bay which had been prepared by Mirabaud at their instigation, and which they had signed in duplicate purportedly on behalf of Galmir. They requested him to return the signed agreements to Mr. Mirabaud in Geneva. Mr. Argand counter-signed the agreements on 1 February 1997, ("**The Silvery Bay Agreement**").

89.    Under the terms of the Silvery Bay Agreement, Silvery Bay was entitled to the payment of commissions by Galmir in consideration of its introduction of identified PIFSS investments.

90.    Further to the above arrangements, Mr Argand arranged for a power of attorney to be issued by the registered local director on 29 January 1997 authorising him to manage the company, and established Silvery Bay as a client within his client account held at BPER pursuant to a purported relationship for which Mr Argand charged no fee. At all material times Mr. Argand represented Silvery Bay pursuant to the 29th January 1997 power of attorney and a further power of attorney issued by Mr. Mirabaud and Mr. Fauchier-Magnan which stated, in terms, that 'the principal' [falsely stated on the document to be Mr. Mirabaud and Mr. Fauchier-Magnan] did not want to appear as the owner of Silvery Bay, providing only a correspondence address.

91.    On 11 August 2003 the Silvery Bay Agreement was varied to provide for commissions to be paid in relation to two additional investments.

92.    Not until 6 July 2005 was any Form A completed in respect of Silvery Bay's account, which then (falsely) identified Mr. Mirabaud and Mr. Fauchier-Magnan as beneficial owners, whereas, as all parties knew (including by reason of the arrangements referred to in paragraph 87 above and the letter of 20 June 2003 referred to in paragraph 106 below), they were not.

93.    In about 2005 Mr. Argand caused Silvery Bay Investments Limited to be incorporated in the Seychelles, where the regulatory regime was laxer. Thereafter the Seychellois entity assumed the role previously performed by the Mauritian entity.

94.    (At least) twelve further purported agreements were entered into between Galmir, purporting to act as agent for "Mirabaud (the Mirabaud Group)" and Silvery Bay between 15 November 2006 and 23 August 2011 providing for commissions to be paid in relation to further specified investments, as reflected in Appendix 1.

95.    As each of Mr. Al Rajaan, Mr. Mirabaud, Mr. Fauchier-Magnan and Mr. Argand was at all

times aware:

a.  Silvery Bay did not perform any or any valuable services under any of the purported Silvery Bay Agreements. Silvery Bay was not, at any material time, an active trading company, and it fulfilled no legitimate commercial purpose;

b.  It was never intended that the purported Silvery Bay Agreements would create any legal rights between the parties, alternatively, it was never intended that the commissions payable under the agreements would be paid to Silvery Bay in return for services supplied to Galmir;

c.  Further, Mr. Mirabaud and Mr. Fauchier-Magnan were not the introducers of the investments the subject of the purported agreement;

d.  the Silvery Bay Agreement and its successor agreements were, as was always intended, used as a front for the payment of Secret Commissions by Mirabaud to its client [Mr Al Rajaan].

96.  In support of the allegation of knowledge against Mr. Argand (as reflecting the arrangements referred to above)[5] PIFSS will further rely on his statement to the Swiss Prosecutor on 5 November 2013 that he supposed (but did not know) that the Silvery Bay arrangements were a way of discreetly redistributing commissions to business introducers, and will therefore rely on his belief that the sums paid through Silvery Bay paid[5] were not beneficially held for Mr. Mirabaud or Mr. Fauchier-Magnan. PIFSS' case is that this statement did not reflect his true belief – which was that the payments were Secret Commissions to Mr. Al Rajaan, or at least, to a client of Mirabaud – but, rather, represented an attempt to present a credible reconciliation of true facts with the documents while minimizing his personal involvement and culpability.

97.  In or about early May 2012 Mr. Al Rajaan became aware of criminal investigations into his conduct in Switzerland pursuant to which the Swiss authorities ordered on or about 2 May 2012 that the Mirabaud accounts held for him should be frozen. As a result of knowledge of such investigations on the part of one or more of Mirabaud, Mr. Mirabaud, Mr. Fauchier-Magnan, Mr. Argand as well as Mr. Al Rajaan, steps were taken to terminate the Silvery Bay Agreement on 8 May 2012.

98.  Between 1997 and about 8 May 2012 the total sum of US$76.9 77.0[6] million was paid by

way of Secret Commissions to Mr. Al Rajaan in respect of ~~28~~ 29[6] investments by PIFSS ("**the Galmir Funds**"). Tables summarising the investments and the payments generated in respect of them are appended as Appendix 1.

99.    Such payments were, at the direction of Mirabaud, acting through Mr. Mirabaud, made to Silvery Bay through Mirabaud's wholly owned Bahamian subsidiary Galmir.

100.    In addition, as particularised in Appendix 1.2A,[6] further payments of ~~US$2.1million~~ US$2.2 million[6] were made, at the direction of Mirabaud, to Mr. Al Rajaan either via Silvery Bay or directly from Galmir, on unauthorised (by PIFSS) personal investments of Mr. Al Rajaan made[6] in connection with investments made by PIFSS which ~~(pending disclosure) PIFSS infers to have been~~ were therefore[6] unauthorised benefits received by Mr. Al Rajaan in connection with the Mirabaud Scheme.

101.    Save for the sum of US$~~97,457~~ ~~109,721~~98,016[6] which was either retained by Silvery Bay or attributable to currency fluctuations, all of the Secret Commissions paid to Silvery Bay pursuant to the purported Silvery Bay Agreements were paid to Mr. Al Rajaan through the network of (principally offshore) companies beneficially owned and controlled by Mr Al Rajaan and/or Ms Al Wazzan as set out in paragraphs 103 to 107 below and set up and used for the purposes of concealing the payment of Secret Commissions to him from PIFSS. Payments totalling US$304,682 (1.2.1-4, 1.2.6, 1.2.8-9 in Appendix 1.2) predate the earliest disclosed bank statements for the Overton account but are inferred to have been paid into that account in the context of the consistent pattern of fund flows thereafter.[6]

102.    On a quarterly basis, as confirmed in correspondence with Mr. Argand, payment was made from an account in Galmir's name held with Mirabaud Canada Inc. (no. 14000 601000) via a series of US correspondent accounts to Mr. Argand's client account with BPER.

103.    On a quarterly basis from 1997 until June 2003:

a.    There was an initial transfer of funds out of Mr. Argand's BPER client account into the Overton account;

b.    Most of the funds in the Overton account were transferred to the New Market account;

c.    To the extent that funds held in Overton's account were not transferred to New Market, they were either transferred directly to Mr Al Rajaan or invested for his

ultimate benefit;

d.   Funds received by New Market from Overton were used to (i) make significant investments for Mr Al Rajaan's ultimate benefit, including (for example) in: three of the Galmir Funds (namely, Asian Capital Holdings, Haussmann Holdings and Permal Europe); Centaurus and Everest, two of the investment managers which paid commissions to Phoenix pursuant to the Further Nasrallah Scheme, as set out in Section H(1)[6] below; (ii) purchase other assets, including real estate in London; and (iii) transfer wealth to other creature companies owned by Mr Al Rajaan and to Ms Al Wazzan.

104.   In or about 2002 Mr Mirabaud instructed Mr. Richard to incorporate two further Panamanian companies to operate in substitution for the Overton/New Market structure): Intermac Group SA ("**Intermac**") and Domini Trading SA ("**Domini**"), notionally to be held beneficially by Ms Al Wazzan but in fact held as nominee for Mr Al Rajaan. These companies were incorporated, respectively, on or around 23 April 2002 and 11 September 2002 and bank accounts in their names were established with Mirabaud by 12 June 2003.

105.   Following the incorporation of Intermac and Domini, Mr Mirabaud procured the closure of the (now unnecessary) Overton and New Market accounts on or around 27 June 2003 and the liquidation of those companies.

106.   Thereafter, from late June 2003 until 2012, pursuant to an instruction from Mr. Mirabaud on behalf of Mirabaud to Mr. Argand contained in a letter of 20 June 2003, informing Mr. Argand that their client "*wished to re-organise his business,*" in place of the arrangements described at 103 above, on a quarterly basis:

a.   There was an initial transfer of funds out of Mr. Argand's BPER client account into the Intermac account;

b.   Most of those funds in the Intermac account were transferred to Domini;

c.   To the extent that Intermac did not transfer the Secret Commissions to Domini, they were transferred to other accounts and ultimately paid or invested for the ultimate benefit of Mr Al Rajaan, including in: an investment in Brahma Management (an investment manager which managed some of the Galmir Funds); Lupercale SA Sicar fund, another of the Galmir Funds; the purchase of a villa in Thailand;

d.    Funds received by Domini and Intermac were used to conduct significant investment activity for the ultimate benefit of Mr. Al Rajaan, including investments in fund managers which paid commissions to Phoenix pursuant to the Further Nasrallah Scheme, as set out in Section H(1)⁶ below. This company also invested in other assets for the benefit of Mr Al Rajaan, in particular, purchases of jewellery for Ms Al Wazzan.

107.    Subsequent transfers were made to Mr. Al Rajaan from the above accounts through a network of further bank accounts held with Mirabaud. Mr. Al Rajaan controlled those accounts, whether held in the name of companies established on his instructions, and beneficially owned by him (including through Ms. Al Wazzan as his nominee), or otherwise in the name of Ms. Al Wazzan as his nominee. The accounts included:

a.    Bernabeu Investments Ltd Limited (Ms. Al Wazzan);

b.    Hogara Investments Limited BVI (Ms. Al Wazzan) which was established to purchase a villa in Thailand;

c.    SCI Cum Laude incorporated in France (Ms. Al Wazzan) which was used to purchase significant real estate;

d.    Tawny Real Estates Ltd incorporated (BVI) (Mr Al Rajaan);

e.    A personal account in the name of Ms Al Wazzan (account no. 504976) opened on 22 January 2008 (Ms. Al Wazzan).

108.    Further, Mirabaud established and/or maintained a valuable commercial relationship with Mr Al Rajaan and/or companies beneficially owned by him as a result of the Secret Commissions which he received and the accounts through which they were paid, which included the provision of loans and overdraft facilities, including by way of example:

a.    A fixed term (12 month) loan to Domini in December 2003 the sum of c. US$2.8 million (advanced in Japanese yen) and renewed on four separate occasions;

b.    An overdraft facility in the sum of US$ 3 million made available to Domini between August 2005 and 31 October 2007 to assist with foreign exchange trading;

c.    A fixed term loan in February 2010 to SCI Cum Laude in the sum of CHF 9.275

45

million (US$8.6 million) to assist with the purchase of a chalet in Courcheval.

109. Further, by virtue of the long-standing friendship between Mr. Mirabaud, Mr. Fauchier-Magnan, Mr Richard and Mr. Argand, the mutual trust which each reposed in the other, the mutual business relationships which each enjoyed and the fact that the circumstances required discretion in light of the corrupt arrangements disclosed, at no time did Mr. Argand undertake any due diligence into the true beneficial owners of Overton, New Market, Intermac, Domini, Silvery Bay, the nature or source of funds held by them, or make any due enquiry about the nature or purpose of the transactions effected through accounts held by them.

110. Only when (it is to be inferred) Mr. Argand became aware that a criminal investigation was being initiated, as a result of which Galmir terminated the Silvery Bay Agreement on or about 8 May 2012, did he file a money-laundering report on 8 May 2012. By that report he falsely reported that the beneficial owners of Silvery Bay were Mr. Mirabaud and Mr. Fauchier-Magnan when, in fact, it is to be inferred that he believed that Silvery Bay was being used to pay corrupt Secret Commissions to Mr. Al Rajaan, or at least a client of Mirabaud. It is further to be inferred that he was told of the criminal investigation directly by either Mr. Mirabaud or Mr Al Rajaan, who was seeking to take steps to shut down his corrupt network and close accounts held within it before they were frozen.

**Assistance in relation to other unlawful schemes**

111. As pleaded above and below, Mirabaud opened and operated bank accounts for Mr. Al Rajaan and Mr. El Ghazzi; in the case of Mr. Al Rajaan, the accounts referred to in paragraph 101-104 and 107 above. A net total of c. US$~~232.5~~ ~~232.6~~233.1[6] 242.1[7] million (ignoring inter-account transfers) was paid into these accounts of which US$~~202.5~~ ~~202.7~~202.3[6] 211.2[7] million was ultimately paid to accounts held for Mr. Al Rajaan. Such payments represented (if not all, then as to the vast majority) Secret Commissions or the traceable proceeds thereof as follows:

  a.   US$~~78.9~~79.2[6] million ~~(being 33.9~~34.0[6]~~% of the total)~~[7] being payments made pursuant to the Mirabaud Scheme and in particular paragraphs 98 and 100 above;

  b.   US$~~110.5~~111[6] million ~~(being 47.5~~47.6[6]~~%)~~[7] being payments made to both Mr. Al Rajaan and Mr. El Ghazzi pursuant to the Man Scheme and in particular section F below;

46

c.    US$~~22.8~~28.5[7] million ~~(being 9.8%)~~[7] (as particularised in Appendix 1.6)[7] being payments made from accounts held for the benefit of Mr. Nasrallah and / or Nadim Nasrallah[7] including at Pictet Group and EFG or from other accounts which, it is to be inferred on the basis of the facts and matters in section H were held for or associated with Mr. Nasrallah, and which are known or inferred to be Secret Commissions or their traceable proceeds under the Pictet, Further Nasrallah or UBP Schemes stated below.

d.    US$~~3~~ 3.2~~7.7~~[7] million ~~(being 1.3~~ 1.4%)[7] being payments made by companies on behalf of Mr. Mombelli pursuant to the Mombelli Scheme and in particular section J(1) below.

e.    US$8.7 million ~~(being 3.7%)~~[7] being payments made by Mr. ~~Michel~~ Ely Michel Ruimy on behalf of the Aerium/Aeriance Group from an account at Mirabaud. ~~It is to be inferred that s~~Such payments were Secret Commissions ~~or the traceable proceeds thereof~~ under ~~one or more further~~ the Aerium Scheme ~~schemes~~ as to which see section J(3) below. ~~in respect of which PIFSS intends to issue a further claim form. It is to be inferred that these sums were Secret Commissions or the traceable proceeds thereof, having regard to the following facts and matters:~~

   ~~a.    Mr. Ruimy was the principal of the Aerium/Aerience group of companies with whom PIFSS placed substantial investments in a total sum of c. US$ 1.98 billion;~~

   ~~b.    Payments were made to Mr. Ruimy's account from entities known to have received commissions on PIFSS' investments;~~

   ~~c.    Mr. Mirabaud was involved in the management of the account.~~

f.    ~~US$2million~~US$2.8 million[6] ~~(being 0.9~~1.2[6]%)[7] were paid by Mr. Abbas Al Qattan, as set out in Appendix 1.5[6]. It is to be inferred that such payments were secret commissions or the traceable proceeds thereof under one or more further schemes, having regard to the facts that Mr. Al Qattan:

   a.    was a known associate of Mr. Al Rajaan at the material time;

   b.    played a role in an investment made by PIFSS in Lehman~~n~~ Brothers in the

first quarter of 2002, the same year as the first known payment was made from him to Mr. Al Rajaan;

    c.    had a banking relationship with Mirabaud**.**

    g.    US$~~6.6~~ ~~6.25~~[6]3.8[7] million ~~(being 2.8~~ 2.71~~[6]%)~~[7] from other or unknown sources, as set out in Appendix 1.5[6].

    h.    US$0.4 million ~~(being 0.2%)~~[7] from accounts ~~105953 and~~[7] 103632 in the name of Ms Al Wazzan at Pictet (as set out in Appendix 1.7)[7], which on the basis of the facts and matters in section G below are known or inferred to be Secret Commissions or their traceable proceeds under the Pictet, Further Nasrallah, Mombelli or UBP Schemes.

112.    Such sums were then paid away through accounts such as are stated in paragraph 107 above for the principal benefit of Mr. Al Rajaan.

112A.    In addition to the sums referred to in paragraph 111 above, Mirabaud facilitated payments totalling US$1.5 million made from Mr Ruimy's account 410510 for the benefit of Mr Al Rajaan as described in paragraph 338XX.b below.

**~~Knowledge~~**[5]

113.    ~~Mirabaud, through at least Mr. Mirabaud and Mr. Fauchier-Magnan knew that the sums transferred into the above accounts pursuant to the Mirabaud Scheme were Secret Commissions by reason of the facts and matters pleaded in connection with that scheme above.~~[5]

114.    ~~Mirabaud also knew that the other sums referred to in paragraphs 108 to 111 (b) –~~ (g h) ~~above were Secret Commissions, by reason of:~~

    a.    ~~The purpose for which the bank accounts were initially set up;~~

    b.    ~~The use to which they were put on the Mirabaud Scheme as set out above, as Mr. Mirabaud and Mr. Fauchier-Magnan knew;~~

    c.    ~~Mr. Mirabaud and Mr. Fauchier-Magnan's knowledge of the Man Scheme and therefore the corrupt nature of the payments made to Mirabaud accounts, by reason of the facts and matters stated in paragraphs 115 to 120 below.~~[5]

115.    ~~Mirabaud, through at least~~[5] Mr. Mirabaud and Mr. Fauchier-Magnan, knew (as evidenced

48

by the memos referred to in paragraphs 116 to 118 below) that Mr. Al Rajaan was receiving Secret Commissions into the Overton account from Mr. El Ghazzi which represented a proportion of commissions paid to Mr. El Ghazzi by the Man Group.

116. On about 8 November 2001 Mr. El Ghazzi opened one or more accounts with Mirabaud. By a memo sent to Mr. Mirabaud on 9 November 2001 it was stated that:

a. Mr. El Ghazzi's main activity was to be an agent of Man Management in Zurich, that, as agent he received sales commissions on funds; that commissions would be paid into his account;

b. Once the money had arrived a portion would go to Mr. Al Rajaan "*(the company's account)*", and the other portion was to be transferred to Beirut pursuant to oral telephone instructions for or on behalf of Mr. El Ghazzi: either "*transfer USD X to Beirut*" in accordance with standing instructions to Mr. El Ghazzi's account in Lebanon or "*transfer USD X to the Company*" meaning to Mr. Al Rajaan's account (Overton, later Intermac).

117. Following a meeting and in discussion with the compliance function on or about 19 December 2007 which, it is to be inferred, had raised concerns about the circumstances of a transfer to Mr. El Ghazzi of US$2 million, Mr. Mirabaud stated that he knew both participants (i.e. Mr. Al Rajaan and Mr. El Ghazzi) well and the business model developed (by which he was referring to the payment of Secret Commissions to Mr. Al Rajaan). He further stated that he did not wish to ask for underlying contracts; that he trusted them completely, and that the Board of Directors (of Mirabaud) was fully informed. Such statements were evidenced by clarification protocol no. 998 of 19 December 2007.

118. In ~~November 2011~~ February 2012 the compliance function sought contracts underlying a transfer of US$1,920,602 from Man Investments. Their production was refused (presumably by Mr. Al Rajaan and Mr. El Ghazzi) on the grounds – it is to be inferred – that no lawful contract existed. The managers responsible for the accounts (at least Mr. Fauchier-Magnan) did not require any further steps to be taken and stated that they were "*comfortable with these moves*" and that the transactions appeared plausible to them.

119. Mr. Mirabaud stated to the Swiss Prosecutor that Mr. El Ghazzi had been introduced to Mirabaud by Mr. Al Rajaan; that he represented a large investment group; that he knew there was a flow of fees from the Man Group to Mr. El Ghazzi who remitted a portion to Mr. Al-

49

Rajaan.

120. Given Mr. Mirabaud's and Mr. Fauchier-Magnan's knowledge of Mr. Al Rajaan's role on behalf of PIFSS, and their knowledge that PIFSS was a substantial sovereign investor on whose behalf Mr. Al Rajaan was acting, and given their knowledge of the facts and matters set out above, it is to be inferred that Mr. Mirabaud knew that Secret Commissions were being remitted from Mr. El Ghazzi to Mr. Al Rajaan in connection with investments held by PIFSS in the Man Group.

121. More generally ~~and in support of the inference that Mirabaud knew that the transfers in and out of accounts which it administered on behalf of Mr. Al Rajaan and Mr El Ghazzi were Secret Commissions or the traceable proceeds thereof PIFSS relies on their failure to take steps which they were required to take pursuant to the obligations set out at paragraph 74 to 77 above, namely, Mirabaud, acting through at least~~[5] Mr. Mirabaud and Mr. Fauchier-Magnan:

    a. Made no or no adequate checks into the source of funds or nature of the transfers into the Overton, New Market, Intermac and Domini accounts;

    b. Took no or no adequate steps consistent with treating Mr. Al Rajaan, Ms. Al Wazzan and Mr. El Ghazzi (as a close associate of Mr. Al Rajaan) as PEPs;

    c. Accordingly, deliberately took no or no adequate steps to investigate transactions which bore the hallmarks of corruption and money- laundering, from which their knowledge of the impropriety of the transfers is to be inferred.

122. Accordingly, in light of the purpose of setting up the accounts, their knowledge of the payments under the Mirabaud Scheme and the Man Scheme and their purpose, and in light of the acts and omissions referred to in paragraph 114 above, it is to be inferred that they ~~(and through them, Mirabaud)~~[5] knew that the other payments into those accounts referred to in paragraphs 111(c) to (~~g~~ h) also represented the payment of Secret Commissions.

123. Accordingly, ~~Mirabaud knew through at least~~[5] Mr. Mirabaud and Mr. Fauchier- Magnan knew[5] that the bank accounts which they established and operated for Mr. Al Rajaan and Mr. El Ghazzi:

    a. were wholly (or at least substantially) funded by Secret Commissions or the traceable

proceeds thereof;

b.     were being used to assist and facilitate the payment of Secret Commissions.

124.   Alternatively, they believed this to be the case and deliberately shut their eyes and took no steps to enquire. In fact, they deliberately took such active steps as were necessary to protect the transfers of Secret Commissions from regulatory oversight, and to ensure that the transfers were not the subject of due diligence, so as to conceal and facilitate the payment of Secret Commissions.

125.   Accordingly, those parties implicated in the Mirabaud scheme are liable to PIFSS as stated below.

## Liability[6]

### Mr. Al Rajaan

126.   Mr. Al Rajaan is liable for civil wrongs under Article 227 of the Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches[6]:

a.     Breach of Articles[6] 11 and 12[6] of the Public Property Law; the manner in which he authorised or influenced PIFSS to enter into the Galmir Funds investments through Mirabaud and its group entities, and intentionally committed it to rights and obligations in return for the payment of Secret Commissions in a manner that was detrimental to PIFSS' interests;

b.     Breach of Article 35 of the Penal Code amended by Law, No. 31 of 1970: Mr. Al Rajaan knew his position as Director General of PIFSS and was acting in the course of his authorised duties in authorising or influencing PIFSS to enter into the Galmir Funds in return for which he secured the promise and payment of Secret Commissions;

c.     Breach of his Civil Service duties;

d.     Breach of Article 2 of the Money Laundering Law No.35 of 2002, and Article 2 of the Money Laundering Law No.106 of 2013[6].

126A.  Alternatively, he is liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of breach of Article 158 SPC for criminal mismanagement of PIFSS's

property; breach of Article 322 *septies* SPC for accepting bribes in return for acting as Director General of PIFSS in ways which were contrary to his duty and/or dependent on his discretion; and breach of Article 305 *bis* SPC for money laundering by causing bribes paid to him or for his benefit to be concealed.

127. Alternatively, he is liable under principles of English law for:

    a.    breach of fiduciary duty (best interests, good faith, no conflict and no profit);

    b.    bribery.

**Mirabaud, Mr. Mirabaud and Mr. Fauchier-Magnan**

128. Mirabaud, Mr Mirabaud, and Mr Fauchier-Magnan are liable for civil wrongs under both Article 227 and 229 of the Kuwaiti Civil Code arising out of:

    a.    Breach of Articles 35 and 39 of the Penal Code for their role in promising and paying Secret Commissions to Mr. Al Rajaan, knowing his position as Director General of PIFSS, to induce him to authorize or influence PIFSS to make investments in which Mirabaud Group had a commercial interest;

    b.    Liability as a perpetrator, and aider and abettor within the meaning of Articles 47-49(3)48 of the Penal Code in respect of their role in relation to Mr. Al Rajaan's breach of Article 11 of the Public Property Law referred to above;

    c.    Liability under Articles 47-49(3)48 of the Penal Code in respect of their role in assisting breaches of Articles 35-39 of the Penal Code and Article 11 in relation to other Schemes in furtherance of their interest and the interest of others.

129. Alternatively, they are liable under principles of English law for:

    a.    Bribery

    b.    Dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty;

    c.    Knowing receipt of trust property in respect of such unauthorised benefits as they may have received under the Mirabaud Scheme.

**Mr. Argand**

130. Mr. Argand is liable for civil wrongs under Article 229 of the Kuwaiti Civil Code arising out of:

52

a.   ~~His liability as a perpetrator and aider and abettor within the meaning of Articles 47-48 of the Penal Code in respect of his role in relation to the payment of bribes by Mirabaud to Mr. Al Rajaan in breach of Articles 35 and 39 of the Penal Code in furtherance of his interests and the interest of others.~~

b.   ~~His liability as a perpetrator and aider and abettor within the meaning of Articles 47-48 of the Penal Code in respect of his role in relation to the breach by Mr. Al Rajaan of Article 11 of the Public Property Law.~~

~~131.   Alternatively, he is liable under principles of English law for dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty.~~

### ~~Secondary/Vicarious liability~~

~~132.   If, which is denied, Mirabaud is not liable as principal for the torts and other civil wrongs alleged, it is vicariously liable for the acts and omissions of Mr. Mirabaud and Mr. Fauchier-Magnan pursuant to Article 240 of the Kuwaiti Civil Code, alternatively pursuant to principles of vicarious liability under English law.[5]~~

### Generally

133.   All transfers of the Secret Commissions are void in law as they were carried out for the purpose of concealing the Secret Commissions.

### F.   THE MAN GROUP SCHEME

134.   Mr. Al Rajaan procured Secret Commissions to be paid to him by Man Group in connection with ~~the~~ his authoris ing or influencing ~~ation by him~~ of investments by PIFSS in Man Group products.

135.   In 1993, Mr El Ghazzi entered into a contract with MIAG entitled 'Intermediary Application and Agreement' (the "**El Ghazzi Agreement**"). ~~The El Ghazzi Agreement, although by its terms denying a relationship of agency, amounted in law to a contract of agency. Pending disclosure no admission is made as to whether that agreement, when made, reflected a genuine commercial relationship between Mr. El Ghazzi and MIAG.[6]~~

136.   ~~If genuine when made, and in any event, i~~I[6]t is to be inferred from the facts and matters below and the existence of other corrupt schemes upon the facts of which PIFSS relies that

Mr. Al Rajaan, Mr Massad and Mr. El Ghazzi, assisted by Mr Nasrallah, exploited the existence of that agreement and, together with the Man Group Defendants, used it as the front for the payment of agreed Secret Commissions to Mr. Al Rajaan.

137.   In the period from 1996 to 2013, MIL established an investment management relationship with PIFSS in respect of PIFSS' investments with Man Group in the course of which:

   a.   MIL introduced and recommended prospective Man Group investment products to PIFSS;

   b.   MIL advised PIFSS as to investments which it should be redeeming or making and on terms which could be arranged for such purposes;

   c.   MIL provided information to PIFSS concerning the state of its funds and more generally performed an investment management role.

138.   From inception of the investment relationship, Mr Massad was the face of MIL's Middle Eastern operation, PIFSS' relationship manager and PIFSS' primary point of contact for Man Group. He was, at all material times prior to the termination of his employment by MIL in October 2008, held out by MIL as (and is believed to have been) the Regional Manager (and most senior representative) of its Middle Eastern operation based first in Bahrain and then in Dubai. From about late November 2005 Mr Massad was, additionally, the Chief Executive Officer of MIMEL and corresponded from time to time with PIFSS on notepaper indicating that capacity.

138A.   Following Mr. Massad's departure from Man Group in 2008, a similar role was fulfilled by Mr. Patrick Merville. Mr. Merville was introduced by Mr. Massad to Mr. El Ghazzi in person in August 2008 as part of the handover process from Mr. Massad to Mr. Merville (even though Patrice Conchon became Mr. El Ghazzi's official principal point of contact at the Man Group). Mr. Merville was, in substance, the person who took over responsibility for the relationship between the Man Group and PIFSS as pleaded in paragraph 137 above and the relationship between the Man Group and Mr. El Ghazzi and Mr. Al Rajaan.[6]

138B.   Christopher Moeller was, from no later than August 1996 (and thus at all material times), the direct superior of Mr. Massad and then Mr. Merville to whom they reported at all material times. In addition, he had the following positions and responsibilities:

54

a.    He was the Head of Sales for the Man Group from 1995 and the Head of Distribution and Client Relationships (to the extent that this differs from "Head of Sales") of the Man Group until July 2013.

b.    From no later than early 1996 (and thus at all material times), he was a member of the Man Group's Divisional Board (then equivalent to the Executive Board of the investments side of the business) and then the Executive Board.

c.    Between 1 December 2001 and 19 April 2013, he was, for the purposes of the Financial Services Authority, a CF1 director of MIL.

d.    He was a director of MIAG from no later than 22 May 2008 (and, it is to be inferred from his roles set out above, from 1995) until after July 2013.

e.    The Man Group regional offices (including the Middle East) were under Mr. Moeller's supervision from 1995.

f.    He was a member of the 2012 Senior Management team (as pleaded at paragraph 147D.e. below).

g.    In the above descriptions, the reference to "the Man Group" reflects the way in which the companies in the Man Group operated in practice. Regardless of Mr. Moeller's formal employment (which was with MIAG from no later than 1 February 2008 and PIFSS infers was with MIAG prior to that), throughout the period that he was Head of Distribution and Client Relationships and/or Head of Sales at the Man Group, he was in charge of the sales of the Man Group's investment products, authorised to act on behalf of all relevant group companies in doing so, and thus acting on MIL's and Man plc's behalf in addition to his formal role on behalf of MIAG.[6]

139.    In 1996:

a.    PIFSS started to invest in Man Group products;

b.    Man Group accordingly received fees payable in respect of such investment;

c.    Mr. El Ghazzi started to receive commission calculated by reference to fees received in respect of PIFSS' investments and/or the value of such investments, purportedly pursuant to the El Ghazzi Agreement;

d.      Accordingly, Mr. Al Rajaan started to receive Secret Commissions from Mr. El Ghazzi. Pending disclosure, PIFSS is unable to particularise the details of these payments prior to 2001.

140.    From 1996 PIFSS invested c. US$2.7 billion in 44 Man Group products, as summarised in the table at Appendix 2.1 to this statement of case. Mr. Al Rajaan was at all material times until his departure in January 2014 PIFSS' main contact for Man Group and authorized or influenced PIFSS to invest in Man Group products during that time.

141.    As pleaded below, as over time PIFSS expanded its investment relationship with Man Group the El Ghazzi Agreement was amended (formally or by practice) to provide for commissions to be paid to him on the majority of such investments made during the term of the El Ghazzi Agreement, albeit that, in fact, commissions were paid on 35 of 38 such investments (and beyond the purported contractual entitlement).

142.    The relationship between Man Group and Mr. El Ghazzi was ostensibly by way of a contract (and variations) agreed between MIAG and Mr. El Ghazzi. However, in reality it is to be inferred from the facts pleaded in paragraphs 144 to 147V[6] below that all such variations were agreed at the direction of and with the knowledge and approval of MIL, acting until 2008 through Mr. Massad.

143.    The 1993 El Ghazzi Agreement ostensibly[6] conferred authority on Mr. El Ghazzi to promote the sale of Man Group products and to procure purchasers in return for which he was entitled to commission on sales of product "effected" by him at designated rates in respect of both one off placement commissions (4%) (known within the Man Group as "FEL", standing for "Front End Load")[6] and ongoing services/management commissions (0.5% per annum) (known within the Man Group as "trail" commission)[6].

144.    Thereafter:

a.      In 1998, a purported amendment was made to the contract to provide that Mr. El Ghazzi would receive enhanced service/management fee commissions (called "*trail*") if certain levels of investments were reached, up to a maximum of 0.5%. This agreement was drafted on MIL's headed paper, signed by Mr. Massad, and included an exclusivity clause (which was also contained in the original El Ghazzi Contract): "*6. In consideration of the above you hereby agree that you will not promote or sponsor in any form directly or indirectly futures, hedge or alternative investment*

56

*products (whether guaranteed or not) other than those products of [MIL]*".

    b.    Soon afterwards, pursuant to Mr. Al Rajaan's authorisation or influence, PIFSS duly made further investments such that the specific levels of investment were met, and Mr. El Ghazzi attained that further level of commission, which was in addition to entitlement to 0.5% service/management commission set out above.

145.    It is to be inferred that in or about February 2004 Mr. Massad and Mr. Al Rajaan agreed that PIFSS would invest a further US$30million in structured bonds if such an investment generated further Secret Commission. Thereafter, and in support of the above inference:

    a.    On 26 February 2004 Mr. Massad wrote to Mr. El Ghazzi referring to a purported conversation with Mr. El Ghazzi and a purported agreement by MIAG to pay him additional placement fee commission of 0.5% if he invested or procured subscribers of US$30 million in Man Group's RMF Multi-Style structured bond Fund;

    b.    On 29 March 2004, pursuant to Mr. Al Rajaan's authorisation or influence, PIFSS duly invested US$30million in the Man RMF Multi-Style Fund;

    c.    By letter apparently dated 27 April 2004 from MIAG sent to Mr. El Ghazzi care of Mr. Massad at MIL in Dubai provision was made for Mr. El Ghazzi to receive additional placement fee commissions to a maximum of 4.5% (the original 4% and later 0.5% increase) for having "*raised*" at least US$ 30 million in respect of the Man RMF Multi Style Ltd Fund.

146.    In 2006, the El Ghazzi Agreement was amended again by letter sent to Mr. El Ghazzi care of Mr. Massad in Dubai (and copied to him), apparently dated 1 June 2006, apparently countersigned by Mr. El Ghazzi on 20 December 2006 and stamped by Man as received on 15 January 2007 to increase Mr El Ghazzi's remuneration in respect of placement fees by up to a further 1.5%. Soon afterwards Man Group began to pay El Ghazzi the maximum, i.e. placement fees of 4% plus additional placement fees of 1.5% = 5.5% total.

146A.    From no later than November 2010, the Man Group's Compliance Department ("**Compliance**", comprising Robin Grew (then Global Head of Compliance and Regulatory for the Man Group), Patrick Kidney and Adam Waghorn at all material times thereafter) were conducting a bribery risk assessment in light of the (then) imminent coming into force in April 2011 of the Bribery Act 2010. Steps were subsequently taken by the Man Group

concerning the general risk posed by the Man Group's practice of using intermediaries for larger or institutional investors as communicated by Ms Grew in an e-mail dated 27 June 2011 which included the circulation to intermediaries of a letter which they were required to sign confirming compliance with anti-bribery obligations.[6]

146B.    In response to that general communication, there were conversations between Compliance and the Man Group's representatives in the Middle East between 27 and 29 June 2011 (including, it is to be inferred, Mr. Merville) seeking to change the terms of the letter which intermediaries had to sign referred to in paragraph 146A above, reflecting (it is to be inferred) the concern that Mr. El Ghazzi would be a serious worry for the Man Group's Middle East operation in light of the Bribery Act 2010.[6]

147.    Pursuant to the actions required by Compliance as stated in paragraph 146B above, bB[6]y letter dated 3 August 2011, handed to Mr. El Ghazzi by Mr. Merville in person at a meeting in September 2011,[6] apparently signed by Mr El Ghazzi on 15 September 2011 and stamped as received by MIAG on 9 December, Mr. El Ghazzi agreed to a further addendum regarding anti-bribery obligations.

147A.    In light of the specific risks posed by Mr. El Ghazzi, and as evidenced by an email from Adam Waghorn to Matthew Williamson in the Middle East office of 7 August 2011, it was recognised that in respect of (at least) Mr. El Ghazzi the Man Group needed to document (if possible) a genuine business rationale for the payments being made to him. No such genuine business rationale was (or could ever have been) ever produced.[6]

147B.    Further, in light of the specific risk posed by certain intermediaries designated by Compliance as "higher risk", which it is to be inferred was a euphemism for "potentially corrupt" and which included Mr. El Ghazzi, the investigation firm Alaco were commissioned in or before October 2011 by Man plc on behalf of the Man Group, as part of a due diligence review, specifically to investigate, and to produce a series of reports on, those intermediaries. Mr. El Ghazzi was the subject of the Project Artis report dated 2 November 2011. The Project Bergen report also contained material information.[6]

147C.    It was obvious from the Project Artis report, in the context of the pre-existing perceptions of risk of corruption described from paragraph 146A to 147B above and in light of the level of payments made by the Man Group to Mr. El Ghazzi over the previous 15 years, that there was, at the very least, a high risk of corrupt relationships between Mr. El Ghazzi and one or

more senior manager(s) of PIFSS, likely Mr. Al Rajaan, and thus between Mr. El Ghazzi and the Man Group. Compliance recognised that it was therefore vital to speak to Mr. Merville as Relationship Manager better to understand the relationship between the Man Group, Mr. El Ghazzi and PIFSS.[6]

147D.   The (correct) perception within Compliance and then senior management of a high degree of risk of corruption is further to be inferred from the fact that the issue was referred to the highest levels of management:

a.      From no later than 9 January 2012, Stephen Ross, Group General Counsel, had been briefed by Compliance on this relationship and the relationship between PIFSS and the Man Group and was continuously updated and actively involved in the investigation into Mr. El Ghazzi thereafter.

b.      From no later than 12 January 2012, Mr. Moeller, who had ultimate responsibility for the relationship between Mr. El Ghazzi and the Man Group as Head of Sales and Distribution, and who had the knowledge pleaded at paragraph 157.n.c. below, was also actively involved in, and sought to be kept updated on, Compliance's investigation into Mr. El Ghazzi. By 12 January he had already prohibited Mr. Merville from speaking to Compliance about Mr. El Ghazzi until after he (Mr. Moeller) had done so.

c.      By no later than 9 February 2012, Peter Clarke, the Chief Executive Officer ("**CEO**") of the Man Group and a director of Man plc (MSHL) and MIL had been briefed by Mr. Ross on Mr. El Ghazzi and Mr. Ross thereafter kept him informed on the issues raised from time to time.

d.      By no later than 27 February 2012, Mr. Clarke had been made aware by Mr. Ross of the risk that Man Group business from Kuwait (and specifically PIFSS) may have been induced by bribes paid to Mr. El Ghazzi and was aware, in that context, of commission rates being charged by Man Group entities on PIFSS' investments which he would have recognised as a potential badge of corruption given their levels (see paragraphs 157.f. and 157.fa. below) given his long experience as Group CEO (from 2007) and before then, as Group Chief Financial Officer ("**CFO**"). He was also aware of PIFSS' importance to the Man Group business.

59

  e. Mr. Clarke, Mr. Moeller and Mr. Ross were the three individuals who in due course comprised the 2012 Senior Management team, authorised to make decisions about the relationship between the Man Group and Mr. El Ghazzi on behalf of the Man Group.

  f. Compliance's report on Mr. El Ghazzi, referred to further below, which was compiled between about 28 February and 16 July 2012, was stored in a folder filed under "*compliance/fraud/fraud sub-committee/bribery/intermediary*".[6]

147E. Accordingly, from February 2012, Compliance continued to undertake a due diligence exercise into the Man Group's relationship with Mr. El Ghazzi to the knowledge of Messrs. Clarke, Moeller and Ross, and under their direction including by e-mail of 27 February 2012 from Mr. Ross to Mr. Kidney, conveying Mr. Clarke's instruction that Compliance should proceed "*very carefully and step by step. Legitimate enquiries, no issue at all, just want to avoid spooking or undermining a legitimate piece of business*".[6]

147F. On or before 2 March 2012, at least Mr. Waghorn had spoken with Mr. Merville about Mr. El Ghazzi, and had established from him, amongst other things, that: (1) the Man Group's relationship with PIFSS was entirely direct in that Mr. El Ghazzi played no apparent role in return for the sums he was paid by way of commission; and (2) Mr. Merville could offer no explanation regarding the relationship between Mr. El Ghazzi and PIFSS and how the two would interact.[6]

147G. Ms. Grew was informed of these developments on 2 March 2012, as was Mr. Ross, who immediately copied Mr. Clarke, noting that Mr. Merville could not answer the most basic questions about the relationship between Mr. El Ghazzi and the Man Group, commenting (amongst other things) that there appeared to be no or only a negligible role played by Mr. El Ghazzi as intermediary and stating (disingenuously) that it was unclear what that implied (when the obvious implication was that Mr. El Ghazzi was corrupt) and that he (Mr. Ross) was working on it. In that regard he reported that he was awaiting a response from Mr. Merville to further questions and that they were taking the investigation "*steady*", in accordance (it is to be inferred) with the direction referred to in paragraph 147E above.[6]

147H. Accordingly, that same day, Mr. Waghorn wrote to Mr. Moeller and Mr. Merville seeking

60

answers to further questions about the relationship between Mr. El Ghazzi, PIFSS and the Man Group which were designed to elicit further and more helpful information to justify the legitimacy of the relationship between Mr. El Ghazzi and the Man Group. That e-mail acknowledged that some of the further information sought may need to be sourced from Mr. El Ghazzi and/or PIFSS, *"and we would like to initially leave this to Sales* [i.e. Mr. Moeller and Mr. Merville] *to manage. We feel at this stage that we do need the answers to the questions to allow us to establish how* [not whether] *we can continue this relationship and ensure that it is properly documented"*.[6]

147I.    On or about 26 March 2012, having been, it is to be inferred, leant upon to provide further and better information, Mr. Merville responded to such questions with information which he had been unable or unwilling to provide on the first occasion of asking, to which Mr. Moeller added further responses in an e-mail of 28 March 2012. The information provided by them as to the role of Mr. El Ghazzi was general, vague, otherwise unverified and unsupported, but treated by Compliance as sufficient for Mr. Waghorn to set out a draft recommendation later that day, subsequently discussed with Mr. Ross, that, in light of information which Compliance would prepare, a senior management group should meet to review and approve the continuation of the relationship in its current form, and be satisfied with the level of due diligence and information obtained to support the relationship. In light of what subsequently took place, as pleaded below, it is to be inferred that this course of action was approved.[6]

147J.    On 16 April 2012, having made an internal audit request for all documents sent to and from PIFSS, and having reviewed the product, which contained no evidence of any active involvement on the part of Mr. El Ghazzi in the relationship between the Man Group and PIFSS, Mr. Waghorn sent a summary of materials to Ms. Grew and Mr. Kidney, and called for the senior management review of that relationship referred to above, but recommending that: (a) full records relating to Mr. El Ghazzi should be obtained; and (b) PIFSS should be set up as a Direct Client of the Middle East Office.[6]

147K.    Through April and May 2012, Compliance continued to try to find out as much as possible about Mr. El Ghazzi from purely internal records, without anyone speaking to PIFSS, even though that was the obvious course to take if Compliance genuinely wished to establish whether Mr. El Ghazzi was involved in corruption in relation to PIFSS' investments with the Man Group.[6]

61

147L.  On or about 29 May 2012, Compliance discovered the payment of US$1m made to Ozak (described in paragraph 37 above) by reference to a letter dated 26 March 1998. Mr. Waghorn, realising that the payment was suspicious, forwarded the information almost immediately to Mr. Kidney and called for investigation. No product of any investigation has been disclosed in this litigation.[6]

147M. On 1 June 2012, Alaco reported to Mr. Kidney the suspension of Mr. Al Rajaan pending investigation into corruption charges, which information was communicated to Ms. Grew on 6 June 2012. On that same day Alaco was instructed by Man plc to assist the Man Group with what Mr. Al Rajaan's suspension could mean for Mr. El Ghazzi, and what the word on the street was in Kuwait about Man or Mr. El Ghazzi in relation to PIFSS. Alaco responded on 8 June 2012 with a report that the "Kuwaiti press and blogsphere" did not appear to be talking about the Man Group or Mr. El Ghazzi in relation to PIFSS.[6]

147N.  Following numerous iterations and drafts prepared internally by Compliance and discussed with Mr. Ross, a final Compliance report was prepared and circulated to the Senior Management Team (copied to Mr. Jonathan Sorrell, the CFO) for discussion at a meeting held on 17 July 2012. The report was not an objective assessment of the risks that the relationship between Mr. El Ghazzi and the Man Group was corrupt. It emphasised those factors (substantially unverified and unsupported) which arguably pointed to that relationship being legitimate and omitted, played down or explained away those factors which pointed to the relationship being corrupt. It was a document prepared with the objective of justifying the continued relationship between Mr. El Ghazzi and the Man Group.[6]

147O.  Subject to recommendations that: (a) Sales should keep documentary records of the relationship; (b) Mr. Merville should "*own*" the relationship with Mr. El Ghazzi and ensure greater contact evidence; (c) Intelligence updates should be provided in respect of Mr. El Ghazzi and PIFSS; and (d) Requisite Compliance approvals should be obtained for administrative updates to the El Ghazzi bank account, the Senior Management Team formally approved the relationship and the adequacy of the controls and procedures in place.[6]

147P.  Accordingly, the Man Group's senior management team did not terminate the relationship between the Man Group and Mr. El Ghazzi, and permitted the continued payment of sums to Mr. El Ghazzi.[6]

147Q.  On 6 February 2013 Alaco were asked to provide an update on PIFSS' investigations into Mr. Al Rajaan. By an updated report dated 21 February 2013, supplied to the Man Group on or about 1 March 2013, Alaco reported that the investigation into Mr. Al Rajaan had been dropped.[6]

147R.  In light of the above developments and changes which had been made to the Executive Committee since the Man/PIFSS/El Ghazzi relationship had been reviewed by senior management in 2012, in particular the departure of Mr. Clarke as CEO on or about 28 February 2013 and the anticipated departure of Mr. Ross on or about 26 April 2013, on 23 April 2013, Ms. Grew: (1) circulated to Luke Ellis, Tim Rainsford and Mr. Dackombe (copied to Mr. Waghorn and Mr. Kidney) an "Enhanced Due Diligence / Senior Management Update" in relation specifically to Mr. El Ghazzi; (2) set out extensive legal advice received about the position that the Man Group found itself in in relation to Mr. El Ghazzi; (3) proposed that a new "Senior Management team" should be formed comprising at least Mr. Ellis, Mr. Rainsford and Mr. Dackombe to meet and to review the position; and (4) "*again, approve/reject the conclusions and recommendations presented by Compliance*" which, it is to be inferred, included reference to the recommendations referred to in paragraph 147O above.[6]

147S.  In the premises, it is to be inferred that such a senior management team was duly established, and that it was briefed by Compliance.[6]

147T.  It is to be inferred from the events that followed, set out below, that shortly after 23 April 2013, Mr. Dackombe, as a member of that senior management team, was tasked by Man plc to take day to day responsibility as Relationship Manager for the relationship with PIFSS as pleaded in paragraph 137 above and generally for the issues arising out of the Man/PIFSS/El Ghazzi relationship, including, in due course, the termination of the El Ghazzi Agreement, in a way that did not materially reduce PIFSS' investments in Man Group funds.[6]

147U.  Mr. Dackombe attended a meeting in Beirut with Mr. El Ghazzi for that purpose on Saturday 1 June 2013. After speaking with Mr. El Ghazzi, Mr. Dackombe was aware, and made the Man Group's Compliance Department aware, that PIFSS did not know about Mr. El Ghazzi. This is to be inferred from:

63

a.   The absence of any report of that meeting or other evidence to contradict the information at that time known to senior management and Compliance, including that provided by Mr. Merville on or before 2 March 2013, which provided no evidence of any role in which Mr. El Ghazzi might be in contact with PIFSS.

b.   The exchange of e-mails between Compliance and Mr. Dackombe between 9 and 11 July 2013 in preparation for an investment presentation to PIFSS in which they explored a form of words with which (falsely) to explain to PIFSS Mr. El Ghazzi's "services" as a "local product advisor" when they knew that he was not a local product advisor and was providing no such services to the Man Group. In the event, no such disclosure was made to PIFSS.

c.   The facts that, in the event, Mr. Dackombe: (1) proceeded to terminate the El Ghazzi Agreement without informing PIFSS of Mr. El Ghazzi's involvement with PIFSS' investments or of the fact that the El Ghazzi Agreement would be or had been terminated; and (2) (together with Mr. Rainsford and Mr. Ellis) subsequently failed to disclose and sought to conceal Mr. El Ghazzi's involvement as set out in paragraph 157.j. below.[6]

147V.   Accordingly, Mr. Dackombe proceeded to negotiate the termination of the El Ghazzi Agreement with Mr. El Ghazzi, resulting in the agreement described at paragraph 154 below.[6]

148.   Sums total[5]ing US$~~156~~155.2[6] million were paid by Man Group pursuant to the Man Scheme as set out in Appendix 2.2[6].

149.   A total sum of US$~~155~~154.2[6] million was paid to Mr. El Ghazzi as follows:

a.   Between 1996 and 2001 payments were made to Mr El Ghazzi's account at ABN-AMRO in Beirut.

b.   In 2001 Mr. El Ghazzi opened an account with Mirabaud in Switzerland and in 2001 payments were made into that account from ED&F Man Finance Limited. From opening of that account in 2001 until May 2012, when that account was frozen pursuant to the criminal investigation referred to at paragraph 4 above, the majority of payments were paid into that account.

c.   From 2004 onwards Mr El Ghazzi received his enhanced service fees into his account

at Byblos Bank in Lebanon.

d.    After 22[6] May 2012, Mr El Ghazzi received payments into his account at Byblos Bank in Lebanon <u>following an instruction from him to Mr. Conchon to this effect</u>[6].

150.    Of the commissions received by Mr. El Ghazzi, he transferred at least US$ 80.6m to Mr Al Rajaan by payment into accounts of companies beneficially owned by Mr Al Rajaan and held for Mr Al Rajaan with Mirabaud namely Overton (US$6.5 million), New Market (US$6.6 million) and Intermac (US$67.5 million<u>, made up of US$7.1 million and EUR44.5 million</u>[6]) <u>as set out in Appendix 2.3</u>[6]. It is to be inferred that Mr. El Ghazzi may have transferred further sums to Mr. Al Rajaan via other accounts, up to a total of US$<s>155</s>154.2[6] million.

151.    The sum of US$1 million was paid to Mr. Nasrallah in 1998, through Ozak, as pleaded in paragraph 37.

152.    Tables summarising the investments and the commissions generated in respect of them <u>and the payments by Mr. El Ghazzi to New Market, Overton and Intermac for the benefit of Mr. Al Rajaan</u>[6] are appended to these <u>Re-[7]Re-[6]Re-Re-[5]Re-Re-Amended Consolidated</u> Particulars of Claim as Appendix 2.

153.    The payments of commissions under the purported El Ghazzi Agreement were made at the instance of and for the ultimate benefit of Mr Al Rajaan. Accordingly, insofar as any part of the commissions were retained by Mr El Ghazzi, it is PIFSS' case that they were retained by him with the authority and/or at the direction of Mr Al Rajaan and are to be treated as corrupt Secret Commissions.

154.    The El Ghazzi Agreement was terminated with an offer of a severance payment of US$3 million in settlement of any claims by letter apparently dated 4 September 2013, apparently signed on 15 September and stamped as received on 30 September 2013 after conversations between Mr El Ghazzi and Mr <s>Paul</s>[6] Dackombe <s>(a senior executive and MIL and/or Man plc and Head of Man's Middle East operation)</s> <u>including on 14 or 15 July 2013</u>[6].

155.    <u>Pursuant to those same conversations, and subsequent negotiations, in which Mr. Massad played a role, i</u>[6]<u>n</u> March 2014, Mr El Ghazzi was purportedly re-engaged by MIAG as a consultant pursuant to which engagement Mr El Ghazzi was entitled to receive a flat salary of US<s>%</s>$ 250,000 per year. This arrangement was terminated in May 2015<u>, it is to be inferred</u>

65

(by reason of the coincidence of the timing) in light of the instigation of criminal proceedings in Switzerland against Mr. Al Rajaan[6].

156. ~~Following Mr. Massad's departure from Man Group in 2008 it is to be inferred that responsibility was taken for the PIFSS relationship by senior management of MIL and Man Plc in London given its value to the Man Group, and as evidenced by the fact that decisions regarding (i) termination of the El Ghazzi Agreement; and (ii) Mr. El Ghazzi's subsequent retainer agreement were, in reality, made by senior management (in particular Mr. Dackombe) in London and that correspondence with PIFSS concerning its relationship with Man Group was conducted in the same way.~~[Not used][6]

157. Accordingly, in the light of the scheme pleaded in section C above~~,~~ and[6] the facts and matters stated in paragraphs 134 to 156 above and pending PIFSS' review of further[6] disclosure PIFSS relies on the following facts and matters in support of the inferences that (i) the El Ghazzi Agreement was used by Mr. Al Rajaan, Mr. El Ghazzi, the Man Group Defendants (including Mr. Massad) assisted by Mr. Nasrallah as a front for the payment of Secret Commissions to Mr. Al Rajaan, and (ii) that this was known and intended by Mr. Al Rajaan, Mr. El Ghazzi, Mr. Massad, Mr. Nasrallah, MIL (through at least Mr. Massad, Mr. Moeller, Mr. Merville[6] and latterly Mr. Dackombe), ~~MIMEL (through at least Mr. Massad)~~[6] MIAG (through at least ~~Mr. El Ghazzi, and~~[6] Mr. Massad, Mr. Moeller, Mr. Merville and Mr. Dackombe), Man plc (through at least Mr. Moeller and Mr. Dackombe)[6] and the Man Group's senior management team from 2 March 2012 (as more fully particularised below) and thus MIL, MIAG and[6] Man Plc ~~(through at least Mr. Dackombe)~~[6]:

a. Mr. El Ghazzi did not apparently perform any introductory, broking or marketing role in respect of PIFSS' investment in Man Group products or engage in any correspondence with PIFSS in connection with such investment, and did not, in any event, effect the sale of any of the products in which PIFSS invested, as the above Defendants would have known.

b. The scale of:

   a. PIFSS' investment in Man Group products, estimated at US$2.7 billion[7].

   b. Payments made to Mr. El Ghazzi in purported pursuance of the El Ghazzi

---

[7] Once consolidated into US$ dollars

66

Agreement, namely US$~~155~~154.2[6] million over a 17 year period. That was such a high level of commissions that MIL would have been aware of its impact on MIL and Group revenue and would not, absent the payment of Secret Commissions, have authorized, directed or permitted payment of such sums to Mr. El Ghazzi in circumstances where he was performing no valuable service for Man Group.

c.  The proportion of fees which Man Group paid to Mr. El Ghazzi by way of commission both in real terms and by reference to the increase in commission entitlement to Mr. El Ghazzi over time. Absent an intention to use the El Ghazzi Agreement as a means of paying Secret Commissions to Mr Al Rajaan, there would have been a downwards renegotiation of the commission entitlement over time given the increasing sums being paid to Mr. El Ghazzi, alternatively termination of the El Ghazzi Agreement. Rather, his commission entitlement was renegotiated upwards, as set out above.

d.  Mr El Ghazzi was purportedly paid commissions which Man was not obliged to pay him under the El Ghazzi Agreement, including:

   a.  in respect of funds in which PIFSS invested but which were not listed in the Schedule referred to in clause 11(1) of the El Ghazzi Agreement, successive iterations of which listed from time to time the funds in respect of which he was potentially entitled to receive commissions.

   b.  Contrary to the express provision in clause 11(2) of the El Ghazzi Agreement that "*commission shall only be payable to the Intermediary pursuant to clause 11(1) hereto to the extent that the purchase or subscription monies…represent new business as defined…*", Mr El Ghazzi routinely received commissions on monies which were not "*new business*" as defined including on "switched" investments and investments which were redeemed and then immediately re-invested as approved by Mr. Moeller from time to time as set out in paragraph 157.n.c.vii. below[6].

e.  MIL's establishment of a relationship with PIFSS, as pleaded in paragraphs 137~~,~~ and[6] 138 ~~and 156~~[6] above under which Man products were introduced and brokered to PIFSS through Mr. Massad, Mr. Merville and Mr. Dackombe, and[6] not Mr. El

67

Ghazzi. PIFSS was unaware that, in practice, either Mr. El Ghazzi or MIAG as his principal was performing any introducing, broking or marketing role in relation to its investments.

f.   ~~At least prior to 2004~~Prior to 2013⁶, Man Group products in which PIFSS was investing were directed more at (and were considered to be more suitable for) private investors than institutional investors by reason of their very high fee rates (from which Secret Commissions could profitably be paid) <u>and were otherwise not offered to PIFSS at normal institutional rates. In particular:</u>⁶

157.f.a.   <u>Although PIFSS was (and is) an institution and should have been categorised as an institutional investor, the Man Group (for instance in at least its 2003, 2007 and 2009 annual accounts) categorised PIFSS as a retail investor on the basis that the products in which PIFSS invested until 2013 were retail products. In particular, until the second half of 2013, the Man Group sold PIFSS guaranteed products which charged high product fees (i.e. management and other fees rather than performance fees) being, as at April/May 2012, 5-6% on average. In June 2015, the Man Group assessed that the average product fee paid by PIFSS in 2013 and before was approximately 5% per annum.</u>

157.f.b.   <u>Using the figure of 5% supplied by the Man Group (and which accords with the preliminary analysis PIFSS has undertaken), the fees charged by the Man Group to PIFSS between December 1996 and June 2013 on the investments in which Mr. El Ghazzi acted as an intermediary are calculated to have been US$370,736,550.</u>

157.f.c.   <u>As a matter of the Man Group's policy, standard headline fees charged to institutional investors other than PIFSS were considerably lower than standard headline fees charged to retail clients. Further, rebates for institutional investors were routinely applied in relation to the funds managed by MIL and the Man Group. PIFSS was not offered and therefore did not benefit from any such rebates. The Man Group's June 2006 Financial Information also recorded that Gross Management Fees payable by (other) institutional investors were, by way of comparison, 1.18% for</u>

2004, 1.28% for 2005, and 1.19% for 2006.

157.f.d.  If PIFSS had been charged fees at 1.25%, which would have been more in line with the standard institutional rates identified above, it would have paid total fees to the Man Group of approximately US$92,684,138, which is US$278,052,413 less than PIFSS' estimate of what it paid, on the basis of the figures set out in the previous sub-paragraphs.

157.f.e.  The Man Group's June 2006 Financial Information recorded that the average commission on investments between 2004 and 2006 on retail investments (and thus presumably paid to intermediaries) was in the region of 1% and the average commission paid by institutional investors was under 0.15%. By way of contrast, PIFSS calculates that the average FEL (including tiered placement fees) paid to Mr. El Ghazzi in relation to PIFSS' investments in Man Group products between 1996 and 2013 was 4.5% and the average trail / servicing fee was 0.87%, giving rise to an overall commission burden well in excess of even the average commission on retail investments, let alone the more appropriately comparable institutional investments.⁶

157.fa. Further, there was a widespread awareness within the Man Group that PIFSS was paying uncommercially high fees, inappropriate for an institutional investor such as PIFSS:

157.fa.a. On 24 October 2002, Mr. Moeller complained to Stanley Fink, the Man Group's then CEO, that RMF had visited PIFSS offering their IP220 portfolio at lower fees than the Man Group was charging and at the same time demonstrated an appreciation that the Man Group's products in which PIFSS were invested were expensive.

157.fa.b. In January 2006 Mr. Massad was seeking to persuade PIFSS to invest $50m in Man Group's Platinum product which was currently being marketed to institutional investors with typical institutional fees including a standard 50bps institutional rebate. Mr. Massad was concerned at how such an investment could be viable given (amongst other things) the need to pay

69

4% FEL and 75bps trail to Mr. El Ghazzi which was not consistent with commissions paid in relation to institutional investors' investments, as was understood by the London team at MIL who were looking at the issue.

157.fa.c. On 8 August 2008 the Man Group produced a new "Intermediary Compensation Schedule" indicating the maximum levels of commission payable to intermediaries on various products. In October 2008 (at the instigation of Mr. Massad and, it is to be inferred, Mr. Al Rajaan), PIFSS invested in Man IP220 Series 6, one of the few funds where a 4% placement fee was available for intermediaries.

157.fa.d. On 15 September 2011, Mr. Waghorn recorded his concerns that the Financial Services Authority would be likely to query PIFSS' investment of US$100m in the Man Group's IP220 GLG product on the basis of the size of the investment and its suitability for high net worth private investors.

157.fa.e. On 30 June 2009, Matthew Williamson (Head of Compliance at the Man Group's Dubai office) recorded his concern that PIFSS was paying excessive fees as they were treated as a private client and was concerned lest PIFSS discover this.

157.fa.f. When Mr. Dackombe was seeking on behalf of the Man Group to retain PIFSS as an investor from late 2013, PIFSS' investments were moved to lower fee investments more suitable for institutional investors, at around the time that he was administering the termination of the El Ghazzi Agreement and thus the cessation of payments to Mr. El Ghazzi that required PIFSS to enter into higher fee investments to make commercial sense for the Man Group given the payment it was making. This was in part motivated in the Man Group by a recognition of the unsuitability of PIFSS' investment in high-fee products more suitable for retail investors.

157.fa.g. In the premises, further to the awareness within the Man Group of the uncommercially and inappropriately high fees being paid by PIFSS, it is to be inferred that the recorded example at sub-paragraph fa.b. above is representative of a more general unrecorded awareness within the Man

70

<u>Group that the said high fees (and the resultant inappropriate approach to investments which the Man Group, MIL and/or MIAG were constrained to take with PIFSS) were necessary to enable commissions at the level paid to be made to Mr. El Ghazzi.</u>6

g.      The payment of US$1 million to Mr Nasrallah, directed to Ozak in 1998 which ~~must have been~~<u>was</u>6 authorised by <u>Mr. Massad on behalf of</u>6 MIL and/or MIAG at the instance of ~~Mr. Al Rajaan and/or Mr. Massad and/or~~6 Mr. El Ghazzi <u>by a letter dated 26 March 1998 (and, it is inferred, at the ultimate request of Mr. Al Rajaan)</u>6 in connection with the Secret Commissions and which could not have been understood as a legitimate commercial payment <u>(and as was subsequently discovered by Compliance as set out in paragraph 147L above)</u>6.

h.      The circumstances in which the El Ghazzi Agreement was terminated in 2013 <u>as set out in paragraphs 147A-V and 154 above</u>6. ~~Such termination was not effected by any representative of MIAG, but following discussion with Mr. Dackombe, an executive of MIL and/or Man plc.~~6

i.      ~~The fact that the El Ghazzi Agreement was terminated shortly after the Swiss Prosecutor had commenced its investigations into Mr Al Rajaan and the day after the Swiss Prosecutor had released a criminal asset restraint over Mr El Ghazzi's Mirabaud bank accounts having imposed such a restraint in 2012. It is to be inferred that MIL (and through them, Man Plc) were aware of the circumstances concerning the prosecution and the freezing of Mr El Ghazzi's account and procured the termination of the El Ghazzi Agreement in an attempt to distance Man Group from the payment of Secret Commissions which was effected through such contractual arrangements.~~<u>[Not used]</u>6

j.      The failure to disclose to PIFSS the existence of the arrangements to pay commissions to Mr. El Ghazzi or Secret Commissions to Mr. Al Rajaan or the payment of US$1 million to Mr. Nasrallah through Ozak. <u>As to this:</u>6

<u>157.j.a.</u>6 Requests were made by PIFSS directly and through WAFRA by (at least) letters of 8 April 2015, 6 October 2015, and in a telephone call in May 2016 to confirm that the Man Group had fully complied with applicable laws governing ethical behavior, that there had been no third party fees or any fee sharing, and no payments had been made (directly or indirectly) to any

officials of PIFSS.

157.j.b.[6]  Such confirmations were provided by Man Plc (for itself and on behalf of other Man Group entities including MIL and MIAG), including by Mr. Dackombe (in letters of 22 April 2015 and 27 October 2015).

157.j.c.  It is the Man Group's case that its responses to PIFSS' letters of April and October 2015 were true because they were limited to the specific funds referred to in the letters (which did not include the funds in relation to which Mr. El Ghazzi obtained commissions).

157.j.d.  If such correspondence was intended by Man plc to bear the limited and literal meaning they now claim, that correspondence was, taken as a whole, deliberately ambiguous. The intention of Man plc in its statements made in that correspondence taken as a whole was to convey to PIFSS the meaning that the denials that any payments had been made by intermediaries to PIFSS' management were general and not intended to be limited to specific funds. In particular:

157.j.d.i.  The letter of 27 October 2015 referred to PIFSS' long history of investments and/or relationship with the Man Group and without any limitation to specific investments.

157.j.d.ii.  In that context, the statement that "*we have no reason to believe that any of our former Covered Associates ever knowingly made, whether directly or indirectly, payment to any [current or former official of PIFSS] in violation of our Global Legal and Compliance Policies, Procedures and Controls*" was false in the sense which was intended (and in which it was understood by PIFSS).

157.j.d.iii.  Man plc were deliberately using that ambiguity to conceal the true position.

157.j.d.iv.  By 2015 Mr. Dackombe (and the other members of the Man

Group's senior management who, it is to be inferred, had approved the above responses to PIFSS) did have reason to believe that Mr. El Ghazzi (who fell within the definition of Covered Associates) had bribed Mr. Al Rajaan for the reasons set out in paragraphs 147R-V above and sub-paragraph 157.n. below.

157.j.d.v.    Further, as to the telephone call between the Man Group and Wafra on 17 May 2016: the question posed in May 2016 by Wafra regarding the payment of third party fees was general; the response that no third party fees had been paid related to the entire relationship between the Man Group and PIFSS and was, in the circumstances set out in sub-paragraphs 147T-V above, false; Mr. Rainsford and Mr. Ellis were both on the call and, as members of the senior management team assembled in 2013 as set out above, by 2016 both individuals knew that answer to be false because they knew that Mr. El Ghazzi had been paid huge commissions by the Man Group.[6]

k.    The fact that Mr El Ghazzi paid (as a minimum) a significant proportion of the commissions which he received to Mr Al Rajaan, there being no legitimate commercial reason why he would have done so other than as part of a corrupt scheme.

157.l.    As particularised in the following sub-paragraphs, Mr. El Ghazzi was given special treatment within the Man Group (though not necessarily unique treatment, as other intermediaries were identified with the Man Group as being of concern as set out in paragraphs 146A-B above):

157.l.a.    Steps were taken by Mr. Massad, Mr. Merville and others at all material times (and those steps were approved by Mr. Moeller) to ensure that: (a) all correspondence and all details of commission payments should be kept to a very limited pool of individuals; and (b) no phone calls or faxes should be made or sent to Mr. El Ghazzi directly.

157.l.b.    At least Mr. Massad, Mr. Merville and Mr. Dackombe adopted a practice

of discussing issues relating to Mr. El Ghazzi and PIFSS by telephone instead of starting or continuing email conversations in order, it is to be inferred, to avoid recording in email details of the corrupt relationship between Mr. Massad, Mr. El Ghazzi and Mr. Al Rajaan.

157.l.c.   Mr. El Ghazzi was routinely paid his commissions earlier than all other intermediaries, typically within 5 working days of funds from PIFSS having cleared.

157.l.d.   The terms of the El Ghazzi Agreement, in particular his additional trail, was repeatedly referred to as "special" in internal communications within the Man Group.

157.l.e.   Mr. El Ghazzi was paid at an unusually high rate in relation to other intermediaries used by the Man Group, particularly other intermediaries paid in relation to institutional investors' investments.

157.l.f.   Mr. El Ghazzi's additional trail commission was, on Mr. Massad's instructions in (at least) August 2004, to be paid separately, put in a separate statement and was not to be referred to in letters and reports.

157.l.g.   The Man Group arranged and paid for a series of extravagant holidays for Mr. El Ghazzi and a large family group on at least the following occasions: to Malaysia (in 2008-2009, at a price of at least 190,000 AE ~~Dinars~~Dirhams[7], approximately US$50,000), Dubai (in 2009) and Abu Dhabi (in 2010).

157.l.h.   There was an awareness among those who knew of, but were not directly involved in dealing with, Mr. El Ghazzi (but were employed by entities within the Man Group) that specific aspects of the arrangements with or behaviour of Mr. El Ghazzi bore traces of corruption.[6]

157.m.   Consistently with the approach towards Mr. El Ghazzi, Mr. Massad and others took steps to ensure that all queries and correspondence from PIFSS should be dealt with exclusively by a small group of individuals working in the Man Group's Middle East

office (both before and after the incorporation of MIMEL), on the basis that PIFSS was "very delicate" or "quite a sensitive entity" and for "extra confidentiality". Such an approach was formalised by Mr. Wallace of HR on or about 23 February 2005 who directed that correspondence should continue to be directed care of the Middle East Representative Office (being the representative office of MIL), making clear that although he would not normally agree to this, the circumstances appeared to justify it.[6]

157.n.  By reason of the above facts and matters in paragraphs 157.a.-m. immediately above and in light of the facts and matters pleaded in paragraphs 134-155 above it is to be inferred that:

157.n.a.  Mr. Massad knew at all material times that the commissions paid to Mr. El Ghazzi were bribes being paid for the benefit of Mr. Al Rajaan and so intended:

157.n.a.i.  As against Mr. Massad, the entirety of paragraphs 134 to 155 and 157.a.-m. above are relied on as: (a) demonstrating his direct knowledge of the said bribes; (b) actions and/or knowledge consistent only with knowledge of the said bribes; and/or (c) evidencing the corrupt relationship between him, Mr. El Ghazzi and Mr. Al Rajaan as it was uncovered by senior management of the Man Group in 2012 and 2013.

157.n.a.ii.  Further, despite not being employed formally by any entity in the Man Group from early 2009, Mr. Massad, to Mr. Dackombe's and Mr. Merville's knowledge, continued to play a role in relation to the Man Group's relationship with Mr. El Ghazzi and PIFSS: shortly before 20 May 2013, Mark Diab (of the Man Group) and Mr. Massad met Mr. El Ghazzi.

157.n.a.iii.  Further still, Mr. Massad maintained a close relationship with Mr. Al Rajaan and Mr. El Ghazzi even after Mr. Massad ceased to be employed by the Man Group, as evidenced by: (i) the facts and matters in the previous paragraph; (ii) the fact that

Mr. Al Rajaan acted as a referee for him in respect of a role he undertook for UBP and that he continued to broker investment products to PIFSS from his association with ISAM, another financial institution headed by Mr. Fink formerly of the Man Group; and (iii) the fact that Mr. El Ghazzi sent Mr. Massad his draft Consultancy Agreement on 15 November 2013 for Mr. Massad to review.

157.n.b.    Mr. Merville also knew at all material times that the commissions paid to Mr. El Ghazzi were bribes being paid for the benefit of Mr. Al Rajaan and so intended:

157.n.b.i.    As set out in paragraph 138A above, in late 2008 he took over responsibility for the relationship between the Man Group, Mr. El Ghazzi and Mr. Al Rajaan, having had a personal introduction from Mr. Massad to Mr. El Ghazzi and Mr. Al Rajaan.

157.n.b.ii.    In circumstances where Mr. Massad knew and intended that the El Ghazzi Agreement was being used as a front to pay Secret Commissions to Mr. Al Rajaan and that this was the defining feature of his (and thus the Man Group's) relationships with Mr. El Ghazzi and Mr. Al Rajaan, it is to be inferred that Mr. Massad (and/or Mr. El Ghazzi and/or Mr. Al Rajaan) told Mr. Merville of the true purpose of the El Ghazzi Agreement.

157.n.b.iii.    The said inference is supported by the fact that Mr. Merville managed to continue to secure significant investments from PIFSS in the Man Group's products after October 2008 (as is demonstrated by Appendix 2.1) on which commission was paid to Mr. El Ghazzi and then Secret Commission to Mr. Al Rajaan by Mr. El Ghazzi.

157.n.b.iv.    It is also supported by the fact that Mr. Merville was aware that his (and thus the Man Group's) relationship with PIFSS was

direct and that Mr. El Ghazzi did nothing by way performing intermediary services yet was being paid enormous commission fees.

157.n.b.v.    It is also supported by the fact that, between 2011 and 2012, Mr. Merville provided inconsistent descriptions to the Man Group's Compliance Department of what Mr. El Ghazzi's role was and whether the Man Group's relationship with PIFSS was direct, although significantly by 2 March 2013 accepting that Mr. El Ghazzi performed no material role, consistent only with his awareness that Mr. El Ghazzi was paying Secret Commissions to Mr. Al Rajaan in the premises set out above.

157.n.c.    Mr. Moeller also knew at all material times that the commissions paid to Mr. El Ghazzi were bribes being paid for the benefit of Mr. Al Rajaan and so intended:

157.n.c.i.    In his role as set out in paragraph 138B above, Mr. Moeller communicated extensively with Mr. Massad in relation to PIFSS and Mr. El Ghazzi. He also met with Mr. Al Rajaan and Mr. Massad on 16 November 2005 in Kuwait.

157.n.c.ii.    PIFSS was a critically important client to the Man Group and the Middle East Representative Office in view of the amounts it invested in the Man Group's products and in view of the types of investment which it purchased, principally and until around 2013 guaranteed products which charged high fees being, as at April/May 2012, 5-6% (as set out at paragraph 157.f.a. above). As at February 2003, PIFSS was one of the largest investors in Man investment products and by far the largest investor in Man guaranteed funds.

157.n.c.iii.    Mr. Moeller knew that Mr. Al Rajaan was the or an important decision maker within PIFSS and that the Man Group, and in particular Mr. Massad, had a direct relationship with Mr. Al

Rajaan (and others at PIFSS such as Amjad Sheikh).

157.n.c.iv.  Mr. Moeller knew of the intermediary agreement with Mr. El Ghazzi such that he knew the terms upon which Mr. El Ghazzi was to be paid commission, and the amounts Mr. El Ghazzi was in fact paid, both in total and as a percentage of the amount invested by PIFSS as set out in paragraph 157.b. above and he knew of the absence of a downward renegotiation of fees as set out in paragraph 157.c. above.

157.n.c.v.  Mr. Moeller authorised the payment of fees to Mr. El Ghazzi, including the early payment of fees and the separate payment of trail commission as set out in paragraph 157.l. above.

157.n.c.vi.  Mr. Moeller was responsible for overseeing the pricing of the Man Group's products, including those sold to PIFSS and thus knew the facts and matters set out in paragraphs 157.f. and fa. above. In particular:

1.  Mr. Moeller knew from his position and role within the Man Group that the products in which PIFSS was investing were designed principally for retail investors.

2.  Mr. Moeller knew and understood that the fees charged to PIFSS by MIL had to be sufficient to cover the very large amounts of commission paid to Mr. El Ghazzi.

3.  Paragraph 157.fa.a. is repeated. Further, Mr. Moeller instructed RMF to increase its fees so that they did not appear to PIFSS to be cheaper than the fees charged by MIL, a fact he communicated to Mr. Massad in confidence.

157.n.c.vii.  Mr. Moeller knew that Mr. El Ghazzi was paid amounts of commission to which he had no contractual entitlement and authorised such payments as set out in paragraph 157.d. above. In particular:

1.  Mr. Moeller knew that when PIFSS 'switched'

investments the 'switch' was treated as a redemption and an application into a new product. Further, Mr. Moeller knew that the 'switched' money was treated as 'new money' on which commission was payable to Mr. El Ghazzi, even though Mr. El Ghazzi was not entitled to be paid placement commission (FEL) on redemption monies reinvested in a new fund.

2.    By way of example, on 19 December 2000 Mr. Moeller authorised the payment of 4% placement commission following PIFSS 'switching' between a Man IP 220 product and Man Glenwood Nexus.

3.    In addition, on or around 20 November 2006, Mr. Moeller (along with Mr. Ruetsch) approved the payment of override commission on the full amount of the investment by PIFSS into the Man Athena fund, including the amount switched from RMF Multi-Style (with 1% FEL being payable on the 'old money' (USD 30 million) and 4% FEL payable on the 'new money' (USD 20 million)).

4.    Where MIAG employees were concerned that a payment to Mr. El Ghazzi fell outside of his contractual entitlement, approval would be sought from and given by Mr. Moeller.

157.n.c.viii. Mr. Moeller knew the facts and matters set out in paragraphs 157.l.a. to f. above. Further, as set out in paragraph 157.l.a. above, Mr. Moeller expressly or impliedly authorised these arrangements, without there being any legitimate commercial or other justification for the arrangements.

157.n.c.ix. The factors leading to the general awareness within the Man Group that the arrangements with Mr. El Ghazzi bore traces of corruption as pleaded in paragraph 157.l.h. above must have led someone in Mr. Moeller's role with his experience to have formed the same view with even greater conviction.

[THE MAN GROUP SCHEME][6]

157.n.c.x.    The facts and matters set out in paragraph 157.n.c. above are consistent only with Mr. Moeller's being aware that Mr. El Ghazzi was not a genuine intermediary but was paying on to Mr. Al Rajaan some or all of the commissions paid to Mr. El Ghazzi by the Man Group, and intending that such arrangement such continue. It is to be inferred that Mr. Massad and/or Mr. Al Rajaan informed Mr. Moeller of the said facts; alternatively Mr. Moeller must have deduced that this was the case; alternatively he must have at least suspected the said facts and deliberately did not ask anyone, lest his suspicion be confirmed.

157.n.c.xi.    Mr. Moeller's role as part of the 2012 Senior Management team at set out above (in particular at paragraphs 147D, 147E, 147I, 147N and 147O above) and in the following paragraph is also specifically relied on as a further basis for the allegation of Mr. Moeller's knowledge and intention that bribes were being paid as set out above.

157.n.d.    Various further individuals (i.e. as well as Mr. Moeller), within the Man Group's senior management team acquired at the various points set out below knowledge (blind-eye or actual, as particularised below) that the commissions paid to Mr. El Ghazzi were bribes being paid for the benefit of Mr. Al Rajaan:

157.n.d.i.    As set out in paragraph 146A above, Compliance intensified its scrutiny on Mr. El Ghazzi from no later than November 2010. By no later than August 2011, Compliance came to suspect (at least) that Mr. El Ghazzi and thus the Man Group were involved in paying secret commissions.

157.n.d.ii.    By no later than 2 March 2012, Compliance and the members of the Man Group's senior management team referred to in paragraph 147D above were aware, from internal discussion and briefing, from the Project Artis report referred to in

paragraph 147C above, and from the information provided by Mr. Merville about the relationship between Mr. El Ghazzi and the Man Group, as set out in paragraph 147F above that: (a) there was a high risk that Mr. El Ghazzi was involved in paying secret commissions in relation to PIFSS' investments in the Man Group's products; and (b) Mr. Al Rajaan may have been the recipient of those secret commissions. That awareness is referred to below as a "suspicion that Mr. El Ghazzi was corrupt".

157.n.d.iii.    In the premises set out in paragraphs 147A-P above, it is to be inferred that:

1.    Compliance was directed by Mr. Clarke, Mr. Ross and Mr. Moeller by 2 March 2012 (which direction continued at all material times thereafter) not to conduct an open-minded investigation with a view to ascertaining the truth but to produce a report which could be seen to satisfy recognised due diligence requirements, and which would enable the relationship between the Man Group and Mr. El Ghazzi to continue, so as to avoid undermining the Man Group's business with PIFSS.

2.    Pursuant to that direction Compliance was not to make enquiries of Mr. El Ghazzi or PIFSS, and other than obtaining such records as were available on Man Group systems, was to leave the Man Group's Sales team (materially Mr. Moeller and Mr. Merville) to determine what material should be provided to Compliance and to senior management, notwithstanding: (i) that if there had been bribery those individuals were prime targets for investigation (at least Mr. Merville received a portion of the internal commissions paid by the Man Group in respect of investments placed by PIFSS); and (ii) the obviousness in any event of asking PIFSS' Investment Committee / management about Mr. El

Ghazzi if the Man Group's senior management genuinely wished to dispel the above suspicion.

3.     It is to be inferred that Mr. Clarke, Mr. Moeller and Mr. Ross (individually and collectively) deliberately decided not to obtain full records in relation to Mr. El Ghazzi or to ask PIFSS' Investment Committee / management about Mr. El Ghazzi in order to avoid finding out the obvious answer, which was that PIFSS' Investment Committee / management (other than Mr. Al Rajaan) was unaware of Mr. El Ghazzi's receipt of commissions in relation to PIFSS' investments with the Man Group.

4.     That information would if provided (and as Compliance and Messrs. Clarke, Moller and Ross must have been collectively and/or individually aware) have put beyond doubt Mr. El Ghazzi's and Mr. Al Rajaan's corruption.

5.     Accordingly, from 2 March 2012, it is alleged that Mr. Clarke, Mr. Moeller and Mr. Ross knew, individually and collectively (through blind-eye knowledge or wilful blindness for the purposes of Swiss law as pleaded in paragraphs 73I. and Q. above) that Mr. El Ghazzi was paying bribes to Mr. Al Rajaan.

6.     Notwithstanding the knowledge of each of those individuals, which collectively constituted the knowledge of the senior management team with authority to make decisions concerning the Man Group/El Ghazzi relationship from no later than 17 July 2012, the relationship between Mr. El Ghazzi and the Man Group was confirmed in the terms pleaded in paragraphs 147O and 147P above.

7.     Accordingly, notwithstanding the knowledge of each of Mr. Clarke, Mr. Moeller and Mr. Ross individually and collectively as the senior management team, (which knowledge is to be attributed and imputed to each of the

Man Defendants and which continued thereafter), the continued payment of commissions to Mr. El Ghazzi was authorised and/or otherwise permitted to continue, reflecting the intention of such individuals and senior management team that such payment should continue.

157.n.d.iv.  Further or alternatively, in the premises set out in paragraphs 147A to 147P above (and in particular from the absence of any further communications involving Compliance and the Man Group's senior management in relation to Mr. El Ghazzi between June 2012 and April 2013 and the fact that this coincided with their awareness of Mr. Al Rajaan's suspension) it is to be inferred that:

1.   If Mr. Clarke, Mr. Moeller and Mr. Ross did not have a suspicion that Mr. El Ghazzi was corrupt by 2 March 2012, they had such a suspicion, collectively and/or individually following receipt of information concerning the Ozak payment set out in paragraph 147L above and on receipt of the update from Alaco set out in paragraph 147M above received in early June reporting that Mr. Al Rajaan had been suspended on suspicion of corruption.

2.   Paragraph 157.n.d.iii is repeated, substituting "early June" for "2 March 2012" in sub-paragraph 5.

157.n.d.v.  Further or alternatively, in the premises set out in paragraphs 147A to 147V above:

1.   Following the departure of Mr. Clarke as CEO of the Man Group on or about 28 February 2013, a new senior management team convened in April 2013 (comprising at least Mr. Dackombe, Mr. Ellis and Mr. Rainsford) and, on being briefed as set out in paragraph 147S above, must have had a suspicion that Mr. El Ghazzi was corrupt, as evidenced by Mr. Dackombe's immediate reaction to the briefing that it raised legal

questions.

2.     Despite making enquiries (through Mr. Dackombe) with Mr. El Ghazzi directly, Mr. Dackombe, Mr. Ellis and Mr. Rainsford did not seek information from PIFSS' Investment Committee / management about its relationship with Mr. El Ghazzi.

3.     Until 1 June 2013 as set out in paragraph 147U above, it is to be inferred that they chose not to do so in order to avoid finding out that PIFSS' Investment Committee / management (other than Mr. Al Rajaan) was unaware of Mr. El Ghazzi's receipt of commissions in relation to PIFSS' investments with the Man Group. That information would, if provided, (and as they must have been aware) have put beyond doubt Mr. El Ghazzi's and Mr. Al Rajaan's corruption.

4.     Accordingly, from shortly after 23 April 2013 until early June 2013, it is alleged that Mr. Dackombe, Mr. Ellis and Mr. Rainsford knew (through blind-eye knowledge or wilful blindness for the purposes of Swiss law) that Mr. El Ghazzi was paying bribes to Mr. Al Rajaan.

5.     On 1 June 2013 (in the case of Mr. Dackombe) and shortly thereafter (in the case of Mr. Ellis and Mr. Rainsford), as set out in paragraph 147U above, they knew that PIFSS (other than Mr. Al Rajaan) was unaware of Mr. El Ghazzi and therefore knew that the Man Group had been involved in the corrupt payment of secret commissions to Mr. Al Rajaan via Mr. El Ghazzi.

6.     At all material times, they authorised and/or otherwise permitted the continued payment of commissions to Mr. El Ghazzi including by way of payment for the termination of the El Ghazzi Agreement, reflecting the intention of such senior management that such payment should continue.[6]

**Liability**

**Mr. Al Rajaan**

158. Mr. Al Rajaan is liable for civil wrongs under Article 227 of the Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches[6]:

   a. Breach of Articles[6] 11 and 12[6] of the Public Property Law; the manner in which he authorised or influenced PIFSS to enter into investments through Man Group entities, and intentionally committed it to rights and obligations in return for the payment of Secret Commissions in a manner that was detrimental to PIFSS' interests;

   b. Breach of Article 35 of the Penal Code amended by Law No. 31 of 1970: Mr. Al Rajaan knew his position as Director General of PIFSS and was acting in the course of his authorised duties in authorising or influencing PIFSS to enter into Man Group investments in return for which he secured the promise and payment of Secret Commissions;

   c. Breach of his Civil Service duties;

   d. Breach of Article 2 of the Money Laundering Law No.35 of 2002, and Article 2 of the Money Laundering Law No.106 of 2013[6].

158A. Alternatively, he is liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of breach of Article 158 SPC for criminal mismanagement of PIFSS's property; breach of Article 322 *septies* SPC for accepting bribes in return for acting as Director General of PIFSS in ways which were contrary to his duty and/or dependent on his discretion; and breach of Article 305 *bis* SPC for money laundering by causing bribes paid to him or for his benefit to be concealed.

159. Alternatively, he is liable under principles of English law for:

   a. breach of fiduciary duty (best interests, good faith, no conflict and no profit);

   b. bribery.

**Man Plc, MIL, ~~MIMEL,~~[6] MIAG and Mr. Massad**

160. Man Plc, MIL, ~~MIMEL,~~[6] MIAG and Mr. Massad are liable for civil wrongs under ~~both~~[6] Articles[6] 227, 228[6] and 229 of the Kuwaiti Civil Code arising out of the following breaches

85

and/or the conduct giving rise to the following breaches (in the case of the corporate entities on the basis pleaded at paragraph 72B above)[6]:

a.   Breach of Articles 35 and 39 of the Penal Code for their role in promising and paying Secret Commissions to Mr. Al Rajaan, knowing his position as Director-General of PIFSS, to induce him to authorise or influence PIFSS to make investments in which they had a commercial interest.

b.   Liability as a perpetrator, and aider and abettor within the meaning of Article 47-49(3)48 of the Penal Code in respect of their role in relation to Mr. Al Rajaan's breaches of Articles[6] 11 and 12[6] of the Public Property Law referred to above and breaches of Article 35 and 39 of the Penal Code in furtherance of their interest and the interest of others.

160A.   Alternatively, they are liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of:

a.   Instigating, jointly perpetrating or assisting (within Article 50(1) SCO) Mr Al Rajaan's criminal mismanagement of PIFSS's property contrary to Article 158 SPC;

b.   Bribing a foreign public official, namely Mr Al Rajaan, contrary to Article 322 *septies* SPC;

c.   Laundering (within Article 305 *bis* SPC) and/or thereby aiding and/or abetting (within Article 50(3) SCO) the payment of bribes to or for the benefit of Mr Al Rajaan in breach of Article 158 SPC and/or Article 322 *Septies* SPC.

d.   The matters pleaded in responses 2(4) and 3(6) of PIFSS' Response to the Man Defendants' Request for Further Information dated 26 March 2021 in support of its case pursuant to Article 102(2) of the SPC.[6]

161.   Alternatively, they are liable under principles of English law for:

a.   bribery

b.   dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty; and

c.   knowing receipt of trust property in respect of such unauthorised benefits as they may have received under the Man Group Scheme.

86

**Mr. El Ghazzi**

162. Mr. El Ghazzi is liable for civil wrongs under Articles 227, 228[6] and 229 of the Kuwaiti Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches[6]:

    a. His liability for promising and paying Secret Commissions ~~whether~~[6] as ~~principal or~~[6] intermediary in breach of Articles 35 and ~~or~~[6] 37 of the Penal Code ~~as an intermediary~~[6] in relation to the payment of bribes to Mr. Al Rajaan, knowing his position as Director General of PIFSS, to induce him to authorise or influence PIFSS to make investments in which he and Man Group companies had a commercial interest.

    b. His liability as perpetrator and aider and abettor within the meaning of Articles 47-48 of the Penal Code in respect of his role in relation to the payment of bribes by Man Plc and/or MIL and/or MIAG ~~and or MIMEL~~[6] to Mr. Al Rajaan in breach of Articles 35 and 39 of the Penal Code;

    c. His liability as a perpetrator and aider and abettor within the meaning of Articles 47-48 of the Penal Code in respect of his role in relation to the breach by Mr. Al Rajaan of Articles[6] 11 and 12[6] of the Public Property Law.

162A. Alternatively, he is liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of:

    a. Instigating, jointly perpetrating or assisting (within Article 50(1) SCO) Mr Al Rajaan's criminal mismanagement of PIFSS's property contrary to Article 158 SPC;

    b. Jointly perpetrating or assisting (within Article 50(1) SCO) the bribery of a foreign public official, namely Mr Al Rajaan contrary to Article 322 *septies* SPC;

    c. Laundering (within Article 305 *bis* SPC) and/or thereby aiding and/or abetting (within Article 50(3) SCO) the payment of bribes to or for the benefit of Mr Al Rajaan in breach of Article 158 SPC and/or Article 322 *Septies* SPC.

163. Alternatively, he is liable under principles of English law for bribery, knowing receipt and/or dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty.

87

**Mr. Nasrallah**

164.   Mr. Nasrallah is liable for civil wrongs under Articles <u>227, 228 and</u>[6] 229 of the Kuwaiti Civil Code arising out of <u>the following breaches and/or the conduct giving rise to the following breaches</u>[6]:

   a.   His liability as aider and abettor within the meaning of Articles 47-48 of the Penal Code in respect of his role in relation to the payment of bribes by Man Plc and/or MIL and/or MIAG ~~and or MIMEL~~[6] to Mr. Al Rajaan in breach of Articles 35 and 39 of the Penal Code in furtherance of his interest and the interest of others;

   b.   His liability as aider and abettor within the meaning of Articles 47-48 of the Penal Code in respect of his role in relation to the breach by Mr. Al Rajaan of Articles[6] 11 <u>and 12</u>[6] of the Public Property Law<u>;</u>

   c.   <u>His liability under Article 2 of the Money Laundering Law No.35 of 2002, and Article 2 of the Money Laundering Law No.106 of 2013</u>[6].

164A.   <u>Alternatively, he is liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of:</u>

   a.   <u>Jointly perpetrating or assisting (within Article 50(1) SCO) Mr Al Rajaan's criminal mismanagement of PIFSS's property contrary to Article 158 SPC;</u>

   b.   <u>Jointly perpetrating or assisting (within Article 50(1) SCO) the bribery of a foreign public official, namely Mr Al Rajaan contrary to Article 322 *septies* SPC;</u>

   c.   <u>Laundering (within Article 305 *bis* SPC) and/or thereby aiding and/or abetting (within Article 50(3) SCO) the payment of bribes to or for the benefit of Mr Al Rajaan in breach of Article 158 SPC and/or Article 322 *Septies* SPC.</u>

165.   Alternatively he is liable under principles of English law for knowing receipt and/or dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty.

**Secondary/Vicarious liability**

166.   If, contrary to PIFSS' case above, Man Plc, MIL, <u>and</u>[6] MIAG ~~and MIMEL~~[6] are not liable as principals for the torts and other civil wrongs alleged they are vicariously liable on the bases set out below:

88

**Man Plc**

a.  Through publicity, promotional material, prospectuses and offering memoranda through which its investment products were launched to the market, and upon which it was intended that prospective investors should rely, Man Plc held itself out as: the party introducing such products to market, a key party for the purposes of the investments, and as the principal of the marketing agents through whom its investment products were introduced to the market.

b.  It is accordingly liable under Article 240 of the Kuwaiti Civil Code, alternatively vicariously liable under principles of Swiss law, alternatively vicariously liable under principles of English law for the acts of Mr. Massad, Mr. Merville, Mr. Moeller[6] and Mr. El Ghazzi[6] and (in any event) for those of Mr. Dackombe and the other members of the Man Group's senior management team described in paragraph 157.n.d. above[6].

**MIL, MIMEL[6]**

c.  MIL and MIMEL areis[6] liable under Article 240 of the Kuwaiti Civil Code, alternatively vicariously liable under principles of Swiss law, alternatively vicariously liable under principles of English law for the acts of Mr. Massad, Mr. Merville, Mr. Moeller[6] and Mr. Dackombe and the other members of the Man Group's senior management team described in paragraph 157.n.d. above[6].

**MIAG**

d.  MIAG is liable under Article 240 of the Kuwaiti Civil Code, alternatively vicariously liable under principles of Swiss law, alternatively vicariously liable under principles of English Law for the acts of Mr. El Ghazzi Mr. Moeller, Mr Merville[6] and Mr. Massad, who it placed in a position to supervise Mr. El Ghazzi, and Mr Dackombe and the other members of the Man Group's senior management team described in paragraph 157.n.d. above[6].

**Generally**

167.  All transfers of the Secret Commissions are void in law as they were carried out for the purpose of concealing the Secret Commissions.

89

## G.   THE PICTET SCHEME

168.   Mr Al Rajaan came to have dealings with Pictet through his contacts and prior association with Mr. Amouzegar and/or Mr. Bertherat. He had known Mr. Amouzegar when the latter was working at Citibank.

169.   In 1998 Mr. Al Rajaan was a director of Albait S.A ("**Albait**"). Albait was an Islamic investments joint venture between Pictet and a Kuwaiti investment bank, The International Investor, with whom PIFSS had a commercial relationship. Mr. Amouzegar and Mr. Bertherat were also board directors of Albait.

170.   If, which is not admitted, there was a genuine commercial relationship between PIFSS and Albait, Albait was retained by PIFSS to manage particular investment portfolios which task it sub-contracted to Pictet.

171.   In the second quarter of 1998 PIFSS opened a deposit account with Pictet, account 99501, as a client of Albait.

Agreement to pay Secret Commissions

172.   In the commercial context above and pursuant to the scheme set out in section C above, on dates unknown prior to August 1998 it is to be inferred that Mr. Al Rajaan had discussions with Pictet, through Mr. Bertherat and Mr. Amouzegar, with a view to:

   a.   Securing Secret Commissions from Pictet in relation to investments and the provision of financial services which Mr. Al Rajaan would authorize or influence PIFSS to agree, and in respect of which the Pictet Group would have a commercial interest including by way of fees;

   b.   Putting in place an off-shore corporate structure for him personally and Mr. Nasrallah through Phoenix as intermediary, through which Secret Commissions could be paid and concealed.

173.   Further to the above discussions, in or about early August 1998, as evidenced by an internal Pictet memo of 11 August 1998, it was agreed by Mr Bertherat and Mr Al Rajaan that the latter would receive a commission of 0.125% (being one third) of the administrative fees payable to Albait and withheld by Pictet on PIFSS' account no 99501. The commission was to be "*payable to an account that will be named later and whose economic beneficiary will*

90

*be Mr Fahad Al Rajaan*" and thus was to be paid by way of Secret Commissions to or for the benefit of Mr Al Rajaan.

174.    On or about 1 September 1998, Pictet additionally assumed the role of custodian in respect of the PIFSS investments notionally managed by Albait as described above, for which it was paid a fee.

175.    It is to be inferred that a subsequent agreement was reached between Mr. Al Rajaan and Mr. Bertherat and Mr. Amouzegar on behalf of Pictet extending the categories of services on which Secret Commissions would be payable to encompass Global Custody, brokerage and net securities lending, in light of Mr. Al Rajaan's indication that if it did so, he would authorise or influence PIFSS to ~~open accounts with Pictet~~ make investments on which such fees were payable.

The Pictet Nasrallah Agreements and the Amouzegar Agreement

176.    Further to the above agreements, on 11 March 1999 Pictet, acting through Mr Bertherat and Mr Amouzegar entered into a purported 'business finder' agreement, by which Pictet purported to agree to pay the following commissions to Mr Nasrallah personally and/or through Phoenix:

   a.    25% of the fees withheld by Global Custody;

   b.    30% of brokerage fees;

   c.    25% of net securities lending;

   d.    0.125% of assets deposited in accounts held by Albait.

        ("**The Pictet Nasrallah Agreement**")

177.    Also on or around 11 March 1999 account no. 97519 was opened with Pictet in the name of Mr Nasrallah.

178.    In April 1999 PIFSS opened a further account (100~~0~~7700.001) authorised or influenced by Mr. Al Rajaan, which was the first of many accounts opened by PIFSS and entities holding assets whose ultimate beneficiary was PIFSS at Pictet on which Global Custody and brokerage fees were charged.

179.    It is, accordingly, to be inferred that:

91

a.      the Pictet Nasrallah Agreement was created as a front to give effect to (but by its terms to conceal) the agreements pleaded in paragraphs 172 to 175 and to regulate the payment of Secret Commissions in respect of further accounts and commissionable services which PIFSS, through Mr. Al Rajaan, would authorise.

b.      account no. 97519 was the account foreshadowed in the August 1998 memo whose "*economic beneficiary*" was Mr. Al Rajaan and that the Form A Money laundering declaration which identified Mr. Nasrallah as the beneficial owner of account 97519 was false and intended to conceal Mr. Al Rajaan's identity as the beneficiary of the Secret Commissions under the Pictet Nasrallah Agreement.

180.    Thereafter, and at all material times, members of the Pictet Group provided services to PIFSS in roles acted as investment manager, custodian and nominee, across a range of investments made by or for the ultimate benefit of PIFSS, some of which were held through accounts with Pictet administered in Switzerland and in Luxembourg through Pictet Europe. Mr Al Rajaan was at all material times the main contact for Pictet at PIFSS. He signed requests to open accounts for PIFSS and had individual signing authority without limit.

181.    Over time PIFSS and other entities holding assets whose ultimate beneficiary was PIFSS came to hold up to 96 accounts with the Pictet Group. As at June 2014 PIFSS and such entities had a total of almost US$20.1 16.7[7] billion of funds managed by the Pictet Group and/or invested in or via accounts held at Pictet and Pictet Europe.

182.    As pleaded below, as over time PIFSS expanded its commercial relationship with the Pictet Group into further types of accounts and/or investments the Pictet Nasrallah Agreements were amended (formally or by practice) to ensure that Secret Commissions were paid in respect of the further accounts and/or investments.

183.    Prior to 15 March 2001, the Pictet Nasrallah Agreement was varied so as to provide, additionally, for commissions at a rate of 25% on commissions derived from assets invested in Pictet Group-managed funds.

184.    That variation was agreed by Mr Bertherat and Mr Amouzegar on behalf of Pictet and Mr Al Rajaan in circumstances where, at the time, PIFSS had not invested in any such funds; but on Mr Al Rajaan's recommendation Pictet Group was about to assume management of a pre-existing fund whose ultimate beneficiary was held by PIFSS (the Mayur fFund) which

92

was at the time managed by a third party (Lazard).

185.    It is to be inferred from the following further facts and matters that Mr. Al Rajaan procured the change of manager to the Pictet Group with the agreement of Mr. Bertherat in order to provide a source of investment management fees from which further Secret Commissions could be paid, and that the variation to the Pictet Nasrallah Agreement was made as part of that plan:

   a.    Mr. Al Rajaan introduced the individual who had been managing the fund at Lazard - Ms. Mahurkur - to Mr. Bertherat in late 2000 and Pictet Asset Management Limited employed her from 1 April 2001;

   b.    At the time PIFSS wholly owned Mayur Fund Limited which held the Mayur fFund in question;

   c.    The fact that at all material times Mr Al Rajaan almost exclusively represented PIFSS in its dealings regarding the Mayur Fund; and

   d.    The fact that commissions of c. US$9.5 10.8 million referable to the Mayur Fund and its successor investments were then paid by Pictet to Mr Nasrallah and Mr Amouzegar between 2001-2015 representing the single largest source of Secret Commissions paid to Mr. Al Rajaan by Pictet.

186.    In around early 2005 Mr Al Rajaan, acting as individual signatory on behalf of PIFSS, signed a resolution permitting the payment of performance fees to the manager of the Mayur Fund notwithstanding that no such fee was contractually payable. Such a resolution was signed, contrary to the interests of PIFSS, in order to provide a further source of Secret Commissions.

187.    In February 2006, Pictet, acting through Mr Bertherat and Mr Amouzegar, confirmed with Mr Al Rajaan that commissions would be payable at 40% of the performance fees of the Mayur Fund, despite there being no provision for commissions on performance fees in the Pictet Nasrallah Agreement. It is to be inferred from the above that the introduction of performance fees was procured by Mr. Al Rajaan in order to provide a further source of investment management fees from which further Secret Commissions could be paid.

188.    Other variations to the Pictet Nasrallah Agreement were agreed in or around December 2000, March 2003, January or July 2009 and May 2010 including the introduction of commissions

93

referable to new categories of fees or services, increases in the rates payable, and the addition of funds on which Secret Commissions would be earned.

189.    From 2000 PIFSS had assets on deposit with Pictet Europe, and Secret Commissions were paid to Mr Nasrallah personally and/or through Phoenix by Pictet Europe referable to the latter's fees notwithstanding that there was no 'business finder' agreement between Pictet Europe and Mr Nasrallah and/or Phoenix which covered such fees.

190.    By a contract (or inter-related contracts) dated 2 May 2011 the Pictet Nasrallah Agreement was superseded by a further purported 'business facilitator' agreement which purported to provide for commissions to be paid to Mr Nasrallah and/or Phoenix at the rate of 25% of global custody administration fees net of custody fees and 30% of brokerage fees and commissions.

191.    In addition to the arrangement with Mr Nasrallah through Phoenix, a separate 'business finder' agreement was entered into between Pictet and Mr Amouzegar on 21 October 2003 pursuant to which Mr Amouzegar was purportedly entitled to commissions of 30% of the fees earned by Pictet in respect of any investments or business of PIFSS (excluding Global Custody) generated after 31 October 2003 ("**the Amouzegar Agreement**"). By a subsequent agreement dated 7 April 2006, the commission rate payable under that agreement was reduced to 5% but the commissions were extended to fees paid on all PIFSS' accounts whatever the date on which they were opened.

Knowledge that the Agreements are a "front"

192.    In fact, as regards the Pictet Nasrallah Agreement each of Mr. Al Rajaan, Mr. Nasrallah, Mr Bertherat and Mr. Amouzegar at all material times knew that:

a.      neither Mr Nasrallah nor Phoenix performed any or any valuable services under any of the purported Pictet Nasrallah Agreements;

b.      it was never intended that those purported agreements would create any legal rights, alternatively, it was never intended that the commissions (or all of them) payable under those agreements would be paid to Mr Nasrallah and/or Phoenix for services supplied by either of them to Pictet;

c.      the agreements were used, as was always intended, as a front for the payment of Secret Commissions to Mr Al Rajaan.

94

193. As regards the Amouzegar Agreement, and pending disclosure, it is to be inferred that the commissions payable to Mr. Amouzegar in respect of fees on PIFSS' business under that agreement represented Mr. Amouzegar's share of the corrupt Secret Commission arrangements which he put in place together with Mr. Al Rajaan and Mr. Nasrallah, and which were agreed with Mr. Bertherat on behalf of Pictet, pursuant to the "gentleman's agreement" referred to in paragraph 214.c.d.b below.

194. Between 1999 and 2015, pursuant to the above arrangements, the total sum of approximately US$26.7 million was paid by way of Secret Commissions in respect of financial services provided by the Pictet Group in respect of assets whose ultimate beneficiary was to PIFSS, and which services were procured or authorised by Mr. Al Rajaan or with his influence. Tables summarising the investments and the commissions generated in respect of them are appended as Appendix 3.

195. Of the known commissions paid under the Pictet Scheme, US$22.8million was paid to Mr. Nasrallah personally or through Phoenix and US$3.9 million was paid to Mr. Amouzegar, as particularised in Appendices 3.4 and 3.5 respectively, where Mr. Nasrallah / Phoenix is referred to as "*Business Finder A*" and Mr. Amouzegar is referred to as "*Business Finder B*", in each case because this reflects the descriptions provided on behalf of Pictet when providing to PIFSS the documents on which the Appendices are based[6].

196. Insofar as any part of the Secret Commissions paid pursuant to the Pictet Nasrallah Agreement and the Amouzegar Agreement were retained by Mr Nasrallah (whether personally or through Phoenix) and/or Mr Amouzegar, it is PIFSS' case that they were retained by them with the agreement and authority of Mr Al Rajaan and are to be treated as corrupt Secret Commissions.

Banking Arrangements

197. In connection with the above arrangements and the operation of the general scheme pleaded in section C above, Mr. Al Rajaan and Mr. Nasrallah instructed Pictet and/or other Pictet entities, at least initially through (it is to be inferred) Mr. Bertherat and Mr. Amouzegar, to set up offshore companies and to open bank accounts to facilitate the transfer of Secret Commissions and their proceeds. The following companies (save for Phoenix) and accounts were accordingly established in addition to account no. 97519. The companies (save for Phoenix) were established and administered through the Rhone Trust, which formed part of

95

the Pictet Group:

a.      Chulani Investments (Nassau) no. 188076 (Mr Al Rajaan) "**Chulani**"

b.      Dryden Worldwide (Singapore) no. 888037 (Mr. Al Rajaan) "**Dryden**"

c.      ~~Northwest~~ Northshore Properties (Singapore) no. 889812 (Mr. Al Rajaan)

d.      Evelyn Assets (Nassau) no. 189194 (Ms A Wazzan) "**Evelyn**"

e.      Glenin Limited (Nassau) no. 190684 (Ms Al Wazzan) "**Glenin**"

f.      SCI Quo Vadis (Geneva) 108738 (Ms Al Wazzan)

g.      Newcrest (Geneva) 107437 (Ms. Al Wazzan)

h.      Personal accounts in the name of Ms. Al Wazzan (Geneva) 105953, 103632, 108738

i.      Personal accounts in the name of Mr. Nasrallah 11358 (Geneva), 190882 (Nassau)

j.      Phoenix (Luxembourg) 40061

k.      Bordertown Trader Ltd (Nassau) 190890 "**Bordertown**"

l.      Further account (name unknown) no. 101259.

198.    By reason of the creation of these companies and accounts and the business conducted through them including the receipt and transmission of Secret Commissions the Pictet Group established and/or maintained valuable commercial relationships with Mr. Al Rajaan which included the provision of loan facilities (for example a 1 month loan of EUR 600k to the Chulani account in 2008), and the provision of advice and brokering services for investments made by Mr. Al Rajaan via Pictet Group accounts in securities and gold options.

199.    At all material times, Mr Bertherat and Mr Amouzegar were responsible for and had continuous oversight of Pictet's relationship with Mr. Al Rajaan, Ms Al Wazzan, Mr Nasrallah and PIFSS and the bank accounts which they held with the various Pictet entities (including Pictet Asia and Pictet Bahamas and Pictet Europe). In the case of Mr Amouzegar, he remained involved in that relationship even after his departure from Pictet in 2003.

200.    Further, the accounts held with Pictet Bahamas and Pictet Asia and Pictet Europe for Mr Al Rajaan, Ms Al Wazzan and Mr Nasrallah were managed centrally and by the same personnel in Geneva until at least May 2012, when their management and administration was transferred to be dealt with locally. Mr Bertherat and Mr Amouzegar had knowledge and

96

overall supervision of all of the Al Rajaan and Nasrallah accounts, including on behalf of Pictet Bahamas and Pictet Asia and Pictet Europe.

201.    The accounts were used for various purposes including the purchase of property, assets / jewellery; the making by Mr. Al Rajaan of investments in securities and gold options; and the payment of luxury expenses including those connected ~~the~~ with the purchase and maintenance of a yacht and private jet fees (via dedicated accounts known within Pictet respectively as "the boat account" and "the plane account").

Concealment of Al Rajaan identity and of the Secret Commissions

Nasrallah and Phoenix as Mr. Al Rajaan's nominee

202.    It is to be inferred from the nature of the Secret Commission arrangements above, the fact that Mr. Al Rajaan corresponded directly with Pictet concerning commissions allegedly due under the Pictet Nasrallah Agreement and the conduct by Mr. Al Rajaan and Pictet of the purported banking relationship between Mr. Nasrallah, his companies and Pictet set out in paragraph 203 below that:

a.    Mr. Nasrallah and his companies were at all times acting as Mr. Al Rajaan's nominee;

b.    Account no. 97519 into which substantially all of the commissions paid under the Pictet Nasrallah Agreement and other accounts held in the name of Mr. Nasrallah and his companies were held beneficially for Mr. Al Rajaan;

c.    Pictet regarded Mr. Al Rajaan as the principal of the accounts held by Mr. Nasrallah and his companies.

203.    Mr Al Rajaan was treated by Pictet as a principal on Mr Nasrallah's bank accounts held with Pictet entities, in that it permitted Mr Al Rajaan to control (and thus treat as his own) the funds in Mr Nasrallah's (and his purported companies') accounts including by:

a.    reporting to Mr Al Rajaan on assets held in accounts 97519, 190882 and 190890;

b.    accepting instructions from Mr Al Rajaan on those accounts including instructions to make substantial transfers out to companies and accounts beneficially held for him or Ms Al Wazzan (as his nominee) or for his personal purposes including (as set out in more detail in Appendices 3.2B, 3.2C and 3.6)[6]:

97

a. CHF 37 million (US$34.7 34.4 million) paid through multiple transfers from 2006 to 2012 to the account of Lipuno Foundation at VP Bank;

b. the payments of CHF 3.8 million (US$3.2 million) and EUR 1 million (US$1.3 million) to Hogara Investments Limited BVI at Mirabaud in 2004 and 2005 which company was established to purchase a villa in Thailand as pleaded at paragraph 107.b above;

c. the payment of GBP £1.7m (US$2.6m) in 2008 from the Bordertown account to the Glenin account, which was then used to make part payment for a luxury yacht purchased from Sunseeker London Limited;

d. the payment of CHF 3.2m (US$3.2m) paid to IHAGBUI[6] in 2010 for jewellery;

e. CHF 11.9m (US$11.5m 10.611.3[6] million) paid through multiple transfers from 2005 to 2011 to the account of J&D Investments in respect of the construction of villas in Dubai.

f. US$2.2 million paid in 2011 and 2012 to Boghossian for jewellery[6].

c. issuing Mr. Al Rajaan with debit and/or credit cards in respect of certain of those accounts.

Further concealment

204. Pictet (acting through Mr Bertherat and Mr Amouzegar and/or others subordinate to them including Mr. Michael William, Mr. Yves Bruggisser and Mr. Gilles Paupe) further concealed the payment of Secret Commissions under the Pictet Scheme from PIFSS by:

a. using the pseudonym "*JR*" to conceal Mr Al Rajaan's identity;

b. ensuring that bank statements in relation to Mr Al Rajaan's personal affairs were not taken to him in Kuwait and that Mr Nasrallah's name was not mentioned on the phone;

c. in or about 2003, reducing the fees payable under the Pictet Nasrallah Agreement in respect of a particular PIFSS investment in a Dual Currency Deposits/Turbo Cash

98

Fund so as to conceal the existence of Secret Commissions (and the identity of "*JR*") from PIFSS and its auditors;

d.    upon Mr Al Rajaan's disclosure to Mr Bertherat on or around 7 May 2012 that he was the subject of criminal investigation in relation to activities concerning accounts held with Mirabaud:

   a.    procuring the immediate termination of the Pictet Nasrallah Agreement (notwithstanding that it had not run its full contractual term), backdated to the end of 2011, with commissions already paid in 2012 being reversed and debited to Mr. Nasrallah's account with Pictet Bahamas;

   b.    procuring the immediate closure of the accounts 190882 and 190890 purportedly owned by Mr Nasrallah at Pictet Bahamas (account 97519 having already been closed in 2011) and liquidation of the company Bordertown Trader;

   c.    procuring the immediate distancing of Mr Al Rajaan from Pictet's operations in Switzerland (with the intention of reducing the risk that the criminal investigation would extend to Mr Al Rajaan's activities at Pictet) by:

      a.    procuring or facilitating the immediate termination of all accounts held for Mr. Al Rajaan and/or Ms Al Wazzan at Pictet;

      b.    procuring or facilitating that the accounts held for Mr. Al Rajaan and/or Ms Al Wazzan at Pictet Bahamas or Pictet Asia, but which had always been under day-to-day management by Mr Bertherat, Mr Amouzegar and/or others subordinate to them at Pictet in Switzerland, would thereafter be managed by personnel located locally at Pictet Bahamas or Pictet Asia, and also that responsibility for the administration of the companies owned by Mr. Al Rajaan and/or Ms Al Wazzan would transfer from Rhone Trust's operation in Switzerland to its operations in the Bahamas or Singapore;

e.    procuring or facilitating the transfer of substantial sums out of the accounts held for Mr. Al Rajaan and/or Ms Al Wazzan and/or Mr Nasrallah including after Mr Bertherat had become aware of the criminal investigation into Mr Al Rajaan. For

example:

   a.     On 29 May 2012:

      a.    €34million (US$42.3m) was paid from the Chulani account to an account of Fyne Properties at Deltec Bank and Trust in Nassau;

      b.    €3.7million (US$4.7m) was paid from the 190882 account to an account of Mr Nasrallah and Nadeem Nasrallah at Bank Audi Saradar in Lebanon (as set out in Appendix 3.2C)⁶;

   b.     On 29 June 2012, US$22.0 million was paid from the Dryden account to Whipple Holdings at the Bank of Singapore;

   c.     On 27 May 2014, US$27 million was paid from the Chulani account to an account of Mr Al Rajaan at Citibank purportedly for the purchase of real estate in the USA. It is to be inferred based on the co-incidence of timing and the quantum of the payment that this transfer was enacted immediately after Mr Al Rajaan had been tipped off by Mr Bertherat and/or others subordinate to him that the preceding day the Swiss criminal authorities had written to Pictet asking for the first time whether Mr Nasrallah and/or Phoenix had received commissions relating to PIFSS.

It is to be inferred that the true purpose of the payments was (and was known by Mr Bertherat and/or others subordinate to him to be) to dissipate corrupt funds. The payment in 2014 was facilitated by Pictet notwithstanding that by this date the internal legal and audit functions were aware of the ties between Mr Al Rajaan and Mr Nasrallah.

   f.     in or about May 2012 when Pictet Bahamas wished to file a "STR" following one of the transfers pleaded in paragraph 204 e.a. above but did not do so in light of a communication from Mr. Bertherat which, it is to be inferred, sought to reassure (wrongly and falsely) that no report was necessary;

   g.     in or around August 2012, actively seeking (through Mr Bertherat) to reassure Pictet Bahamas's legal/compliance function that the situation concerning Pictet Group's relationship with Mr Al Rajaan was in order and that there was no need to file a report to the authorities. In fact, and by reason of the Secret Commissions and the further

assistance pleaded in paragraph 205 to 207 below, Mr Bertherat knew that the situation was not in order and that a report should be filed;

h.   in or around October 2012 providing an incomplete and misleading response to the Swiss criminal authorities enquiries regarding Mr Al Rajaan by:

    a.   Failing to disclose details of the accounts beneficially owned by Mr Al Rajaan and Ms Al Wazzan at Pictet Bahamas and Pictet Asia;

    b.   Failing to disclose the existence of any business introducer contract regarding the PIFSS relationship;

    c.   Failing to disclose existence of the Phoenix Nasrallah Agreement or the Amouzegar Agreement or the matters pleaded at paragraphs 172 to 175 and 192 to 196 above;

i.   in or around May 2014, in response to further enquiries by the Swiss criminal authorities regarding possible links between Mr Al Rajaan and Mr Nasrallah, again failing to disclose the matters referred to at paragraphs 172 to 179 and 192 to 195 above, and only reporting the matters once it became apparent to Pictet that the Swiss criminal authorities had identified the link independently;

j.   (notwithstanding paragraph 51.e of the Reply)⁶ between 2014 and 2017, failing to disclose to PIFSS the payment of Secret Commissions to Mr Al Rajaan, including in the normal course of the ongoing business relationship with PIFSS and in response to correspondence written by or on behalf of PIFSS in 2015, 2016 and 2017;

k.   attempting to redact documents within the Swiss criminal evidence file, so as to prevent PIFSS from reading or using their contents; such documents included a report provided by Pictet to the Swiss banking regulator in 2014 which detailed *inter alia* the matters pleaded in this section. Only when this attempt was rejected, was PIFSS able to access the documents, in 2017.

l.   The operation of other known schemes upon the similarity of the facts of which PIFSS will rely.

Assistance in relation to other unlawful schemes

205. As pleaded above and below, Pictet, Pictet Europe, Pictet Bahamas and Pictet Asia opened and operated bank accounts for Mr. Al Rajaan and Mr. Nasrallah. A net total of at least US$~~294.2~~ ~~308.6~~ ~~284.6~~[6] 285.8[7] million (ignoring inter-account transfers) was paid into these accounts. PIFSS' primary case is that all such payments were for the ultimate benefit of Mr. Al Rajaan, Mr. Nasrallah acting for him as nominee, the payments representing (if not all, then as to the vast majority) Secret Commissions or the traceable proceeds thereof. In the alternative, of the US$~~294.2~~ ~~308.6~~ ~~284.6~~[6] 285.8[7] million, US$~~217.7~~ ~~231.2~~ ~~209.6~~[6] 210.8[7] million was paid to accounts held in the name of or for Mr. Al Rajaan (including through accounts held in the name of or for Ms. Al Wazzan as his nominee). The payment of US$~~294.2~~ ~~308.6~~ ~~284.6~~[6] 285.8[7] million comprises the following:

a. US$22.8 million ~~(being 7.7~~ ~~7.4~~ 8.0[6]%)[7] represented known Secret Commissions paid by Pictet and Pictet Europe to Mr. Nasrallah personally and/or through Phoenix under the Pictet Scheme as pleaded herein;

b. US$~~173.4~~ ~~185.9~~ 164.2[6] million ~~(being~~ ~~58.9~~ ~~60.2~~ 57.7[6]%)[7] was paid via accounts at EFG, as to which:

   a. ~~US$54~~ ~~54.0~~ ~~million was accumulated within the Chulani account at Pictet Bahamas; it is to be inferred (by reason of the matters pleaded in section H(1)~~[6] ~~and in particular paragraph 243.a) that such payments were Secret Commissions or the traceable proceeds thereof paid under the Further Nasrallah Scheme.~~[6]

   a.1. ~~US$4.3 million was paid between 2003 and 2004 into the Evelyn account from an account at EFG in the name of Phoenix.~~[6]

   b. US$~~119.4~~ ~~127.5~~ 164.2[6] million was paid in the period ~~2005~~ 2000[6] to 2012 into accounts held beneficially for Mr. Al Rajaan from accounts at EFG in the names of Phoenix (US$~~95.7~~ ~~104.2~~ 139.9[6] million as set out in Appendices 4.2F-I and L[6]), Ozak (US$~~20.6~~ ~~20.3~~ 21.3[6] million as set out in Appendices 4.5J, K and N)[6] and Thaxton (US$~~3.1~~ 3.0 million). It is to be inferred (by reason of the matters pleaded in sections H and I) that such payments were Secret Commissions or the traceable proceeds thereof paid under the Further Nasrallah and/or UBP Schemes.

c.   US$44.3 45.346.5[7] million (being 15.1 14.7 15.9[6]%)[7] was paid in the period 2005 to 2012 into accounts held for Mr. Al Rajaan from Mr. Mombelli or by companies on his behalf. By reason of the matters pleaded in paragraphs section J(1) such payments were Secret Commissions or the traceable proceeds thereof, paid under the Mombelli Scheme.

d.   US$53.8 54.6 52.3[6] million (being 18.3 17.7 18.4[6]%)[7] was paid principally by companies associated with Zetland Corporate Services Limited into the account of Bordertown or by Wentworth Development Corp, Phillip Conway Thomas and[6] Calmer Overseas into account numbered 190882. The entities linked to Zetland, which are owned by or associated with Mr. Amouzegar, that are known to have made payments to Bordertown include Dalmeny Real Estate Inc; Hillows Management Real Estate Corp; Treadmore Corporation; Dalton Financial Group Ltd; Garibaldi Management Investments Ltd; and Monaro Properties Development.[6] It is to be inferred from the facts and matters set out in section H(1)[6] and in particular paragraphs[6] 247-248[6] that such payments were Secret Commissions or the traceable proceeds thereof paid under other schemes not pleaded herein[6]. Further, as to Phillip Conway Thomas see paragraph 248.fh[7]. below.[6] The best particulars PIFSS is currently able to give of the payments into Bordertown, into account 190882, the source of payments to such entities, and the PIFSS investments to which they relate is at Appendix 3.2, 3.2A and 3.3.[6]

206.   In addition, Pictet paid Secret Commissions of US$3.9 million to an account of Mr. Amouzegar at Pictet (as to which see paragraph 195 above)[6].

207.   Such sums were then paid away through accounts such as are stated in paragraph 197 above for the principal benefit of Mr. Al Rajaan.

Knowledge[5]

208.   Until May 2012, Pictet was liable for the management and administration of the Al Rajaan and Nasrallah accounts on behalf of Pictet Bahamas, Pictet Asia and Pictet Europe accounts, because authority to do so had been delegated to it, alternatively because, as a matter of fact, Pictet employees were conducting business on these accounts (transferring payments between accounts, paying invoices) at the direction of Mr. Al Rajaan.[5]

103

209. ~~Accordingly, Mr Bertherat at all material times up to May 2012 and Mr. Amouzegar (prior to 2003) were managing the relationship between Mr. Al Rajaan and his nominees (including Mr. Nasrallah) and their companies on behalf of the other Pictet Defendant entities, such that their knowledge is to be imputed to each of those entities (as principal) as well as to Pictet (as agent exercising delegated authority to manage the accounts).~~[5]

210. ~~Further, and by reason of the delegation of authority by Pictet Bahamas, Pictet Asia and Pictet Europe to Pictet, each of Pictet, Pictet Bahamas, Pictet Asia and Pictet Europe were directly alternatively vicariously liable for the conduct of Mr. Bertherat, Mr. Amouzegar and those acting under their supervision.~~[5]

211. ~~Accordingly, each of the Pictet entities, through at least~~[5] Mr. Bertherat and Mr. Amouzegar and those working under their supervision, knew that the sums transferred into the above accounts pursuant to the Pictet Scheme were Secret Commissions by reason of the facts and matters pleaded in connection with that scheme.

212. They also knew, by reason of the facts and matters set out in paragraphs 214 to 216 below, that some or all of the sums in paragraphs 205 b – d were Secret Commissions.

213. Accordingly, ~~the Pictet entities and each of them, through~~[5] at least Mr. Bertherat and Mr. Amouzegar and those working under their supervision, knew that the bank accounts which they had established and operated for Mr. Al Rajaan and Mr. Nasrallah:

    a.    were wholly (or at least substantially) funded by Secret Commissions or the traceable proceeds thereof;

    b.    were being used to assist and facilitate the payment of Secret Commissions.

**~~Particulars of Knowledge~~**[5]

214. ~~The Pictet entities, through a~~[5]<u>A</u>[5]t least Mr. Bertherat and Mr. Amouzegar and those acting under their supervision, knew that:

    a.    In respect of the payments from Phoenix's account at EFG Bank, the payments were from the same corporate party (i.e. Phoenix) as Pictet was, itself, using as a front for the payments of Secret Commissions as pleaded above;

    b.    In respect of the payments from Ozak's account at EFG Bank, the payments were from the same bank and followed a similar pattern to the Phoenix payments;

104

[THE PICTET SCHEME][6]

   c.     In respect of the payments into the Bordertown account:

       a.    the account opening documents recorded that the account was to be funded by business introducer commissions;

       b.    Pictet treated Mr Al Rajaan as the principal of that account notwithstanding that on paper it was beneficially owned by Mr Nasrallah, including by allowing Mr Al Rajaan to direct substantial transfers to an account in the name of Lipuno Foundation at VP Bank beneficially owned by Mr Al Rajaan;

       c.    Pictet (via Rhone Trust) established the company Bordertown Trader and administered it at all material times, and was aware that it had no business activity other than the operation of account 190890, and then facilitated its liquidation immediately following discovery of the criminal investigation into Mr Al Rajaan pursuant to Mr Nasrallah's instruction on or shortly after 8 May 2012;

       d.    in respect of Mr Amouzegar:

           a.    he was noted on the account opening forms as the introducer of the client Bordertown;

           b.    he (with Mr Al Rajaan and Mr Nasrallah) represented to VP Bank in 2010 that the Bordertown account was used as a vehicle to process commissions from PIFSS' investments which were then shared between the three men via the Lipuno Foundation account in accordance with a "gentleman's agreement";

   d.     The quantum of payments was such that there could be no legitimate explanation for them;

   e.     The true relationship between Pictet, Mr Al Rajaan, Mr Nasrallah and Mr Amouzegar was being concealed;

   f.     Regulatory scrutiny of the relationship between Mr. Al Rajaan and Pictet was being suppressed as pleaded above.

215.   In support of the inference that at least Mr. Bertherat and Mr. Amouzegar[5] all Pictet

Defendant entities[5] knew that the transfers in and out of accounts which they administered on behalf of Mr. Al Rajaan and his nominees were Secret Commissions or the traceable proceeds thereof PIFSS relies on their failure to take steps which they were required to take pursuant to the obligations set out at paragraphs 74 to 77 above, namely:

a.    Failure to undertake adequate enquiries as to the beneficial ownership of the companies and accounts which they were creating in light of the control exercised by Mr. Al Rajaan in practice over such companies and accounts;

b.    Failure to investigate the source of funds in respect of transfers into those accounts;

c.    Completion of transfers of funds worth up to CHF 10 million without any written signed instruction from the client;

d.    Failure to take any or any adequate steps consistent with treating Mr. Al Rajaan, Ms. Al Wazzan and Mr. Nasrallah (as a close associate of Mr. Al Rajaan) as PEPs;

e.    Accordingly, deliberately taking no or no adequate steps to investigate transactions which bore the hallmarks of corruption and money-laundering and from which their knowledge of the corrupt nature and the impropriety of the transfers is to be inferred.

216.    Accordingly, if and to the extent that they[5] Pictet Defendants entities[5] did not have actual knowledge that the transfers in and out of accounts held at Pictet, Pictet Europe, Pictet Asia and Pictet Bahamas were Secret Commissions or the traceable proceeds thereof (by reason of the discussions between Mr. Al Rajaan, Mr. Bertherat and Mr. Amouzegar at the outset of the Pictet Scheme) alternatively, it is to be inferred that they believed this to be the case and deliberately shut their eyes and took no steps to enquire. In fact, they deliberately took such active steps as were necessary to protect the transfers of Secret Commissions from regulatory oversight, and to ensure that the transfers were not the subject of due diligence, so as to conceal and facilitate the payment of Secret Commissions and to protect Mr. Al Rajaan and Mr. Nasrallah from criminal investigation.

217.    Accordingly, those parties implicated in the Pictet Scheme are liable to PIFSS as stated below.

106

### Liability

### Mr. Al Rajaan

218. Mr. Al Rajaan is liable for civil wrongs under Article 227 of the Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches[6]:

   a. Breach of Articles[6] 11 and 12[6] of the Public Property Law; the manner in which he authorised or influenced PIFSS to commit to contracts for financial services and to enter into financial investments through Pictet and its group entities, and intentionally committed it to rights and obligations in return for the payment of Secret Commissions in a manner that was detrimental to PIFSS' interests;

   b. Breach of Article 35 of the Penal Code amended by Law, No. 31 of 1970: Mr. Al Rajaan knew his position as Director General of PIFSS and was acting in the course of his authorised duties in authorising or influencing PIFSS to enter into the contracts for financial services and to make investments in return for which he secured the promise and payment of Secret Commissions;

   c. Breach of his Civil Service duties;

   d. Breach of Article 2 of the Money Laundering Law No.35 of 2002, and Article 2 of the Money Laundering Law No.106 of 2013[6].

218A. Alternatively, he is liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of breach of Article 158 SPC for criminal mismanagement of PIFSS's property; breach of Article 322 *septies* SPC for accepting bribes in return for acting as Director General of PIFSS in ways which were contrary to his duty and/or dependent on his discretion; and breach of Article 305 *bis* SPC for money laundering by causing bribes paid to him or for his benefit to be concealed.

219. Alternatively, he is liable under principles of English law for:

   a. breach of fiduciary duty (best interests, good faith, no conflict and no profit);

   b. bribery.

### ~~Pictet, Pictet Europe, Mr. Bertherat, Mr. Amouzegar,~~[5] Mr. Nasrallah

220. ~~Pictet, Pictet Europe, Mr. Bertherat, Mr. Amouzegar and~~[5] Mr. Nasrallah ~~are~~is[5] liable for civil wrongs under ~~both~~[6] Articles[6] 227, 228[6] and 229 of the Kuwaiti Civil Code arising out of the

107

following breaches and/or the conduct giving rise to the following breaches[6]:

a.  Breach of Articles 35 to 39 of the Penal Code for ~~their~~his[5] role in promising and paying Secret Commissions to Mr. Al Rajaan, knowing his position as Director General of PIFSS, to induce him to authorise or influence PIFSS to enter into contracts and to make investments in which the Pictet Group had a commercial interest;

b.  Liability as a perpetrator, and aider and abettor within the meaning of Articles 47-~~49(3)~~48 of the Penal Code in respect of ~~their~~his[5] role in relation to Mr. Al Rajaan's breach of Articles[6] 11 and 12[6] of the Public Property Law referred to above;

c.  Liability under Articles 47-~~49(3)~~48 of the Penal Code in respect of ~~their~~his[5] role in assisting breaches of Articles 35-39 of the Penal Code and Articles[6] 11 and 12 of the Public Property Law[6] in relation to other Schemes;

d.  His liability under Article 2 of the Money Laundering Law No.35 of 2002, and Article 2 of the Money Laundering Law No.106 of 2013[6].

220A.  Alternatively, Mr Nasrallah is liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of:

a.  Jointly perpetrating or assisting (within Article 50(1) SCO) Mr Al Rajaan's criminal mismanagement of PIFSS's property contrary to Article 158 SPC;

b.  Jointly perpetrating or assisting (within Article 50(1) SCO) the bribery of a foreign public official, namely Mr Al Rajaan contrary to Article 322 *septies* SPC;

c.  Laundering (within Article 305 *bis* SPC) and/or thereby aiding and/or abetting (within Article 50(3) SCO) the payment of bribes to or for the benefit of Mr Al Rajaan in breach of Article 158 SPC and/or Article 322 *Septies* SPC.

221.  Alternatively, ~~each of the Defendants listed at paragraph 220~~ ~~above~~ ~~they are~~Mr Nasrallah[5] is liable under principles of English law for:

a.  Bribery;

b.  Dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty;

108

     c.       Knowing receipt of trust property in respect of such unauthorised benefits as they may have received under the Pictet Scheme.

**~~Pictet Asia, Pictet Bahamas, Pictet Europe~~[5]**

222.   ~~Pictet Asia, Pictet Europe, Pictet Bahamas are liable for civil wrongs under Article 229 of the Kuwaiti Civil Code arising out of:~~

     a.      ~~Liability as a perpetrator and aider and abettor within the meaning of Articles 47-~~ ~~49(3)~~~~48~~ ~~of the Penal Code in respect of their role in relation to the payment of bribes by Pictet to Mr. Al Rajaan in breach of Articles 35 and 39 of the Penal Code in furtherance of their interest and the interest of others~~.

     b.      ~~Liability as a perpetrator and aider and abettor within the meaning of Articles 47-~~ ~~49(3)~~~~48~~ ~~of the Penal Code in respect of their role in relation to the breach by Mr. Al Rajaan of Article 11 of the Public Property Law.~~

     c.      ~~Liability under Articles 47-~~~~49(3)~~~~48~~ ~~of the Penal Code in respect of their role in assisting breaches of Articles 35-39 of the Penal Code and Article 11 in relation to other Schemes in furtherance of their interest and the interest of others.~~[5]

223.   ~~Alternatively they are liable under principles of English law for dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty.~~[5]

**~~Secondary/Vicarious liability~~[5]**

224.   ~~If, which is denied, Pictet is not liable as principal for the torts and other civil wrongs alleged, it is vicariously liable for the acts and omissions of Mr. Bertherat and Mr. Amouzegar pursuant to Article 240 of the Kuwaiti Civil Code, alternatively pursuant to principles of vicarious liability under English law.~~[5]

**Generally**

225.   All transfers of the Secret Commissions are void in law as they were carried out for the purpose of concealing the Secret Commissions.

## H(1).  FURTHER NASRALLAH SCHEME

226.    Between about 1995 and 2012 and (other than as explained below) separately from the Pictet Scheme, Man Scheme and the UBP Scheme, Mr. Al Rajaan procured the payment to Mr Nasrallah and his companies through accounts at EFG of approximately US$~~332.1~~ ~~323.4~~ ~~321.7~~[6] ~~320.8~~[6] 348.1[7] million of Secret Commissions in respect of investments which he authorised or influenced PIFSS to make with at least nineteen financial institutions (in addition to those pleaded in the Schemes set out above) (as set out in Appendices 4.2A, C, D and 4.5B-E, G- H[6] and Appendix 4.8[7])[6]. From May 1997, Mr Nasrallah's son Nadim also participated in the said "Further Nasrallah Scheme", principally via his company Phoenix International Brokerage ("**PIB**"). As set out in Appendices 4.7A, B and C, Secret Commissions with a value equivalent to US$53.3 million were procured by Mr Al Rajaan to be paid to Nadim Nasrallah and Mr Nasrallah and their companies in this way[7].

227.    In addition to these sums, further payments of US$~~42.8~~ 42.9 million, US$1.0 million and US$0.8 million were made into the same accounts representing part of the proceeds of the UBP Scheme, Man Scheme and Pictet Scheme respectively (as set out in Appendices 4.2B, 4.5A, F)[6].

228.    The total sum of no less than US$~~219.9~~ ~~232.4~~ 230.8[6] million was paid from the accounts of Mr Nasrallah's companies at EFG to Mr Al Rajaan (~~Appendix 4~~ Appendices 4.2E-L, 4.5I-N, and 4.6A-B[6]). A sum equivalent to at least US$14.7 million was paid from PIB to Mr Al Rajaan (as to which see Appendix 4.7D and paragraph 258F.a below) and a further sum, ultimately derived from PIB, equivalent to at least US$13.5 million was paid from an account originally in the name of Nadim Nasrallah (as to which see Appendix 4.7D and paragraph 258F.b below).[7]

229.    Mr Al Rajaan and Mr Nasrallah were common friends of Mr Guerin from at least the late 1980s. It is to be inferred that Mr Al Rajaan and Mr Nasrallah were in contact by no later than the early 1990s, at which time PIFSS had investments with Paribas for whom Mr Nasrallah worked at the time with responsibility for selling investment products in the Middle East. At some point prior to 1996, Mr Guerin met Nadim Nasrallah through Mr Nasrallah.[7]

230.    It is to be inferred that by no later than July 1995 (and likely earlier) Mr Al Rajaan and Mr Nasrallah reached an agreement whereby they would share commissions on investments made by PIFSS, and that pursuant to the above arrangements, Mr. Al Rajaan authorised or

110

influenced PIFSS to invest in funds which duly paid commissions to Mr Nasrallah. At some point prior to May 1997, it is to be inferred from the facts and matters set out in this Section H(1) that it was agreed between Mr Al Rajaan, Mr Nasrallah and Nadim Nasrallah that Nadim Nasrallah would also participate in the above arrangements. Thereafter, Mr Al Rajaan, Mr Nasrallah and Nadim Nasrallah operated the Further Nasrallah Scheme together, as set out below.[7]

231. Between 1995 and 2012 Mr. Nasrallah, his family and his companies came to hold at least fourteen accounts at EFG including those in the name of Nadim Nasrallah,[7] Phoenix, Ozak, Wynacre Limited ("**Wynacre**"), PIB[7] and Golgen Property SA ("**Golgen**") ("**Nasrallah EFG accounts**").

231A. Pursuant to the agreement alleged at paragraph 230 above, Mr Al Rajaan, Mr Nasrallah and Nadim Nasrallah participated together in the Further Nasrallah Scheme receiving a share (alternatively proceeds) of Secret Commissions. The participation of both Mr Nasrallah and Nadim Nasrallah pursuant to such agreement is to be inferred from:

    a. The similar timings of the commencement of their involvement in the Further Nasrallah Scheme (from around 1995 to 1997) as set out below;

    b. Their use of companies with the word "Phoenix" in the company name ("Brokerage" for Nadim Nasrallah, "Consultants" for Mr Nasrallah);

    c. The similar pattern of their involvement in the Further Nasrallah Scheme: in each case obtaining payments from funds which were paid into "Phoenix" accounts at EFG and then transferred to offshore accounts ultimately owned or controlled by Mr Al Rajaan;

    d. The fact that they are father and son;

    e. Their combined close relationship with Mr Guerin as demonstrated in part (without prejudice to the other facts and matters referred to herein) by the attendance of Mr Guerin at Nadim Nasrallah's wedding in or about October 1997;

    f. Phone conversations between Mr Guerin and Nadim Nasrallah and Mr Nasrallah in which their respective shares of the Secret Commissions generated within the Further Nasrallah Scheme are discussed;

111

g.      Mr Nasrallah's use on 12 October 2011 of a fax machine at Nadim Nasrallah's house to send false instructions that a particular transfer (described in more detail at paragraph 264.ea.d below) related to real estate; and

h.      The manner in which Mr Guerin, Nadim Nasrallah and Mr Nasrallah closely liaised from May 2012 in relation to the closure of the Nasrallah EFG Accounts following their joint discovery that a Swiss criminal investigation had been launched, as described in more detail from paragraph 266 below.[7]

232.    From ~~no later than 2000 (and, it is to be inferred, earlier, from~~[7] the respective dates of account opening in 1995 and 1997)[7] the Phoenix and Ozak and Wynacre and PIB[7] accounts operated as "gateway" accounts from which Secret Commissions were transferred to (i) other EFG accounts of Mr Nasrallah and his family; and (ii) external accounts held for Mr Al Rajaan and (from 2008) internal accounts of Mr Al Rajaan.

**Banking arrangements and fund flows**

Phoenix Consultants SARL

233.    In August 1994 Mr Nasrallah incorporated Phoenix.

234.    In July 1995 Mr Nasrallah opened two accounts at EFG:

a.      The Phoenix account (number 530115). From 1995 (and, it is to be inferred, at all material times thereafter) the stated purpose of the Phoenix account in internal EFG documents was to receive commissions on funds sold by Mr Nasrallah personally or through Phoenix in Kuwait;

b.      An account in Mr Nasrallah's own name (number 530109). The stated purpose of account 530109 was "*to receive various incomes from his company account 530115 [Phoenix] to pay his bills worldwide and to cover his other accounts in Bahamas, Singapore, Paris, Beirut, etc*".

235.    In 2004 Mr Nasrallah opened a further account in the name of Fondation Antheya (number 542523), being a Liechtenstein trust which EFG assisted him to create, to replace account 530109. The account opening documents recorded that Antheya was to receive 35% of the revenue of the Phoenix account.

236.    It is to be inferred from the above reference, further documentary references to a "35/65"

112

share and from the practice of the fund transfers that the usual arrangement between Mr Nasrallah and Mr Al Rajaan was that 35% of the Secret Commissions paid into Phoenix would promptly on receipt be paid into Mr Nasrallah's accounts (initially 530109 and latterly Antheya) with the balance of 65% being retained in the Phoenix account, from which, periodically, rounded bulk sums were paid to accounts held for Mr Al Rajaan which over time were consistent with a 65% share.

237.    ~~Pending disclosure PIFSS is unable to establish the first Secret Commissions paid via Mr. Nasrallah pursuant to this Scheme. As of the date of opening of the Phoenix account in July 1995 PIFSS already held 2 investments which it made in 1993 and 1994 with or through Paribas, for whom Mr. Nasrallah had worked and which subsequently paid commissions to Phoenix. Pending disclosure PIFSS' position is reserved as to whether Secret Commissions were paid prior to July 1995 by Paribas via other accounts of Mr. Nasrallah and/or (from its incorporation in August 1994) Phoenix.[6]~~

238.    ~~Pending disclosure it is to be inferred that~~ As part of the payments identified in paragraph 240 below,[6] in the period 1995 - 1999 at least the following investment managers paid commissions into the Phoenix account: ~~Access International Advisors,[6]~~ AXA, Axis, CPR / Credit Agricole, Everest, Jenni / Sarasin, Paribas / Parvest, Partech, Sigma /[6] Atlas and SISU. The facts and matters which give rise to this inference are that:

    a.    PIFSS made and held investments with each manager during that period;

    b.    Account opening and KYC documents which stated that Mr. Nasrallah / Phoenix had commission arrangements with most of these managers and that the funds paid into the account represented commissions on investments sold in Kuwait;

    c.    The known payments from those managers to Phoenix ~~PIFSS~~ from 2000 onwards as pleaded at paragraph 240 below; and

    d.    Admissions made by EFG in Appendix 1 to its Defence herein[6].

239.    ~~Based on an extrapolation of the incoming payments into Phoenix from 2000 onwards from the managers referred to in paragraph 238, admissions by EFG in Appendix 1 to its Defence (and pending a full reconciliation of those admissions with disclosed material, currently underway),[6] incoming payments into Phoenix between 1995 and 1999 from those managers are estimated to be c. US$32.5 million 34.2 million (see Appendix 4).[6]~~

113

240. Between ~~2000~~ 1995[6] and 2012 the Phoenix account received total incoming payments of US$ ~~273.6~~ ~~265.5~~ ~~296[6]~~ 295.5[7] million (as set out in Appendix 4.2A, 4.2B and 4.2C)[6]. Of these incoming payments:

 a. at least US$ ~~160.7m~~ ~~213.5m~~ ~~253.0 million[6]~~ 252.5 million[7] (being ~~58.7%~~ ~~80.4~~85.5[6]% of the total) were made by the managers listed in Appendix 4 and 4.1[6] with whom PIFSS had placed investments at the time and are, it is to be inferred, Secret Commissions (as set out in Appendix 4.2A)[6];

 b. US$42.9 million (being ~~15.7%~~ ~~16.2~~14.5[6]%) are attributable to the Secret Commissions paid via the UBP Scheme pleaded below (as set out in Appendix 4.2B)[6];

 c. ~~US$29.3~~ ~~5.2 million (being 10.7% 1.9%) are, it is to be inferred, Secret Commissions because they were subject to the usual 35/65% percentage split referred to above;[6]~~

 d. US$~~40.7~~ ~~3.9~~ 0.1[6] million (being ~~14.9%~~ ~~1.5~~0.03[6]%) were from Alternative Advisors Limited and MFEX Mutual Funds Exchange AB (as set out in Appendix 4.2C) ~~other named or unnamed sources, including, it is to be inferred, from the managers referred to in (a);~~.[6]

240A. Further, in July and August 2012 (and therefore after the events pleaded in paragraphs 266-271 below) the Antheya account (see paragraph 234 above) received payments totalling US$0.8 million from investment managers listed in Appendix 4.1 (as set out in Appendix 4.2D), which are in the circumstances inferred to be the continuation of the payment flows referred to in paragraph 240.a above.[6]

241. ~~Pending disclosure~~[6] PIFSS' primary case is that at least the sums referred to in 240 (a)-(b) and 240A ~~(c)~~[6] above in the total sum of US$~~232.8~~ ~~261.5~~ ~~296.7[6]~~ 296.2[7] million are Secret Commissions or the traceable proceeds thereof, of which the sums referred to in paragraphs 240[6] (a) and 240A ~~(c)~~[6] above total[6]ing US$ ~~190.0~~ ~~218.6~~ ~~253.8[6]~~ 253.3[7] million are not claimed under any of the other schemes pleaded herein. In all the circumstances, PIFSS infers that the remaining sums in 240(d) are also Secret Commissions or the traceable proceeds thereof.

[H(1).  FURTHER NASRALLAH SCHEME][6]

Payments from Phoenix to Mr Al Rajaan

242.    At least US$ ~~107.0~~ ~~115.5~~ 171.2[6] million was paid from the Phoenix account to accounts held for the benefit of Mr Al Rajaan from ~~2005~~ 1995[6]-2012 as follows:~~:~~[6]

   a.    Between 1995 and 2000, US$ 20.1 million was paid into an account of Kitaro Trust at Credit Suisse, which was an account established for Mr Al Rajaan (as set out in Appendix 4.2E).

   b.    Between 2000 and 2001, US$ 14.4 million was paid to Leonis Investments, a company linked to Pictet Bahamas and which (in between the arrangements pleaded at paragraphs 242.a. and 242.c.) acted as a conduit for payments to Mr Al Rajaan's accounts including at Pictet Bahamas (as set out in Appendix 4.2F). US$ 9.8 million was paid on directly by Leonis to Chulani and it is to be inferred that the other sums received by Leonis were ultimately paid to other accounts held for the benefit of Mr Al Rajaan.

   c.    Between 2001 and 2012 USD$ 108.8 million was paid directly to Chulani (as set out in Appendix 4.2H).

   d.    From 2003 through to 2012, in addition to the primary flow of funds to Chulani as pleaded above, funds were additionally paid as follows: (i) US$2.9 million to Evelyn Assets (as set out in Appendix 4.2G); (ii) US$2.5 million to Glenin (as set out in Appendix 4.2I); (iii) US$4.3 million to Suncoast (as set out in Appendix 4.2J); (iv) US$6.9 million to Thaxton (as set out in Appendix 4.2K); (v) US$11.3 million to Dryden (as set out in Appendix 4.2L).[6]

   e.    As set out in paragraph 252D below, some of the payments set out in paragraphs c. and d. above originated from payments by Wynacre to Phoenix and thus resulted from the Secret Commissions paid as a result of the arrangements set out in paragraphs 252A to C below.[7]

242A.  ~~At least US$12.0 million was paid from the Phoenix account to accounts held for the benefit of Mr Al Rajaan between February 2003 and May 2004: US$7.7 million into the Chulani account and US$4.3 million into the Evelyn account.~~[6]

243.    ~~Pending disclosure PIFSS is unable to particularise all~~ ~~other~~ ~~payments made to Mr Al Rajaan prior to 2005 but it is inferred that such payments were made pursuant to the usual 35/65% split pleaded above and included at least the following sums:~~

   a.    ~~US$54 million~~ ~~(including the US$7.7 million referred to in paragraph 242A above)~~ ~~based on the following facts and matters:~~

a.     Internal Pictet memos dated (i) 21 February 2001 2000 which stated that Mr Al Rajaan already had a "substantial" account at Pictet Bahamas (which was a reference to Chulani), and (ii) 20 December 2004 which stated that as of that date Mr Al Rajaan already had an account at Pictet Bahamas (assumed to be Chulani) with a stated balance of 54m (assumed to be US$);

b.     PIFSS infers that from 1999-2004 Secret Commissions were received by Mr Al Rajaan into the Chulani account pursuant to the scheme of payments made from Mr. Nasrallah through Phoenix to accounts held for Mr. Al Rajaan as pleaded at paragraph 205.b.b above, and that prior to December 2004 the total of those payments was no less than US$ 54 million. In particular:

   a.     Payments in the total sum of US$ 14.4 million were made in 2000-2001 to Leonis Investments, a company linked to Pictet Bahamas and which it is to be inferred acted as a conduit for payments to Mr Al Rajaan's accounts at Pictet Bahamas including Chulani;

   b.     Payments in the total sum of US$3.8million were made in 2002 to an account at Pictet Bahamas which it is be inferred was either Leonis Investments or Chulani;

   c.     Other substantial payments, each in excess of US$0.5million and in the total sum of US$19.6 9.2 million, which were made to unknown accounts between 2000 and 2004 and which it is to be inferred were to Mr Al Rajaan's accounts including Chulani;

   d.     From at least 2007 onwards, the Chulani account was funded almost exclusively by large transfers from Phoenix's account at EFG, giving rise to the reasonable inference that Phoenix was the source of funds prior to December 2004;.

   e.     The known payments of US$7.7 million referred to in paragraph 242A above.[6]

244.   Further sums of US$9.1 5.9 million were paid to Golgen, as to which see paragraphs 253 to 255 below.

116

Ozak Services Inc.

245.    In July 1997 Mr Nasrallah established Ozak with assistance from EFG and Citco; and opened an account at EFG in the name of Ozak (number 541596).

246.    From the outset (and it is to be inferred throughout) the stated purpose of the Ozak account in the account opening and KYC documents was to receive "new business introduction and broker fees" on funds sold by Mr Nasrallah / Ozak to "a single client (an institutional client from the Gulf)" which was a reference to PIFSS.

Payments to Nasrallah/Ozak

247.    Between 1998 and 2012 the Ozak account received total incoming payments of US$ US$~~69.1~~ ~~68.4~~ 68.7[6] million (as set out in Appendix 4.5A-H)[6].

248.    ~~Pending disclosure PIFSS is unable to identify the~~The[6] investments linked to the Ozak receipts ~~other than~~are[6] as pleaded below, including as appears in Appendix 4.4 and[6] in respect of Man Group, Gapstow Capital Partners and Banque SCS Alliance. Of the payments into Ozak:

    a.    As pleaded in paragraphs 37 and 151 above, in 1998 Ozak received a payment of US$1.0m (being ~~1.4%~~ 1.5% of the total) from the Man Group in respect of PIFSS' investments (as set out in Appendix 4.5A)[6];

    b.    Payments of US$~~23.0~~ ~~35.1~~ 35.3[6] million (being ~~33.4%~~ 51.4% of the total) (as set out in Appendix 4.2B)[6] were made by companies registered in Hong Kong which were identified in compliance statements as being entities through which Mr Nasrallah collected commissions, either by Mr Guerin (in respect of Wentworth, Garibaldi and Moccak) or by Pictet (in respect of Gold Coaster, which also made payments into the account of Bordertown at Pictet Bahamas). The entities linked to Zetland, which are owned by or associated with Mr. Amouzegar, that are known to have made payments to Ozak include Moccak Management Ltd; Wentworth Development Corp; Garibaldi Management Investments Ltd; Monaro Properties Development; Quyvern Investments Corp; and Zetland Financial Group Ltd. The best particulars PIFSS is currently able to give of the payments made by such entities into Ozak, the source of payments to such entities and the PIFSS investments to which they relate is at Appendix 4.4[6];

117

c.    Payments of US$0.6 0.8 0.3[6] million (being 0.9% 1.2%0.4%) (as set out in Appendix 4.2C[6]) were made by Caradoc Consulting Limited, a further Hong Kong company with a common address to those referred to in (a). It is to be inferred that these payments constitute Secret Commissions on PIFSS' investments with Gapstow Capital Partners which were shared between Mr Al Rajaan, Mr Nasrallah and Mr Amouzegar pursuant to the "gentleman's agreement" referred to at paragraph 214.c.d.b above. Such inference is based on the following facts and matters:

a.    A meeting in 2015 between Gapstow and Wafra (acting on behalf of PIFSS), at which Gapstow's founder Chris Acito identified an entity called "Caradoc" as having received compensation for its role in facilitating PIFSS' investments with Gapstow. When asked for further information regarding Caradoc, Gapstow cited a confidentiality agreement and refused to provide any additional information;

b.    Mr Acito is the brother in law of Mr Amouzegar;

c.    Gapstow was established in 2009 and until (at least) 2015 PIFSS was its sole client;

d.    Mr Al Rajaan procured or influenced PIFSS to invest in 6 funds managed by Gapstow between 2009 and 2013, with a total capital commitment of US$900.0 million.

d.    Payments of US$1.0 4.4 million (being 1.5% 6.4%) (as set out in Appendix 4.5D[6]) were made by other Hong Kong companies with common address to those referred to in (a) and (b) and which are therefore inferred to be[6] other entities through which Mr Nasrallah received commissions (in respect of the PIFSS investments identified in Appendix 4.4)[6];

e.    Payments of US$ 1.1 million (being 1.5%) (as set out in Appendix 4.5E)[6] were made by Banque SCS Alliance, with whom PIFSS held investments during the period that the above payments were made;

f.    Payment of US$ 0.8 million (being 1.2%) (as set out in Appendix 4.2F)[6] was paid from account 97519 at Pictet and are the proceeds of Secret Commissions paid via

the Pictet Scheme pleaded above;

g.      Payments of US$ ~~5.9~~ 18.1 million (being ~~8.5%~~ ~~26.5%~~26.4%) (as set out in Appendix 4.5G6) were made by Abraaj Investment Management Limited ("**Abraaj**"). Abraaj was, at the material time, an investment manager based in Dubai with whom PIFSS had made investments of approximately US$280 million by 2008/09 and had advanced substantial loans (see Appendix 4.4)6.

h.      Payments of US$~~35.6~~ ~~7.1~~7.76 million (being ~~51.6%~~ ~~10.3~~11.26%) (as set out in Appendix 4.2H)6 were from other named or unnamed sources of which: (i) USD$4.3m was received from Phillip Conway Thomas, and at least one of these payments was identified by Mr Guerin in internal compliance documents as being commission payments on management fees, and, accordingly it is to be inferred that all such payments were; (ii) USD$ 0.05m was received from Paribas which is identified as a source of secret commissions in Appendix 4.1 and 4.2; and (iii) US $3.4 million from other sources6, at least some of which, it is to be inferred, are as-yet unidentified payments from the above sources or secret commissions from other sources6.

249.   ~~Pending disclosure~~6 PIFSS' primary case is that ~~at least~~ all6 the sums ~~in the total of US$27.6 43.2  million~~6 referred to in (a)-~~(h)(f)~~6 above are Secret Commissions or the traceable proceeds thereof, of which the sums referred to in (b)-(e) and (g)-(h)6 above in the total sum of US$ ~~25.8~~ ~~41.4~~ 66.96 million are not claimed under any of the other schemes pleaded herein (save to the extent that they fall within the claims made pursuant to the Aerium Scheme at Section J(3) below)6. ~~In all the circumstances, it is to be inferred that the remaining sums in (g) and (h) are also Secret Commissions or the traceable proceeds thereof.~~6 PIFSS relies in particular on the account opening documents pleaded at paragraph 246 above and the similarity of fact with other schemes.

Payments from Ozak to Mr. Al Rajaan

250.   At least US$ ~~28.5~~ ~~28.2~~ 32.06 million was paid from the Ozak account to the accounts held for Mr Al Rajaan from ~~2005~~19986-2012:

a.      US$ 0.9 million to Thaxton (EFG) (see Appendix 4.5M)6;

b.      US$ 0.7~~m~~ million to Chulani (Pictet Bahamas) (see Appendix 4.5J)6;

119

c.     US$ 19.9 19.6 million to Dryden (Pictet Asia) (see Appendix 4.5K)[6];

d.     US$ 7.0 million to Suncoast (UBP SA) (see Appendix 4.5L)[6].

e.     US$ 1.0 million to Evelyn Assets (see Appendix 4.5N).[6]

f.     USD$ 2.9 million to Overton (see Appendix 4.5I).[6]

251.   Pending disclosure PIFSS is unable to particularise payments made to Mr Al Rajaan prior to 2005 other than payments in the total sum of US$ 2.8 2.9 million made to the Overton account at Mirabaud in 1998 and 2000.[6]

252.   Further sums of US$ 10.7 million were paid to Golgen, as to which see paragraphs 253 to 255 below.

Wynacre Limited[7]

252A.  Wynacre was incorporated in the British Virgin Islands on 11 July 1997. In January 1998, account 971022 was opened at Banque Edouard Constant in Wynacre's name; this account changed its number to 542257 following the merger with EFG (the "**Wynacre Account**"). On 19 January 1998, Mr Nasrallah was designated by Wynacre's board of directors to be the sole signatory on the Wynacre Account. Mr Nasrallah was recorded by EFG as the beneficial owner. It is accordingly to be inferred that Mr Nasrallah was Wynacre's sole beneficial owner at all material times.[7]

252B.  Between May 1998 and April 2007, PIFSS invested approximately US$ 290 million in 5 funds within the SISU group, namely SISU Capital Fund Limited, SISU Capital Fund – Euro, Arvo Fund Limited, SISU Capital Private Equity Fund and Arvo Fund II Limited. Each of these funds made payments of commissions to Phoenix as set out in paragraphs 238 and 240 above and Appendices 4.1 and 4.2.[7]

252C.  The Wynacre Account received further payments from the fund management group SISU. Between 1999 and 2008, funds in the SISU group made payments in various currencies equivalent to US$ 27.8 million into the Wynacre Account, as set out in detail in Appendix 4.8A (including one payment that was made by mistake to Phoenix and then forwarded to the Wynacre Account, as set out as entry 4.8.21 and footnote 7 in Appendix 4.8A). It is to be inferred that those further payments were sums paid in relation to some or all of the SISU

120

funds listed at paragraph 252B as a result of PIFSS' investments in those funds and were thus Secret Commissions. The facts and matters giving rise to this inference are:

a.  The facts and matters set out in paragraphs 238 and 252B above and the header of this paragraph;

b.  The Client Information Profile for Wynacre records that the purpose of the Wynacre account was (in part) to received payments from SISU;

c.  A letter from SISU to Sara Beltrametti of EFG in which it recorded that management fees were to be paid to Phoenix and performance fees were to be paid to Wynacre;

d.  The onward payment to Mr Al Rajaan of approximately 60% of the sums received by Wynacre from SISU as set out in paragraph 252D below; and

e.  The payment by Wynacre to SISU of the sum of £602,701 in four tranches between 1998 and 1999, which was in return for 615,000 preference shares in SISU Capital Limited, which held a 25% ownership stake in SISU Capital Limited Partnership ("**SCLP**") and 20% ownership stake in SISU Capital Limited Partnership II ("**SCLP II**"). SCLP and SCLP II received compensation by way of management and performance fees for 4 of the 5 SISU group funds listed at paragraph 252B above (the exception being SISU Capital Private Equity Fund). Neither Wynacre nor Mr Al Rajaan nor Mr Nasrallah performed any management services for SISU such as to justify the payments of US$ 27.8 million in return for an initial contribution of £602,701. It is to be inferred from all the circumstances set out in the previous sub-paragraphs, and from Mr Al Rajaan's modus operandi as demonstrated by the Scheme alleged at section C above, that the obtaining of preference shares by Wynacre was a front for the making of payments to Mr Al Rajaan as a result of PIFSS' investments in the SISU funds.[7]

252D.  Wynacre made payments for the benefit of Mr Al Rajaan:

a.  To Phoenix for onward transmission to Mr Al Rajaan in the sum of US$ 11.2 million as set out in Appendix 4.8B; and

b.  To Golgen in the sum of US$6 million, as set out in Appendix 4.6C.[7]

Golgen Property SA

253.     In 2007 Mr Nasrallah opened the account of Golgen Property (number 533815), the stated purpose of which was to invest US$6.0 million in "the IPO of National Air Services". In fact the Golgen account was used primarily to fund investments made with Abraaj (see above and the transfers set out in Appendix 4.6D[7]).

254.     The account of Golgen was funded substantially by payments from Phoenix, Wynacre[7] and Ozak and therefore by Secret Commissions or the traceable proceeds thereof (see Appendix 4.6C)[7].

255.     Between 2008 and 2012 Golgen made payments totaling US$ 27.4 27.5 million to accounts held for Mr Al Rajaan:

         a.       US$25.9 million into Thaxton (EFG) (see Appendix 4.6B)[6];

         b.       US$ 1.5 million to Suncoast (UBP SA) (see Appendix 4.6A)[6].

Thaxton

256.     In February 2008 Mr Al Rajaan:

         a.       Established the entity Thaxton Foundation, being a Liechtenstein trust, with assistance from EFG who created the entity and administered it on behalf of Mr Al Rajaan;

         b.       Opened an account at EFG in the name of Thaxton (number 534414).

257.     In 2009 Mr Al Rajaan also opened an account in his own name (number 536007).

258.     The account of Thaxton was funded almost exclusively by payments totaling US$ 33.87[6] million from Phoenix, Ozak and Golgen and therefore by Secret Commissions or the traceable proceeds thereof (as set out in Appendices 4.2K, 4.5M and 4.6B)[6].

Phoenix International Brokerage / PIB[7]

258A.   PIB is a Lebanese company founded on 7 April 1997 with Nadim Nasrallah as its beneficial owner.[7]

122

258B.   Nadim Nasrallah set up the following accounts at EFG:

 a.  In April 1996, he set up a personal account (number 31542, subsequently renumbered as account 530249 upon the merger of Banque Edouard Constant with EFG Private Bank in 2003) ("**account 530249**"). At some point unknown to PIFSS, this changed to be an account in the name of Nadim and Lama Nasrallah; and

 b.  In or around May 1997, he set up an account for PIB (number 31743, subsequently renumbered as account 530303 upon the merger of Banque Edouard Constant with EFG Private Bank in 2003) (the "**PIB Account**"). In an email from Mr Guerin on 28 June 1999, the PIB Account was described as being financed by retrocessions from banks, acquired through the sale of blocks of shares to institutional clients in the Gulf. In fact, the PIB Account was financed by payments from banks in respect of investments made by PIFSS, as set out below.[7]

Payments to Nadim Nasrallah / PIB[7]

258C.   Between 1997 and 2007 the PIB Account received sums in various currencies equivalent to US$53,260,033 (comprising 303 payments), as to which:

 c.  123 payments set out in Appendix 4.7A with a total value of US$28,537,748 derived from BNP Paribas and included contemporaneous reference to fees. These payments are inferred to be payments from BNP Paribas by reference to fees or commissions. In the premises set out at paragraph 258E below, those fees or commissions are inferred to be fees or commissions in relation to PIFSS's investments;

 d.  A further 163 payments set out in Appendix 4.7B with a total value of US$22,079,599 derived from BNP Paribas without express contemporaneous reference to fees. In the context set out in this paragraph, it is to be inferred that these payments are payments from BNP Paribas by reference to fees or commissions. In the premises set out at paragraph 258E below, it is to be inferred that those fees or commissions are fees or commissions in relation to PIFSS's investments;

 e.  A further 17 payments set out in Appendix 4.7C with a total value of US$2,642,686. In the context of the payments set out in this paragraph and the similar pattern and quantum of payments (as well as other factors set out in relation to specific payments in Appendix 4.7C), it is to be inferred that these payments are also payments by reference to fees from BNP Paribas or from another bank or fund on which Nadim

123

[H(1).  FURTHER NASRALLAH SCHEME][6]

Nasrallah / PIB was being paid fees or commissions. In the premises set out at paragraph 258E below, it is to be inferred that those fees or commissions are fees or commissions in relation to PIFSS's investments.[7]

258D.    Of the total set out at paragraph 258C above, sums with a total value of US$36,763,361 were paid on from the PIB Account to various accounts held by Nadim Nasrallah, Mr Nasrallah and other members of the Nasrallah family, as well as their businesses. Of this sum:

   a.    account 530249 received sums in various currencies equivalent to US$29,438,363 (as set out in Appendix 4.7E);

   b.    Nadim Nasrallah's account with Société Nouvelle De La Banque De Syrie Et Du Liban received US$3,759,901 (as set out in Appendix 4.7F); and

   c.    Mr Nasrallah's account with Société Nouvelle De La Banque De Syrie Et Du Liban received US$1,686,349 (as set out in Appendix 4.7G).[7]

258E.    The payments set out in paragraph 257C above related to PIFSS' investments with BNP Paribas and / or with other banks or funds:

   a.    PIFSS and BNP Paribas entered into an "Over-the-Counter Equity Option Agreement" dated 14 September 1993;

   b.    Nadim Nasrallah was described in the EFG account opening documentation for the PIB Account, and is alleged to have been, a senior trader at BNP Paribas until around 1997;

   c.    Nadim Nasrallah retired from BNP Paribas in or around May 1997 to set up his own brokerage business;

   d.    Either pursuant to the "Over-the-Counter Equity Option Agreement" or otherwise, Nadim Nasrallah undertook trades on behalf of PIFSS (or its wholly-owned subsidiary Macro International Limited, incorporated in the BVI). It is to be inferred that he did so at first while employed by BNP Paribas and thereafter on his own account;

   e.    Mr Guerin in an email dated 28 June 1999 described the PIB Account as being an account financed by retrocessions from banks, acquired through the sale of blocks of shares to institutional clients in the Gulf;

   f.    In the above premises, it is to be inferred that the sums received into the PIB Account

124

relating to BNP Paribas were payments made to Nadim Nasrallah / PIB in relation to PIFSS' options trades or other trades with BNP Paribas or other banks or funds;

g.  As set out in paragraph 258F below, a significant proportion of the said payments to Nadim Nasrallah / PIB were paid on to Mr Al Rajaan, from which it is to be inferred that Nadim Nasrallah and Mr Nasrallah and Mr Al Rajaan had agreed that they would share those fees / commissions in a manner similar to that which applied to the commissions paid to Mr Nasrallah as set out in paragraph 230 above; and

h.  The sums set out in paragraph 257C accordingly were Secret Commissions.[7]

Payments from PIB to Mr Al Rajaan[7]

258F.  Transfers with a value of at least US$28,192,800 were received by Mr Al Rajaan through Overton, Intermac,  Balboa Trust Reg. ("**Balboa**") or Moolwurf Investments Ltd BVI ("**Moolwurf**") (Balboa and Moolwurf both being beneficially owned by Mr Al Rajaan) as set out in Schedule 4.7D:

a.  Sums equivalent to US$14,698,809 were paid directly to Mr Al Rajaan's entities by PIB; and

b.  Further sums equivalent to US$13,493,991 were paid from account 530249 from the sum set out at paragraph 258D.a above.[7]

EFG's role

259.  By reason of the creation of these companies and accounts and the business conducted through them including the receipt and transmission of Secret Commissions EFG established and/or maintained valuable commercial relationships with Mr. Al Rajaan and Mr Nasrallah and Nadim Nasrallah[7] which included the provision of loan facilities - for example a loan facility of US$10.0million made to Thaxton in 2011 to cover a stock option open position at Bank of America - and the provision of advice and brokering services for investments made by Mr. Al Rajaan via the Thaxton accounts in securities and gold options as well as transaction charges and commissions earned on forex transactions[6].

260.  On leaving EFG in late 2015 Mr Guerin joined Bank Bordier, whereupon Mr Nasrallah transferred his remaining business with EFG to that institution.

**Banking Assistance**

261.  At all material times Mr Guerin was the relationship manager in relation to, and had

125

oversight of, the Nasrallah EFG Accounts. From 2008 he was the relationship manager in relation to, and had oversight of, the accounts held at EFG for Mr Al Rajaan.

262. Mr Guerin was at all material times an executive and officer of, EFG with the roles and titles described in paragraph 262A below[6], and was a long-time friend of Mr Nasrallah and Mr Al Rajaan from the 1970s and the late 1980s respectively. He was known by Mr. Al Rajaan and Mr. Nasrallah (and Nadim Nasrallah)[7] to be someone who would show the necessary "flexibility" as referred to in paragraph 41 above. This is to be inferred from:

a.   The close personal connection with both Mr. Nasrallah and Mr. Al Rajaan and the resulting trust and confidence that both (and Mr Nasrallah's son, Nadim) placed in Mr Guerin in dealing with their financial affairs, in particular:

  a.   On 23 July 2004, Mr Guerin was appointed to the board of Antheya on behalf of Mr Nasrallah and his family;

  b.   On 23 January 2008, Mr Guerin was granted power of management and administration for Thaxton; and

  c.   On 25 May 2012, Nadim Nasrallah requested Mr Guerin to be appointed to the board of Antheya (again) shortly after Nadim Nasrallah and Mr Guerin (together with Mr Al Rajaan and Mr Nasrallah) became aware of the Swiss criminal investigation as set out in more detail from paragraph 266 below, and Mr Guerin was so appointed[6];

b.   The strong commercial incentive for EFG and Mr. Guerin in particular to act for clients (Mr. Nasrallah and Mr Al Rajaan) with a requirement for banking services over funds of this magnitude;

c.   The facts and matters set out below;

d.   The operation of other known schemes pleaded above upon the similarity of the facts of which PIFSS will rely.

262A.  As to Mr Guerin's role within EFG:

a.   From no later than 1 July 2000, Mr Guerin held and/or used (in official

126

correspondence) the title "Directeur" at Banque Edouard Constant.

b.     Mr Guerin continued to hold and/or use the title "Directeur" once Banque Edouard Constant and EFG had merged (as set out in paragraph 26 above).

c.     During at least 2007 and 2008, Mr Guerin was held out as "Head of International Private Banking" at EFG, which is to be inferred from the fact that he was addressed as such by at least Abraaj.

d.     Mr Guerin was at least a trusted representative of Mr Latsis (who was regarded within EFG as a "major shareholder", which PIFSS infers was via his role as ultimate owner and controller of the Latsis Group, which indirectly controlled EFG). Mr Guerin was appointed by Mr Latsis to represent him at the World Policy Conference in Marrakech as EFG's "Managing Partner" in or about October 2010, sponsored by the Latsis Foundation.

e.     In practice, Mr Guerin carried out a significant sales function on behalf of EFG and was responsible for creating and maintaining substantial new business on behalf of EFG.

f.     Mr Guerin was accorded substantial autonomy by EFG in fulfilling the roles set out above, and had individual decision-making responsibility consistent with the nature of the roles and responsibilities referred to above.[6]

263.   By reason of ~~his management of the banking relationship of the Nasrallah EFG accounts and Mr Al Rajaan's accounts~~ the facts and matters set out in paragraph 264 below,[6] it is to be inferred that Mr Guerin was aware that the funds paid into the Phoenix, Wynacre[7] and Ozak and PIB[7] accounts were commissions paid by banks and investment managers on investments made by PIFSS, and that Mr Nasrallah and Nadim Nasrallah were ~~was~~[7] sharing those sums with Mr Al Rajaan who he knew was the Director General of PIFSS. Accordingly Mr Guerin knew that the flow of funds through the accounts which he had caused to be established represented Secret Commissions or the traceable proceeds thereof arising out of unlawful schemes.

263A.  Mr Guerin was assisted in managing EFG's relationship with Mr Nasrallah, Nadim Nasrallah and Mr Al Rajaan (and their entities) by Sara Beltrametti and Ekaterina Likhotal; material information communicated to Ms Beltrametti and Ms Likhotal was in turn communicated

127

by them to Mr Guerin, as set out below.[6]

264. In particular Mr Guerin knew that:

a. All or substantially all of the sums paid into the Nasrallah EFG accounts were commissions paid in respect of investments made by a single institutional client in Kuwait. Given his knowledge of both Mr. Nasrallah and Mr. Al Rajaan, and his knowledge of Mr. Al Rajaan's role at PIFSS, he knew that client to be PIFSS. He had a detailed understanding of the source of and basis of the payments made into the Nasrallah EFG accounts.

b. The incoming commission revenue was split and usually paid as to 35% into personal accounts of Mr. Nasrallah held at EFG, with the balance transferred in regular bulk sums (frequently in excess of US$1.0million per payment) into accounts held at other banks which were not in Mr. Nasrallah's name. In particular, as to the 35 / 65% split:

   a. On or about 16 August 2004, EFG recorded account information for Antheya on the basis of instructions from Mr Guerin that Antheya would receive a 35% share of income from Phoenix;

   b. On 12 February 2010, Ms Beltrametti recorded an instruction to pay 35% of Phoenix's receipt from Sigma Asset Management to Antheya and this transfer was approved by Mr Guerin;

   c. On 7 May 2010, Mr Guerin told Mr Nasrallah that he had done "35 65" in relation to Phoenix and "family", which was in the context a reference to Antheya (which was frequently referred to by Mr Guerin, Mr Nasrallah and Ms Beltrametti as the "family" account);

   d. On 7 December 2010, Mr Guerin confirmed to Mr Nasrallah that he had transferred 35% of commissions received from each of Everest, Sigma, UBP and Paribas;

   e. On 28 April 2011, Mr Nasrallah instructed Mr Guerin to "do 65/35 as usual" in relation to a sum of approximately EUR53,587 from Centaurus;

f.      On 28 July 2011, Ms Likhotal emailed Mr Guerin (and Ms Beltrametti) to the effect that she had been in touch with Mr Nasrallah and that the "35-65" would be done once the funds had arrived into Phoenix and Ozak;

g.      On 15 March 2013 (after the events described from paragraph 266 below starting with Mr Al Rajaan's discovery of the criminal investigation of his dealings with Mirabaud), Mr Guerin told Mr Nasrallah that the "35, 65" was over and that he did not want to speak on the phone; and

h.      It is also to be inferred from paragraph g. above that Mr Guerin was at all material times aware that the 35/65 split of commission involved wrongdoing (which wrongdoing, in the context of all of this paragraph 264, was known to be the unlawful and corrupt receipt of Secret Commissions by Mr Al Rajaan).⁶

ba.     Further, as to the fact the payments from the Nasrallah EFG accounts to external accounts were commissions that were being distributed, on numerous occasions Mr Guerin approved such payments with the description "redistribution of commissions". For example:

a.      On 19 April 2007, Mr Guerin approved (together with Mr Diriberry, as to whom see paragraph 265A below) a transfer from Ozak to Dryden in the sum of EUR785,000 as a "redistribution of commissions";

b.      On 5 June 2007, Mr Guerin approved (together with Mr Diriberry, as to whom see paragraph 265A below) a transfer from Ozak to Dryden in the sum of EUR690,000 as a "redistribution of commissions";

c.      On 30 August 2007, Mr Guerin approved (together with Mr Diriberry, as to whom see paragraph 265A below) a transfer from Ozak to Dryden in the sum of EUR400,000 as a "redistribution of commissions";

d.      Also on 30 August 2007, Mr Guerin approved (together with Mr Diriberry, as to whom see paragraph 265A below) a transfer from Phoenix to Chulani in the sum of EUR1.5 million as a "distribution of brokerage commissions";

e.      On 9 November 2007, Mr Guerin approved a transfer from Phoenix to

129

Chulani in the sum of EUR 1.4 million as a "distribution of brokerage commissions"; and

f.   On 6 December 2007, Mr Guerin approved (together with Mr Diriberry, as to whom see paragraph 265A below) a transfer from Phoenix to Chulani in the sum of EUR1.3 million as a "distribution of brokerage commissions".[6]

c.   The above bulk transfers out to external accounts were to Mr Al Rajaan as to which:

a.   Mr. Guerin knew that Mr. Nasrallah, Nadim Nasrallah[7] and Mr. Al Rajaan were sharing revenue, as evidenced by a file note in 2008 which (at least as to the sharing of revenue)[6] set out his understanding at that time which, it is to be inferred, he had had at all material times, in which he stated that:

"[*Phoenix and Mr. Al Rajaan's accounts*] *share the revenues (management fees and performance fees) from the investment and private equity funds that they manage together independently. Until now [Mr. Al Rajaan / Thaxton] received its fees at its other banks, directly from the banks with which it dealt. I decided to do it here with us*".

b.   From at least March 2008 (and it is to be inferred at all material times) Mr Guerin knew that the accounts of Chulani and Dryden were held for and beneficially owned by Mr Al Rajaan:

a.   From at least 2004̲5̲[6] to 2012 Mr Guerin routinely and falsely signed off payments from Phoenix/Ozak to Chulani/Dryden on the basis that the latter were owned by Mr Nasrallah with the explanations such as "it's the same beneficial owner", "transfer to his other account", "transfer to client's own account", "one client";

b.   On 4̲5̲[6] March 2008 Mr Guerin received an instruction on the Thaxton account to pay EUR 2m to Chulani: "*Please transfer EUR 2m to my account at [Pictet Bahamas] as usual [Chulani]*". As this was the first payment out of the Thaxton account, the instruction to pay Chulani "as usual" can only have been intended to mean (and must have been understood by Mr Guerin to mean) a continuation of the existing fund flows through the Phoenix/Ozak accounts to Mr Al Rajaan. Mr

[H(1).  FURTHER NASRALLAH SCHEME][6]

Guerin sanctioned the payment on the basis that Thaxton/Chulani had the same beneficial owner, which was true, but directly contrary to his prior and subsequent explanations for the payments from Phoenix/Ozak to Chulani;

c.    Sub-paragraphs ea.a to ea.c below.[6]

d.    The funds in Phoenix were to Mr Guerin's knowledge available to Mr Al Rajaan for his personal use when required:

a.    On 22 March 1999, Mr Guerin approved a payment of 83,876 French Francs from Phoenix to Air Sea Packing Group Ltd for the benefit of Mr Al Rajaan, with Mr Al Rajaan's name used as a reference; and

b.    On 6 November 2008, Mr Nasrallah orally instructed Mr Guerin to take US$150,000 from the Phoenix account, transfer them to Mr Nasrallah's personal account and then transfer them to SNBSL in Beirut to pay for jewellery for Ms Al Wazzan.[6]

d.    From 2008 the purpose of the Thaxton account was to share the revenue received into the Phoenix and Ozak accounts. This is to be inferred from the following facts and matters:

a.    the express statement to that effect in paragraph 264c.a above, which was given in response to a money laundering / compliance enquiry regarding the initial transactions from Phoenix to Thaxton to fund the latter account;

b.    Mr Guerin recorded in account opening documents that Thaxton would be funded by an initial deposit from the Phoenix account, with a note "business partner and friend";

c.    Further payments that were then made into the Thaxton account as pleaded at paragraph 258 above;

d.    Mr Guerin had a signature on the Thaxton account.

e.    Notwithstanding the above, the account opening documents for Thaxton, prepared

by Mr Guerin, stated that Mr Al Rajaan "*has invested several millions of dollars in various funds and now he is cashing in the dividends on a monthly and quarterly basis (management and performance fees)*". It is to be inferred that this was a deliberately misleading description of the source of funds, which Mr Guerin knew to in fact be commissions on funds in which PIFSS had invested:

a.    Investments made by Mr Al Rajaan would not have generated "dividends" based on monthly/quarterly management and performance fees, that is a description of commissions received by agents on investments sold (as an experienced banker such as Mr Guerin would have known);

b.    On the basis of the matters pleaded above, Mr Guerin knew that the source of funds into Phoenix and Ozak (and therefore into Thaxton) was commissions on funds in which PIFSS had invested;

ea.    The payments to, between and from the various EFG accounts involved unlawful conduct (and Mr Nasrallah⁶, Nadim Nasrallah⁷ and Mr Al Rajaan were also aware of this):

a.    On Friday 20 May 2011, Mr Guerin expressed a concern to Mr Nasrallah that the nature of the transfers that Mr Al Rajaan had requested (in that case in relation to a credit balance of approximately EUR2,920,000) to the "Bahamas" and "Singapore" (viz Chulani and Dryden) was "too obvious" and that "one day we'll have a problem" and they would "not be able to do it anymore", but agreed to make the payment on Monday 23 May 2011.

b.    On Monday 23 May 2011, even though Mr Guerin knew that the said payments were for the benefit of Mr Al Rajaan and notwithstanding his awareness that those payments were for an unlawful purpose, as set out in sub-paragraph a. above, he authorised payments of approximately EUR1.4 million each from Phoenix to Dryden and Chulani with the references "Personal Treasury Needs" and "Same BO" for each payment.

c.    On 6 June 2011, Mr Guerin warned Mr Nasrallah (in response to a request of Mr Nasrallah on behalf of Mr Al Rajaan for EUR 1.4 million to be sent to "the Bahamas" (viz Chulani) and EUR 1 million to be sent to "Singapore" (viz Dryden)) that he did not think that EFG would "be able to do this

132

anymore" because the receipt and distribution of payments as requested by Mr Nasrallah was too obviously the laundering of assets via what Mr Guerin called "bathtub" accounts.

d.    On 12 October 2011, Mr Guerin agreed with Mr Nasrallah that he would "dress up" a payment of US$1,748,000 from Golgen to Thaxton as "real estate". Mr Nasrallah stated that he would go to "Nadim's" to send a fax to that effect. The same day, Mr Nasrallah faxed Mr Guerin at EFG asking that a payment with the above details be made for a real estate purchase. The payment was authorised by Mr Guerin on that knowingly false basis.

e.    PIFSS will also rely on the reaction of Mr Guerin, Mr Al Rajaan, Mr Nasrallah and Nadim Nasrallah to the discovery by Mr Al Rajaan of the Swiss criminal investigation in particular as set out in paragraph 266A-C below.[6]

f.    The quantum of the payments into the Phoenix, PIB[7] and Ozak accounts (whether viewed annually or in aggregate between 1995 and 2012) was not explicable by legitimate commissions referable to any individual agent's activity and/or that of any single client.

265.    Notwithstanding that knowledge Mr. Guerin:

a.    Routinely signed off payments from Mr. Nasrallah to external accounts on the basis that the accounts and their proceeds were beneficially owned by him, when, as he must have known, they were not;

aa.    Routinely signed off payments from Nadim Nasrallah to external accounts on the basis that the accounts and their proceeds were beneficially owned by him, when, as he must have known, they were not;[7]

b.    Routinely signed off internal payments from Phoenix, Ozak and Golgen to internal accounts held by Mr. Al Rajaan on the basis that they were "in business together", when as he must have known the funds represented Secret Commissions;

c.    Repeatedly noted the good standing of Nasrallah and his affairs both internally within EFG and externally when questioned by third parties regarding compliance issues, e.g. "*we regard him as financially reliable and [of] good moral standing…*"; "*Mr.

133

*Nasrallah deserves our complete trust*"; "*he receives fees, certainly huge.... He transfers these amounts to his personal nominative account, which is declared with total transparency*", when he must have known that Mr Nasrallah was party to an unlawful and corrupt scheme;

d.   Similarly noted the good standing of Nadim Nasrallah including to The Financial Services Commission regarding PIB on or about 26 March 2002, stating that he and Ms Beltrametti "would consider the director Mr Nadim Nasrallah to be respectable and trustworthy" (and to similar effect by letter dated 4 April 2003), when he must have known that Nadim Nasrallah was party to an unlawful and corrupt scheme[7].

265A.  In addition to Mr Guerin, from no later than early 2008 at least Alain Diriberry of EFG knew or alternatively had blind-eye knowledge of (and / or wilful blindness, for the purposes of Swiss law as pleaded in paragraphs 73I and 73Q above, to) the fact that Mr Al Rajaan and Mr Nasrallah were using their accounts at EFG to launder Secret Commissions and authorised and / or otherwise permitted them to continue to do so:

a.   Mr Diriberry was a member of EFG's senior management team on joining EFG:

  a.   From August 2003, he was Deputy CEO of EFG;

  b.   From January 2005, he was EFG's Head of Private Banking for Geneva;

  c.   From July 2008, he was COO of EFG International (the 100% owner of EFG) and a member of EFG International's Executive Committee;

  d.   From January 2011, he became CEO of EFG while remaining on the EFG International Executive Committee; and

  e.   From April 2011, he became CEO of EFG Europe.

b.   From no later than 2005, Mr Diriberry was aware from significant transactions that were brought to him for review and approval that:

  a.   Mr Nasrallah / Phoenix purportedly operated as introducing agents for funds, earning huge sums (between US$20 million and US$30 million per annum according to a Business Introducer Profile for Phoenix / Mr Nasrallah) by way of commissions;

134

b.      Mr Nasrallah / Phoenix had as its client "One public institution in the Gulf";

c.      The above facts were both known to Mr Diriberry by reason of his having approved Phoenix as a business introducer as part of a management committee meeting in November 2005, as confirmed by an email from Mr Diriberry to the rest of the management committee on 6 January 2006;

d.      Mr Nasrallah, Phoenix and Nadim Nasrallah distributed huge sums to external recipients including in some cases by way of redistribution of commissions. In particular, Mr Diriberry specifically approved payments of:

i.      EUR 601,500 from account 530249 in the name of Nadim Nasrallah to Intermac on 15 November 2004[6], with an identical transfer from PIB to Nadim Nasrallah also approved on the same day by Mr Diriberry[7];

ia.     EUR 765,600 from account 530249 in the name of Nadim Nasrallah to Moolwurf on 13 May 2005, on the same day approving the transfer of EUR750,078.80 from PIB to Nadim Nasrallah;[7]

ii.     EUR 625,000 from the Phoenix account to Chulani on 23 May 2005;

iia.    EUR 836,000 from account 530249 in the name of Nadim Nasrallah to Moolwurf on 9 August 2005, on the same day approving the transfers of EUR 680,000 and £377,000 and CHF388,000 from PIB to Nadim Nasrallah;[7]

iii.    EUR 1 million from Phoenix to Glenin on 18 April 2006;

iv.     CHF 1,365,000 from account 530249 in the name of Nadim Nasrallah to Intermac on 15 May 2006[6], an identical sum having been transferred from PIB to Nadim Nasrallah on the same day (also approved by Mr Diriberry)[7];

v.      CHF 905,000 from account 530249 in the name of Nadim Nasrallah to Intermac on 26 September 2006[6], the sum of CHF 1,596,685.24 having been transferred from PIB to Nadim Nasrallah on the same day (also approved by Mr Diriberry)[7];

[H(1).  FURTHER NASRALLAH SCHEME][6]

vi.    EUR 1,355,000 from Ozak to Dryden on 20 November 2006 described as a redistribution of commission;

vii.   CHF 1,505,000 from[6] ~~Phoenix first to~~[7] account 530249 in the name of Nadim Nasrallah[6] ~~and then~~[7] to Intermac on 30 May 2007[6], the sum of CHF 1,516,000 having been transferred from PIB to Nadim Nasrallah on the same day (also approved by Mr Diriberry)[7];

viii.  EUR 800,000 from Phoenix to Chulani on 7 September 2007, described as a distribution of brokerage commissions;

ix.    The further payments already set out at paragraphs 264.ba.a, b, c, d and f in the sums of EUR 785,000, EUR 690,000, EUR 400,000, EUR 1.5 million and EUR 1.3 million, each of which was described as a redistribution of commissions.

ba.   On or before 17 July 2006, Mr Diriberry was aware from his approval of a credit request within EFG for loans to PIFSS (via wholly-owned French corporate subsidiaries) in relation to proposed investments with the Hardstone Group (which, like EFG, was part of the broader Latsis Group run by Mr Latsis, as to which see paragraph 262A.d above), of the following:

a.     Mr Al Rajaan was the Director General of PIFSS;

b.     Mr Al Rajaan was close to Mr Latsis, who was described as EFG's "principal shareholder"; and

c.     PIFSS and entities within the Hardstone Group were planning together to set up funds for real estate investments.

bb.   On or before 21 November 2006, Mr Diriberry was aware from having approved the Higher Risk Client information profile update for Nadim Nasrallah on that date that Nadim Nasrallah's business activity was "[selling] shares and funds to middle east investors".[7]

c.    Between February and March 2008 (to the extent that he did not know these facts and matters before), Mr Diriberry additionally became aware, through internal reporting to him, of the following:

136

[H(1).  FURTHER NASRALLAH SCHEME]6

a.     Mr Al Rajaan was the beneficial owner of the Thaxton Account;

b.     Mr Al Rajaan was the Director General of PIFSS, chairman of Wafra (which was owned by PIFSS) and a board member of Ahli United Bank. He was, thus, clearly a PEP;

c.     PIFSS itself was a client of EFG (which it is be inferred was understood to be a reference to the separate investment banking division of the EFG Group) and was linked to Mr Latsis (the "major shareholder" of EFG in the sense described at paragraph 262A.d above);

d.     Part of the explanation on EFG's internal Client Information Profile for the source of funds coming into Thaxton / Mr Al Rajaan's account was the receipt of "management fees and performance fees" (as per the text quoted at paragraph 264.e. above);

e.     The Thaxton Account was to receive an initial deposit of EUR 2 million (updated to EUR 5 million) from Phoenix / Mr Nasrallah, who was described as Mr Al Rajaan's "business partner and friend";

f.     The facts set out in paragraphs a. to e. above were included in a Client Information Profile for Thaxton / Mr Al Rajaan approved by Mr Diriberry at least on 4 February 2008 and again, with updated information, on 12 February 2008;

g.     On 6 February 2008, EUR 2,184,196.13 (converted from US$ 3.2 million) was transferred with Mr Diriberry's approval from Phoenix to Thaxton with the description "Debt Repayment";

h.     On the same day, Mr Diriberry approved the transfer of 100,000 shares in EFG International (the parent company of EFG) from Phoenix to Thaxton (with a value of approximately CHF 3,255,000) with the description "Debt Repayment";

i.     On 11 February, Mr Diriberry approved a EUR 2 million transfer to take place on 13 February 2008 from Phoenix to Chulani with the description "transfer to same [beneficial owner]";

j.     On 12 February 2008, Mr Diriberry reviewed and approved "High Risk

Client" Annual Reviews for Nadim Nasrallah and Mr Nasrallah in which each was described as an "Investment Consultant";

k.  On 18 February 2008 – Mr Diriberry approved a transfer of EUR 1.5 million from Phoenix to Chulani with the description – "distribution of brokerage commissions";

l.  On 4 March 2008, Mr Diriberry approved a transfer of EUR 2 million from Thaxton to Chulani with the description "transfer to same [beneficial owner] margin call" (referred to at paragraph 264.c.b.b above);

m.  On the same day, Mr Diriberry approved a transfer of EUR 550,000 from Phoenix to Thaxton with the explanation "split of investments".

d.  Accordingly, by no later than 12 February (alternatively 4 March) 2008, Mr Diriberry was, in summary, aware that:

a.  Mr Al Rajaan was the Director General of PIFSS, a Gulf institution;

b.  Mr Nasrallah was an introducing agent whose sole client was a Gulf institution on whose investments tens of millions of Euros were being generated;[6]

ba.  Nadim Nasrallah was Mr Nasrallah's son and also had extensive business in the Middle East and was using EFG to transfer large sums through EFG accounts to offshore accounts;[7]

c.  Inconsistent descriptions were being provided within EFG as to the ownership of Phoenix / Thaxton / Chulani;

d.  Huge sums were being transferred to multiple recipients by Mr Nasrallah and his related accounts and Mr Al Rajaan / Thaxton, in circumstances that made clear that commissions / management fees / performance fees earned on the investments by Mr Nasrallah's sole Gulf institutional client were being distributed;

e.  There was no (alternatively no satisfactory) documentary record to support the explanations provided by Mr Guerin, Ms Beltrametti and Ms Likhotal of the transfers to and from Mr Nasrallah's accounts and Mr Al Rajaan's

138

accounts; and

f.  That Mr Al Rajaan (and by extension Mr Nasrallah) were properly categorised as PEPs yet were not so categorised.

e.  By reason of the facts and matters set out in paragraphs 265A.b. to 265A.d. above, and as confirmed by the further facts and matters set out in paragraphs 265A.g. and h. below, it is to be inferred that (by 12 February alternatively 12 March 2008):

a.  Mr Guerin must have told Mr Diriberry about the scheme being operated by himself, Mr Al Rajaan and Mr Nasrallah for Mr Al Rajaan to receive Secret Commission earned on PIFSS' investments and to launder the resulting funds through EFG; alternatively

b.  If Mr Guerin did not actually tell Mr Diriberry the above, then (at the very least) Mr Diriberry must have suspected the same and deliberately avoided seeking the further information from Mr Guerin or elsewhere that would have confirmed his suspicion. Mr Diriberry therefore had blind-eye knowledge of those facts and matters and / or was wilfully blind to them.

f.  In either case, Mr Diriberry approved the unlawful arrangements made between Mr Nasrallah, Mr Al Rajaan and Mr Guerin and assisted in those arrangements by (at least) permitting them to continue and authorising further transactions pursuant to the said arrangements, as set out in paragraph 265A.g. below.

g.  Mr Diriberry continued to authorise transactions involving and the relationship with Mr Al Rajaan and / or Mr Nasrallah and failed to take any step to prevent them notwithstanding his knowledge as set out in paragraph 265A.e.a. or 265A.e.b. above:

a.  In particular (but without limiting his general failure to prevent all other relevant transfers from the Nasrallah EFG Accounts) Mr Diriberry continued to approve transfers of very large sums of money between Mr Nasrallah's and Mr Al Rajaan's accounts, such as:

i.  On 27 May 2008, Mr Diriberry approved the transfer of EUR 1,100,000 from Phoenix to Chulani with the description "same [beneficial owner]";

139

ii. On 9 June 2008, Mr Diriberry approved the transfer of US$ 5 million from Golgen to Thaxton with the description "profits sharing";

iii. On 31 October 2008, Mr Diriberry approved a transfer of EUR 665,000 from Ozak to Thaxton with the description "share of investments";

iv. On 28 November 2008, Mr Diriberry approved a transfer of EUR1,563,500 from Phoenix to Chulani with the description "Same [beneficial owner]";

v. On 9 September 2009, Mr Diriberry approved a transfer of US$ 2 million from Golgen to Thaxton with the description "business partner" and "first reimbursement"; and

vi. On 5 October 2009, Mr Diriberry approved a further transfer of US$ 2 million from Golgen to Thaxton with the descriptions "business partner" and "second reimbursement".

b. Mr Diriberry approved on 28 October 2009 an updated Client Information Profile for Mr Al Rajaan on his application to open a personal account at EFG, in which:

i. The description of Mr Al Rajaan's source of wealth had changed so as now to refer to the proceeds of the Thaxton account as "*shares in the private equity business. he does with Albraaj [sic] Capital Dubai together with one of our customers who is his partner in the ventures*". This was inconsistent with the explanation given in February 2008 as set out at paragraph 264.e. above and the fact that the ultimate source of wealth was the commission allegedly earned by Mr Nasrallah as a consultant.

ii. Mr Al Rajaan was flagged in a World Check report dated 28 October 2009 as Director General (and a member of the board of directors) of PIFSS and as a PEP. Although this document was obtained by EFG after Mr Diriberry had approved the CIP, the same was already known to Mr Diriberry as set out above. No steps were taken to re-categorise

Mr Al Rajaan as a PEP, notwithstanding the obviousness of doing so; instead he was flagged merely as a "*local public figure*", which attracted a lower degree of scrutiny under EFG's internal anti-money laundering rules (as to which see paragraph 273A below). Subsequently (on or around 12 December 2009), Mr Al Rajaan's status within EFG's Compliance systems appears to have been updated to "*Local PEP*" (though not consistently so), which also and in any event was distinct from and attracted a lower degree of scrutiny under EFG's internal anti-money laundering rules than the correct "*PEP*" classification.

h.    Further, the relationships and transactions set out in paragraph 265A.g. above called out for further due diligence and explanation such that Mr Diriberry's continued authorisation and approval without requiring any such due diligence or explanation is consistent only with the knowledge and understandings pleaded by way of inference in paragraph 265A.e. above.[6]

Account closures / dissipation

266.   On or about 7 May 2012 upon learning of the criminal investigation into his dealings with Mirabaud Mr. Al Rajaan contacted Fransabank where he held an account in Beirut and asked them to provide details of his account for the purposes of transferring the proceeds of his EFG accounts which they did by letter of that date (as pleaded in paragraph 302, Mr Al Rajaan made the same request on the same day in respect of his accounts at UBP SA).

266A.  Further, on 7 May 2012, Mr Al Rajaan, Mr Nasrallah, Mr Guerin and Nadim Nasrallah spoke on numerous occasions, as is clear from the two following recorded conversations:

a.    On 7 May 2012, at or around 3.01 pm, Nadim Nasrallah spoke to Mr Guerin. He referred to Mr Nasrallah as panicking as a result of what Mr Al Rajaan had told him and expressed the argument to Mr Guerin that, although Mr Al Rajaan should not have accepted the commissions that had been sent to him, they (viz Nadim and Mr Nasrallah) could not have done anything wrong as it was no-one's business what they did with the commissions received. Mr Guerin assented.

b.    On 7 May 2012, at or around 4.38 pm, Mr Guerin spoke to Mr Nasrallah. Mr Nasrallah asked if it would be better to give back the money he had received in Ozak.

141

Mr Guerin confirmed to Mr Nasrallah that Mr Al Rajaan had called him and had simply told him to liquidate the positions / options. Mr Nasrallah expressed a concern that the assets of Antheya would be at risk.[6]

266B.   Accordingly, it is to be inferred that:

    a.    Mr Al Rajaan had told Mr Guerin and Mr Nasrallah about the Swiss criminal investigation;

    b.    Mr Al Rajaan had spoken to Mr Guerin earlier that day and had given instructions to Mr Guerin to liquidate his positions, which meant to sell any assets held for Mr Al Rajaan or Thaxton and to transfer any assets so sold and any credit balances to Fransabank;[6]

    ba.    Nadim Nasrallah was aware, either from Mr Nasrallah or directly from Mr Al Rajaan, of the Swiss criminal investigation and believed that Mr Guerin was already aware about Mr Al Rajaan's receipt of Secret Commissions (and was thus himself aware that Secret Commission had been paid to Mr Al Rajaan through the Nasrallah EFG accounts);[7] and

    c.    Mr Nasrallah was concerned that his wrongdoing in assisting Mr Al Rajaan to receive Secret Commissions and in receiving a share from Mr Al Rajaan of such Secret Commissions would be uncovered.[6]

266C.   The said facts and matters are consistent only with Mr Al Rajaan's, Mr Nasrallah's[6], Nadim Nasrallah's[7] and Mr Guerin's knowledge that they had been engaged in an unlawful scheme (or schemes) through which Mr Al Rajaan received Secret Commissions or their proceeds in relation to PIFSS' investments with Mr Nasrallah's[6], Nadim Nasrallah's[7] and EFG's (through at least Mr Guerin's) assistance.[6]

267.   Further to the discussion Mr Guerin and Mr Al Rajaan had already had to similar effect on 7 May 2012 as described in paragraph 266A.b. above, ~~Oo~~[6]n 9 May 2012 Mr Al Rajaan gave formal[6] instructions to dissolve the Thaxton Foundation and to pay the sum of US$18.6 million to his account at Fransabank in the Lebanon. The transaction was effected on 10 May 2012, and shortly thereafter the account was closed and Thaxton was dissolved. Mr Al Rajaan's personal account (number 536007) was also closed in 2012.

142

268. On or around 10 May 2012 Mr Guerin created a file note which purported to record interaction with Mr Al Rajaan whereby the latter had supposedly (i) invited him to dinner to discuss the future of the relationship; (ii) told Mr Guerin that following "the Arab Spring" he was afraid that European governments would block his assets unilaterally and therefore he felt safer to bank in an Arab country; and (iii) signed all the necessary orders to close his accounts and transfer the money. As set out in paragraph 266A-C above, this was false to Mr Guerin's knowledge.[6]

269. Further to the conversation between Mr Guerin and Mr Nasrallah on 7 May 2012 described in paragraph 266A above (and, it is to be inferred, further conversations over the intervening days) Oo[6]n or before[6] 16 May 2012 Mr Nasrallah called Mr Guerin and subsequently[6] wrote on that date to him to Mr Guerin[6] stating that "in view of the political situation" he wanted to close the accounts of Phoenix, Ozak and his personal account and to transfer the balance to an account at Banque Audi Saradar in Beirut. In a further[6] letter of 2010[6] May 2012 Mr Nasrallah wrote had written[6] to Mr Guerin requesting the closure of the Golgen account. Shortly thereafter Mr Nasrallah gave instructions to Citco to liquidate Ozak "since there is no longer any reason for it to exist". In total Mr Nasrallah closed six of his EFG accounts in 2012, it is to be inferred those accounts most closely connected to Mr Al Rajaan. On 16 May 2012, Nadim Nasrallah wrote instructing EFG (through Mr Guerin and Ms Beltrametti) to close the PIB Account as well as account 530249 (which by this time was a joint account held in the names of Nadim Nasrallah and his wife Lama), "following our telephone conversation and in view of the political situation".[7] As in relation to Mr Rajaan as set out at paragraph 268 above, Mr Guerin gave (or accepted) various false and conflicting reasons for the closure of Mr Nasrallah's[6] and Nadim Nasrallah's / PIB's[7] accounts:

aa.    On 23 May 2012, Mr Guerin approved an account closing form for the PIB Account stating that the reason for the closure of the account was that "client retired and does not need his business account any more"; on 24 May 2012, Mr Guerin approved an account closing form for account 530249, stating that the reason for closure was "cleint [sic] retired. Does not need the account any more"[7];

a.    On 6 June 2012, Mr Guerin approved an account closing form stating that the reason for Mr Nasrallah's closure of the accounts of Phoenix, Ozak and Mr Nasrallah was the "concentration of assets on one account";

143

b.      On 13 June 2012, Mr Guerin signed a letter to Antheya on behalf of EFG Bank explaining that the reason for the transfers by Mr Nasrallah to Antheya and elsewhere was that Mr Nasrallah was ill;

c.      On 15 June 2012, the reason for a sale of a portfolio of shares by Antheya was given as "collateral real estate purchase" by Mr Guerin;

d.      On 21 June 2012, Mr Guerin approved an account closing form stating that the reason for Mr Nasrallah's closure of all accounts held by Phoenix, Ozak and Mr Nasrallah and the transfer of the assets to Banque Audi Saradar in Beirut was that the client was retiring, which was false to Mr Guerin's and Mr Nasrallah's knowledge; and

e.      On 26 November 2012, in an internal visit report Mr Guerin recorded that Nadim and Mr Nasrallah were withdrawing assets in the 4 remaining accounts (including Antheya) from EFG because of an African mobile deal.[6]

270.    These instructions were given by Mr Al Rajaan and Mr Nasrallah and Nadim Nasrallah[7] to mitigate the threat of further criminal investigation and so as to remove assets from the jurisdiction into a jurisdiction where enforcement would be difficult.

270A.  In addition, Mr Nasrallah sought, with Mr Guerin's assistance, to conceal his wrongdoing: on 28 September 2012, Mr Nasrallah instructed Mr Guerin to destroy various contracts and other documents relating to at least Ozak and Golgen (and, it is to be inferred, Phoenix) that had been held by EFG in its safe for Mr Nasrallah. Mr Guerin agreed to do so.[6]

271.    PIFSS' primary case, based on the facts and matters set out in paragraph 266A-C and 270A above,[6] the timing of the events set out in paragraphs 266 to 270 and the facts of other schemes (in particular Mirabaud, Pictet and UBP) is that Mr. Al Rajaan expressly told (at least) Mr Guerin of the criminal investigation into his conduct and therefore of the need to liquidate his and Mr. Nasrallah's[6] assets, and that Mr Nasrallah gave instructions to Mr Guerin to similar effect including those in relation to assets[6] held in accounts of Phoenix, Ozak and Golgen, and that Nadim Nasrallah gave instructions to Mr Guerin to similar effect in relation to assets held in his accounts and the PIB Account[7] to mitigate the risk of criminal investigation. It is to be inferred that[6] Mr. Guerin then took such steps as were necessary internally within the bank to fulfil Mr. Al Rajaan's and Mr. Nasrallah's and Nadim Nasrallah's[7] instructions in circumstances in which, if he had acted in compliance with the

144

obligations set out above in paragraphs 74 to 78, the transactions the subject of the instructions would have raised significant concerns and been the subject of proper enquiry, and should have been declined.

272. In any event, at all material times, EFG (through at least Mr Guerin and / or Mr Diriberry[6]) knew the connection between Mr. Nasrallah and Mr. Al Rajaan and the companies incorporated by them and knew or believed that Mr. Al Rajaan was the ultimate beneficiary of the commissions paid into the Phoenix and Ozak accounts and (in the case of Mr Guerin) had agreed in or around 1995 that EFG would assist Mr. Al Rajaan and Mr. Nasrallah to launder the Secret Commissions from PIFSS' investments[6] (and had made a materially identical agreement with Nadim Nasrallah and Mr Al Rajaan around 1997)[7], as approved[6] (at least in the case of the arrangements between Mr Al Rajaan and Mr Nasrallah)[7] by Mr Diriberry in early 2008[6]. This is to be inferred from:

a. The facts and matters set out in paragraphs 261 to 265B and 266A-C[6] above;

b. The co-incidental timing of the instructions from Mr. Al Rajaan and Mr. Nasrallah and Nadim Nasrallah[7] to liquidate and realise their assets and transfer them away from their EFG accounts into a jurisdiction where ready asset protection measures would be difficult without plausible explanation;

c. The apparent lack of enquiry or challenge by EFG to those instructions in light of the coincidence of timing and given the nature of the instructions, in breach of the obligations set out in paragraphs 74 to 77 above;

d. The lack of action taken by EFG internally or externally whether before or after those instructions;

e. The partial and misleading account of the relationships between PIFSS, EFG, Phoenix and Nasrallah provided to the Swiss Prosecutor.

273. Alternatively, Mr. Guerin and / or Mr. Diriberry[6]:

a. Made no or no adequate checks into the source of funds or nature of the transfers into the ~~EFG~~[6] Nasrallah EFG[6] accounts or into transfers to internal/external accounts controlled by Mr. Al Rajaan;

b. Took no prudent steps consistent with treating Mr. Al Rajaan and Mr. Nasrallah and

145

Nadim Nasrallah[7] as PEPs;

c.       In the circumstances acted in breach of the money-laundering obligations to which theyhe[6] and EFG were subject.

d.       Accordingly, deliberately took no or no adequate steps to investigate transactions which bore the hallmarks of corruption and money-laundering, from which his their[6] knowledge of the impropriety of the transfers and the payments underlying them is to be inferred;

e.       Thereby dishonestly permitted unlawful Secret Commissions to be successfully paid to Mr. Al Rajaan both under the Further Nasrallah Scheme and other pleaded schemes.

**EFG's liability for Mr Guerin's and Mr Diriberry's acts of money-laundering[6]**

273A.   EFG was (and its employees were), at all material times, subject to the obligations pleaded in paragraph 74 above. References below to the AMLA, the OMLA and/or the Swiss Banks' Code of Conduct are to the provisions as respectively applicable across the relevant period as set out in paragraph 74 above. In all the circumstances pleaded above, Mr Guerin and / or Mr Diriberry committed offences of money-laundering, as set out in paragraph 278A below. As set out in paragraph 278A below, PIFSS' primary case is that each of them was acting as a governing organ of EFG in so acting, such that EFG is liable for their wrongs.[6]

273B.   Alternatively, by reason of its failure to take all reasonable organisational measures to prevent such unlawful money-laundering (as particularised in paragraph 273D below), EFG was, pursuant to Article 102(2) of the SPC attributively liable for money laundering by reference to the unlawful acts committed by Mr Guerin and/or Mr Diriberry.[6]

273C.   If the allegations set out in paragraph 265A.e., f. and h. are not established against Mr Diriberry, PIFSS relies upon what he, as a director and senior executive (and accordingly EFG) knew or ought to have known as set out in the rest of paragraph 265A in support of its case pursuant to Article 102(2) of the SPC. PIFSS also relies on the fact that, from approximately June 2004, a member of EFG's senior management had to authorise each of the transactions complained of above and to approve of each of the relevant customer relationships with EFG.[6]

146

273D.   At all material times, EFG failed to take all reasonable organisational measures to prevent unlawful money-laundering in that:

    a.    It failed properly to verify the identity and beneficial owner of its client(s) prior to commencing its business relationship with those clients, or to re-verify the same, contrary to Articles 3 to 5 of AMLA and Article 14 of the OML and/or Articles 2 to 4 and 6 of the Swiss Banks' Code of Conduct. In particular:

        a.    Given the nature of the account activity on the Nasrallah EFG Accounts and the instructions that EFG received in relation thereto, there was a material doubt, both at the outset of the customer relationships and throughout, as to the identity of the person who controlled Phoenix, Ozak[6], Wynacre[7] and Golgen and/or whether they were operated for the benefit of a person other than Mr Nasrallah[6] and there was a similar material doubt in relation to PIB and Nadim Nasrallah[7].

        b.    However, no, or no adequate, attempt was made by EFG's compliance department (or its senior management including but not limited to Mr Diriberry) to verify (or subsequently to repeat the verification of) those matters.

    b.    It failed to identify that its business relationships with Mr Al Rajaan, Mr Nasrallah, Phoenix, Ozak[6], Wynacre[7] and Golgen[6], Nadim Nasrallah and PIB[7] were relationships with PEPs or to designate those relationships as such, contrary to Article 6 of AMLA and Articles 7 and 17 to 18 of the OML and/or Articles 2 to 4 of the Swiss Banks' Code of Conduct.  In particular:

        a.    Mr Al Rajaan (and by extension Thaxton) were PEPs within the meaning of Article 1(a)(1) of the OML and Mr Nasrallah (and by extension Phoenix, Ozak[6], Wynacre[7] and Golgen) were PEPs within the meaning of Article 1(a)(2) of the OML[6] and Nadim Nasrallah (and by extension PIB) were also PEPs within the meaning of Article 1(a)(2) of the OML6[7].

        b.    However, neither Mr Al Rajaan nor Thaxton nor Mr Nasrallah, nor any of Phoenix, Ozak[6], Wynacre[7] and Golgen[6], Nadim Nasrallah or PIB[7], were identified as PEPs by the Bank (notwithstanding that a contemporaneous World-Check search undertaken by the Bank identified Mr Al Rajaan as a

[H(1).  FURTHER NASRALLAH SCHEME][6]

PEP, also making Mr Nasrallah[6] (and Nadim Nasrallah)[7] a PEP given his connection to Mr Al Rajaan).  As for Mr Al Rajaan, he was identified only as a "local public figure" by EFG: see paragraph 265A.f.b.ii above.

    c.    The failure to identify Mr Al Rajaan and Mr Nasrallah (and by extension Phoenix, Ozak[6], Wynacre[7] and Golgen[6], Nadim Nasrallah and PIB[7]) as PEPs was the result of inadequate review and monitoring of those relationships by EFG's compliance department and its senior management including Mr Diriberry, despite Mr Nasrallah's[6] (and Nadim Nasrallah's)[7] connections to Mr Al Rajaan, and Mr Al Rajaan's connections to PIFSS being known to the EFG (alternatively, being information that any reasonable bank would have ascertained).

c.    It failed to clarify, or properly to investigate in light of the existence of a high-risk relationship, the economic background to transactions where those transactions and the underlying business relationships were unusual and not obviously legal, and indications existed that the assets the subject of the transactions originated from a crime, contrary to Article 6 of AMLA and Articles 8 and 17 to 18 of the OML and/or Articles 2 to 4 of the Swiss Banks' Code of Conduct.  In particular:

    a.    As set out above, the banking relationships with Mr Al Rajaan, Mr Nasrallah and Phoenix, Ozak[6], Wynacre[7] and Golgen[6] and Nadim Nasrallah and PIB[7] involved PEPs.  The particular risk associated with PEPs is that they seek to abuse their position to make an unlawful private gain.  Further to Article 4 of the OML, EFG was not permitted to accept assets that it knew, or should be expected to have known, were the proceeds of criminal activities, including assets obtained through corruption, abuse of an official function or dishonest dealings by a public officer such as a PEP.  In that context, EFG knew or should have known both of the risk of bribery inherent in the above banking relationships and of the facts and matters set out in paragraphs 261 to 270A above, which indicated that those relationships were being exploited to launder bribes.

    b.    At all material times the monies paid into and out of the Nasrallah EFG accounts were the proceeds of Mr Al Rajaan's corrupt schemes as EFG knew or ought to have known (through its senior management including Mr

Diriberry or through the application of proper compliance procedures as required by AMLA, the OML and the Swiss Banks' Code of Conduct).  As to the application of proper compliance procedures:

i.      Since the transactions on the Nasrallah EFG accounts were higher risk transactions associated with PEPs, EFG was required to carry out enhanced due diligence as to the nature and rationale of those transactions further to Article 6 of AMLA and Articles 17 and 18 of the OML.  Those transactions were marked by indicators of money laundering set out in the Schedule to the OML, in particular in light of: the connections to a PEP; the structure and nature of the account dealings, with substantial sums of money received from Mr Nasrallah's[6] and Nadim Nasrallah's[7] dealings with PIFSS, to which Mr Al Rajaan was connected; the lack of legitimate business rationale for the account activity observed; the use of the Nasrallah EFG accounts as pass-through accounts (with monies being relayed on a 35/65 basis to further accounts, certain of which were owned by Mr Al Rajaan); and the provision by Mr Nasrallah[6] and Nadim Nasrallah[7] of false or misleading information as to the purpose of the accounts and the purpose of the transactions conducted through them.

ii.     However, EFG's compliance department failed to conduct proper independent monitoring and analysis of the activity on the Nasrallah EFG accounts, or to scrutinise the stated economic justifications for that activity, particularly given that the activity was higher risk and connected to one or more PEPs.  It also failed to raise a challenge or make due enquiry notwithstanding that its customer files contained contradictory and inconsistent information: see paragraphs 264.c.b.b., 264.e. and 265A.f.b. above. Any adequate due diligence, monitoring or analysis conducted in accordance with AMLA and the OML would have determined (including by reference to what was or ought to have been known to Mr. Diriberry and, it is to be inferred, others in senior management who approved the relevant transactions) that there were reasonable grounds to  suspect that transactions on those accounts were carried out in order to launder the proceeds of criminal activity.

149

EFG failed to conduct proper due diligence, monitoring or analysis and so failed to identify (and so prevent) the laundering of those proceeds.

d.      It failed to report to the Money Laundering Reporting Office in circumstances where reasonable grounds existed to suspect that the assets implicated in the above transactions and business relationships originated from criminal offences, and failed to freeze the assets the subject of those transactions and business relationships and/or failed to refuse to enter into those relationships or execute those transactions, contrary to Articles 9 and 10 of AMLA and/or Articles 10.h and 24 of the OML and/or Articles 3 and 6 of the Swiss Banks' Code of Conduct.

e.      In the circumstances, it failed to apply proper controls, including contrary to Articles 10 and 12 of the OML, whether via its front office and management (including Mr Diriberry) or via its compliance function, to ensure that the factors indicating that the Nasrallah EFG accounts were used to launder money were monitored, identified and acted upon (as to the last of which, see paragraph 273D.d. above).[6]

**Liability**

**Mr. Al Rajaan**

274.    By reason of the above facts and matters, Mr. Al Rajaan is liable for civil wrongs under Article 227 of the Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches[6]:

a.      Breach of Articles[6] 11 and 12[6] of the Public Property Law; the manner in which he authorised or influenced PIFSS to enter into the investments made through Mr. Nasrallah as an intermediary in relation to the investments identified at Appendix 4, and intentionally committed it to rights and obligations in return for the payment of Secret Commissions, was detrimental to PIFSS' interests;

b.      Breach of Article 35 of the Penal Code amended by the Bribery Law: Mr. Al Rajaan knew his position as Director General of PIFSS and was acting in the course of his authorised duties in authorising or influencing PIFSS to enter into the above investments in return for which he secured the promise and payment of Secret Commissions;

150

    c.        Breach of his Civil Service duties;

    d.        Breach of Article 2 of the Money Laundering Law No.35 of 2002.

274A.    Alternatively, he is liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of breach of Article 158 SPC for criminal mismanagement of PIFSS's property; breach of Article 322 *septies* SPC for accepting bribes in return for acting as Director General of PIFSS in ways which were contrary to his duty and/or dependent on his discretion; and breach of Article 305 *bis* SPC for money laundering by causing bribes paid to him or for his benefit to be concealed.

275.    Alternatively, he is liable under principles of English law for:

    a.        breach of fiduciary duty (best interests, good faith, no conflict and no profit);

    b.        bribery.

**Mr. Nasrallah and Phoenix**

276.    Mr. Nasrallah and Phoenix are liable for civil wrongs under ~~both~~⁶ Articles⁶ 227, 228⁶ and 229 of the Kuwaiti Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches (in the case of the corporate entity on the basis pleaded at paragraph 72B above)⁶:

    a.        Breach of Articles 35 to 39 of the Penal Code for their roles in promising and paying Secret Commissions to Mr. Al Rajaan, knowing his position as Director General of PIFSS, to induce him to authorise or influence PIFSS to make investments with financial institutions whose products he promoted in which he had a commercial interest.

    b.        Liability as a perpetrator, and aider and abettor within the meaning of Articles 47-~~49(3)~~48 of the Penal Code in respect of his role in relation to Mr. Al Rajaan's breaches of Articles⁶ 11 and 12⁶ of the Public Property Law referred to above and breaches of Article 35 and 39 of the Penal Code under the Further Nasrallah Scheme and other schemes.

    c.        Liability under Article 2 of the Money Laundering Law No.35 of 2002.⁶

151

276A.   Alternatively, they are liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of:

    a.    Instigating, jointly perpetrating or assisting (within Article 50(1) SCO) Mr Al Rajaan's criminal mismanagement of PIFSS's property contrary to Article 158 SPC;

    b.    Bribing a foreign public official, namely Mr Al Rajaan, contrary to Article 322 *septies* SPC;

    c.    Laundering (within Article 305 *bis* SPC) and/or thereby aiding and/or abetting (within Article 50(3) SCO) the payment of bribes to or for the benefit of Mr Al Rajaan in breach of Article 158 SPC and/or Article 322 *Septies* SPC.

277.   Alternatively, they are liable under principles of English law for:

    a.    dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty;

    b.    knowing receipt of trust property; and

    c.    bribery.

**EFG and Mr. Guerin**

278.   EFG and Mr. Guerin are liable for civil wrongs under both[6] Articles[6] 227, 228[6] and 229 of the Kuwaiti Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches (in the case of the corporate entity on the basis pleaded at paragraph 72B above)[6]:

    a.    Liability as a perpetrator, and aider and abettor within the meaning of Articles 47-49(3)48 of the Penal Code in respect of their roles in relation to Mr. Al Rajaan's breaches of Articles[6] 11 and 12[6] of the Public Property Law referred to above and breaches by Mr. Al Rajaan, Mr. Nasrallah and Phoenix of Articles 35 to 39 of the Penal Code in connection with the payment of Secret Commissions under the Further Nasrallah Scheme and other pleaded Schemes.

    b.    Liability under Article 2 of the Money Laundering Law No.35 of 2002.[6]

278A.   Alternatively, they[6] Mr Guerin (through his own acts and knowledge) and EFG (including

152

through the acts and knowledge of Mr Guerin and/or Mr Diriberry)[6] are liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of:

a. Instigating, jointly perpetrating or assisting (within Article 50(1) SCO) Mr Al Rajaan's criminal mismanagement of PIFSS's property contrary to Article 158 SPC;

b. Jointly perpetrating or assisting (within Article 50(1) SCO) the bribing of a foreign public official, namely Mr Al Rajaan, contrary to Article 322 *septies* SPC;

c. Laundering (within Article 305 *bis* SPC) and/or thereby aiding and/or abetting (within Article 50(3) SCO) the payment of bribes to or for the benefit of Mr Al Rajaan in breach of Article 158 SPC and/or Article 322 *Septies* SPC;

d. Laundering in the circumstances pleaded in paragraph 273B and following.[6]

279. Alternatively, each is liable under principles of English law for:

a. Bribery, as joint tortfeasors;

b. Dishonest assistance in breach of fiduciary duty.

**Secondary/Vicarious liability**

280. If, contrary to PIFSS' case above, EFG is not liable as principal for the torts and other civil wrongs alleged, it is liable under Article 240 of the Civil Code, alternatively vicariously liable under principles of Swiss law, alternatively vicariously liable under principles of English law for the torts and civil wrongs committed by Mr. Guerin and those employees which it supervised.

**Generally**

281. All transfers of the Secret Commissions are void in law as they were carried out for the purpose of concealing the Secret Commissions.

**H(2).    THE NASRALLAH/PENSÉE SCHEME**

281A. Following the intervention of the Swiss authorities in about May 2012 as set out above, Mr Al Rajaan and Mr Nasrallah took steps as set out below to procure that Mr Al Rajaan could continue to receive Secret Commissions from those financial institutions and intermediaries

153

that remained willing to continue to pay them in a way that ensured that such receipt was concealed, in particular from PIFSS. PIFSS infers that those Secret Commissions were paid as a continuation of one or more of the Schemes identified, alternatively pursuant to a new scheme arranged during Mr Al Rajaan's tenure as Director General of PIFSS.

281B. To that end, in or about June/July 2013, at Mr Al Rajaan's request, Mr Nasrallah commissioned Deltec Bank & Trust Limited ("**Deltec**") to create a Bahamian Foundation pursuant to the Bahamas Foundations Act 2004 (as amended) ("**the Foundations Act**"), namely Pensée. ~~The purpose of~~ Pensée was created to receive Secret Commissions for the benefit of Mr Al Rajaan and to conceal Mr Al Rajaan's receipt and ownership thereof, In particular:

a. In or about June 2013, a meeting took place between (at least) Mr Nasrallah, Mr Al Rajaan, and Mr Chalopin (on behalf of Deltec as Chairman) at the George V Hotel in Paris ("**the Deltec Meeting**", so called because Mr Nasrallah defines it as such in paragraph 159B of his defence herein).

b. The purpose of the Deltec Meeting was to arrange a mechanism by which Secret Commissions could be paid into accounts held by Deltec on behalf of Mr Al Rajaan, whilst ensuring that such receipt and Mr Al Rajaan's interest therein was concealed.

c. At the Deltec Meeting, Mr Nasrallah, Mr Al Rajaan and Mr Chalopin (on behalf of Deltec) agreed that Mr Nasrallah would indirectly open two bank accounts with Deltec, one in the name of Phoenix (on his own behalf) and a bank account with Deltec in the name of Pensée (on behalf of Mr Al Rajaan).

d. It was therefore also necessary for Pensée to be created with Mr Nasrallah as the Founder. Mr Chalopin (on behalf of Deltec) presented the necessary documents to Mr Nasrallah at the Deltec Meeting, at which they were signed by Mr Nasrallah. The documents so presented and signed included the execution of Pensée's Charter as set out in paragraph 281C below and the documents necessary to open the Pensée Account defined in paragraph 281D below.

e. At or around the time of the Deltec Meeting, Mr Nasrallah also signed a letter, as Founder of Pensée, in which he stated that the goal of Pensée was to provide for the educational and personal needs of Nadim Nasrallah (Mr Nasrallah's son) and that 100% of Pensée's assets should be held for Nadim Nasrallah ("the Pensée Letter of

154

Wishes").

f.   In addition, at or around the time of the Deltec Meeting:

   i.   Mr Nasrallah signed an "Appointment of Beneficiaries" pursuant to which he purported to appoint Nadim Nasrallah as a beneficiary of Pensée.

   ii.   A "Foundation Questionnaire and Agreement" was filled in and signed by Mr Nasrallah (dated 18 June 2013) and on behalf of Deltec (dated 18 July 2013), in which Mr Nasrallah was identified as the Founder of Pensée and Nadim Nasrallah was identified as the sole beneficiary of Pensée (and pursuant to which Deltec was to receive fees of US$19,000 for the establishment of Pensée and US$75,000 as an annual fee).

   iii.   Various other administrative documents ("Account Opening Form and Agreement", "Hold Mail Instructions", "General Terms and Conditions", "Waiver for Instructions Given by Telephone, Electronic Mail and / or Facsimile", "Account Profile for Investment Management Services", "Authorised Signatories", "Client Profile - Foundation Form") in relation to Pensée and the Pensée Account, were signed by Mr Nasrallah as the "Client".

g.   Further in relation to the "Client Profile - Foundation Form" signed by Mr Nasrallah and bearing the date 22 June 2013, section 5 (Statement of Wealth / Ownership) listed as the source of the funds to be credited to the Pensée Account "Inheritance", "Employment" and "Investments"; and provided further details in relation to the said sources: "Family Wealth. General Manager & CEO of Kuwait Pension Fund. Own Investment Portfolios". This was a reference to Mr Al Rajaan's claimed sources of wealth, not Mr Nasrallah's.

h.   Mr Chalopin (on behalf of Deltec) had arranged for the preparation of the documents referred to in sub-paragraphs d. to g. above in advance of the Deltec Meeting. As the arrangements made at the Deltec Meeting were for the ultimate benefit of Mr Al Rajaan, it is to be inferred that Mr Chalopin did so at the request of Mr Al Rajaan (or by someone else known by Mr Chalopin to be acting on behalf of Mr Al Rajaan).

i.   Each of Mr Nasrallah, Mr Al Rajaan and Mr Chalopin (and thus Deltec) was aware of each of the facts and matters set out in sub-paragraphs a. to h. above.

155

j.      For the avoidance doubt, the particulars set out above rely on documents and evidence provided by Mr Nasrallah on and after 15 June 2020. Where Mr Nasrallah has not provided supporting documents, PIFSS believes and relies on his account to the extent reflected above, pending disclosure, but was not aware of the relevant events at the time. PIFSS believes and relies on Mr Nasrallah's account as it is more likely than not to be true, including because it is (on PIFSS' case) contrary to Mr Nasrallah's own interests and is not (even if it intended to be) exculpatory.

281C.  Deltec duly caused Pensée to be created; Mr Nasrallah executed its Charter as its Founder on 18 June 2013 and it was registered in accordance with the Foundations Act on 3 July 2013.

281D.  At Mr Nasrallah's request, Deltec opened an account for the custody, administration and management of the assets of Pensée ("**the Pensée Account**").

281E.  By a private and confidential agreement which took effect from 20 June 2013 ("**the Pensée Agreement**") Mr Al Rajaan and Mr Nasrallah agreed that:

a.      In relation to Pensée, Mr Nasrallah would act as nominee for and on behalf of Mr Al Rajaan.

b.      The assets used to fund Pensée would be 100% owned by Mr Al Rajaan, regardless of their sources.

c.      Mr Nasrallah waived his automatic right under Bahamian law to revoke Pensée and agreed not to do so unless expressly directed to do so by Mr Al Rajaan.

d.      In the event of Mr Al Rajaan's incapacitation or death, his power under the Pensée Agreement should be vested in his daughters Fajer and/or Farah.

281E1. The circumstances in which the Pensée Agreement was agreed were as follows:

a.      At the Deltec Meeting, Mr Nasrallah prepared the original version of the Pensée Agreement by hand.

b.      Mr Chalopin (and through him Deltec) retained a copy of the original handwritten version of the Pensée Agreement at the conclusion of the Deltec Meeting.

c.      A typed version of the Pensée Agreement was produced at some point and signed by Mr Al Rajaan and Mr Nasrallah.

156

> d.      The typed version of the Pensée Agreement was retained by Deltec.
>
> e.      In the premises, it is to be inferred that Mr Chalopin (on behalf of Deltec) arranged for the typed version of the Pensée Agreement to be prepared.
>
> f.      Paragraph 281B.j is repeated in relation to the facts and matters set out in this paragraph.

281F.   Between July 2013 and October 2015 and as listed in Appendix 4A.1 to this statement of case, the following total amounts were received into the Pensée Account for the benefit of Mr Al Rajaan from the sources set out below (and, to the extent that PIFSS is presently aware, Appendix 4A.2 sets out the source of payments to the entities referred to below and the PIFSS investments to which they relate)[6]:

| No. | Payer | Total Amount Received (US$)* |
|---|---|---|
| 1 | ~~"Client"~~ | ~~781,896~~[6] |
| 2 | Caradoc Consulting Limited | ~~7,806,846~~ 8,588,742[6] |
| 3 | Quyvern Investments Corporation Services | 122,669 |
| 4 | Zetland Financial Group Ltd | 2,494,306 |
| 5 | Moccak Management Limited | 237,631 |
| 6 | Wentworth Development Corp | 526,371 |
| 7 | Garibaldi Management Investments Co | 1,967,966 |
| 8 | Monaro Properties Development | 12,371,037 |
| 9 | Benton Consultancy Ltd | 175,416 |
| 10 | Gold Coaster Holdings Limited | 1,664,517 |
| 11 | Breakers Management Corp | 14,733 |
| 12 | Dalton Financial Group Limited | 1,084,397 |
| 13 | Treadmore Corporation / Treadmore Ltd | 905,998 |
| 14 | Berwyn Management Limited / Berwyn Int'l | 816,406 |
| 15 | Dalmeny Real Estate Inc | 300,472 |
| 16 | Hillows Management Real Estate Corp | 262,451 |

157

\* All credits were received in Euros and they have been converted in to US$ at the rate applicable at the value date of payment.

281G.    Prior to 2013, the payers numbered 2 to 10 in the above table paid Secret Commissions to Mr Nasrallah's Ozak account at EFG Bank and the payers numbered 7 to 16 in the table paid Secret Commissions to Mr Nasrallah's Bordertown account at Pictet Bahamas, in each case for the benefit of Mr Al Rajaan.

281H.    Further, following the establishment of Pensée and the Pensée Account, Deltec acted on Mr Al Rajaan's instructions and reported to him in relation to the assets held in the account. In particular:

a.    Deltec has always understood and described itself (for example in its letter to Mr Nasrallah's solicitors dated 13 October 2020) as at all material times treating Mr Al Rajaan as the "beneficial owner" of Pensée.

b.    Deltec identified only Mr Al Rajaan as the person from whom it has taken instructions "on behalf of" Pensée.

c.    Deltec identified only Mr Al Rajaan as the person to whom it has reported in relation to Pensée, including informing him of the assets held by Pensée and providing portfolio reports upon request.

d.    In January 2017, Mr Nasrallah travelled to the Bahamas to try to close the Pensée Account but Mr Chalopin (on behalf of Deltec) was unwilling to do so and instead telephoned Mr Al Rajaan for instructions. Paragraph 281B.j is repeated in relation to this sub-paragraph.

281H1.    In the premises set out in paragraphs 281A to 281H above:

a.    The Pensée Agreement set out the true arrangements between Deltec, Mr Nasrallah and Mr Al Rajaan. It is relied on by PIFSS as demonstrating that various other documents prepared and/or executed by Mr Chalopin (of behalf of Deltec), Mr Nasrallah and Mr Al Rajaan were false and that each of them knew that. In particular:

i.    Mr Nasrallah signed the Pensée Letter of Wishes, which falsely stated that the goal of the Foundation was to provide for the educational and personal needs of Nadim Nasrallah and that 100% of Pensée's assets should be held

158

for Nadim Nasrallah, whereas in fact they were held to the order of Mr Al Rajaan as set out in the Pensée Agreement; and, as each of Mr Nasrallah, Mr Al Rajaan and Mr Chalopin (and thus Deltec) was aware, there was no intention that Nadim Nasrallah would benefit in any way.

ii.   Both the "Appointment of Beneficiaries" and the "Foundation Questionnaire and Agreement" falsely identified Nadim Nasrallah as the sole beneficiary of Pensée whereas in fact Pensée's assets were held to the order of Mr Al Rajaan as set out in the Pensée Agreement and, as each of Mr Nasrallah, Mr Al Rajaan and Mr Chalopin (and thus Deltec) was aware, there was no intention that Nadim Nasrallah would benefit in any way.

iii.   The various administrative documents described in paragraph 281B above identified Mr Nasrallah as the "Client" of Deltec in relation to Pensée and the Pensée Account, whereas it is clear from (a) the circumstances in which Pensée and the Pensée Account were set up (as described above) and (b) how Pensée and the Pensée Account were in practice operated as set out below that Mr Al Rajaan was the true client of Deltec and the sole provider of instructions to Deltec, as each of Mr Nasrallah, Mr Al Rajaan and Mr Chalopin (and thus Deltec) was aware.

b.   It is to be inferred from the facts and matters in sub-paragraph a. above that Pensée and the Pensée Account were created and operated with the intention of the key participants (namely Mr Chalopin, Mr Nasrallah and Mr Al Rajaan) of concealing and/or enabling Mr Al Rajaan to conceal through the creation of the false documents the fact that the true ultimate beneficial owner of Pensée was Mr Al Rajaan and that the purpose of the creation of Pensée and the Pensée Account was to enable Mr Al Rajaan to receive unlawful/corrupt payments[6].

c.   Accordingly, in setting up and operating Pensée and the Pensée Account as set out above, each of Mr Chalopin (and thus Deltec), Mr Nasrallah and Mr Al Rajaan was acting dishonestly.

d.   Mr Chalopin's (and thus Deltec's) actual or blind-eye knowledge of the purpose of Pensée and the Pensée Account as set out in sub-paragraph b. above is to be inferred from:

159

     i.     The inference in sub-paragraph c. above that he was acting dishonestly in setting up and operating Pensée and the Pensée Account in a manner designed to conceal Mr Al Rajaan's ultimate beneficial receipt of the funds paid into the Pensée Account;

     ii.     His awareness from at least the material set out in paragraph 281B.g. above that Mr Al Rajaan was "General manager & CEO" of PIFSS;

     iii.     Such that he must have realised or been told by Mr Al Rajaan and / or Mr Nasrallah that the funds being paid into the Pensée Account were unlawful and corrupt payments relating to Mr Al Rajaan's senior position at PIFSS; alternatively he turned a blind eye to the obvious source of the said funds, suspecting that they were unlawful and corrupt payments.[6]

281H2. Further, as against Mr Nasrallah and Mr Al Rajaan, PIFSS relies on their knowledge of and participation in the other Schemes described herein in support of the plea that they were dishonest in setting up and operating Pensée and the Pensée Account.

281I. As at 8 May 2020, the total value of the assets held in the Pensée Account for the benefit of Mr Al Rajaan was US$42.9 million.

**The role of Pensée**

281I1. As to Pensée:

     a.     As set out in paragraph 281B above, Pensée was and is a Bahamian Foundation established pursuant to the Foundations Act and is a legal and not a natural entity; by Article 20 of its Foundation Charter, it is expressly governed by Bahamian law. Accordingly (and consistently with paragraph 56 above), the issue of attributing the mental states and conduct of human individuals to Pensée is governed by Bahamian law. Bahamian law relating to the attribution of states of mind and conduct to legal entities is, in these respects, the same as English common law.

     b.     As set out in paragraphs 281A to 281I above, in relation to the facts and matters there set out Pensée was controlled by, and/or acted through and/or at the direction of, Mr Al Rajaan and/or Mr Nasrallah. Accordingly, the knowledge and/or dishonesty of each of them is to be attributed to Pensée in relation to the facts and matters set out in paragraphs 281A to 281I above. In particular:

i.   The facts and matters set out in paragraph 281H above are repeated, which demonstrate that in practice Mr Al Rajaan acted on behalf of Pensée and/or was its controlling mind and will. Further, in a letter dated 13 October 2020, Deltec confirmed that Mr Al Rajaan instructed Deltec on behalf of Pensée. Accordingly, PIFSS infers that Mr Al Rajaan had actual or implied authority from Pensée in relation to the arrangements pleaded above.

ii.   The true arrangements recorded in the Pensée Agreement necessarily result in Mr Al Rajaan's being the beneficiary and the controlling mind and will of Pensée, as is also confirmed by the facts and matters set out in paragraph 281H above. In particular, Mr Al Rajaan was the ultimate source of all of Pensée's assets and retained control over those assets.

iii.   Mr Nasrallah was the Founder of Pensée and had actual or implied authority to execute and then operate (albeit in reality under the control of Mr Al Rajaan) the Pensée arrangements on its behalf.

c.   Further or in the alternative, Deltec is the foundation agent in respect of Pensée within the meaning of section 12 of the Foundations Act, which by virtue of that section of that Act is (and was at all material times) consequently also an officer of Pensée. At all material times, Deltec was Pensée's sole appointed officer (and thereby its official representative with authority to act on its behalf). In relation to the events described in paragraphs 281A to 281I above (and as set out in those paragraphs), Deltec was in turn acting through Mr Chalopin. Accordingly, Mr Chalopin's state of mind is to be attributed to Pensée (via its officer Deltec).

d.   Accordingly, the dishonest conduct and knowledge of Mr Al Rajaan and/or Mr Nasrallah and/or Mr Chalopin (and thus Deltec) is to be attributed to Pensée in relation to the creation and operation of the Pensée Account.

**Liability**

**Mr Al Rajaan**

281J.   By reason of the above facts and matters, Mr Al Rajaan is liable for civil wrongs under Article 227 of the Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches[6]:

161

a.   Breach of Articles[6] 11 and 12[6] of the Public Property Law; the manner in which he authorised or influenced PIFSS to enter into the investments to which the above Secret Commissions related and intentionally committed it to rights and obligations in return for the payment of Secret Commissions, was detrimental to PIFSS' interests;

b.   Breach of Article 35 of the Penal Code amended by the Bribery Law: Mr Al Rajaan knew his position as Director General of PIFSS and was acting in the course of his authorised duties in authorising or influencing PIFSS to enter into investments in return for which he secured the promise and payment of Secret Commissions; ~~and/or~~[6]

c.   Breach of his Civil Service duties; and/or

d.   Breach of Article 2 of the Money Laundering Law No.35 of 2002, and Article 2 of the Money Laundering Law No.106 of 2013[6].

281K.  Alternatively, he is liable under principles of Bahamian law, which is in this respect the same as English law for:

a.   breach of fiduciary duty (best interests, good faith, no conflict and no profit); and/or

b.   bribery.

281L.  In any event, PIFSS has proprietary rights in relation to all assets held in the Pensée Account because those assets are Secret Commissions or their traceable proceeds and constitute public property as a matter of Kuwaiti law, under which PIFSS is entitled to enforce proprietary rights in respect of the unlawful retention of public property.

281M.  Alternatively, Mr Al Rajaan holds the Pensée Account, the assets held within it and all rights vested in him in relation to such assets (including as against Mr Nasrallah and Deltec) on trust under Bahamian law, which in this respect is the same as English law, for PIFSS such that PIFSS is entitled to orders that he take all necessary steps to ensure that such assets are transferred to PIFSS.

**Mr Nasrallah ~~and the Pensée Foundation~~**

281N.  Mr. Nasrallah is ~~and Pensée are~~ liable for civil wrongs under ~~both~~[6] Articles[6] 227, 228[6] and 229 of the Kuwaiti Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches:[6] as a perpetrator, and aider and abettor within the

162

meaning of Articles 47-48 of the Penal Code in respect of his ~~their~~ role~~s~~ in relation to Mr.[6] Al Rajaan's breaches of Article~~s~~[6] 11 and 12[6] of the Public Property Law referred to above and breaches of Article 35 and 39 of the Penal Code; and/or for breach of Article 2 of the Money Laundering Law No.35 of 2002, and Article 2 of the Money Laundering Law No.106 of 2013[6].

281O.    Alternatively:

    a.    Mr. Nasrallah is ~~and Pensée are~~ liable under principles of Bahamian law, which in this respect is the same as English law, for dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty and knowing receipt of trust property in respect of the funds paid to the Pensée Account; and

    b.    Mr Nasrallah ~~and Pensée~~ hold~~s~~ any rights vested in him ~~them~~ in relation to the assets in the Pensée Account on trust for PIFSS such that PIFSS is entitled to orders that they take all necessary steps to ensure that such assets are transferred to PIFSS.

**The Pensée Foundation**

281P.    Under Kuwaiti law, Pensée is liable for civil wrongs under ~~both~~[6] Article~~s~~[6] 227, 228[6] and 229 of the Kuwaiti Civil Code as a result of the conduct of each of Mr Al Rajaan and / or Mr Nasrallah in acting (on the basis pleaded at paragraph 72B above)[6] as a perpetrator, and aider and abettor within the meaning of Articles 47-48 of the Penal Code in respect of ~~its role~~ their roles[6] in relation to Mr Al Rajaan's breaches of Article~~s~~[6] 11 and 12[6] of the Public Property Law referred to above and breaches by Mr Al Rajaan and / or Mr Nasrallah[6] of Article 35 and 39 of the Penal Code on the basis that (as is PIFSS's primary case) the acts and state of mind of Mr Al Rajaan and / or Mr Nasrallah are attributable to Pensée. Further or alternatively, Pensée is liable for civil wrongs under Articles 227, 228 and 229 of the Kuwaiti Civil Code for its breaches (by attribution of the acts and state of mind of Mr Al Rajaan, Mr Nasrallah and / or Mr Chalopin (either through Deltec or directly)) of Article 2 of the Money Laundering Law No.106 of 2013 and/or the conduct giving rise to such breaches.[6]

281Q.    Alternatively (if Bahamian law applies):

    a.    Pensée is liable under principles of Bahamian law, which in this respect is the same as English law, for dishonest assistance in Mr Al Rajaan's breach of fiduciary duty in respect of the funds paid to the Pensée Account in that (as set out above):

163

       i.       Pensée assisted Mr Al Rajaan in his breach of fiduciary duty by receiving and concealing assets on behalf of Mr Al Rajaan;

       ii.      Such assistance was dishonest, the dishonest state of mind (as set out at paragraph 281I1 above) of Mr Al Rajaan and /or Mr Nasrallah and/or Mr Chalopin (and thus Deltec) being attributed to Pensée;

b.      Pensée is liable under principles of Bahamian law, which in this respect is the same as English law, for knowing receipt of the funds paid to the Pensée Account which were the traceable proceeds of Mr Al Rajaan's breach of fiduciary duty. In particular:

       i.       Each of Mr Al Rajaan and Mr Nasrallah knew that the funds represented the proceeds of Mr Al Rajaan's breach of fiduciary duty; and

       ii.      As set out at paragraph 281I1 above, the state of mind of Mr Al Rajaan and /or Mr Nasrallah is to be attributed to Pensée for these purposes.

281R.    In any event, the proprietary claims set out in paragraph 281L above are repeated in relation to the Pensée Foundation regardless of attribution on the basis of the Kuwaiti law claims against Mr Al Rajaan (alternatively Mr Nasrallah).

281S.    Alternatively, under Bahamian law, Pensée holds any rights vested in it in relation to the assets in the Pensée Account on trust for PIFSS on the basis that (if Bahamian law applies) Pensée has received those rights / assets as the traceable proceeds of bribes to which PIFSS has an equitable proprietary claim and Pensée is not a bona fide purchaser for value without notice.

## I.    THE UBP SCHEME

282.    On a date unknown in or prior to 2003 and pursuant to the scheme pleaded at section C above, Mr Al Rajaan and/or Mr. Nasrallah had discussions with UBP SA, principally through Mr. Edgar de Picciotto with a view to:

a.      Securing Secret Commissions from UBP in relation to investments which Mr. Al Rajaan would authorize or influence PIFSS to agree, and in respect of which UBP would have a commercial interest including by way of fees;

b.      Putting in place an off-shore corporate banking structure for him personally and Mr. Nasrallah and Phoenix as intermediary, through which Secret Commissions could be

164

paid and concealed.

283.    Mr. Al Rajaan and Mr. Nasrallah procured Secret Commissions to be paid to Mr. Al Rajaan by UBP SA and/or UBP AM at its direction in connection with the authorisation or influencing by Mr. Al Rajaan of investments by PIFSS in UBP investment products.

284.    UBP SA is a private bank which was at all material times ultimately owned and controlled by members of the de Picciotto family.

285.    It is to be inferred from the facts and matters set out below that in or about December 2002 and/or[6] January 2003 Edgar de Picciotto agreed to pay Secret Commissions to Mr. Al Rajaan through Mr. Nasrallah and his company Phoenix as intermediary.

286.    Accordingly, it is to be inferred that Mr. Edgar de Picciotto procured UBP SA to enter into a purported "Introducer's" Agreement with Phoenix ("**the UBP Nasrallah Agreement**") dated 30 January 2003. Its terms included the following:

    a.    The address for Phoenix was Mr. Nasrallah's home address;

    b.    The Bank would recompense the agent (stated as Phoenix) for clients introduced;

    c.    Remuneration for the agent's activity: the Bank would pay the agent a finder's fee on the basis of each client's assets provided that the contributions were more than CHF 20 million: *inter alia* 50% of the gross management fees and incentive fees calculated quarterly;

    d.    Correspondence: for Phoenix it was to be sent to UBP SA's address, notwithstanding that, by its terms, the agreement purported to disavow any relationship of agency with UBP SA.

287.    It is to be inferred from the operation of other known schemes upon the similarity of the facts of which PIFSS will rely and from the facts and matters set out in paragraphs 294 to 308 below that, at all material times, Mr. de Picciotto and his family (with whom he would have shared the information given their status as family, owners / senior personnel of UBP SA) knew and intended that:

165

[THE UBP SCHEME]<sup></sup>[6]

a.      The UBP Nasrallah Agreement was a front for the payment of Secret Commissions to Mr. Al Rajaan;

b.      The ultimate beneficiary of the payments under the UBP Nasrallah Agreement was intended to be Mr. Al Rajaan for whom Mr. Nasrallah was intermediary and nominee;

c.      Phoenix would be used as the vehicle to receive Secret Commissions on behalf of Mr. Nasrallah and, ultimately, Mr. Al Rajaan.

287A.  In further support of PIFSS' case at paragraph 287 above, as was known to and intended by Mr. Al Rajaan, Mr. Nasrallah, Mr. Edgar de Picciotto and his family, Mr. Nasrallah performed no material services as introducer and/or intermediary, let alone any services that could justify the fees that he and Phoenix received pursuant to the UBP Nasrallah Agreement on any genuine commercial basis. For example:

a.      Mr. Nasrallah did not introduce PIFSS to UBP.

b.      Mr. Al Rajaan attended an introductory meeting at UBP's offices on 9 December 2002 with Messrs. Edgar and Daniel de Picciotto (and, it is to be inferred, Mr. Guy de Picciotto who, along with Mr. Daniel de Picciotto, signed a letter to Mr. Al Rajaan after the meeting). Mr. Nasrallah was not involved in that meeting. The relevant communications took place between Mr. Al Rajaan and UBP directly and without intermediation by, or reference to, Mr. Nasrallah or Phoenix.

c.      Ms. Anne de Picciotto made contact with Mr. Nasrallah in January 2003, after Mr. Al Rajaan's introductory meeting at UBP. On 13 January 2003 she proposed Mr. Nasrallah as an introduction agent in an internal memo. Whilst that memo states that "*the client*" was "*introduced by the agent*", it is to be inferred from (i) the fact that Mr. Al Rajaan had already met with Mr. Edgar de Picciotto (and Messrs. Daniel and/or Guy de Picciotto) directly and without Mr. Nasrallah's involvement on 9 December 2002; and (ii) the lack of contemporary evidence of such introduction, that this statement by Ms. Anne de Picciotto was false, and that the true position is recorded in a memo dated 6 September 2013 prepared by Ms. Edith Dickson (UBP Jersey Head

of Compliance) that PIFSS had been "*introduced by the Chairman of UBP* [Edgar de Picciotto] *and one of his sons*".

d.    Throughout the course of the relationship between PIFSS and UBP, Mr. Nasrallah performed no material intermediary services.

e.    Mr. Nasrallah's involvement and the fees he was being paid (through Phoenix) were deliberately concealed in UBP's communications with PIFSS throughout the course of the relationship (including as further particularised at paragraph 307.d below).

f.    Mr. Nasrallah's interactions with UBP in practice principally related to chasing and processing fees under the UBP Nasrallah Agreement. This included monthly (or, at least, regular) direct personal contact by telephone between Mr. Nasrallah and Ms. Anne de Picciotto and/or others at UBP (including, at least during Ms. Anne de Picciotto's maternity leave in 2003, Mr. Daniel de Picciotto) to notify Mr. Nasrallah of how much he would receive in the quarter and notifications each time his account was credited.

g.    Mr. Nasrallah had no (or no material) role in negotiating the fees paid under the UBP Nasrallah Agreement from time to time, including any changes to the fees paid which were negotiated and agreed directly between Mr. Al Rajaan and UBP(including as further particularised at paragraph 289A below).

h.    Mr. Nasrallah also did not even purport to introduce any investor other than PIFSS to UBP pursuant to the UBP Nasrallah Agreement.⁶

288.    Shortly following the agreement to pay Secret Commissions and the UBP Nasrallah Agreement PIFSS made its first UBP investment, on 26 February 2003, and thereafter established an investment relationship between UBP SA, PIFSS and UBP AM in the course of which:

a.    At all material times, PIFSS was represented by Mr. Al Rajaan;

b.    UBP SA procured five dedicated funds to be set up with PIFSS as sole beneficial investor ("**the Kuva Funds**") for which UBP AM performed the role of investment

167

manager, and on the boards of directors and investment committees Mr. Al Rajaan sat. Initially, Mr. Al Rajaan, Ms. Lama Al Dhakeel and Ms. Safa Al Mulla were directors and members of the investment committee of Kuva Alternative, though Ms. Lama Al Dhakeel and Ms. Safa Al Mulla resigned in November 2004. Mr. Al Rajaan also resigned as a director of Kuva Alternative at that time, though he remained part of the investment committee. Furthermore:

a.  In July 2003, and in the context of Ms. Anne de Picciotto notifying Ms. Lama Al Dakheel of the management fees, legal fees and travel expenses of Kuva Alternative for her approval, Ms. Anne de Picciotto attempted to charge Kuva Alternative US$50,000 for travel expenses, which Ms. Lama Al Dhakeel queried with Mr. Al Rajaan and reported to Ms. de Picciotto that there had been a "*misunderstanding*" and the correct figure was only US$15,000, "*not $50,000 which is extremely high*".

b.  After Ms. Lama Al Dhakeel and Ms. Safa Al Mulla had resigned, Mr. Al Rajaan received from the Kuva Funds substantial quarterly payments: (i) labelled, at Mr. Al Rajaan's direction, as investment committee "*expenses*" (recorded by UBP to be US$160,000 per quarter across the funds as at 31 December 2008) and; (ii) subsequently (following termination of the relevant investment committees) in relation to the Acti B fund, director fees (recorded by UBP to be US$75,000 per quarter from the fourth quarter of 2009).

c.  Such payments were known to be exceptionally high within UBP (as expressly recognised internally by at least Ms. Elaine Miskiewicz (née Coulter) and Mr. Daniel de Picciotto in 2006).

d.  It is in any event to be inferred that these payments did not represent compensation that was proportionate to any services rendered by Mr. Al Rajaan to the Kuva Funds or expenses incurred by him. Although in an email to Mr. Frogg on 24 November 2005, Mr. Daniel de Picciotto requested that the payments be labelled as "*expenses*" and not "*Fees*", and in an email from Mr. Frogg to Ms. Miskiewicz dated 20 April 2007 Mr. Frogg conveyed the fact that Mr. Al Rajaan had underlined that UBP must make sure to call "*this "fee" "investment committee expenses relating to meetings etc …." in the transfers*", Mr. Al Rajaan never incurred or provided documents to UBP to substantiate any claims for expenses, and it is to be inferred that the payments were fees and not reimbursement for expenses.

e.  Such payments to Mr. Al Rajaan from the Kuva Funds were deliberately

168

concealed from PIFSS notwithstanding direct enquiries as to what payments Mr. Al Rajaan received in the circumstances pleaded further below.[6]

c.    PIFSS invested c. US$1.3 billion in the Kuva Funds which generated fees for UBP SA and/or UBP AM of <u>at least</u>[6] c. US$170 million (and, on the UBP Defendants' admission, c. US$180.3 million)[6]. The fees charged to PIFSS (not including any administrative or credit fees (on the loans made by UBP to the Kuva Funds)) were as follows:

   a.    Kuva Alternative: 1.5% management fees (on the basis pleaded at paragraph 288A below); 12% performance fees; 0.15% custody fees;

   b.    Japan Fund: 1.5% management fees; 12% performance fees; 0.15% custody fees;

   c.    India Fund: 1.5% management fees; 12% performance fees; 0.15% custody fees;

   d.    Acti Fund: 1% management fees; 10% performance fees; 0.15% custody fees – save in respect of Acti Class B shares in 2009, in respect of which UPB charged performance fees at 20% and management fees at 1.5% (the latter uplift agreed, it is to be inferred, during a call between Mr. Al Rajaan and Mr. Edgar de Picciotto in or around August 2009);

   e.    MDMS Fund: 1.5% management fees; 15% performance fees; 0.15% custody fees.[6]

d.    The fees generated for UBP by the Kuva Funds were inflated to facilitate the payment of exceptionally high fees under the UBP Nasrallah Agreement and therefore the payment of Secret Commissions. For example:

   a.    As confirmed in an email from Mr. Michael de Picciotto to Mr. Richard Wohanka (of UBP) on 18 January 2011, PIFSS' investment relationship with UBP, through its investments in the Kuva Funds was well known within UBP to be its most profitable relationship, even with 50% of the management and performance fees charged being paid to Mr. Nasrallah/Phoenix. Mr. Wohanka commented in reply: "*I keep forgetting how much in dirty fees we take at UBP!*" This email exchange was also copied to Mr. Guy de Picciotto.

   b.    In contrast to the fees paid under the UBP Nasrallah Agreement, according to an internal UBP memorandum dated 2 May 2011, UBP's general policies mandated a maximum fee under finders contracts of 30% of fees (if the net

assets of clients introduced by the finder exceeded CHF 20 million). Furthermore, the bank's general policies provided that retrocessions would only be paid after a minimum profitability threshold of 0.50% was reached for the bank.

c.     Mr. Al Rajaan did not on behalf of PIFSS at any time seek to negotiate the level of fees being charged to PIFSS (whereas he did, through Ms. Lama Al Dakheel, negotiate down the amount of interest which PIFSS paid to UBP on the loans provided to the Kuva Funds by the bank, and which interest payments would not result in commissions being paid to him).

d.     Had there been any genuine commercial negotiations, PIFSS would have had significant leverage to negotiate substantial discounts on fees, including in circumstances where it was the only investor in the Kuva Funds and was investing very substantial sums.[6]

288A.   UBP procured a change in the basis on which their management fee was calculated from net asset value (NAV) to average invested asset value. This meant that loans from UBP to the Kuva Funds would be included in the calculation, resulting in a substantial increase in the management fees (for example, in the case of Kuva Alternative, the value on which management fees were calculated increased by some US$100 million, and PIFSS estimates that the change of basis led to an overall increase in fees received by UBP by some US$5.8 million). This change was proposed by UBP, and was agreed by Mr. Al Rajaan, it is to be inferred in at least 2004 and 2006 based on the dates of documents agreeing to the change of basis signed by Mr. Al Rajaan in respect of Kuva Alternative (and in the case of 2006 signed during a meeting between Mr. Daniel de Picciotto and Mr. Al Rajaan on or around 5 January 2006), with the intention (contrary to the interests of PIFSS) of increasing the level of management fees received by UBP and, as a result, a commensurate increase in the level of commissions paid under the UBP Nasrallah Agreement. For the avoidance of doubt, the average invested asset basis for calculating the management fee was not limited to Kuva Alternative, and PIFSS understands it to have applied to other Kuva funds (including Kuva Japan, Kuva India, Kuva Acti, Kuva Acti B, and MDMSF).[6]

288B.   On or around 9 June 2008, prior to establishing the Acti Fund, Mr. Daniel de Picciotto agreed with Mr. Al Rajaan, having spoken with him, that the director expenses of the fund would not be subtracted from the 50% of the management fee to be shared with Mr. Nasrallah/Phoenix. Mr. Nasrallah was not party to that conversation and agreement,

170

confirming that Mr. Daniel de Picciotto knew that Mr. Al Rajaan was the true negotiating party in respect of fees and the beneficiary of payments under the UBP Nasrallah Agreement.[6]

289. The UBP Nasrallah Agreement was amended on 30 January 2009, and then replaced by a substitute agreement on or about 13 October 2009 at or about the time that PIFSS increased (including by investing US$550 million into the Acti Fund)[6] and restructured its holdings in the Kuva Funds, and further amended on or about 14 June 2011. By such 2009 substitute agreement UBP SA correspondence was to be sent to Daniel de Picciotto, from which fact his personal knowledge of and involvement of the arrangements pleaded above is additionally[6] to be inferred.

289A. It is to be further inferred from the circumstances in which the fees under the UBP Nasrallah Agreement were negotiated, agreed and amended that: (i) Mr. Nasrallah had no material role in negotiating the fees paid under the UBP Nasrallah Agreement, which were negotiated and agreed directly between Mr. Al Rajaan and UBP; and (ii) it was known by all parties involved that Mr. Al Rajaan was the true negotiating party in respect of fees and the beneficiary of payments under the UBP Nasrallah Agreement. For example:

a. On 23 September 2008, Ms. Elaine Miskiewicz emailed Mr. Daniel de Picciotto and Mr. Jan Frogg asking for their comments in relation to the investment committee fees paid in respect of the Kuva Acti Fund and attaching the "*Phoenix introduction fee agreement*" (point 2). Mr. Frogg replied that "*we need to ask Al-Rajaan the question on both items*", and asked Mr. Daniel de Picciotto to handle this as he was going to call Mr. Al Rajaan. Mr. Daniel de Picciotto replied that he had not realised that the incentive fee split for the Acti Fund was to be 60%/40% and that he was trying to reach Mr. Al Rajaan to check about proceeding with the allocation. He subsequently confirmed on 25 September 2008 that he had spoken to Mr. Al Rajaan and that Mr. Frogg and Ms. Miskiewicz should proceed with the 60%/40% split regarding the incentive fee.

b. In November 2008, email correspondence within UBP involving (at least) Mr. Daniel de Picciotto, Ms. Elaine Miskiewicz, and Ms. Laurence Mondako made clear their understanding that amendments to the UBP Nasrallah Agreement were being negotiated with Mr. Al Rajaan, and were being prepared by UBP for agreement with

171

Mr. Al Rajaan, without any (or any genuine) involvement of Mr. Nasrallah. This included Ms. Miskiewicz asking on 10 November 2008 for the document to be sent to Mr. Daniel de Picciotto's office for signing at a "*client meeting*" with Mr. Al Rajaan.

c.      Only late in the process of amending the UBP Nasrallah Agreement was it pointed out in an email from Ms. Mondako to Ms. Miskiewicz on 24 November 2008 that the amendments "*must be signed by Phoenix and not Mr. A.R.*",  from which it is to be inferred that they recognised: (i) that it would be improper and unacceptable for the agreement to be signed by Mr. Al Rajaan; and/or (ii) that the true beneficiary of the UBP Nasrallah Agreement was Mr. Al Rajaan.

d.      In or around May 2009, Mr. Al Rajaan asked UBP for a copy of each and any document he had signed, including those he had signed every time he visited UBP. In answer to a question from Mr. Daniel de Picciotto (through Ms. Diot-Saroglia) as to what the documents that Mr. Al Rajaan signed related to, Mr. Frogg stated "*essentially the retrocession contracts*". Mr. Frogg also said to Ms. Diot-Saroglia that the only documents signed by Mr. Al Rajaan that he could send were the documents held on UBP's "*official files*" in Bermuda, which he would ask Ms. Miskiewicz to compile. It is to be inferred from the absence of any such documents from the UBP Defendants' disclosure that the documents referred to by Mr. Frogg existed but were deliberately not saved to the "*official files*" and/or destroyed by reason of their incriminating nature.

e.      As part of the process within UBP whereby the UBP Nasrallah Agreement was terminated and replaced by a substitute agreement on or about 13 October 2009, it was confirmed that the issue of the new agreement with Phoenix was being personally monitored by UBP's president (which was a reference to Mr. Edgar de Picciotto) and was part of a very important relationship. Mr. Edgar de Picciotto (through Ms. Mondako), Mr. Frogg and Ms. Miskiewicz subsequently exchanged emails on 4 November 2009, in which Mr. Edgar de Picciotto requested the payment of all commissions due to Phoenix up to 30 September 2009 (such payments having been on hold), Ms. Miskiewicz requested a copy of the new agreement, and Mr. Frogg suggested that it had been signed during one of Mr. Al Rajaan's visits.

172

[THE UBP SCHEME][6]

f.      On 11 October 2010, Mr. Edgar de Picciotto emailed Mr. Wohanka, copying Mr. Guy de Picciotto, to report on a meeting he had held with Mr. Al Rajaan concerned with a potential investment (by PIFSS) in a Turkish Fund. Mr. Wohanka replied that he would prepare the relevant documents ready for Mr. de Picciotto's next meeting with Mr. Al Rajaan in Geneva that week, and expressed the view that it was "*better for us*" that PIFSS subscribe to the fund. Mr. Edgar de Picciotto replied at 10.07 stating: "*Please bear in mind that we will have to give him* [i.e. Mr Al Rajaan] *back 50% of all fees*." Mr. Wohanka replied on the same day stating that he understood, to which reply Mr. Guy de Picciotto was also copied.

g.      On 15 October 2010, Mr. Edgar de Picciotto emailed Mr. Wohanka about a call from Mr. Al Rajaan confirming the time of his meeting at 12.30 that day. Mr. Edgar de Picciotto emailed again after this meeting with Mr. Al Rajaan to report that he had "*subscribed to 50 millions $ .at the management fee of 1.75% to be shared 50% with Nasrallah*", describing such deal as "*our usual deal*", so referring to the deal under which 50% of fees were paid to Mr. Al Rajaan as stated in subparagraph (f) above.[6]

290.    Phoenix received payments of no less than US$69.6 million pursuant to the UBP Nasrallah Agreement, as follows (as set out in Appendix 5.2)[6]:

a.      From 2003 to early 2008 US$19.5 million was transferred from UBP AM's bank account in Geneva to Phoenix's UBP SA bank account in London, and a single payment of US$330k was made to Phoenix's EFG bank account in Geneva.

b.      From 2008 to 2012, US$30.9 million was transferred from UBP AM's bank account in Geneva to Phoenix's UBP SA account in Geneva.

c.      From 2012 to 2015, US$18.8 million was transferred from UBP AM's bank account in Geneva to Mr. Nasrallah's account with Audi Bank, in Beirut.

291.    Tables showing the investments made and the Secret Commissions paid are appended to these Re-[7]Re-[6]Re-[5]Re-Re-Re-Amended Consolidated Particulars of Claim at Appendix 5.

292.    Of the commissions of US$69.6 million paid pursuant to the UBP Nasrallah Agreement, it is reasonably to be inferred that Mr. Al Rajaan ultimately received all or a substantial

173

proportion of the commissions which were paid to Mr Nasrallah through Phoenix. Such inference is to be drawn from the following (in addition to the facts and matters already pleaded at paragraphs 287A to 289A above)[6]:

a. Between 2004 and 2012, the sum of at least US$42.9 million was paid to Phoenix's EFG Account in Geneva (US$42.6 million paid from Phoenix's UBP SA accounts in London and Geneva as set out in Appendix 5.3[6] and US$330,000 paid directly from UBP AM as set out at entry 5.2.9 in Appendix 5.2[6]).

b. As pleaded in paragraph 237 228, in the period 2005 to 2012 payments of at least US$219.9 232.4230.8[6] million were made from accounts at EFG in the names of Mr. Nasrallah's companies to accounts held for Mr. Al Rajaan. Of those payments in the period 2005 2004[6] to 2012 (i.e. the period during which the transactions referred to in paragraph 292(a) were made)[6]:

   a. A total of at least US$107.0 115.5136.8[6] million was made from the same Phoenix account at EFG referred to in (a) above (see Appendices 4.2(G-L)[6];

   b. A total of US$12.9 million was made from the EFG accounts to the Suncoast Finance account at UBP SA referred to in paragraph 297 including US$4.3 million from the same Phoenix account (see Appendices 4.2J, 4.5L and 4.6A)[6];

c. The pattern of payments remitted by Mr. Nasrallah through his companies to Mr. Al Rajaan, or companies held for him pursuant to other known schemes, upon the similarity of the facts of which PIFSS will rely.

293. The payments under the purported UBP Nasrallah Agreement were made at the instance of and for the ultimate benefit of Mr Al Rajaan. Accordingly, insofar as any of the commissions were retained by Phoenix and/or Mr Nasrallah, it is PIFSS' case that they were retained with the authority and/or at the direction of Mr Al Rajaan and represented corrupt Secret Commissions.

294. At all material times, Edgar de Picciotto oversaw and managed the investment relationship between UBP SA and UBP AM and PIFSS with assistance from Daniel, Guy[6] and Anne de

174

Picciotto, and with further assistance from (at least) Mr. Jan Frogg, Ms. Elaine Miskiewicz, Mr. Roberto Joos and Ms. Laurence Mondako⁶.

295.   At all material times Edgar de Picciotto was ultimately responsible for all client relationships between Mr. Nasrallah and his companies and UBP SA and UBP AM as evidenced by a note on file by Ms. Anne de Picciotto to that effect dated 2~~2~~3⁶ July 2003 in the context of Mr. Nasrallah opening a bank account with UBP SA in London to receive the commissions payable under the UBP Nasrallah Agreement.

296.   Further, it is to be inferred that he, Daniel de Picciotto and Anne de Picciotto and Guy de Picciotto⁶ also oversaw the banking relationship between UBP SA and each of Mr. Nasrallah and his companies and Mr. Al Rajaan and his companies. Such inference is to be drawn from:

   a.   The structure of the bank, pursuant to which the members of the de Picciotto family took an active role in managing important commercial relationships;

   b.   Mr. Edgar de Picciotto's apparent personal relationship with Mr. Nasrallah;

   c.   Mr. Edgar de Picciotto visiting Lebanon such that, on or about 10 March 2008 he was personally able to verify Mr. Nasrallah's personal address for the purpose of purported compliance with money laundering obligations;

   d.   Ms. Anne de Picciotto meeting Mr. Nasrallah both in London and Geneva;

   da.   Ms. Anne de Picciotto oversaw the introduction of Mr. Nasrallah and was initially the relationship manager overseeing the relationship with Mr. Nasrallah and Phoenix, and personally oversaw: (i) the authorisation of commission payments to Phoenix's bank account in July 2003 (including by instructing Ms. Elaine Miskiewicz to make the payment, notwithstanding that the latter had been unable to find any copy of the retrocession agreement); and (ii) monthly notifications to Mr. Nasrallah of the payments he would receive;⁶

   e.   The fact that Daniel de Picciotto was the nominated contact for UBP SA on the UBP Nasrallah Agreement and was (subsequently to Ms. Anne de Picciotto) the relationship manager responsible for overseeing the relationship with Mr. Nasrallah

175

and Phoenix[6];

f.      The strategic importance of PIFSS as a client, as evidenced by its investment of c. US$1.3billion in UBP products, and accordingly of Mr. Al Rajaan as its Director General;

g.      The statement in the Form A Declaration for Mr. Al Rajaan's UBP SA account 201-0254253 that Mr. Edgar de Picciotto introduced Mr. Al Rajaan as a banking client on 13 February 2006;

h.      The obligations upon the bank summarised above at paragraphs 74 to 77 from which it is to be inferred that members of the family would be responsible for the banking relationship given Mr. Al Rajaan's status as a PEP, a status also occupied by Mr. Nasrallah given his close association with Mr. Al Rajaan. For example, the accounts of Scopeset and Suncoast were (as confirmed by UBP in the risk index tables completed in respect of those accounts) accounts of politically exposed persons, such that, pursuant to paragraph 77 above, decisions on those banking relationships were, as a matter of Swiss law, required to be taken at a bank's top management level, namely (in the case of UBP) by (or at least with the knowledge of) the de Picciotto family;[6]

i.      The personal involvement of (at least) Messrs. Daniel and Guy de Picciotto in the opening of accounts by Mr. Al Rajaan's companies, including as pleaded at paragraph 297 below;[6]

j.      The involvement of the de Picciotto family in overseeing Mr. Al Rajaan's instructions to close his accounts as soon as possible in 2012, including as pleaded at paragraph 303 below.[6]

297.    In the course of the above banking relationships the following accounts were opened with UBP SA:

a.      19 June 2003: Phoenix account no. 002-2037038 – UBP London (beneficial owner Mr. Nasrallah);

b.      19 December 2006: Mr. Al Rajaan: Account no. 201-0254253;

176

[THE UBP SCHEME][6]

c.    19 December 2006: Scopeset Ltd: Account no. 201-0254255 (beneficial owner Mr. Al Rajaan), which was opened with the involvement and initial approval of (at least) Mr. Guy de Picciotto[6];

d.    6 February 2007: Suncoast Finance Ltd: Account no. 201-0254314 (beneficial owner Mr. Al Rajaan), which was opened with Mr. Daniel de Picciotto recorded as a point of contact[6];

e.    18 March 2008: Phoenix; Account no. 6118409 (beneficial owner Mr. Nasrallah) in light of closure of the UBP London account (on 31 March 2008).

**Knowledge**

298.    UBP SA through at least Mr. Edgar de Picciotto, Mr. Daniel de Picciotto and Ms Anne de Picciotto and Mr. Guy de Picciotto[6] and those to whom they had delegated day to day management of the bank (including at least Mr. Frogg, Mr. Wohanka, Ms. Mondako and Ms. Miskiewicz)[6] knew or believed that the accounts operated by Mr. Nasrallah in the names of Ozak, Phoenix and Golgen and the sums held in them were held beneficially for Mr. Al Rajaan, as evidenced by the following facts and matters:

a.    Through the opening and operation of the accounts of Phoenix at UBP SA London and Geneva, UBP SA would have been aware that those accounts effectively acted as sweep accounts for the onward transmission of the Secret Commissions paid to Phoenix in respect of the Kuva Funds, in that (i) the accounts had no other source of income, and (ii) all (or substantially all) of the funds in the accounts were transferred to Phoenix's account at EFG;

b.    By transfers dated 19 February 2007, 27 February 2007, 5 March 2007 and 4 September 2007 Phoenix transferred the total sum of US$4.3 million from the same EFG account to Suncoast's UBP SA account (see Appendix 4.2J)[6]. The compliance forms for those transfers confirmed that these accounts had the same beneficial owner (i.e. Mr Al Rajaan) and in respect of the transfers of 27 February and 5 March the forms confirmed that the sums came from Mr Al Rajaan's personal wealth;

c.    Between April 2007 and November 2008 a total of US$7 million was transferred by

177

Ozak, from its account with EFG in Geneva to Suncoast's UBP SA account (see Appendix 4.5L)[6]. In respect of transfers dated 27 November 2007 and 14 July 2008 the compliance statements noted that the sums came from Mr Al Rajaan's personal wealth;

d.    On 17 June 2008 Golgen Property SA transferred the sum of US$1.5 million from its account with EFG to Suncoast's UBP SA account (see Appendix 4.6A)[6]. The compliance form for that transfer stated that this came from Mr Al Rajaan's personal wealth,;[6]

e.    The facts and matters pleaded at paragraphs 287A to 289A above.[6]

299.   At all material times UBP SA (through the same parties as stated in paragraph 298 above) knew that the purposes of its UBP SA accounts were to receive and transfer the commissions payable under the UBP Nasrallah Agreement to Mr Al Rajaan as evidenced by the above notes on file to that effect and because it was obvious from the nature and existence of the arrangement to pay Secret Commissions through the UBP Nasrallah Agreement.

300.   As pleaded above and below, UBP SA opened and operated bank accounts for Mr. Al Rajaan and Mr. Nasrallah. As stated above, the only source of funds for the Phoenix accounts was the Secret Commissions paid in respect of the Kuva Funds.

301.   Total net sums of at least US$14.9 million (ignoring inter account transfers) were paid into Mr. Al Rajaan's accounts, the vast majority (and likely all) of which represented Secret Commissions or the traceable proceeds thereof:

a.    US$12.9 million (being 86.6%) were payments made from the accounts of Phoenix, Ozak and Golgen at EFG and which it is reasonably to be inferred, on the basis of the matters pleaded in respect of the UBP Scheme and in section H, are Secret Commissions or the traceable proceeds thereof under the UBP Scheme or Further Nasrallah Scheme.

b.    US$2 million (being 13.4%) were from other sources and form no part of the six seven nine identified schemes.

178

Account closures and acts of dissipation

302.   On or about 7 May 2012 upon learning of the criminal investigation into his dealings with Mirabaud Mr. Al Rajaan contacted Fransabank where he held an account in Beirut and asked them to provide details of his account for the purposes of transferring the proceeds of his UBP SA accounts which they did by letter of that date.

303.   On or about 10/611 May 2012, Mr. Al Rajaan orally instructed UBP SA from London, as confirmed by fax to:

   a.   Liquidate securities (or other non-cash investments) from his accounts;

   b.   Convert all cash balances into Euros and to transfer that sum to his Fransabank account in Beirut;

   c.   To close all of his accounts as soon as possible;

303A.6 These instructions were given to mitigate the threat of further criminal investigation and so as to remove assets from the jurisdiction into a jurisdiction where enforcement would be difficult. Furthermore:

   a.   The instructions were intended to be, and were, understood by UBP as urgent. For example, a letter from Mr. Al Rajaan was prepared dated 11 May 2012, referring to his agreement that UBP acquire certain illiquid securities held by Suncoast at a 50% discount on their value.

   b.   Mr. Al Rajaan's instructions were initially received by Ms. Laurence Mondako by telephone on 10 May 2012. Ms. Mondako worked closely with the de Picciotto family (having been Mr. Edgar de Picciotto's personal assistant in 1986 and, it is to be inferred, privy to his dealings at all material times since); she was familiar with the PIFSS relationship and assisted the de Picciotto family (including Mr. Daniel de Picciotto) in relation to the PIFSS relationship. Further to PIFSS' case at paragraph 296 above, it is to be inferred that she was the initial point of contact because Mr. Al Rajaan's and his companies' banking relationship with UBP was overseen by the de Picciotto family.6

179

[THE UBP SCHEME][6]

304. On the same day Mr. Nasrallah instructed UBP SA to transfer of US$2.9million to his bank account with the Audi Bank in Beirut.

305. On 13 June 2012 Mr. Nasrallah withdrew US$290,000 in cash giving the reason that he "needs money" and by letter of that date instructed UBP SA to sell all bonds and shares in his portfolio, convert them to US dollars and to send him the cash. The instructions in May and June by Mr. Nasrallah were made following discussion with Mr. Al Rajaan and were made for the same reasons as set out in paragraph 303 above. Mr. Nasrallah's instructions on 13 June 2012 followed a meeting with Mr. Edgar de Picciotto on 12 June 2012, which he subsequently reported to Ms. Mondako.[6]

306. PIFSS' primary case, based on the timing of the events set out in paragraphs 302 to 305 and the facts of other schemes (in particular Mirabaud, Pictet and the Further Nasrallah Schemes) is that Mr. Al Rajaan and/or Mr. Nasrallah[6] expressly told (at least) Mr. Edgar de Picciotto of the criminal investigation into his conduct and therefore of the need to liquidate his and Mr. Nasrallah's assets, including those held in accounts of Phoenix, to mitigate the risk of criminal investigation. It is to be inferred that Mr. Edgar de Picciotto, Ms Anne de Picciotto, and[6] Mr Daniel de Picciotto and Ms. Mondako[6] then took such steps as were necessary internally within the bank to fulfil Mr. Al Rajaan's and Mr. Nasrallah's instructions in circumstances in which, if they had acted in compliance with the obligations set out in paragraphs 74 to 77, the transactions the subject of the instructions would have raised significant concerns and been the subject of proper enquiry, and should have been declined. It is to be inferred that they also knew that the instructions from Mr. Al Rajaan and Mr. Nasrallah were received at or around the same time and were connected.[6]

307. In any event, at all material times, UBP SA (through the individuals referred to in paragraph 2987 above[6]) and UBP AM (through Edgar de Picciotto or from information provided by him, and/or Ms. Miskiewicz who was at the material times a managing director of UBP AM[6]) knew the connection between Mr. Nasrallah and Mr. Al Rajaan and the companies incorporated by them and knew or believed that Mr. Al Rajaan was the ultimate beneficiary of all, alternatively the majority, of the commissions paid under the UBP Nasrallah Agreement and that, accordingly, the UBP Nasrallah Agreement was a front for the payment of Secret Commissions to Mr. Al Rajaan. So far as knowledge was not express, it is to be inferred from the following – in the case of UBP AM, sub-paragraphs (a) to (d):

[THE UBP SCHEME]<sup>6</sup>

a.  The facts and matters set out in paragraphs 287A8<sup>6</sup>-297 above;

b.  The lack of commercial rationale for UBP SA and UBP AM to pay commissions at a rate and scale and for an extended period which UBP paid to Mr. Nasrallah personally and/or through Phoenix if they were a legitimate introduction agent performing no further services for UBP SA and UBP AM having introduced a single institutional investor;

c.  The fact that the commissions paid to Mr. Nasrallah and/or Phoenix were not disclosed to PIFSS or referred to in any of the contractual documentation;

d.  The deliberate concealment, by omission and/or by deliberately ambiguous and/or untruthful statements<sup>6</sup>, by UBP SA of the Secret Commission arrangements underlying the UBP Nasrallah Agreement:

   a.<sup>6</sup>  In 2015, PIFSS sought information from UBP as to whether payments had been made to third parties and officers of PIFSS in respect of PIFSS' investments in the Kuva Funds. In particular, PIFSS wrote to UBP by letter dated 8 April 2015, asking UBP to confirm that UBP and "*Covered Associates…have not knowingly made…whether directly or indirectly any contribution or payment to any official, employee, staff, fiduciary or similar associate of* [PIFSS] *in violation of applicable law…*". The letter was headed "*Kuva Limited – The Acti Fund (Class A)*". However, it is PIFSS' case that no recipient of that letter with knowledge of the matters pleaded above could have honestly considered that the payments to Mr. Al Rajaan in respect of the Kuva Funds, either directly or through Phoenix, were not relevant to disclose in response.<sup>6</sup>

   b.  PIFSS' questions were initially responded to by email from Ms. Miskiewicz dated 30 June 2015, which stated that UBP had complied with applicable laws but ignored PIFSS' questions as to whether payments had been made to third parties and officers of PIFSS.<sup>6</sup>

   c.  On 7 July 2015 PIFSS requested further details including a request for any retrocession contracts between the Acti Fund (Class A) and any party.<sup>6</sup> By an

email dated 20 July 2015, Mr Mathew Davies on behalf of UBP (who would have taken instructions from at least Edgar de Picciotto before sending this letter) stated that the "Kuva Acti Fund" had not entered into any commission agreements, so (it is to be inferred) deliberately concealing the UBP Nasrallah Agreement;. Furthermore, Mr. Davies' response represented that the "*Beneficiary*" of the management fees (1%) and incentive fees (10%) paid in respect of the Acti Fund (Class A) was UBP, which in circumstances where those fees were shared under the UBP Nasrallah Agreement was misleading or (at best) deliberately ambiguous.[6]

d.      On 6 October 2015, PIFSS wrote to UBP requesting its (repeated) confirmation, that (relevantly) UBP had not knowingly made payments (directly or indirectly) to any official (including former senior officials) of PIFSS in violation of applicable laws.[6]

e.      A letter was then drafted within UBP and sent to Ms. Miskiewicz to sign. She did not sign it; rather, she emailed Mr. Roberto Joos on 19 October 2015 stating that she was not sure how to respond "*given there were payments made to Mr. Al-Rajaan as director of the funds (Kuva Alternative, Kuva Limited) also I am not aware of the person(s) behind the Phoenix to whom the introduction agent payments were made*". In fact, in the premises of the above, Ms. Miskiewicz was aware, as she had been personally involved in the negotiation of the UBP Nasrallah Agreement with Mr. Al Rajaan (as pleaded at paragraph 289A above). Mr. Joos forwarded the email to Mr. Edgar de Picciotto who questioned why Phoenix was being raised and otherwise, materially, responded: "*Don't do anything. I get back to Geneva today and [you] have to come see me [this week]/[tomorrow] IN ORDER TO SORT OUT WHAT SEEMS TO ME TO BE A REAL PROBLEM. Make sure there are no communications with them [i.e. PIFSS].*" It is to be inferred that the "*real problem*" arose because, as Mr. Edgar de Picciotto knew and as Ms. Miskiewicz knew (or at least suspected), the payments to Phoenix were going to Mr. Al Rajaan, and PIFSS was not aware of this. The decision was therefore taken deliberately to conceal the payments when any honest reply to PIFSS' enquiries would have disclosed them.[6]

f.      UBP accordingly responded to PIFSS by letter on 30 October 2015, signed by Mr. Davies and Mr. Homer. Again, the letter did not disclose any retrocession payments and confirmed the statements in PIFSS' letter dated 6 October 2015 "*without exception*". Ms. Miskiewicz did not sign this letter as originally intended, and it is to be inferred that she considered herself unable to do so in the circumstances pleaded above.⁶

g.      On 19 June 2016, PIFSS wrote to UBP requesting details of any PIFSS representatives on the board or advisory committee of the Kuva Acti Fund, including any amounts paid to them (whether by way of salary, bonus, allowance, reimbursement, or any other emoluments paid). Mr. Homer responded on behalf of UBP on 5 October 2016 representing that there had been no payments made by the fund.⁶

e.      The co-incidental timing of the instructions from Mr. Al Rajaan and Mr. Nasrallah, without plausible explanation, to liquidate and realise their assets and transfer them away from their UBP SA accounts into cash or a jurisdiction where asset protection measures would be difficult;

f.      The apparent lack of enquiry or challenge by UBP SA to those instructions in light of the coincidence of timing and given the nature of the instructions, in breach of the obligations set out in paragraphs 74 to 77 above;

g.      The lack of action taken by UBP SA internally or externally whether before or after those instructions to investigate or report the transactions connected with the UBP Nasrallah Agreement and the transfers between Mr. Nasrallah and his entitles and Mr. Al Rajaan and his entities.

308.    Further or alternatively, if (which is denied) the monies paid under the UBP Nasrallah Agreement represented legitimate payments for genuine services rendered and were not corrupt as regards the intention of UBP SA and UBP AM, in any event the arrangements between Mr. Nasrallah and Phoenix and the subsequent payments by Mr. Nasrallah, acting personally or through Phoenix to Mr Al Rajaan or corporate or other accounts held on his behalf constituted the unlawful promise and payment to Mr. Al Rajaan (at his request) of Secret Commissions. Mr. Nasrallah acting through Phoenix had a commercial interest in the

183

establishment and maintenance of an investment relationship between PIFSS and UBP SA and UBP AM (through their commission arrangements under the UBP Nasrallah Agreement) and sought to influence Mr. Al Rajaan to authorise or influence PIFSS to make investments with UBP SA and UBP AM which would benefit Mr. Nasrallah and Phoenix personally through those arrangements with UBP SA and UBP AM.

**Liability**

**Mr. Al Rajaan**

309. Mr. Al Rajaan is liable for civil wrongs under Article 227 of the Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches[6]:

   a.   Breach of Articles[6] 11 and 12[6] of the Public Property Law; the manner in which he authorised or influenced PIFSS to enter into the Kuva Funds through or managed by UBP entities, and intentionally committed it to rights and obligations in return for the payment of Secret Commissions in a manner that was detrimental to PIFSS' interests;

   b.   Breach of Article 35 of the Penal Code amended by Law, No. 31 of 1970: Mr. Al Rajaan knew his position as Director General of PIFSS and was acting in the course of his authorised duties in authorising or influencing PIFSS to enter into the Kuva Investments in return for which he secured the promise and payment of Secret Commissions;

   c.   Breach of his Civil Service duties;

   d.   Breach of Article 2 of the Money Laundering Law No.35 of 2002, and Article 2 of the Money Laundering Law No.106 of 2013[6].

309A.   Alternatively, he is liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of breach of Article 158 SPC for criminal mismanagement of PIFSS's property; breach of Article 322 *septies* SPC for accepting bribes in return for acting as Director General of PIFSS in ways which were contrary to his duty and/or dependent on his discretion; and breach of Article 305 *bis* SPC for money laundering by causing bribes paid to him or for his benefit to be concealed.

310. Alternatively, he is liable under principles of English law for:

184

[THE UBP SCHEME]⁶

a.    breach of fiduciary duty (best interests, good faith, no conflict and no profit);

b.    bribery.

**UBP SA, Mr. Nasrallah, Phoenix and the Picciotto Heirs**

311.    UBP SA, Mr. Nasrallah, ~~and~~ Phoenix are and the late Edgar de Picciotto was liable for civil wrongs under ~~both~~⁶ Articles⁶ 227, 228⁶ and 229 of the Kuwaiti Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches (in the case of the corporate entity on the basis pleaded at paragraph 72B above)⁶:

a.    Breach of Articles 35 and 39 of the Penal Code for their role in promising and paying Secret Commissions to Mr. Al Rajaan, knowing his position as Director General of PIFSS, to induce him to authorise or influence PIFSS to make investments in which they had a commercial interest.

b.    Liability as a perpetrator, and aider and abettor within the meaning of Articles 47-~~49(3)~~48 of the Penal Code in respect of their role in relation to Mr. Al Rajaan's breaches of Articles⁶ 11 and 12⁶ of the Public Property Law referred to above and breaches of Article 35 and 39 of the Penal Code.

311A.   Alternatively, they are or (in the case of the late Edgar De Picciotto) were liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of:

a.    Instigating, jointly perpetrating or assisting (within Article 50(1) SCO) Mr Al Rajaan's criminal mismanagement of PIFSS's property contrary to Article 158 SPC;

b.    Bribing a foreign public official, namely Mr Al Rajaan, contrary to Article 322 *septies* SPC;

c.    Laundering (within Article 305 *bis* SPC) and/or thereby aiding and/or abetting (within Article 50(3) SCO) the payment of bribes to or for the benefit of Mr Al Rajaan in breach of Article 158 SPC and/or Article 322 *Septies* SPC.

312.    Alternatively, they are or (in the case of the late Edgar De Picciotto) were liable under principles of English law for:

a.    Bribery;

b.    dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty;

185

c. Knowing receipt of trust property in respect of such unauthorised benefits as they may have received under the UBP Scheme.

312A. The Picciotto Heirs are jointly and severally liable as successors to the civil liability of Edgar de Picciotto under Title Seventeen of the Swiss Civil Code, in particular (without limitation) Articles 560, 603 and 639.

**Mr. Nasrallah/Phoenix**

313. Further or in the alternative to the above, Mr. Nasrallah and Phoenix are liable for civil wrongs under Articles 227, 228 and[6] 229 of the Kuwaiti Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches (in the case of the corporate entity on the basis pleaded at paragraph 72B above)[6]:

a. Their liability for promising and paying Secret Commissions in breach of Article 37 of the Penal Code as amended by Law No31 of 1971 as an intermediary in relation to the payment of bribes to Mr. Al Rajaan, knowing his position as Director General of PIFSS, to induce him to authorise or influence PIFSS to make investments in KUVA Investments in which he had a commercial interest under the UBP Nasrallah Agreement;

b. Their liability as perpetrator and aider and abettor within the meaning of Articles 47-48 of the Penal Code in respect of his role in relation to the payment of bribes by UBP SA to Mr. Al Rajaan through UBP AM in breach of Articles 35 and 39 of the Penal Code in furtherance of their interest and the interest of others;

c. Their liability as perpetrator and aider and abettor within the meaning of Articles 47-48 of the Penal Code in respect of their role in relation to the breach by Mr. Al Rajaan of Articles[6] 11 and 12[6] of the Public Property Law.

d. Liability under Article 2 of the Money Laundering Law No.35 of 2002, and/or and Article 2 of the Money Laundering Law No.106 of 2013.[6]

313A. Alternatively, they are liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of:

a. Jointly perpetrating or assisting (within Article 50(1) SCO) Mr Al Rajaan's criminal

mismanagement of PIFSS's property contrary to Article 158 SPC;

b.    Jointly perpetrating or assisting (within Article 50(1) SCO) the bribery of a foreign public official, namely Mr Al Rajaan contrary to Article 322 *septies* SPC;

c.    Laundering (within Article 305 *bis* SPC) and/or thereby aiding and/or abetting (within Article 50(3) SCO) the payment of bribes to or for the benefit of Mr Al Rajaan in breach of Article 158 SPC and/or Article 322 *Septies* SPC.

314.    Alternatively, they are liable under principles of English law for knowing receipt and dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty.

**UBP AM, Ms de Picciotto, ~~and~~ Mr. Daniel de Picciotto and the Picciotto Heirs**

315.    UBP AM, Ms. Anne De Picciotto, Mr. Guy de Picciotto[6] and Mr. Daniel de Picciotto are and the late Edgar de Picciotto was liable for civil wrongs under Articles 227, 228 and[6] 229 of the Kuwaiti Civil Code arising out of their respective roles in (a) paying the Secret Commissions to Phoenix and (b) assisting Mr. Nasrallah and his companies and Mr. Al Rajaan and his companies to effect the successful payment of the Secret Commissions to Mr. Al Rajaan through their management of the banking relationships with those clients. The Picciotto Heirs are jointly and severally liable as successors to the civil liability of Edgar de Picciotto under Title Seventeen of the Swiss Civil Code, in particular (without limitation) Articles 560, 603 and 639.

316.    Accordingly, UBP AM, Ms. Anne De Picciotto, Mr. Guy de Picciotto,[6] Mr. Daniel de Picciotto and the Picciotto Heirs ~~they~~ are liable for civil wrongs under Articles 227, 228 and[6] 229 of the Kuwaiti Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches (in the case of the corporate entity on the basis pleaded at paragraph 72B above)[6]:

a.    Their liability as perpetrator and aider and abettor within the meaning of Articles 47-48 of the Penal Code in respect of his role in relation to the payment of bribes by UBP SA through UBP AM to Mr. Al Rajaan in breach of Articles 35 and 39 of the Penal Code in furtherance of their interest and the interest of others.

b.    Their liability as perpetrator and aider and abettor within the meaning of Articles 47-48 of the Penal Code in respect of their role in relation to the breach by Mr. Al Rajaan of Articles[6] 11 and 12[6] of the Public Property Law.

187

[THE UBP SCHEME]6

316A.  Alternatively, they are liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of:

a.    Jointly perpetrating or assisting (within Article 50(1) SCO) Mr Al Rajaan's criminal mismanagement of PIFSS's property contrary to Article 158 SPC;

b.    Jointly perpetrating or assisting (within Article 50(1) SCO) the bribery of a foreign public official, namely Mr Al Rajaan contrary to Article 322 *septies* SPC;

c.    Laundering (within Article 305 *bis* SPC) and/or thereby aiding and/or abetting (within Article 50(3) SCO) the payment of bribes to or for the benefit of Mr Al Rajaan in breach of Article 158 SPC and/or Article 322 *Septies* SPC.

317.  Alternatively, they are liable under principles of English law for dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty.

**Secondary/Vicarious liability**

318.  If, contrary to PIFSS' case above, UBP SA and UBP AM are not liable as principals for the torts and other civil wrongs alleged they are vicariously liable on the bases set out below:

**UBP SA**

a.    UBP SA is liable under Article 240 of the Kuwaiti Civil Code, alternatively vicariously liable under principles of Swiss law, alternatively vicariously liable under principles of English law for the acts of Mr. Edgar de Picciotto, Ms. Anne de Picciotto, Mr. Guy de Picciotto,6 Mr. Daniel de Picciotto or those whom they supervised.

**UBP AM**

b.    UBP AM is liable under Article 240 of the Kuwaiti Civil Code, alternatively vicariously liable under principles of Swiss law, alternatively vicariously liable under principles of English law for the acts of its employees or agents.

**Generally**

319.  All transfers of the Secret Commissions are void in law as they were carried out for the purpose of concealing the Secret Commissions.

188

## J(1)    THE MOMBELLI SCHEME

320.    Between around 1995 and no earlier than 2015[6][7], Mr. Mombelli, whether personally or through his companies on his behalf (including ICS, Sintesi, and[7] Methis, FEM International Ltd (formerly Blue Nile Trading SA), Delfin Capital Management Ltd, Serenity Advisory Ltd, Green Sea Ltd, Creative Advisors Ltd and Morel Management Ltd as well as various entities with the name "Madrina"[7]) or initially through Gesfinance (see paragraph 323 below), received commissions from at least seventeen investment managers in respect of investments made by PIFSS of approximately US$3.8 billion in up to 48[49][7] different funds, as set out in Appendix 6.1, in the circumstances set out below.

321.    In this way, he received the sum of approximately US$102.4 104.2126.3[7] million in the period 20001996[7] to 2015[6][7] of which he paid the sum of approximately US$49.1 50.388.3[7] million to Mr. Al Rajaan (through various[7] accounts held for him, including[7] in the names of Evelyn Assets and Dryden Worldwide at Pictet Group and Overton at Mirabaud, in the period from 2000 to 24 April 2012as set out in Appendices 6.2 and 6.3[7]). PIFSS is not presently able to quantify the sums received by Mr. Al Rajaan from Mr. Mombelli in the period from 1995 to 1999 inclusive but it is to be inferred that such payments would have commenced into the Overton account shortly after the date of the earliest investment referred to in Appendix 6.1.[7] These receipts and payments are particularised in Appendices 6.2 and 6.3, as to which:

a.    Appendix 6.2 sets out all amounts that PIFSS alleges were paid to Mr Mombelli (directly or to his companies) and thus the proportion payable to Mr Al Rajaan in accordance with the arrangements set out from paragraph 322 below;

b.    Appendix 6.3 sets out all relevant bank transfers recorded as having been paid by Mr Mombelli (directly or through his companies) to Mr Al Rajaan or (in the case of entries 6.3.142 to 6.3.201) payments to be inferred to be cash payments to Mr Al Rajaan or (in the case of entry 6.3.202) payments admitted by Mr Mombelli; and

c.    It is to be inferred that the difference between the sums payable to Mr Al Rajaan in Appendix 6.2 and recorded as paid to Mr Al Rajaan in Appendix 6.3 were also paid to Mr Al Rajaan (and that they are not recorded as having been paid because they were paid from and to undisclosed accounts or otherwise accounted for between Mr Mombelli and Mr Al Rajaan in a manner of which PIFSS in unaware).[7]

322.     Such sums were paid by reference to fees on investments which PIFSS made and in respect of which it appears that Mr. Mombelli acted as intermediary. In the circumstances described below it is to be inferred that the entirety of the sums paid to Mr. Mombelli personally and/or through his companies and/or through Gesfinance between 1995 and 2015 represented Secret Commissions, both in his hands (and those of his companies acting for him) and in the hands of Mr. Al Rajaan (personally and through corporate and other accounts held for him).

323.     Mr. Mombelli first met with Mr. Al Rajaan in or about 1995. At the time he was working for Gesfinance with a Mr. Yves Byrde who was based in the Middle East. He was introduced to Mr. Al Rajaan through two third parties.

324.     Following a presentation which Mr. Mombelli gave on risk arbitrage and merger acquisition strategy Mr. Al-Rajaan showed an interest in being considered as a "business introducer", to be paid on a part of Mr. Mombelli's commissions. Mr. Mombelli told him that this was not possible, because (as he had been told by Mr. Byrde) the third parties also wanted to get compensation.

325.     Mr. Al Rajaan was annoyed by Mr. Mombelli's response and asked why Mr. Byrde interfered with his decisions, on the basis that: Mr. Al Rajaan was the Director General of PIFSS; he made the decisions and he would take care of it that nobody else had to get involved. Mr. Al Rajaan also told Mr. Mombelli to tell the third parties that, as things stood, he was not interested and would not invest (meaning that PIFSS would not invest). He then asked Mr. Mombelli to keep him informed and told him that when the third parties were no longer interested, he would be ready to invest (i.e. PIFSS would be ready to invest in funds proposed by Mr. Mombelli), in exchange for a sharing of commissions.

326.     Once the risk of third party claims to a share in Mr. Mombelli's commissions had gone away, Mr. Al Rajaan met again with Mr. Mombelli. They agreed on a 50/50 commission split in relation to commissions paid to Mr. Mombelli arising out of fees paid on PIFSS' investments, which they understood that Mr. Al Rajaan would procure or influence. On a subsequent occasion Mr Al Rajaan handed Mr. Mombelli a piece of paper containing the details of the bank account to be credited. It is to be inferred that this was, until 2003, the Overton account. There was no written contract between Mr. Mombelli and Mr. Al Rajaan at any time, or paper trail evidencing such arrangements. Both parties were aware of the impropriety of the arrangements, given Mr. Al Rajaan's role at PIFSS and the conflict which

190

this generated between his personal interest in securing Secret Commissions and his duties to PIFSS.

327.     In due course, and on the understanding that Mr. Al Rajaan required a further incentive to authorise or influence PIFSS to place further investments proposed by Mr. Mombelli, Mr. Mombelli offered and he and Mr. Al Rajaan agreed a revised 70/30 commission split in favour of Mr. Al Rajaan. Based on paragraph 53 of the defence of the Mombelli Defendants, PIFSS avers that this revised arrangement took effect from the start of 1998.[7]

328.     Pursuant to the above arrangements, Mr. Al Rajaan authorised or influenced PIFSS to invest in funds proposed by Mr. Mombelli.

Knowledge of the Defendants

329.     Mr. Al Rajaan and Mr. Mombelli both knew that they were party to corrupt arrangements because they both knew (by reason of Mr. Mombelli's admission to this effect to the Swiss Prosecutor) that those arrangements and the payments made pursuant to them placed Mr Al Rajaan in a position where his personal interest (in receiving the bribes) conflicted with his duty to PIFSS. PIFSS relies on the facts and matters set out above and on the following specific facts and matters:

a.     Mr. Mombelli had a commercial interest in the establishment and maintenance of an investment relationship between PIFSS and the investment houses and managers on whose behalf he was promoting products, through his intermediary agreements with them. He wished, through the payment of Secret Commissions, to influence Mr. Al Rajaan to authorise or influence PIFSS to make investments with such institutions which would in turn benefit him personally under his commission arrangements with them.

b.     Mr Mombelli's admission to the Swiss Prosecutor that he was prepared to pay Secret Commissions to Mr. Al Rajaan because he had a cover story for the payment of sums to Mr. Al Rajaan, who, he believed, held a number of other positions (for example, he believed that Mr. Al Rajaan was as a director of Wafra Inc in New York and a director of the Ahli United Bank in Bahrain and Egypt). However, as Mr Mombelli knew, the payments to Mr Al Rajaan were unrelated to Mr Al Rajaan's other positions.

191

330.   So far as ICS, Sintesi and Methis were companies which operated as genuine trading companies and only to the extent that the concealment and evasion principles do not apply:

a.   Mr. Mombelli's acts and knowledge as pleaded above are to be attributed to them;

b.   In making payment to Mr. Al Rajaan and/or at his direction through each of ICS Investment Consulting Services SA, Sintesi and Methis, they either jointly participated in or dishonestly assisted in the payment of Secret Commissions to Mr. Al Rajaan.

**Liability**

**Mr. Al Rajaan**

331.   Mr. Al Rajaan is liable for civil wrongs under Article 227 of the Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches[6]:

a.   Breach of Articles[6] 11 and 12[6] of the Public Property Law; the manner in which he authorised or influenced PIFSS to enter into the investments made through Mr. Mombelli as an intermediary in relation to (at least) funds operated by the investment managers referred to in Appendix 6.1 and intentionally committed it to rights and obligations in return for the payment of Secret Commissions was detrimental to PIFSS' interests;

b.   Breach of Article 35 of the Penal Code as amended by the Law 31 of 1970: Mr. Al Rajaan knew his position as Director General of PIFSS and was acting in the course of his authorised duties in authorising or influencing PIFSS to enter into the above investments in return for which he secured the promise and payment of Secret Commissions;

c.   Breach of his Civil Service duties;

d.   Breach of Article 2 of the Money Laundering Law No.35 of 2002, and Article 2 of the Money Laundering Law No.106 of 2013[6].

331A.   Alternatively, he is liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of breach of Article 158 SPC for criminal mismanagement of PIFSS's property; breach of Article 322 *septies* SPC accepting bribes in return for acting as Director General of PIFSS in ways which were contrary to his duty and/or dependent on his

192

discretion; and breach of Article 305 *bis* SPC for money laundering by causing bribes paid to him or for his benefit to be concealed.

332. Alternatively, he is liable under principles of English law for:

a.      breach of fiduciary duty (best interests, good faith, no conflict and no profit);

b.      bribery.

## Mr. Mombelli

333. Mr. Mombelli is liable for civil wrongs under ~~both~~[6] Articles[6] 227, 228[6] and 229 of the Kuwaiti Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches[6]:

a.      Breach of Articles 35 to 39 of the Penal Code for his roles in promising and paying Secret Commissions to Mr. Al Rajaan, and/or as an intermediary in relation to such payments knowing Mr. Al Rajaan's position as Director- General of PIFSS, to induce him to authorise or influence PIFSS to make investments with financial institutions whose products he promoted and in which he had a commercial interest.

b.      Liability as a perpetrator, and aider and abettor within the meaning of Articles 47-~~49(3)~~48 of the Penal Code in respect of his role in relation to Mr. Al Rajaan's breaches of Articles[6] 11 and 12[6] of the Public Property Law referred to above and breaches of Article 35 and 39 of the Penal Code in furtherance of their interest and the interest of others.

333A.  Alternatively, he is liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of:

a.      Instigating, jointly perpetrating or assisting (within Article 50(1) SCO) Mr Al Rajaan's criminal mismanagement of PIFSS's property contrary to Article 158 SPC;

b.      Bribing a foreign public official, namely Mr Al Rajaan, contrary to Article 322 *septies* SPC;

c.      Laundering (within Article 305 *bis* SPC) and/or thereby aiding and/or abetting (within Article 50(3) SCO) the payment of bribes to or for the benefit of Mr Al Rajaan in breach of Article 158 SPC and/or Article 322 *Septies* SPC.

334. Alternatively, he is liable under principles of English law for:

193

a.    Bribery;

b.    dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty;

c.    Knowing receipt of trust property.

**ICS, Sintesi, Methis**

335.    Each of ICS, Sintesi and Methis are liable for civil wrongs under ~~both~~[6] Article<u>s</u>[6] 227, 228[6] and 229 of the Kuwaiti Civil Code arising out of <u>the following breaches and/or the conduct giving rise to the following breaches (in the case of the corporate entities on the basis pleaded at paragraph 72B above)</u>[6]:

a.    Breach of Articles 35 and 39 of the Penal Code for their role in promising and paying Secret Commissions to Mr. Al Rajaan, and/or as intermediaries in relation to such payments, knowing Mr. Al Rajaan's position as Director General of PIFSS to induce him to authorise <u>or influence</u> PIFSS to make investments with financial institutions whose products Mr. Mombelli promoted in which they all had a commercial interest.

b.    Liability as a perpetrator, and aider and abettor within the meaning of Article<u>s</u> 47-~~49(3)~~<u>48</u> of the Penal Code in respect of their role in relation to Mr. Al Rajaan's breaches of Article<u>s</u>[6] 11 <u>and 12</u>[6] of the Public Property Law referred to above and breaches by Mr. Al Rajaan and Mr. Mombelli of Article 35 to 39 of the Penal Code in furtherance of their interest and the interest of others.

335A.    <u>Alternatively, they are liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of:</u>

a.    <u>Instigating, jointly perpetrating or assisting (within Article 50(1) SCO) Mr Al Rajaan's criminal mismanagement of PIFSS's property contrary to Article 158 SPC;</u>

b.    <u>Jointly perpetrating or assisting (within Article 50(1) SCO) the bribery of a foreign public official, namely Mr Al Rajaan, contrary to Article 322 *septies* SPC;</u>

c.    <u>Laundering (within Article 305 *bis* SPC) and/or thereby aiding and/or abetting (within Article 50(3) SCO) the payment of bribes to or for the benefit of Mr Al Rajaan in breach of Article 158 SPC and/or Article 322 *Septies* SPC.</u>

336.    Alternatively, each is liable under principles of English law.

194

337.    This arises for:

    a.    Bribery, as joint tortfeasors;

    b.    Dishonest assistance in breach of fiduciary duty;

    c.    Knowing receipt of trust property.

**Generally**

338.    All transfers of the Secret Commissions are void in law as they were carried out for the purpose of concealing the Secret Commissions.

## J(2)    VP BANKING ASSISTANCE SCHEME

338A.    Between about 2006 and at least 2012 VP Bank AG and VP Bank Switzerland assisted in the concealment and payment of Secret Commissions to Mr Al Rajaan by:

    a.    establishing and operating bank accounts in his name and/or for his benefit in the names of Lipuno Foundation ("**Lipuno**"), Dugamo Foundation ("**Dugamo**"), Silvermoon Finance SA ("**Silvermoon**") (of which Mr. Al Rajaan's son, Khaled Al Rajaan, was falsely designated the beneficial owner), Ms Al Wazzan, Mr. Nasrallah, Mr. Amouzegar and/or companies/entities established at their instance;

    b.    knowingly permitting those accounts to be used for the receipt of Secret Commissions;

    c.    authorising transfers between those accounts and to external accounts on the instructions of Mr. Al Rajaan, Mr. Nasrallah and Mr. Amouzegar which included transactions recorded in the banks' records as cash withdrawals or deposits which, it is to be inferred, were in fact regular electronic transfers of funds, in order to conceal the routing and destination of the funds and, accordingly, the nature of the payments;

    d.    authorizing and permitting the transfer out of accounts at VP Bank Switzerland to Mr. Al Rajaan's account at Fransabank in Lebanon of US$25.3 million in May 2012 when Mr Al Rajaan became aware of criminal investigations into his activities and (it is to be inferred) told at least Mr Ghittini of the same.

338B.    Mr Ghittini was a personal friend of Mr. Amouzegar, having known him since they worked

195

together at Citibank in the 1980s. Mr. Amouzegar was a regular source of introductions to VP Bank AG and VP Bank Switzerland through Mr. Ghittini, including the introductions of Mr Al Rajaan and Mr Nasrallah.

338C.  It is to be inferred from the facts and matters below that:

a.    At all material times Mr. Ghittini knew that the funds which were to be, and which were, transferred in and out of the accounts at VP Bank AG and VP

Bank Switzerland were (or were the proceeds of) Secret Commissions and were corrupt.

b.    At all material times from no later than 2010, as particularized below, the most senior levels of management within both entities had the same knowledge.

**Banking arrangements and fund flows**

338D.  In February 2006 two accounts were established at VP Bank Switzerland under the supervision of Mr. Ghittini: (i) No. 10.401.901 in the name of Mr. Al Rajaan; and (ii) 10.501.972 in the name of Lipuno ("**the Lipuno Account**"). The accounts were opened on or around 21 February 2006. Mr. Al Rajaan was the beneficial owner of the assets of such accounts as evidenced by two "Form As" dated 15 February 2006 designating him as such.

338E.  Also in February 2006 an account was established at VP Bank Switzerland (No.10.501.984) under the supervision of Mr. Ghittini in the name of Mr. Amouzegar ("**the Amouzegar Account**"). A Form A dated 15 February 2006 indicated that Mr. Amouzegar was the beneficial owner. The account was opened on 17 March 2006.

338F.  In July 2008 an account (with sub-accounts for different currencies) was established in the name of Silvermoon at VP Bank Switzerland (No. 10.503.397) under the supervision of Mr. Ghittini ("**the Silvermoon Account**"). By a Form A dated 15 July 2008 Khaled Al Rajaan was falsely designated as the beneficial owner of the account; the true beneficial owner was Mr. Al Rajaan.

338G.  On 18 December 2009 a personal account was opened in the name of Ms Al Wazzan at VP Bank Switzerland numbered 10.204.768. The purpose of this account was stated to be for covering travel and other family expenses.

196

338H.  In parallel to the establishment of the above accounts, accounts were established at VP Bank AG in the names of:

   a.    Orkina Foundation (of which the beneficial owner was designated as Mr. Nasrallah but which was held by him as a nominee for the benefit of Mr. Al Rajaan) ("**Orkina**", "**the Orkina Account**");

   b.    Dugamo (of which the beneficial owner was Mr. Al Rajaan) ("**the Dugamo Account**");

   c.    Kyma Overseas Corporation (of which the beneficial owner was designated as Mr. Amouzegar) ("**Kyma**", "**the Kyma Account**").

338I.  Each of Lipuno, Orkina and Dugamo (all Liechtenstein entities registered in Vaduz), Silvermoon and Kyma (both Anguillan companies) were established in order to facilitate the transfers referred to below, and thus to assist the payment, receipt and concealment of Secret Commissions. Such facilitation was achieved with the assistance of a Liechtenstein entity - ATU ("**Allgemeines Treuunternehmen**") ("**ATU**") acting through Christopher Langenauer, a lawyer to whom Mr. Ghittini introduced each of Mr. Al Rajaan, Mr. Nasrallah and Mr. Amouzegar. Mr. Langenauer was the sole director of Silvermoon and, it is to be inferred, managed the affairs of all of the entities referred to above as a fiduciary in accordance with the instructions of Mr. Al Rajaan, Mr. Nasrallah and Mr. Amouzegar (which were typically given to him through Mr. Ghittini).

338J.  In fact, and contrary to indications in the account records and compliance materials, none of the entities referred to above operated any trading business. Their sole purpose, as was known by Mr. Langenauer and Mr. Ghittini, by reason of the facts and matters stated below, was to operate bank accounts as a conduit for the payment of Secret Commissions or the proceeds thereof.

338K.  Between 2006 and 2012 there were incoming transfers of funds to accounts held by VP Bank Switzerland and VP Bank AG respectively as follows:

   a.    US$34.7 34.4 million to the Lipuno Account from Bordertown as referred to in paragraphs 203(b) and 214(d) above and particularised in Appendices 3.2B and 6A[6],

197

such sums being Secret Commissions (or the proceeds thereof).

    b.    US$10.9 million to the Orkina Account from companies including Quadra Properties SA "(Quadra"), an entity which VP Bank AG believed to be beneficially owned by Mr Al Rajaan but without having obtained documentary proof (and PIFSS does not know the true position), which sums PIFSS infers were Secret Commissions or the proceeds thereof. The best particulars PIFSS is currently able to give of the Quadra payments, the source of payments to Quadra and the PIFSS investments to which they relate is at paragraph 338BBB1 below.[6] Quadra also paid sums into Bordertown's account at Pictet Bahamas.

    c.    Unknown sums transferred to the Kyma Account of which some were transferred on to the Amouzegar Account, which PIFSS infers were Secret Commissions or the proceeds thereof.

338L.    The inference that the sums referred to in paragraph 338K b and c above were Secret Commissions is to be drawn from the facts and matters below and from the operation of other Schemes upon the similarity of the facts of which PIFSS will rely.

338M.    In relation to the transfers into the Lipuno Account (as set out in Appendix 6B)[6]:

    a.    At least US$~~23.1~~22.2[6] million was subsequently transferred to the Silvermoon Account;

    b.    Substantial sums believed to be at least US$~~5.6~~7.3[6] million were subsequently transferred to the Dugamo Account;

    c.    The sum of US$0.5 million was transferred to Mr Al Rajaan's account numbered 10.401.901 described in paragraph 338D above; and

    d.    Transactions described as "*Cash withdrawals*" totalling at least US$3.9 million were made (as to which see paragraph 338R below).[6]

338N.    In relation to the transfers into the Orkina Account at least US$10.2 million was transferred to the Dugamo and/or Lipuno accounts.

338O.  In relation to the transfers into the Dugamo account referred to above at least 3.5 million (assumed to be US$) was transferred out in cash payments. It is to be inferred that such payments were made to Mr. Al Rajaan.

338P.  Mr. Al Rajaan, Mr. Nasrallah and Mr. Amouzegar expressly instructed Mr. Ghittini that they did not want to have direct transfers from one account to another. It was understood both by VP Bank Switzerland (through at least Mr. Ghittini to whom it was expressly stated), and (it is to be inferred) by VP Bank AG (whether through Mr. Ghittini or another individual or individuals and/or because it was obvious), that this was because none of Mr. Al Rajaan, Mr. Nasrallah and Mr. Amouzegar wanted to disclose the connection between the accounts or between themselves or for the payments to be traced and, accordingly wanted the paper trail to be broken.

338Q.  Accordingly, save for a limited number of substantial transfers from the Lipuno Account to the Silvermoon Account, the majority of transactions at VP Bank Switzerland were booked as cash disbursements (including those described at paragraph 338M.d. above)6, and evidenced in receipts signed by Mr. Ghittini and others (witnessed on occasion by Mr. Langenauer) by which the signatory confirmed that he was acting on a mandate from Mr. Al Rajaan. These were matched by purported cash deposits in Liechtenstein. The sums in question were typically substantial, often of US$1 million or more. A frequent explanation provided for the use of such sums was in connection with expenses incurred in relation to Mr. Al Rajaan's chalet in Courchevel.

338R.  It is to be inferred that, in fact, no cash withdrawals and subsequent deposits were in fact made, that the records which showed them as cash withdrawals and deposits were false, and, in fact, there were electronic transfers of such sums. Such inference is to be drawn from the following facts and matters:

a.   the inherent improbability that Mr Al Rajaan or persons acting on his behalf would withdraw sums in excess of US$1 million in cash in Zurich and then travel to Vaduz (in excess of 100km away) to deposit the same;

b.   the fact that Mr Ghittini and (it is to be inferred) others at VP Bank Switzerland and VP Bank AG were aware that the "cash" transactions were between the above accounts and were designed to break up the paper trial, i.e. knowingly and willingly facilitated this, and the inherent unlikelihood that they would have insisted on

199

physical withdrawals of cash when the same result could be achieved more easily by falsely recording electronic transfers as cash;

c.    Mr. Ghittini was prepared to, and did, undertake improper and dishonest transactions for valued clients who were the source of valuable client relationships. PIFSS relies (in addition to the facts and matters above and below) upon the fact that in or about June or July 2009 Mr Ghittini agreed with Mr Amouzegar that he would try to facilitate the transfer to the VP Bank Group of the sum of €3m which Mr Amouzegar then held at Lombard Odier Bank, without leaving any trace of the source of funds, because Mr Amouzegar was concerned that he might face claims to repay the money, and wished to put it out of reach of creditors.

**Account closures / dissipation**

338S.   Between 7 and 9 May 2012 and upon learning of the criminal investigation into his dealings with Mirabaud, Mr. Al Rajaan issued instructions, directly or through the entities referred to below, to VP Bank Switzerland to close all accounts of which he was the beneficial owner, as follows:

a.    On 7 and/or 8 May 2012 he telephoned VP Bank Switzerland (it is to be inferred that the call was to Mr. Ghittini) and asked him to close all positions in the Silvermoon Account and to transfer the cash to his account in Vaduz as he was not comfortable keeping his money in Switzerland.

b.    On or about 9 May 2012 Lipuno wrote to VP Bank Switzerland requesting the closure of the Lipuno Account and that the balance be sent to the Silvermoon Account. As was noted in the KYC documentation in respect of this transaction, the payment to Silvermoon from Lipuno was to the same beneficial owner (namely Mr. Al Rajaan).

c.    On or about 9 May 2012 Silvermoon (it is inferred acting through Mr Langenauer in his capacity as sole director) wrote to Mr. Pistolese of VP Bank Switzerland requesting the closure of the Silvermoon Account and that the balance be sent to Mr. Al Rajaan's account at Fransabank.

338T.   Save that the initial instruction to transfer funds from the Silvermoon Account to accounts

200

[J(2)   VP BANKING ASSISTANCE SCHEME][6]

at VP Bank AG does not appear to have been followed through, the above instructions were implemented. In particular substantial funds comprising US$25.2 million and US$0.1 million were paid away from the Silvermoon Account to Mr Al Rajaan's account at Fransabank in Lebanon on 10 May 2012 and 15 May 2012 respectively, and the accounts were duly closed on or about 14 or 15 May 2012.

338U.  Shortly thereafter, on or about 14 June 2012, Mr. Amouzegar issued instructions to close account number 10.501.984 stating that he no longer needed the account.

338V.  These instructions were given by Mr Al Rajaan and Mr Amouzegar to mitigate the threat of further criminal investigation and so as to remove assets from the jurisdiction into a jurisdiction where enforcement would be difficult.

338W. PIFSS' primary case, based on the timing of the events set out in paragraphs 338S-U and the facts of other schemes (in particular Mirabaud, Pictet, Further Nasrallah and UBP) is that Mr. Al Rajaan expressly told (at least) Mr Ghittini of the criminal investigation into his conduct and therefore of the need to liquidate his and Mr. Amouzegar's assets, including those held in the Lipuno Account, Silvermoon Account and Amouzegar Account, to mitigate the risk of further criminal investigation and/or seizure of assets. It is to be inferred that Mr. Ghittini then took such steps as were necessary internally within the bank to fulfil Mr. Al Rajaan's and Mr. Amouzegar's instructions in circumstances in which, if he had acted in compliance with the obligations set out above in paragraphs 74 to 78 and paragraph 338KK below, the transactions the subject of the instructions would have raised significant concerns and been the subject of proper enquiry, and should and would have been declined and reported.

**Knowledge/dishonesty**

338X.  At all material times Mr. Ghittini knew the following about the source of funds into VP Bank Switzerland and VP Bank AG by reason of what he was told by Mr. Al Rajaan, Mr. Amouzegar and Mr. Nasrallah:

a.      Mr. Al Rajaan was the Director General of PIFSS, a multi-billion dollar pension fund, and had influence over the investment decisions of PIFSS;

b.      The monies received were, or were the proceeds of, commissions paid on funds

201

invested by the institution that Mr. Al Rajaan represented, i.e. by PIFSS;

c.    Mr. Nasrallah and Mr. Amouzegar were representing (or purporting to represent) the banks and financial institutions in or through which investments were made;

d.    The commissions referred to in paragraph (b) above were being split between Mr. Al Rajaan, Mr. Nasrallah and Mr. Amouzegar pursuant to a "gentleman's agreement" for which there was no contractual or documentary support;

e.    Payments were made to the Lipuno Account from Bordertown which had an account with Pictet Bahamas and which received commissions on financial investments;

f.    Mr. Al. Rajaan was a PEP and that Mr. Nasrallah and Mr. Amouzegar were his associates.

338Y.  He further knew that:

a.    The beneficial owner of Silvermoon was, in fact, Mr. Al Rajaan, and not Mr. Khaled Al Rajaan as falsely represented on the Form A for Silvermoon.

b.    The beneficial owner of Orkina was, in fact, Mr. Al Rajaan, and not Mr. Nasrallah as falsely represented in corporate and compliance materials for Orkina.

c.    Mr. Al Rajaan, Mr. Nasrallah and Mr. Amouzegar wanted the purported contracts with the banks and financial institutions which gave rise to the commission entitlements to be dealt with in a discreet way. That meant (and would have been understood to have meant) that they did not want to disclose the contract(s) itself/themselves.

d.    Under pressure (it is to be inferred) from VP Bank Switzerland's Compliance Department, Mr. Al Rajaan and Mr. Nasrallah had agreed to show a copy of the purported contract(s) to Mr. Langenauer but were not willing to permit copies to be taken.

e.    There was no legitimate basis for the cash transactions referred to in paragraph 338P to 338S above; they were designed to conceal the payment of Secret Commissions and no legitimate explanation could be given for them to the bank's auditors,

202

something which Mr. Langenauer also knew;

f.      In the premises, the funds transferred into the VP Bank Switzerland accounts were Secret Commissions or the proceeds thereof.

338Z.   In support of its allegations of knowledge PIFSS relies upon (by way of example and, pending disclosure, without limitation) the following material:

a.      Account entries made by Mr. Ghittini and explanations provided by him to members of VP Bank Switzerland's Compliance Department, as reflected in KYC and other notes made by members of the Compliance Department;

b.      what was said at a meeting of 28 May 2010 attended by Mr. Al Rajaan, Mr. Nasrallah, Mr. Asham (an oil magnate and a source of business for the VP Bank Group), Mr. Amouzegar, Mr. Langenauer and Mr. Ghittini and which largely reflected the substance of paragraphs 338X and Y above, as evidenced (in part) by a memo prepared by Mr. Langenauer on or about 28 May and an e-mail of 30 May 2010 sent by Mr. Ghittini to members of the Compliance Department at VP Bank Switzerland and to Mr. Juerg Sturzenegger (as to whom see paragraph 338CC below);

c.      what was said at a meeting of on or around 10 November 2010 attended by at least Mr. Al Rajaan, Mr. Nasrallah, Mr. Langenauer, Mr Hartmann and Mr. Ghittini at which further related discussions were held as evidenced by a file note of 10 November 2010;

d.      a memo prepared after May 2012 on behalf of the VP Bank Group and ATU by Beat Graf, (from 2004-2012) Head of Compliance at ATU and a director of VP Bank AG from 2014.

338AA.  In or about 2010, and (it is to be inferred) by reason of increased activity and/or suspicious activity on the accounts referred to above, VP Bank Switzerland's Compliance Department began to question the legitimacy of the transactions on those accounts. Over the course of a number of months members of the Compliance Department noted features of the banking arrangements and associated transactions which caused concern and put them on notice of potential corruption and criminality. They sought explanations and recommended that a member of the Executive Board ("**Geschaftleitung**" – "**GL**" or "**GEL**") approve the risks

203

identified in the business relationship. Those risks included:

    a.      Regular high receipts based on a gentleman's agreement;

    b.      Regular high withdrawals in cash so as to avoid paper trails;

    c.      A purported contract which Mr. Al Rajaan and Mr. Nasrallah provided (it is to be inferred reluctantly) for inspection on the basis that no copy would be taken between Phoenix and Bordertown which was not signed, and in relation to which the contracting party (namely Bordertown) could not be verified;

    d.      Mr. Al Rajaan, Mr. Nasrallah and Mr. Amouzegar wanted absolute discretion (in other words non-disclosure) regarding the fund business which generated the commissions;

    e.      Mr. Al Rajaan was a PEP and responsible for the state pension fund in Kuwait;

    f.      The assets in Lipuno in 2010 exceeded CHF 10 million;

    g.      The business which generated the commissions could not be checked or assessed on the basis of the available information.

338BB.   However, such concerns were ignored by VP Bank Switzerland acting through at least Mr. Ghittini and (it is to be inferred) Mr. Juerg Sturzenegger and by VP Bank AG (it is to be inferred) acting through at least Mr. Sturzenegger and Mr. Roger Hartmann.

338CC.   Juerg Sturzenegger was VP Bank Switzerland's Chairman of the Executive Board and Leader of Wealth Management Solutions from the beginning of 2010 until 1 September 2010 when he moved to VP Bank AG: first as a member of the Group Executive Board; then, from January 2012 as Chief Operating Officer of the VP Bank Group and from July 2012 until April 2013 as its Chief Executive Officer (succeeding Mr Hartmann). Thereafter he served as President and Chairman of the Board of Directors of VP Bank Switzerland.

338DD.   Mr. Hartmann was from 2010 until 11 July 2012 the Chief Executive Officer of VP Bank AG.

338EE.   By (at least) the e-mail of 30 May 2010 referred to above Mr. Ghittini communicated the

204

substance of the facts and matters set out in paragraphs 338X(a) to (f) and 338Y (a) to (f) above to Mr. Sturzenegger (as recipient). By such communication and (it is to be inferred as being probable in the circumstances) further oral communication from at least Mr. Ghittini conveying or relating to such information, Mr. Sturzenegger would have known those facts and matters and accordingly knew of the features of the banking arrangements and underlying transactions which had raised the concerns of the Compliance Department.

338FF.    Rather than endorse those concerns, or seek an objective assessment of the relevant arrangements and transactions, Mr. Ghittini, by his e-mail, asked whether Mr. Sturzenegger had time to have lunch with Mr. Al Rajaan on 3 June 2010 with a view to persuading Mr. Al Rajaan that the VP Bank Group should manage some of PIFSS's funds. Mr Ghittini noted that those present on 28 May 2010 were extremely satisfied with the VP Bank Group's services, may expand their business with the VP Bank Group and particularly appreciated the bank's "flexibility," which meant (and would have been understood by all readers to mean) its willingness not to enforce money- laundering obligations, so as more readily to permit the concealment and payment of the Secret Commissions which Mr Ghittini had described in his email.

338GG.    A further meeting was organised between Mr. Al Rajaan and Mr. Hartmann on about 10 November 2010, which was also attended by Mr. Ghittini and Mr. Langenauer in advance of which, it is to be inferred, Mr. Hartmann would have been briefed in similar terms to Mr. Sturzenegger as summarised above and would, accordingly, have had the same knowledge.

338HH.    At the meeting of 10 November 2010 Mr. Al Rajaan showed Mr. Langenauer copies of purported contracts (it is to be inferred that these were one or more of the UBP Nasrallah Agreement (see paragraph 176 above), the Pictet Nasrallah Agreement (see paragraph 286 above) and/or a similar contract with Cheyne Capital International Limited of which PIFSS has no current independent knowledge save that (i) payments made by Cheyne Capital to Phoenix's account at EFG Bank form part of the Secret Commissions paid pursuant to the Further Nasrallah Scheme described in Section H above) and (ii) contracts with Cheyne Capital International Limited are referred to and exhibited to Mr Nasrallah's Defence to these proceedings.

338II.    Thereafter, Mr. Ghittini:

205

a.    Continued to emphasise the commercial opportunities to the VP Bank Group of an enhanced relationship with Mr. Al Rajaan and his family and associates, including the potential for management of investments from PIFSS.

b.    Took active steps to persuade both the Compliance Department (including at least Mr. Patrick Regamey) and senior management (including at least Mr. Juerg Moll, at the time a member of the Executive Board of VP Bank Switzerland) of the legitimacy of the arrangements with Mr. Al Rajaan including by the (obviously) flawed argument that there was no conflict of interest in Mr. Al Rajaan sharing commissions with Mr. Nasrallah on the basis that (it was said) he could only influence the Investment Committee at PIFSS as to which investments to make, but could not make those decisions on his own.

338JJ.    As evidenced by the memo prepared by Mr. Graf referred to at paragraph 338Z(d) above, even after closure of accounts in May 2012 with the transfer out (via the Silvermoon Account) of US$25.3 million to Fransabank, and despite being on notice of serious issues (summarised in paragraph 338Z) for some time, neither VP Bank Switzerland, VP Bank AG nor ATU had clarified or obtained plausible explanations for those issues. In the event no action was ever taken, whether in 2010 or at any material time, by senior management of VP Bank Switzerland or VP Bank AG further to investigate or otherwise to question, terminate or report the banking arrangements referred to above or the transactions underlying them. Rather, both banks continued to authorise and implement the banking arrangements and transactions referred to above.

338KK.    It is to be inferred that, in so doing, the senior management of VP Bank Switzerland and VP Bank AG made a deliberate decision to assist in the concealment and payment of Secret Commissions to Mr. Al Rajaan, because of the commercial opportunities which presented themselves by doing so and which would not have been available had they acted in accordance with their legal obligations – in the case of VP Bank Switzerland as set out in paragraphs 74-77 above and in the case of VP Bank AG as contained in (at least) sections II and III of the Due Diligence Act (LGBI 2009/047) and sections II and III and Annexe 3 of the Due Diligence Ordinance (LGBI. 2009/098).

338LL.    In the above circumstances, VP Bank Switzerland and VP Bank AG:

a.    Took no or no adequate steps to investigate or consider the legitimacy of the banking

206

arrangements and the transactions set out above notwithstanding the concerns of the Compliance Department as communicated to management and the information known to Mr. Ghittini throughout and provided to other members of senior management from at least 2010;

b.   Took no prudent steps consistent with treating Mr. Al Rajaan, Mr. Nasrallah and Mr. Amouzegar (as his associates) as PEPs;

c.   Acted in breach of the money-laundering obligations to which they were subject;

d.   Accordingly, deliberately took no or no adequate steps to investigate or report transactions which bore the hallmarks of corruption and money-laundering, from which their knowledge of the impropriety of the transfers and the payments underlying them is to be inferred;

e.   Thereby dishonestly permitted unlawful Secret Commissions to be successfully paid to Mr. Al Rajaan.

338MM. As regards the acts and knowledge of each of Mr. Al Rajaan, Mr. Nasrallah and Mr. Amouzegar PIFSS relies on the facts and matters set out above and the further facts and matters particularised in (i) the Pictet Scheme, in particular paragraphs 202-203, 205(d), 209-212 and 214-217 above; (ii) the Further Nasrallah Scheme; and (iii) the UBP Scheme.

**Liability**

**Mr. Al Rajaan**

338NN. By reason of the above facts and matters, Mr. Al Rajaan is liable for civil wrongs under Article 227 of the Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches[6]:

a.   Breach of Articles[6] 11 and 12[6] of the Public Property Law; the manner in which he authorised or influenced PIFSS to enter into the investments made through Mr. Nasrallah and Mr Amouzegar and paid through (at least) Bordertown and Quadra and intentionally committed it to rights and obligations in return for the payment of Secret Commissions, was detrimental to PIFSS' interests;

207

b.    Breach of Article 35 of the Penal Code amended by the Bribery Law: Mr. Al Rajaan knew his position as Director General of PIFSS and was acting in the course of his authorised duties in authorising or influencing PIFSS to enter into the above investments in return for which he secured the promise and payment of Secret Commissions;

c.    Breach of his Civil Service duties;

d.    Breach of Article 2 of the Money Laundering Law No.35 of 2002, and Article 2 of the Money Laundering Law No.106 of 2013[6].

338NNA. Alternatively, he is liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of breach of Article 158 SPC for criminal mismanagement of PIFSS's property; breach of Article 322 *septies* SPC for accepting bribes in return for acting as Director General of PIFSS in ways which were contrary to his duty and/or dependent on his discretion; and breach of Article 305 *bis* SPC for money laundering by causing bribes paid to him or for his benefit to be concealed.

338OO.    Alternatively, he is liable under principles of English law for:

a.    breach of fiduciary duty (best interests, good faith, no conflict and no profit);

b.    bribery.

**Mr. Nasrallah, Mr. Amouzegar**

338PP.    Mr. Nasrallah and Mr. Amouzegar are liable for civil wrongs under both[6] Articles[6] 227, 228[6] and 229 of the Kuwaiti Civil Code arising out of their liability and/or the conduct giving rise to such liability as a perpetrator, and aider and abettor within the meaning of Articles 47-49(3)48 of the Penal Code in respect of their role in relation to Mr. Al Rajaan's breaches of Articles[6] 11 and 12[6] of the Public Property Law referred to above and breaches of Article 35 and 39 of the Penal Code and/or breach of Article 2 of the Money Laundering Law No.35 of 2002, and/or of Article 2 of the Money Laundering Law No.106 of 2013[6].

338PPA. Alternatively, Mr. Nasrallah is liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of:

208

[J(2)    VP BANKING ASSISTANCE SCHEME][6]

a.    Jointly perpetrating or assisting (within Article 50(1) SCO) Mr Al Rajaan's criminal mismanagement of PIFSS's property contrary to Article 158 SPC;

b.    Jointly perpetrating or assisting (within Article 50(1) SCO) the bribery of a foreign public official, namely Mr Al Rajaan, contrary to Article 322 *septies* SPC.

c.    Laundering (within Article 305 *bis* SPC) and/or thereby aiding and/or abetting (within Article 50(3) SCO) the payment of bribes to or for the benefit of Mr Al Rajaan in breach of Article 158 SPC and/or Article 322 *Septies* SPC.

338QQ.  Alternatively, they are liable under principles of English law for:

a.    dishonest assistance in Mr. Al Rajaan's breach of fiduciary duty;

b.    Knowing receipt of trust property; and

c.    bribery.

**VP Bank Switzerland, VP Bank AG, Mr. Ghittini**

338RR.  VP Bank Switzerland and VP Bank AG and Mr Ghittini are liable for civil wrongs under both[6] Articles[6] 227, 228[6] and 229 of the Kuwaiti Civil Code arising out of liability and/or the conduct giving rise to such liability (in the case of the corporate entities on the basis pleaded at paragraph 72B above)[6] as a perpetrator, and aider and abettor within the meaning of Articles 47 49(3)48 of the Penal Code in respect of their roles in relation to Mr. Al Rajaan's breaches of Articles[6] 11 and 12[6] of the Public Property Law referred to above and breaches by Mr. Al Rajaan, Mr. Nasrallah and Mr. Amouzegar of Articles 35 to 39 of the Penal Code in connection with the payment of Secret Commissions.

338SS.  Alternatively, each is liable under principles of English law for:

a.    Bribery, as joint tortfeasors

b.    Dishonest assistance in breach of fiduciary duty.

c.    Knowing receipt of trust property

**Secondary/Vicarious liability**

338TT.  If, contrary to PIFSS' case above, VP Bank Switzerland and VP Bank AG are not liable

209

as principal for the torts and other civil wrongs alleged, they are liable under Article 240 of the Civil Code, alternatively vicariously liable under principles of English law for the torts and civil wrongs committed by Mr. Ghittini, Mr. Sturzenegger, Mr. Moll, Mr. Hartmann and all relevant employees whom they supervised.

**Generally**

338UU.  All transfers of the Secret Commissions are void in law as they were carried out for the purpose of concealing the Secret Commissions.

**J(3) THE AERIUM SCHEME**

**Secret Commissions paid by Mr Ruimy to Mr Al Rajaan**

338VV.  On various dates from September 2003 onwards PIFSS invested over US$2 billion in 20 funds managed (or in 2 cases introduced/advised) by the Aerium Group and the Aeriance Group, as summarised in the table at Appendix 7.1 to this statement of case. In summary: (1) between September 2003 and March 2016, PIFSS invested a total of US$1.4 billion in 14 funds managed by the Aerium Group; (2) between May 2008 and July 2013, PIFSS invested a total of US$636.3 million in 4 funds managed by the Aeriance Group; and (3) in December 2006 and June 2007, PIFSS invested a total of US$100 million in 2 funds managed by third parties, for which Aerium Finance acted as the introducer.

338WW. During the period from January 2008 to March 2010, there was a sharp increase in the amounts which PIFSS invested in funds managed by the Aerium Group and/or the Aeriance Group. PIFSS' cumulative investment increased from approximately US$391 million at the start of that period to approximately US$1.4 billion at the end of the period. This contrasts with a steady increase from zero to US$391 million over 4 years from 2003 to 2008, and from US$1.4 billion to US$1.6 billion over 3 years from early 2010 to mid-2013.

338XX.  During the period March 2008 to December 2010 (i.e. substantially overlapping with the period when PIFSS' investments increased sharply), Mr Ruimy made payments of at least US$10.1 million to or for the benefit of Mr Al Rajaan, which, for the reasons pleaded herein, PIFSS infers to be Secret Commissions paid pursuant to a corrupt arrangement between Mr Ruimy and Mr Al Rajaan in return for Mr Al Rajaan causing or influencing PIFSS to invest in funds managed and/or introduced by the Aerium Group and/or the

210

Aeriance Group. The payments to Mr Al Rajaan are set out in the table at Appendix 7.2 to this statement of case and comprised (to the extent PIFSS has been able to identify so far and pending disclosure):

a. US$8.7 million apparently withdrawn in cash from Mr Ruimy's Mirabaud account 410510 between March 2008 and December 2010 and paid in cash to Mirabaud account 504976, which was nominally held by Ms Al Wazzan but which was in fact Mr Al Rajaan's account; and

b. US$1.5 million paid in settlement of invoices addressed to Mr Al Rajaan from jewellers, namely: (i) Gemcut SA (US$460,000 on 19 November 2009); and (ii) Hamilton Associates (US$994,200 on 30 November 2009).

338YY. Between 29 February 2008 and 15 December 2010, the only withdrawals from Mr Ruimy's account 410510 comprised cash withdrawals and the payments of the above invoices, which were payments to and for the benefit of Mr Al Rajaan. Over the same period Mr Ruimy's account was funded by credits including:

a. US$3.0 million from a Rothschild account held by Winston Advisory Group Ltd ("**Winston**"). Between 28 October 2009 and 21 September 2011, credits into Winston's Rothschild account (1938.034) (US$13.7 million in total) included US$9.8 million referencing fee beneficiaries of PIFSS' investments. Mr Ruimy is the beneficial owner of Winston, alternatively of its bank account at Rothschild;

b. US$2.8 million from accounts held by Spiranese Capital Ltd ("**Spiranese**") with: (i) Rothschild (US$1.4 million); and (ii) UBS (US$1.4 million). Between 26 May 2008 to 23 February 2009, credits into Spiranese's Rothschild account (1832015) (US$4.3 million in total) included US$3.9 million referencing fee beneficiaries of PIFSS' investments. Mr Ruimy is the beneficial owner of Spiranese, alternatively of its bank accounts at Rothschild and UBS; and

c. US$1.9 million from accounts held by Hiram Holdings Ltd (a 70% shareholder of Aeriance Investments Sarl, an entity within the Aeriance Group, such that PIFSS infers that the payments were in relation to its investments in the Aeriance Group).

Details are set out in tables at Appendices 7.3 and 7.4 to this statement of case.

338ZZ. Accordingly, a combined total of US$5.8 million was transferred into Mr Ruimy's

211

account 410510 from Winston and Spiranese (credited between 29 February 2008 and 20 January 2010). Winston and Spiranese were themselves funded by transfers between 4 June 2008 and 12 August 2011 totalling US$13.7 million from 9 fee beneficiaries of PIFSS' investments in funds managed and/or introduced by the Aerium Group and/or the Aeriance Group, namely: (i) Aerium Finance; (ii) European Retail Asset Management (ERAM) Sarl; (iii) Aerium Septem Properties SCA / Septem France Capital Sarl; (iv) Golden Hawk Management Sarl; (v) Stratton Capital; (vi) Platon Capital; (vii) Asset Management Luxembourg (AML) Sarl; (viii) Aeriance Investments Sarl; and (ix) Ansa-Newton Management Sarl. PIFSS was the 100% or majority investor in nearly all of the relevant funds.

338AAA. Between June 2008 and October 2010 Aerium Finance paid US$7.1 million into the aforesaid accounts of Winston and Spiranese. Thus Aerium Finance (at least indirectly) financed at least some of the payments from Mr Ruimy to and for the benefit of Mr Al Rajaan pleaded above. Moreover, as pleaded at paragraph 28G above, Mr Ruimy was at all material times the owner and/or controller of Aerium Group including Aerium Finance; and his knowledge and conduct in relation to the payment of Secret Commissions to and for the benefit of Mr Al Rajaan is attributable to Aerium Finance.

338BBB. PIFSS infers that the above payments from Mr Ruimy to and for the benefit of Mr Al Rajaan were Secret Commissions, paid pursuant to a corrupt arrangement between Mr Ruimy and Mr Al Rajaan in return for Mr Al Rajaan causing or influencing PIFSS to invest in funds managed or introduced by the Aerium Group or the Aeriance Group. Pending disclosure, PIFSS relies (without limitation) upon:

a.   the coincidence of the payments to Mr Al Rajaan and the very substantial increase in PIFSS' investments in Aerium/Aeriance funds between January 2008 and March 2010;

b.   the similar fact pattern of Secret Commissions as pleaded in relation to and evidenced by the other Schemes pleaded herein;

c.   the scale of the payments in question, which cannot rationally be explained as being without any corrupt intent or expectation of preferential treatment from Mr Al Rajaan in return;

d.   the source of the payments in question, being traceable at least in part to fees paid

212

in relation to PIFSS' investments in Aerium/Aeriance funds and then routed through Winston and Spiranese bank accounts and Mr Ruimy's own bank account;

e. the establishment of account 410510 at Mirabaud in Mr Ruimy's name (rather than in the name of a member of the Aerium/Aeriance Group), the sole or main purpose of which was to receive funds for onward transfer to or for the benefit of Mr Al Rajaan as set out above;

f. the establishment of Ms Al Wazzan's Mirabaud account 504976, the sole or main purpose of which was to receive funds from Mr Ruimy for Mr Al Rajaan while concealing the fact that the true recipient was Mr Al Rajaan;

g. the further concealment of Mr Al Rajaan as the true recipient by paying the jewellers directly;

h. disguising the payments as "*cash withdrawals*" from Mr Ruimy's account and cash deposits to Ms Al Wazzan's account. PIFSS does not know whether there were in fact genuine cash withdrawals and deposits or whether bank transfers (e.g. via intermediate accounts) were misleadingly booked as cash. In any event, even if there were genuine "*cash withdrawals*", PIFSS infers that this was an attempt to break up the paper trail and thereby conceal the payments, there being no legitimate reason for such substantial transfers to be effected in cash; and

i. Mr Ruimy's use of his personal account rather than any account held by companies in the Aerium/Aeriance Group, being consistent with the need to keep his dealings with Mr Al Rajaan secret from others (including PIFSS) and with the payments being part of a secret corrupt arrangement rather than legitimate commercial dealings.

338BBB1 Further or alternatively, and in connection with PIFSS's Aerium/Aeriance investments (as summarised in Appendix 7.1), entities associated with some or all of PIFSS' Aerium/Aeriance investments (including but not limited to the investment manager/fee beneficiary connected to such investments as summarised in Appendix 7.1) and/or entities associated with Mr Ruimy made payments (directly or indirectly) to entities that are owned by or associated with Mr Amouzegar (and/or Mr Al Rajaan – see in relation to Quadra paragraph 338K(b) above). PIFSS claims in respect of any and all such payments. Pending disclosure, the best particulars PIFSS is currently able to give of such payments

213

are set out in Appendix 7.5 and are presently known to total at least US$ 468,995. The entities that received the aforesaid payments (directly or indirectly) in connection with PIFSS's Aerium/Aeriance investments were as follows:

a.  Wentworth Development Corp, which paid a total of (at least): (i) US$ ~~17,282,922~~17,370,802[7] to Ozak which made payments to Mr Al Rajaan as pleaded at paragraphs 245 to 251 (in particular paragraph 248(b)) above and Appendix 4.5; (ii) US$ 869,146 to account 190882 as pleaded at paragraph 205(d) above; and (iii) US$ 526,371 to Pensée as pleaded at paragraph 281F.6 above and Appendix 4A.1.

b.  Moccak Management Limited, which paid a total of (at least): (i) US$ ~~4,742,447~~4,851,685[7] to Ozak which made payments to Mr Al Rajaan as pleaded at paragraphs 245 to 251 (in particular paragraph 248(b)) above and Appendix 4.5; and (ii) US$ 237,631 to Pensée as pleaded at paragraph 281F.5 above and Appendix 4A.1.

c.  Quadra, which paid a total of (at least): (i) up to US$ 10.9 million to the Orkina Account as pleaded at paragraph 338K(b) above; and (ii) US$ ~~0.394 million~~838,510[7] to Bordertown.

The sums pleaded at Appendix 7.5 formed part of the total sums pleaded in subparagraphs (a) – (c) above.[6]

338BBB2  As pleaded above, it is to be inferred that such payments were payments made to or for the benefit of Mr Al Rajaan because they were ultimately made to entities and/or accounts which he beneficially owned or controlled:

a.  As regards the payments in paragraph 338BBB1(a), by reference to the facts and matters set out in paragraphs 250 and 281E.

b.  As regards the payments in paragraph 338BBB1(b), by reference to the facts and matters set out in paragraphs 250 and 281E.

c.  As regards the payments in paragraph 338BBB1(c), by reference to the facts and matters set out in paragraphs 338D to 338R, and in particular 338D, 338H(a) and (b), 338K(b), and 338N-R.[6]

338BBB3  PIFSS infers that the above payments were Secret Commissions paid to and for the benefit

214

of Mr Al Rajaan, and paid pursuant to a corrupt arrangement between Mr Ruimy and Mr Al Rajaan in return for Mr Al Rajaan causing or influencing PIFSS to invest in funds managed or introduced by the Aerium Group or the Aeriance Group. Pending disclosure, PIFSS relies (without limitation) upon the following:

a.   the similar fact pattern of Secret Commissions as pleaded in relation to and evidenced by the other Schemes pleaded herein, including the involvement of Mr Nasrallah as evidenced by the routing of payments through Ozak (see paragraphs 245 and 246 above), Bordertown (see paragraph 197(k) above) and to Pensée (see paragraph 281E above);

b.   the likely scale of the payments in question, which cannot rationally be explained as being without any corrupt intent or expectation of preferential treatment from Mr Al Rajaan in return;

c.   the fact that the payments were made in connection with and/or derived at least in part from fees paid in relation to PIFSS' investments in Aerium/Aeriance funds;

d.   the deliberate concealment of Mr Al Rajaan as the true recipient by routing the Aerium/Aeriance payments through entities owned by or associated with Mr Amouzegar;

e.   the involvement of Mr Amouzegar and entities owned by or associated with him: (i) given their involvement in facilitating the widescale payment of Secret Commissions to Mr Al Rajaan as pleaded herein; and (ii) which cannot rationally be explained as being without any corrupt intent, in particular in connection with the Pictet, Further Nasrallah, Pensée and VP Banking Schemes;

f.   the Aerium group's repeated (and, it is be inferred, deliberate) failure to disclose the payments, including:

(i)   by denying (in response to repeated requests from WAFRA about how the PIFSS relationship developed and the payment of introducer fees) that any fee was paid to placement agents/solicitors with respect to PIFSS' Aerium investments (with the exception of Aerium Properties IV); and

215

(ii)     without disclosing any interaction with Mr Amouzegar or any entities owned by or associated with him.

Those denials and non-disclosures (for which PIFSS infers there is no innocent explanation) were given on various occasions in 2015, including by email(s) from Franck Ruimy, including of 8 August 2015, having confirmed the position with his brother (Mr Ruimy);

g.      the facts and matters stated in paragraphs 338VV to 338BBB above;

h.      the fact that Mr Ruimy and Mr Al Rajaan plead contradictory explanations in respect of the payments pleaded at paragraph 338XX above, in circumstances where the purpose of such payments was within the personal knowledge of Mr Ruimy and Mr Al Rajaan and, were Mr Ruimy correct that there was an innocent explanation, it is inexplicable that Mr Al Rajaan would not have pleaded a consistent case;

i.      in the premises of the above and given the nature of the payments and payment arrangements, the arrangements would not have been entered into without the direct personal involvement of Mr Ruimy promising and procuring the payment of Secret Commissions to Mr Al Rajaan.[6]

338BBB4 Further to paragraph 338BBB1 above, PIFSS further infers that such Secret Commissions represent a fraction of a wider pattern of regular payments that would have been determined by reference to an agreed proportion of the relevant fees pursuant to the scheme set out in section C above. The first payment which PIFSS is able to particularise (see Appendix 7.5) was made on or before 22 December 2006. Further payments were made on or before: (a) 20 March 2007; and (b) 2 July 2009.  It is to be inferred that payments were made, at the least, consistently between 2006 and 2009 and more likely from shortly after September 2003 until at least October 2014 (in which month the last known payments from both Moccak and Wentworth to Pensée were made).[6]

## Liability

## Mr Al Rajaan

338CCC. By reason of the above facts and matters, Mr Al Rajaan is liable for civil wrongs under Article 227 of the Civil Code arising out of the following breaches and/or the conduct

giving rise to the following breaches[6]:

    a.    Breach of Articles[6] 11 and 12[6] of the Public Property Law; the manner in which he authorised or influenced PIFSS to enter into the investments made through Mr Ruimy and intentionally committed it to rights and obligations in return for the payment of Secret Commissions, was detrimental to PIFSS' interests;

    b.    Breach of Article 35 of the Penal Code amended by the Bribery Law: Mr Al Rajaan knew his position as Director General of PIFSS and was acting in the course of his authorised duties in authorising or influencing PIFSS to enter into investments in return for which he secured the promise and payment of Secret Commissions; and/or

    c.    Breach of his Civil Service duties; and/or

    d.    Breach of Article 2 of the Money Laundering Law No.35 of 2002, and Article 2 of the Money Laundering Law No.106 of 2013[6].

338DDD.    Alternatively, he is liable under principles of English law for:

    a.    breach of fiduciary duty (best interests, good faith, no conflict and no profit); and/or

    b.    bribery.

338EEE.    Alternatively, he is liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of breach of Article 158 SPC for criminal mismanagement of PIFSS's property; breach of Article 322 *septies* SPC for accepting bribes in return for acting as Director General of PIFSS in ways which were contrary to his duty and/or dependent on his discretion; and breach of Article 305 *bis* SPC for money laundering by causing bribes paid to him or for his benefit to be concealed.

**Mr Ruimy and Aerium Finance**

338FFF.    Mr Ruimy and Aerium Finance are liable for civil wrongs under ~~both~~[6] Articles[6] 227, 228[6] and 229 of the Kuwaiti Civil Code arising out of the following breaches and/or the conduct giving rise to the following breaches (in the case of the corporate entity on the basis pleaded at paragraph 72B above)[6]:

    a.    Breach of Articles 35 to 39 of the Penal Code for their roles in promising and paying Secret Commissions to Mr Al Rajaan, knowing his position as Director General of PIFSS, to induce him to authorise PIFSS to make investments with financial

217

institutions whose products they promoted in which they had a commercial interest.

b.     Liability as a perpetrator, and aider and abettor within the meaning of Article 47-48 of the Penal Code in respect of their role in relation to Mr Al Rajaan's breaches of Articles[6] 11 and 12[6] of the Public Property Law referred to above and breaches of Article 35 and 39 of the Penal Code.

338GGG. Alternatively, they are liable under principles of English law for:

a.     dishonest assistance in Mr Al Rajaan's breach of fiduciary duty; and/or

b.     bribery; and/or

c.     knowing receipt of trust property in respect of such unauthorised benefits as they may have received under the Aerium Scheme.

338HHH. Alternatively they are liable under principles of Swiss law for civil wrongs under Article 41 SCO arising out of:

a.     Instigating, jointly perpetrating or assisting (within Article 50(1) SCO) Mr Al Rajaan's criminal mismanagement of PIFSS' property contrary to Article 158 SPC;

b.     Bribing a foreign public official, namely Mr Al Rajaan, contrary to Article 322 *septies* SPC;

c.     Laundering (within Article 305 *bis* SPC) and/or thereby aiding and/or abetting (within Article 50(3) SCO) the payment of bribes to or for the benefit of Mr Al Rajaan in breach of Article 158 SPC and/or Article 322 *Septies* SPC.

**Secondary/Vicarious liability**

338III.    If, which is denied, Aerium Finance is not liable as principal for the torts and other civil wrongs alleged, it is in any event liable under Article 240 of the Civil Code, alternatively vicariously liable under principles of English law, alternatively pursuant to Article 55 SCO, for the torts and civil wrongs committed by Mr Ruimy and all relevant employees whom he supervised.

**Generally**

338JJJ.    All transfers of the Secret Commissions are void in law as they were carried out for the

218

purpose of concealing the Secret Commissions.

**Further Relief**

338KKK. In addition to the relief pleaded above, PIFSS is entitled to and claims *Norwich Pharmacal* relief from Mr Ruimy and Aerium Finance, which is necessary to uncover the full extent of the Aerium Scheme by requiring them to identify whether any, and if so what, further corrupt payments were made to or for the benefit of Mr Rajaan by or on behalf of Aerium Group or Aeriance Group, and if so, by which entities or individuals. Furthermore:

a.   the payments to Mr Al Rajaan pleaded above were deliberately concealed from PIFSS, such that it is very difficult for PIFSS to uncover the full extent of the wrongdoing (the pleaded payments only coming to light at all as a result of criminal investigations in Switzerland);

b.   the payments evidence a corrupt relationship or arrangement between Mr Ruimy and Mr Al Rajaan for the reasons pleaded above;

c.   PIFSS infers that the Secret Commissions are likely to have extended beyond the identified payments pleaded above, in circumstances where:

    a.   there is abundant evidence of Mr Al Rajaan receiving Secret Commissions pursuant to other Schemes as pleaded herein, in amounts which were generally in proportion to the size of PIFSS' investments in the relevant funds, and which were generally paid throughout the period of PIFSS' investment (or at least until May 2012 when Mr Al Rajaan became aware of the Swiss criminal investigation into his affairs);

    b.   PIFSS invested over US$2 billion in funds managed, introduced or advised by Aerium Group or Aeriance Group;

    c.   PIFSS paid very substantial fees to the Aerium Group and the Aeriance Group (at least US$432 million in relation to funds numbered 3-8, 10- 11 and 13-18 in Appendix 7.1 and further fees in relation to funds 1-2, 12 and 19-20 in which PIFSS invested over time). Consistently with his conduct in relation to the other Schemes, Mr Al Rajaan would have expected to receive substantially more than about 2% of those fees in return for causing or

219

influencing PIFSS to invest; and

d.     unless the above relief is granted, PIFSS will be unable to ascertain whether (as appears to be likely) Mr Al Rajaan received further Secret Commissions pursuant to the Aerium Scheme, and the full extent of the relevant corruption may never be redressed.

## K.     SUMMARY OF MR AL RAJAAN'S AND MS AL WAZZAN'S LIABILITY

### Mr. Al Rajaan

339.   Mr. Al Rajaan acted in breach of the duties set out in paragraphs 58 to 61 above in the terms set out in section C above as further particularised by the facts set out in respect of each of the Schemes in sections E to J(2)(3) by:

a.     Arranging for the payment and receipt of Secret Commissions;

b.     Failing to disclose to PIFSS or to account to it for or otherwise to rebate to PIFSS the Secret Commissions;

c.     Failing to negotiate reductions and/or waivers in the level of fees payable by PIFSS to the extent of the Secret Commissions;

d.     Failing, as set out above and below and generally:

a.     To act loyally;

b.     To protect and preserve public funds.

### Ms Al Wazzan

340.   PIFSS' primary case is that in relation to all of the Schemes above, Ms. Al Wazzan was used by Mr. Al Rajaan as his nominee, in setting up companies and bank accounts in her name through and/or in to which Secret Commissions were paid. It claims that the acts and omissions carried out by him in her name are acts for which he is liable. She is joined to these proceedings for the reasons pleaded at paragraph 12A above and/or[6] to ensure that PIFSS' obtains effective remedies, including under Article 22 of the Kuwait Public Property Law.

341.   PIFSS reserves the right, should disclosure reveal her to have played an active part in setting up the companies and bank accounts concerned and in actively participating in and assisting

220

[REMEDY]6

the procurement and payment of Secret Commissions to amend its claim to bring claims against her under Articles 227-229 of the Kuwait Civil Code, for money laundering and/or as an accomplice under Swiss law and under principles of English law for bribery and accessory liability in equity.

## L.    REMEDY

**Principles of Kuwait Law**

Kuwait Civil Code

342.    Article 247(1) provides: "The judge shall determine the amount of compensation that will remedy the harm in line with article 230 and 231 with due consideration to the circumstances of the victim."

343.    Article 246 provides that the judge:

   a.    Shall determine monetary compensation.

   b.    May according to the circumstances of the case and at the request of the victim order restitution or any other performance as compensation.

344.    Article 230 provides that:

   a.    The harm that the wrongdoer is obligated to compensate shall be determined based on the loss incurred and opportunity foregone as long as it is the natural consequence of the tort.

   b.    The loss or opportunity foregone shall be deemed the natural consequence if it is unavoidable by reasonable effort by a normal person in the same circumstances.

345.    Harm is not limited to financial harm but can extend to reputational or other commercial harm. Loss is not limited to direct pecuniary loss.

346.    [Not used]

   Under Article 231:

   a.    The harm which the person committing the wrongful conduct is responsible for compensating shall be determined on the basis of losses incurred and opportunity foregone as long as it was the natural consequence of the wrongful conduct.

[REMEDY][6]

b.    ~~The losses incurred and the opportunity foregone shall be deemed the natural consequence of the wrongful conduct as long as they could not be avoided by reasonable effort of the normal person under similar circumstances.~~

347.    Under Article 23~~12~~ compensation for harm caused by wrongful conduct shall include harm even if it was moral and provides for the availability of general damages which are not assessed by reference to direct pecuniary loss but are at the discretion of the judge to restore the equilibrium which was distorted by the wrongful conduct and bring the victim whose right was violated back to the position the victim was in prior to the violation and erase the resulting harm. It must not be exaggerated and exorbitant or undervalued.

348.    The process of determining the amount of compensation is one which involves the identification of the harm the law recognises as entitling the victim to a remedy and assigning the financial value that would be remedial and would restore the victim to the situation prior to the violation of the victim's right.

349.    In the case of unlawful conduct concerning Public Property, the above remedies are in addition to the rights of victims of breach of the Public Property Law to claim compensation or repayment/[6]restitution  (insofar as may be necessary, in the alternative to restitution under Article 246 of the Kuwaiti Civil Code)[6] by way of repayment/[6]restitution of or in relation to[6] public property falling within the meaning of that Law which includes the receipt of all unlawful profits or benefits, pursuant to Articles 16 and/or 22 of the Public Property Law, against the public employee perpetrator and those who have assisted in his conduct (whether as criminal accessories pursuant to Articles 47-48 of the Penal Code, alternatively pursuant to Article 229 of the Kuwaiti Civil Code)[6].

350.    ~~By reason of the operation of the provisions of Articles 227 – 229 of the Kuwait Civil Code, where the illicit acts relied on by the victim is a crime, and where the provisions of Articles 47~~ ~~49(3)~~~~48 or any of them is satisfied, the victim is entitled based on Article 22 of the Public Property Law in the case of breach of the Public Property Law to recover the value of the public property in question as well as the unlawful benefits derived by the principal wrongdoer from those Defendants who have participated in or assisted the wrongdoing in question.~~[Not used][6]

[REMEDY][6]

Application of principle

351.    By reason of the civil wrongdoing alleged against all Defendants and pursuant to Articles 16 and[6] 22 of the Public Property Law set out at paragraphs 68-[6]69 above, ~~Article 42 of the Penal Code as amended by Law, No. 31 of 1970, which provides for confiscation of the bribe in question~~[6] and Articles 246 and 247 of the Kuwaiti Civil Code pleaded[6] above,[6] PIFSS is entitled to an order for payment by each Defendant of:

a.      The value of the Secret Commissions which, through his or her unlawful conduct under Articles 227 – 229 of the Civil Code were paid to Mr. Al Rajaan and/or to others at his direction.

b.      The value of any benefits realised by each Defendant in connection with the unlawful conduct alleged, as follows:

   a.      As regards all Defendants (whether natural or legal persons), and whether those benefits were received directly by that Defendant or indirectly, pursuant to Article 22 of the Public Property Law.

   b.      Further or in the alternative, as regards all Defendants who are natural persons, whether received directly or indirectly via that Defendant assisting Mr. Al Rajaan in the procurement of benefits for related third parties pursuant to Article 16 PPL.[6]

352.    PIFSS is entitled to enforce proprietary rights in respect of the unlawful retention of public property including unauthorised benefits arising from dealings with public property and to follow and trace such property into the hands of third parties pursuant to the provisions pleaded in paragraphs 69-70 above[6].

353.    Further, PIFSS is entitled to claim the value of the Secret Commissions paid to Mr. Al Rajaan or others at his direction through the unlawful conduct of the Defendants as compensation to remedy the violation of the rights as set out in paragraphs 60 and 62 above protected under Articles[6] 11 and 12[6] of the Public Property Law and Article 35 of the Penal Code.

354.    Further or in the alternative, PIFSS is entitled to compensation in the value of at least[6] the Secret Commissions in the sum of the bribe, being the sum which represents the direct and financial loss caused by the wrongdoing. If Mr. Al Rajaan had not acted corruptly and in his

223

[REMEDY][6]

self-interest in seeking and procuring the payment of Secret Commissions, and had he acted in accordance with his obligations under the Civil Service Law set out in paragraph 59 PIFSS would have received the benefit of ~~those~~[6] sums <u>overpaid in fees by PIFFS,</u>[6] whether by way of reduced fees, waiver of fees or a rebate in fees ~~payable to PIFSS~~. <u>Those sums were at least as great as the Secret Commissions paid in relation to the respective investments by PIFSS.</u>[6] ~~This~~<u>Loss in the sum of the Secret Commissions</u>[6] is to be presumed as a matter of law, alternatively <u>that loss and/or any greater loss in the form of overpaid fees is to be</u>[6] proven and inferred from the circumstances of the case, in particular given:

a.   The leverage which PIFSS enjoyed with financial institutions and its ability to negotiate reductions in fees;

b.   The fact that many of the funds in which investment was authorised <u>or influenced</u> by Mr. Al Rajaan were either beneficially owned by PIFSS or were funds in which PIFSS was the cornerstone investor;

c.   The fee structure in the Man Group funds which was designed for private and not institutional investors, and where PIFSS would have had particular leverage to negotiate substantial discounts <u>and, in relation to the Man Group funds, the further facts and matters set out in paragraph 157.f. above and in particular the provisional estimate of overpaid fees in the sum of US$278,052,413</u>[6].

d.   The practice of certain Funds to waive and reduce their fees in the sum of the Secret Commissions once criminal investigations into the payment of Secret Commissions had been commenced.

e.   <u>The fact that the relevant Defendants were willing to pay a share of their fees to or at the direction of Mr Al Rajaan secretly and improperly as bribes in order to obtain and/or retain investments and the absence of any reason to think they would have been any less willing openly and properly to remit the equivalent sums as reductions or retrocessions of fees otherwise due or chargeable on such investments. In so far as it will be the case of any Defendant that it was only willing to pay such sums secretly and improperly by way of bribes to Mr Al Rajaan and would have refused to pay the equivalent amounts openly and properly by way of legitimate reductions or retrocessions of fees, such Defendant is put to strict proof of that case.</u>

355.   Further, PIFSS is entitled to discretionary compensation under Article 23<u>12</u>[6] by way of

224

moral or general damages.

<u>Under Swiss Law principles</u>[5]

355A.   PIFSS is entitled to damages assessed in the value of the Secret Commissions in relation to which it relies on the principles set out at paragraph 73O above and/or[5] the same facts as set out at paragraph 354 above.

<u>Under English Law principles</u>

356.   PIFSS is entitled to the following remedies under principles of English law:

a.   Damages being the higher of actual damage proved or the value of the Secret Commissions, in the case of damages for bribery loss being irrebuttably presumed to the extent of the value of the Secret Commissions.

b.   Restitution of the value of the Secret Commissions to reverse unjust enrichment.

c.   An account of profits and proprietary claims in respect of all benefits made in breach of fiduciary duty.

d.   An account of profits and equitable compensation against all dishonest assistants to breaches of Mr. Al Rajaan's fiduciary duties.

e.   Proprietary and personal relief arising out of the knowing receipt of trust property.

f.   Further and other relief including all necessary accounts, directions and enquiries.

g.   Compound or simple interest.

**M.   INTEREST AND PRAYER**

<u>Interest</u>

357.   PIFSS is entitled to and claims:

a.   save to the extent governed by Kuwaiti or Swiss law,[6] compound interest with three-monthly rests:

a.   pursuant to the Court's equitable jurisdiction;

225

[INTEREST AND PRAYER][6]

    b.      as damages based on the lost opportunity to generate a return on the funds;

    b.      alternatively, simple interest under s 35A of the Senior Courts Act 1981 at such rate and for such period as the Court thinks fit. To the extent governed by Swiss law, and/or the Court in its discretion has regard to Swiss law, PIFSS relies on a rate of 5% per annum.[6]

AND the Claimant claims under Kuwaiti and/or Swiss and/or Bahamian and/or English law:

(A)    An account of profits

(B)    Restitution and disgorgement of public property

(C)    Proprietary relief and orders to reflect and/or transfer PIFSS' proprietary interest in the above property

(D)    Damages and compensation

(E)    Further or other relief

(F)    Interest

226

[INTEREST AND PRAYER][6]

Statement of Truth

~~The Claimant believes that the facts stated in these Particulars of Claim are true.  I am duly authorised to sign this statement of truth on behalf of the Claimant.~~
The Claimant believes that the facts stated in these Re-[7]Re-[6]Re-[5]Re-Re-Re-Amended Consolidated Particulars of Claim are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:        …⟨signature⟩………

Name:        …Martin Walsh………………

Position:        …Partner………………………

Dated:        …25/10/2024…………………

**STUART RITCHIE QC**

**NICO LESLIE**

**MICHAEL LAZARUS**

**CHRISTOPHER BURDIN**

**STUART RITCHIE QC**

**HUGH NORBURY QC**

**CHRISTOPHER BURDIN**

**STUART RITCHIE KC**

**HUGH NORBURY KC**

**ANNA DILNOT KC**

**NICO LESLIE**

**CHRISTOPHER BURDIN**[6]

227