# Exhibit 2

IN THE HIGH COURT OF JUSTICE          Claim no. CL-2019-000118
BUSINESS AND PROPERTY COURTS
OF ENGLAND AND WALES
COMMERCIAL COURT (QKBD)

BETWEEN:


THE PUBLIC INSTITUTION FOR SOCIAL SECURITY

**Claimant**


**-and-**


(1) ~~FAHAD MAZIAD RAJAAN AL RAJAAN~~ MUNA AL-RAJAAN AL-WAZZAN (ALSO KNOWN AS MUNA MOHAMMED ABDULAZIZ AL WAZZAN) (IN HER CAPACITY AS REPRESENTATIVE OF THE ESTATE OF FAHAN MAZIAD RAJAAN AL RAJAAN (DECEASED))
(2) MUNA MOHAMMED ABDULAZIZ AL WAZZAN (ALSO KNOWN AS MUNA AL-RAJAAN AL-WAZZAN)
~~(3) BANQUE PICTET & CIE SA~~
~~(4) PHILIPPE BERTHERAT~~
(5) KAMRAN AMOUZEGAR
(6) PHOENIX INTERNATIONAL CONSULTANTS SARL
(7) ANTOINE NASRALLAH
~~(8) PICTET & CIE (EUROPE) SA~~
~~(9) PICTET BANK AND TRUST LIMITED~~
~~(10) BANK PICTET & CIE (ASIA) LIMITED~~
~~(11) MIRABAUD & CIE SA~~
~~(12) PIERRE MIRABAUD~~
~~(13) THIERRY FAUCHIER-MAGNAN~~
~~(14) LUC ARGAND~~
(15) MAN GROUP LIMITED (FORMERLY MAN GROUP PLC)
(16) MAN STRATEGIC HOLDINGS LIMITED
(17) MAN INVESTMENTS LIMITED
(18) MAN INVESTMENTS AG
(19) MAN INVESTMENTS MIDDLE EAST LIMITED
(20) ANTOINE MASSAD
(21) MOHAMMED EL GHAZZI
(22) UNION BANCAIRE PRIVÉE, UBP SA
(23) UBP ASSET MANAGEMENT (BERMUDA) LIMITED
(24) ANNE ROTMAN DE PICCIOTTO
(25) DANIEL DE PICCIOTTO

1

**(26) FRANCESCO MOMBELLI**
**(27) ICS INVESTMENT CONSULTING SERVICES SA**
**(28) SINTESI LIMITED**
**(29) METHIS MANAGEMENT LIMITED**
**(30) EFG BANK AG**
**(31) GILLES GUERIN**
**(32) THE ESTATE OF EDGAR DE PICCIOTTO**
**(33) GUY DE PICCIOTTO**
**(34) MARC DE PICCIOTTO**
~~**(35) DANIELE DE PICCIOTTO**~~
**(36) VP BANK AG**
**(37) VP BANK (SCHWEIZ) AG**
**(38) RENATO GHITTINI**
**(39) ELY MICHEL RUIMY**
**(4) AERIUM FINANCE LIMITED**
**(41) THE PENSÉE FOUNDATION**
**(42) KHALED AL RAJAAN**
**(43) FAWAZ AL RAJAAN**
**(44) FAJER AL RAJAAN (OR AL WAZZAN)**
**(45) FARAH AL RAJAAN**

**<u>Defendants</u>**

---

**<u>RE-RE-</u>AMENDED DEFENCE OF THE 30th DEFENDANT**

---

1.   In this Re-Re-Amended Defence, the 30th Defendant (**EFG**) responds only to those paragraphs of the Re-Re-Re-Re-Re-Amended Consolidated Particulars of Claim (~~**RRRRACPOC**~~ **6RACPOC**) that are relevant to the claims against it. All other paragraphs are not admitted.

2.   ~~As a Swiss bank, EFG is subject to Article 47 of the Swiss Federal Act on Banks and Savings Banks (Swiss Banking Act, **BA**).~~

3.   ~~Article 47 BA makes it a criminal offence for current or former officers, employees, agents or other representatives (including external legal counsel) of a Swiss bank to disclose any information relating to the bank's commercial relationship with any of its clients, including the mere existence of such a~~

2

relationship. The duty to maintain banking secrecy persists beyond termination of the bank's relationship with a client.

4. A breach of Article 47 BA can sound in a custodial sentence of up to three years, a monetary penalty and/or regulatory sanctions, including the loss of the bank's licence.

5. To the extent that the APOC include allegations concerning commercial relationships said to have existed between EFG and named individuals and entities, Article 47 BA prohibits EFG from responding thereto.

6. In the event that the restrictions imposed by Article 47 BA are lifted at any point during the course of these proceedings, EFG will seek permission to amend its Defence to engage with PIFSS' allegations concerning parties said to have been clients of EFG.

7. Pending the lifting of those restrictions, nothing in this Defence should be construed as an admission or averment that EFG has or has ever had a commercial relationship with any individual or entity named in the APOC.

## SUMMARY

7A. PIFSS' claims against EFG are denied in their entirety, whether under Swiss, Kuwaiti or English law. In summary, as more fully particularised below:

(1) PIFSS' claims against EFG are governed by Swiss law.

(2) No admissions are made as to the unlawful or corrupt schemes alleged in the RRRRACPOC 6RACPOC, including the unlawful or corrupt conduct alleged against Mr Guerin, as set out in paragraph 15A below. PIFSS is required to prove the entirety of such schemes.

(2A) PIFSS' claims in respect of Mr Diriberry are each denied.

(3) Even if the allegations in the RRRRACPOC 6RACPOC were otherwise well founded:

3

(a)   EFG has no primary liability to PIFSS in respect of wrongdoing by Mr Guerin. Pursuant to Swiss law principles of authority and attribution, a legal entity is liable as principal only for the acts and omissions of its formal, factual or apparent governing bodies acting within the scope of their functions as such. Mr Guerin – the former EFG employee alleged to be complicit in the Further Nasrallah Scheme – was never a formal, factual or apparent governing body or officer of EFG and was not acting within the scope of its functions as such a governing body or officer.

(b)   EFG has no secondary liability to PIFSS:

(aa)   PIFSS alleges *secondary* liability under Swiss law only in respect of acts of Mr Guerin, and not Mr Diriberry.

(a)   Claims against EFG founded on *secondary* liability under Swiss law prescribed prior to the issue of these proceedings.

(b)   In any event, if, contrary to his Defence, Mr Guerin acted as now alleged in the ~~RRRRACPOC~~ 6RACPOC, EFG is not vicariously liable for his conduct. He was not acting in the performance of his work for EFG. Further, EFG took all due care in selecting, instructing and supervising him. Further, if, which is denied, PIFSS has sustained loss or damage by reason of any conduct of Mr Guerin in the performance of his work, that loss or damage would have occurred even if all due care had been exercised by EFG.

(ba)   EFG has no liability to PIFSS pursuant to Article 102(2) of the Swiss Penal Code: Article 102(2) is merely a rule of criminal attribution; it does not create a qualifying protective norm and is not capable of founding civil liability under Article 41 of the Swiss Code of Obligations. In any event, EFG took all reasonable and necessary organisational measures to avoid money laundering.

4

(c) In any event, PIFSS has suffered no loss by reason of the conduct of EFG complained of: it paid market-standard management and performance fees in respect of investments which were profitable. It is not to be presumed as a matter of Swiss law that, had Mr Al Rajaan not acted corruptly, PIFSS would have received the benefit of the alleged Secret Commissions by way of reduced fees, waiver of fees or a rebate. It is not entitled to relief from EFG.

(d) Further, PIFSS' fault and/or the conduct of third parties broke the chain of causation; alternatively, PIFSS consented or contributed to any relevant damage; such that any compensation payable to PIFSS falls to be extinguished entirely or otherwise reduced. In particular, as more fully set out in paragraph 76A and following below:

   (a) PIFSS knew, or should have, known about Mr Al Rajaan's activities by no later than 2000/2001 (when, *inter alia,* the Kuwaiti Parliament opened an investigation into Mr Al Rajaan's conduct); alternatively on an ongoing basis thereafter including (at the latest) 2008 (when, *inter alia,* PIFSS' Deputy Director General and board member Dr Fahad Al Rashed sought to discuss commissions allegedly paid to PIFSS' leader (i.e., it is inferred, Mr Al Rajaan) with the Kuwaiti Minister of Finance/PIFSS' Chairman, Mustafa Jassim Al Shamali, and then complained to the Kuwaiti public prosecutor that Mr Al Rajaan had exploited his position to obtain illegal commissions); alternatively, on an ongoing basis thereafter.

   (b) On its own case, PIFSS entrusted Mr Al Rajaan with substantial control and influence as to how PIFSS' assets should be invested. Further, it had particular reason to monitor Mr Al Rajaan's activities, given repeated and longstanding allegations, complaints and investigations as to his conduct and/or wealth and lifestyle.

5

(c)     Despite this, PIFSS failed adequately to monitor, supervise, investigate and/or challenge Mr Al Rajaan's activities in relation to the investments which are the subject of the instant claim at any material time. It did not (for example) suspend and/or otherwise remove Mr Al Rajaan from the position of PIFSS' Director General (save for a limited period in 2012) and/or prevent him from participating in any further investment decisions and/or undertake full and/or adequate investigations into his conduct, and/or monitor his conduct and/or seek confirmation of commissions paid directly from product providers. Further, it narrowed the scope of an investigation by KPMG in 2008 such as to entail no adequate or meaningful scrutiny of Mr Al Rajaan's conduct or the allegations that had been raised.

(d)     Had PIFSS adequately monitored, supervised, investigated and/or challenged Mr Al Rajaan's activities, at any material time over the period which is the subject of this claim, and *a fortiori* from the date of Dr Al Rashed's criminal complaint in 2008, *inter alia*, PIFSS would have discovered Mr Al Rajaan's activities, Mr Al Rajaan would have been suspended and/or removed from his position and/or prevented from participating in any further investment decisions, no further alleged secret commissions would have been paid to him and he would not have been in a position to influence PIFSS' investment decisions by reference to such alleged secret commissions.

(e)     In any event, the State of Kuwait has already recovered sums approximating to the damages claimed in respect of substantially all of the claims herein, and those sums are to be treated as being to the credit of PIFSS, *inter alia* in circumstances in which PIFSS is a public institution controlled by the State of Kuwait, and/or in any

6

event given that the State of Kuwait is obliged or permitted to credit such sums to PIFSS.

## INTRODUCTION AND OVERVIEW

8. Since the matters pleaded in PIFSS' introduction and overview are either addressed in greater detail in the body of the ~~RRRRACPOC~~ 6RACPOC, or duplicative of those matters, EFG's response thereto appears below.

9. EFG will rely on relevant provisions of foreign law at the trial herein for their full terms and true effect.

## THE PARTIES

### The Claimant

10. Save that PIFSS was established by the 1976 Order, paragraphs 6 to 8 are not admitted.

11. Save that it is admitted that Article 17 of Kuwait's constitution and Article 1 of the Public Property Law are in the terms alleged, paragraph 9 is not admitted.

12. As to paragraph 10:

    (1) EFG will refer to Article 2 of the Public Property Law for its full terms and true effect.

    (2) It is denied, if it be alleged, that the Public Property Law has extraterritorial effect. For the English Court to give effect to its provisions in the manner suggested would be to enforce, directly or indirectly, the public and/or penal laws of a foreign state.

    (2A) It is denied in any event that PIFSS' claim against EFG relates to *"public funds"* as defined in Article 2, or that, even on PIFSS' case, there has been wrongdoing in relation to *"public funds"*. The Secret Commissions and

7

"*unauthorised benefits*" relevantly alleged in the ~~RRRRACPOC~~ 6RACPOC are not *"public funds"* as defined in Article 2.

(2B) As a matter of Kuwaiti law, PIFSS is not entitled to rely upon the Public Property Law in a civil claim where there has been no relevant criminal prosecution and conviction in Kuwait. A claim for civil fault under Kuwaiti law cannot be based upon allegations of criminal conduct without a relevant criminal conviction in the Kuwaiti criminal court.

(2C) As a matter of Kuwaiti law, PIFSS is not entitled to claim remedies provided for in the Public Property Law in a civil claim. PIFSS' entitlement to relief in civil proceedings alleging breach of Articles 227 to 229 of the Civil Code is governed exclusively by the Civil Code (Article 22 of the Public Property Law being irrelevant to PIFSS' claims in these proceedings, as set out in paragraphs 35, 84 and 88A below).

(3)    Otherwise, no admissions are made.

**The First and Second Defendants**

13.    Paragraphs 11 to 13 are not admitted. If, which is not admitted, Mr Al Rajaan was able "*to decide upon investments without material challenge or scrutiny*" that state of affairs entailed a serious failing in corporate governance and, as is set out below, must be reflected in any award of damages as a factor causing and/or contributing materially to any losses PIFSS may have sustained.

**The Other Defendants**

**Intermediaries**

*Mr Nasrallah and the Nasrallah companies*

14.    Save that the second sentence of paragraph 14 fairly summarises PIFSS' amended claim, paragraphs 14 and 14A are ~~is~~ not admitted.

**The financial institutions and associated parties**

*EFG Bank and Mr Guerin*

15.   As to paragraph 26:

(1)   ~~Save that Banque Edouard Constant merged with EFG Bank as of 30 June 2003, t~~The first two sentences are admitted.

(2)   It is admitted that Gilles Guerin was an employee of EFG (or its predecessors, Banque Edouard Constant ("**BEC**") and Banque Scandinave en Suisse) in the period 1995 to 2012. In particular, Mr Guerin was appointed as:

(a)   Senior Portfolio Manager by Banque Scandinave en Suisse as of 1 October 1995;

(b)   "*Sous-directeur*" of Banque Edouard Constant as of 1 January 1998;

(c)   "*Directeur adjoint*" of Banque Edouard Constant as of 1 January 1999;

(d)   "*Directeur*" of Banque Edouard Constant as of 1 July 2000;

(e)   Customer Relationship Officer with the rank of Senior Vice President at EFG as of 1 April 2004; and

(f)   Client Relationship Officer with the rank of Senior Vice President as of 1 November 2014.

(2A)  Mr Guerin acted as Client Relationship Officer for each of the accounts listed in paragraph 56E below, and for accounts 536007 and 534414 held respectively in the names of Mr Al Rajaan and Thaxton:

(a)   In the case of account 530218 until its closure in ~~January~~ July 2004;

(b)   In the case of account 536006 until its closure in April 2010;

9

(c)    In the case of accounts 536007, 534414, 530109, 530115, ~~541596,~~ 533815, 530249 and 530303 until their closure in May/June 2012;

(ca)    In the case of account 541596, until its closure in July 2012;

(d)    In the case of account 542257 until its closure in October 2015; and

(e)    In the case of accounts 532745, 532746, 532747 and 534312 until the closure of the accounts and/or until he left EFG's employment on 31 October 2015.

(2B)    No admissions are made as to Mr Guerin's "friendships", save that he and Mr Nasrallah had a long-standing and cordial professional acquaintance pre-dating his employment with Banque Edouard Constant ~~("BEC")~~.

(2C)    By his Defence dated 28 February 2020 ("**Mr Guerin's Defence**") and by his draft Amended Defence circulated on 12 May 2023, Mr Guerin has denied having had friendships with either Mr Nasrallah or Mr Al Rajaan.

(2D)    The allegation that EFG was "*represented at all material times between 1995 and 2012*" by Mr Guerin "*in relation to the matters stated below*" is too broad to be admitted. EFG pleads further in paragraph 15A below.

(3)    Paragraph 26 is otherwise not admitted.

15A.    Mr Guerin retired from EFG in 2015, prior to the issue of these proceedings. He is now employed by Bank Bordier, a competitor of EFG. No admissions are made as to Mr Guerin's conduct, knowledge or intention in any material respect save as specifically set out below. Further, and as to Mr Guerin's position:

(1)    Mr Guerin's position, as set out in Mr Guerin's Defence, and in his draft Amended Defence circulated on 12 May 2023, is that he did not know of any Secret Commissions, or the unlawful or corrupt scheme alleged by PIFSS; that he did not act in concert with Mr Al Rajaan or Mr Nasrallah in that regard; and that he was not party to, and did not intend to assist with or facilitate any such scheme, or act dishonestly or unconscionably.

10

(2)    In any event, as set out in this Re-Re-Amended Defence:

(a)    It is denied that EFG is liable as principal for any relevant actions and/or omissions of Mr Guerin; and

(b)    It is denied that EFG is vicariously liable for such actions and/or omissions;

whether under Kuwaiti, Swiss or English law.

(3)    Further, if, contrary to Mr Guerin's Defence, Mr Guerin did in fact act dishonestly and/or pursuant to the unlawful and corrupt scheme between him and Mr Al Rajaan and Mr Nasrallah and Nadim Nasrallah alleged in the ~~RRRRACPOC~~ 6RACPOC:

(a)    Mr Guerin acted in breach of his duties to EFG as his employer and without EFG's knowledge or consent.

(b)    Such breaches were induced and/or encouraged by Mr Al Rajaan, acting personally and/or through Mr Nasrallah. Mr Al Rajaan was PIFSS' "*most senior manager*" at all relevant times. His relevant acts, knowledge and intentions are attributable to PIFSS (and/or in any event, so far as relevant, he was an apparent governing body or officer of PIFSS at all material times within the meaning of Article 55 SCC); alternatively, PIFSS is vicariously liable for Mr Al Rajaan's conduct; in each case, whether under Kuwaiti and/or Swiss law.

**THE UNLAWFUL SECRET COMMISSION SCHEMES**

16.    As to paragraphs 29 to 37:

(1)    It is denied for the reasons set out in this Re-Re-Amended Defence that EFG was "implicated" in any corrupt scheme or that it acted "in concert"

11

with Mr Al Rajaan or any alleged "corrupt intermediary" in any relevant respect.

(1A) It is denied, if it is alleged, that all deliberations regarding PIFSS' investments took place in Kuwait. On PIFSS' own case, in the First Witness Statement of Ms Al Dakheel dated 17 September 2024, Mr Al Rajaan travelled frequently and often took investment decisions abroad. Mr Al Rajaan was a Swiss resident and the evidence of Ms Al Wazzan in her First Witness Statement dated 29 July 2024 is that he spent more time in Switzerland than in Kuwait.

(2) Otherwise, ~~P~~ paragraphs 29 to ~~40~~ 37 are not admitted.

16A. As to paragraph 38:

(1) It is admitted that Mr Nasrallah:

(a) Incorporated Phoenix International Consultants SARL ("**Phoenix**") and Ozak Services Inc ("**Ozak**") respectively in 1994 and 1997; and

(b) Instructed EFG to make the payments detailed in Appendices 2 and 3 hereto. EFG pleads further to alleged fund flows in paragraph 55A below.

(2) Otherwise, no admissions are made.

16B. Paragraphs ~~29 to~~ 39 and 40 are not admitted.

17. As to paragraph 41:

(1) It is admitted that EFG:

(a) Opened Account 534414 in the name of the Thaxton Foundation on 5 February 2008 and administered the same until its closure on 6 June 2012; and

12

(b)    Opened Account 536007 in the name of Mr Al Rajaan on 28 October 2009 and administered the same until its closure on 30 May 2012.

~~It is not admitted that EFG opened or administered any accounts held beneficially for Mr Al Rajaan or any relevant intermediary.~~

(2)    It is denied, if it be alleged, that EFG ~~or Mr Guerin~~:

(a)    paid Secret Commissions to Mr Al Rajaan, either in return for the promise of investment by PIFSS in products or services in which they and/or their partners and officers were commercially interested, or at all;

(b)    acted dishonestly, with knowledge of the alleged corrupt schemes, or with the intention of harming PIFSS' interests at any time; or

(c)    withheld information from PIFSS or any regulator with the intention of concealing the alleged corrupt schemes, or demonstrated "flexibility" as alleged in their approach to regulatory issues.

(2A)   At no time prior to its letter before action in these proceedings did PIFSS enter into relevant correspondence with EFG or direct enquiries to EFG in relation to the matters at issue.

(2B)   As to Mr Guerin, paragraph 15A above is repeated.

(3)    Otherwise, and pending particularisation of the "*steps*" alleged to have been taken by EFG to avoid regulatory scrutiny, ~~and~~ the matters alleged to have been concealed by EFG, and the enquiries alleged to have been made by PIFSS in correspondence, paragraph 41 is not admitted.

18.    As to paragraph 42:

(1)    Paragraphs 15(2) and 15A above are ~~is~~ repeated.

(2)    Otherwise, no admissions are made.

19. As to paragraphs 43 and 44~~,~~:

    (1) No admissions are made as to PIFSS' allegations against Mr Al Rajaan, including as to the alleged Secret Commissions and concerted action.

    (2) Further, no admissions are made as to whether Mr Al Rajaan exercised control and/or influence over PIFSS' investment decisions and/or encountered a conflict of interest as alleged or at all and/or as to how he would have exercised any control and/or influence absent such alleged Secret Commissions. The allegations as to "benefits" are unparticularised.

    (3) As to Mr Guerin, being the party with whom Mr Al Rajaan is said to have been dealing so far as concerns EFG, paragraph 15A above is repeated.

    ~~it is denied, if it be alleged, that EFG or Mr Guerin procured or was responsible for paying Secret Commissions to Mr Al Rajaan. In the premises, paragraphs 43 and 44 are denied if and to the extent that they relate to EFG and Mr Guerin.~~

20. Insofar as it relates to EFG, Mr Diriberry and Mr Guerin, paragraph 45 is denied as to EFG and Mr Diriberry, and not admitted as to Mr Guerin:

    (1) ~~Paragraph 17(1) above is repeated.~~

    (2) ~~In the premises, no admissions are made regarding EFG's and/or Mr Guerin's alleged participation in, assistance with, or facilitation of the Further Nasrallah Scheme or its concealment.~~

    (3) If, which is not admitted, EFG ~~and/or Mr Guerin~~ did participate in, assist with or facilitate the Further Nasrallah Scheme or its concealment, it is denied that it ~~either EFG or Mr Guerin~~ did so dishonestly or with knowledge that it was ~~they were~~ assisting or facilitating an unlawful scheme.

    (4) EFG does not understand PIFSS to allege that ~~either~~ any of EFG or Mr Diriberry or Mr Guerin was a beneficiary of the alleged Secret

Commissions. It is denied, if it be alleged, that any proceeds of the alleged Secret Commissions were received or retained by EFG or Mr Guerin, whether knowingly and unconscionably or at all.

(5) As to Mr Guerin, paragraph 15A above is repeated.

(6) As to Mr Diriberry, he did not know of any Secret Commissions, or the unlawful or corrupt scheme alleged by PIFSS; he did not act in concert with Mr Al Rajaan or Mr Nasrallah or Nadim Nasrallah or Mr Guerin in that regard; and was not party to, and did not intend to assist with or facilitate any such scheme, or act dishonestly or unconscionably.

21. Save that it is denied that all of the investments held by PIFSS from 1995 onwards generated commissions and/or benefits for Mr Al Rajaan, Pparagraphs 46 to 49 are not admitted, including as to what PIFSS knew as to Mr Al Rajaan's "*personal circumstances*" at any material time.

21A. The (limited) disclosure given by PIFSS to date reveals that multiple investments were concluded by PIFSS between 1996 and 2014 such as are not alleged to have generated commissions and/or benefits for Mr Al Rajaan and/or in respect of which no claim is advanced in these proceedings. Without limitation, in the period from 1996 to 2018 PIFSS made some 88 investments in an aggregate sum of not less than US$6.7 billion in the funds identified in Appendix 10 hereto.

22. Insofar as it relates to EFG, paragraph 50 is denied:

(1) It is denied, if it be alleged, that EFG paid any Secret Commissions.

(2) EFG does not understand PIFSS to allege that either any of EFG or Mr Guerin or Mr Diriberry was a beneficiary of the alleged Secret Commissions, or that either EFG or Mr Guerin or Mr Diriberry received any of the alleged (but unparticularised) "*unauthorised benefits*" arising out of the transactions giving rise to the alleged Secret Commissions. For the avoidance of doubt, it is denied that either EFG or Mr Diriberry or Mr

15

~~Guerin~~ received any of the alleged Secret Commissions or unauthorised benefits; and not admitted that Mr Guerin did so.

(2A) It is denied in any event:

    (a) That any "Secret Commissions" or "unauthorised benefits" as alleged by PIFSS constituted "public property" under Kuwaiti law; and/or

    (b) That PIFSS has or would have any right to recover the same from EFG, as alleged in paragraph 50 or at all: see paragraphs 35 and 84 below.

(3) Accordingly, it is denied that EFG is required to account to PIFSS in any sum and denied that PIFSS is entitled to claim disgorgement/restitution against EFG to vindicate its alleged property rights or to follow or trace the benefits or their proceeds into EFG's property.

(4) Further and in any event, even if, which is denied, EFG received any "*unauthorised benefits*" or Kuwaiti public property within the meaning of Article 2 of the Public Property Law, that law is not enforceable as against EFG: paragraph 12(2) above is repeated.

(5) The final sentence is denied. EFG is not liable to PIFSS in any sum, for the reasons set out in this Re-Re-Amended Defence and including without limitation:

    (a) It is not admitted that PIFSS has suffered any relevant harm or loss (and denied that any unspecified "*harm (including reputational harm)*" is material in the absence of financial loss).

    (b) If, which is not admitted, PIFSS has suffered loss, it is denied that such loss was caused by any act of EFG or any act of Mr Guerin or Mr Diriberry for which EFG is liable.

16

(c) It is denied that ~~either~~ EFG or Mr Diriberry ~~or Mr Guerin~~ carried out any concerted, unlawful and/or intentional acts designed to damage PIFSS' interests, and/or that it is liable for any such acts by Mr Guerin.

(d) Further and in any event, PIFSS' claims against EFG are governed by Swiss law and are time-barred: see paragraphs 45 to 54 below.

(e) Alternatively and in any event, such claims are materially time-barred under Kuwaiti and/or English law: see paragraphs 54A and 55 below.

(6) As to Mr Guerin, paragraph 15A above is repeated.

(7) As to Mr Diriberry, paragraph 20(6) above is repeated.

22A. Paragraph 52 is not understood. EFG pleads to the alleged Further Nasrallah Scheme in paragraphs 55Aff ~~56 ff~~ below. If paragraph 52 is intended to allege that EFG was party to a "general scheme" separate and/or in addition to the Further Nasrallah Scheme, that allegation is embarrassing and in any event denied.


**GOVERNING LAW**

22B. Paragraph 52A relates to PIFSS' claims against Mr Al Rajaan, and is not admitted.

23. As to paragraph 53, it is denied that EFG has committed any tort or delict. Save that the word "*principally*" is not understood and is therefore not admitted, paragraph 53 is otherwise admitted.

24. Paragraph 54 is irrelevant to PIFSS' claims against EFG in circumstances where PIFSS does not advance any claims for restitutionary and/or proprietary remedies against EFG or seek any account of profits or benefits from EFG. ~~As to paragraph 54:~~

17

(1) ~~Paragraph 54(a) is denied. Claims for restitutionary and/or proprietary remedies or an account of profits or benefits are to be characterised, for the purposes of private international law, as claims in restitution to reverse unjust enrichment.~~

(2) ~~Paragraph 54(b) is admitted if, by "*the general law*", PIFSS means the English common law.~~

(3) ~~If, contrary to EFG's primary case, such claims are to be characterised as claims in tort or delict, it is admitted that the analysis in paragraph 53 applies save as appears in paragraph 23 above.~~

25. ~~To the extent that PIFSS advances any proprietary claims against EFG on the basis that any property constitutes "*public property*" within Article 2 of the Public Property Law, questions relating to proprietary rights and/or interests in such property are to be determined in accordance with the *lex situs* of the property at the time of the relevant transfer. Pending particularisation of PIFSS' case (if any) against EFG in this regard, EFG's position is reserved.~~

26. Paragraph 55 is denied:

(1) To the extent that PIFSS' claims against EFG are to be characterised as claims in tort or delict and arise from acts or omissions of EFG alleged to have occurred in Switzerland prior to 1 May 1996, the principle of double actionability requires the claims to be actionable under both English law as the *lex fori* and Swiss law as the *lex loci delicti*. Alternatively, Swiss law applies as the law of the country that has the most significant relationship with PIFSS' claims against EFG.

(2) To the extent that PIFSS' claims against EFG are to be characterised as claims in tort or delict and arise from acts or omissions of EFG alleged to have occurred in Switzerland between 1 May 1996 and 10 January 2009:

18

(a)    Under section 11(1) of PILA 1995 those claims are governed by Swiss law as the law of the country in which the events constituting the alleged tort occurred.

(b)    Alternatively, under section 11(2)(c) of PILA 1995 they are governed by Swiss law as the law of the country in which the most significant element or elements of those events occurred.

(c)    In the further alternative, under section 12 of PILA 1995, they are governed by Swiss law because it is substantially more appropriate for Swiss law to apply than Kuwaiti law.

(3)    To the extent that PIFSS' claims against EFG are to be characterised as claims in tort or delict and arise from acts or omissions of EFG alleged to have occurred in Switzerland on or after 11 January 2009:

(a)    Under Article 4(1) of the Rome II Regulation those claims are governed by Swiss law, being the law of the country in which the alleged damage occurred.

(b)    Alternatively, under Article 4(3) of the Rome II Regulation they are governed by Swiss law, being the law of the country with which the claims are manifestly more closely connected than the law (if any) indicated by Article 4(1) of the Rome II Regulation.

(4)    Paragraph 55(c) is irrelevant, for the reasons in paragraph 24 above. In the alternative, tTo the extent that PIFSS' claims against EFG are to be characterised as claims in restitution to reverse unjust enrichment:

(a)    If and to the extent that such claims arise from an alleged enrichment of EFG occurring in Switzerland before 11 January 2009, under English common law rules they are governed by Swiss law, being the law of the country in which the alleged enrichment occurred;

(b)    If and to the extent that such claims arise from an alleged enrichment of EFG occurring in Switzerland on or after 11 January 2009:

19

(a)  Under Article 10(1) of the Rome II Regulation they are governed by Swiss law, Swiss law being the law that governs the relationship arising out of the alleged torts/delicts that are closely connected to the unjust enrichment: sub-paragraphs 26(1) to (3) above are repeated.

(b)  Alternatively, under Article 10(3) of the Rome II Regulation they are governed by Swiss law, being the law of the country in which the alleged enrichment occurred.

(c)  In the further alternative, under Article 10(4) of the Rome II Regulation they are governed by Swiss law, being the law of the country with which the claims are manifestly more closely connected than the law (if any) indicated by Articles 10(1) to 10(3) of the Rome II Regulation.

(4A)  In any event, questions of attribution to EFG for the purposes of liability as principal in the period prior to 11 January 2009 are governed by Swiss law as the *lex societatis* and/or the law governing the relationship between EFG and any of its agents.

(5)  EFG responds to PIFSS' case on Kuwaiti law below, without prejudice to its case that Kuwaiti law does not govern any claims against EFG.

27.  Paragraph 56(a) is not admitted. Paragraph 56 is otherwise admitted.

28.  As to paragraph 57:

(1)  It is admitted that English law will apply in the absence of any foreign law plea, but only where neither PIFSS nor any of the Defendants pleads a foreign law.

(2)  EFG reserves the right to re-amend its Re-Re-Amended Defence in the event that PIFSS seeks to rely on additional principles of foreign law.

20

**RELEVANT PROVISIONS OF KUWAITI LAW**

**Kuwaiti Law - the Legal Framework**

29.    As to paragraph 58:

(1)    Paragraphs 58(a) to (c) are admitted in general terms, save that:

(a)    In relation to paragraph 58(c):,

(i)    the allegation that, under Article 227, an act of fault or harm can be established by reference to "*the expected norms of society*" is vague and unparticularised, and in any event irrelevant to PIFSS' claim, and is therefore not admitted.

(ii)    PIFSS does not rely upon any codified civil obligation against EFG.

(iii)    As a matter of Kuwaiti law, "Conduct that gives rise to a criminal act" can only be "treated as fault" under Article 227 once the relevant criminal act has been established by a conviction in the Kuwaiti criminal court. Kuwaiti civil courts have no jurisdiction to adjudicate upon criminal law or to entertain allegations that crimes have been committed, whether as a foundation for an allegation of fault under Article 227 or otherwise, and would dismiss any claim for a breach of Article 227 based on allegations of conduct giving rise to a crime.

(b)    The contention that violation of the Civil Service Code gives rise to liability under Article 227 is similarly vague and unparticularised, and in any event irrelevant to PIFSS' claim against EFG, and is therefore not admitted.

(c)    It is a defence to any liability in damages under Article 227:

21

(i)   If the harm alleged resulted from a cause beyond the control of the alleged tortfeasor (including the conduct of the injured party), in which case there is no liability: Article 233 of the Civil Code (as set out in paragraphs 74(c)(iv) and 85 below); and/or

(ii)  If the injured party contributed to such harm, in which case there is apportionment of liability based on the extent of each party's causal contribution to the damage. Where respective causal contribution cannot be determined, the court will instead apportion damages following an assessment of the gravity of each party's fault. Where the assessment of the gravity of the respective faults is not possible or is inconclusive, the court will distribute liability equally: Article 234 of the Civil Code (as set out in paragraph 86 below).

(2)   In relation to paragraph 58(d), it is denied, if it be alleged, that the alleged "*hierarchy*" of wrongdoing has any relevance to establishing liability under Article 227. EFG further repeats paragraphs 12(2B) and 29(1)(a)(iii) above: as a matter of Kuwaiti law, a claim for civil fault cannot be based upon allegations of criminal conduct without a relevant criminal conviction in the Kuwaiti criminal court.

(2A)  In relation to paragraph 58(e), Article 40 of Law, No. 31 of 1970 is concerned with criminal penalties for bribery committed with certain specified purposes. It is irrelevant to civil claims, including to PIFSS' claim for damages against EFG.

(2B)  Legal persons can only be criminally liable in Kuwaiti law for offences under the Public Property Law or the KPC where the conduct said to give rise to such criminal liability occurred after January 2023. Further, legal persons can only be criminally liable in Kuwaiti law for offences under the MLL 2002 if they are not joint stock companies.

22

(3)    In relation to paragraph 58(f):

(a)    The first sentence is irrelevant to PIFSS' claims against EFG, which are claims in respect of torts constituted in the commission of criminal acts.

(b)    The second sentence is admitted. Where a tort is constituted in the commission of a criminal act, and the accessory has been convicted of the crime at issue, accessorial liability of parties to the criminal act of the principal actor is established pursuant to Articles 47 to 48 of the Penal Code. However, EFG has and can have no primary liability to PIFSS in respect of torts constituted in the commission of such criminal offences. There is no such liability absent a criminal conviction in the Kuwaiti criminal court in relation to the relevant defendant. Further, criminal acts by an individual before January 2023 cannot be attributed to a legal person for the purposes of Articles 47 and 48 SPC. ~~Such liability could only be vicarious, under Article 240 of the Civil Code.~~

(c)    In any event, liability between principal tortfeasors and accessories can be subject to apportionment.

(d)    ~~Between 2008 and 2010, each of Articles 49(1), 49(2) and 49(3) was found to be unconstitutional by the Constitutional Court of Kuwait. Pursuant to Article 173(3) of the Kuwait Constitution, if the Constitutional Court finds that a law or executive regulation is unconstitutional, it is deemed to have never existed. Accordingly, Article 49 has no application to PIFSS' claims.~~

(3A)    As to paragraph 58(g):

(a)    The effect of Article 228(1) of the Civil Code is that where damage is caused by the faults of multiple tortfeasors, each of them is *prima facie* liable to compensate the victim for that damage.

23

(b)   However, Article 228(2) provides that the relevant liability in compensation should be apportioned as between those tortfeasors in proportion to the degree to which each tortfeasor's fault contributed to the damage ~~relationship between their fault and the damage caused~~. It is only if apportionment is impossible that the liability in compensation should be equally divided between those tortfeasors.

(ba)  Paragraphs 12(2B), 29(1)(a)(iii) and 29(2) above are repeated.

(c)   Otherwise, paragraph 58(g) is denied.

(4)   In relation to paragraph 58(h), Article 240 of the Civil Code imposes vicarious liability for harm occasioned by an illicit act committed by a subordinate in the course or as a result of the subordinate's employment. Vicarious liability does not entail any "guarantee", and the employer's liability will not necessarily be to the full extent of the subordinate's liability, as set out in sub-paragraph (c) below. However, there is no vicarious liability under Article 240:

(a)   When the employee's wrongful act occurs at the request or direction of or with the intervention of a subordinate of the alleged victim, and/or a subordinate of the alleged victim knew that the employee was exceeding the functions of his employment or was working on behalf of himself rather than on behalf of his employer, and/or is otherwise a partner to the employee in causing the fault; and/or

(b)   When the employee's wrongful act causes no damage to the victim.

(c)   Where there is no relationship of subordination, because the employer does not have the actual ability to supervise and instruct in the task the employee is performing.

(d)   Where the employee's wrongful act does not occur in the course of performing their duties or as a consequence of performing their duties. It is insufficient that the subordinate used his employment

24

status or resources to commit the unlawful act, or that his employment provided him with the opportunity to commit the act.

(e) Where the employer took all necessary and reasonable steps to prevent wrongdoing by the employee, such that the employee's conduct breaks the causal chain for the purposes of Article 233 of the Kuwaiti Civil Code.

(5) Paragraph 58 is otherwise admitted. EFG will rely upon the Kuwaiti Civil Code at trial for its full terms, meaning and effect.

29A. EFG pleads to the 6RACPOC, including PIFSS' pleas as to Kuwaiti law and as to its alleged claims below, without prejudice to its position as set out in paragraphs 12(2B), 29(1)(a)(iii), 29(2), and 29(3A)(ba) above and accordingly without prejudice to its position that the criminal offences relied upon by PIFSS cannot be relied upon in its civil claim in the absence of a relevant Kuwaiti criminal conviction.

### Kuwaiti Law - alleged liability of Mr Al Rajaan

30. Paragraphs 59 to 62 are admitted, save that:

(1) ~~It is not admitted that Mr Al Rajaan was a member of the Investment Committee and Chairman of the sub-committee.~~

(2) PIFSS' alleged adoption of the Civil Service Law is not admitted.

(3) As to paragraph 61, t~~T~~o the extent "*the bribery provisions*" are a reference to the Penal Code as amended by Law No. 31 of 1970, they do not refer to the maintenance of equal treatment under the law. In any event, the relevant protected right so far as material to PIFSS' claim against EFG is the protection of the integrity of public office.

(4) As to paragraph 62:

(a) Mr Al Rajaan's alleged "*control*" of public funds is not admitted.

25

(b)    Mr Al Rajaan's alleged "*responsibilities to PIFSS in connection with the public funds under his control*" are not identified and (so) not admitted.

(5)    EFG will rely upon the Civil Service Law, the Penal Code and the Public Property Law for their full terms, meaning and effect to the extent that they are relevant to the claims against EFG (which relevance is denied).

30A.   Paragraph 62A is denied:

(1)    Article 12 of the Public Property Law applies only to certain public officials, employees or workers involved in the management of construction projects, supplies or public works related to PIFSS or who was involved in overseeing the same.

(2)    It is denied that Mr Al Rajaan was a public official, employee or worker within the scope of Article 12.

30B.   Paragraph 62B is denied:

(1)    The Money Laundering Law No. 106 of 2013 (the "**MLL 2013**") only came into effect on 26 May 2013 and is irrelevant to PIFSS' claims against EFG, which relate to the period between 1995 and 2012.

(2)    Paragraph 62B is admitted as a general summary of the effect of Article 2 of the Money Laundering Law No. 35 of 2002 (the "**MLL 2002**"). EFG will rely upon the MLL 2002 for its full terms, meaning and effect.

**Kuwaiti law – alleged bribery**

31.    Paragraph 63 is admitted, save that, Article 11 of the Penal Code does not refer to Articles 47 or 48. It is denied that Article 49 of the Penal Code has any application: paragraph 29(3) above is repeated.

32.    Paragraphs 64 (as to Article 37 of the Amended Penal Code (31/1970)) and 65 (as to Article 39 of the Amended Penal Code (31/1970)) are admitted save that:

26

(1)     Paragraph 29(3) is repeated.

(2)     The offence described in paragraph 65 derives from Articles 35 and 39 of the Penal Code as amended by Law No. 31 of 1970, read in conjunction.

(3)     The relevant intention for the offence described in paragraph 65 is an intention to induce the public employee to perform or refrain from performing activities in his public office.

33.     As to paragraph 66:

(a)     Paragraphs 66(a) and (b) are admitted.

(b)     Paragraph 66(c) is denied. The relevant intention is an intention to induce the public employee to act or refrain from acting in consideration of the bribe and in exploitation of his public office.

(c)     Proof of intention on the part of the briber also requires knowledge and intention that the intermediary would offer the bribe to the public employee.

(d)     The requirements of proof of intention are cumulative, rather than alternative.

**Kuwaiti Law – the Public Property Law**

34.     Paragraphs 67 and 68 are admitted as general summaries of Articles 4 and 16 in their application to public officials. However:

(1)     Paragraph 12(2) above is repeated.

(2)     The removal of the public employee from office is effected by order of the Court.

(3)     Article 16 of the Public Property Law relates to criminal (not civil) penalties, to be imposed by a judge in criminal proceedings following conviction of the relevant defendant.

27

35.   As to paragraph 69:

(1)   The first sentence is admitted as a materially accurate description of Article 22 of the Public Property Law. Article 22 applies only where a penal case has been commenced and then "lapsed" including by virtue of the death of the accused. Further:

(a)   The alleged relevance of Article 22 to PIFSS' claim against EFG is not understood.

(b)   Paragraph 12(2) above is repeated.

(c)   In any event:

(i)   Insofar as Article 22 contains any relevant right to return of unlawfully appropriated public funds or public property from a person who derived material benefit from a relevant offence, such right is limited to the sum of the unlawfully appropriated public funds or public property, and is further capped at the amount of the benefit derived by that person.

(ii)   It is denied, if it be alleged, that Article 22 provides any right to restitution of any "*unauthorised benefits deriving from breach of Article 11 and/or 12*".

(2)   The second sentence is denied: EFG will refer to the Public Property Law at the trial herein for its full terms and true effect.

(3)   Without limitation:

(a)   "[*U]nauthorised benefits deriving from breach of Article 22* [of the Public Property Law]*"* are not deemed the property of the public institution as a matter of Kuwaiti law, as alleged or at all;

(b)   Even if they were, the Public Property Law does not confer on PIFSS any right to follow and trace property.

28

36.    Paragraph 70 is admitted.

36A.   As to paragraph 70A:

    (1)    Paragraph 30B above is repeated.

    (2)    Further and in any event, joint stock companies cannot be criminally liable for crimes under Article 2 of the MLL 2002. In the premises, EFG cannot be criminally liable for such crimes.

## Kuwaiti Law – Accessorial Liability

37.    Paragraphs 71 to 72 are admitted save that the second circumstance in which a person is deemed the perpetrator of a crime under Article 47 is where he commits acts of assistance during the commission of the crime or is present at or near the location of commission of the crime to overcome any resistance or to strengthen the perpetrator's resolve.

38.    In addition to the requirements of criminal accessorial liability set out at paragraphs 71 and 72, Kuwaiti law requires that:

    (1)    the accessory has (i) knowledge that a crime is being committed and that the accessory's acts will result in the commission of a crime, and knowledge of its harmful consequences; and (ii) a free and conscious intention to assist in the crime; and

    (2)    there is a causal link between the accessory's conduct and the crime, such that the harm would not have occurred or would have been less severe without the accessory's assistance; and

    (3)    the accessory's act must be committed before or during the commission of the crime. Assistance *after* the primary tortfeasor's unlawful act cannot give rise to accessory liability.

39.    Paragraph 73 is denied: paragraph 29(3) above is repeated.

39AA.  As to paragraphs 72A to 72D:

(1) It is admitted and averred that a legal person cannot be directly criminally liable for an offence under the Public Property Law or the KPC or the MLL 2002. Otherwise, paragraph 72A is denied in the premises below.

(2) Paragraphs 72B and 72C are stated in vague and general terms, without appropriate qualifiers, and are accordingly denied. In particular:

(a) criminal wrongdoing cannot be attributed to a legal person using civil law attribution rules where that legal person is not and/or cannot be directly criminally liable in Kuwaiti law;

(b) paragraphs 12(2B), 29(1)(a)(iii) and 29(2) above are repeated as to the need for a criminal conviction in a Kuwaiti criminal court; and

(c) in any event, EFG repeats its Re-Re-Amended Defence above and below as to tortious, criminal, accessory and vicarious liability.

(3) Paragraph 72D is denied. Paragraph 36A above is repeated.

**Relevant provisions of Swiss Law**

39A. As to paragraphs 73A to 73F ('Liability in tort'):

(1) Neither the French original of Article 41(2) SCO (*"un dommage"*), nor the unofficial English translation (*"damage"*) on the Fedlex website, contain the word "loss". Otherwise, paragraph 73A is admitted.

(2) Tort liability pursuant to Article 41 SCO depends on four cumulative conditions: (i) damage; (ii) an unlawful act; (iii) a natural and adequate causal link between the unlawful act and the damage; and (iv) fault.

(3) Further:

(a) By Article 8 of the SCC, so far as material, the burden of proving the existence of an alleged fact, including each of the four cumulative conditions in sub-paragraph (2) above, and the burden of allegation,

30

is on the claimant. Ordinarily, a fact must be proved in such a way that is considered certain and established.

(b)  As to 73B(a) and (d):

(a)  An "act or omission" is only material for the purposes of Article 41 SCO if that act or omission is unlawful.

(b)  In cases of economic loss and/or damage to property, there is no unlawfulness for the purposes of Article 41 SCO unless a claimant can show the violation of a relevant protective norm (i.e. a norm of conduct intended by its purpose to protect against such damage), as set out in sub-paragraph (6) below.

(c)  "Omissions" are not unlawful for the purposes of Article 41 SCO save in limited and prescribed circumstances. It is denied, if it be alleged, that any such circumstances apply so far as relevant to PIFSS' claims against EFG.

(c)  As to paragraph 73B(e):

(a)  Negligence is not sufficient for liability in tort under Article 41 SCO where the alleged tort is founded on the commission of a criminal offence which requires intention;

(b)  Vicarious liability is not regulated by Article 41 SCO; and

(c)  In any event, negligence is not presumed in all cases of vicarious liability under Article 55 SCO.

Insofar as consistent with the foregoing, paragraph 73B is admitted. Otherwise, it is denied.

(4)  Paragraph 73C is admitted as an approximate summary of Articles 42(1), 42(2) and 43(1) SCO. It is denied, if it be alleged, that Article 42(2) SCO relieves the allegedly injured party of its burden of proof and/or its duty to

31

plead the facts necessary to establish the existence and quantum of any damage. Further, those provisions do not relieve the claimant of the requirement to provide the court with all available information necessary for the assessment of damages. The onus remains on the allegedly injured party to show that such loss exists with prevalent probability, and convince the Court that it is impossible to provide certain proof of the loss. If the court is not satisfied that the claimant has done all which it could reasonably be asked to do to provide evidence as to the ambit of the loss, no damages will be awarded. Further, compensation in tort may be reduced or extinguished pursuant to Article 44 SCO where the injured party consented or contributed to the damage, for instance by failure to take reasonable measures to prevent occurrence of the damage, or by a failure to mitigate.

(5)     Paragraph 73D is admitted as an approximate summary of the causal link required under Article 41 SCO. Such causal link must be natural (*i.e.* in that the damage would not, as a matter of fact, have occurred without the alleged unlawful act); and also adequate (*i.e.* in that the result caused by the alleged unlawful act was in the ordinary course of things and the general experience of life). Further, a causal link may be broken by the fault of the injured party or a third party, such that the chain of events loses its legal significance, and there is no civil liability~~, pursuant to Articles 43(1) and/or 44(1) SCO~~.

(5A)   The default standard of proof as a matter of Swiss civil law is met where there is a numerical probability of truth of at least 90%. Even where a lower standard of proof is adopted out of necessity, the numerical probability of truth must be at least 75%.

(6)     As to paragraph 73E:

(a)     In cases of economic loss and/or damage to property, there is no unlawfulness for the purposes of Article 41 SCO unless a claimant can show the violation of a relevant protective norm (i.e. a norm of

32

conduct intended by its purpose to protect the claimant's private interest against such damage).

(b) Not every provision of Swiss criminal law constitutes a protective norm, the violation of which can be the basis for tortious liability under Article 41 SCO. A provision will only amount to a protective norm if it is intended to protect the assets of the victim of the criminal act.

(c) Further, when the protective norm is derived from Swiss criminal law, the allegedly injured party must prove both the subjective and objective constituent elements of the relevant criminal offence.

(d) Article 115(1) of the Swiss Criminal Procedure Code, and the decision of the Swiss Federal Supreme Court in ATF 140 IV 155 c. 3.2, are irrelevant to liability in tort under Article 41 SCO. The right to make an adhesive claim in criminal proceedings pursuant to article 115(1) does not mean the criminal offence constitutes a protective norm.

(e) Otherwise, paragraph 73E is admitted in broad summary.

(7) As to paragraph 73F:

(a) Paragraphs 73F(a) and (c) are admitted, save that Article 305 *bis* SPC may constitute a protective norm for the purposes of claims in tort for economic loss only if the elements of the predicate offence are established, the predicate offence is a felony or aggravated tax misdemeanour, and the predicate offence is itself a protective norm, and only insofar as the claim in tort is brought in respect of losses caused to the victim of the predicate offence by the money launderer.

(b) Paragraph 73F(b) is denied. Article 322 *septies* SPC is not a protective norm. *Inter alia*, it is not designed to protect individual interests or assets. Further, and in any event, it entered into force

33

only on 1 May 2000 (as to its first paragraph) and 1 July 2006 (as to its second).

(c)  For the avoidance of doubt, it is denied, if it be alleged, that the ability to bring an adhesive civil claim under Art. 122 of the Swiss Criminal Procedure Code for damage arising out of a criminal offence indicates that the relevant criminal offence gives rise to a protective norm.

39B.  As to paragraphs 73G to 73I ('Joint and Several (Solidary) liability'):

(1)  Paragraph 73G and 73H accurately quote the unofficial English translation of Article 50(1), (3) SCO on the Fedlex website.

(2)  Joint and several civil liability as an "*accomplice*" for the purposes of Article 50(1) SCO is conditional upon:

(a)  An unlawful act by the principal tortfeasor under Article 41 SCO;

(b)  An unlawful act by the accomplice under Article 41 SCO;

(c)  A common fault, which requires that each of the participants know of the contribution of the other parties to the harmful act, or could have known the same by exercising due care and attention, and that the parties consciously collaborate towards such an end result; and

(d)  A natural and adequate causal link between the common fault and damage suffered by the alleged injured party. The link must exist not merely between any joint action and the loss claimed, but between all participants and the loss, for the totality of the loss.

(2A)  Vicarious liability for a wrong committed by an employee does not give rise to joint and several liability with the employee's co-offenders, but only to liability on different legal grounds pursuant to Article 51 SCO.

34

(3)    An abettor (i.e. "*receleur*") within the meaning of Article 50(3) SCO is a recipient of stolen goods or someone who conceals or assists in the disposal of such goods. Pursuant to Article 50(3), the liability of such a person is limited to the extent of the consequential damage caused by his actions or their share in the gains, whichever is less.

(4)    As to criminal liability for assisting in a Swiss criminal offence:

    (a)    Pursuant to Article 25 SPC, such liability requires wilful assistance in another person's commission of a crime prior to or contemporaneously with its commission, the person providing such assistance (i) making a causal contribution to the commission of the offence by the principal offender, such that events would not have unfolded in the same way without his assistance; (ii) intending to facilitate the commission of the offence; and (iii) if the assistance alleged is by way of omission, being subject to a duty to act.

    (b)    Article 26 SPC is concerned with the mitigation of punishment. It does not create any additional offence.

    (c)    Pursuant to Article 12(2) SPC, a person commits a felony or misdemeanour wilfully if he carries out the act in the knowledge of what he is doing and in accordance with his will. A person acts wilfully when they act either intentionally or with *dolus eventualis*, which means seriously anticipating a high possibility that the offence will be committed, but nonetheless going ahead; mere recklessness is not sufficient. ~~as soon as he regards the realisation of the act as being possible and accepts this.~~

(5)    Save as aforesaid, these paragraphs are denied.

39C.  As to paragraphs 73J to 73Q ('Criminal mismanagement – 158 SPC'):

(1)    As to paragraph 73J:

(a) PIFSS accurately quotes the unofficial English translation of Article 158 SPC on the Fedlex website.

(b) The aggravated offence in Article 158(1) SPC requires:

    (a) A perpetrator acting as a "manager";

    (b) The violation of a management or safeguarding duty inherent to the role of "manager";

    (c) Damage suffered by the principal;

    (d) A causal relationship between the violation of duty by the "manager" and the damage suffered by the principal;

    (e) Intention relating to all the constituent elements; and

    (f) That the perpetrator is acting with the intention of procuring unjust enrichment for himself or for a third party.

(c) The offence in Article 158(2) SPC requires:

    (i) A perpetrator with a power of representation;

    (ii) An abuse of that power;

    (iii) Damage suffered by the principal;

    (iv) A causal relationship between the abuse of power of representation and the damage suffered by the principal;

    (v) Intention relating to all the constituent elements; and

    (vi) That the perpetrator is acting with the intention of procuring unjust enrichment for himself or for a third party.

(d) In itself, the violation of a duty to return a sum of money received by a "manager" from a third party is not an act of criminal mismanagement contrary to Article 158(1) SPC.

(e)    Further, it is necessary for liability under Article 158(1) SPC that the sum received has determined the manager to behave in a manner contrary to the principal's interests and to the principal's detriment as more fully set out in paragraph 39C(3) below.

(2)    As to paragraph 73K:

(a)    "Manager" status is conditional upon a high level of independence and an autonomous power of disposal over the managed assets. This must be established and will not be assumed. The manager's obligation to preserve the principal's assets must be the central content of the legal duties arising from the relationship between them, and not merely secondary or ancillary.

(b)    The mere fact of being a member of a governing organ of a legal entity is insufficient to entail "manager" status, i.e. a high level of independence and an autonomous power of disposal over the managed assets.

(c)    Otherwise, paragraph 73K is admitted as an approximate summary of the meaning of "manager" for the purposes of Article 158 SPC.

(3)    As to paragraph 73L:

(a)    Sub-paragraph 73L(a) is denied. Receipt of a "bribe", and/or the failure by a manager to disclose or account for a sum of money received from a third party does not *ipso jure* constitute criminal mismanagement. Such an offence is committed only if the relevant payment induces the manager to act against the pecuniary interests of his principal, in breach of his duty as manager, and causes prejudice to such pecuniary interests. Further, no offence will be committed if the manager's conduct took place with the express or implied agreement or ratification of his or her principal. Further, where the relationship between principal and manager is not governed by Swiss law, then the question of whether there is a breach

37

of the manager's duty for the purpose of Article 158 SPC will fall to be determined by reference to the law applicable to that relationship.

(b)    Sub-paragraph 73L(b) is denied. The making of "disadvantageous management decisions" on behalf of a principal is not sufficient to give rise to liability under Article 158 SPC.

(c)    Sub-paragraph 73L(c) is too broadly stated:

(i)    The criminal conduct referred to in the first paragraph of Article 158 SPC is conduct by which the manager violates the specific obligations incumbent on him by virtue of his duty to manage and protect the pecuniary interests of a third party.

(ii)    That issue is necessarily fact- and context-specific, to be examined in the light of the legal relationship between the manager and the owners of the assets he administers.

(iii)   Otherwise, sub-paragraph 73L(c) is denied.

(4)    Paragraph 73M is too broadly stated and (accordingly) denied. Whether there is damage in any particular case is fact- and context-specific.

(5)    As to paragraph 73N:

(a)    The first sentence is admitted. The causal relationship must not have been broken by another concomitant cause.

(b)    As to the second sentence, it is admitted that a manager can in principle be liable under Article 158 SPC in the event that he or she allows a third party to cause prejudice to the pecuniary interests of the principal. Whether that is so will depend on all relevant circumstances and on the realisation of all the conditions of Article 158 SPC. Otherwise, the second sentence is too broadly pleaded to be admitted, and is denied.

38

(6)    Paragraph 73O is denied. Sub-paragraphs (3)(a) and (5) above are repeated. In any event, whether loss has been suffered and in what sum is a question of fact in each case; there is no "deemed" loss and no rule or principle of general application as paragraph 73O suggests. Further, the relevant counterfactual in a case where a manager receives an undisclosed bribe is that the manager neither sought nor procured any such bribe.

(7)    Paragraph 73P is ~~not~~ admitted, subject to the qualifications as to the content of the relevant Swiss law pleaded at paragraph 39C(3) above.

(8)    Paragraph 73Q is admitted. Where it is alleged that an offence under Article 158 SPC has been committed because the manager has received retrocessions, it is necessary that the manager must have been induced by the retrocessions to behave in a way that damaged the assets under his management.

**<u>Bribery of foreign public official – 322 *septies* SPC</u>**

39D.  As to paragraph 73R:

(1)    PIFSS accurately quotes the unofficial English translation on the Fedlex website of the different versions of Article 322 *septies* SPC in force since 1 May 2000 (for paragraph 1) and 1 July 2006 (for paragraph 2). Further, the final two sentences are admitted.

(2)    Article 322 *septies* SPC does not constitute a protective norm. Its relevance is accordingly denied.

(3)    In any event, the granting of an undue advantage is not prohibited *per se* under Article 322 *septies* SPC. Rather, liability arises only if the undue advantage is offered in order for the official to carry out or fail to carry out a specific ~~an~~ act in connection with official activities which is contrary to his duties or dependent on his discretion. It is necessary for the advantage to be understood as consideration for a specific official act by the official.

39

(4)  Proof of wilfulness requires, in this context, proof of knowledge and intention including as to the nature of the unfair advantage.

(5)  Authorisation to receive the advantage can be granted retrospectively, and will preclude any offence under Article 322*septies*.

39E.  Paragraph 73S is admitted only to the extent that "foreign public official" under Article 322 *septies* SPC is an autonomous concept that may, on appropriate facts, include *inter alia* public officials of foreign states. Otherwise, the paragraph is too vague and broadly pleaded to be admitted. *Inter alia*, the "*international standards*" and "*public duties*" relied upon are neither identified nor defined.

## Money laundering – 305 *bis* SPC

39F.  As to paragraph 73T:

(1)  PIFSS accurately quotes extracts from the unofficial English translation of Article 305 *bis* SPC on the Fedlex website.

(2)  The predicate offence to money laundering must be a felony within the meaning of Article 10(2) SPC, namely an offence that carries a custodial sentence of more than three years, or an aggravated tax misdemeanour.

(3)  A civil tort claim based upon a breach of Article 305*bis* SPC must also satisfy the requirements of Article 41 SCO, including damage resulting from the alleged acts of money laundering. For the avoidance of doubt, both the predicate offence and the breach of Article 305*bis* must have created separate and distinct damage.

39G.  As to paragraph 73U:

(1)  Paragraph 73U is admitted as an approximate summary of the requirements for a claim in tort for economic loss under Article 305 *bis* SPC. The mental state required is wilfulness in the sense of intent or *dolus eventualis*; mere negligence or recklessness is not sufficient.

40

(2)     Tort liability will only arise under Article 305 *bis* SPC if the predicate offence is itself a protective norm; if the predicate offence was committed before the alleged money laundering; if the alleged victim of money-laundering is the victim of the predicate offence; if the assets subject to the alleged money laundering are the produce of the predicate offence or their substitute; and if the requirements of Article 41 SCO are met, including as to resulting damage.

(3)     Further, the mere provision of banking services is not, without more, an "act" sufficient to give rise to ~~tort~~ liability under Article 305 *bis* SPC.

(4)     ~~Tort~~ lLiability will only arise under Article 305 *bis* SPC in respect of "omissions" if the omissions are by persons specified in Article 29 SPC. Mr Guerin was not such a person.

39H.  As to paragraph 73V:

(1)     Sub-paragraph 73V(a) is too broadly pleaded and accordingly denied. Compensation in relation to money laundering is limited to compensation up to the amount the confiscation of which was frustrated by the money laundering, not (without limitation) all damage suffered as a result of the predicate offence.

(2)     Sub-paragraph 73V(b) is denied. Not every money launderer will amount to an aider and abettor of the wrong, and as a matter of Swiss law, the same act cannot amount to both assistance in the crime and money laundering.

39I.  ~~PIFSS does not advance any claim against EFG under Article 102(2) SPC. Paragraph 73W is, accordingly, irrelevant. Without prejudice to that position:~~ As to paragraph 73W:

(1A)   Article 102(2) SPC only came into effect on 1 October 2003 and does not apply to conduct prior to that date.

(1)     It is admitted that with effect from 1 October 2003 Article 102(2) SPC has provided for the attribution of corporate criminal liability in the

41

circumstances there described, save that the relevant test is whether the corporation took all <u>necessary and reasonable</u> organisational measures.

(2)     Article 102(2) is merely a rule of criminal attribution; it does not create a qualifying protective norm and is not capable of founding civil liability under Article 41 of the SCO. The civil liability of legal persons is determined under Article 55 of the SCC or Article 55 of the SCO. Further, and for the avoidance of doubt, satisfaction of the requirements of Art. 102(2) SPC does not itself give rise to liability: liability must be established by reference to one of the specified offences listed therein.

(3)     It is denied, if it be alleged, that EFG / its predecessor BEC failed to take all necessary and reasonable organisational measures required to prevent the bribery of foreign public officials within Article 322 *septies* SPC and to prevent money laundering within the meaning of Article 305 *bis* SPC. EFG pleads more particularly in that regard in paragraph 73B and 73C below. In particular, but without limitation and without prejudice to the fact that the relevant period for Article 102(2) runs only from 1 October 2003:

    (a)     Mr Guerin's contract of employment with Banque Scandinave en Suisse dated 27 June 1995 required Mr Guerin to observe the bank's code of ethics and to follow the bank's guidance on combating money laundering. Without limitation, the code of ethics obliged Mr Guerin:

       (i)     To maintain professional ethics within the bank.

      (ii)     Responsibly and carefully to carry out the work entrusted to him and loyally to safeguard the legitimate interests of the bank.

     (iii)     To act strictly in compliance with all rules applicable to banking activity, including the bank's internal procedures and instructions.

42

(iv) Not to support clients in any breach of any applicable legal or regulatory provisions.

(v) Not to accept any proceeds of crime or corruption, or otherwise to support money laundering.

(b) Mr Guerin's contract of employment with EFG dated 1 April 2004 required him to respect Swiss banking law and EFG's internal rules concerning money laundering and to apply adequate vigilance concerning financial matters. The contract also required Mr Guerin to adhere to the Swiss banks' code of conduct with regard to the exercise of due diligence.

(ba) Further, EFG's internal regulations also required employees to comply with all laws, ordinances, agreements and regulations governing banking and banking activities and implement with particular rigour all money-laundering provisions. These mandatory requirements applied to all EFG employees, including both Mr Guerin and Mr Diriberry.

(c) At all material times:

(i) EFG (and its predecessor companies, BEC and Banque Scandinave en Suisse) maintained appropriate internal policies and directives aimed at the prevention and combat of money laundering.

(ii) Prudential audits were undertaken to monitor EFG's compliance with its anti-money laundering ("**AML**") obligations, and the results were presented in audit reports.

(iii) EFG's relevant staff (including Mr Guerin and Mr Diriberry) underwent appropriate AML training; and

43

(iv)    With effect from 2004, EFG maintained an automated transaction monitoring system such as generated alerts for investigation by the bank's transaction monitoring personnel.

**Limitation**

39J.    Paragraph 73X is an approximate summary of Article 60(1)-(2) SCO. However:

(1)    The extended 3-year relative limitation period is irrelevant to PIFSS' claim against EFG:

(a)    Until 31 December 2019, a 1-year limitation period applied to tort claims, under Article 60(1) SCO.

(b)    Further, by Article 49(1) of the Final Title of the SCC, *"[w]here the new law specifies a longer period than the previous law, the new law applies, provided prescription has not yet taken effect under the previous law"*.

(c)    Accordingly, where (as here) a claim was already time-barred by 31 December 2019, the new longer 3-year limitation period under Article 60(1) SCO does not apply.

(2)    Further:

(a)    The "absolute" time limitation period under Article 60(1) SCO starts to run from the date the damage was caused, regardless of whether the injured party is aware of such damage or of the person liable for it.

(b)    Article 60(2) SCO and the longer limitation period envisaged in criminal law does not apply to an employer's *secondary* (vicarious) liability under Article 55 SCO.

(3)    Without prejudice to that position, an injured party:

44

(a)    Is aware of the damage when he learns of the existence, nature and elements on which a claim can be based and motivated. The injured party need not be aware of the exact amount of the damage, provided that he knows of the elements to assess such damage.

(b)    Is aware of the person liable for the damage when in possession of sufficient information to take legal action against that person.

(4)    A claimant is not entitled to advance a claim if to do so would constitute an abuse of rights.

39K.    Paragraph 73Y is an approximate summary of Articles 97(1)(b) and 98 SPC. EFG will rely on the criminal law limitation periods set out in paragraph 201 of the Expert Report of Professor Wohlers dated 6 September 2024. The applicable limitation period is the one in force at the time the offence was committed, unless the later limitation period is more lenient. However:

(1)    Pursuant to Article 2 SPC, criminal law shall not have any retroactive effect, unless the new law is more favourable to the offender.

(2)    The limitation period applying to an offence carrying a custodial sentence of more than 3 years was 10 years until 30 September 2002 and 15 years as of 1 October 2002.

(3)    The limitation period applying to an offence carrying a custodial sentence not exceeding 3 years was 5 years until 30 September 2002, 7 years between 1 October 2002 to 31 December 2013 and 10 years as of 1 January 2014.

(4)    The duration and the *dies a quo* of the limitation period under Article 102(2) SPC is determined by reference to the underlying main offence.

(5)    By Article 98(a) SPC, criminal limitation starts to run from the day the criminal activity was carried out by the perpetrator. It is denied, if it be alleged, that Articles 98(b) and (c) have any relevance to PIFSS' claims.

45

*Inter alia*, Article 98(b) SPC applies only where there is ~~legal or~~ natural unity of action as a matter of Swiss law between the different acts.

39L. Paragraph 73Z is an approximate summary of Article 135(2) and 136 SCO. However, to the extent material:

(1)    As to Article 135(2) SCO:

   (a)    The filing of a claim before a foreign court will only interrupt the limitation period if the foreign court has jurisdiction and its relevant formal requirements are each fulfilled.

   (b)    There is no "relation back" principle in Swiss law. If a party amends an existing claim to add new claims or increase the sum claimed, these new claims must be filed within the limitation period.

(2)    Article 136 SCO applies only in cases of "perfect solidarity", i.e. where debtors are jointly and severally liable under Article 50(1) SCO. It does not apply in cases where persons are liable for the same damage on different legal grounds under Article 51 SCO.

(3)    Further, the interruption of the limitation period is effective only in respect of claims based on the same facts as those alleged and only in respect of the maximum amount claimed by the claimant.

39LA. A claimant is not entitled to advance a claim if to do so would constitute an abuse of rights, which may include where a claimant chose not to investigate adequately or at all and accordingly did not discover a potential claim.

**Application of Swiss law**

39M. As to paragraphs 73AA to 73BB:

(1)    It is denied that the facts and matters in paragraph 59 would each be sufficient to give rise to "manager" status. Paragraph 39C(2) is repeated.

46

(1A)   Insofar as Mr Al Rajaan would otherwise be liable for breaching his duties to PIFSS, it is averred that PIFSS expressly or impliedly approved of his actions and/or otherwise waived its rights to issue a claim in respect of them. Paragraph 7A(3)(d) is repeated.

(2)    Otherwise, these paragraphs are not admitted.

39N.   As to paragraphs 73CC to 73FF, EFG's response to PIFSS' particularised case as regards its conduct appears in paragraphs 56 to 73 below, and its response to PIFSS' case as to Swiss law appears in paragraphs 39A to 39L above. It is denied that EFG has acted unlawfully as alleged in paragraph 73CC to 73FF. *Inter alia*:

(1)    EFG did not act as alleged in paragraphs 73CC to 73FF; did not have the necessary intention; and did not commit the offences alleged;

(1A)   Payments alleged to be bribes are not suitable objects for a money laundering offence;

(2)    PIFSS did not suffer any relevant loss or damage; any liability would in any event be limited to losses suffered caused by the money laundering (not the predicate offence) and no compensation would be payable in respect of assets that are recovered or recoverable;

(3)    PIFSS' claims are time-barred as set out in this Defence; and

(4)    No admissions are made in relation to allegations concerning any other Defendants. It is denied that Mr Al Rajaan was induced by the payment of Secret Commissions relevant to the Further Nasrallah Scheme to act so as to damage any assets under his management.

39O.  As to paragraph 73GG:

(1)    It is admitted that:

(a)    each of the SPC offences of criminal mismanagement, bribery of a foreign public official and money laundering carries a maximum

47

   custodial sentence of more than three years in the circumstances pleaded; and

  (b) claims against EFG founded upon such offences are subject to limitation periods of 15 years insofar as *primary* liability is alleged (i.e. on the (disputed) basis that Mr Guerin was a formal, factual or apparent governing body or officer of EFG or acting within the scope of any functions as such within the meaning of Article 55 of the SCC);

(2) It is denied, if it is alleged, that claims against EFG founded upon such offences are subject to limitation periods of 15 years insofar as *secondary* liability is alleged (i.e. in reliance on Article 55 of SCO on the basis that Mr Guerin was an employee or auxiliary of EFG): such claims prescribed one year after PIFSS became aware of its loss or damage (if any) and the identity of the persons said to be liable for it and in any event ten years after the date on which the loss or damage was caused.

39P. As to paragraphs 73HH and 73II:

(1) It is denied that the alleged acts of EFG have unity of action for the purposes of Art. 98(b) SPC or constitute a continuous offence causing or maintaining an unlawful condition for the purposes of Art. 98(c) SPC. Accordingly the criminal limitation period for any claim against EFG began to run either (i) on the conclusion of the alleged agreement to pay Secret Commissions or in the alternative (ii) separately in respect of each such alleged act when it is alleged that such act occurred. EFG's response to PIFSS' particularised case as regards the Further Nasrallah Scheme appears in paragraphs 56 to 73 below, and EFG's case on prescription under Swiss law appears in paragraphs 50-53 below.

(2) It is denied, if it is alleged, that Section 2 of the Foreign Limitation Periods Act 1984 can be invoked so as to disapply the limitation period in respect

of claims falling under the Rome II Regulation, i.e. claims in respect of conduct postdating 10 January 2009.

(3) Further and in any event, application of the Swiss limitation period would not cause PIFSS undue hardship.  Without limitation:

(a) At all material times PIFSS had at its disposal very substantial resources and access to legal advice with which to investigate and initiate its claims.

(b) PIFSS is deemed to have known of the applicable Swiss limitation periods, both as a matter of law and by reason of its access to legal advice as aforesaid.

(c) PIFSS had a reasonable opportunity to pursue its claims against EFG in good time if acting with reasonable diligence, *inter alia* in light of the matters set out in paragraph 76A to 76LK below, and in PIFSS' Note to the Court of 4 October 2023, and having secured access to the materials concerning the so-called Mirabaud and Pictet schemes by no later than 2015, and having (on its own case) considered materials relating to the so-called Further Nasrallah Scheme in mid-2017.

## Banking Obligations

40. To the extent that the "*Defendant banks*" are Swiss banks, paragraph 74 is admitted, save that:

(1) The regulations set out at paragraphs 74(a) to (c) apply to financial intermediaries, including Swiss banks. Most of the obligations imposed by these regulations do not apply directly to employees of Swiss banks.

(2) It is not admitted, if it be averred, that breach of the alleged obligations is in all cases actionable at the suit of PIFSS.

(3) The AMLO OML issued by the Swiss Banking Supervisory Authority

(entitled AMLO-CFB) entered into force on 1 July 2003.

41.   As to paragraph 75:

(1A)  In relation to paragraph 75(b), in the period prior to CDB 2016 coming into force on 1 January 2016:

(a)   there was a general (albeit rebuttable) presumption that the contracting party and the beneficial owner were identical;

(b)   Banks were not expected to verify the correctness of the contents of a Form A identifying the beneficial owner except in case of serious doubt, that is, where the bank had indications that the Form A did not reflect the real facts.

(1B)  In relation to paragraph 75(e), in the relevant time period, transactions between the same account holders or the same beneficial owner(s) were typically not considered to be unusual, suspicious or implausible, unless reason for doubt existed in the particular case.

(1)   In relation to paragraph 75(f):

(a)   The obligation to establish and retain documents applied only to documents related to (i) transactions carried out; ~~and~~ (ii) clarifications required for the purposes of AML regulations; and (iii) account opening.

(b)   Documents need only be retained for 10 years from the termination of the business relationship or, in the case of a document related to a transaction, 10 years from the completion of the transaction ~~date on which the document was generated~~.

(2)   In relation to paragraph 75(g), the alleged obligation is owed when there are "*well-founded*" suspicions (ie. when the bank knows or has grounded suspicions that the assets involved are the proceeds of a serious criminal offence, or subject to the disposal of a criminal organisation).

50

(3)     It is not admitted that the alleged core obligations were owed at "*all material times*". Rather, they were owed only as set out below; further, the nature, substance and implementation standards of these obligations varied over time:

(a)     As to sub-paragraph (a): at all material times from 1 May 1992.

(b)     As to sub-paragraph (b): at all material times from 1 May ~~July~~ 1992, save that banks were at all material times entitled to presume that the contracting party and beneficial owner were identical except where the presumption was rebutted ~~between 1 July 1992 and 1 April 1998 the obligation was owed only if there was a doubt as to whether the contracting party was the beneficial owner~~ and in the case of a cash transaction exceeding CHF 25,000.

(c)     As to sub-paragraph (c): at all material times from 1 ~~July~~ October 1992, save that the circumstances in which Swiss banks had to comply with such obligations differed prior to and after 1 July 2008.

(d)     As to sub-paragraph (d): at all material times from 30 June 2004, to the extent that Swiss banks were required to set criteria flagging the presence of higher legal and reputational risks for business relationships; that business relationships with PEPs were deemed to bear higher risks; and that business relationships bearing higher risks were to be identified and designated as such for internal use.

(e)     As to sub-paragraph (e): at all material times from 1 May 1992, save as to sub-paragraph (e)(a) only, until 30 June 1998, unless economic justification and legality were apparent, and save that the condition in sub-paragraph (e)(b) applied only from 1 April 1998.

(f)     As to sub-paragraph (f): at all material times from 1 May 1992, save that the obligation applied to certain categories of documents, not all documents as set out in sub-paragraph 41(1) above; and save that the period of 10 years was first introduced with effect from 1 April 1998.

51

(g)   As to sub-paragraph (g): at all material times from ~~1 May 1992~~ 1 April 1998, save that the nature, substance and implementation standards of the obligation varied over time. From ~~1 May 1992~~ 1 August 1990 until 31 March 1998, there was only the right but not the obligation to file a suspicious activity report. From 1 May 1992, where Swiss banks had suspicions that assets originated from a crime, they had to decide, depending on the weight of their suspicions, whether they intended to monitor more closely the suspicious business relationship, proceed with additional clarifications, refuse or terminate the business relationship, and/or notify the criminal authorities. From 1 April 1998, where Swiss banks had well-founded suspicions (i.e. knew or had grounded suspicion) that the assets involved in a business relationship ~~originated from a crime~~ were the proceeds of a serious criminal offence, they had to report those suspicions to the Money-Laundering Reporting Office. Further, sub-paragraph 41(2) is repeated.

42.   As to paragraph 76:

(1)   It is admitted that:

(a)   Swiss banks have been required to ascertain the purpose of the banking relationship in certain circumstances since 1 April 1998; and

(b)   Swiss banks have been required to ascertain the purpose of the banking relationship in all cases since 1 February 2009, pursuant to Article 6 of the AMLA (revised).

(2)   The extent of the information that must be obtained by the banks under this provision is determined by the risk represented by the customer.

(3)   Paragraph 76 is denied to the extent that it is inconsistent with sub-paragraphs (1) and (2) above.

43.   As to paragraph 77:

    (1)   It is admitted that since 1998 decisions on banking relationships with PEPs were to be taken at the bank's top management level.

    (2)   As to paragraph 77(b), Swiss law prohibited the acceptance of assets that a bank knows or must presume (in the sense of *dolus eventualis* and not mere negligence) derived from a crime.

    (3)   It is not admitted that the matters set out in paragraphs 77(a) and (b) applied "*at all material times*".

    (4)   Paragraph 77 is otherwise not admitted.

**Liability of Swiss entities for the acts of their officers**

44.   As to paragraph 78:

    (1)   It is admitted that:

        (a)   pursuant to Swiss law principles of authority and attribution (including Article 55 of the Swiss Civil Code), a legal entity is liable as principal for the acts and omissions of its formal, factual or apparent governing bodies where those acts and omissions were committed by the relevant person within the scope of their functions as such.

        (b)   The term "governing body/officer" within the meaning of Article 55 SCC refers to any individual who is effectively involved in the shaping of the social will of a legal person and decisively influences the latter's decisions. This includes any individual who: (i) is legally or statutorily responsible for the management and representation of the legal person, such as a board member or a member of the upper management (formal governing body/officer); (ii) without being a formal governing body/officer, actually manages and decisively influences the decisions taken by the legal person (de facto

governing body/officer); or (iii) has been designated by the legal person as having the power of a governing body/officer, even though this is not the case (apparent governing body/officer). However, an act will not be attributable to the entity if committed outside the scope of the entity's activities.

(c) Pursuant to Article 55 SCO an employer is vicariously liable for damage caused by its employees:

(a) In the performance of their work;

(aa) Provided there is a relationship of subordination between the employer and the employee; and

(b) Save where the employer can demonstrate that:

(a) It took all due care in selecting, instructing and supervising the employee; or

(b) That the damage in question would have occurred even if all due care had been exercised; and

(c) Provided that the ordinary requirements for tortious liability pursuant to Article 41 SCO are met, and none of the general law defences to liability apply.

(d) Mr Diriberry was a governing body or officer of EFG from 2003.

(2) It is denied that Mr Guerin was a formal, factual or apparent governing body or officer of EFG at any time, or acting within the scope of any functions as such.

(3) Accordingly, EFG is not liable for the alleged acts or omissions of Mr Guerin pursuant to Article 55 of the Swiss Civil Code.

(4) Further, EFG is not liable for the alleged acts or omissions of Mr Guerin pursuant to Article 55 SCO (PIFSS having confirmed by Part 18 response

54

dated 22 July 2024 that it does not pursue any claim pursuant to Article 55 SCO in respect of Mr Diriberry). In particular:

(a) It is denied and/or not admitted (as set out in this Defence) that Mr Guerin has any primary liability to PIFSS; alternatively any such claim is time-barred; in each case for all the reasons herein.

(b) Further, if, contrary to his own Defence, Mr Guerin acted as alleged in the ~~RRRRACPOC~~ 6RACPOC, it is denied that he so acted in the performance of his work for EFG.

(c) Further or alternatively, EFG took all due care in selecting, instructing and supervising Mr Guerin; and/or the damage in question would have occurred even if all due care had been exercised.

(5) Paragraph 78 is otherwise not admitted.

## PIFSS' CLAIMS ARE TIME-BARRED

45. PIFSS' claims against EFG are time-barred.

46. In respect of claims falling under the principles of double actionability or PILA 1995, the law applicable to limitation is determined by reference to the Foreign Limitation Periods Act 1984 (**FLPA 1984**).

47. Pursuant to section 1 of the FLPA 1984, where the law of a foreign country falls to be taken into account in English proceedings (in accordance with rules of private international law) in the determination of any matter, the law of that foreign country relating to limitation shall apply in respect of that matter for the purposes of the proceedings, unless the law of England and Wales also falls to be taken into account, in which case the limitation laws of both countries shall apply, the effective limitation period being the shorter of the two.

55

48. In respect of claims falling under the Rome II Regulation, Article 15(h) of the Rome II Regulation provides that the applicable law shall govern the manner in which an obligation may be extinguished and rules of prescription and limitation.

49. In the premises, the effective limitation period in relation to all of the claims against EFG (whether under the principles of double actionability, PILA 1995 or the Rome II Regulation) is that prescribed by Swiss law, as in force at the time these proceedings were commenced.

Swiss law

50. Pursuant to Article 60(1) of the Swiss Code of Obligations, as in force until 1 January 2020, tort claims become time-barred one year from the date on which the injured party became aware of the loss or damage and of the identity of the person liable for it (the "relative limitation period") but in any event ten years after the date on which the loss or damage was caused or (in cases of continuous breach, which for the avoidance of doubt is denied to be applicable to PIFSS's claims against EFG) ceased (the "absolute limitation period"). From 1 January 2020, the relative limitation period was three years.

51. Pursuant to Article 67(1) of the Swiss Code of Obligations, as in force until 1 January 2020, claims for restitution to reverse unjust enrichment become time-barred one year from the date on which the injured party became aware of his claim but in any event ten years after the date on which the claim first arose. From 1 January 2020, the relative limitation period was three years.

51A. EFG's alleged acts (which are denied) are isolated acts such that each triggers the running of a separate limitation period as a matter of Swiss law.

*Relative limitation*

52. PIFSS became aware of the alleged loss or damage suffered and of the identity of the person allegedly liable for it (EFG):

   (1) no later than 2015, when (on its own case) PIFSS was given access to relevant materials generated in the course of criminal proceedings and in

56

any event by 17 October 2015 when PIFSS sent a Statement of Facts to the Swiss Federal Prosecutors complaining *inter alia* of corrupt payments and embezzlement alleged to have taken place through BEC and EFG.

(2)  Alternatively, by such date thereafter by when PIFSS could reasonably be expected to have considered the relevant materials concerning BEC/EFG.

(3)  Alternatively, PIFSS had the relevant knowledge by July 2017.

(4)  In the further alternative, PIFSS had the relevant knowledge by 20 February 2018, when PIFSS wrote to the Swiss Federal Prosecutors making allegations of unlawful conduct by Mr Guerin and EFG; alternatively, 11 March 2018.

52A.  As to PIFSS' relevant knowledge, EFG further relies upon the facts and matters pleaded at paragraph 147.2 of the Man Defence.

52B.  In the premises, any claims against EFG are time-barred under Article 60(1) of the SCO.

(1)  Such claims were time-barred prior to the date of issue of the original claim forms on 11 March 2019, and in any event prior to 1 January 2020, when the relative limitation period changed.

(2)  Alternatively, such claims were time-barred prior to (i) 25 March 2021, the date on which PIFSS is deemed to have introduced its original Swiss law claims by way of amendment; (ii) 5 June 2024, pursuant to the Order of 30 July 2024; (iii) alternatively, such date as on which PIFSS is deemed to have introduced its most recent claims.

53.  In the premises, the claims are time-barred under Swiss law.

*Absolute limitation*

54.  Alternatively, any claims against EFG are time-barred under Art. 60(1) SCO to the extent that the loss (if any) occurred 10 years or more prior to:(i) the date of

57

issue of the original claim forms on 11 March 2019; (ii) 25 March 2021, the date on which PIFSS is deemed to have introduced its original Swiss law claims by way of amendment; (iii) 5 June 2024, pursuant to the Order of 30 July 2024; (iv) alternatively, such date as on which PIFSS is deemed to have introduced its most recent claims. In particular but without limitation:

(1)    Insofar as PIFSS has any claim against EFG (which is denied) and any loss to EFG arose out of EFG's actions or actions for which EFG is liable (which is also denied), that claim arises out of the supposed agreement with Mr Al Rajaan pleaded in the 6RACPOC paragraph 39. That agreement, on PIFSS' case, was entered into in or around 1994. As a matter of Swiss law, the alleged agreement was the harmful conduct which would trigger the absolute limitation period under Article 60(1) SCO.

(2)    Alternatively, if (which is denied) PIFSS has any claim against EFG in relation to the alleged Secret Commissions and as a matter of Swiss law the relevant harmful conduct for the purposes of Article 60(1) SCO is not the agreement to pay the Secret Commissions (which is also denied), then the relevant harmful conduct is each individual payment of a Secret Commission. To the extent that such payments caused loss to PIFSS, claims arising out of the same which were made 10 years or more before 5 June 2024, alternatively 25 March 2021, alternatively 11 March 2019 are time-barred.

any tortious claims in which the loss or damage was caused prior to 11 March 2009 are time-barred (alternatively, 11 March 2004); and any restitutionary claims to reverse unjust enrichment that arose before 11 March 2009 (alternatively, 11 March 2004) are time-barred.

*Extended limitation*

54AA. In the further alternative, any claims against EFG to which Article 60(2) of the SCO applies are time-barred to the extent that the relevant criminal limitation period expired prior to the date of such claims. EFG relies on the limitation

58

periods set out in paragraph 201 of the Expert Report of Professor Wohlers dated 6 September 2024, each running from the date of the individual criminal offence separately, and without relation back. In the premises:

(1)    On PIFSS' case, the alleged agreement between Mr Al Rajaan, Mr Nasrallah, and Mr Guerin was entered into in or around 1995. Accordingly the claims against EFG were issued more than 15 years later and are time-barred in their entirety.

(2)    Further or alternatively, such claims are time-barred to the extent that:

(a)    Such claims are based on acts that occurred prior to 11 March 2004.

(b)    Such claims are based on acts that occurred between 11 March 2004 and 25 March 2006, by reference to the date on which PIFSS is to be deemed to have introduced the Swiss law claims by way of amendment (25 March 2021).

(c)    Such claims are based on acts that occurred following 25 March 2006, to the extent that such acts were more than 15 years before the date on which PIFSS is to be deemed to have introduced further claims by subsequent amendment.

*Interruption*

54AB.  For the avoidance of doubt, PIFSS' issue of Claim CL/2019-000118 on 21 January 2019 did not interrupt or suspend limitation as regards EFG, in that EFG is not in "perfect solidarity" with any defendant to Claim CL/2019-000118 and is not jointly and severally liable to PIFSS for any damage within Article 50(1) SCO.

Abuse of rights

54AC.  Alternatively, PIFSS is not entitled to advance the present claims because to do so would constitute an abuse of rights under Article 2(2) SCC. EFG relies on (a) the particulars of PIFSS's knowledge of Mr Al Rajaan's wrongdoing and

59

manifest failures to monitor, supervise, investigate and/or challenge Mr Al Rajaan's activities to discover and/or prevent his continued wrongdoing as pleaded at paragraphs 76A to 76L below, and (c) the further facts and matters set out at paragraph 151.3B of the Man Defendants' Re-Re-Amended Defence (the "**Man Defence**")).

Kuwaiti law

54A. Alternatively, if and to the extent that any of PIFSS' claims against EFG are governed by Kuwaiti law:

(a) By Article 253(1) of the Civil Code, a claim arising out of an illicit act (including a claim under Article 227 and/or Article 229) will become time barred on the earlier of the date: (a) three years from the date on which the claimant becomes aware of the damage caused and the identity of the person responsible or liable for it; and (b) in any event 15 years after the date of the occurrence of the unlawful act ~~commission of the offence (not, as alleged in paragraph 38(b) of PIFSS' Reply, the date on which the damage was caused)~~.

(ab) Article 253(2) of the Civil Code only suspends the limitation periods applicable under Article 253(1) in the event that a criminal case is commenced before the Kuwaiti criminal courts in respect of the same conduct, and only for so long as the criminal case is ongoing. It has no application to PIFSS' claims against EFG.

(b) If, contrary to that position, criminal limitation periods have any relevance to PIFSS' claims against EFG:

(a) By Article 4 of the Penal Code (the relevance of which is denied), the limitation period for the offence of bribery under Articles 35-39 of the Amended Penal Code (31/1970) (including accessorial liability to bribery under Articles 47 and 48) is 10 years from the date of the commission of the offence. Further, by Article 35, the offence of bribery is committed when the wrongdoer asks for or

accepts a bribe. However, it is denied that the criminal limitation period applies to claims brought under Article 227 of the Kuwaiti Civil Code, to which (in the absence of a criminal conviction) only the civil limitation periods under Article 253(1) apply.

(b) It is denied that the disapplication of limitation periods for claims under the Public Property Law, effected by Article 21 bis of that statute, applies to this case. That provision applies only in criminal proceedings for breaches of the Public Property Law.

(c) Insofar as Kuwaiti law provides for claims by reference to the Public Property Law with no limitation provision, that position should be disapplied under Section 2 of the Foreign Limitation Periods Act 1984 and/or under the Rome II Regulation, and the English law limitation provisions applied instead. Application of the Kuwaiti law position would conflict with English public policy and would cause EFG undue hardship.

(c) In the premises:

(a) All PIFSS' claims against EFG are time-barred pursuant to Article 253(1) to the extent that the wrongs alleged were committed at least 15 years prior to the issue of the claim form and/or the date of any relevant amendment, and/or PIFSS acquired knowledge of the damage and the identity of the persons responsible for it more than three years prior to the issue of the claim form and/or such amendment. For the avoidance of doubt, there is no "relation back" principle in Kuwaiti law. If a party amends an existing claim to add new claims or increase the sum claimed, these new claims must be filed within the limitation period;

(b) Further or alternatively, all PIFSS' claims against EFG relying on the criminal offence of bribery are time-barred to the extent that

61

those claims arise out of illicit acts committed on or before 11 March 2009 and/or the date 10 years prior to any relevant amendment.

(d)    Contrary to paragraph 39(b) of PIFSS' Reply, Article 52 of the Penal Code applies only to the offence of embezzlement of public funds. It does not apply to offences under Articles 35-39 of the Penal Code, and (accordingly) it has no application to PIFSS' claim against EFG. In any event, even if it does apply, time starts to run on the commencement of any earlier investigation of such crimes.

English law

55.    Alternatively, if and to the extent that any of PIFSS' claims against EFG are governed by English law:

(1)    PIFSS' causes of action accrued no later than the end of 2012, being the end of the period to which the claims against EFG relate.

(2)    More than six years elapsed between the accrual of PIFSS' causes of action and the date on which it brought its claims against EFG (whether by claim form or, as relevant, amendment).

(3)    Alternatively, if, as alleged in PIFSS' Reply paragraph 58, any relevant fact was deliberately concealed by EFG (which is denied) or Mr Guerin (which is not admitted), PIFSS could, with reasonable diligence, have discovered all such matters as are material under s.32 Limitation Act 1980 prior to 2013.

(4)    In the premises the claims are time-barred under English law.

(5)    Further and in any event, EFG and Mr Diriberry were not party to any common design to commit the tort of bribery and were therefore not joint tortfeasors in any such tort. No admissions are made as to Mr Guerin.

**THE FURTHER NASRALLAH SCHEME**

55A. Save as set out in Appendix 9 to this Re-Re-Amended Defence, it is admitted that the funds detailed in Appendices 4.2, 4.5, 4.6, 4.7, 4.2A, C, D, 4.5 B-E, G and H, 4.7A-E and 4.8 to the 6RACPOC were received into EFG accounts from the financial institutions identified by PIFSS in those Appendices, between 1995 and 2012. As to the other Appendices to the 6RACPOC relevant to the Further Nasrallah Scheme (the "Further Appendices") (i.e. Appendices 4.1 and 4.4 of the 6RACPOC), no admissions are made save insofar as those Appendices are consistent with Appendices 1 to 7 of EFG's Amended Defence dated 20 October 2023. The Further Appendices set out alleged investments which do not relate to payments to or from EFG accounts and are not supported by bates number references to documents disclosed by PIFSS. In those circumstances, EFG is not in a position to admit or deny their contents. EFG will plead further to the Further Appendices forthwith.

55B. Otherwise, no admissions are made as to paragraphs 226 and 227. Without limitation, it is not admitted that Mr Al Rajaan authorised or influenced PIFSS to make any investments, or procured the payment of any commissions to Mr Nasrallah and/or his companies.

56. Paragraphs 226 to 232 are not admitted.  As to paragraph 226:

    (1)    It is admitted that between 1995 and 2012, the funds detailed in Appendix 1 totalling US$254,431,042.92 were received into the EFG accounts there listed from the 19 financial institutions identified by PIFSS in Response 21 of its Further Information served on 25 June 2021 (the "Nineteen Institutions").

    (2)    Otherwise, no admissions are made.

    (3)    Without limitation, it is not admitted that Mr Al Rajaan authorised or influenced PIFSS to make any investments, nor that he procured the payment of any commissions to Mr Nasrallah and/or his companies.

63

56A    As to paragraph 227:

(1)    It is admitted that:

(a)    Payments totalling US$39,882,645.54 were received into the EFG Phoenix account 530115 from UBP, as appears from Appendix 6;

(b)    US$1,601,466.40 was received into the EFG Ozak account 541596 from EDF Man Management on or about 29 April 1998; and

(c)    Two payments totalling US$800,000 were received into the EFG Ozak account 541596 from an account held with Pictet & Cie, Geneva, through payments on or about 27 September 2000 and 14 June 2001;

(2)    Otherwise, no admissions are made.

56B.    As to paragraph 228:

(1)    It is admitted that Mr Al Rajaan was the primary beneficiary of the Thaxton Foundation.

(2)    No admissions are made as to the beneficial ownership of Chulani, Dryden, Evelyn, Glenin, Overton and Suncoast Finance SA.

(3)    As to the alleged fund flows, paragraph 55A above is repeated, including in relation to Ssums paid from the accounts of Phoenix (530115), Phoenix International Brokerage SARL (530303), Ozak (541596) and Golgen Property SA ("**Golgen**") (533815) at EFG to Chulani, Dryden, Evelyn, Glenin, Overton and Suncoast Finance SA between 1995 and 2012 totalled US$175,759,536.28 as set out in Appendix 2.

(4)    Sums paid from the accounts of Phoenix, Ozak and Golgen at EFG to Thaxton between 1995 and 2012 (including a securities transfer of US$2,965,339.33) totalled US$33,793,280.81 as set out in Appendix 3.

64

56C.    Save that it is admitted that Mr Guerin and Mr Nasrallah had a long-standing and cordial professional acquaintance pre-dating Mr Guerin's employment with BEC, no admissions are made as to paragraph 229.

56D.    Paragraph 230 is not admitted.

56E.    Paragraph 231 is admitted. The accounts identified in the ~~RRRRACPOC~~ 6RACPOC and in PIFSS' Part 18 Response dated 5 October 2021 were opened at BEC / EFG as set out below (the "**Nasrallah EFG Accounts**"). No admissions are made as to any other accounts held at EFG.

| EFG A/c No | A/c No prior to merger of EFG and BEC in 2003 | A/c Name | Opening Date |
|---|---|---|---|
| 530109 | 1030754 | Antoine, Mona and Nadim Nasrallah | 27 July 1995 |
| 530115 | 1030784 | Phoenix | 27 July 1995 |
| 530218 | 1031371 | Nadim and Antoine Nasrallah | 4 January 1996 |
| 530249 | 1031542 | Nadim Nasrallah | 17 April 1996 |
| 530303 | 1031743 | Phoenix International Brokerage SARL | 12 May 1997 |

65

| 532745 | 2000056 | Thea-Marie Nasrallah | 30 January 2003 |
| 532746 | 2000057 | Antoine Marc Nadim Nasrallah | 30 January 2003 |
| 532747 | 2000058 | Alice Yara Nasrallah | 30 January 2003 |
| 533815 | N/A | Golgen | 6 February 2007 |
| 534312 | N/A | Antoine Nasrallah and Ms Bilikova | 22 November 2007 |
| 536006 | N/A | Antoine Nasrallah and Ms Penalver | 22 October 2009 |
| 542257 | 1971022 | Wynacre Limited | 19 January 1998 |
| 541596 | 1699080 | Ozak | 21 July 1997 |
| 542523 | N/A | Fondation Antheya | 29 July 2004 |

56EA. No admissions are made as to paragraph 231A, save that it is admitted that Mr Nasrallah and Nadim Nasrallah are father and son, that both have used the word "Phoenix" in company names, that Mr Guerin attended Nadim Nasrallah's wedding in Beirut in October 1997, and save that Mr Nasrallah's fax of 12 October 2011 is admitted as a document. As to sub-paragraph (f),  EFG pleads

to calls on 12 October 2011 in paragraph 68FA below, and will refer to any other relevant call transcripts at trial for their full terms, meaning and effect. EFG pleads to the closure of the Nasrallah EFG Accounts in paragraphs 70 to 73 below.

56F.    As to paragraph 232, save that funds were transferred from the Phoenix and/or Ozak, Wynacre and/or PIB accounts to the extent admitted in paragraph 55A above (i) to the Nasrallah EFG Accounts as appears in Appendices 4 and 5 hereto, (ii) to Chulani, Dryden, Evelyn, Glenin, Overton and Suncoast Finance SA as appears in Appendix 2, and (iii) to the EFG account of Thaxton as appears in Appendix 3, no admissions are made.

**Banking arrangements and fund flows**

*Phoenix Consultants SARL*

57.    Paragraphs 233 to 241 are not is admitted.

57A.  As to paragraph 234:

(1)    It is admitted that Phoenix, represented by Mr Nasrallah and his son, opened account 530115 in or around October 1995 at Banque Scandinave en Suisse (subsequently BEC) and that a "Connaissance du client" form dated 25 October 1996 recorded the provenance of the funds deposited as (in translation) 'commissions on listed funds sold by Paribas, Sarasin, Axa to Kuwait'. It is denied, if it be suggested, that precisely the same language was used in all internal BEC/EFG documents in that regard. By way of example:

(a)    A "Connaissance et Acceptation du Client" form completed in 2004 recorded that the account's beneficial owner sold investment funds in the Persian Gulf region to institutional clients.

(b)    An updated "Client Information Profile" dated 12 November 2009 recorded that the account had "been set up to receive various incomes charged by his [Mr Nasrallah's] company account as a

67

broker and consultant in the Middle East." Mr Nasrallah was said to be "selling a wide range of funds (Everest, SISU, UBP Funds, Sarasin Funds, Atlas Funds, Partech Funds, Resolution Funds etc) to Middle East investors against retrocessions from the issuers."

(2) Account 530109 was opened by Mr Nasrallah and his son in or around August 1995. As to that:

(a) A "Client Information Profile" update of November 2009 in relation to Account 530109 included the words quoted in paragraph 234(b).

(b) It is denied, if it be suggested, that precisely the same language was used in all internal BEC/EFG documents in that regard. By way of example, a "Connaissance du Client" form dated 25 October 1996 recorded that the provenance of the client's funds was inheritance and commissions on funds and investments [sc sold] to Kuwait.

57B. As to paragraph 235:

(1) The Antheya Foundation was created by Liecthestein service providers (Consilium Treuhand AG) on 7 July 2004.

(2) No admissions are made as to any "assistance" said to have been provided by EFG or its predecessor BEC.

(3) Account 542523 was opened with EFG in July 2004.

(4) A "Connaissance et Acceptation du Client" form completed in relation to the Fondation Antheya account in or around August 2004 recorded that the economic purpose of the account was to accumulate savings for Mr Nasrallah's son and three grandchildren and that it was envisaged that the account would receive 35% of the revenues from account 530115 at EFG.

57C. As to paragraph 236:

(1)   No admissions are made as to a "usual arrangement" (if any) between Messrs Nasrallah and Al Rajaan.

(2)   Mr Nasrallah habitually issued instructions to EFG (by telephone, fax or in person) to transfer 35% of funds received into the Phoenix account (530115) to account 530109 and (with effect from August 2004) to the account of Fondation Antheya.

(3)   The said instructions were consistent with the objective recorded on Fondation Antheya's "Connaissance et Acceptation du Client" form, namely to accumulate savings for Mr Nasrallah's son and three grandchildren.

(4)   Not all funds received into the Phoenix account (530115) were directed to account 530109 or (with effect from August 2004) to the account of Fondation Antheya whether as to 35% or at all.

(5)   Mr Nasrallah habitually directed that 40% of monies incoming to the Phoenix account (530115) from his SISU funds were remitted to account 530109 and (with effect from August 2004) to the account of Fondation Antheya.

(6)   Mr Nasrallah occasionally directed that 40% of monies incoming to the Phoenix account (530115) from Atlas and Access International Advisors Ltd were remitted to account 530109 and (with effect from August 2004) to the account of Fondation Antheya.

(7)   Mr Nasrallah occasionally directed that 100% of monies incoming to the Phoenix account (530115) from Axa, Everest Capital Global Fund, Plutus, SISU and UBP were remitted to account 530109 and (with effect from August 2004) to the account of Fondation Antheya, and on at least one occasion directed that 22.5% of funds incoming to the Phoenix account (530115) be remitted to the account of Fondation Antheya.

69

(8)    Funds were remitted from the Phoenix (530115) and Phoenix International Brokerage SARL (530303) accounts to Chulani, Dryden, Evelyn, Glenin, Overton and Suncoast Finance SA as appears in Appendix 2 and to the EFG account of Thaxton as appears in Appendix 3.

(9)    The funds so remitted to Chulani, Dryden, Evelyn, Glenin, Suncoast Finance SA and Thaxton from the Phoenix account (530115)  amounted to some 46.06% of total funds incoming to the EFG Phoenix account 530115 between 1995 and 2012.

57D.  Paragraph 237 is not admitted.

57E.  As to paragraphs 238 and 239:

(1)    Paragraph 55A above is repeated.

It is admitted that:

(a)    In the period 1 January 1995 – 31 December 1999 funds were received into the Phoenix account 1030784 from AXA, Axis, CPR / Credit Agricole, Everest, Jenni / Sarasin, Paribas / Parvest, Partech, Sigma / Atlas and SISU as set out in Appendix 1;

(b)    In aggregate, the sums received from those investment managers into Phoenix account 1030784 totalled $32,758,399.39; and

(c)    AXA, Atlas, Everest, Paribas, Partech, Resolution Funds, Sarasin, SISU and UBP Funds were named on the Phoenix account opening documentation referred to in paragraph 57A above.

(2)    Otherwise no admissions are made.

(3)    EFG's response to paragraph 240 appears at paragraph 57F below.

57F.  As to paragraph 240:

(1A)  Paragraph 55A above is repeated.

70

(1)    No admissions are made as to:

(a)    ~~Whether PIFSS placed investments with any of the investment managers identified in Appendix 4.1 to the RRRRACPOC, whether between 2000 and 2012 or at all; or~~

(b)    Whether any 'Secret Commissions' were paid pursuant to a 'UBP Scheme', as alleged.

(2)    Otherwise, paragraph 240 is denied.

(3)    ~~Between 1 January 2000 and 31 December 2012 the EFG Phoenix account 530115 received total incoming payments of US$263,731,273.95, as set out in Appendix 6. Of those incoming payments:-~~

~~(a)    US$218,148,112.50 (being 82.72% of the total) was paid by the institutions listed in section 2(A) of Appendix 4.1 of the RRRRACPOC;~~

~~(b)    US$39,882,645.54 (being 15.12% of the total) was received from an account at UBP;~~

~~(c)    US$2,926,058.13 (being 1.11% of the total) was received from Goldman Sachs; and~~

~~(d)    US$2,774,457.78 (being 1.05% of the total) was received from other sources.~~

57G.    As to paragraph 240A, EFG pleads to the fund flows in paragraph 55A above. No admissions are made as to whether these entailed Secret Commissions as alleged or at all or whether these were otherwise the "continuation of the payment flows referred to in paragraph 240.a above". EFG pleads to paragraph 240(a) in paragraph 57F above. Paragraph 241 is not admitted.

*Payments from Phoenix to Mr Al Rajaan*

57H.  As to paragraph 242:

(1)    As to the alleged fund flows, paragraph 55A above is repeated.

(2)    No admissions are made as to the "arrangements" alleged or any unlawful Secret Commissions.

(3)    No admissions are made as to whether Kitaro Trust was established for Mr Al Rajaan, or whether Leonis Investments is linked to Pictet Bahamas.

(4)    Otherwise, paragraph 242 is denied.

58.    ~~As to Pparagraphs 242, between 2005 and 2012 payments from the EFG Phoenix account (530115) to Chulani, Dryden, Glenin, Suncoast and Thaxton totalled US$112,842,643.23 as set out in Appendices 2 and 3 to 244 are not admitted.~~

58A.   ~~Save that it is admitted that (as set out in Appendix 2) US$10,399,091.91 was paid from the EFG Phoenix account 530115 to Chulani between February 2003 and May 2004, paragraph 242A is denied.~~

58B.   ~~As to paragraph 243:~~

(1)    ~~It is admitted that payments totalling US$14,353,755.07 were made from the Phoenix account 1030754 to an account held by Leonis Investments at Barclays Bank, Nassau between February 2000 and February 2001.~~

(2)    ~~No admissions are made as to:~~

(a)    ~~The existence or content of the internal Pictet memos referred to;~~

(b)    ~~Payments totalling US$3.8 million alleged to have been made into an unspecified account at Pictet Bahamas;~~

(c)    ~~The alleged payment of US$9.2 million into "unknown accounts" between 2000 and 2004; or~~

72

(d)    The funding of the Chulani account whether prior or subsequent to 2007.

(3)    It is denied that US$54 million was paid from the EFG Phoenix account 530115 to Chulani prior to 2005. As appears from Appendix 2, the relevant payments totalled US$21,187, 026.52.

(4)    Otherwise, paragraph 243 is not admitted.

58C.    EFG's case as to alleged payments from Phoenix to Golgen appears in paragraphs 55A above 62 to 62B below.

*Ozak Services Inc.*

59.    Paragraph 245 to 246 are not is admitted.

59A.    As to paragraph 246:

(1)    The Form A signed by Genmanco Corporation on 21 July 1997 as Ozak's sole director identified Mr Nasrallah and his son, Nadim Nasrallah, as the beneficial owners of Ozak.

(2)    It is admitted that the "Connaissance et Acceptation du Client" form completed on 18 July 1997 identified the origin of the account's funds as business introducer and broker's commissions from a single institutional client from the Gulf, and recorded that the commissions would be distributed after receipt.

(3)    It is denied, if it be suggested, that precisely the same language was used in all internal BEC/EFG documents in that regard. By way of example, an updated Client Information Profile dated 24 July 2009 recorded *inter alia* that Mr Nasrallah was said to be selling a wide range of funds to Middle East investors against retrocessions from the issuers, and that Ozak received rents and other income from family private equity investments.

(4)    Otherwise no admissions are made.

73

*Payments to Nasrallah/Ozak*

60.  As to paragraphs 247, paragraph 55A above is repeated. to 249 are not admitted as appears from Appendices 1 and 7, external payments incoming to the Ozak account between 1998 and 2012 totalled US$70,018,172.83.

60A.  As to paragraphs 248 and 248(a):

    (0)  As to the alleged fund flows, paragraph 55A above is repeated.

    (1)  On or about 29 April 1998, Ozak received a payment of US$1.6m from EDF Man Management AG.

    (2)  No admissions are made as to whether the payment was referable to any investment by PIFSS.

    (3)  Otherwise, no admissions are made.

60B.  As to paragraph 248(b):

    (1)  As to the alleged fund flows, paragraph 55A above is repeated. It is admitted that Ozak received payments totalling US$34,566,826.63 from Wentworth, Garibaldi, Moccak and Gold Coaster, as appears from Appendix 7.

    (2)  No admissions are made as to the place/s of incorporation of those entities Wentworth, Garibaldi, Moccak and Gold Coaster, their ownership by or association with Mr Amouzegar or Zetland, or, pending their identification, as to the content of compliance statements (if any) made by Mr Guerin or Pictet in relation thereto.

    (3)  Otherwise, no admissions are made.

60C.  As to paragraph 248(c):

    (1)  Ozak received payments totalling US$293,122.65 from Caradoc Consulting Ltd.

74

(2)    Otherwise, no admissions are made.

60D.  As to paragraph 248(d):

(1)    As to the alleged fund flows, paragraph 55A above is repeated. ~~It is admitted that Ozak received payments totalling US$4,420,828.36 from Benton Consultancy Ltd, Illington Management SA and Quyvern Investment Corp.~~

(2)    Otherwise, no admissions are made.

60E.  As to paragraph 248(e):

(1)    It is admitted that Ozak received payments amounting to US$1,056,317.29 from Banque SCS Alliance.

(2)    Otherwise, no admissions are made.

60F.  As to paragraph 248(f):

(1)    It is admitted that Ozak received payments from Pictet & Cie of US$500,000 and US$300,000 for value on 27 September 2000 and 14 June 2001 respectively.

(2)    Otherwise, no admissions are made.

60G.  As to paragraph 248(g):

(1)    It is admitted that Abraaj was an investment manager based in Dubai and that Ozak received payments totalling US$18,142,652.07 from it.

(2)    Otherwise, no admissions are made.

60H.  As to paragraphs 248(h) and 249:

(1)    As to the alleged fund flows, paragraph 55A above is repeated. ~~Ozak received payments from Affinity Enterprises, Double Black Diamond (through Phoenix), Dr Taleb Ahmad Moh, Eminent Marketing, KBG Ltd,~~

75

Kleinwort Benson, Paribas, Philip Conway Thomas, Shanco, Banque SCS Alliance, Monaro Properties Development Enterprise and Zetland Financial Group Ltd as appears in Appendix 1 and Appendix 7.

(1A) Paragraph 248(h) is not properly particularised in its reference to unspecified "internal compliance documents" and is accordingly not admitted. Without prejudice to that position, it is admitted that in an email to Philippe Martin-Achard, Mr Guerin identified that a payment of US$459,960 made from Phillip Conway Thomas on or about 14 February 2000 was *"les rétros de fin d'année et les management fees, ainsi que les performances fees"*.

(1B) It is denied that it follows from one payment from Phillip Conway Thomas being in the nature of *"les rétros de fin d'année et les management fees"* that all other payments from Phillip Conway Thomas were of the same nature.

(2)    Otherwise no admissions are made.

*Payments from Ozak to Mr Al Rajaan*

61.    As to pParagraphs 250 and 251: to 252 are not

(1A)    As to the alleged fund flows, paragraph 55A above is repeated.

(1)    i It is admitted that transfers took place from the Ozak account to Thaxton, Chulani, Dryden, Suncoast and to Overton's account at Mirabaud broadly as alleged, and to the extent consistent with paragraph 55A above as particularised in Appendices 2 and 3.

(2)    Transfers totalling US$2,846,463.64 took place from the Ozak account to Overton in 1998 and 2000.

(3)    Otherwise, no admissions are made.

76

61A. EFG's case as to alleged payments from Ozak to Golgen appears in paragraphs 62 to 62B below.

*Wynacre Limited*

61B. As to paragraph 252A:

(1)    The first to third sentences are admitted.

(2)    Mr Nasrallah was identified to EFG as the beneficial owner of Wynacre by Form A dated 12 January 1998, and he and Nadim Nasrallah were identified to EFG as the beneficial owners by Form As dated 30 September 2010 and 25 February 2014 (and accordingly recorded by EFG as such). In the premises, the fourth sentence is admitted but incomplete, and the fifth sentence is denied.

61C. No admissions are made as to paragraph 252B.

61D. As to paragraph 252C:

(1)    As to the alleged fund flows, paragraph 55A above is repeated.

(2)    It is admitted that the EFG Client Information Profile for Wynacre prepared by Mr Guerin stated originally *inter alia* that: *"The money came from [Mr Nasrallah's] partnership in the SISU range of funds on a quarterly basis"* and in a subsequent update *inter alia* that *"This account has been set up to pay the legitimate taxes to the inland revenue in UK, generated by SISU profits"*.

(3)    Sub-paragraph (c) is understood to refer to SISU's fax (not letter) of 10 January 2001 in relation to certain specific payments, and on that basis admitted.

(4)    Otherwise, no admissions are made.

61E. As to paragraph 252D:

77

(1)   As to the alleged fund flows, paragraph 55A above is repeated.

(2)   Otherwise, no admissions are made.

*Golgen Property SA*

62.   Paragraphs 253 to 255 are not is admitted save that:

(1)   So far as EFG is aware, in the event, National Air Services did not IPO;

(2)   The Golgen account opening application form described Golgen's business as "portfolio management";

(3)   The Form A signed by Jose E Silva as Golgen's President and by Dianeth de Ospino on 7 February 2007 identified Mr Nasrallah as the beneficial owner of Golgen; and

(4)   In addition to funding investments made with Abraaj, in 2008 Golgen received and sent funds with a reference to Concord.

(5)   As to alleged fund flows, paragraph 55A above is repeated.

62A.  As to paragraph 254:

(1)   Golgen's first substantial receipt was a transfer of around US$6 million on 4 April 2007 from Wynacre Limited.

(1A)  As to alleged fund flows, paragraph 55A above is repeated.

(2)   Otherwise, no admissions are made.

(3)   It is denied that the account of Golgen was funded substantially by payments from Phoenix and Ozak.  Of the US$44,651,767.99 that was paid into Golgen's account, just US$16,504,041.24 was paid from the Phoenix (530115) and Ozak (541596) accounts.

62B.  As to paragraph 255:

78

(1) As to alleged fund flows, paragraph 55A above is repeated. It is admitted that Golgen made payments totalling US$27,491,018.65 to Thaxton and to an account held by Suncoast at UBP SA, as appears from Appendices 2 and 3.

(2) Otherwise, no admissions are made.

*Thaxton*

63. Subject to the following, pParagraphs 256 and 257 are to 258 are not admitted:

(1) Thaxton was established by Tondury & Partner AG on Mr Al Rajaan's instructions and administered by its legal representative Beata Domus Establishment; and

(2) Mr Guerin had power of management and administration over Thaxton's account at EFG (534414).

63A. As to paragraph 258:

(1) Funds and securities incoming to Thaxton between 2008 and 2012 totalled US$40,659,704.45.

(2) Of the above funds, US$30.8 million comprised internal fund transfers from Golgen, Phoenix and Ozak as appears from Appendix 3.

(3) Further, 100,000 shares in EFG International valued at US$2.965 million were transferred from Phoenix to Thaxton on or around 6 February 2008.

(4) The balance of funds and securities incoming to Thaxton between 2008 and 2012 did not derive from Phoenix, Ozak or Golgen.

*Phoenix International Brokerage / PIB*

63B.  As to paragraph 258A, Mr Guerin recorded in a Client Information Profile on 4 June 2009 that PIB is a Lebanese company and that Nadim Nasrallah was its beneficial owner. Otherwise, no admissions are made.

63C.  As to paragraph 258B:

   (1)  Sub-paragraph (a) is admitted, save that Lama Nasrallah had power of attorney over the account with effect from 15 December 1998, rather than the account being held in her joint name.

   (2)  The first sentence of sub-paragraph (b) is admitted. As to the second sentence, the email is admitted as a document. Mr Guerin said *inter alia*, in relation to Phoenix and PIB: *"Il s'agit des 2 comptes sociétés de facturation du père et du fils, qui retransfèrent après reception de leurs commissions – retrocessions de banques – chaque mois à leur comptes personnels chez nous …"*. Mr Guerin also said generally, in relation to Nadim Nasrallah's business interests, that (unlike his father) Nadim Nasrallah only sold blocks of shares, and that the buyers were Gulf institutions. As to the third sentence, paragraph 55A above is repeated.

*Payments to Nadim Nasrallah / PIB*

63D.  As to paragraphs 258C and 258D:

   (1)  As to alleged fund flows, paragraph 55A above is repeated.

   (2)  Otherwise, no admissions are made.

63E.  As to paragraph 258E:

   (1)  There is no paragraph 257C in the 6RACPOC. If PIFSS intends to refer instead to paragraph 258C, paragraph 63D above is repeated.

   (2)  The agreement in sub-paragraph (a) is admitted.

80

(3)   Sub-paragraphs (b) and (c) are understood to be referring to information included in the BEC 'Connaissance du Client' form completed by Mr Guerin on 11 May 1997 and, to that extent, are admitted.

(4)   Sub-paragraph (e) is admitted to the extent set out in paragraph 63C(2) above and otherwise denied.

(5)   Otherwise, no admissions are made.

63F.  As to paragraphs 258F:

(1)   As to alleged fund flows, paragraph 55A above is repeated.

(2)   Otherwise, no admissions are made.

*EFG's role*

64.   As to pParagraph 259:

(1)   it is not admitted that EFG:

(a)   Established client relationships with Messrs Al Rajaan and Nasrallah and with Nadim Nasrallah through the accounts referred to in paragraphs 233 to 258 of the RRRRACPOC 6RACPOC;

(b)   Extended credit to Antheya Foundation and to Thaxton, including credit of US$10 million in 2011 to Thaxton to cover a stock option open position on Bank of America;

(c)   Provided banking services as alleged; and

(d)   Received market standard remuneration for its services as aforesaid.

(2)   Otherwise no admissions are made.

(3)   Trading on the Thaxton account was execution only and EFG did not provide advice in relation thereto.

81

65.   Paragraph 260 is not admitted, save that it is admitted that Mr Guerin joined Bank Bordier upon leaving EFG on 31 October 2015.

**Banking assistance**

66.   Save that no admissions are made as to Mr Guerin's 'oversight' of the accounts in question, pParagraph 261 is not admitted.

67.   As to paragraph 262:

   (1)   Mr Guerin was an employee of EFG, not an "*executive*" or "*officer*" of EFG, whatever is intended by those terms. His job titles from time to time were as set out in paragraph 15 above. EFG pleads to paragraph 262A in paragraph 67A below.

   (2)   No admissions are made as to Mr Guerin's "friendships" or his alleged "close personal connection" with Mr Nasrallah and Mr Al Rajaan or any relevant "trust and confidence" placed in him by Mr Nasrallah or Mr Nasrallah's son, Nadim, save that he and Mr Nasrallah had a long-standing and cordial professional acquaintance. As to new sub-paragraphs (a)-(c):

      (a)   Sub-paragraph (a) is admitted;

      (b)   It is admitted that Mr Guerin had power to manage and administer Thaxton's funds, securities and other assets held with EFG in relation to bank accounts held with EFG pursuant to a (standard) EFG form dated 23 January 2008. The (standard) form stated expressly that "*the Power governs solely the powers of representation of the Manager* [i.e. Mr Guerin] *vis-à-vis the Bank* ...*" and was subject to EFG's General Conditions. It is denied that Mr Guerin was granted "*power of management and administration for Thaxton*" in any broader sense; and

      (c)   Nadim Nasrallah's request, and Mr Guerin's appointment, are admitted. No admissions are made as to when Nadim Nasrallah, Mr

82

Guerin, Mr Al Rajaan or Mr Nasrallah became aware of the Swiss criminal investigation, save as pleaded in paragraphs 70 to 73 below.

(3) EFG pleads to Mr Guerin's conduct and intentions in paragraph 15A above.

(4) No admissions are made as to what Mr Al Rajaan or Mr Nasrallah or Nadim Nasrallah "knew".

(5) It is denied that EFG or Mr Guerin had a strong commercial incentive to act for Mr Nasrallah and Mr Al Rajaan. It is denied in any event that the banking services required by Mr Al Rajaan and Mr Nasrallah incentivised EFG or Mr Guerin to breach and/or ignore regulatory requirements, or to participate in and/or facilitate corrupt and unlawful schemes.

(6) The operation of other alleged schemes (as to which no admissions are made) is irrelevant. Mr Guerin is not alleged to have participated in any other such scheme.

(7) It is denied in any event that the pleaded inference can fairly or properly be drawn from the matters relied on at paragraphs 262(a) to (d).

(8) Paragraph 262 is otherwise not admitted.

(1) Mr Guerin was an employee of EFG, not an "*executive*" of EFG or "*officer*" of EFG, whatever is intended by those terms.

(2) If by "*someone who would show the necessary "flexibility"*" PIFSS means corrupt and/or willing to breach applicable regulations, it is denied that Mr Guerin was such a person: Mr Guerin was an honest employee.

(3) It is denied that the pleaded inference can fairly or properly be drawn from the matters relied on at paragraphs 262(a) to (d). In particular:

(a) It is denied that the banking services required by Mr Al Rajaan and Mr Nasrallah incentivised Mr Guerin to breach and/or ignore

83

~~regulatory requirements, or to participate in and/or facilitate corrupt and unlawful schemes. To do so would have jeopardised Mr Guerin's professional reputation and his livelihood.~~

~~(b)    The operation of other schemes (as to which no admissions are made), in which Mr Guerin is not alleged to have participated, is irrelevant to Mr Guerin's willingness to show the alleged "*flexibility*".~~

~~(4)    Paragraph 262 is otherwise not admitted.~~

67A.  As to paragraph 262A:

(1)    It is admitted that:-

a.    Mr Latsis was regarded within EFG as a principal shareholder (albeit he was not in fact personally a direct shareholder in EFG).

b.    On a handful of occasions Abraaj wrongly addressed Mr Guerin as 'Head of International Banking'.

(2)    Mr Guerin's job titles from time to time were as set out in paragraph 15 above.

(3)    The BEC title "Directeur" was equivalent to the title "Senior Vice President" at EFG. It did not signify membership of the board of directors.

(4)    Mr Guerin was never "Head of International Private Banking" or "Managing Partner" at EFG, and was not held out by EFG in that role. These were not roles or titles recognised at EFG. Mr Guerin's use of that title in an email to Abraaj on 8 May 2007 was not authorised by EFG.

(5)    Mr Guerin was not at any time a "representative of Mr Latsis", and Mr Latsis did not appoint Mr Guerin "to represent him at the World Policy Conference in Marrakech" as alleged in sub-paragraph (d).

84

(6) Mr Guerin carried out a "sales function" for EFG only to the extent that all Customer Relationship Officers have such a function. He did not, in practice, create and maintain substantial new business on behalf of EFG.

(7) It is admitted that, in general, EFG employees have autonomy and responsibility consistent with the nature of their particular roles. Mr Guerin's roles at all material times were as set out in paragraph 15 above. It is denied that this meant that Mr Guerin was accorded *"substantial autonomy"* or *"decision-making responsibility"*.

(8) Otherwise, paragraph 262A is denied.

68. As to paragraphs 263 ~~and 264~~:

(1) It is not admitted that ~~either Mr Nasrallah or Mr Al Rajaan held accounts at EFG, that Mr Guerin managed any such accounts, or that~~ any of Mr Nasrallah, Nadim Nasrallah and Mr Al Rajaan were sharing commissions on investments made by PIFSS pursuant to an unlawful and corrupt scheme as alleged.

(2) Without prejudice to those non-admissions:

(a) Paragraph 15A above is repeated, as to Mr Guerin.

(b) It is denied in any event that knowledge as alleged can be fairly or properly be inferred from Mr Guerin's management of the banking relationships with Mr Nasrallah and/or Mr Al Rajaan.

(ba) EFG pleads to paragraph 264 in paragraphs 68A to 68G below.

~~It is denied in any event that Mr Guerin knew that Mr Nasrallah was sharing commissions with Mr Al Rajaan pursuant to an unlawful and corrupt scheme and denied that such knowledge can be fairly or properly be inferred from Mr Guerin's alleged (but not admitted) management of the banking relationships with Mr Nasrallah and/or Mr Al Rajaan.~~

85

(c)    The fund flows alleged are consistent with legitimate commissions.

(3)    Paragraphs 263 ~~and 264 are~~ is otherwise not admitted.

68AA.  As to paragraph 263A:

(1)    It is admitted that Ms Beltrametti and Ms Likhotal assisted Mr Guerin in administering Mr Nasrallah, Nadim Nasrallah and Mr Al Rajaan's accounts with EFG, and the accounts of their associated companies, and communicated information in relation to those accounts to Mr Guerin as alleged in paragraph 264, to the extent admitted in paragraphs 68A to 68G below.

(2)    Otherwise, no admissions are made.

68A.  As to paragraph 264(a):

(1)    No admissions are made as to Mr Guerin's knowledge.

(2)    By the Client Information Profiles in relation to the accounts opened by Mr Nasrallah, Mr Guerin recorded that Mr Nasrallah was an investment broker who had enjoyed a highly successful career at Paribas before setting up independently in 1994, and that the Phoenix and Ozak accounts were to receive commissions on funds sold to a plurality of Middle East investors.

(3)    In any event:

(a)    It is not admitted that funds incoming to the Phoenix and Ozak accounts from the Nineteen Institutions (as particularised in Appendix 1) comprised commissions paid in respect of investments made by PIFSS.

(b)    As appears from ~~Appendices 6 and 7~~ the fund flows admitted in paragraph 55A above, not all of the funds incoming to the Phoenix and Ozak derived from the Nineteen Institutions.

86

      (c)    At least US$6 million of Golgen's funds derived from Wynacre Limited, as appears from paragraph 62A(1) above.

(4)    Otherwise, paragraph 264(a) is not admitted.

68B.  As to paragraph 264(b):

(1A)   It is admitted that a BEC 'Connaissance et acceptation du client' form in relation to the Antheya Foundation dated 16 August 2004 stated, under the heading *"apport initial"* that *"apports futurs envisages"* were *"35% des revenus du compte 530115 chez nous"* (i.e. Phoenix).

(1B)   Sub-paragraphs (b), (c), (d), (e) and (f) are admitted. EFG will refer to the relevant documents and transcripts at trial for their full meaning and effect.

(1C)   As to sub-paragraph (g), it is admitted that in a telephone call on 15 March 2013 in response to something said by Mr Nasrallah which is not audible, Mr Guerin said: *"Et les 35, 65 c'est fini hein. On fait plus ça."* It is denied that Mr Guerin told Mr Nasrallah that he did not want to speak on the phone; that passage of the transcript appears to relate to a potential new customer, known to Mr Nasrallah, whose wife was very sick, and who EFG might not be prepared to accept as a client. In that context, Mr Guerin stated that he wished to sit down with the client rather than merely speaking by phone: *"Bon, je ne pouvais pas parler de ca au telephone. Il faudra qu'on s'assoie. Parce qu'en plus il est dans une profession qui est chez nous à risqué."* EFG pleads to paragraph 266 in paragraph 70 below.

(1)    No admissions are made as to Mr Guerin's knowledge.

(2)    Paragraph 57(C)(2) is repeated, as are paragraphs 57(C)(3) - 57(C)(9).

68BA.  As to paragraph 264(ba):

(1)    The approvals alleged are admitted as documents (save that the transfer approved on 9 November 2007 was in the sum of EUR1.4 million). To that

87

extent, it is admitted that Mr Guerin approved payments with the description "redistribution of commissions".

(2)   No admissions are made as to Mr Guerin's knowledge.

(3)   EFG pleads to Mr Diriberry's position in paragraphs 69A to 69I below.

68C.  As to paragraph 264(c)(a):

(1)   No admissions are made as to Mr Guerin's knowledge.

(2)   The existence of the file note dated 11 February 2008 quoted in sub-paragraph (a) is admitted. The final sentence reads, in the original French: "Je l'ai décidé à le faire chez nous" (i.e. words to the effect, "I decided him to do it here with us" or "I got him to decide to do it here with us").

(3)   No admissions are made as to the beneficial ownership of Chulani, Dryden, Evelyn, Glenin, Overton and Suncoast Finance.

(4)   Mr Guerin further recorded:

(a)   In the Client Information Profile referred to in paragraphs 63A above and the Client Information Profile completed in relation to Mr Al Rajaan's personal account (i.e. Account 536007) that Mr Al Rajaan had a fortune deriving in the main from his wife, that he personally had invested millions of dollars in various funds and in real estate and that he transacted some business with the private equity group Abraaj in partnership with another EFG client, being Mr Nasrallah;

(b)   In an email to EFG's AML unit dated 25 September 2009 that Mr Nasrallah and Mr Al Rajaan were "partners and share certain deals. They are common investors with Abraaj Capital Dubai and shareholders of SISU Capital in London. When one has not got the money immediately available, the other lends it to him on a short term basis";

88

(c)    In an email to EFG's AML unit dated 21 October 2011, that Mr Nasrallah and Mr Al Rajaan had been in a business relationship for a long time and had close ties, especially in Lebanon where they were neighbours. Instead of remitting funds from EFG, sometimes they settled their dues through their accounts at EFG; and

(d)    In signing off payments from Phoenix, Ozak and Golgen, that Messrs Nasrallah and Al Rajaan were in business together.

68D.   As to paragraph 264(c)(b):

(1)    No admissions are made as to Mr Guerin's knowledge.

(2)    It is admitted that:

(a)    From in or around May 2001 to in or around March 2012, Mr Guerin routinely received and executed instructions from Mr Nasrallah to transfer funds from the Phoenix account to account number 188076 in the name of Chulani at Pictet, Bahamas; and

(b)    From in or around November 2006 to in or around March 2012 Mr Guerin routinely received and implemented instructions from Mr Nasrallah to transfer funds from the EFG Ozak account 541596 to account number 888037 in the name of Dryden at Pictet, Singapore.

(3)    In documenting and/or approving the above transfers, Mr Guerin routinely recorded or affirmed that the beneficial owners of the respective accounts were the same;

(4)    It is admitted that:

(a)    A file note on the Thaxton account appears to record that a telephone instruction was received by Mr Guerin from Mr Al Rajaan on 3 March 2008 to transfer €2 million from Thaxton "a mon compte chez Pictet Bank & Trust aux Bahamas comme d'habitude, A/c 188076"; and

89

(b) Mr Guerin actioned the instruction, being the first transfer out of the Thaxton account, indicating that the transfer related to a margin call and that the beneficial owners of Thaxton and Chulani were the same.

(5) Otherwise, no admissions are made.

68DA. As to paragraph 264(c)(c), EFG pleads to sub-paragraphs (ea.a) to (ea.c) in paragraphs 68FA below.

68DB. As to paragraph 264(c)(d):

(1) The approval and instructions alleged are admitted.

(2) No admissions are made as to Mr Guerin's knowledge.

68E. As to paragraph 264(d):

(1) No admissions are made as to Mr Guerin's knowledge.

(2) It is admitted that the phrase "business partner and friend" appears in account documentation relating to Thaxton.

(3) It is admitted that payments were made into the Thaxton account as described in paragraph 63A above.

(4) No admissions are made as to Mr Al Rajaan's "purpose" in opening the Thaxton account.

(5) The Thaxton account was used by Mr Al Rajaan actively to trade securities and options, including gold options, for which purpose Thaxton sought and obtained credit facilities from EFG, including the US$10 million facility cited in ~~RRRRACPOC~~ 6RACPOC paragraph 259.

(6) Mr Guerin did not have a signature on the Thaxton account.

68F. As to paragraph 264(e):

90

(1)    It is admitted that a revised version of the Thaxton Client Information Profile which appears to have been signed by Mr Guerin on 12 February 2008 included the words quoted.

(2)    Otherwise, no admissions are made.

68FA.  As to paragraph 264(ea):

(1)    No admissions are made as to the alleged unlawful conduct or purpose, or Mr Guerin, Mr Nasrallah, Nadim Nasrallah and/or Mr Al Rajaan's knowledge of the same.

(2)    It is admitted that:

(a)    By 23 May 2011, Mr Guerin had authorised payments of approximately EUR1.4 million from Phoenix to Dryden and Chulani with the references alleged;

(b)    In a telephone call on 6 June 2011, Mr Guerin stated to Mr Nasrallah that in his (Mr Guerin's) view, neither EFG nor any other bank would be able to continue *"l'argent qui rentre qui sort"* – i.e. what were informally known as *"bathtub accounts"*. This appears to have been a general statement by Mr Guerin as to changing market appetite to operate such accounts.  Mr Guerin did not observe, expressly or impliedly, that such accounts involved "obviously the laundering of assets" as alleged. It is not admitted that the requested transaction was on behalf of Mr Rajaan;

(c)    Mr Nasrallah sent the fax dated 12 October 2011; and

(d)    Conversations took place between Mr Guerin and Mr Nasrallah that same day in relation to the transfer of US$1,748,000 from Golgen to Thaxton and that Mr Guerin authorised the payment in question. EFG will refer to the recordings of the parties' conversations at the trial herein. It is not admitted that the words *'on habille'* were used

91

by Mr Guerin. The recording indicates that Mr Guerin may have said *'on a mis'*. Para 15A is repeated as to Mr Guerin's knowledge.

(3)    EFG will refer to the transcripts at trial for their full meaning and effect and no admissions are made *inter alia* as to PIFSS' summary of the call between Mr Guerin and Mr Nasrallah on Friday 20 May 2011.

(4)    EFG pleads to paragraphs 266A-C in paragraphs 70AA and 70AB below.

68G.    As to paragraph 264(f):

(1)    No admissions are made as to Mr Guerin's knowledge.

(2)    At all material times:

(a)    The purpose of the Phoenix and Ozak accounts was recorded in the Client Information Profiles referred to in paragraphs 57A(2) and 59A(2) above, as to receive commissions on funds sold to a plurality of Middle East investors and (in the case of Ozak) that it would also receive rents and other income. The source of funds in the PIB account was recorded in the 'Connaissance du Client' form referred to in paragraph 57A(2)(b) above, as *"heritage + fruit de son travail"*.

(b)    By no later than September 2010, the Ozak account was receiving rents from property in Hong Kong and substantial dividends from different funds across the world.

(3)    In the premises, the funds incoming to Phoenix and Ozak and PIB did not fall to be assessed on the footing that they derived from investments made by a single client, nor that they exclusively comprised brokers' commissions;

(4)    Further and in any event it is denied that the quantum of payments into the Phoenix and Ozak and PIB accounts was not explicable by legitimate commissions;

92

(5)   The Phoenix updated Client Information Profile expressly anticipated an annual income of €20 million;

(6)   Mr Nasrallah had enjoyed a highly successful career at Paribas before setting up independently in 1994, (as represented by Mr Guerin) being among the very first Arabic-speaking executives to work with Paribas, having been rated as a highly successful Paribas salesman and having sold most of the Eurobonds issued by Paribas to Middle East investors.

(7)   In the premises, Mr Nasrallah was well connected and well placed to secure lucrative fees, revenues and commission arrangements.

(8)   On the account given by Mr Guerin in the BEC 'Connaissance du Client' form in relation to PIB, Nadim Nasrallah had also enjoyed a successful career at Paribas before setting up independently in 1994.

(9)   In the premises, Nadim Nasrallah was also well connected and well placed to secure lucrative fees, revenues and commission arrangements.

69.   Save that it is denied that Mr Guerin knew that Mr Nasrallah was party to an unlawful and corrupt scheme (if Mr Nasrallah was in fact party to such a scheme, which is not admitted), As to paragraph 265 is not admitted.:

(1)   No admissions are made as to Mr Guerin's knowledge.

(2)   Paragraphs 68D(1) and (2) above are repeated as to the external transfers.

(3)   Paragraph 68C(4) above is repeated as to the internal transfers.

(3A)  It is admitted that Mr Guerin signed off certain payments from Nadim Nasrallah to external accounts on the basis that the accounts and their proceeds were beneficially owned by him. Otherwise, no admissions are made as to sub-paragraph (aa).

(4)   Save that no admissions are made as to Mr Guerin's knowledge, or as to the alleged unlawful and corrupt scheme, sub-paragraph (c) is admitted.

93

(5)    Save that no admissions are made as to Mr Guerin's knowledge, or as to the alleged unlawful and corrupt scheme, sub-paragraph (d) is admitted so far as it relates to Mr Guerin's letters dated 26 March 2002 and 4 April 2003.

(6)    Otherwise, no admissions are made.

69A.    Paragraph 265A is denied:

(1)    No admissions are made as to the alleged unlawful and corrupt scheme or as to Mr Guerin's knowledge.

(2)    It is denied that Mr Diriberry knew, had blind-eye knowledge of and/or was wilfully blind to Mr Al Rajaan and Mr Nasrallah allegedly using accounts at EFG to launder Secret Commissions and it is denied that Mr Diriberry authorised or otherwise permitted them to continue to do so.

69B.    As to paragraph 265A(a):

(1)    It is admitted that Mr Diriberry was a member of EFG's senior management team on joining EFG:-

(a)    He was COO and Deputy CEO from August 2003 and sat on the Management Committee.

(b)    He was appointed Head of Private Banking for Geneva in January 2006 and became Chairman of EFG's Operating Credit Committee and a member of EFGI's Executive Credit Committee at or about the same time.

(c)    He ceased to act as Head of Private Banking for Geneva in 2008 and became the Senior Executive for Operations and Administration for EFG International.

(d)    He re-joined EFG as its CEO in January 2011 and in April of the same year became CEO for EFGI Continental Europe.

94

(e)     He joined the International Executive Committee when it was created in or around October 2011, in his capacity as CEO.

(f)     He stepped down from his CEO roles in 2014, being appointed as EFG's Chairman of Private Banking and EFGI's Global Coordinator for Eastern Europe and Africa before leaving EFG in 2015.

(2)     Otherwise paragraph 265A(a) is denied.

69C.  As to paragraph 265A(b):

(1)     The email from Mr Diriberry dated 6 January 2006 is admitted as a document, as is the management committee's approval of Phoenix as a business introducer in November 2005. Such approval was expressly subject to a satisfactory background report (which was subsequently commissioned by EFG from a specialist external compliance firm in the UK, which raised no concerns as to Mr Nasrallah or Phoenix, and which confirmed that they were of good standing).

(2)     It is admitted that Mr Diriberry approved the particular payments set out in paragraph 265A(b)(d)(i)-(viii), but denied (if it is alleged) that the fund transfer forms presented to him for approval all gave the name of the relevant account holder or beneficiary. EFG pleads to the payments at paragraphs 264(ba) in paragraph 68BA above.

(3)     It is denied that Mr Diriberry retained any meaningful knowledge or recollection of those matters over a period of years as alleged. Mr Diriberry was required to consider and approve a significant volume of transactions and arrangements on an ongoing basis in the course of his work for EFG. He reasonably expected Mr Guerin to provide him with honest and accurate information about the beneficial owners of accounts and the rationale for any transfers.

69D.  As to paragraph 265A(ba):

95

(1)    It is admitted that two iterations of a credit request for loans to PIFSS were shared with Mr Diriberry between July and October 2006, that Mr Diriberry approved the second iteration for onward forwarding to the relevant Credit Committee, and that the credit request (in both iterations) recorded the matters recited in sub paragraphs 265A(ba)(a)-(c) of 6RACPOC inclusive.

(2)    Minutes of the contemporaneous meetings of the Operating Credit Committee indicate that Mr Al Rajaan's role at PIFSS was not discussed in the context of that credit request.

(3)    The credit request in question was:-

(a)    one of many which Mr Diriberry was asked to review in his role as a member of the Operating Credit Committee and Executive Credit Committee; and

(b)    ultimately rejected with the consequence that Mr Diriberry was not required to give any further consideration to the same or its contents.

(4)    It is denied that Mr Diriberry retained any meaningful knowledge or recollection of those matters over a period of years as alleged.

69E.   As to paragraph 265A(bb):

(1)    It is admitted that an HRC information profile update for Nadim Nasrallah prepared by Mr Guerin was approved by Mr Diriberry on 21 November 2006.

(2)    In approving that update, Mr Diriberry corrected Mr Guerin's indication that Nadim Nasrallah should not be considered a high risk client.

(3)    In addition to indicating that Nadim Nasrallah's business activity was "selling shares and funds to Middle East investors", the update described Nadim Nasrallah as a "Financial Consultant".

96

(4)    It is denied, if it is alleged, that Mr Diriberry would have understood the reference to Middle East investors as a reference to PIFSS.

(5)    The update was one of very many reviews that Mr Diriberry would have been required to carry out.

(6)    It is denied that Mr Diriberry retained any meaningful knowledge or recollection of such matters over a period of years as alleged.

69F.  As to paragraph 265A(c):

(1)    As to sub-paragraphs (c)(a)-(f):

(a)    It is admitted that:

(a)    on 4 February 2008 and 12 February 2008 respectively Mr Diriberry approved two iterations of a Thaxton Client Information Profile prepared by Mr Guerin, both of which identified Mr Al Rajaan as Thaxton's beneficial owner, and the second of which referred to the receipt of "management fees and performance fees"; and

(b)    The first of the profiles identified that Thaxton was to receive €2 million from a business partner and friend; the second identified that €5 million were to be received "from 530115".

(b)    Neither iteration of the profile named Mr Nasrallah or Phoenix;

(c)    It is denied that Mr Diriberry knew any of the matters alleged in sub-paragraphs (b) or (c), or that he knew that Mr Nasrallah was described as Mr Al Rajaan's "business partner and friend" as alleged in sub-paragraph (e), at any material time. These allegations appear to be founded on notes made by EFG's compliance team *after* Mr Diriberry had approved the relevant Client Information Profile(s).

97

(2)    The approvals alleged in sub-paragraphs (g)-(m) are admitted, save that it is denied (if it is alleged) that the fund transfer forms presented to Mr Diriberry for approval named the relevant account holder or beneficiary.

(3)    It is denied that Mr Diriberry retained any meaningful knowledge or recollection of such matters as alleged. He was required to consider and approve a significant volume of transactions on an ongoing basis. He did not have meaningful 'knowledge' of all such transactions.

(4)    As to paragraph 265A(c)(c), PIFSS was a client of European Financial Group which was not a separate division but a separate bank and legal entity.

69G.    As to paragraph 265A(d):

(1)    It is denied that Mr Diriberry knew the matters alleged in sub-paragraphs (a)-(d) in the sense of registering and retaining those matters whether at all and/or to any meaningful extent. EFG pleads to the facts said to underlie the inference of knowledge in paragraphs 69A to 69F above.

(2)    Sub-paragraph (e) is not understood. Swiss law and regulation did not require any further or additional "documentary record".

(3)    As to sub-paragraph (f):

(a)    It is denied that Mr Al Rajaan and Mr Nasrallah were properly categorised as PEPs at any material time, at all and/or "*clearly*" so, as a matter of Swiss law and/or under EFG's policies. It is denied in any event that Mr Diriberry knew that they were properly so categorised.

(b)    As to Mr Diriberry's knowledge:

(a)    Mr Diriberry knew that Mr Nasrallah and Nadim Nasrallah were categorised as HRCs. In approving an HRC information profile update for Mr Nasrallah and Nadim Nasrallah on 21

98

November 2006, Mr Diriberry corrected Mr Guerin's indication that those account holders should not be considered as high risk clients.

(b)     The personal account opening form which Mr Diriberry approved for Mr Al Rajaan on 27 October 2009 recorded that Mr Al Rajaan was not a PEP, but rather an HRC in EFG's internal category 10, i.e. a Local Public Figure.

(c)     That categorisation of Mr Al Rajaan as a Local Public Figure was confirmed by a member of EFG's Compliance department – Ms Nuvolone – on 28 October 2009.

69H.  As to paragraph 265A(e):

(1)     EFG pleads to paragraphs 265A(b) to 265A(d) in paragraphs 69B to 69E above.

(2)     EFG pleads to paragraphs 265A(g) and 265A(h) in paragraphs 69J and 69K below.

(3)     No admissions are made as to Mr Guerin's knowledge.

(4)     The inference pleaded is denied. Mr Guerin did not tell Mr Diriberry any such thing. Nor did Mr Diriberry suspect the same and/or deliberately avoid seeking further information to confirm any such suspicion. It is denied that Mr Diriberry had relevant blind-eye knowledge or was wilfully blind.

69I.  Paragraph 265A(f) is denied. No admissions are made as to Mr Guerin's knowledge, or as to the existence of any unlawful arrangements as alleged. Mr Diriberry did not knowingly or recklessly approve any unlawful arrangements. Nor did he knowingly or recklessly assist in those arrangements, whether by permitting them to continue or authorising further transactions pursuant to such arrangements or in any way.

69J.    As to paragraph 265A(g):

    (1)    Paragraphs 69A(3) and 69G(1) above are repeated.

    (2)    The approvals alleged in sub-paragraphs (a)(i)-(vi) are admitted.

    (3)    As to sub-paragraph (b):

        (a)    the CIP is admitted as a document. Mr Diriberry appears to have approved that document on 27 October 2009, not 28 October 2009;

        (b)    it is denied if it be alleged that, when approving that CIP in relation to Mr Al Rajaan in October 2009, Mr Diriberry did or should have recalled the details of a Thaxton CIP which he had approved 18 months earlier, or identified any inconsistency between the two;

        (c)    it is denied in any event that Mr Al Rajaan was a PEP, alternatively "obviously" so, and/or that Mr Diriberry knew him to be a PEP. Mr Al Rajaan was properly classified as an HRC; and

        (d)    It is denied that the documents referred to in paragraphs 264(e) and 265A(g)(b)(i) are necessarily inconsistent in their description of Mr Al Rajaan's wealth or that Mr Diriberry did or should have appreciated any inconsistency.

    (4)    It is denied that Mr Diriberry had any duty to "*prevent all other relevant transfers from the Nasrallah EFG Accounts*" as alleged, and/or any duty to take any (unparticularised) "*step*" to prevent transactions involving, and/or EFG's client relationship with, Mr Al Rajaan and/or Mr Nasrallah.

69K.    Paragraph 265A(h) is denied. Mr Diriberry's authorisation and approval as alleged is not consistent only with the knowledge and understandings pleaded by PIFSS. EFG pleads to paragraphs 265A(e) in paragraph 69F above.

*Account closures/dissipation*

70. Save that it is admitted that by letter dated 7 May 2012 Fransabank provided the IBAN details for Mr Al Rajaan's Euro account at Fransabank, ~~P~~paragraph 266 ~~to 270 are~~ is not admitted.

70AA. As to paragraph 266A, it is admitted that Mr Nasrallah, Nadim Nasrallah and Mr Guerin spoke on 7 May 2012. No admissions are made as to PIFSS' summary of the conversations that took place. At the trial herein EFG will refer to the audio recordings for their meaning and effect.

70AB. No admissions are made as to paragraphs 266B and 266C, save that it is admitted that Mr Al Rajaan had instructed Mr Guerin to liquidate positions.

70A. Save that: (a) Mr Al Rajaan's signed instruction on 9 May 2012 specified the sum of €14 million, not US$18.6 million; ~~and~~ (b) Mr Al Rajaan's account at Fransabank in the Lebanon was a Euro account, and approximately €14.4 million was transferred; and (c) no admission is made as to any prior informal instruction given by Mr Al Rajaan to Mr Guerin on 7 May 2012 to dissolve the Thaxton Foundation, paragraph 267 is admitted.

70B. Paragraph 268 is admitted as a partial summary of the relevant file note. It is denied, if it be alleged, that sub-paragraph 268(ii) is a direct quotation. EFG pleads to paragraph 266A-C in paragraphs 70AA and 70AB above. No admissions are made as to Mr Guerin's knowledge.

70C. As to paragraph 269:

    (1) EFG pleads to paragraph 266A in paragraph 70AA above. No admissions are made as to any "further conversations over the intervening days".

    (2) The original first three sentences are admitted.

    (3) The new fourth sentence is admitted.

101

(4)     As to the fifth ~~final~~ sentence, of the accounts tabulated in paragraph 56E above:

(a)     Accounts 530109, 530115, 541596, 533815, 530249 and 530303 were closed on the instructions of Mr Nasrallah in 2012;

(b)     Accounts 530249 and 530303 were closed on the instructions of Nadim Nasrallah in 2012;

(c)     ~~Neither account 530249 (in the joint names of Mr Nasrallah and Nadim Nasrallah) nor account 530303 (in the name of Phoenix International Brokerage SARL) is alleged to have been to any extent connected with Mr Al Rajaan; and~~

(d)     Account 542523 (in the name of Fondation Antheya) which, according to PIFSS was the recipient of 35% of "Secret Commissions" incoming to Phoenix with effect from 2004, and account 542257 (in the name of Wynacre Limited) which (as appears from paragraph 62A(1) above) was Golgen's initial source of funds, remained open until August 2016 and October 2015 respectively.

(5)     As to the final sentence:

(a)     The forms, letters and reports referred to in sub-paragraphs (aa), (a), (b), (d) and (e) are admitted as documents. Insofar as necessary, EFG will refer to them at trial for their full terms and effect. Further:

(i)     Mr Guerin appears to have appended Nadim Nasrallah's letter of 16 May 2012 to the account closing forms relied upon in (aa);

(ii)    Mr Guerin appears to have appended Mr Nasrallah's letter of 16 May 2012 to the account closing form relied upon in (a);

(iii)   the letter from Mr Guerin of 13 June 2012 relied upon in (b) does not state that Mr Nasrallah's illness is the reason and/or

102

sole reason for the transfers, but rather that Mr Nasrallah wished to transfer his assets held with EFG to the Antheya Foundation and to make Nadim Nasrallah, who managed the Nasrallah family affairs, the primary beneficiary;

(iv)    the account closing form dated 21 June 2012 relates only to Ozak. No admissions are made as to whether Mr Nasrallah was retiring. He had stated to Mr Guerin on 7 May 2012 that he no longer had the desire to make visits in the course of business, and he stated in a letter to Citco dated 12 June 2012 that there was no longer any reason for Ozak to continue to exist. Further, Mr Guerin appears to have appended Mr Nasrallah's letter of 16 May 2012 to the account closing form in any event; and

(v)    the note of an internal visit dated 26 November 2012 recorded that Nadim Nasrallah had withdrawn EUR8,000, and further that EFG could not offer returns to compete with returns of 14% p.a. obtained in an investment in pre-paid mobile phones in Africa made by the Nasrallah family with a Lebanese friend. It is not clear from the report whether this investment in Africa was the reason for Nadim Nasrallah's withdrawal of EUR8,000.

(b)    It is admitted that in a Securities Transfer Form dated 15 June 2012, signed by Mr Guerin, the "transfer reason" for a share sale by Antheya was given as "collateral for real estate purchase" (not "collateral real estate purchase").

(c)    No admissions are made as to the alleged falsity of the reasons given in those documents, or Mr Guerin's knowledge of the same.

70D.  Paragraph 270 is not admitted.

70DA. As to paragraph 270A:

103

(1) It is admitted that on 28 September 2012 Mr Nasrallah instructed Mr Guerin to destroy certain documents, and that Mr Guerin agreed to do so.

(2) No admissions are made as to what those documents entailed, Mr Nasrallah's purpose, and/or as to Mr Guerin's knowledge of the same.

71. As to paragraph 271:

(1) In relation to the alleged obligations pleaded at paragraphs 74 to 78, EFG repeats paragraphs 40 to 44 above.

(2) EFG pleads to paragraphs 266A-C and 270A in paragraphs 70AA, 70AB and 70DA above.

(3) The first sentence is not admitted. Paragraph 15A above is repeated. Mr Guerin's file note dated 10 May 2012 recorded that the drivers were principally political, as did Mr Nasrallah's and Nadim Nasrallah's written instructions dated 16 May 2012.

(4) Further, closure of the various EFG accounts held by Messrs Al Rajaan and Nasrallah and by Nadim Nasrallah could not have served to "mitigate the risk of criminal investigation" if, as PIFSS maintains, that risk had already materialised by 7 May 2012.

(5) It is admitted that Mr Guerin took such steps as were necessary within EFG to implement the respective instructions of Messrs Al Rajaan and Nasrallah to close accounts 534414, 536007 and the accounts identified in paragraph 70C(2)(a) above, and the instructions of Nadim Nasrallah to close the PIB account and his personal account.

(6) The alleged non-compliance, "significant concerns", and "proper enquiry" are each unparticularised. It is denied that the closure instructions should have been declined, or made the subject of further enquiry.

(7) Paragraph 271 is otherwise not admitted.

72.  As to paragraph 272:

(1)  ~~None of (i) the alleged connection between Mr Nasrallah and Mr Al Rajaan and the companies incorporated by them, (ii) the alleged existence of the Phoenix and Ozak accounts, (iii) the alleged payment of commissions into those accounts, or (iv) the alleged identity of Mr Al Rajaan as the ultimate beneficiary of those commissions is admitted.~~

(2)  ~~Without prejudice to those non-admissions, i~~It is denied ~~in any event~~ that EFG (through Mr Guerin, Mr Diriberry or otherwise) knew or believed that Mr Nasrallah was sharing commissions with Mr Al Rajaan pursuant to an unlawful and corrupt scheme (if he was in fact doing so, which is not admitted).

(3)  No admissions are made as to whether Mr Guerin entered into any agreement as alleged. It is denied that Mr Diriberry ever approved such agreement, whether in early 2008 or at all.

(4)  It is further denied that an inference of the knowledge/belief alleged at paragraph 272 can fairly or properly be drawn from the matters pleaded at paragraphs 272(a) to (e).

(5)  It is denied that the explanations given to EFG for the instructions from Mr Al Rajaan and Mr Nasrallah to close accounts were implausible.

(6)  The "enquiry", "challenge", and "action" said to have been required of EFG is unparticularised. Without prejudice to that position, it is denied that in failing to challenge the closure instructions EFG breached any of the obligations set out in paragraphs 74-77 of the ~~RRRRACPOC~~ 6RACPOC.

(7)  It is denied that EFG has ever given a partial or misleading account of a client relationship to the Swiss Prosecutor.

(8)  Paragraph 272 is otherwise not admitted.

73. Paragraph 273 is materially unparticularised and in any event makes no allegation against EFG. The allegation of "breach of the money-laundering obligations to which they [ie, Mr Guerin and Mr Diriberry] and EFG were subject" is unparticularised (as are the "checks", and "prudent steps" which PIFSS asserts were required), but in any event, for the avoidance of doubt, denied as to EFG. As to Mr Guerin, paragraph 15A above is repeated. As to Mr Diriberry, he sought to discharge his obligations, reasonably relying on Mr Guerin to provide him with honest and accurate information about the beneficial owners of accounts and the rationale for fund transfers. Otherwise, paragraph 273 is not admitted. *Inter alia*, no admissions are made as to whether unidentified transactions bore unidentified "hallmarks of corruption and money-laundering" as alleged in paragraph 273(d), pending proper particularisation of PIFSS' case in that regard.

As to paragraph 273:

(1) It is denied that Mr Guerin acted dishonestly if (which is not admitted) he permitted unlawful Secret Commissions to be successfully paid to Mr Al Rajaan either under the Further Nasrallah Scheme or other pleaded schemes.

(2) Paragraph 273 is otherwise not admitted.

**Alleged liability for money laundering**

73A. As to paragraph 273A:

(1) EFG pleads to paragraph 74 in paragraph 40 above.

(2) No admissions are made as to any alleged money laundering by Mr Guerin. In any event, Mr Guerin was not a governing body of EFG at any material time and/or acting as such, and EFG accordingly has no primary liability for his alleged wrongs. Paragraph 7A(3)(a) above is repeated.

(3) It is denied that Mr Diriberry committed any offence of money laundering as alleged or at all. Paragraphs 69A to 69I above are repeated.

106

73B.  As to paragraphs 273B to 273D:

    (1)    No admissions are made as to any alleged unlawful acts committed by Mr Guerin. It is denied that Mr Diriberry committed any unlawful act.

    (2)    Article 102(2) SPC only came into effect on 1 October 2003. Further, it is a criminal attribution norm and cannot found civil liability.

    (3)    Without prejudice to that position:

        (a)    it is denied that EFG failed to take all necessary and reasonable organisational measures to prevent unlawful money laundering; and

        (b)    in particular, (i) neither paragraph 273D nor the Further Information served by PIFSS on 22 July 2024 accurately state the requirements of Swiss banking regulatory law at the relevant time; (ii) it is denied that EFG failed to comply with any relevant requirement in any material respect; alternatively, (iii) it is denied that such failure entailed a failure to take necessary and reasonable organisational measures.

        (c)    If, contrary to the above, Mr Guerin and/or Mr Diriberry committed offences of money laundering, and EFG failed to take any particular necessary and reasonable organisational measures to prevent unlawful money laundering, that failure did not cause any loss to PIFSS. On that premise, Mr Guerin and/or Mr Diriberry will have deliberately and dishonestly sought to evade EFG's internal controls. None of the organisational measures relied on by PIFSS could or would have prevented such deliberate and dishonest wrongdoing.

    (4)    Paragraph 273C is not understood. As to the first sentence, if PIFSS fails to make out its case against Mr Diriberry, its (failed) allegations are not material to Article 102(2) SPC. The requirement alleged in the second sentence is not particularised. As to the requirements of Swiss banking regulatory law, paragraphs 40 to 43 are repeated. EFG will rely on its

internal policies for their full terms, meaning and effect. In any event, such a requirement does not support any allegation of attribution pursuant to Article 102(2) SPC.

73C. Further, and as to paragraphs 273D(b) and 273D(c) specifically (without prejudice to paragraphs 73A and 73B above):

(1) It is admitted that a World-Check search undertaken on 28 October 2009 identified Mr Al Rajaan as a PEP. An earlier World-Check search undertaken on 5 February 2008 yielded no matches.

(2) Mr Al Rajaan, Mr Nasrallah, Phoenix, Ozak, Wynacre, Golgen, Nadim Nasrallah and PIB were High Risk Clients, not PEPs, as a matter of Swiss law and regulation and/or in any event under EFG's policies, and were properly classified as such by EFG.

**Liability**

*EFG and Mr Guerin*

*Kuwaiti law*

74 Paragraph 278 is denied. Pending particularisation of PIFSS' case on liability under Kuwaiti law, EFG responds as follows:

(1) The law governing PIFSS' claims is Swiss law (and in the case of claims subject to the principles of double actionability, also English law) and not the law of Kuwait: paragraph 26 above is repeated.

(2) PIFSS' reference to "*Articles 35 to 39 of the Penal Code*" is assumed to be a reference to Articles 35 to 39 of the Penal Code as amended by Law No. 31 of 1970, and EFG responds to paragraph 278 on this basis.

(3) If, contrary to EFG's primary case, Kuwaiti law applies to PIFSS' claims:

(a) EFG's claims under Kuwaiti law are time-barred to the extent set out in paragraph 54A above.

108

(b)    Further or alternatively, EFG:

   (i)    Is not liable as principal for any of the torts alleged whether on the basis alleged in paragraph 72B or at all; and

   (ii)    Is not vicariously liable for any alleged torts by Mr Guerin as set out in paragraph 76 below.

(ba)    In the absence of a criminal conviction of the relevant defendant, there is no civil liability in Kuwaiti law by reference to crimes and/or conduct giving rise to crimes.  Neither EFG nor Mr Guerin nor Mr Diriberry have been convicted of an offence in Kuwait.

(c)    As to alleged liability as principal under Article 227 by reference to offences under Articles 47 and 48 of the Penal Code in relation to breach by Mr Al Rajaan of Article 11 of the Public Property Law:

   (i)    Paragraphs 12(2) and 29(3) above are repeated.

   (ii)    There has been no relevant illicit act by EFG:

      1.    PIFSS is required to prove its claims against Mr Al Rajaan.

      2.    PIFSS is further required to prove that Mr Al Rajaan committed any alleged crime wholly or partially in the territory of Kuwait, for the purposes of Article 11 of the Penal Code (EFG not being alleged by PIFSS to have committed, and not having committed, any act in the territory of Kuwait).

      3.    The assistance alleged against EFG by PIFSS is assistance *after* Mr Al Rajaan's commission of any crime under Article 11 of the Public Property Law. Assistance *after* the commission of a crime does not give rise to accessory liability under Articles 47 or 48 of the

109

Penal Code. It was previously the subject of Article 49 of the Penal Code. Between 2008 and 2010, each of Articles 49(1), 49(2) and 49(3) was found to be unconstitutional by the Constitutional Court of Kuwait. Pursuant to Article 173(3) of the Kuwait Constitution, if the Constitutional Court finds that a law or executive regulation is unconstitutional, it is deemed to have never existed.

4. It is denied in any event that EFG is liable as an accessory under Article 47 and/or Article 48: see paragraphs 74A and 74B below.

(iii) Further or alternatively, such illicit act has not caused damage to PIFSS, as required by Article 227. It is not admitted that PIFSS has suffered loss and denied that any such loss was caused by any illicit act by EFG or for which EFG is liable.

(iv) Further or alternatively, EFG will rely on Article 233 of the Civil Code. In particular, each and/or all of the following were causes of PIFSS' loss beyond EFG's relevant control: (i) PIFSS' acts and omissions in failing adequately to supervise Mr Al Rajaan and/or investigate his activities sooner and/or more thoroughly and/or prevent him from carrying out the acts now alleged; (ii) Mr Al Rajaan's own acts, which are attributable to PIFSS and/or for which PIFSS is vicariously liable as set out in paragraph 15A(3) above; (iii) the alleged acts of Mr Nasrallah; and/or (iv) the alleged acts of other Defendants and/or third parties.

(v) Further or alternatively, EFG will rely on Article 234 of the Civil Code, as set out in paragraphs 86 and 87A(5) below.

110

(ca) As to alleged liability as principal under Article 227 by reference to offences under Articles 47 and 48 of the Penal Code in relation to breach by Mr Al Rajaan of Article 12 of the Public Property Law:

(i) Paragraphs 12(2), 29(3) and 74(3)(c) above are repeated.

(ii) There has been no relevant illicit act by EFG. Sub-paragraph (c) is repeated *mutatis mutandis* as to Article 12 of the Public Property Law.

(iii) Further or alternatively, such illicit act has not caused damage to PIFSS, as required by Article 227. It is not admitted that PIFSS has suffered loss and it is denied that any such loss was caused by any illicit act by EFG or for which EFG is liable.

(iv) Further or alternatively, EFG will rely on Articles 233 and/or 234 of the Civil Code. Sub-paragraph (c)(iv)-(v) are repeated *mutatis mutandis* as to Article 12 of the Public Property Law.

(d) As to alleged liability as principal under Article 227 by reference to offences under Articles 47 and 48 in relation to breaches by Mr Al Rajaan, Mr Nasrallah and Phoenix of Articles 35 to 39 of the Penal Code, sub-paragraphs (c)(i)-(v) above are repeated (including *mutatis mutandis* as to Mr Nasrallah and Phoenix).

(e) The reference to the payment of "*Secret Commissions*" under "*other pleaded Schemes*" is not understood. PIFSS does not allege that EFG was party to any scheme other than the alleged Further Nasrallah Scheme.

(f) Paragraph 278(b) is denied. Joint stock companies such as EFG are not subject to liability under the MLL 2002. Further, EFG had no such liability. No admissions are made as to whether any relevant funds were obtained from a crime. EFG's liability is otherwise denied. EFG did not launder funds; further or alternatively, did not

know that the relevant funds were obtained from a crime and did not intend to launder those funds.

74A. EFG is not liable as the perpetrator of a crime pursuant to Article 47 of the Penal Code:

(a)   Only civil servants, workers or employees entrusted with protecting the interests of a public institution can be the perpetrator of a breach of Article 11 of the Public Property Law. Accordingly, EFG cannot be liable as the perpetrator of this offence.

(b)   Only public servants can be the perpetrator of breaches of Articles 35 and 36 of the Penal Code as amended by Law No. 31 of 1970. Accordingly, EFG cannot be liable as the perpetrator of these offences.

(c)   It is denied, if it be alleged, that any liability arises under Article 38 of the Penal Code as amended by Law No. 31 of 1970. Article 38 provides only that there is no materiality threshold in the definition of a bribe.

(d)   Further or alternatively none of the acts attributed to EFG and/or Mr Guerin (which acts are denied as to EFG and not admitted as to Mr Guerin) amounted to:

(i)    the commission of (1) a crime, or (2) a component of a crime, such as to give rise to liability under Article 47(1) of the Penal Code; or

(ii)   assistance during the commission of a crime. Nor was EFG or (on the case in his Defence) Mr Guerin present at or near the commission of any of the alleged crimes to overcome any resistance or to strengthen the perpetrator's resolve. Accordingly, EFG is not liable under Article 47(2) of the Penal Code.

(e)   Further or alternatively, neither EFG nor (on the case in his Defence) Mr Guerin acted dishonestly, with knowledge that they were assisting or facilitating an unlawful scheme, or with the intention of assisting a crime or harming PIFSS' interests.

112

74B. EFG is not liable as the aider or abettor of a crime pursuant to Article 48 of the Penal Code. None of the acts of EFG and/or Mr Guerin alleged by PIFSS (which are denied as to EFG and not admitted as to Mr Guerin) amounted to:

(a) incitement to commit a crime; further or alternatively, none of the alleged crimes of Mr Al Rajaan, Mr Nasrallah and/or Phoenix were committed based on incitement by EFG and/or Mr Guerin. Accordingly, EFG is not liable pursuant to Article 48(1) of the Penal Code.

(b) entering into an agreement to commit a crime; alternatively, none of the alleged crimes of Mr Al Rajaan, Mr Nasrallah and/or Phoenix were committed based on an agreement entered into by EFG and/or Mr Guerin. Accordingly, EFG is not liable pursuant to Article 48(2) of the Penal Code.

(c) assistance of Mr Al Rajaan, Mr Nasrallah and/or Phoenix in the preparatory steps to a crime; alternatively, neither EFG nor (on the case in his Defence, which is not admitted) Mr Guerin knew that they were assisting a crime or crimes; alternatively, none of the alleged crimes of Mr Al Rajaan, Mr Nasrallah and/or Phoenix were committed as a result of the assistance of EFG and/or Mr Guerin. Accordingly, EFG is not liable pursuant to Article 48(3) of the Penal Code.

(d) Further or alternatively, neither EFG nor (on the case in his Defence) Mr Guerin acted dishonestly, with knowledge that they were assisting or facilitating an unlawful and corrupt scheme, or with the intention of assisting a crime or harming PIFSS' interests.

*Swiss law*

74C. Paragraph 278A is denied. Without limiting the generality of the foregoing:

(1A) PIFSS' claims under Swiss law are time-barred. Paragraphs 50 to 54AC above are repeated.

113

(1)   Paragraph 44(2) and (3) are repeated:  Mr Guerin was not a formal, factual or apparent governing body or officer of EFG at any material time or acting within the scope of any functions as such.

(2)   In the premises, if, contrary to his Defence, Mr Guerin acted in breach of Article 41 SCO, EFG is not in any event liable for his acts and omissions pursuant to Article 55 of the Swiss Civil Code.

(3)   Mr Diriberry has not committed any criminal or civil wrong, as alleged or at all; accordingly, EFG cannot be jointly liable under Article 50 SCO.

(4)   The requirements of the criminal offence of money-laundering are not established. Paragraphs 39G(1), 39G(3) and 39G(4) above are repeated.

(5)   The requirements of a civil claim based on the criminal offence of money laundering are not established. Paragraphs 39F(3), 39G(2), 39G(3) and 39G(4) are repeated.

*English law*

75   Paragraph 279 is denied:

(1)   PIFSS' claims against EFG are governed by Swiss, not English, law.

(2)   PIFSS' claims under English law are time-barred: paragraph 55 above is repeated. In its Re-Re-Amended Reply, PIFSS seeks to rely on section 32(1)(b) Limitation Act 1980. PIFSS cannot rely upon section 32(1)(b) because PIFSS had knowledge of, or could with reasonable diligence have discovered, the relevant matters more than six years prior to issuing the claim. EFG relies upon paragraph 76B to 76L below and the additional facts and matters at paragraph 151.3B of the Man Defence.

(3)   EFG is not liable as principal for bribery (whether as joint tortfeasor or at all) and/or in dishonest assistance in breach of fiduciary duty.

(a)   The alleged unlawful and corrupt schemes are not admitted.

114

(b)    Paragraph 15A above is repeated in respect of Mr Guerin's alleged involvement in those schemes. If, contrary to his Defence, he acted as alleged in the ~~RRRRACPOC~~ 6RACPOC, his acts and omissions, knowledge and intention are not to be attributed to EFG for the purposes of primary liability under English law. *Inter alia*, he was not, at any time, EFG's directing mind or will or a member of its management team; and if he acted as alleged, he acted outside any authority from EFG.

(c)    Mr Diriberry has not committed any criminal or civil wrong, as alleged or at all.

~~EFG's non-admission of Mr Guerin's/EFG's assistance or facilitation of the alleged unlawful and corrupt schemes, neither EFG nor Mr Guerin at any time acted dishonestly or with knowledge that they were assisting or facilitating an unlawful and corrupt scheme, or with the intention of doing so.~~

**Secondary/vicarious liability**

76.    Paragraph 280 is denied:

(1)    ~~P~~paragraphs 15A, 74 and 75 above are repeated.

(2)    PIFSS' claims against EFG founded on secondary liability are time-barred by dates unknown prior to full consideration of PIFSS' disclosure herein and/or PIFSS' corrective evidence to be served as set out in its Note to the Court dated 4 October 2023, but no later than as follows:

(a)    Under Swiss law, no later than 2016, alternatively 26 July 2017 (when PIFSS was granted access to the files from the Swiss criminal investigation) or a reasonable period thereafter, alternatively July 2018, alternatively December 2018, and in any event no later than 11 March 2019 (i.e. prior to the issue of these proceedings), and/or (i) 25 March 2021, the date on which PIFSS is deemed to have

115

introduced its original Swiss law claims by way of amendment; (ii) 5 June 2024, pursuant to the Order of 30 July 2024; (iii) alternatively, such date as on which PIFSS is deemed to have introduced its most recent claims: paragraphs 39J(2)(b), 39O, 39P and 45-54 are repeated;

(b) Under Kuwaiti law, as set out in paragraph 54A above; and

(c) Under English law, no later than 2016, alternatively 26 July 2017 (when PIFSS was granted access to the files from the Swiss criminal investigation) or a reasonable period thereafter, alternatively July 2018, alternatively December 2018, and in any event no later than 11 March 2019 (i.e. prior to the issue of these proceedings): paragraph 55 is repeated.

(3) Further or alternatively, PIFSS is required to prove both that Mr Guerin acted as alleged in the ~~RRRRACPOC~~ 6RACPOC and that his actions give rise to any primary liability on his part as alleged in the ~~RRRRACPOC~~ 6RACPOC. *Inter alia*, PIFSS is required to prove that Mr Guerin:

(a) Instigated, jointly perpetrated or assisted in criminal mismanagement of PIFSS' property (which is not admitted) contrary to Article 158 SPC;

(b) Jointly perpetrated or assisted in the bribing of a foreign public official (which is not admitted) contrary to Article 322 *septies* SPC; and/or

(c) Laundered (which is not admitted) in breach of Article 305 *bis* SPC. *Inter alia*: (i) no admissions are made as to any relevant predicate offence, or any loss caused thereby; (ii) no admissions are made as to Mr Guerin's alleged acts or aims; (iii) no admissions are made as to any omissions by Mr Guerin, and in any event no liability would attach to such omissions in circumstances in which Mr Guerin is not within Article 29 SPC.

116

(4)    Further or alternatively, it is denied that EFG can be held vicariously liable for the acts of Mr Guerin under Swiss, Kuwaiti or English law in circumstances where PIFSS' claims against Mr Guerin are time-barred.

(5)    Further or alternatively, if, contrary to his Defence, Mr Guerin acted as alleged in the ~~RRRRACPOC~~ 6RACPOC, EFG is not vicariously liable for his conduct.

    (a)    As regards Kuwaiti law, inter alia:

        (i)    the wrongdoing alleged in respect of Mr Guerin occurred at the request or direction of or with the intervention of Mr Al Rajaan (acting personally and/or through Mr Nasrallah and/or Nadim Nasrallah, and whose knowledge and actions are attributed to PIFSS and/or for which PIFSS is vicariously liable), and/or Mr Al Rajaan knew that Mr Guerin was exceeding the functions of his employment or that he was working on behalf of himself rather than on behalf of his employer, EFG, and/or Mr Al Rajaan was otherwise a partner to Mr Guerin in causing the fault; and/or

        (ii)    PIFSS has not sustained damage by reason of any conduct of Mr Guerin.

    (b)    As regards Swiss law, inter alia:

        (i)    it is denied that Mr Guerin was acting in the performance of his work for EFG;

        (ii)    in any event, EFG took all due care in selecting, instructing and supervising Mr Guerin; and/or

        (iii)    if, which is denied, PIFSS has sustained loss or damage by reason of any conduct of Mr Guerin in the performance of his work, that damage would have occurred even if all due care had been exercised.

117

(c)    Further or alternatively, as regards English law, *inter alia*:

(i)    Mr Guerin was not authorised by EFG to do the acts alleged in the ~~RRRRACPOC~~ 6RACPOC, and his wrongful conduct was not done in the ordinary course of his employment; and

(ii)    Mr Guerin was not acting in the interests of EFG.

## CHAIN OF CAUSATION / CONTRIBUTORY FAULT

76A.  Further:

(1)    PIFSS' own actions broke the chain of causation. If (which is not admitted) PIFSS has suffered loss, such loss was caused by PIFSS' failure adequately to monitor, supervise, investigate and/or challenge Mr Al Rajaan's activities to discover and/or prevent his continued wrongdoing;

(2)    Alternatively, PIFSS consented and/or contributed to the damage it now claims against EFG,

such that any compensation for which EFG would otherwise be liable falls to be extinguished (or reduced) as set out in paragraphs 88A(3)-(5) and 88C(6)(b) below.

76B.  PIFSS was or should have been aware of Mr Al Rajaan's wrongdoing, or the risk thereof, by dates unknown pending further disclosure and witness evidence from PIFSS, including the corrective evidence to be served by PIFSS further to its Note to the Court of 4 October 2023, but which are inferred to have been throughout the period of its claim. By way of example and without limitation, PIFSS had such knowledge or should have had such knowledge:

(1)    By no later than in or around 2000/2001, when *inter alia* there appear to have been persistent rumours in Kuwait that Mr Al Rajaan was receiving payments from third parties and the Kuwaiti Parliament opened an investigation into Mr Al Rajaan's conduct; alternatively

118

(2)    By no later than 2008, when *inter alia* PIFSS' Deputy Director General and Board member Dr Fahad Al Rajaan sought to meet with Kuwaiti Minister of Finance/PIFSS' Chairman, Mustafa Jassim Al Shamali, to discuss commissions allegedly paid to PIFSS' leader (i.e., it is inferred, to Mr Al Rajaan), and complained to the Kuwaiti public prosecutor alleging that Mr Al Rajaan had exploited his position to obtain illegal commissions; and in any event

(3)    On an ongoing basis thereafter.

76C.   Had PIFSS taken any material and/or adequate steps to monitor, supervise, investigate and/or challenge Mr Al Rajaan's activities, on or by such dates, to discover and/or prevent such wrongdoing (including without limitation by suspending and/or otherwise removing Mr Al Rajaan from the position of Director General and/or undertaking full and/or adequate investigations into his conduct, and/or monitoring his conduct and/or seeking confirmation of commissions paid directly from product providers), *inter alia*, no further alleged secret commissions would have been paid to Mr Al Rajaan and Mr Al Rajaan would not have been in a position to influence PIFSS' investment decisions by reference to such alleged secret commissions.

76D.   Pending further disclosure and witness evidence, EFG relies in particular on:

(1)    The number of corrupt and unlawful schemes allegedly perpetrated by Mr Al Rajaan;

(2)    The length of time over which the corrupt and unlawful schemes were allegedly perpetrated by Mr Al Rajaan;

(3)    The overall amount of Secret Commissions allegedly received and volume of investments controlled by Mr Al Rajaan; and

(4)    The further facts and matters below, and those set out in the Man Defence paragraph 182.2(a)-(c).

76E.   As to the position in or around 2000/2001:

(1)    On its own case in paragraph 12 of the ~~RRRRACPOC~~ 6RACPOC, PIFSS entrusted Mr Al Rajaan with *"substantial control and/or influence over decisions as to how PIFSS' assets should be invested"*; his ability to decide on investments was *"without material challenge or scrutiny"*; and the relevant sub-committee *"operated at all material times under his sole control"*.

(2)    By around 2000, allegations were being made to the effect that certain investments made by PIFSS in 1988/1989 involved wrongdoing by Mr Al Rajaan, on the account given in a letter from Mr Al Rajaan's then-solicitors dated 28 November 2017 (the "**Gherson Letter**") (exhibited to the First Witness Statement of Mohan Bhaskaran of Stewarts Law LLP).

(3)    Further, *"PIFSS knew that certain banks and other financial institutions were transferring monies to Mr Al Rajaan"*; there were *"persistent rumours (from at least 2001) that Mr Al Rajaan was receiving payments from third parties"*; and it was evident and widely known in Kuwait that Mr Al Rajaan could not afford his lifestyle from his PIFSS public servant salary alone, on Mr Al Rajaan's case in paragraphs 4.8, 12.2 and 36AA.6 of his Amended Defence dated 3 August 2021 (the "**Al Rajaan Defence**").

(4)    The Kuwaiti Parliament opened an investigation into Mr Al Rajaan in 2001, on the account in paragraph 4.10 of the Al Rajaan Defence.

(5)    Questions were repeatedly asked in the Kuwaiti Parliament about PIFSS' management of funds, auditing arrangements, and transfers into the account of one of PIFSS' leaders. These questions were raised by various members of Parliament, including by Awad Al Enezi in 2000; and Walid Al Tabtabaei in 2001. In particular:

(a)    In 2001, Dr Al Tabtabaei specifically referred to Mr Al Rajaan's decision-making about investments and illicit transfers into the bank account of one of PIFSS' leaders.

120

(b)    Indeed, on PIFSS' own account in paragraph 51 of its Reply, *"Prior to 2008 allegations made in the Kuwaiti Parliament were communicated to PIFSS that Mr. Al Rajaan had received secret commissions through a company owned or controlled by him called the Ralmin Trust in the sum of c. US$5.5 million in relation to investments that Mr. Al Rajaan had led PIFSS to make in 1988 and 1989"*.

(6)    The Speaker of the Kuwaiti Parliament drew these questions to the attention of the Minister of Finance, who was also the Chairman of PIFSS, (including in a letter dated 13 November 2001).

(7)    The media in Kuwait repeatedly investigated and reported on wrongdoing at PIFSS. In particular, the Nation newspaper specifically reported on the questions asked in Parliament, and the Al Qabas newspaper specifically asked PIFSS about bank account number 221100901062 in connection with wrongdoing.

(8)    In 2016, Mr Al Rajaan was convicted in Kuwait of gross negligence, in relation to his role in procuring PIFSS to enter into certain US share option investments between 1995 and 1997. Allegations were made against Mr Al Rajaan in 2000 and were investigated by members of the Kuwaiti Parliament in 2001. It is to be inferred that PIFSS was aware of the allegations relating to the share option investments by 2000, alternatively before 2012.

76F.    Despite the above, PIFSS failed to take any material and/or adequate steps to monitor, supervise, investigate and/or challenge Mr Al Rajaan's activities to discover and/or prevent his wrongdoing. Had it done so (including for example but without limitation by undertaking full and/or adequate investigations, or suspending or otherwise removing Mr Al Rajaan from the position of Director General and/or monitoring his conduct and/or seeking confirmation of commissions paid directly from product providers), *inter alia*, no further alleged

121

secret commissions would have been paid to him, and he would not have been in a position to influence PIFSS' investment decisions by reference to the same.

76G. As to the position by 2008, and in addition to the matters above:

(1) The Kuwaiti Parliament opened further investigations into Mr Al Rajaan in 2005, and 2006, on the account in paragraph 4.10 of the Al Rajaan Defence.

(2) Further questions were repeatedly asked in the Kuwaiti Parliament about PIFSS' management of funds, auditing arrangements, and transfers into the account of one of PIFSS' leaders (i.e., it is inferred, Mr Al Rajaan). These questions were raised by various members of Parliament, including by Awad Al Enezi in 2005; Walid Al Tabtabaei in 2010; and Ahmed Al Mulaifi in 2006, 2007, and 2008. In particular:

(a) In 2006, Mr Al Mulaifi specifically asked about the receipt of commissions by one of PIFSS' leaders through specific entities (including Faberge Properties and Ralmin Trust) and bank accounts (including account numbers 22110090106 and 402049.81), PIFSS' auditing arrangements, and the selection of KPMG as its auditor.

(b) In 2007, Mr Al Mulaifi specifically asked about suspicions against a particular PIFSS official and the appropriateness of that official being involved in the selection of KPMG to audit PIFSS.

(c) In 2008, Mr Al Mulaifi specifically asked about PIFSS' auditing arrangements, and the selection of KPMG as its auditor.

(d) In 2010, Dr Al Tabtabaei specifically asked about transfers into the account of one of PIFSS' leaders and suspicions of the misuse of public funds.

(e) Indeed, on PIFSS' own account in paragraph 51 of its Reply, *"Prior to 2008 allegations made in the Kuwaiti Parliament were communicated to PIFSS that Mr. Al Rajaan had received secret*

122

*commissions through a company owned or controlled by him called the Ralmin Trust in the sum of c. US$5.5 million in relation to investments that Mr. Al Rajaan had led PIFSS to make in 1988 and 1989".*

(3)  The Speaker of the Kuwaiti Parliament repeatedly drew these questions to the attention of the Minister of Finance who was also the Chairman of PIFSS (including in further letters dated 31 July 2006, 2 December 2007, 2 July 2008, 20 July 2008, and 24 February 2010). In turn, the Minister of Finance repeatedly drew these questions to the attention of PIFSS (including in letters dated 5 August 2006 and 27 September 2006).

(4)  The media in Kuwait repeatedly investigated and reported on wrongdoing at PIFSS. In particular, the Nation newspaper specifically reported on the questions asked in Parliament, and the Al Qabas newspaper specifically asked PIFSS about bank account number 221100901062 in connection with wrongdoing.

(5)  In 2007, the Minister of Finance who was also the Chairman of PIFSS arranged a meeting of the PIFSS board to discuss the appointment of an auditor to investigate accusations made against a leader of PIFSS (i.e., it is inferred, Mr Al Rajaan).

(6)  In late 2007/early 2008, PIFSS made arrangements for the appointment of KPMG to conduct an investigation into the allegations made against Mr Al Rajaan including those raised by Mr Al Mulaifi. However:

(a)  Mr Al Rajaan himself was permitted to be involved in engaging KPMG and arranging the KPMG investigation.

(b)  The main KPMG partner instructed on the investigation had worked at PIFSS' investment accounting department during the period for which investments were being investigated.

123

(c)    PIFSS narrowed the scope of the KPMG investigation by limiting KPMG's terms of reference to (for example) checking the mathematical accuracy of certain schedules and that certain authorised persons had signed the right documentation, and preventing the broad information gathering exercise initially proposed (which would, *inter alia*, have entailed meeting with members of the Kuwaiti Parliament who had raised concerns, as well as potential digital evidence recovery). In consequence, KPMG's report was limited to four pages; did not refer to Mr Al Rajaan or the allegations against him; and was explicitly stated not to amount to an audit in compliance with the relevant accounting standards.

(d)    Concerns about how KPMG had been engaged and/or the scope of its investigation were raised by Dr Fahad Al Rashed, Deputy Director General of PIFSS, at PIFSS board meetings and in correspondence with the Minister of Finance and Chair of PIFSS in 2008; Mr Al Mulaifi and Mr Ashour, members of Parliament, in questions submitted in 2008; and subsequently the Kuwaiti public prosecutor in the course of its investigation.

(6A)    In his autobiography, Mr Al Mulaifi stated that Mr Al Humaidhi was under pressure from members of Parliament not to cooperate fully with ongoing Parliamentary investigations, and that the *"the Minister acquiesced to this pressure… he evaded the question, took responsibility, bought more time, and succumbed to the pressure exerted on him from within the Council"* and assigned responsibility for KPMG's investigation to Mr Al Rajaan himself.

(7)    On 22 January 2008, Dr Fahad Al Rashed, Deputy Director General of PIFSS and a member of PIFSS' board, asked the Kuwaiti Minister of Finance/PIFSS' Chairman, Mustafa Jassim Al Shamali, for a board meeting to discuss commissions allegedly paid to PIFSS' leader (i.e., it is inferred, Mr Al Rajaan).

124

(8)   On 25 September 2008, Dr Al Rashed made a complaint to the Kuwaiti Public Prosecutor alleging that Mr Al Rajaan was in breach of Kuwait's laws for the protection of public property, specifically alleging that he had exploited his position to obtain illegal commissions. Dr Al Rashed specifically drew the Kuwaiti Public Prosecutor's attention to the allegations made against Mr Al Rajaan in Parliament including some of the specific entities and bank account numbers identified by Mr Al Mulaifi.

(9)   Following Dr Al Rashed's complaint, a prosecution was commenced against Mr Al Rajaan in 2008 in relation to alleged receipt by him of hidden commissions from fund managers in relation to the management of funds invested in by PIFSS between 1998 and 2005. The Kuwaiti Public Prosecutor notified PIFSS of the investigation and sought information from it, including in letters dated 30 December 2008, 22 June 2009, 9 October 2009, 22 October 2009, and 28 May 2012.

76H.   Despite the above, PIFSS still failed to take any material and/or adequate steps to monitor, supervise, investigate and/or challenge Mr Al Rajaan's activities to discover and/or prevent his wrongdoing. Had it done so (including for example but without limitation by undertaking full and/or adequate investigations, or suspending or otherwise removing Mr Al Rajaan from the position of Director General and/or monitoring his conduct and/or seeking confirmation of commissions paid directly from product providers), *inter alia*, no further alleged secret commissions would have been paid to him, and he would not have been in a position to influence PIFSS' investment decisions by reference to the same.

76I.   Further and in particular, had PIFSS instructed and/or permitted KPMG to conduct a full and appropriate investigation into the allegations, rather than limiting KPMG's terms of reference as set out above, Mr Al Rajaan's activities would have been discovered and/or PIFSS would have suspended or otherwise removed Mr Al Rajaan from the position of Director General and/or would have monitored his conduct and/or sought confirmation of commissions paid directly from product providers. In the premises, *inter alia*, no further alleged secret

125

commissions would have been paid to him, and he would not have been in a position to influence PIFSS' investment decisions by reference to the same.

76J.  As to the position since 2008, and in particular:

(1A)  In his autobiography, Mr Al Mulaifi stated that he *"continued to follow up the matter* (i.e. allegations against Mr Al Rajaan) *with the new Minister of Finance, Mr Mustafa Al Shamali",* and that Mr Al Shamali was removed from office in May 2012 after *"a questioning session led by opposition lawmakers over alleged financial irregularities in departments he oversees".*

(1)  On 14 June 2011, the Kuwaiti Public Prosecutor made a request for mutual legal assistance to the Swiss authorities for the purposes of the criminal investigation into *inter alia* Mr Al Rajaan. A further request was made on 11 April 2012.

(2)  On 27 July 2011, the PIFSS board held an emergency meeting after the Kuwaiti Audit Bureau identified serious financial irregularities and administrative violations.

(3)  On 1 May 2012, the Swiss Attorney General opened an investigation into Mr Al Rajaan and his wife. PIFSS has supported and assisted that investigation since at least 2015.

(4)  On 21 May 2012, Mr Al Rajaan was suspended from the role of Director General of PIFSS by the Prime Minister and Minister of Finance. In the same month, he was prohibited from leaving Kuwait. On 4 September 2012, the suspension was renewed for a further three months. Nonetheless, PIFSS reinstated Mr Al Rajaan in or around April 2013.

(5)  In 2012, Pictet sent Sheikh Al Sabah a copy of the Swiss prosecutor's Ordinance by which the prosecutor sought information from Pictet concerning accounts held at Pictet, including by PIFSS, in connection with

126

a Swiss criminal investigation into money-laundering under Article 305 SPC.

(6) At some point prior to 23 November 2012, Mr Al Sabah requested certain documents in relation to the Swiss prosecutor's investigation of Mr Al Rajaan. Under cover of a letter dated 23 November 2012, Pictet disclosed some of its correspondence with the prosecutor which showed that PIFSS' bank accounts were the subject of the investigation.

(7) On PIFSS' own account in paragraph 54(b) of its Reply, PIFSS began an investigation in around 2014 into internal governance issues involving a fund in respect of which Mr Al Rajaan is alleged to have earned secret commissions. Mr Al Rajaan departed from PIFSS that same year.

(8) On 23 September 2014, Mr Hamad Al Humaidhi (at the time PIFSS' Director General) was made aware at a meeting held with Jacques de Saussure (Chair of the Board of Directors of Pictet) and Marc Pictet (CEO of Pictet) in Kuwait that PIFSS' *"former senior officer"* may have had an economic interest in payments made by Pictet to third party business introducers.

(9) On 5 November 2014, the Swiss courts dismissed objections to Kuwait's request for mutual legal assistance. Less than two weeks later, on 14 November 2014, Mr Al Rajaan fled Kuwait.

(10) On 27 January 2015, PIFSS was formally invited to join the Swiss proceedings against Mr Al Rajaan as a victim. PIFSS did so on 16 March 2015.

(11) On 19 February 2015, the Kuwaiti Public Prosecutor made a request for mutual legal assistance to the UK authorities for the purposes of the criminal investigation into Mr Al Rajaan.

(12) In a letter from Mirabaud to PIFSS dated 21 April 2015, Mirabaud stated that Mr Al Rajaan had been compensated by a Mirabaud group company

127

and that its representative understood that this personal remuneration was known about by PIFSS.

(13)    On the account given in the Gherson Letter, the Kuwait Public Prosecution charged Mr Al Rajaan in November 2015 with "gross negligence" in relation to his role in procuring PIFSS to enter into certain US share option investments between 1995 and 1997. In the event, Mr Al Rajaan was convicted in his absence on 28 April 2016.

76K.    Throughout this period, PIFSS <u>still</u> failed to take any material and/or adequate steps to monitor, supervise, investigate and/or challenge Mr Al Rajaan's activities to discover and/or prevent his wrongdoing. Had it done so (including for example but without limitation by undertaking full and/or adequate investigations, or suspending him prior to May 2012 and/or continuing such suspension rather than reinstating Mr Al Rajaan to the position of Director General, and/or monitoring his conduct and/or seeking confirmation of commissions paid directly from product providers), *inter alia*, no further alleged secret commissions would have been paid to him, and he would not have been in a position to influence PIFSS' investment decisions by reference to the same.

76L.    PIFSS' failure to take any material and/or adequate steps to monitor, supervise, investigate and/or challenge Mr Al Rajaan's activities to discover and/or prevent his wrongdoing reflected and was consistent with its lack of adequate governance and control structures and procedures. Without limitation:

(1)    The 2015 EY review of PIFSS' investment governance structure (the "**EY Review**") noted that PIFSS had *"substantial governance gaps"* and required *"urgent attention and a fundamental transformation on many levels"* in order to *"Stop The Bleed"* (and it is inferred, for the avoidance of doubt, that PIFSS did have the failings and omissions identified in the EY Review and lacked control frameworks and functions as there set out). Without limitation, the EY Review noted that:

128

(a) PIFSS lacked effective control frameworks and functions, including lacking governance and compliance functions and lacking effective internal audit and risk management functions;

(b) PIFSS' board exercised no oversight of major investment decisions, had no direct role in maintaining the governance and control environment, and met randomly and infrequently;

(c) PIFSS lacked governance policies including a code of conduct and conflict of interest policy;

(d) PIFSS lacked a compliance framework and systematic management and monitoring of compliance responsibilities;

(e) PIFSS had no approved investment policy, framework or strategy, and did not justify or document investment decisions or ensure appropriate segregation between front and back offices;

(f) PIFSS suffered from *"higher operational risks (eg. Fraud)"*;

(g) PIFSS fell materially short on all of the seven *"key dimensions"* and 40 *"investment framework criteria"* assessed by EY;

(h) PIFSS ranked the lowest of comparable peer institutions on almost all criteria used by EY; and

(i) the State Audit Bureau had raised significant concerns which were unresolved by PIFSS.

(2) On PIFSS' own case, in the First Witness Statement of Ms Al Dakheel dated 17 September 2024:

(a) Mr Al Rajaan was the only person involved in choosing investments and deciding how much would be invested, and new investments and relationships only came through him; other employees were

129

criticised if they recommended new investments, and he was the only individual within PIFSS with any oversight of its business; and

(b)     Mr Al Rajaan controlled the Internal Investment Committee without further scrutiny or challenge.

76M. Further or alternatively, in each of the respects set out in paragraphs 76B to 76L above, PIFSS failed to mitigate its loss, whether under Kuwaiti, Swiss or English law.

## RECOVERED ASSETS

76N. The State of Kuwait has recovered assets and funds from the First and Second Defendants with a value understood to be not less than US$658 million (the "**Recovered Assets**"). The State of Kuwait has also frozen assets and funds (the "**Frozen Assets**"). The precise value of the Recovered Assets and the Frozen Assets is unknown to EFG prior to adequate disclosure herein. However, and without limitation:

(1)     On or about 19 January 2011 Switzerland restrained assets of the First and Second Defendants in the value of approximately US$100 million in response to a request for mutual legal assistance from the State of Kuwait.

(2)     On 5 March 2015 on the application of the Director of Public Prosecutions under the POCA 2002 (External Requests and Orders) Order 2005 pursuant to an external request from the State of Kuwait, HH Judge Clarke QC froze approximately US$23,500 standing to the credit of accounts held by or for the benefit of the First and Second Defendants at Al Ahli Bank, London branch.

(3)  PIFSS itself asserted in a response under CPR Part 18 dated 15 December 2023 that Kuwait had collected KWD 131 million (i.e. US$427 million[1]) in Recovered Assets as at that date.

(4)  Kuwait asserted to the Crown Prosecution Service of England and Wales (the "**CPS**") in a memorandum dated 23 May 2024 that it had recovered (i) KWD 85,943,945.041 (i.e. US$280,450,502.42[2]) in Kuwait; and (ii) KWD 44,989,035.736 (i.e. US$146,807,290.14[3]) in Bahrain.

(5)  The press reports and other documents listed in Appendix 8 suggest that the State of Kuwait has in fact recovered assets and funds with a value over US$658.36 million (i.e. KWD 201.75 million[4]) and it is inferred that such reporting is accurate.

76O. Kuwait continues to pursue further recoveries. Without limitation, the KPP asserted to the CPS in a memorandum dated 2 May 2024 that requests for legal assistance have been sent to 12 (unidentified) countries, believed to include the USA, France, the Bahamas, Thailand, Singapore, the BVI, Liechtenstein, China, and Lebanon.

76P. EFG has sought information and disclosure in relation to the Recovered Assets and the pursuit of further recoveries, not only from PIFSS by letter to PIFSS' solicitors dated 26 July 2024 but also directly by letters dated 6 August 2024 to the Kuwaiti Attorney General, the Kuwaiti Minister of Justice and the Director of the Department of Legal Advice and Legislation, and by letter to the solicitors to the First and Second Defendants dated 20 August 2024. PIFSS has not provided material disclosure in that regard and the Kuwaiti Attorney General, the Kuwaiti Minister of Justice and the Director of the Department of Legal

---

[1] Xe.com exchange rate as at 13 October 2024, KWD1 = US$3.2631793.

[2] Xe.com exchange rate as at 13 October 2024, KWD1 = US$3.2631793.

[3] Xe.com exchange rate as at 13 October 2024, KWD1 = US$3.2631793.

[4] Xe.com exchange rate as at 13 October 2024, KWD1 = US$3.2631793.

131

Advice and Legislation, have not substantively responded to EFG's correspondence.

76Q. To the best of EFG's knowledge and understanding:

(1)     The Recovered Assets have been confiscated pursuant to the judgment of the Criminal Court of First Instance dated 27 June 2019 in case number 1499/2008 which centred on alleged wrongdoing by Mr Al Rajaan with the alleged assistance of Mirabaud & CIE SA ("**Claim 1499/2008**"; the "**2019 Criminal Judgment**").

(2)     By the 2019 Criminal Judgment the Kuwaiti Criminal Court ordered:-

(a)     Restitution of US$82.2 million said to represent secret commissions received by Mr Al Rajaan pursuant to the Mirabaud Scheme;

(b)     The payment of fines totalling US$312 million; and

(c)     Confiscation of property, companies, stocks and movable property used in committing the crime of money laundering.

(3)     The Recovered Assets significantly exceed the secret commissions of US$82.2 million alleged to have been paid pursuant to the Mirabaud Scheme.

(4)     The position of Kuwait as set out in Memoranda to the CPS dated 2 May 2023 and 29 April 2024 is that over and beyond the sum of US$82.5 million awarded by the Kuwaiti Criminal Court by way of restitution penalty, which sum is due to be paid over to PIFSS, the Kuwaiti State is entitled to confiscate any assets used in the wrongdoing at issue in the 2019 Criminal Judgment, regardless of their value, including assets which have been mixed with the proceeds of Mr Al Rajaan's alleged wrongdoing, assets substituted for those proceeds, and other benefits resulting from those proceeds.

132

(5)    In the premises, it is reasonable to infer that the Recovered Assets include assets and funds used in the other alleged Schemes, including the results of and/or substitutes for commissions alleged to have been paid under the alleged Schemes, and/or benefits resulting from those Schemes, *pro rata* to the secret commissions claimed in respect of each alleged Scheme.

## PIFSS is an emanation and/or privy of the State of Kuwait

76R.  PIFSS is an emanation and/or privy of the State of Kuwait. Without limitation:

(1)    PIFSS is a public institution, supervised by the Kuwaiti Ministry of Finance.

(2)    The Kuwaiti Minister of Finance is PIFSS' Chairman.

(3)    PIFSS' board include members nominated by the Minister of Finance.

(4)    PIFSS' budget is underwritten by the State of Kuwait.

(5)    PIFSS is represented by the Department of Legal Advice and Legislation in the State of Kuwait, including by Resolution of the Council of Ministers of Kuwait dated 19 January 2015 and/or mandate dated 12 March 2015.

(6)    PIFSS has worked and continues to work closely with the State of Kuwait in relation to criminal proceedings against the First and Second Defendants and their heirs in Kuwait including recoveries pursuant to the 2019 Criminal Judgment. It is inferred that this was and is in the expectation that PIFSS would receive the benefit of the Recovered Assets. *Inter alia:*

(a)    The KPP notified PIFSS of its investigation in relation to the First and Second Defendants and sought information, including by letters dated 30 December 2008, 22 June, 9 October, and 22 October 2009, and 28 May 2012.

133

(b)     PIFSS provided extensive documentation and assistance to the KPP in connection with such investigation. The 2019 Criminal Judgment records that the KPP relied, inter alia, on information provided by PIFSS' Director General and on PIFSS' investment files.

(c)     On a date unknown but prior to 13 April 2015, PIFSS Board of Directors decided to join the KPP's investigation into the First and Second Defendants as a civil party. Such decision was re-approved at a meeting on 13 April 2015.

(d)     Four senior present and/or former officers and/or employees of PIFSS gave evidence in support of the KPP at trial in Claim 1499/2008: Mr Hamad Mashari Al Hamaidi; Dr Al Rashed; Mr Salah Abdullateef Al Madhaf; and Dr Ayman Bader Al Baloushi.

(e)     PIFSS has participated since at least 2019 in a committee established by the Kuwaiti Minister of Finance to assist in obtaining recoveries pursuant to the 2019 Criminal Judgment.

76S.    Further, PIFSS is entitled to all or some Recovered Assets under Kuwaiti law (including but without limitation as a judgment creditor in respect of the restitution order described at paragraph 76Q(2)(a) above; by application to the Kuwaiti Criminal Court in respect of the Recovered Assets generally; and/or in any event, in that PIFSS is a public institution funded and controlled by the State of Kuwait and the State of Kuwait can credit such sums to PIFSS on request by PIFSS and/or otherwise).

76T.    In the premises, if and insofar as the Recovered Assets are presently held by emanations of the State of Kuwait other than PIFSS, they are to be treated in these Proceedings as available to PIFSS.

**The application of Recovered Assets in these Proceedings**

134

76U. Without prejudice to EFG's defences above, insofar as the claim against EFG rests on its alleged laundering of the proceeds of the Mirabaud Scheme, pursuit of at least that claim is barred, including by reason of the satisfaction of the restitutionary award referred to in paragraph 76Q(2)(a) above. Further or alternatively, PIFSS' claim falls to be reduced by a *pro rata* share of the Recovered Assets and/or any future recoveries, whether under Swiss, Kuwaiti or English law, including in that:

(1)    The amount of loss suffered by a claimant is to be assessed at the time when final judgment is delivered.

(2)    A claimant is not entitled to damages in excess of the effective amount of his loss, or to unjust enrichment or double recovery.

(3)    PIFSS being an emanation of the Kuwaiti state, the Recovered Assets are to be brought into account in assessing PIFSS' losses.

(4)    The same is necessary, consistently with the principle of good faith and to avoid an abuse of rights, whether under Kuwaiti (articles 30 and 197 of the Kuwaiti Civil Code) or Swiss law (article 2 of the SCC).

(5)    Under Swiss law, in that no civil liability lies under Article 41 SCO in respect of money laundering where the laundered assets have in fact been confiscated.

76V. If (contrary to the above) Swiss and/or Kuwaiti law permits double recovery in respect of the same loss or damage, those laws are manifestly contrary to English public policy and they fall to be disapplied in favour of English law pursuant to:

(1)    The common law principle recognised in *Kuwait Airways v Iraqi Airways (No 6)* [2002] 2 AC 883;

(2)    Section 14(3) of PILA; and/or

(3)    Article 26 of Rome II.

135

**<span style="color:green">Failure to Mitigate</span>**

<span style="color:green">76W. Further or alternatively, in circumstances in which PIFSS has taken no, alternatively no adequate, steps to obtain the Recovered Assets or any part thereof from the State of Kuwait, and/or in the circumstances set out in the Man Defence para 183B, PIFSS has:</span>

<span style="color:green">(1) failed to comply with its duty to mitigate, whether under Swiss law (Article 2(1) SCC), Kuwaiti law (Article 230 Kuwaiti Civil Code) or English law, and/or</span>

<span style="color:green">(2) caused or contributed to the damage claimed against EFG within the meaning of Articles 43 and/or 44 of the SCO and/or Articles 233 and/or 234 of the Kuwaiti Civil Code.</span>

**REMEDY**

**Principles of Kuwait law**

*<span style="color:red">Remedies under the Civil Code</span>*

77. As to paragraph 342, Article 247(1) of the Civil Code provides: *"The judge shall determine the compensation in the amount that is equivalent to the harm in line with Articles 230 and 231 of the Civil Code, with due consideration to the personal circumstances of the injured party."*

78. Save that Article 246(2) provides that at the request of the victim the judge may restore the parties to the position they were in prior to the unlawful act or make any other order, paragraph 343 is admitted. <span style="color:red">For the avoidance of doubt, Article 246(2) does not permit or provide for any order for "restitution" as alleged, but rather an order for compensation to restore the parties to the position they were in prior to the unlawful act, or other orders by way of compensation.</span>

79. Paragraph 344 <span style="color:red">(summarising Article 230 of the Civil Code)</span> is admitted as a materially accurate description of the provisions referred to therein <span style="color:red">save that the word "opportunity" should be translated as "gain".</span> <span style="color:green">Further, by Article 300, the</span>

136

alleged tortfeasor shall not be liable in damages for losses that the injured party could have avoided by making reasonable efforts.

80. Paragraph 345 is admitted to the extent that material harm within Article 230 of the Civil Code can include loss of reputation. It is denied that Article 230 permits compensation for ~~other~~ generalised non-financial "commercial harm" in the absence of either financial loss or foregone profit.

81. Paragraph 346 appears to be a typographical error. Paragraphs 346(a) and (b) summarise Article 230 (as already pleaded at paragraph 344), not Article 231.

82. Paragraph 347 summarises Article 231, not Article 232. Subject to the correction of that error (which EFG takes to be typographical), paragraph 347 is admitted save that:

   (1) Article 231 is concerned with moral (rather than material) harm.

   (2) A legal person cannot suffer moral harm or claim moral damages.

   (3) Article 231 is, accordingly, irrelevant to PIFSS' claim.

   (4) As a matter of Kuwaiti law, remedies under Articles 246 and 247 are strictly compensatory. They aim to restore the injured party to the position it was in before the unlawful act, rather than to deprive the wrongdoer of any gain or benefit.

83. Paragraph 348 is admitted.

*Remedies under the Public Property Law*

84. Paragraph~~s~~ 349 ~~and 350 are~~ is denied:

   (0) Paragraphs 12(2) and 29(3) above are repeated.

   (1) If, which is denied, EFG is liable to PIFSS under Articles 227 to 229 of the Civil Code, PIFSS' entitlement to relief is governed exclusively by the Civil Code. Paragraphs 12(2), 35(2) and ~~35(2)~~35(3) above are repeated.

137

(1A) In any event, as to the Public Property Law:

  (a)    Paragraphs 4 and 34 to 36 above are repeated.

  (b)    It is further denied that Article 22 of the Public Property Law (whether in isolation or in conjunction with Articles 227 to 229 of the Civil Code) permits any relevant injured party to recover (i) the "*value of the public property in question*"; and/or (ii) the value of unlawful benefits derived by a principal wrongdoer, in each case from a person who has participated in or assisted relevant wrongdoing under that Law, but has not received the relevant public property or benefits; and/or (iii) in any event, to so recover in addition to remedies under the Civil Code.

(2)    Article 49(3) of the Penal Code has no application: paragraph ~~29(3)~~ 74(3)(c)(iii)(3) above is repeated.

(3)    It is denied, if it be alleged, that PIFSS can rely upon, or is entitled to, any remedies provided for by the Penal Code or which would not otherwise be available to a private person claiming relief in relation to a civil tort; any such remedy would involve the enforcement, directly or indirectly, of the penal and/or public laws of Kuwait.

*Other relevant provisions*

85.    Article 233 of the Civil Code provides that where the tortfeasor establishes that the damage has resulted from a foreign cause beyond his control, including the act of the injured person or a third party, the tortfeasor is not liable unless expressly stated otherwise by law.

86.    Article 234(1) of the Civil Code provides: "*If the fault of a tortfeasor contributed with the fault of the injured party in perpetrating the harm, the tortfeasor's indemnification obligations are limited to his proportion of the contribution of his fault to the occurrence of the damage in relation to the fault of the injured party.*"

87.    As to the apportionment of liability between tortfeasors:

    (1)    Article 341 of the Civil Code provides that there is no presumption of joint and several liability between debtors, except by contract or by specific provision of law (excluding commercial matters).

    (2)    As to Article 228, paragraph 29(3A) above is repeated.

    (3)    As to Article 229, paragraph 29(3) is repeated.

*Application of principle*

88.    It is denied that EFG has any liability to PIFSS, whether as alleged or at all; and denied in any event, that PIFSS is entitled to the relief claimed from EFG under Kuwaiti law, or any relief, whether for the reasons alleged or at all: paragraphs 351 to 355 are accordingly denied.

88A.  Without prejudice to the generality of that denial:

    (1)    As to paragraphs 351 to 353, PIFSS' entitlement to relief is governed exclusively by the Civil Code: paragraph 84(1) above is repeated. Pursuant to Articles 246 and 247(1) of the Civil Code, the amount of compensation is conditional on proof of harm (i.e. proof of loss) and determined at the Court's discretion.

    (1A)  As to paragraph 351:

        (a)    PIFSS has no such entitlement as against EFG, whether pursuant to Article 22 of the Public Property Law, Article 42 of the Penal Code, Articles 246 and/or 257 of the Civil Code, or at all.

        (b)    As to Article 22 of the Public Property Law:

            (ii)    Paragraphs 4 and 35 above are repeated.

            (iii)   Further, PIFSS does not contend that EFG has unlawfully retained any public property or realised any unauthorised

139

benefits (and for the avoidance of doubt, EFG has not done so).

(iv)    Further, even if EFG had received the value of any Secret Commissions or realised any benefits in relation to such commissions (which it has not), those did not derive from public funds within the meaning of Article 2 of the Public Property Law and/or are not public property which could be the subject of any order under Article 22.

(v)    Further or alternatively, EFG acted in good faith for the purposes of Article 28 of the Public Property Law.

(vi)    In the further alternative, if, contrary to EFG's position in this Defence, any order were made under Article 22, such order should be (1) limited to the fees earned by EFG; and (2) subject to deductions for the profits PIFSS has made on investments relevant to its claim against EFG and/or the expenses EFG incurred in earning the fees.

(c)    Article 42 of the Penal Code has no application to PIFSS' claims against EFG. EFG is not alleged to have paid or received any bribe. In any event, Article 42 is a criminal law forfeiture provision, to be imposed by a Judge in criminal proceedings; it has no application to a civil law claim and cannot be relied upon as a legal basis for a civil claim for compensation.

(d)    Articles 246 and/or 257 do not entitle PIFSS to any restitutionary order as claimed or at all. Those Articles provide only for awards of compensation, which are dependent on PIFSS proving material loss. PIFSS has suffered no loss by reason of the conduct of EFG complained of: it paid market-standard management and performance fees in respect of investments which were profitable.

(1B)    As to paragraph 352, paragraph 84 above is repeated. It is denied in any event that EFG has received or retained any public property and/or that

140

PIFSS has relevant "*proprietary rights*" and/or that it is entitled to restitution of the sums alleged as against EFG and/or to "*follow and trace*" any property in EFG's hands, whether under the Public Property Law or otherwise.

(1C) Paragraph 353 is denied. Neither Article 11 of the Public Property Law nor Article 35 of the Penal Code give rise to any such entitlement as alleged. Paragraph 84 above is repeated, as to the Public Property Law. Further, any order for compensation against EFG is dependent on PIFSS proving material loss. PIFSS has suffered no loss by reason of the conduct of EFG complained of: it paid market-standard management and performance fees in respect of investments which were profitable.

(2) As to paragraph 354:

(a) It is denied that it is to be presumed as a matter of Kuwaiti law that, had Mr Al Rajaan not acted corruptly but had acted in accordance with his obligations under the Civil Service Law, PIFSS would have received the benefit of the Secret Commissions by way of reduced fees, waiver of fees or a rebate ~~payable to PIFSS~~.

(b) The relevant counterfactual for the assessment of loss is that Mr Al Rajaan had not sought or procured the payment of commissions pursuant to the agreement (if any) alleged at ~~RRRRACPOC~~ 6RACPOC paragraph 230. Save as set out in (c) below, n~~No~~ admissions are made as to what PIFSS would have done in such circumstances, including what investments it would have placed, with which financial institutions, on what terms, and with what overall returns.

(ba) As to the unparticularised allegation of "overpaid" fees:

(i) The investments which are the subject of the Further Nasrallah Scheme were, in significant part (relating to approximately US$400 million of the total of approximately US$450 million

141

claimed), concluded with institutions against whom no complaint is made and whose fees are not alleged to have been other than market standard.

(ii)    Otherwise, no admissions are made.

(bb)    As to paragraphs 354(a) to (e):

(i)    Insofar as can be discerned from PIFSS' limited disclosure, to date, the practice of PIFSS (as regards fee negotiation) did not differ materially or markedly as between investments alleged to have generated Secret Commissions and investments such as are not alleged to have generated Secret Commissions ("**Scheme Investments**" and "**Non Scheme Investments**" respectively). In particular:-

1.    Fee rates varied widely across funds, with management fees ranging from 0.25% per annum to 4% per annum and performance fees ranging from 10% to 20% above disparate hurdles;

2.    Where a given fund underperformed, or faced a liquidity crisis, in common with other investors PIFSS was sometimes offered management fee discounts in relation to Scheme and Non Scheme Investments;

3.    In the period prior to Mr Al Rajaan's resignation in January 2014, PIFSS' proactive scrutiny and analysis of fees charged across Scheme and Non-Scheme Investments alike was very limited. In particular:-

a.    As to Scheme Investments, PIFSS received fee discounts in 1998, 2008, 2010 and 2011 respectively on four Scheme Investments (Al Dar Islamic Fund, Glenn Arrow LDV Management III,

142

J-Land Select Fund and Glenn Arrow II UK Property Fund)

b.    As to Non-Scheme Investments, PIFSS did not prioritise the negotiation of fee discounts.  When, exceptionally, in September of 2003 PIFSS sought to negotiate a reduction in management fees (in the context of its investment in the Cybervest Fund) its request was declined.

4.    In the period after Mr Al Rajaan's resignation in January 2014, PIFSS continued to demonstrate a significant degree of indifference to the level of management and performance fees it was charged.  In particular:-

a.    As to Scheme Investments, of the 254 Scheme Investments in respect of which disclosure has been given, no more than 23 of them (i.e. fewer than 10%) benefited from fee reductions in the period between 2014 and 2019, and only a small fraction of those 23 benefited from fee reductions as a result of proactive negotiation by PIFSS (as distinct from circumstances such as the extension of an investment period or the increase of PIFSS' level of investment).

b.    Where discounts were negotiated or volunteered in respect of Scheme Investments, those discounts were often modest, and lower than 50%.

c.    As to Non-Scheme Investments, although there are signs from 2014/2015 of a growing awareness on the part of PIFSS of the negotiability of management and performance fees (with or

143

without the assistance of WAFRA) at least where the size of PIFSS' capital commitment warranted it, discounts were not sought or obtained routinely and such discounts as were granted were often modest / lower than 50%, and in many cases did not exceed discounts enshrined in the prospectus relating to the investment at issue.

In the premises it is to be inferred that in the period prior to 2014 PIFSS did not recognise that it had material leverage with relevant financial institutions and/or the ability to negotiate fee reductions if (which is not admitted) it did. Further or alternatively, PIFSS determined not to exercise such leverage as it enjoyed and/or failed to do so.

(ii) The fee structure in Man Group funds, and PIFSS' allegations against the Man Group Defendants, are irrelevant to PIFSS' claim against EFG, as is the allegation that *other* Defendants were willing to pay a share of fees secretly and improperly as bribes. There is no such allegation against EFG; nor against the majority of the financial institutions said to have paid the commissions relevant to the Further Nasrallah Scheme.

(iii) As to the practice referred to in subsection (d), it is admitted that:-

1. In or around July 2015 Antoine Massad agreed to reduce management fees payable by PIFSS on its investment in ISAM Systematic Trend fund from 3% to 2%;

2. In or around June 2016 UFG Asset Management agreed a number of management and performance fee discounts in relation to PIFSS' investments in various UFG funds;

3. In or about August 2017 it was agreed that the

144

management fees payable on PIFSS' investment in the Apollo European Principal Finance Fund III (Dollar) LP would be reduced by 0.35% (rather than 0.15%) annually on condition that PIFSS' initial capital commitment should be not less than US$300 million.

4.    In or around December 2017 it was agreed that the management fees payable in relation to PIFSS' investment in the Apollo Offshore Structured Credit Recovery Fund IV Ltd would be reduced from 1% to 0.5% for so long as PIFSS committed not less than US$300 million to that fund;

5.    In or about January of 2018, in consideration of PIFSS' agreement to increase its aggregate subscription to the Canyon Value Realization Fund (Cayman) Ltd to at least US$1 billion, it was agreed that for so long as PIFSS' aggregate investment did not fall below US$250 million, PIFSS would be charged a management fee of 1.25% (instead of 1.5%);

6.    in January 2019 PIFSS qualified for a special management fee of 1.3% (as against 1.4%) pursuant to an Amended and Restated Limited Partnership Agreement with Warburg Pincus Financial Sector L.P;

(c)    Otherwise, ~~T~~the matters pleaded at paragraphs 354(a) to ~~(d)~~ (e) are not admitted, but it is denied in any event that the pleaded inference can fairly or properly be drawn from them.

(d)    PIFSS' purported case as to "market practice", sought to be introduced by Part 18 response dated 25 June 2024 is not pleaded in the 6RACPOC and in any event (and without prejudice to that position):

145

(i)    irrelevant, in circumstances in which its claim depends on establishing that *PIFSS* would have obtained reduced fees, waiver of fees or a rebate in fees, and PIFSS would neither have sought or achieved the same. Sub-paragraph (bb) is repeated;

(ii)    further irrelevant, in circumstances in which its claim depends on establishing that PIFSS "overpaid" fees, and there is no allegation that the fees paid to the majority of the financial institutions relevant to the Further Nasrallah Scheme were other than market-standard. Sub-paragraph (ba)(i) is repeated;

(iii)    denied, insofar as it asserts that there was any universal "market practice" across all jurisdictions, all funds, managers and investors, and all investments, over an indefinite period;

(iv)    in any event specifically denied, insofar as it relates to market practice involving sovereign and/or other institutional investors in Kuwait specifically and/or the Middle East generally; and

(v)    otherwise, not admitted.

(3)    If (which is not admitted) PIFSS has suffered loss, such loss was caused, alternatively contributed to, by PIFSS' failure adequately to supervise Mr Al Rajaan and/or investigate his activities sooner and/or more thoroughly and/or prevent him from carrying out the acts now alleged. EFG refers in particular to the facts and matters set out in paragraph 76A-76L~~K~~ above.

~~Pending disclosure, EFG relies on the following facts and matters:~~

~~(a)    PIFSS had particular reason to monitor Mr Al Rajaan's activities closely:~~

~~(a)    In or around 2007/2008, PIFSS investigated allegations that Mr Al Rajaan had received commissions in relation to~~

146

investments he had caused PIFSS to make in 1988 and 1989. The investigation was continued by the Kuwaiti Attorney General.

(b) In 2016, Mr Al Rajaan was convicted in Kuwait of gross negligence, in relation to his role in procuring PIFSS to enter into certain US share option investments between 1995 and 1997. Allegations were made against Mr Al Rajaan in 2000 and were investigated by members of the Kuwaiti Parliament in 2001. It is to be inferred that PIFSS was aware of the allegations relating to the share option investments by 2000, alternatively before 2012.

(b) If PIFSS' narrative of events is substantially correct, it is to be inferred from that narrative that PIFSS did not adequately supervise and/or investigate Mr Al Rajaan's activities in relation to the investments which are the subject of PIFSS' claim. EFG relies in particular on:

(a) The number of corrupt and unlawful schemes allegedly perpetrated by Mr Al Rajaan;

(b) The length of time over which the corrupt and unlawful schemes were allegedly perpetrated by Mr Al Rajaan; and

(c) The overall amount of Secret Commissions allegedly received by Mr Al Rajaan.

(4) Accordingly and/or in any event in the circumstances alleged in the RRRRACPOC 6RACPOC, pursuant to Article 233 of the Civil Code, EFG is not liable to PIFSS because PIFSS' fault and/or the conduct of third parties broke the chain of causation. Paragraph 74(3)(c)(e) above is repeated.

(5) Alternatively, pursuant to Article 234(1) of the Civil Code, EFG's liability

147

to PIFSS is extinguished, alternatively reduced, by PIFSS' contributory fault to the loss it has suffered.

(6)  It is denied, if it be alleged, that EFG is jointly and severally liable for the wrongs of any other tortfeasor. Alternatively, any such liability should be apportioned to reflect the conduct of PIFSS and/or other Defendants and/or third parties, and the relative insignificance of the role of EFG in the commission of any harm.

(7)  Paragraph 355 is in any event denied. PIFSS' reference to "Article 232" is assumed to be a typographical error, and it is assumed that the intended reference was to Article 231 of the Civil Code. Article 231 provides for moral damages (not other "general damages" as alleged). PIFSS is a legal person and cannot claim moral damages. Paragraph 82 above is repeated.

**Under Swiss law principles**

88B.  Paragraph 355A is denied. It is denied that PIFSS is entitled to the relief claimed from EFG, or any relief from EFG, whether for the reasons alleged or at all.

88C.  Without prejudice to the generality of the foregoing:

(1)  It is not to be presumed as a matter of Swiss law that, had Mr Al Rajaan not acted corruptly, PIFSS would have received the benefit of the Secret Commissions by way of reduced fees, waiver of fees or a rebate.

(2)  The relevant counterfactual for the assessment of loss is that Mr Al Rajaan had not sought or procured the payment of commissions pursuant to the agreement (if any) alleged at ~~RRRRACPOC~~ 6RACPOC paragraph 230. No admissions are made as to what PIFSS would have done in such circumstances, including what investments it would have placed, with which financial institutions, on what terms, and with what overall returns.

(3)  As to paragraph 73O, paragraph 39C(6) above is repeated.

(4)  As to PIFSS' claims by reference to Article 305 *bis* SPC, any

148

compensation would in any event be limited to the amount the confiscation of which PIFSS could show was frustrated by any money laundering.

(5) PIFSS has suffered no loss by reason of the conduct of EFG complained of: it paid market-standard management and performance fees in respect of investments which were profitable.

(6) Further or alternatively:

(a) Pursuant to Article 43(1) the extent of the compensation ordered should be limited to the fees earned by EFG; and

(b) Pursuant to Article 44(1) SCO, PIFSS consented or contributed to the damage now alleged as set out in paragraph 76A-K above, such that any compensation falls to be extinguished, alternatively reduced; alternatively, PIFSS' fault broke the chain of causation; alternatively, pursuant to Article 43 (1) SCO, the conduct of a third party broke the chain of causation or is such that it would be manifestly unfair to hold EFG liable.

**Under English law principles**

89. It is denied that PIFSS is entitled to the relief claimed from EFG, or any relief from EFG, whether for the reasons alleged or at all: paragraph 356 is accordingly denied. Without prejudice to the generality of that denial:

(1) PIFSS' claims against EFG are governed by Swiss, not English, law.

(2) PIFSS has not particularised the remedies that it claims against each Defendant. It is therefore unclear which of the seven claimed remedies PIFSS seeks against EFG.

(3) As to paragraph 356(a):

(a) It is denied that in the case of damages for bribery loss is irrebuttably presumed to the extent of the value of the Secret Commissions in a claim against an alleged third-party accessory in the position of EFG.

149

(b)      It is not to be presumed that, had Mr Al Rajaan not acted corruptly, PIFSS would have received the benefit of the Secret Commissions by way of reduced fees, waiver of fees or a rebate.

(c)      The relevant counterfactual for the assessment of loss is that Mr Al Rajaan had not sought or procured the payment of commissions pursuant to the agreement (if any) alleged at ~~RRRRACPOC~~ 6RACPOC paragraph 230. No admissions are made as to what PIFSS would have done in such circumstances, including what investments it would have placed, with which financial institutions, on what terms, and with what overall returns.

(d)      PIFSS has suffered no loss by reason of the conduct of EFG complained of: it paid market-standard management and performance fees in respect of investments which were profitable.

(e)      In any event, PIFSS has not alleged that it has suffered any damage in excess of the value of the Secret Commissions. Any damages are therefore limited to the value of the Secret Commissions.

(4)    It is denied, if it be alleged, that PIFSS is entitled to the remedies claimed at paragraphs 356(b) and 356(c) against EFG: paragraphs 22(2) to 22(3) above are repeated.

(5)    As to paragraph 356(d), PIFSS is not entitled to claim both an account of profits and equitable compensation against dishonest assistants.

(6)    It is denied, if it be alleged, that PIFSS is entitled to the remedy claimed at paragraph 356(e) against EFG. PIFSS makes no claim for knowing receipt of trust property against EFG.

(7)    As to paragraph 356(g), PIFSS is not entitled to compound interest on any sum payable by EFG.

150

**INTEREST AND PRAYER**

90.    Paragraph 357 and the prayer are denied insofar as they relate to EFG.

91.    As to PIFSS' claim to interest, further and without limitation:

(1)    The law governing PIFSS' entitlement to compound interest pursuant to the Court's equitable jurisdiction and/or as damages based on the alleged lost opportunity to generate a return on the funds, is the *lex causae*.

(1A)    The law governing PIFSS' entitlement to simple interest pursuant to the Court's equitable jurisdiction and/or as damages based on the alleged lost opportunity to generate a return on the funds, is the *lex causae* in the period governed by the Rome II Regulation.

(2)    As to the *lex causae*, paragraphs 22B to 28 above are repeated.

(3)    PIFSS has no entitlement to compound interest as alleged or at all, under Swiss and/or Kuwaiti law, and no entitlement to simple interest under Kuwaiti law:

(a)    In so far as the *lex causae* is Kuwaiti law (as alleged by PIFSS), no interest is available (whether compound or simple) and PIFSS has confirmed by Stewarts' letter dated 14 October 2024 that *"PIFSS does not claim interest under Kuwaiti law"*. Further, the award of interest is contrary to Kuwaiti public policy. Interest is only available and/or awarded as a matter of Kuwaiti law in claims under the Kuwaiti Commercial Law (Law No. 68/1980) (and only then as simple interest at 7% *per annum* from the date the obligation to pay became due and ascertainable). This is not such a claim.

(b)    In so far as the *lex causae* is Swiss law (as alleged in the alternative by PIFSS), compound interest is not available. Compensatory interest is only available and/or awarded as a matter of Swiss law insofar as necessary to put the injured party back in the position he would have been in if compensated at the time the damage occurred,

151

but is limited to simple interest, and is at the maximum rate of 5% *per annum* (including by analogy with art. 73 SCO).

(4)    In so far as the *lex causae* is English law:

(a)    Compound interest is not available for the tort of bribery.

(b)    Further and in any event, PIFSS' claim for compound interest as damages is unparticularised and (accordingly) not admitted.

(5)    Further, in determining the relevant rate and period for any award of simple interest under s.35A of the Senior Courts Act, the Court should have regard in the exercise of its discretion to relevant provisions of the *lex causae* relating to the recovery of interest (and should be nil or close thereto if Kuwaiti law; and no more than 5% *p.a.* if Swiss law).

CAMILLA BINGHAM QC

PATRICIA BURNS

CAMILLA BINGHAM KC

AMY ROGERS

HARRY STRATTON

CAMILLA BINGHAM KC

AMY ROGERS KC

HARRY STRATTON

152

CAMILLA BINGHAM KC

AMY ROGERS KC

HARRY STRATTON

**Statement of Truth**

The 30th Defendant believes that the facts stated in this Defence are true. I am duly authorised by the Defendant to sign this statement.

Name:

Signature:

Position:

Served this 28th day of February 2020 by Simmons & Simmons LLP of CityPoint, One Ropemaker Street, London EC2Y 9SS.


**Statement of Truth**

The Thirtieth Defendant believes that the facts stated in this Amended Defence are true. The Thirtieth Defendant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised by the Thirtieth Defendant to sign this statement.

Name:

Signature:

Position:

Served this 20th day of October 2023 by Simmons & Simmons LLP of CityPoint, One Ropemaker Street, London EC2Y 9SS.


**Statement of Truth**

The Thirtieth Defendant believes that the facts stated in this Re-Amended Defence are true. The Thirtieth Defendant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised by the Thirtieth Defendant to sign this statement.

154

Name:

Signature:

Position:

Re-served this 14th day of October 2024 by Allen Overy Shearman Sterling LLP, of One Bishops Square, London E1 6AD.

**Statement of Truth**

The Thirtieth Defendant believes that the facts stated in this Re-Re-Amended Defence are true. The Thirtieth Defendant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised by the Thirtieth Defendant to sign this statement.

Name: Jason A. Otto

Signature:

Position: Global Head of Litigation & Investigations

Re-served this 5th day of November 2024 by Allen Overy Shearman Sterling LLP, of One Bishops Square, London E1 6AD.

155