# Exhibit 3

**Amended pursuant to the Order of Mr Justice Henshaw dated 22 June 2021**
**Amended pursuant to the Order of the Honourable Mr Justice Jacobs dated 9 June 2022**
**Amended pursuant to the Order of the Honourable Mr Justice Jacobs dated 14 November 2022 and the Order of Mr Justice Henshaw dated 21 March 2023**
**Amended pursuant to the Order of the Honourable Mr Justice Jacobs dated 30 July 2024[4]**
**Amended pursuant to the Order of the Honourable Mr Justice Jacobs dated 18 October 2024[5]**

**Case No. CL 2019-000118**

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (~~Q~~KBD)**

**BETWEEN**

**THE PUBLIC INSTITUTION FOR SOCIAL SECURITY**

**Claimant**

**- and -**

~~FAHAD MAZIAD AL-RAJAAN AL-WAZZAN~~
**(1) MUNA AL-RAJAAN AL-WAZZAN**
**(in her capacity as representative of the estate of**
**Mr Fahad Maziad Rajaan Al Rajaan (deceased))**

**First Defendant**

---

**RE[5] RE[4] RE RE AMENDED**
**DEFENCE OF THE FIRST**
**DEFENDANT**

---

1.    Unless otherwise stated, references to paragraph numbers in this statement of case are reference to paragraphs of the Re[7] Re[6] Re[5] Re 4 Re Re Amended Consolidated Particulars of Claim ("**the Particulars of Claim**").

2.    For convenience only, this statement of case adopts some of the abbreviations and headings used in the Particulars of Claim. It does not however adopt the term "*Secret Commissions*" (used by the Claimant in paragraph 2 and elsewhere in the Particulars of Claim); that term is contentious and therefore inappropriate by reason of paragraph C1.1(i) of the Commercial Court Guide. Any admission or non-admission of any paragraph of the Particulars of Claim that includes that term should be read as subject to the proviso set out in the previous sentence.

3.      Save as is hereinafter expressly admitted or expressed to be not admitted, each and every allegation of fact contained within the Particulars of Claim is denied. Where an allegation is not admitted, the Claimant is required to prove that allegation at trial.

3AA     The First Defendant's position in relation to the various payments pleaded by the Claimant (as reflected in the Appendices to the Particulars of Claim) is set out in Annex 1 hereto. Any admission, denial or non-admission in relation to pleaded payments in the body of this Re-Re-Re-Re-Amended Defence should be read as subject to the First Defendant's position as set out in Annex 1.[4]

3A      Mr Al Rajaan (the former First Defendant ("**Mr Al Rajaan**")) died on 6 September 2022. The claims are now pursued against the estate of Mr Al Rajaan ("**the Estate**"), which is represented by Ms Al Wazzan ("**Ms Al Wazzan**"). References in this Defence to the state of knowledge, belief or understanding of Mr Al Rajaan are to his state of knowledge, belief or understanding at the time of the Defence or Amended Defence in which it was pleaded.

## A.  SUMMARY AND INTRODUCTION

4.      In summary and by way of outline only, the First Defendant ("**Mr Al Rajaan**") contends that the claim against him it is liable to be struck out and/or denies that he it is liable to the Claimant as alleged or at all for at least the following reasons:

Proceedings not properly authorised

4.1.    These proceedings have not been properly brought or authorised by the Public Institution for Social Security ("**PIFSS**") as a matter of Kuwaiti law. They have been (impermissibly) commenced at the instigation of the Kuwaiti Department of Legal Affairs and Legislation ("**DLAL**") and (impermissibly) continued by English solicitors without the benefit of a valid and sufficient Power of Attorney granted by the incumbent Director General of PIFSS. In the remainder of this statement of case, the First Defendant Mr Al Rajaan refers to the Claimant as PIFSS, but for convenience only and without prejudice to these contentions.

Abuse of process

4.2.    Further or alternatively, these proceedings are politically motivated and abusive. They are part of a series of unjustified actions taken against Mr Al Rajaan by the State of Kuwait (of which PIFSS is an organ). Mr Al Rajaan washas been the target of accusations and high profile proceedings that awere politically motivated and groundless. These proceedings are just one instance of this

persecution and are an abuse of process.

4.3.    Further or alternatively, these proceedings are an abuse of process insofar as they are being used (at least in part) in order to seek disclosure of documents obtained by the Swiss Criminal Authorities under compulsion which are subject to restrictions imposed by the Swiss Criminal Courts, Swiss law and/or Swiss Banking Secrecy laws.

4.3A    Further or alternatively, the Swiss criminal authorities have been investigating Mr Al Rajaan since 2012 and PIFSS has supported and assisted that investigation since at least 2015.  In those circumstances, insofar as PIFSS seeks to rely on provisions of Swiss criminal law and alleged offences which are being investigated by the Swiss criminal authorities, those claims are an abuse of process and/or should be stayed to await a final decision of those authorities. In the event the Swiss authorities determine that no criminal offence was committed, PIFSS's civil claims in respect of such alleged offences would be groundless as a matter of Swiss law.

Applicable law

4.4.    Further or alternatively, PIFSS's claim is liable to be struck out insofar as that it proceeds on the basis that its claim against the Estate Mr Al Rajaan arises under the laws of Kuwait.  This is misconceived.  PIFSS's claim relates to the payment of certain monies to Mr Al Rajaan into Swiss bank accounts (or, in a minority of cases, into offshore accounts operated by Pictet, a Swiss financial institution (save in respect of the alleged "Nasrallah/Pensée scheme, which is an alleged continuation of other alleged schemes)). Further, the financial institutions with which PIFSS invested and which PIFSS claims to have been party to the alleged schemes were Swiss financial institutions (with the sole exception of the Man Group, which, in any event, used a Swiss subsidiary to contract with, and pay the relevant intermediary for these proceedings, Mr El Ghazzi and the Aerium/Aeriance Group, the parent company of which was incorporated in Luxembourg) and/or (it is to be inferred pending disclosure) contracted with PIFSS on the basis of terms and conditions which did not provide for Kuwaiti law to be the applicable law. Moreover, after August 1990 Mr Al Rajaan was domiciled and/or living in Switzerland.

Penal and/or public laws

4.5.    Further or alternatively, PIFSS's claims are based, at least in part, on provisions of

the Kuwaiti Penal Code, ~~and~~ the Kuwaiti Public Property Law and the Swiss Penal Code. Such claims represent an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait and Switzerland. They are not justiciable in the Courts of England and Wales.

The alleged schemes

4.6.     Further or alternatively, Mr Al Rajaan was not in breach of the pleaded civil law duties.

4.7.     Mr Al Rajaan considered that he was entitled to receive monies from Swiss financial institutions and/or intermediaries in circumstances where (a) PIFSS's Supreme Investment Committee (and/or the Internal Investment Committee) had chosen those institutions for reasons unconnected to the possibility of payments to Mr Al Rajaan and based on internal investigations into those potential investments by staff other than Mr Al Rajaan; (b) Mr Al Rajaan did not personally authorise investments by PIFSS; (c) the financial institutions offered good value for money and sound investment advice; (d) Mr Al Rajaan had not asked to be given any money but had been offered payments by the Swiss financial institutions and/or intermediaries and understood that it was standard market custom and practice for Swiss financial institutions and/or intermediaries to do so in Switzerland and Kuwait; (e) Mr Al Rajaan understood that the financial institutions' terms and conditions provided that they could pay fees to intermediaries; (f) in some instances, he was providing services to Swiss financial institutions in helping them to establish valuable investment activities with third parties, and (g) Mr Al Rajaan received money into accounts in his or his wife's own name or their companies' names.

4.8.     Further or alternatively, it was widely known (including by senior Government ministers, such as the Kuwaiti Minister of Finance and Chairman of the board of PIFSS (in 2006-2007), Bader Al Humaidhi ("**Mr Bader[4] Humaidhi**")) and/or rumoured in Kuwait (from at least the early 2000s) that Mr Al Rajaan was receiving monies from financial institutions and/or intermediaries with whom PIFSS was investing. It was well known that from at least the late 1990s that Mr Al Rajaan spent a considerable amount of time in Switzerland, where he had a house in Rolle and later in Cologny (one of the most expensive parts of Switzerland) and that he travelled to Switzerland on at least a monthly basis. Mr Al Rajaan could not, as was evident and widely known in Kuwait at the time, have afforded this lifestyle

4

on the basis of his PIFSS salary alone. Further, Mr Al Rajaan understood that employees of some or all of the financial institutions, when visiting Kuwait, talked to representatives of PIFSS (other than Mr Al Rajaan) and/or members of the Kuwaiti Government about making such payments and that they were aware that such payments were commonly made.

4.9.     Further or alternatively, Mr Al Rajaan received the monies in circumstances where he understood it was standard market custom and practice in Kuwait for money to be given to senior individuals who were acting on behalf of Kuwaiti public authorities.

4.10.    Further or alternatively, despite the persistent rumours, Mr Al Rajaan was permitted to continue to work as the Director General of PIFSS and was not even asked to confirm or deny the fact of his receipt of retrocessions. Indeed, the Kuwaiti Parliament opened investigations into Mr Al Rajaan in 2001, 2005 and 2006 but did not see the need for him to be questioned.  By reason of the persistence of the rumours and the fact of investigations being opened and then closed, Mr Al Rajaan inferred (reasonably) that, and as he already believed based on standard market custom and practice, there was no objection to him receiving reasonable amounts from financial institutions with whom PIFSS was investing and/or intermediaries.

4.11.    Further or alternatively, Mr Al Rajaan's receipt of such monies caused PIFSS no harm and no loss.

(1)    PIFSS did not pay more fees for the financial services which were provided to it (including fees on investments) than it would have had to pay had Mr Al Rajaan not received the money (and in many cases Mr Al Rajaan and/or other individuals within PIFSS succeeded in negotiating a deal by which PIFSS came to pay lower fees than were paid by other investors).  Consequently, there was no artificial inflation of the fees paid by PIFSS. In any event, the level of fees for each investment was assessed by PIFSS as part of its internal analysis prior to any approval being given. It was known to PIFSS that institutions and funds could and did pay fees to intermediaries. However, to the best of Mr Al Rajaan's knowledge, these fees were never passed on to PIFSS.

(2)    The Swiss financial institutions and/or other funds were chosen by the Supreme Investment Committee and/or the Internal Investment

5

Committee (neither of which was under the control of Mr Al Rajaan), based on analysis conducted by staff within PIFSS (other than Mr Al Rajaan).  Where Mr Al Rajaan did undertake negotiations about fees that were to be paid by PIFSS, he was a tough negototiator on behalf of PIFSS. Moreover and in any event, the investments performed very well on PIFSS's behalf. To the best of Mr Al Rajaan's knowledge, PIFSS continued to invest with Mirabaud after the investigations in Switzerland in 2012 and after Mr Al Rajaan ceased to be Director General in 2014 (pending disclosure Mr Al Rajaan does did, and the First Defendant does, not know the position in respect of the other financial institutions and funds).

(3)     Further, those institutions and/or intermediaries would not have paid the money that they paid to Mr Al Rajaan to PIFSS in any event and, following the retirement of Mr Al Rajaan as Director General in 2014, no attempt was made by PIFSS itself to receive similar amounts as those which had previously been paid to Mr Al Rajaan.

Remedies

4.12.   There is no basis for PIFSS to assert a proprietary claim against the Estate Mr Al Rajaan.  No such claim is asserted under Swiss law (and none arises in the circumstances of this case).  Moreover, Kuwaiti law (that being the primary applicable law on which PIFSS relies) does not recognise a proprietary claim against Mr Al Rajaan the Estate in the circumstances of this case.  The amounts that he received came from the monies of the financial institutions and/or intermediaries concerned and are not to be treated as public property and/or the property of PIFSS for the purposes of Kuwaiti law.

4.13.   Further or alternatively, there is no basis for PIFSS to claim anything in excess of the amounts in fact received by Mr Al Rajaan.

4.14.   To the extent PIFSS claims in respect of the same amounts under different alleged schemes, PIFSS is plainly not entitled to double-recovery.

4.14A   To the extent that assets have[4] compensation for losses has been recovered in respect of which claims are now brought in these proceedings, either as a result of actions taken in Kuwait or elsewhere (including auctions and sales of Mr Al Rajaan's and/or the Estate's assets), PIFSS is not entitled to double-recovery.

4.14B    In particular (but without limitation), very substantial recoveries have been made at least pursuant to a judgment of the Kuwaiti Criminal Court against Mr Al Rajaan and Ms Al Wazzan dated 27 June 2019 ("**2019 Criminal Judgment**") which concerned the same alleged wrongdoing and/or involved the same causes of action as the claims now advanced by PIFSS under the 'Mirabaud Scheme'.[4]

4.14C    As further particularised below, PIFSS' claims are barred and/or fall to be reduced insofar as they are the subject of previous judgments (including the 2019 Criminal Judgment) which (i) are enforceable or entitled to recognition in England and Wales and/or (ii) have given rise to recoveries or an entitlement to recoveries by PIFSS and/or its privies. [14]

4.14D    Pursuant to the 2019 Criminal Judgment, the Kuwaiti Criminal Court made the following orders against Mr Al Rajaan and Ms Al Wazzan:[4]

(1)    Restitution in the amount of US$82.2 million under Article 16 of the Public Property Law for offences of misappropriating and intentionally harming public property under Articles 10 and 11 of the Public Property Law.[4]

(2)    Fines totaling US$312 million (i) under Article 16 of the Public Property Law for the same public property offences as above and (ii) under Articles 6 and 7 of Law No. 35/2002 ("**Money Laundering Law**") for offences of money laundering contrary to Article 2 of the Money Laundering Law. The fine against Mr Al Rajaan ceased to be payable upon his death.[4]

(3)    The confiscation of property, companies, stocks and movable property under Articles 6 and 7 of the Money Laundering Law for the same money laundering offences as above.[4]

4.14E    As the alleged victim of these offences, PIFSS is entitled to receive recoveries pursuant to these orders as a matter of Kuwaiti law. In particular:[4]

(1)    All sums recovered pursuant or allocated to the restitution award, which is a civil compensatory remedy, must be transferred to PIFSS by the Kuwaiti authorities.[4]

---

[1]    For the avoidance of doubt, the First Defendant makes no admissions as to (i) the 2019 Criminal Judgment's enforceability or entitlement to recognition or (ii) PIFSS' entitlement to recoveries (save to the extent pleaded in paragraphs 4.14E and 4.14F below). The First Defendant's right to dispute any assertion as to those matters is reserved.[4]

(2)     Article 228 of Law No. 17/1960 ("**Criminal Procedure Code**") provides that the Kuwaiti Criminal Court may allocate all or part of a fine to compensate the victim of a criminal offence.[4]

(3)     Article 237 of the Criminal Procedure Code provides that confiscated assets become property of the State of Kuwait and may be transferred to a particular government authority for its benefit.[4]

4.14F     Further, PIFSS was and/or is able to pursue recoveries under the 2019 Criminal Judgment on its own initiative. In particular:[4]

(1)     PIFSS was and/or is able to ask the Kuwaiti Criminal Court and/or the relevant Kuwaiti authorities to arrange for recoveries to be transferred to PIFSS in the ways set out in paragraph 4.14E above.[4]

(2)     At all times since the handing down of the 2019 Criminal Judgment, PIFSS has been able to enforce the restitution award itself as a judgment creditor pursuant to Article 118 of Decree-Law No. 38/1980 ("**Civil Procedure Code**").[4]

4.14G     Pursuant to the 2019 Criminal Judgment, the Kuwaiti authorities have informed the First Defendant that they have so far recovered at least c. KWD 132 million[2] (equivalent to c. US$432.98 million)[3] of assets belonging to the First and Second Defendants in Kuwait and Bahrain. Of this total, c. KWD 72 million (equivalent to c. US$236.17million) has apparently been allocated to the discharge of the confiscation order; the balance of c. KWD 60 million (equivalent to c. US$196.81 million) remains unallocated. The Kuwaiti authorities have also made requests for judicial assistance to at least 11 other countries to trace and recover the First and Second Defendants' assets. Pursuant to some of those requests, and further to the US$432.98 million already recovered, the Kuwaiti authorities have restrained:[4]

(1)     US$100 million of assets in Switzerland, which the Kuwaiti authorities claim are the proceeds of commissions received pursuant to the 'Mirabaud Scheme';

---

[2]    In a memorandum to the Crown Prosecution Service ("**CPS**") from the Kuwaiti Prosecuting Authorities dated 2 May 2024, Kuwait confirmed that KWD 85,943,945.041 had been recovered from Bahrain and KWD 44,989,035.736 had been recovered from Kuwait. The CPS has also informed the First Defendant that a further KWD 1,227,862.458 was recovered from Bahrain on 29 May 2024. The First Defendant has no direct knowledge of whether this information is correct or complete. Some press articles have indicated that the recoveries made pursuant to the 2019 Criminal Judgment have in fact been much greater. The First Defendant accordingly reserves the right to submit that the recoveries have exceeded the sums currently pleaded above.[4]

[3]    The US$ amounts in this paragraph have been calculated using a KWD:USD rate of 1:3.2023596. That rate was taken from xe.com at 08:41 UTC on 18 September 2024.[4]

and[4]

(2)     c. US$25 million of assets in the UK, which the Kuwaiti authorities have committed to transferring to PIFSS in satisfaction of the restitution award. The Kuwaiti authorities filed an enforcement request in respect of this c. US$25 million on 7 June 2024. The CPS has applied to give effect to that enforcement request and will seek a hearing in September or October 2024.[4]

4.14H     PIFSS is an emanation, alternatively a privy, of the State of Kuwait. The State of Kuwait was a party to the proceedings in respect of which the 2019 Criminal Judgment was given. Accordingly, PIFSS' claim (alternatively at least its Mirabaud Scheme claim) is barred as a matter of English statutory and/or procedural law pursuant to:[4]

(1)     Section 34 of the Civil Jurisdiction and Judgments Act 1982, insofar as the 2019 Criminal Judgment (or a relevant part thereof) is enforceable or entitled to recognition in England and Wales;[4]

(2)     The common law rule against 'former recovery' or 'double satisfaction', insofar as the State of Kuwait has made recoveries pursuant to the 2019 Criminal Judgment. If (contrary to the First Defendant's primary case) PIFSS is not an emanation or privy of the State of Kuwait, the First Defendant's alternative case is that this rule applies to the extent that recoveries pursuant to the 2019 Criminal Judgment have been transferred to PIFSS in any of the ways identified in paragraph 4.14E above; and/or[4]

(3)     The High Court's inherent jurisdiction to prevent abuses of its process.[4]

4.14I     Further or alternatively, and without prejudice to the First Defendant's denial that PIFSS has suffered any actionable loss, PIFSS' claim (alternatively at least its Mirabaud Scheme claim) falls to be reduced as a matter of substantive law. In particular:[4]

(1)     If Swiss law applies, the claim falls to be reduced to the extent that:[4]

(a)     The State of Kuwait and/or PIFSS have made recoveries in respect of the same loss or damage, on the basis that Swiss law does not permit double recovery and/or have made recoveries which amount to unjust enrichment under article 62 of the Swiss Code of Obligations;[4]

(b)    PIFSS has declined to pursue recoveries in respect of the same loss or damage (in any of the ways set out in paragraph 4.14F above), on the basis that PIFSS has failed to comply with its duty to mitigate under Article 44(1) of the Swiss Code of Obligations.[4]

(2)    If Kuwaiti law applies, the claim falls to be reduced to the extent that:[4]

(a)    The State of Kuwaiti and/or PIFSS have made recoveries in respect of the same loss or damage, on the bases that: (i) there is no outstanding harm to Kuwaiti public property within the meaning of Article 11 of the Public Property Law; and/or (ii) Kuwaiti law does not permit double recovery; and/or[4]

(b)    PIFSS has declined to pursue recoveries in respect of the same loss or damage (in any of the ways set out in paragraph 4.14F above), on the bases that: (i) its fault has caused or contributed to the damage within the meaning of Articles 234(1) and/or 294 of the Kuwaiti Civil Code; and/or (ii) it could have avoided damage by making reasonable efforts within the meaning of Article 300(2) of the Kuwaiti Civil Code.[4]

(3)    If (contrary to the First Defendant's primary case) Swiss and/or Kuwaiti laws permit double recovery in respect of the same loss or damage, those laws are manifestly contrary to the public policy of English law. Accordingly, they fall to be disapplied in favour of English law pursuant to:[4]

(a)    The common law principle recognised in *Kuwait Airways v Iraqi Airways (No. 6)* [2002] 2 AC 883;[4]

(b)    Section 14(3) of the Private International Law (Miscellaneous Provisions) Act 1995; and/or[4]

(c)    Article 26 of the Rome II Regulation.[4]

(4)    If English law applies, the claims fall to be reduced to the extent that:[4]

(a)    The State of Kuwait and/or PIFSS have made recoveries in respect of the same loss or damage; and/or[4]

(b)    PIFSS has declined to pursue recoveries in respect of the same loss or damage (in any of the ways set out in paragraph 4.14F above), on the basis that PIFSS has failed to comply with its duty to mitigate.[4]

4.14J    The First Defendant reserves the right to supplement and/or amend the above particulars in light of further information and/or disclosure concerning recoveries made pursuant to the 2019 Criminal Judgment and/or any other relevant proceedings.[4]

Limitation

4.15.    Further or alternatively, PIFSS's claims are wholly or partly time-barred under Swiss law or (if applicable, which is denied) Kuwaiti or English law.

5.    Save as set out above, the summary of PIFSS's case set out in paragraphs 1 and 3 is noted but its substance is denied.  The First Defendant ~~Mr Al Rajaan~~ repeats and relies upon the contentions set out in paragraphs 4.6 to 4.15 above in respect of each "scheme" alleged by PIFSS.

6.    ~~Save that it is not admitted that any criminal investigation is ongoing in Kuwait (that being outside the direct knowledge of Mr Al Rajaan), p~~Paragraph 4 is admitted.

7.    Paragraph 5 is noted.

## B.    THE PARTIES

### The Claimant

8.    Paragraph 6 is admitted, subject to paragraphs 8.9 to 8.17 below.  Further:

Politically motivated claim

8.1.    Although Mr Al Rajaan ha~~d s~~ no political affiliation and ~~has~~ maintained a strict political neutrality throughout his career, there is a clear perception in Kuwait that he ~~is~~ was an associate and supporter of two very significant political figures (Musallam Al-Barrak ("**Mr Al Barrak**") and Sheikh Ahmad Al Fahd Al Sabah ("**Sheikh Ahmad**")).

8.2.    Both are considered to be significant threats to the political establishment in Kuwait, headed by the current and former Emir.  Sheikh Ahmad has been involved in political battles with Sheikh Nasser Al Mohammad ("**Sheikh Nasser**") in relation to the succession of ~~to~~ the present Emir.  Mr Al Barrak is a politician and is seen to be a political firebrand.

8.3.    In Kuwait, allegations of corruption in public life are highly politically sensitive

11

and Mr Al Rajaan ~~has been~~ was singled out for action without any good reason. Not only was Mr Al Rajaan not in breach of the pleaded civil law duties, his receipt of monies from financial institutions and intermediaries (as pleaded further below) was widely known at the time and in accordance with his understanding of custom and practice in Kuwait.

8.4.     Mr Al Rajaan ~~has~~ made enemies among the ranks of the political elite in Kuwait largely due to his former position in PIFSS but also due to his political background. The criminal cases that have been brought against him are supported and endorsed by the <u>former</u> Emir personally. As a result of the persecution that he face~~ds~~, Mr Al Rajaan ~~is~~ <u>was</u> unable to return to Kuwait and ~~has been~~ <u>was</u> convicted *in absentia* and sentenced to life imprisonment with hard labour. Given the conditions that exist in prisons in the State of Kuwait, Mr Al Rajaan's human rights would <u>have</u> be<u>en</u> breached ~~were~~ <u>had</u> he ~~to~~ serve<u>d</u> that sentence.

8.5.     The claims advanced in these proceedings are another part of the attempt by the State of Kuwait to persecute Mr Al Rajaan and are, for that reason, an abuse of process.

<u>Swiss Documents</u>

8.6.     Further or alternatively, these proceedings are an abuse of process insofar as they are being used (at least in part) in order to seek disclosure of documents obtained by the Swiss Criminal Authorities under compulsion which are subject to restrictions imposed by the Swiss Criminal Courts ("**the Swiss Documents**"). Those documents are also subject to restrictions imposed by fundamental principles of Swiss Criminal law and Swiss Banking Secrecy laws.

8.7.     As a result of a series of decisions made by the Swiss Criminal Courts, PIFSS has no right to receive copies of the Swiss Documents <u>(save in respect of documents sent by the Swiss Federal Prosecutor's Office to the Kuwaiti authorities pursuant to the requests by Kuwaiti authorities for mutual legal assistance)</u>.

8.8.     In these proceedings, PIFSS ~~has~~ asked Mr Al Rajaan <u>(and now asks the First Defendant)</u> to provide it with unrestricted access to the Swiss Documents. Such access, particularly on an unrestricted basis, is inappropriate as a matter of Swiss law and English civil procedure. Insofar as Mr Al Rajaan <u>referred and/or the First Defendant</u> refers in this Defence to any document (or pleads in relation to such document), he<u>/it</u> should not be taken as mentioning that document for the

12

purpose of CPR PD 51U.21 and/or he/it objects to production.

Proceedings not properly authorised

8.9.    For proceedings to be validly issued in the name of and on behalf of PIFSS, under Kuwaiti law, the issuing of proceedings must be expressly authorised by the Director General of PIFSS in office at the time of the decision to issue such proceedings. No evidence has been provided by the *de facto* Claimant, DLAL, to demonstrate that any such authorisation was given prior to the issue of each of the Claim Forms in these proceeding.  Pending receipt of adequate evidence proving such authorisation, no admissions are made as to the validity of these proceedings.

8.10.   Further, in order for DLAL to be entitled to conduct any proceedings in the name of and on behalf of PIFSS, it is necessary for a named person at DLAL who has conduct of the proceedings to be validly authorised to conduct those proceedings pursuant to a valid Power of Attorney granted by the Director General of PIFSS in office at the time that such Power of Attorney is granted and remaining in office throughout the period of the conduct of such proceedings unless the continuation of and/or further steps in such proceedings is expressly authorised by Power of Attorney issued by any replacement Director General.

8.11.   No acts purportedly carried out on behalf of PIFSS pursuant to a Power of Attorney by way of the initiation and pursuit of legal proceedings are valid under Kuwaiti law unless expressly authorised by the Director General in relation to the initiation of proceedings and the person named in the Power of Attorney in relation to the pursuit of the legal proceedings.

8.12.   No sub-delegation of a Power of Attorney validly granted by a Director General to an individual at DLAL whether to another attorney or executive within DLAL or a firm of lawyers such as those purporting to represent PIFSS in these proceedings is valid unless supported by a valid Power of Attorney in favour of such other person granted either by the Director General of PIFSS or by the individual effectively nominated by a Power of Attorney issued by the Director General which permits sub-delegation by Power of Attorney; and any act purportedly carried out by such other person or firm of lawyers is invalid unless carried out pursuant to a subsisting Power of Attorney validly issued to such person before the relevant act is carried out.

13

8.13.    Further, it is denied that any acts carried out without proper authorisation under a valid Power of Attorney as aforesaid can subsequently validly and effectively be ratified under Kuwaiti law.

8.14.    In these proceedings, (1) the first and second Claim Forms were issued at a time when there was no valid and subsisting Power of Attorney issued by an incumbent Director General in favour of an individual at DLAL; (2) no evidence has been produced that the person at DLAL purporting to authorise the issuing and/or continuation of these proceedings, including the application for freezing and other relief, was the holder of a valid Power of Attorney issued to them; (3) and no evidence has been produced, despite multiple requests, to demonstrate that the firm of lawyers (Stewarts) purporting to act in these proceedings held a valid Power of Attorney issued in favour of the relevant lawyer(s).

8.15.    In the premises, it is denied that the institution and/or conduct of proceedings pursuant to the first or second Claim Forms were/was valid or effective and it is further denied that any such invalidity can be ratified or otherwise cured by any subsequent act. No admissions are made as to the validity of the third Claim Form or as to the authority of DLAL or Stewarts to act on behalf of PIFSS in these proceedings.

8.16.    Further, no admissions are made as to the authority of Stewarts to act on behalf of PIFSS in these proceedings.  In the light of the foregoing and in circumstances where they were instructed by DLAL rather than PIFSS, and where it has not hitherto been asserted that DLAL is acting as agent for PIFSS, in view of their legal and regulatory duties to have proper authorisation to act issued by the named Claimant as their client either directly or by its duly authorised agent acting as such.

8.17.    In all the premises, the First Defendant ~~Mr Al Rajaan~~ reserves the right to apply to have these proceedings, alternatively the first and second Claim Forms, struck out as disclosing no reasonable cause of action or in the exercise of the Court's inherent jurisdiction.

9.    Paragraphs 7 and 8 are admitted.  Further:

The Investment Committee and Internal Investment Committee

9.1.    The Investment Committee was also known as the Supreme Investment

14

Committee. A sub-committee of the Supreme Investment Committee, the Internal Investment Committee, was responsible with the Supreme Investment Committee for PIFSS's investments.

9.2. During the relevant period, the Supreme Investment Committee comprised four or five members at any given time:

(1) The Minister of Finance (who chaired the Committee and was also chair of PIFSS's board of directors);

(2) Mr Al Rajaan, as Director General of PIFSS (whose membership of the Committee was compulsory pursuant to Article 9 of the Amiri Decree of the Law No. (61) of the year 1976 to promulgate the Law of the Social Security); and

(3) Two or three other individuals (all of whom were members of PIFSS's board of directors).

9.3. Membership of PIFSS's board of directors was a pre-requisite to membership of the Supreme Investment Committee.

9.4. Pursuant to Article 3 of Resolution No. (9) of 1977 ("*forming a committee for investing PIFSS funds and determining its jurisdiction*"), the meetings of the Supreme Investment Committee required a quorum of the majority of its members, and decisions were adopted by majority vote. Mr Al Rajaan could not, therefore, control and did not influence the decisions of the Supreme Investment Committee.

9.5. The Internal Investment Committee was created by Mr Al Rajaan on 21 April 1987 (Decision No 73 of 1987) and he acted as its chairman until sometime around April 2012, and then from around May 2013 until he left PIFSS in 2014. The other members of the Internal Investment Committee included the Assistant or Deputy General Managers, the heads of the investment departments (for example the Department of Direct Investment (which was split into two sub-departments – one for open ended investments and the other for closed ended investments), the Banking Department, the Real Estate Department and the Investment Accounting Department), deputy managers and a representative from the Settlement Department. Typically, meetings were attended by seven or eight individuals. Decisions of the Internal Investment Committee were reached by a simple

15

majority vote. Mr Al Rajaan could not, therefore, control and did not influence the decisions of the ~~Supreme~~ Internal Investment Committee.

9.6.     The Supreme Investment Committee was responsible for fixing the maximum level of investments which could be made by the Internal Investment Committee.

<u>Scrutiny of investment proposals and continued monitoring of funds</u>

9.7.     Investment proposals received by PIFSS were analysed by the relevant investment department within PIFSS. If the department considered that the proposed investment was suitable, it would submit the proposed investment to the Supreme Investment Committee or Internal Investment Committee for consideration and approval. This process involved the department producing a report for the Supreme Investment Committee or Internal Investment Committee and the head of the department presenting the case for the investment to the relevant Committee. Mr Al Rajaan had no involvement in, or influence over, the process carried out by the relevant departments of analysing and preparing reports on potential investments.

9.8.     Investment proposals were scrutinised by the members of the Committees. The Committees did not rubber-stamp all proposals and rejected proposals put forward by departments.

9.9.     When assessing the viability of proposals, the Supreme Investment Committee and Internal Investment Committee considered factors such as: (1) the level of risk carried by the investment, (2) the ease of entry and exit from funds, (3) the levels of cash returns and capital returns envisaged, (4) whether the manager of the fund was known to PIFSS and had a proven track record and (5) the susceptibility of the proposed funds to market movements. The level of fees for each investment was reviewed by the relevant department and Committee (such fees would commonly include management and/or performance fees, which would have been set out in the relevant investment proposal).

9.10.    On 5 May 2002, PIFSS's board of directors resolved that its accounts would be audited by two international auditors, rather than one. This was in addition to the Kuwaiti Government Audit Bureau and PIFSS's own internal auditors. The government auditors were sent a box of transaction tickets (confirming, for example, the amount deposited or invested and with which institution) every week for scrutiny.

16

9.11.   The performance of PIFSS's investments was also closely monitored by the investment departments, which prepared reports and submitted them to the Supreme Investment Committee, and the Internal Investment Committee, for discussion and action as appropriate.

9.12.   The Internal Investment Committee was required to give, and gave, the Supreme Investment Committee an account of its investment activities on a quarterly basis.

9.13.   PIFSS's investments were successful.  In particular, in the period from 1998 to 2013 Mr Al Rajaan believeds that the investments enjoyed a healthy rate of return.

10.   Save that the first and second sentences are not admitted, paragraph 9 is admitted.

11.   As to paragraph 10, the first sentence is admitted. The second sentence is embarrassingly vague.  It is in any event denied; as a matter of Kuwaiti law, unauthorised benefits do not constitute public property for the purposes either of the Kuwaiti Constitution or the Public Property Law.

**The First and Second Defendants**

12.   Paragraph 11 is admitted. Further:

12.1.   During Mr Al Rajaan's time as the Director General of PIFSS, there were twelve different Finance Ministers.

12.2.   Despite persistent rumours (from at least 2001) that Mr Al Rajaan was receiving payments from third parties, Mr Al Rajaan was permitted to continue to work as the Director General of PIFSS and was not even asked (despite the investigations and criminal complaints set out below) to confirm or deny the fact of any payments. In January 2014 Mr Al Rajaan received a letter of appreciation for his work as Director General from Meshal Al Ahmad, Deputy Chief of the National Guard.

12.3.   The Kuwaiti Parliament opened investigations into Mr Al Rajaan in 2001, 2005 and 2006 and a criminal complaint was filed in 2008.  By reason of the persistence of the rumours and the fact of investigations being opened and then closed, Mr Al Rajaan inferred (reasonably) that, as he already believed given the standard market custom and practice, there was no objection to him receiving reasonable amounts from financial institutions with whom PIFSS was investing and/or intermediaries.

12.4.    Mr Al Rajaan died on 6 September 2022.

13.    Save that the first, and second and last sentences are admitted, paragraph 12 is denied. Paragraph 9 above is repeated.

13A.    As to paragraph 12A, no admission is made as to whether the Al-Rajaan Heirs have been joined to these proceedings on a proper legal basis. [4]

14.    Save that it is admitted that Ms Al Wazzan is was Mr Al Rajaan's wife, paragraph 13 is insufficiently particularised to permit a meaningful response and is not admitted.

**The Other Defendants (and other relevant parties)**

15.    Paragraphs 14 to 16 are not admitted, save that:

15.1.    PIFSS's claims against Mr Al Rajaan in relation to Mr Nasrallah, Mr El Ghazzi and Mr Mombelli are denied for the reasons pleaded below.

15.2.    It is admitted, to the best of Mr Al Rajaan's knowledge, that Mr Nasrallah and Mr El Ghazzi were Lebanese financial intermediaries, and that Mr Nasrallah was the beneficial owner of Phoenix. It is also admitted that Mr Nadim Narallah is Mr Nasrallah's son.[5]

15.2A    It is admitted that the Pensée Foundation is a Bahamian foundation which Mr Nasrallah caused to be created in 2013. It is denied that the Pensée Foundation was created to receive Secret Commissions for the benefit of Mr Al Rajaan and to conceal his ownership thereof.

16.    As to paragraphs 17 to 28A28H:

16.1.    It is admitted that Mirabaud and Pictet provided financial services to PIFSS.

16.2.    It is admitted that Mr Mirabaud and Mr Fauchier-Magnan have been partners in Mirabaud.

16.3.    It is admitted that Mr Bertherat is a former partner of Pictet and that Mr Amouzegar is a former employee of Pictet.

16.4.    The first sentences of paragraphs 20(a), 26, 27 and 28A are admitted.

16.5.    It is admitted that Mr Ghittini worked for VP bank (the precise nature of his role and which entity employed him is not admitted).

18

16.5A It is admitted that the Luxembourg Register of Beneficial Owners records Mr Ruimy as the indirect beneficial owner of 100% of Aerium Holdings as at 6 September 2019.

16.6. Save as set out above, paragraphs 17 to 28AH are not admitted as they contain allegations made against other Defendants and/or contain matters and details outside the direct knowledge of Mr Al Rajaan and the First Defendant.

## C.   THE ALLEGED SCHEMES

17. Paragraphs 29 to 50 are denied for the reasons pleaded below and at paragraph 4 above (which is repeated). The allegation in paragraph 50 brought by way of amendment that PIFSS has suffered unspecified "*harm*", including (also) unspecified "*reputational harm*", is embarrassingly vague and unparticularised. Without prejudice to the generality of that contention, by a letter of 25 July 2024 PIFSS clarified and confirmed that (i) the allegation of reputational harm is made only insofar as PIFSS fails to establish any other relevant harm, (ii) it does not seek to "*quantify or claim any specific compensation attributable to loss of reputation, beyond the remedy afforded under Article 16*" as a result of alleged breaches of Articles 11 and/or 12 PPL (i.e. the value of the "Secret Commissions" and any benefits received pleaded at paragraph 351). Even so limited, the pleading is embarrassingly vague, unparticularised and denied, because: (i) compensation for reputational harm is available only under Article 231 of the KCC, not Articles 11 and 16 off the PPL (as PIFSS has itself pleaded at paragraph 345); and (ii) further or alternatively, no particulars are given of any harm other than the financial harm caused by the Secret Commissions. That does not constitute a distinct "*material*" (i.e. financial) harm resulting from damage to reputation which would in principle be recoverable under Article 231.[4] Paragraphs 51 and 52 are noted.

18. PIFSS's allegations in relation to the alleged schemes are complex and span a time period in excess of two decades. Mr Al Rajaan pleadeds (and the First Defendant now pleads) to the detail of these allegations in sections E-J(3) below. In so doing:

18.1. Mr Al Rajaan was and the First Defendant is under no obligation to admit or deny PIFSS's allegations otherwise than on the basis of his/its then current/current knowledge and what was/is readily ascertainable from information or documents at his ready disposal. Without prejudice to that (and without any further waiver of privilege), Mr Al Rajaan has caused his legal advisers to review substantial repositories of documents and information made available to him during the course of legal proceedings (in particular the Swiss criminal

proceedings), and (in the limited time available) ~~has~~ sought the assistance of a forensic accountant, so as to enable him to plead more fully than might otherwise have be~~en~~ possible in light of those materials.  For the avoidance of doubt, ~~(a) such work is ongoing (including the verification of documents generated by the Swiss Criminal Authorities) and (b)~~ the First Defendant and Mr Al Rajaan make~~s~~ no waiver of privilege in respect of ~~his~~ Mr Al Rajaan's and/or the First Defendant's advisers' review of such repositories or in the forensic accountant's instructions or work product.

18.2.    In the context of the alleged schemes, Mr Al Rajaan admit~~ted~~s certain allegations made by PIFSS and in relation to certain documents identified by PIFSS.  Such admissions ~~are~~ were based on documents or information obtained by Mr Al Rajaan in the course of legal proceedings, without any admission as to the authenticity, validity or effect of such documents or as to the accuracy of their contents. To the extent that Mr Al Rajaan admit~~ted~~s those allegations, it is not admitted that Mr Al Rajaan had knowledge of the fact, matter, relevant document or information at the time, unless an allegation is made in respect of a document signed by Mr Al Rajaan personally or unless that is specifically alleged and admitted or an allegation is made of an act or omission by Mr Al Rajaan personally.

18.3.    Mr Al Rajaan admit~~ted~~s certain allegations in relation to sums transferred or invested. Such admissions ~~are~~ were based on documents or information ~~currently~~ then available to Mr Al Rajaan as a result of legal proceedings and with the assistance of the forensic accountant.  Where Mr Al Rajaan admit~~ted~~s that sums broadly in the amount alleged were transferred or invested, the precise amount is not admitted.

18.4.    The First Defendant ~~Mr Al Rajaan~~ reserves the right to seek to amend this Defence if and when further documents or information become available or with the benefit of further analysis by the First Defendant's legal advisers and the forensic accountant, in particular (but without limitation) in relation to allegations that transfers were made to or from individuals other than Mr Al Rajaan and admissions are made without prejudice to that position.

**D.    GOVERNING LAW**

18A.    As to paragraph 52A, it is denied that "*Kuwaiti law applies… to the exclusion of all other potential governing laws*" for the reasons at paragraph 21 below.

19.    Paragraph 53 is admitted.

20.    Paragraph 54(a) is denied. Paragraph 54(b) is admitted, on the basis that PIFSS's reference to "*the general law*" is to common law principles of private international law.

21.    Paragraph 55 is denied. The monies paid to the benefit of Mr Al Rajaan were paid into Swiss bank accounts or, in a minority of cases, into offshore accounts operated by Pictet, a Swiss financial institution (save in respect of the alleged "4 Nasrallah/Pensée scheme, which is an alleged continuation of other alleged schemes). Further, the financial institutions with which PIFSS invested and which PIFSS claims to have been party to the alleged schemes were Swiss financial institutions (with the ~~sole~~ exception of the Man Group, which used a Swiss subsidiary to contract with, and to pay, Mr El Ghazzi and the Aerium/Aeriance Group, the parent company of which was incorporated in Luxembourg); and it is to be inferred (pending disclosure) that none of PIFSS's contracts with such institutions provided for Kuwaiti law to be the applicable law. Moreover, after August 1990 Mr Al Rajaan was domiciled and/or living in Switzerland. Accordingly:

    21.1.    As to paragraph 55(a), the relevant foreign law for any claim that PIFSS wishes to bring against the Estate ~~Mr Al Rajaan~~ that arises from acts or omissions prior to 1 May 1996 is the law of Switzerland and not the law of Kuwait.

    21.2.    As to paragraph 55(b), the relevant events constituting the tort or delict occurred in Switzerland and/or the damage occurred in Switzerland and there is no reason to displace the general rules provided in PILA 1995 or the Rome II Regulation. Accordingly, PIFSS's claims relating to acts or omissions that occurred after 1 May 1996 are governed by the law of Switzerland.

    21.3.    As to paragraph 55(c), PIFSS's claims in restitution in relation to payments that were received by Mr Al Rajaan after 1 May 1996 are governed by the law of Switzerland, that being the system of law in respect of which any tort or delict claim arises and/or that being the country in which any alleged enrichment occurred.

22.    As to paragraph 56:

    22.1.    The reference in paragraph 56(a) to "*the relationship*" between PIFSS and Mr Al Rajaan is embarrassingly vague.

    22.2.    The reference in paragraph 56(b) to "*the relationship*" between agents and employees of the Swiss Bank defendants is embarrassingly vague.

22.3.    Pending proper particulars, paragraph 56 is denied.

23.    Paragraph 57 is denied.  There is no basis for finding that English law applies to any claim against the Estate~~Mr Al Rajaan~~ and it would be inappropriate (and wrong) for the Court to assume that any relevant applicable law is the same as English law.  Given that the proper law of any claim against the Estate ~~Mr Al Rajaan~~ is Swiss law, in the absence of any pleaded case by PIFSS under the law of Switzerland, PIFSS's claim was liable to ~~should~~ be struck out on the basis that PIFSS had ~~has~~ failed to set out the facts and matters on which its claim is properly based.  Accordingly and in any event, the First Defendant ~~Mr Al Rajaan~~ should be entitled to ~~his~~ the costs of these proceedings until such moment as PIFSS's claim was properly constituted (through the inclusion of the claims based on Swiss law).

## Kuwaiti Law – The Legal Framework

24.    As to paragraph 58:

24.1.    The first sentence of paragraph 58(a) is admitted.

24.2.    As to the second sentence of paragraph 58(a), it is admitted that there are specific Kuwaiti laws that also provide for specific wrongful conduct but it is denied that the Kuwaiti Civil Code is "*supplemented*" by those laws as alleged.  Where there is a *lex specialis*, that law prevails and takes priority over the Kuwaiti Civil Code (being a *lex generalis*), rather than merely supplementing the Kuwaiti Civil Code.

24.3.    Paragraph 58(b) is admitted.

24.4.    Save that the reference to "*default provision*" is embarrassingly vague, the first sentence of paragraph 58(c) is admitted.  The reference to "*[c]onduct that gives rise to a criminal act*" being "*treated as fault*" in the second sentence of paragraph 58(c) is embarrassingly vague, and that sentence is not admitted.[4] The ~~second~~ third[4] sentence of paragraph 58(c) is further[4] denied.  In fact:

(1)    In order for a victim to bring a civil claim under Article 227 in reliance on the fact of a criminal act, it is necessary ~~(a)~~ for a criminal court to have found that a crime has been committed.~~; and/or~~ Alternatively, ~~(b) for~~ the victim can seek restitution or compensation ~~to have~~ by becoming ~~a~~ a civil party to the criminal proceedings and ~~to have~~ claiming~~ed~~ in those proceedings for the loss and damage suffered by them.

(2)    Accordingly, ~~in either case,~~ it is necessary for the victim to rely on the

findings of a Kuwaiti criminal court in order to advance a claim under Article 227 where the victim ~~wrong~~ relie~~d up~~on the fact of a criminal act to establish the wrong ~~is a breach of the Kuwaiti~~ ~~criminal law~~.

(3)     A claim under Article 227 by PIFSS, which is an emanation of the Kuwaiti State, on the basis of an alleged breach of Kuwaiti criminal law, represents an assertion of foreign sovereign authority and an attempt directly or indirectly to enforce the penal law of a foreign state and is not justiciable in the Courts of England and Wales.

(4)     As a matter of Kuwait law, where an individual dies: (i) before criminal proceedings are commenced, then no criminal proceedings may be brought; (ii) after criminal charges are brought but before the court renders its judgment, the proceedings must be discontinued and the criminal case is extinguished; (iii) after a first instance judgment but before appeal proceedings are concluded, the criminal case is extinguished.

24.5.   Save that the reference to "*Breach of other specific laws*" in paragraph 58(d)(c) is embarrassingly vague, paragraph 58(d) is admitted.

24.6.   Paragraph 58(e) is admitted. Claims by PIFSS under or reliant upon Article 40 of Law No.31 of 1970 or the Public Property Law represent an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal laws of Kuwait. They are not justiciable in the Courts of England and Wales.

24.7.   The first sentence of paragraph 58(f) is admitted. The second sentence of paragraph 58(f) is denied. In fact:

(1)     In order for a victim to bring a civil claim under Article 229 in reliance on a criminal act, it is necessary ~~(a)~~ for a criminal court to have found that a crime has been committed~~.; and/or~~ Alternatively, ~~(b) for~~ the victim can seek restitution or compensation ~~to have~~ by becom~~ing~~ ~~e~~ a civil party to the criminal proceedings and ~~to have~~ claim~~ing~~~~ed~~ in those proceedings for the loss and damage suffered by them.

(2)     Accordingly, ~~in either case,~~ it is necessary for the victim to rely on the findings of a Kuwaiti criminal court in order to advance a claim under Article 229 where the victim ~~wrong~~ relie~~d up~~on the fact of a criminal act to establish the wrong ~~is a breach of the Kuwaiti~~ ~~criminal law~~.

23

(3)     A claim under Article 229 by PIFSS, which is an emanation of the Kuwaiti State, on the basis of an alleged breach of Kuwaiti criminal law, represents an assertion of foreign sovereign authority and an attempt directly or indirectly to enforce the penal law of a foreign state. It is not justiciable in the Courts of England and Wales.

(4)     ~~Further or alternatively, if it is material (which it is not for the reasons set out above), Article 49 of the Penal Code was ruled as unconstitutional by three decisions of the Supreme Constitutional Court of Kuwait: challenge No. 6, J.Y 2007, hearing session 22 April 2008 (as to the first paragraph of Article 49); challenge No. 7, J.Y 2009, hearing session 7 June 2009 (as to the second paragraph of Article 49); challenge No. 12, J.Y 2010, hearing session 15 March 2010 (as to the third paragraph of Article 49).~~

24.8.   Save that ~~(a) the reference to "*principal*" tortfeasors is not understood; and (b)~~[4] paragraphs 24.4(1)-(3), 24.6 and 24.7(1)-(3) above are repeated, paragraph 58(g) is admitted.

24.9.   Paragraph 58(h) is irrelevant to the claim that is brought against <u>the Estate</u> ~~Mr Al Rajaan~~ and is not admitted.

**Specific provisions of foreign law**

**Kuwait law**

<u>Mr Al Rajaan</u>

25.     As to paragraph 59:

25.1.   Paragraphs 24.4, 24.6 and 24.7 above are repeated.

25.2.   Further or alternatively, if it is material (which it is not for the reasons set out above), it is admitted that Mr Al Rajaan would be deemed by a Kuwaiti Court to be a public employee for the purposes of Article 3 of the Public Property Law and Article 43 of the Penal Code.

25.3.   It is denied that Mr Al Rajaan owed PIFSS any fiduciary duties. The laws of Kuwait do not recognise the existence of such duties.

25.4.   It is not admitted that PIFSS adopted Civil Service Law No.15 of 1979 pursuant to board decision No.1/1977.

24

25.5.    It is admitted that Mr Al Rajaan owed to PIFSS the duties identified in paragraphs 59(a) to 59(e).

25.6.    Save as set out above, paragraph 59 is denied.

26.    Paragraph 60 is admitted.  A claim by PIFSS under or reliant upon Article 35 of the Penal Code as amended by Law No.31 of 1970 represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait.  It is not justiciable in the Courts of England and Wales.

27.    Contrary to the requirements of paragraph C1.1(e) of the Commercial Court Guide paragraph 61 does not plead facts and/or the source of the assertions made in that paragraph is unclear.  As a result and/or pending proper particulars, paragraph 61 is not admitted.

28.    Paragraph 62 is admitted as containing a partial summary of Article 11 of the Public Property Law and the explanatory memorandum thereto. A claim by PIFSS under or reliant upon that Article represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait.  It is not justiciable in the Courts of England and Wales.

28A.    Paragraphs 62A and 62B are admitted as containing partial summaries of Article 12 of the Public Property Law, Article 2 of the Money Laundering Law No.35 of 2002 and Article 2 of the Money Laundering Law No.106 of 2013. However:[4]

28A.1.    An offence is only committed under Article 12 if the relevant profit or benefit is sought or obtained "*in any unlawful manner*".[4]

28A.2.    It is denied that the two Article 2 provisions applied "*at all material times*" (insofar as this is intended to denote the claim period of 1995 to 2015). Those provisions applied prospectively from their enactments in 2002 and 2013 respectively.[4]

28A.3.    Claims by PIFSS under or reliant upon these Articles represent an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait. They are not justiciable in the Courts of England and Wales.[4]

**Third parties**

Bribery

29.    Save that Article 49 of the Penal Code was ruled as unconstitutional (by reason of the

25

~~decisions identified in paragraph 24.7(4) above),~~ Paragraph 63 is admitted as containing a partial summary of Article 11 of the Penal Code.  A claim by PIFSS under or reliant upon that Article represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal laws of Kuwait. It is not justiciable in the Courts of England and Wales.

30.    Save that the words "*for himself or for others*" should be inserted after the words "*public employee*", paragraph 64 is admitted as containing a partial summary of Article 37 of the Penal Code as amended by Law No.31 of 1970.  A claim by PIFSS under or reliant upon that Article represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait.  It is not justiciable in the Courts of England and Wales.

31.    Paragraph 65 is denied. Article 39 of the Penal Code as amended by Law No.31 of 1970 makes no reference to a party offering a payment or promise with the intention of buying the public employee's loyalty.  Article 39 of the Penal Code provides in material part that, "*The briber and intermediary shall be punished by the penalty prescribed for the bribee*".   In any event, a claim by PIFSS under or reliant upon the Penal Code represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait.  It is not justiciable in the Courts of England and Wales.

32.    Paragraph 66 is admitted.

Public Property

33.    Paragraphs 67 and 68 are admitted as containing a partial summary of Articles 4 and 16 of the Public Property Law.  A claim by PIFSS under or reliant upon those Articles represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait.  It is not justiciable in the Courts of England and Wales.

34.    As to paragraph 69:

34.1.    The first sentence of paragraph 69 is admitted as containing a partial summary of Article 22 of the Public Property Law, save that it is denied that Article 22 refers to an order being executory against a person's "*property*": an order is expressed to be executory against a person's "*monies*".  A claim by PIFSS under or reliant upon that Article represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait.  It is not

justiciable in the Courts of England and Wales.

34.2.   The second sentence of paragraph 69 is denied. Article 2 of the Public Property Law defines "*public property*" as property which is "*owned by or is subject to*" various public institutions. Neither Article 2 nor the other Articles relied on by PIFSS (Articles 11, 22-25 and 28 of the Public Property Law) render any unauthorised benefit the property of the public institution, nor give the public institution any right to follow or trace. Alternatively, if (which is denied) the provisions relied on by PIFSS had that effect, they amount to a penal and/or public Kuwaiti law of confiscation and any claim by PIFSS under or reliant on them represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait. It is not justiciable in the Courts of England and Wales.

35.   Paragraph 70 is admitted as containing a partial summary of Article 28 of the Public Property Law. A claim by PIFSS under or reliant upon that Article represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait. It is not justiciable in the Courts of England and Wales.

Money laundering[4]

35A.   Paragraph 70A is not understood to be relevant (or said by PIFFS to be relevant) to the claim against Mr Al Rajaan. In any event paragraph 28A (including subparagraphs 28A.2 and 28A.3) above are repeated.[4]

**Provisions of the Penal Code concerning incitement, participation and accessory liability to criminal offences**

36.   ~~Save that Article 49 of the Penal Code was ruled as unconstitutional (by reason of the decisions identified in paragraph 24.7(4) above), p~~Paragraphs 71, and 72 ~~and 73~~ are admitted as containing a partial summary of Articles 47, and 48 ~~and 49~~ of the Penal Code. A claim by PIFSS under or reliant upon those Articles represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal laws of Kuwait. It is not justiciable in the Courts of England and Wales.

Liability of legal persons[4]

36AA.   Paragraphs 72A to 72D are irrelevant to the claim against the Estate and are not admitted.[4]

**Provisions of Swiss Law**

27

36A    As to paragraph 73A:

36A.1    The translation of the SCO (and SPC) relied on by PIFSS is not an official version of the SCO. The First Defendant Mr Al Rajaan reserves the right to refer to the official French, German or Italian versions of the SCO and SPC (and any other relevant provisions of Swiss law) in the event of any dispute as to the accuracy, meaning or effect of the English translations in the Particulars of Claim.

36A.2    Where Mr Al Rajaan it is admitted s that the Particulars of Claim contain an accurate summary of a provision of Swiss law (whether in relation to paragraph 73A or elsewhere in this Defence), the admission is limited to admitting that the paragraph contains an accurate summary of the particular provision; no admission is made as to how the provision is to be interpreted or applied under Swiss law, unless expressly admitted below.

36A.3    The First Defendant Mr Al Rajaan will as necessary rely on such other sections of the SCO and/or on any other applicable provision of Swiss law, as well as on any case law and/or legal literature that are relevant to interpreting the provisions of Swiss law and determining liability in tort.

36B    As to paragraph 73B:

36B.1    It is admitted that paragraph 73B contains a broadly accurate summary of the constituent elements of liability in tort.

36B.2    It is denied that negligence is presumed in all cases of vicarious liability pursuant to Article 41 of the SCO.

36B.3    Negligence does not give rise to liability in tort where the alleged fault is based on a criminal offence which requires proof of intention (which is the case for Articles 158, 322 *septies* and 305 *bis* of the SPC, as set out below).

36C    As to paragraph 73C:

36C.1    The first sentence is admitted.

36C.2    It is admitted that paragraph 73C contains an accurate summary of Articles 42(1), 42(2) and 43(1) of the SCO.

36C.3    In determining the amount of any "*compensation*" due, Article 44.1 of the SCO provides that: "*Where the person suffering damage consented to the harmful act or*

*circumstances attributable to him helped give rise to or compound the damage or otherwise exacerbated the position of the party liable for it, the court may reduce the compensation due or even dispense with it entirely"*.

36D    Paragraph 73D is admitted. A causal link may be broken by the fault of the victim or a third party as set out in Articles 44 (1) and 43 (1) of the SCO.

36E    Paragraph 73E is admitted. Claims by PIFSS under or reliant upon the Swiss Criminal Procedure Code represent an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal laws of Switzerland. They are not justiciable in the Courts of England and Wales.

36F    Paragraph 73F is inadequately particularised and is not admitted. A breach of the Articles set out in paragraph 73F may give rise to a claim in tort in certain circumstances. However, Articles 322 *septies* and 305 bis of the SPC only give rise to protective norms that would in turn give rise to a civil claim in respect of damage to property in specific circumstances (addressed below). In any event, claims by PIFSS under or reliant upon the SPC represent an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal laws of Switzerland. They are not justiciable in the Courts of England and Wales.

**Joint and several (solidary) liability in cases of complicity on the part of multiple defendants**

36G    As to paragraph 73G:

36G.1    The first sentence of paragraph 73G is admitted.

36G.2    The second sentence of paragraph 73G is admitted as containing a broadly accurate summary of the circumstances in which joint liability may arise.

36G.3    The SCO provides that there are two types of joint liability: perfect joint liability (provided for in Article 50 of the SCO and pleaded by PIFSS) and imperfect joint liability (Article 51 of the SCO).

36G.4    Joint liability arises under Article 50 of the SCO where there is (i) damage, resulting from a common fault committed by the co-defendants, and where there exists a causal link between the behaviour of the co- defendants and the damage. Common fault exists where there is an intent to jointly cause damage, in the sense that there is a "consciousness" between the parties involved that they are

29

collaborating towards a particular result.

36H     Paragraph 73H is admitted. For the purposes of Article 50(3) of the SCO, an abettor is a recipient of stolen goods. The liability of an abettor is limited to the extent of the consequential damage caused by the abettor.

36I     Paragraph 73I is admitted as containing a broadly accurate summary of Articles 12(2), 25 and 26 SPC, save that:

> 36I.1     Article 26 SPC provides in full that: "*If criminal liability is established or increased by a special obligation on the part of the offender, a participant is liable to a reduced penalty*".

> 36I.2     Article 12(2) SPC provides in full that: "*A person commits a felony or misdemeanour wilfully if he carries out the act in the knowledge of what he is doing and in accordance with his will. A person acts wilfully as soon as he regards the realisation of the act as being possible and accepts this.*"

**Criminal Mismanagement – Article 158 of the SPC**

36J     It is admitted that paragraph 73J contains an accurate summary of the offence under Article 158 SPC. Claims by PIFSS under or reliant upon Article 158 of the SPC represent an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal laws of Switzerland. They are not justiciable in the Courts of England and Wales.

36K     It is admitted that paragraph 73K contains a broadly accurate summary of the cumulative conditions that must be met in order for a person to be a "*manager*" for the purposes of Article 158, save that:

> 36K.1     As to paragraphs 73K(a) and (b): a "*manager*" must be subject to an obligation or duty to safeguard or supervise the pecuniary interests of the owner of the managed assets and his activities must relate to the management or protection of such pecuniary interests.

> 36K.2     The reference to "*other authorisation*" in paragraph 73K(a) is embarrassingly vague and is not admitted.

> 36K.3     It is denied that the requisite level of independence is satisfied solely on the basis that an individual is one member of a governing organ of a legal entity. In those circumstances the autonomy is exercised by the organ and its members as a whole.

36K.4    It is denied that a "*minimum level of independence in her/his decision taking in relation to the property*" is sufficient; a relatively high level of independence in relation to the relevant decisions is required.

36L    As to paragraph 73L:

36L.1    It is denied that the forms of conduct set out in paragraph 73L would always constitute a breach of duty contrary to the requirements of Article 158. PIFSS must in each case establish that (i) the manager breached one of the specific obligations to which he was subject by virtue of his duty to manage and protect the pecuniary interests of PIFSS, and (ii) the specific conduct that constituted the breach of duty was contrary to the interests of PIFSS and caused damage to PIFSS. Further, there is no breach of duty where it is demonstrated that the relevant act was known, and thus approved, by the alleged victim.

36L.2    As to paragraph 73L(a): it is denied that the failure to disclose or return an undue advantage constitutes criminal mismanagement *per se*. A breach of Article 158 occurs where the payment or receipt of the undue advantage leads the manager to act contrary to the interests of the principal and the principal thereby suffers damage.

36L.3    Save as set out above, paragraph 73L is not admitted.

36M    Paragraph 73M is admitted.

36N    Paragraph 73N is admitted. Paragraph 36D above is repeated.

36O    Paragraph 73O is denied. Paragraph 36L is repeated.

36P    Paragraph 73P is inadequately particularised in that the legal basis for the assertion is not set out and is not admitted. The First Defendant Mr Al Rajaan reserves the right to plead further if better particulars are provided.

36Q    Paragraph 73Q is admitted.

**Bribery of a foreign public official – Article 322 *septies* of the SPC**

36R    Paragraph 73R is admitted, save that:

36R.1    Claims by PIFSS under or reliant upon Article 322 *septies* of the SPC represent an assertion of foreign sovereign authority and an attempt to enforce directly or

31

indirectly the penal laws of Switzerland.  They are not justiciable in the Courts of England and Wales.

36R.2    Article 322 *septies* separates active corruption and passive corruption: the former concerns the payment or conferring of an undue advantage and the latter the receipt of any such undue advantage.

36R.3    In order for a breach of Article 322 *septies* to be established, there must be a relationship between the undue advantage promised or conferred and the conduct that is contrary to the public official's duties.

36S    As to paragraph 73S:

36S.1    Save that it is admitted that "*Foreign public official*" is an autonomous concept which includes individuals who perform public duties, the first sentence is embarrassingly vague and is not admitted.

36S.2    The last sentence of paragraph 73S is admitted.

**Money laundering – 305 *bis* of the SPC**

36T    Paragraph 73T is admitted. Claims by PIFSS under or reliant upon Article 305 *bis* of the SPC represent an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal laws of Switzerland.  They are not justiciable in the Courts of England and Wales.

36U    Paragraph 73U is admitted.

36V    As to paragraph 73V:

36V.1    Assets can only be the object of money laundering for the purposes of Article 305 *bis* of the SPC where the assets are the direct product of a crime or their proven replacement.

36V.2    The damage for which a defendant is liable in a civil claim which is itself predicated on the criminal offence of money laundering is limited to the value of the assets the defendant concealed and does not extend to the entire assets originating from the predicate offence.

36V.3    The legal basis for the assertions in paragraph 73V(b) is not stated and the paragraph is not admitted.

36V.4    Save as set out above, paragraph 73V is not admitted.

36W    Paragraph 73W concerns the liability of "corporate entities" and the First Defendant Mr Al Rajaan does not plead to it.

**Limitation**

36X    As to paragraph 73X:

36X.1    It is admitted that paragraph 73X contains an accurate summary of Articles 60(1), 60(2) and 55 of the SCO. The First Defendant Mr Al Rajaan will refer at trial to the provisions of Article 60 of the SCO, together with related case law, for their full meaning and effect.

36X.2    It is not necessary for the claimant to be able to quantify the full extent of the loss in order to be "aware" of the loss or damage for the purposes of calculating the date from which the limitation period starts to run pursuant to Article 60(1).

36Y    As to paragraph 73Y:

36Y.1    Paragraph 73Y contains a partial summary of Articles 97(1)(b) and 98 of the SPC and their application.  They have no relevance in that claims by PIFSS under or reliant upon the SPC represent an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal laws of Switzerland.  They are not justiciable in the Courts of England and Wales.

36Y.2    As to paragraph 73Y(b), the provision relied on by PIFSS is primarily applicable in situations where the commission of an offence involves several actions and has the effect that the limitation period runs from when the last action forming part of the offence was committed. In the case of separate, successive offences, the limitation period runs separately for each offence from the date of the last action forming part of each offence.  It has no relevance to this case for the reasons set out below.

36Y.3    As to paragraph 73Y(c): the provision relied on by PIFSS is primarily applicable where the offence is a continuing offence and has the effect that the limitation period runs from the date on which the continuing offence ceases. It has no relevance to this case for the reasons set out below.

36Y.4    The principles in paragraphs 73Y(b) and (c) are exceptions to the standard limitation provision in Article 60 of the SCO and are applied restrictively.

33

36Z        As to paragraph 73Z:

    36Z.1    It is admitted that paragraph 73Z contains an accurate summary of Articles 135(2) and 136 of the SCO.

    36Z.2    In the event proceedings commenced before a court in a jurisdiction outside Switzerland are not properly filed in the sense that the foreign court was not competent (according to the domestic law of that court or Swiss international law) or the formal requirements for filing the claim were not complied with, the statute of limitations is not interrupted.

    36Z.3    The interruption of a limitation period is effective to interrupt the limitation period only in respect of the maximum sum indicated by the claimant in the action relied on to interrupt the limitation period.

**Application of Swiss law**

**Criminal Mismanagement – Article 158 of the SPC**

36AA     As to paragraphs 73AA and 73BB:

    36AA.1  It is denied that Mr Al Rajaan committed an offence under Article 158 of the SPC and/or that he is liable to PIFSS for a civil claim predicated on such an offence.

    36AA.2 Article 158 does not apply where the property alleged to have been mismanaged is the property of a public entity. PIFSS, as a state entity, cannot claim for alleged criminal mismanagement under Article 158 in respect of its property. The following paragraphs are without prejudice to this position.

    36AA.3 Further as to paragraph 73AA:

        (1)    It is denied that Mr Al Rajaan was entrusted with the management of property in the interests of PIFSS within the meaning of Article 158 of the SPC.

        (2)    Mr Al Rajaan was not in a position of sufficient autonomy or independence in respect of the management of PIFSS's assets for the purposes of Article 158 of the SPC. Investment decisions were made by the Internal Investment Committee or Supreme Investment Committee based on analysis and reports prepared by the relevant PIFSS departments. Mr Al Rajaan did not control or influence decisions to invest PIFSS's assets. Paragraphs 9.1 to 9.11

34

above are repeated.

(3)     Further, paragraph 73AA is inadequately particularised in that it is unclear which of the duties pleaded in paragraph 59 are alleged to constitute breaches of qualifying protective norms protecting PIFSS's interests such that the breach gives rise to liability under Article 158.

36AA.4  Further as to paragraph 73BB, it is denied that Mr Al Rajaan breached the duties listed at paragraph 59 in the manner pleaded at paragraph 339 (as further particularised in the POC) for the reasons set out below at paragraphs 296.1 and 296.4 and as particularised in this Defence in response to each of the alleged schemes.

36AA.5  Further or alternatively, PIFSS did not suffer any actionable loss or damage for the purposes of Article 158 of the SPC:

(1)     The receipt and/or non-disclosure of a financial advantage does not per se amount to a loss consequent on criminal mismanagement for the purposes of Article 158: the receipt or non-disclosure must have caused Mr Al Rajaan to act contrary to the interests of PIFSS, which he did not do.

(2)     Mr Al Rajaan did not act with the requisite intention for the purposes of Article 158. In particular, Mr Al Rajaan did not intend to cause harm or loss to PIFSS. Paragraph 4.11 above is repeated.

(3)     Mr Al Rajaan did not act with an intention to secure an unlawful gain. Mr Al Rajaan believed that he was permitted to receive the monies. Paragraphs 4.7 to 4.10 above are repeated.

(4)     The payments to Mr Al Rajaan were not made from money belonging to PIFSS or that would ultimately and eventually be due to PIFSS from the banks or the financial intermediaries. The payments were made from money that was contractually and lawfully the money of the banks and the financial intermediaries with whom or through whom PIFSS made investments.

36AA.6  Alternatively, if (which is denied), PIFSS suffered any damage:

(1)     PIFSS consented to the harm in that PIFSS knew that certain banks and other financial institutions were transferring monies to Mr Al Rajaan and/or were

35

aware of the rumours that Mr Al Rajaan was receiving such monies and of his lifestyle (Article 44.1 SCO). Paragraphs 4.8 and 4.10 above are repeated.

(2)     Further or alternatively, Mr Al Rajaan did not cause such loss.

(3)     Further or alternatively, PIFSS's claims are time-barred for the reasons set out at paragraphs 36FF and 36GG below.

36AA.7    Further or alternatively, in bringing the claims PIFSS is not acting in   good faith in breach of Article 2 of the Swiss Civil Code ("**SCC**"):

(1)     Article 2 of the SCC provides that, "*Every person must act in good faith in the exercise of his or her rights and in the performance of his or her obligations.*"

(2)     The claims by PIFSS are politically motivated such that PIFSS is not acting in good faith. Paragraphs 8.1 to 8.5 above are repeated.

(3)     Further or alternatively, paragraphs 36AA.6(1) and (2) are repeated.  It is a breach of the duty of good faith to bring a claim in those circumstances, as it is for PIFSS (a) to fail to disclose assets that have already been confiscated in Kuwait and other jurisdictions; (b) to assert a distinction between it and the State of Kuwait in refusing to provide such disclosure; and (c) to fail to reduce the value of its claims to reflect the confiscations that have been made.

(4)     Further or alternatively, PIFSS's conduct in electing initially to pursue claims in Switzerland and to use that process to obtain extensive disclosure through the Swiss Prosecutor's investigation and mutual legal assistance process and injunctive relief, before bringing claims and seeking further injunctive relief in the courts of England and Wales notwithstanding that PIFSS continues to seek information (and encourage the Swiss Prosecutor to make requests for information) via the Swiss criminal investigation is contrary to the obligation to litigate in good faith.

(5)     Accordingly, by reason of that breach of Article 2 of the SCC, PIFSS's claim should be dismissed.

36AA.8    Further, PIFSS brings a civil claim predicated on the fact that Mr Al Rajaan has committed an offence under Article 158 of the SPC. The Swiss criminal authorities have been investigating Mr Al Rajaan since 2012 and PIFSS has supported and

assisted that investigation since at least 2015. In those circumstances, PIFSS's claims which rely on an allegation that such an offence was committed should be stayed to await a final decision of those authorities. In the event the Swiss authorities determine that no offence was committed, PIFSS's civil claims would be groundless as a matter of Swiss law.

36BB    Paragraph 73CC concerns the liability of Defendants other than Mr Al Rajaan and the First Defendant Mr Al Rajaan does not plead to it.

**Article 322 *septies* (2) of the SPC – bribery of foreign public official**

36CC.    As to paragraph 73DD:

36CC.1    It is denied that Mr Al Rajaan committed an offence under Article 322 *septies* (2) of the SPC and/or is liable to PIFSS in a civil claim predicated on such an offence.

36CC.2    Mr Al Rajaan cannot be considered a typical "*foreign public official*" for the purposes of Article 322 *septies* (2) SPC in circumstances where he was, at the relevant times, domiciled and had a work permit in Switzerland, paid taxes in Switzerland and was permitted to engage in other professional activities in addition to his role at PIFSS.

36CC.3    Mr Al Rajaan did not receive an "*undue*" advantage in circumstances where: (i) PIFSS was aware that Mr Al Rajaan received monies from financial institutions and did not inform Mr Al Rajaan that he was not permitted to do so; (ii) PIFSS consented to the acts that caused the alleged harm; (iii) Mr Al Rajaan considered it to be standard market custom and practice in Kuwait for institutions to make such payments. Paragraphs 4.7 to 4.10 above are repeated.

36CC.4    Mr Al Rajaan did not carry out acts or omissions in breach of his duties as Director General of PIFSS (for the reasons set out elsewhere in this Defence) and did not use his discretion to carry out acts or omissions as a result of the receipt of monies from any financial institutions.

36CC.5    Mr Al Rajaan did not act with the requisite intention in that: (i) he did not intend to obtain or receive an undue advantage (as set out above, Mr Al Rajaan believed that he was entitled to receive the monies); (ii) in the event he committed any act or omission in breach of his duties as Director General of PIFSS (which is denied) he did not intend to do so; and/or (iii) he did not intend to exercise his discretion in relation to PIFSS's assets as a result of the receipt of monies.

37

36CC.6     PIFSS did not suffer any loss or damage as a direct result of the alleged offences. Paragraph 4.11 above is repeated. PIFSS therefore has no civil claim.

36CC.7     Further or alternatively, Article 322 *septies* (2) of the SPC was introduced in July 2006. PIFSS has no basis for a claim where the acts relied on to found liability took place before July 2006.

36CC.8     PIFSS's claims are time-barred for the reasons set out at paragraphs 36FF and 36GG below.

36CC.9     Further or alternatively, in bringing the claims PIFSS is acting in breach of Article 2 of the SCC.  Paragraph 36AA.7 above is repeated.

**Article 305 *bis* of the SPC – money laundering**

36DD.     As to paragraph 73EE:

36DD.1   It is denied that Mr Al Rajaan committed an offence under Article 305 *bis* of the SPC and/or is liable to PIFSS in a civil claim predicated on such an offence.

36DD.2   It is denied that payments to Mr Al Rajaan constituted "*Secret Commissions*" and that their transfer to or receipt by him constituted a criminal offence. In the circumstances, there was no predicate criminal offence and no tainted assets resulting from an offence to be the object of money laundering.

36DD.3   Mr Al Rajaan did not frustrate the forfeiture of assets. The overseas companies of Mr Al Rajaan were set up by and/or on the advice of the financial institutions for inheritance and tax planning purposes.

36DD.4   Mr Al Rajaan did not act with the requisite intention or wilfulness for the purposes of Article 305 *bis* SPC: (i) if, which is denied, the payment of any monies to Mr Al Rajaan was a criminal offence, it is denied that Mr Al Rajaan "*knew or turned a blind eye to the fact that such payments originated from criminal conduct*". Mr Al Rajaan believed that he was permitted to receive the monies (paragraphs 4.7 to 4.10 are repeated); (ii) Mr Al Rajaan did not intend to frustrate the forfeiture of assets in circumstances where structures were created by and on the advice of the financial institutions and for his own inheritance and tax planning purposes.

36DD.5   Mr Al Rajaan did not launder money in a professional capacity.

36DD.6     PIFSS did not suffer any damage from the alleged predicate offences, which

38

therefore cannot give rise to a liability in tort based on Article 305bis SPC.

36DD.7    Without prejudice to Mr Al Rajaan's primary position that he is not liable, the extent of the Estate's Mr Al Rajaan liability in a civil claim predicated on Article 305 *bis* SPC is limited to any amounts that he Mr Al Rajaan is found to have laundered; his liability does not extend to the entire proceeds of the predicate criminal offence.

36DD.8    Further or alternatively, PIFSS's claims are time-barred for the reasons set out at paragraphs 36FF and 36GG below. Further or alternatively, to the extent that the predicate criminal offence was time barred when the alleged acts constituting money laundering took place, there is no money laundering and PIFSS cannot make any claim on that basis.

36DD.9    Further or alternatively, in bringing the claims PIFSS is acting in breach of Article 2 of the SCC.  Paragraph 36AA.7 above is repeated.

36DD.10  Further, PIFSS brings a civil claim predicated on the fact that Mr Al Rajaan has committed an offence under Article 305 of the SPC. The Swiss criminal authorities have been investigating Mr Al Rajaan since 2012 and PIFSS has supported and assisted that investigation since at least 2015.  In those circumstances, PIFSS's claims which rely on an allegation that such an offence was committed should be stayed to await a final decision of those authorities. In the event the Swiss authorities determine that no offence was committed, PIFSS's civil claims would be groundless as a matter of Swiss law.

36EE.    Paragraph 73FF is denied.

36EE.1    Mr Al Rajaan did not commit offences under Articles 158, 322 *septies* (2) or 305 *bis* and is not liable in tort to PIFSS for the reasons set out above.

36EE.2    Further, Mr Al Rajaan did not act with an intention jointly to cause damage to PIFSS such that he is jointly liable for any damage caused by third parties.

36FF.    As to paragraph 73GG, a custodial sentence of more than three years is available only where the aggravated offences under Articles 158 and 305 *bis* are met. Without prejudice to Mr Al Rajaan's/the First Defendant's position that heMr Al Rajaan did has not committed any breaches of Articles 158, 322 *septies* (2) or 305 *bis*, it is denied that the conditions for the aggravated offences are met for the reasons set out in this Defence. In such a case, the limitation period is as set out at paragraph 73X.

36GG.    Paragraph 73HH is denied.

    36GG.1  For the reasons set out above, the limitation period runs separately for each alleged commission of an offence (i.e. from the date of each individual alleged act of mismanagement or receipt of a retrocession) under Articles 158, 322 *septies* (2) or 305 *bis*. It is denied that Articles 98(b) or 98(c) apply as the conditions for their application (at 36Y above) are not met.

    36GG.2  For the reasons set out at paragraph 310 of the Defence, PIFSS's claim under Swiss law is time-barred in its entirety.

36HH.    Paragraph 73II is noted. The First Defendant ~~Mr Al Rajaan~~ reserves the right to plead further in the event that PIFSS amends the Particulars of Claim to rely on s. 2 of the Foreign Limitation Periods Act 1984. Without prejudice to that position, it is denied that the application of Swiss limitation periods would cause undue hardship to PIFSS, in particular in circumstances where PIFSS was aware of Mr Al Rajaan's receipt of retrocessions and the Kuwait Parliament conducted investigations into Mr Al Rajaan as far back as the 2000s.

37.    Paragraphs 74 to 78 are irrelevant to the claim that is brought against the Estate ~~Mr Al Rajaan~~ and are not admitted.

## E.    THE MIRABAUD SCHEME

38.    Save as set out below, paragraph 79 is denied:

    38.1.    It is admitted that Mr Al Rajaan had discussions with Mr Mirabaud between about 1994 and January 1997. Mr Al Rajaan had very limited contact with Mr Fauchier-Magnan during the same period. Mr Al Rajaan did not discuss the payment of "*Secret Commissions*" with either Mr Mirabaud or Mr Fauchier-Magnan; Mirabaud has said that it paid monies to Mr Al Rajaan in return for Mr Al Rajaan's support in establishing valuable investment activities with third parties. Mr Al Rajaan did not ask Mirabaud for payments and there was no agreement that a certain amount would be paid. Mr Al Rajaan considered it to be standard market custom and practice in Switzerland and Kuwait for banks and financial institutions to make such payments and did not consider that this suggestion undermined his relationship with PIFSS (which it did not).

    38.2.    Further, Mirabaud put in place appropriate corporate structures for him for inheritance and tax planning purposes. To the best of Mr Al Rajaan's recollection, any discussions about incorporating offshore companies took place in that

context.

38.3.   In any event, payments (from Galmir through Silvery Bay) were made to accounts in the names of Mr Al Rajaan's companies. In the circumstances, they were not concealed.

38.4.   Mr Al Rajaan did not authorise <u>or influence</u> PIFSS's investments. Paragraphs 9.1 to 9.12 above are repeated.

38.5.   The assertion that Mr Mirabaud and Mr Fauchier-Magnan had supervision of the relationships between PIFSS and Mirabaud and Mr Al Rajaan and Mirabaud is not admitted. Mr Al Rajaan's communications with Mirabaud took place primarily with Mr Mirabaud. However, Mr Al Rajaan <u>did</u> ~~does~~ not know who was assigned by Mirabaud to supervise the relationship with PIFSS. Further, during the course of the relationship between Mirabaud and PIFSS, a number of different employees at Mirabaud and PIFSS were directly in contact regarding PIFSS's investments.

39.   As to paragraph 80:

39.1.   Paragraph 80(a) is inadequately pleaded. It is unclear which "*facts and matters*" set out "*below*" are relied on. In any event, it is denied that discussions took place in the manner asserted by PIFSS at paragraph 79 (paragraph 38 above is repeated).

39.2.   Paragraph 80(b) is noted.

39.3.   Paragraph 80(c) is denied save where expressly admitted in response to the relevant paragraph below.

40.   As to paragraph 81:

40.1.   It is admitted that Overton was incorporated under the laws of Panama on 4 January 1995. New Market was incorporated on 5 January 1995. The companies were incorporated on the advice of, and by, Mirabaud.

40.2.   Save as set out above, paragraph 81 is not admitted.

41.   As to paragraph 82:

41.1.   Paragraphs 82(a) and 82(c) are admitted.

41.2.   Paragraph 82(b) is not admitted.

41

42. Save that it is admitted that an account for Overton was opened at Mirabaud on or around 26 February 1996, paragraph 83 is not admitted. Without prejudice to that non-admission, Overton was managed, including in respect of Overton's account, by Mirabaud and/or Mr Richard.

43. As to paragraph 84:

43.1. It is denied that Mr Al Rajaan deliberately sought to distance himself from the affairs of Overton. It is further denied that the notes in the paperwork referred to in paragraph 84 were made on the instruction of Mr Al Rajaan. Mirabaud and/or Mr Richard were responsible for managing Overton and its account, including the preparation of relevant paperwork. Mr Al Rajaan relied on Mirabaud and Mr Richard in this regard and, having delegated responsibility to Mirabaud and/or Mr Richard, did not review the paperwork. The following paragraphs are without prejudice to this position.

43.2. As to paragraph 84(a), it is admitted that a Form A money-laundering declaration for Overton recorded Mr Mirabaud as the beneficial owner and that an internal entry stated "*en fait Mr Al Rajaan*". It is unclear on what basis it is said that "*Mr Mirabaud was deliberately and falsely identified in the Form A*" given that it was noted on the same Form A that it was "*en fait Mr Al Rajaan*" ("*in fact Mr Al Rajaan*").

43.3. As to paragraph 84(b):

(1) It is admitted that the account opening form contained the words "*compte epargne*" (meaning a savings account).

(2) The "*Investment Objectives*" form and "*Client Information Sheet*" on the account file, both dated 3 October 2003, recorded that it was a sweep account ("*compte de passage*").

(3) It is denied (if it be alleged) that Mr Al Rajaan was responsible for describing the account as either a "*compte epargne*" or indeed a "*compte de passage*". Those descriptions were provided by Mirabaud.

(4) The materiality of the allegation of falsity is not understood. Pending proper particulars, it is denied.

43.4. As to paragraph 84(c), the account opening form records the source of funds ("*provenance des fonds*") as being "*Kuwait*" and refers to Mr Al Rajaan being the

beneficial owner. It is unclear on what basis it is said that this was an attempt to distance Mr Al Rajaan from Overton, given that Mirabaud knew that Mr Al Rajaan worked in, and was originally from, Kuwait.

44.     As to paragraph 85:

44.1.   It is denied that Mr Al Rajaan received "*Secret Commissions*". Paragraph 38 above is repeated.

44.2.   Mr Al Rajaan did ~~does~~ not recall the date on which it was first mentioned to him that monies would be paid to him for the reasons outlined at paragraph 38.1 above. It is admitted that monies were thereafter paid to Mr Al Rajaan, the details of which are set out below insofar as they ~~are currently~~ were known by Mr Al Rajaan.

44.3.   It is denied that Mr Al Rajaan "*reached agreement*" with Mr Mirabaud or Mr Fauchier-Magnan as alleged or at all.

44.4.   It is admitted that Mr Mirabaud told the Swiss Prosecutor that monies were paid to Mr Al Rajaan as a business provider.

44.5.   Save as set out above, paragraph 85 is denied.

45.     As to paragraph 86:

45.1.   It is admitted that Mr Al Rajaan signed the account opening form for account 500750 on behalf of PIFSS. It was common practice for Mr Al Rajaan to sign documents on behalf of PIFSS, given his position as Director General and pursuant to Article 8 of the 1976 Order. However, a decision to open an account on behalf of PIFSS would have been approved by several departments within PIFSS (and Mr Al Rajaan believed~~s~~ was approved in this instance). PIFSS is a large organisation and work was carried out by the relevant departments. In his capacity as Director General, Mr Al Rajaan was asked to sign documents without having read the detail of each transaction.

45.2.   Paragraph 86 is inadequately pleaded in that it fails to specify the 12 "*PIFSS's investments*" that it is alleged Mirabaud held and on which it is further alleged that "*Secret Commissions*" were paid. Save that it is denied that Mr Al Rajaan received "*Secret Commissions*", the number of investments held is not admitted.

45.3    It is denied that Mr Al Rajaan influenced PIFSS to open custodian account number

43

500750.

46.    As to paragraphs 87 and 88:

46.1.    It is denied that any events set out in paragraphs 87 and 88 took place on Mr Al Rajaan's instruction. To the best of Mr Al Rajaan's knowledge and recollection, (a) Silvery Bay was not a company owned or controlled by or on his behalf; and (b) he did not become aware of Silvery Bay or the Silvery Bay Agreement until (without waiving privilege) he was informed of Silvery Bay in the context of legal proceedings.

46.2.    It is admitted that:

(1)    Silvery Bay was incorporated in Mauritius on 14 January 1997.

(2)    There is an agreement signed on behalf of Silvery Bay and Galmir dated 1 February 1997.

(3)    A letter date-stamped 31 January 1997 from Mr Mirabaud and Mr Fauchier-Magnan to Mr Argand contains instructions to Mr Argand to establish Silvery Bay and to sign and return the attached Silvery Bay Agreement.

46.3.    Save as set out above, paragraphs 87 and 88 are not admitted.

47.    Paragraph 89 is admitted.

48.    Paragraph 90 is not admitted, save that it is admitted that there is a power of attorney in favour of Mr Argand dated 29 January 1997 in respect of Silvery Bay, and a further undated power of attorney containing reference to Mr Mirabaud and Mr Fauchier-Magnan not wanting to appear as owners of Silvery Bay. If by the word "*falsely*", it is intended to allege that the beneficial owner of Silvery Bay was Mr Al Rajaan (not Mr Mirabaud and Mr Fauchier-Magnan), this is denied (paragraph 46.1 above is repeated).

49.    Paragraph 91 is admitted, save that the agreement refers to "*funds*", not "*investments*".

50.    As to paragraph 92:

50.1.    It is admitted that a Form A dated 6 July 2005 was completed in respect of a Silvery Bay account and that it identifies Mr Mirabaud and Mr Fauchier- Magnan as being the beneficial owners.

50.2.   As to the letter dated 20 June 2003 (pleaded in paragraph 106 and cross- referred to in paragraph 92), paragraph 64 below is repeated.

50.3.   Save as set out above, paragraph 92 is denied.  Paragraph 46.1 above is repeated.

51.   Paragraph 93 is not admitted, save that it is noted that the date of incorporation in the Seychelles was 14 October 2010.

52.   As to paragraph 94:

52.1.   It is admitted that at least 12 further agreements were entered into by Galmir and Silvery Bay between 15 November 2006 and 23 August 2011.

52.2.   ~~It is admitted that the payments listed in Appendix 1.2 were made to Silvery Bay and that sums were received by Overton and Intermac in the amounts in Appendix 1.1. Appendix 1 is otherwise not admitted.~~ The payments in Appendix 1 are admitted only to the extent set out in Annex 1 hereto.[4]

52.3.   Save as set out above, paragraph 94 is not admitted.

53.   As to paragraph 95:

53.1.   It is denied that Mr Al Rajaan was aware of the matters alleged in paragraphs 95(a) to 95(d).  Paragraph 46.1 above is repeated.

53.2.   The allegations of knowledge on the part of Mr Mirabaud, Mr Fauchier- Magnan and Mr Argand are not admitted.

54.   Paragraph 96 is irrelevant to the claim brought against the Estate ~~Mr Al Rajaan~~ and is not admitted.

55.   As to paragraph 97:

55.1.   The first sentence of paragraph 97 is admitted.

55.2.   As to the second sentence of paragraph 97: (a) it is denied as regards Mr Al Rajaan, (b) the allegations of knowledge on the part of Mr Mirabaud, Mr Fauchier-Magnan and Mr Argand are not admitted; and (c) it is insufficiently particularised in that PIFSS fails to state what steps were taken or by whom those steps were taken.

56.   As to paragraph 98:

45

56.1.    It is admitted that payments of approximately US$ 76.9 million were received by Overton and Intermac from Silvery Bay.

56.2.    It is denied that any payments to Mr Al Rajaan were by way of "*Secret Commissions*". Paragraph 38 above is repeated.

56.3.    Paragraph 52.2 above is repeated in respect of Appendix 1.

56.4.    Save as set out above, paragraph 98 is not admitted.

57.    As to paragraph 99, it is admitted that the payments referred to in paragraph 98 were made to Silvery Bay by Galmir. Paragraph 99 is otherwise not admitted.

58.    ~~Paragraph 100 is inadequately pleaded given that the specific payments are not identified, and is not admitted, save that it is denied that Mr Al Rajaan received unauthorised benefits~~. Paragraph 100 is not admitted pending proper particularisation of the payments alleged at Appendix 1.2A (and the First Defendant's detailed review of the same), save that it is denied that Mr Al Rajaan received unauthorised benefits.[4]

59.    As to paragraph 101, it is admitted that most of the monies paid to Silvery Bay were transferred to Overton or Intermac. It is denied that they were paid to Mr Al Rajaan "*through a network*" of companies beneficially owned and controlled by Mr Al Rajaan and/or Ms Al Wazzan. The monies were received into two companies of which either Mr Al Rajaan or Ms Al Wazzan was the beneficial owner.

60.    Paragraph 102 is not admitted.

61.    As to paragraph 103:

61.1.    The payments recorded in Appendix 1.2 (as being received by Silvery Bay) were generally made on a quarterly basis between 1997 and June 2003.

61.2.    As to paragraph 103(b) it is admitted that monies were transferred from Overton to New Market. The precise amount is not admitted.

61.3.    As to paragraph 103(c), it is admitted that monies were transferred from Overton to entities other than New Market for Mr Al Rajaan's benefit.

61.4.    As to paragraph 103(d):

(1)    It is admitted that funds received by New Market were used to make investments on behalf of Mr Al Rajaan. Mr Al Rajaan ~~can~~ could not recall

the precise funds in which he invested (albeit, Mr Al Rajaan believeds that he may have invested in the funds identified in paragraph 103(d)).

(2)    As to paragraphs 103(d)(ii) and (iii), it is admitted that funds received by New Market were transferred to and used by Mr Al Rajaan and/or Ms Al Wazzan and/or companies owned by them.

61.5.    Save as set out above, paragraph 103 is not admitted.

62.    As to paragraph 104:

62.1.    It is admitted that Intermac was incorporated on 23 April 2002 and that Domini was incorporated on 11 September 2002. The companies were created with Ms Al Wazzan being named as the beneficial owner for inheritance and tax purposes.

62.2.    The allegation that Ms Al Wazzan held the beneficial interest in those companies as nominee for Mr Al Rajaan is too vague properly to be answered in that it is unclear whether "*nominee*" is being used as a legal term of art and, if so, under what law.

62.3.    It is admitted that bank accounts in the names of Intermac and Domini were established with Mirabaud on or around 12 June 2003.

62.4.    Save as set out above, paragraph 104 is not admitted.

63.    As to paragraph 105:

63.1.    It is admitted that following the incorporation of Intermac and Domini, the Overton and New Market accounts were closed on or around 27 June 2003 and Overton and New Market were liquidated on or around 26 and 30 June 2003 respectively.

63.2.    The closure of the account was actioned by Mirabaud.

63.3.    Save as set out above, paragraph 105 is not admitted.

64.    As to paragraph 106:

64.1.    It is admitted that a letter dated 20 June 2003 from Mr Mirabaud to Mr Argand refers to "*their client having wished to reorganise his affairs*" and instructs Mr Argand to make payments to an Intermac account on the basis that Overton had been liquidated.

47

64.2. It is admitted that the payments recorded in Appendix 1.2 (as being received by Silvery Bay) were made broadly (but not exclusively) on a quarterly basis from June 2003 to 2012.

64.3. As to paragraph 106(b), it is admitted that a significant amount of the sums received by Intermac were transferred to Domini.

64.4. As to paragraph 106(c), it is admitted that monies were transferred from Intermac to entities other than Domini, or invested, for Mr Al Rajaan's benefit, including to Lupercale and Brahma Management, or for works on a villa in Thailand.

64.5. As to paragraph 106(d):

(1) It is admitted that funds received by Domini and, to a lesser extent, Intermac were used to conduct investment activity on behalf of Mr Al Rajaan. Investments were made in funds, rather than in fund managers. Mr Al Rajaan ~~can~~ could not recall the precise funds in which he invested.

(2) The final sentence is inadequately particularised: it is unclear which company is said to have invested in other assets.

64.6. Save as set out above, paragraph 106 is not admitted.

65. As to paragraph 107:

65.1. The first sentence of paragraph 107 is inadequately pleaded. It is unclear what is meant by transfers being made to Mr Al Rajaan from the "*above accounts through a network of further bank accounts held with Mirabaud*". Beyond the accounts referred to at paragraphs 103 and 106, the Particulars of Claim do not particularise any "*further network*" of transfers. Further, not all sums received into the Intermac and Domini accounts were transferred to other accounts: the accounts held approximately US$ 83 million when they were blocked by the Swiss Federal Prosecutor.

65.2. As to the second and third sentences of paragraph 107, the First Defendant and Mr Al Rajaan is/was unable to plead in respect of any companies that are not identified in the Particulars of Claim. As to the companies and account listed in paragraph 107:

(1) It is admitted that:

(a)     Ms Al Wazzan was recorded as the beneficial owner of Bernabeu Investments Ltd, before it was liquidated in 2010.

(b)     Ms Al Wazzan is recorded as the beneficial owner of the companies listed in paragraphs 107(b) and (c).

(c)     Hogara Investments Limited was used to purchase a property in Thailand.

(2)     As to paragraph (c), it is admitted that SCI Cum Laude was incorporated in France. It is unclear what constitutes "*significant real estate*". The company was used to purchase two chalets in France (one of which was purchased through SCI Cum Laude's subsidiary, SCI La Taupinière).

(3)     It is admitted that Mr Al Rajaan is was the beneficial owner of Tawny Real Estates Ltd.

(4)     As regards the assertion that Ms Al Wazzan was Mr Al Rajaan's "*nominee*", the assertion is too vague properly to be answered in that it is unclear whether "*nominee*" is being used as a legal term of art and, if so, under what law. Without prejudice to that position, it is admitted that Mr Al Rajaan used account no. 504976, which was in the name of Ms Al Wazzan, as his own.

(5)     The Particulars of Claim contain no particulars of the transfers alleged to have been made to the companies and accounts listed in paragraph 107. It is admitted that transfers were made to Bernabeu Investments Ltd and Tawny Real Estates Ltd. No further admissions are made regarding alleged transfers to companies and accounts listed in paragraph 107.

66.     As to paragraph 108:

66.1.   It is admitted that Mirabaud provided certain loan and overdraft facilities to Mr Al Rajaan and companies beneficially owned by him, which included loans and overdraft facilities in the amounts listed at paragraph 108(a) and 108(b).

66.2.   Mr Al Rajaan believeds that Mirabaud provided the services on an ordinary commercial basis, given that interest was charged. Mr Al Rajaan considered the provision of such facilities to be standard market custom and practice. It is denied that Mr Al Rajaan received "*Secret Commissions*".

49

66.3.    Save as set out above, paragraph 108 is not admitted.

67.    Paragraph 109 is not admitted, save that it is denied that arrangements concerning Mr Al Rajaan were "*corrupt*".

68.    As to paragraph 110:

68.1.    Mr Al Rajaan was not aware of Silvery Bay in 2012 and therefore took no steps in relation to the company or accounts held in its name in 2012. It is denied that Mr Al Rajaan told Mr Argand about the criminal investigation. It is further denied that any payments constituted "*Secret Commissions*" or were "*corrupt*".

68.2.    Save as set out above, paragraph 110 is not admitted.

**Alleged assistance in relation to other schemes**

69.    As to paragraph 111:

69.1.    It is admitted that Mirabaud opened and operated bank accounts for Mr Al Rajaan and Mr El Ghazzi. It is denied that the accounts operated on behalf of Mr Al Rajaan included all the accounts referred to in paragraphs 101-104 and 107 for the reasons set out above.

69.2.    The second sentence is not admitted.

69.3.    It is denied that amounts in paragraph 111 were "*Secret Commissions*" or the traceable proceeds thereof.

69.4.    As to paragraph 111(a), paragraphs 56 and 58 above are repeated. Paragraphs 111(b), 111(c) and 111(d) are inadequately particularised (in that payments are not specified and the relationship between these amounts and other sums in the Particulars of Claim and Appendices are not explained) and are not admitted.

69.5.    As to paragraph 111(e):

(1)    It is admitted that approximately US$ 8.7 million was transferred by Mr Ruimy. It is not admitted that the payments were made on behalf of the Aerium/Aeriance Group, as this is was outside Mr Al Rajaan's knowledge.

(2)    It is denied the payments were "*Secret Commission*" or the traceable proceeds thereof, and/or paid pursuant to "*one or more further schemes*" (as addressed further below in section J(3)).

50

(3)   ~~As to paragraph 111(e)(a): (a) it is admitted that Mr Ruimy was a principal of Aerium Group, with which PIFSS placed investments; (b) the total invested by PIFSS is not admitted.~~

(4)   ~~Paragraphs 111(e)(b) and (c) are not admitted.~~

69.6.   As to paragraph 111(f):

(1)   Paragraph 111(f) is inadequately particularised, in that it is unclear to whom it is alleged that US$ 2 million was paid. It is not admitted. Without prejudice to the foregoing, it is denied the payment was "*Secret Commission*" and/or paid pursuant to "*one or more further schemes*".

(2)   Paragraph 111(f)(a) is admitted.

(3)   Paragraphs 111(f)(b) and (c) are not admitted. Mr Al Rajaan ~~is~~ was not aware that PIFSS invested in Lehman Brothers.

69.7.   Paragraph 111(g) is inadequately particularised. It is unclear on what basis it is alleged that the amount constituted "*Secret Commissions*" in circumstances where no information regarding the payments is set out in the Particulars of Claim.

69.7A   Paragraph 111(h) is inadequately particularised in that it is unclear on what basis the figure of US$0.4 million is calculated. It is denied that any such payments were "*Secret Commissions*".

69.8.   Save as set out above, paragraph 111 is not admitted.

70.   Paragraph 112 is too vague properly to be answered. In particular, it is not clear to what extent it is said that "*such sums*" were paid to other accounts. Paragraph 65.2(5) above is repeated.

70A   Paragraph 112A is not admitted save that in respect of the sums and payments alleged, paragraph 295B.2 below is repeated.

~~Knowledge~~

71.   Paragraphs 11~~5~~3 to 125 concern allegations of knowledge on the part of Mirabaud (and actions taken internally by Mirabaud) and, save as set out below, are not admitted:

71.1.   It is denied that any payments made to Mr Al Rajaan were "*corrupt*" or that he received "*Secret Commission*" or the traceable proceeds thereof.

71.2.    As to paragraph 116(b), it is admitted that Mr Al Rajaan received monies from Mr El Ghazzi. This is addressed in Section F below.

71.3.    As to paragraph 118, there was no written agreement between Mr Al Rajaan and Mr El Ghazzi. Consequently, even if Mr Al Rajaan was asked to provide a copy of the alleged contracts, which is not expressly pleaded or admitted, it is denied that "*production was refused*" by Mr Al Rajaan.

**Mr Al Rajaan**

72.    Paragraph 126 is denied:

72.1.    The law applicable to any claims against the Estate Mr Al Rajaan is Swiss law and the Particulars of Claim disclose no claim in Swiss law.  Paragraphs 21 and 23 above are repeated.

72.2.    Further or alternatively, any claim under or reliant upon Article 11 or Article 12[4] of the Public Property Law,[4] or[4] Article 35 of the Penal Code as amended by Law No. 31 of 1970, Article 2 of the Money Laundering Law No.35 of 2002 or Article 2 of the Money Laundering Law No.106 of 2013[4] represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait and is not justiciable in the Courts of England and Wales.

72.3.    Further or alternatively, the allegation that Mr Al Rajaan breached his "Civil Service" duties is embarrassingly vague.  Insofar as this is an allegation that Mr Al Rajaan breached the Civil Service Law (the terms of which are pleaded in paragraph 59), it is denied that the facts or matters relied on by PIFSS (or capable of being proved by PIFSS) constitute a breach by Mr Al Rajaan of that law.

72.4.    The factual premises for the allegation that the Estate Mr Al Rajaan is liable to PIFSS in Kuwaiti law are in any event denied.

72A.    Paragraph 126A is denied:

72A.1    Paragraphs 36AA to 36DD above are repeated.

72A.2    Further or alternatively, any claim under or reliant upon Articles 158, 322 *septies* (2) or 305 *bis* of the SPC represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal laws of Switzerland and is not justiciable in the Courts of England and Wales.

72A.3   Further or alternatively, the Swiss criminal authorities have been investigating Mr Al Rajaan since 2012 and PIFSS has supported and assisted that investigation since at least 2015.  In those circumstances, insofar as PIFSS seeks to rely on provisions of Swiss criminal law and alleged offences which are being investigated by the Swiss criminal authorities, those claims should be stayed to await a final decision of those authorities. In the event the Swiss authorities determine that no criminal offence was committed, PIFSS's civil claims in respect of such alleged offences would be groundless as a matter of Swiss law.

72A.4   The factual premises for the allegation that the Estate ~~Mr Al Rajaan~~ is liable to PIFSS in Swiss law are in any event denied.

73.   Paragraph 127 is denied.  There is no basis for any claim against the Estate ~~Mr Al~~ ~~Rajaan~~ under English law.

### ~~Mirabaud, Mr Mirabaud and Mr Fauchier-Magnan~~

74.   ~~Paragraphs 128 and 129 make claims against other Defendants and Mr Al Rajaan does not plead to them.~~

### ~~Mr Argand~~

75.   ~~Paragraphs 130 and 131 make claims against another Defendant and Mr Al Rajaan does not plead to them.~~

### ~~Secondary/Vicarious liability~~

76.   ~~Paragraph 132 makes claims against other Defendants and Mr Al Rajaan does not plead to it.~~

### Generally

77.   Paragraph 133 is embarrassingly vague and is denied.  The payments that were made to Mr Al Rajaan and/or any of the financial intermediaries were not void and PIFSS has failed to explain (by reference to any relevant applicable law) the basis for so asserting.

### F.   THE MAN GROUP SCHEME

78.   Paragraph 134 is denied.

78.1.   Mr Al Rajaan did not have discussions with Man Group regarding payment of commissions to him (either in respect of purportedly "*Secret Commissions*" or

otherwise).

78.2.    Mr Al Rajaan first met Mr El Ghazzi when Mr El Ghazzi was working with an investment company in Kuwait. A number of years later Mr El Ghazzi contacted Mr Al Rajaan with an investment proposal for PIFSS. Mr El Ghazzi went to Kuwait with Mr Massad of Man Group to meet with PIFSS.

78.3.    Mr El Ghazzi introduced PIFSS to the Man Group. Whilst Mr Al Rajaan was unaware of the precise nature of Mr El Ghazzi's role and relationship with Man Group, he understood that Mr El Ghazzi was a placing agent or intermediary for Man Group and that Mr El Ghazzi was entitled to be compensated by Man Group for his services. Mr Al Rajaan was not aware of the terms of the relationship between Mr El Ghazzi and Man Group.

78.4.    After PIFSS's investment, Mr El Ghazzi suggested that he pay money to Mr Al Rajaan. Mr Al Rajaan considered it to be standard market custom and practice in Kuwait and in Switzerland for intermediaries to make such payments and did not consider that this suggestion undermined his relationship with PIFSS (which it did not). There was no arrangement between Mr El Ghazzi and Mr Al Rajaan as to how much Mr Al Rajaan would receive.

78.5.    Payments from Mr El Ghazzi to Mr Al Rajaan were not secret or concealed. They were paid into accounts in the names of Mr Al Rajaan or his wife or to companies with which Mr Al Rajaan was associated (Overton, New Market, Intermac).

78.6.    Mr Al Rajaan did not authorise or influence PIFSS's investments in Man Group. Paragraphs 9.1 to 9.12 above are repeated. Potential investments were assessed and proposed by the relevant department within PIFSS, in this case the Direct Investment Department under Ms Lama Al Dakheel ("**Ms Al Dakheel**").

79.    As to paragraph 135:

79.1.    It is admitted that Mr El Ghazzi and E.D. & F Man Management A.G. (which Mr Al Rajaan understood ands to be the company defined in the Particulars of Claim as MIAG, albeit the definition in the Particulars of Claim is only "*Man Management AG*") signed a document entitled "*Intermediary Application and Agreement*" dated March 1993.

79.2.    Save as set out above, paragraph 135 is not admitted.

54

80.    As to paragraph 136:

80.1.    It is denied that Mr Al Rajaan received "*Secret Commissions*" or exploited the existence of the El Ghazzi Agreement in order to do so. It is also denied that there were any "corrupt" schemes.  Paragraph 78 above is repeated.

80.2.    Paragraph 136 contains allegations regarding the conduct and related intention of other individuals and, save for the foregoing denial, is not admitted.

81.    Paragraph 137 is admitted, save that it is not admitted which Man Group entity was responsible for providing the services.

82.    As to paragraph 138:

82.1.    It is admitted that Mr Massad was the main contact for PIFSS at Man Group. To the best of Mr Al Rajaan's knowledge and recollection, Mr Massad visited PIFSS approximately every couple of months. Whilst Mr Massad would greet Mr Al Rajaan if Mr Al Rajaan was present in the office, Mr Massad's discussions regarding Man Group investment products took place with Ms Al Dakheel.

82.2.    Mr Al Rajaan was not closely involved in PIFSS's relationship with Man Group, which was managed by Ms Al Dakheel and her department.

82.3.    Save as set out above, paragraph 138 is not admitted.

82A.    Paragraphs 138A and 138B concern the roles and responsibilities of named individuals within the Man Group, to which the First Defendant does not plead.[4]

83.    As to paragraph 139:

83.1.    Save that the precise date is not admitted, paragraphs 139(a) and (b) are admitted.

83.2.    As to paragraph 139€, it is admitted that Mr El Ghazzi received payments from Man Group from 1996. The basis on which commission received by Mr El Ghazzi was calculated is not admitted. Without prejudice to the foregoing, the El Ghazzi Agreement provides for commission based on a percentage of sales, rather than "*by reference to fees received in respect of PIFSS' investments*".

83.3.    As to paragraph 139(d), it is denied that Mr Al Rajaan started to receive payments from Mr El Ghazzi in 1996.

84.    As to paragraph 140:

84.1.    The first sentence of paragraph 140 and contents of Appendix 2 are not admitted, save as set out at paragraph 83.1 above and paragraph 93 below.

84.2.    It is denied that Mr Al Rajaan was at all times until his departure in 2014 PIFSS's main contact for Man Group. Paragraph 82.2 above is repeated.

84.3.    It is denied that Mr Al Rajaan 56articular or influenced PIFSS's investments in Man Group products. Paragraph 78.6 above is repeated.

85.    Paragraph 141 is not admitted, save that it is admitted that there are documents dated between 1996 and 2013 containing variations to the El Ghazzi Agreement.

86.    Paragraphs 142 and 143 concern the nature of the relationship between Man Group and Mr El Ghazzi and are not admitted.

87.    As to paragraph 144:

87.1.    As to paragraph 144(a), it is admitted that a letter dated 31 October 1998 stating that it was "*supplemental and subject to the terms and conditions of our existing intermediary agreement*" provided for "*additional marketing incentives*", which included additional trail commissions up to a maximum of 0.5%. It is further admitted that the letter was on MIL letterhead and signed off by Mr Massad, and that it contained the exclusivity clause described in paragraph 144(a).

87.2.    As to paragraph 144(b), Mr Al Rajaan did not "*56articula*" or influence investments and paragraph 78.6 above is repeated. To the extent that it is implied that Mr Al Rajaan 56articular or influenced investments by PIFSS to a level to ensure that Mr El Ghazzi met certain thresholds, this is denied. Further, Mr Al Rajaan had no knowledge of the terms of Mr El Ghazzi's relationship with Man Group and could not have sought to procure investments with the intention of meeting thresholds of which he was not aware.

87.3.    Save as set out above, paragraph 144 is not admitted.

88.    As to paragraph 145:

88.1.    It is denied that Mr Al Rajaan agreed with Mr Massad (or Mr El Ghazzi) that PIFSS would invest a further US$ 30 million in structured bonds if such an investment generated further "*Secret Commission*". Paragraph 87.2 above is repeated.

88.2.    As to paragraph 145(a), it is admitted that a letter dated 26 February 2004 from Mr

Massad to Mr El Ghazzi refers to a discussion between them and contains an offer to pay additional commission of 0.5% if Mr El Ghazzi invested or procured subscribers for at least US$ 30 million of bonds in Man RMF Multi-Style Ltd. The letter is on Man Investments letterhead.

88.3. Save that Mr Al Rajaan did not "*57articula*" or *"influence"* investments and paragraph 78.6 above is repeated;, paragraph 145(b) is not admitted.

88.4. As to paragraph 145(c), it is admitted that a letter dated 27 April 2004 sent to Mr El Ghazzi c/o Mr Massad at Man Investments in Dubai confirmed that additional commission, in the amount of 0.5%, would be paid to Mr El Ghazzi as a result of raising at least US$ 30 million in Man RMF Multi-Style Ltd. The letter is on Man Investments letterhead (rather than MIAG (based on the definitions in the Particulars of Claim)) and makes no reference to PIFSS or Mr Al Rajaan.

88.5. Save as set out above, paragraph 145 is not admitted.

89. As to paragraph 146:

89.1. It is admitted that a letter dated 1 June 2006 sent to Mr El Ghazzi (c/o Mr Massad) on behalf of Man Investments AG, countersigned by Mr El Ghazzi on 20 December 2006 and stamped as received on 15 January 2007, set out terms for the payment of additional ("*override*") commission of 1.5% if certain levels of investment were met.

89.2. Save as set out above, paragraph 146 is not admitted.

89A. Paragraphs 146A and 146B contain allegations which appear to be based on disclosure given by the Man Group in relation to internal matters and developments within the Man Group. The First Defendant does not plead to those paragraphs.[4]

90. Save that it is not admitted that the letter was stamped as received by MIAG on 9 December, paragraph 147 is admitted. Mr Al Rajaan did does not know who stamped the letter. The letter is on letterhead of Man Investments AG.

90A. Paragraphs 147A and 147V contain allegations which appear to be based on disclosure given by the Man Group in relation to internal matters and developments within the Man Group. The First Defendant does not plead to those paragraphs.[4]

91. Paragraph 148 is inadequately pleaded. On the basis PIFSS intended to refer to amounts

pleaded in paragraphs 149 and 151, paragraphs 92 and 94 below are repeated.

92.    Paragraph 149 is not admitted.

93.    As to paragraph 150:

93.1.    It is admitted that approximately US$ 80.6 million was transferred to Mr Al Rajaan from Mr El Ghazzi through Overton, New Market and Intermac broadly in the amounts in paragraph 150.

93.2.    It is denied that Mr El Ghazzi transferred monies to Mr Al Rajaan up to a total of US$ 155 million.

93.3.    It is further denied that payments were received by Mr Al Rajaan from Mr El Ghazzi in relation to Man Group into accounts other than those referred to in paragraph 150.

94.    As to paragraph 151, it is admitted that US$ 1 million was paid by Man Group to Ozak in 1998.

95.    Paragraph 152 is noted and the contents of Appendix 2 are not admitted save as set out at paragraph 93.

96.    Paragraph 153 is denied. Further:

96.1.    Payments made under the El Ghazzi Agreement were not made at the instance of or for the ultimate benefit of Mr Al Rajaan. To the best of Mr Al Rajaan's knowledge, sums paid to Mr El Ghazzi pursuant to the El Ghazzi Agreement were paid to him for his sole benefit and he was free to use the monies as he wished.

96.2.    Mr El Ghazzi had no obligation to give Mr Al Rajaan money and there was no agreement between them that Mr El Ghazzi would give Mr Al Rajaan a particular amount.

96.3.    In those circumstances, Mr El Ghazzi did not require the authority or direction of Mr Al Rajaan to retain the monies paid to him by Man Group (for the avoidance of doubt it is denied that any such authority or direction was given by Mr Al Rajaan).

96.4.    It is further denied that payments received by Mr Al Rajaan relating to the El Ghazzi Agreement were "*corrupt Secret Commissions*".

97.    Paragraph 154 is admitted to the extent that it records the letter dated 4 September 2013 and its contents.  Paragraph 154 is otherwise not admitted.

98.    As to paragraph 155, it is admitted that a consultancy agreement between Mr El Ghazzi and Man Investments AG provided that Mr El Ghazzi would be paid an annual consulting fee of $250,000 per annum. It is further admitted that a letter from Man Investments AG dated 31 March 2015 stated that the consultancy agreement was terminated. Save for the foregoing admissions, paragraph 155 is not admitted.

99.    The deletion of paragraph 156 is noted.[4]  ~~Paragraph 156 is not admitted.[4]~~

100.   As to paragraph 157:

  100.1.   It is denied that Mr Al Rajaan used the El Ghazzi Agreement as a front for the payment of "*Secret Commissions*" to him by Man Group, and, therefore it is further denied that Mr Al Rajaan knew or intended that the El Ghazzi Agreement should be used for that purpose. Paragraph 78 above is repeated.

  100.2.   Further, it is denied that the facts and matters relied on by PIFSS support the inferences PIFSS seeks to draw at paragraph 157.

  100.3.   Paragraph 157(a) is denied.  Paragraph 78 above is repeated.

  100.4.   Paragraph 157(b) is not admitted. Without prejudice to that non-admission, as to the second sentence of 157(b)(b), given the alleged levels of investment by PIFSS, Mr El Ghazzi would appear to have provided a valuable service to Man Group in introducing it to PIFSS.

  100.5.   Paragraph 157€ is not admitted. Paragraph 100.4 is repeated.

  100.6.   Paragraph 157(d) is inadequately particularized given that it does not set out which payments it is alleged that Mr El Ghazzi was not entitled to receive. It is not admitted. Without prejudice to the foregoing non admission, Mr Al Rajaan had no knowledge of the terms of Mr El Ghazzi's arrangements with Man Group.

  100.7.   As to paragraph 157(e), it is denied that Mr El Ghazzi did not perform any "*introducing role*". Paragraph 78.3 above is repeated.

  100.8.   Paragraph 157(f) is not admitted. Without prejudice to that non-admission, PIFSS's investments, including the fees that would be payable, were assessed by the relevant department at PIFSS. Mr Al Rajaan  believed that products and

associated costs supported by the department were acceptable to PIFSS.

100.8A   As to the various sub-paragraphs which follow paragraph 157(f), the overarching allegation that Man Group products were "*not offered to PIFSS at normal institutional rates*" is not admitted, as are the particular allegations relied upon to support that contention. Paragraph 100.8 above is repeated.[4]

100.8B   The allegation in paragraph 157(fa)(c) that it is to be inferred that PIFSS's investment in Man IP220 Series 6 was instigated by Mr Al Rajaan is denied. Paragraph 78 above is repeated.[4]

100.9.   As to paragraph 157(g), paragraph 94 above is repeated. It is denied that the alleged payment was authorised at the instance or ultimate request[4] of Mr Al Rajaan.

100.10.  Paragraph 157(h) is not admitted.

100.11.  As to paragraph 157(i):

(1)      It is denied that there was any proximity between the termination of the El Ghazzi Agreement and the Swiss Prosecutor investigations being commenced. The latter commenced in or around May 2012 and, as stated at paragraph 154, the El Ghazzi Agreement was terminated in September 2013.

(2)      To the best of Mr Al Rajaan's current knowledge, a restraint on Mr El Ghazzi's Mirabaud account was lifted on 5 September 2013 (the day after the termination letter referred to in paragraph 154) on the basis that it was no longer justified.

(3)  Save as set out above, paragraph 157(i) is not admitted. The deletion of paragraph 157(i) is noted.[4]

100.12.  Paragraph 157(j) and its sub-paragraphs, which concern communications between PIFSS and the Man Group following Mr Al Rajaan's retirement, are not admitted.[4] The first sentence of paragraph 157(j) is inadequately particularised. It is unclear who is alleged to have failed to disclose the existence of the alleged arrangements and/or when or how the obligation to disclose arose. The paragraph is in any event not admitted.

100.13.  As to paragraph 157(k):

(1) On the figures asserted by PIFSS, the total commission alleged to have been paid to Mr Al Rajaan is US$ 80.6 million (of US$ 155 million said to have been received by Mr El Ghazzi), which is approximately 50%.

(2) It is denied that that there was no legitimate commercial reason for Mr El Ghazzi to give money to Mr Al Rajaan. Paragraph 78 above is repeated.

100.13A  Paragraph 157(l) and its sub-paragraphs concern the alleged "*special treatment*" of Mr El Ghazzi within the Man Group. The First Defendant does not plead to those allegations.[4]

100.13B  Paragraph 157(m) is not admitted.[4]

100.13C  Paragraph 157(n) and its sub-paragraphs concern the knowledge and intent of named individuals within the Man Group and the First Defendant does not plead to them. To the extent that those allegations are predicated on the allegations that "*the commissions paid to Mr El Ghazzi were bribes being paid for the benefit of Mr Al Rajaan*" and "*the El Ghazi Agreement was being used as a front to pay Secret Commissions to Mr Al Rajaan*", that is denied. Paragraph 78 above is repeated.[4]

100.14. Save as set out above, paragraph 157 is not admitted.

**Liability**

**Mr Al Rajaan**

101. Paragraph 158 is denied:

101.1. The law applicable to any claims against the Estate ~~Mr Al Rajaan~~ is Swiss law ~~and the Particulars of Claim disclose no claim in Swiss law~~.  Paragraphs 21 and 23 above are repeated.

101.2. Further or alternatively, any claim under or reliant upon Article 11 or Article 12[4] of the Public Property Law,[4] ~~or[4]~~ Article 35 of the Penal Code as amended by Law No. 31 of 1970, Article 2 of the Money Laundering Law No.35 of 2002 or Article 2 of the Money Laundering Law No.106 of 2013[4] or Article 35 of the Penal Code as amended by Law No. 31 of 1970 represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait and is not justiciable in the Courts of England and Wales.

101.3. Further or alternatively, the allegation that Mr Al Rajaan breached his "Civil

Service" duties is embarrassingly vague.  Insofar as this is an allegation that Mr Al Rajaan breached the Civil Service Law (the terms of which are pleaded in paragraph 59), it is denied that the facts or matters relied on by PIFSS (or capable of being proved by PIFSS) constitute a breach by Mr Al Rajaan of that law.

101.4.    The factual premises for the allegation that the Estate Mr Al Rajaan is liable to PIFSS in Kuwaiti law are in any event denied.

101A.      Paragraph 158A is denied and paragraph 72A above is repeated.

102.    Paragraph 159 is denied.  There is no basis for any claim against the Estate Mr AlRajaan under English law.

**Man Plc, MIL, MIMEL, MIAG and Mr Massad**

103.    Paragraphs 160, 160A and 161 make claims against other Defendants and the First Defendant Mr Al Rajaan does not plead to them.

**Mr El Ghazzi**

104.    Paragraphs 162, 162A and 163 make claims against another Defendant and the First Defendant Mr Al Rajaan does not plead to them.

**Mr Nasrallah**

105.    Paragraphs 164, 164A and 165 make claims against another Defendant and the First Defendant Mr Al Rajaan does not plead to them.

**Secondary/Vicarious liability**

106.    Paragraph 166 makes claims against other Defendants and the First Defendant Mr Al Rajaan does not plead to it.

**Generally**

107.    Paragraph 167 is embarrassingly vague and is denied.  The payments that were made to Mr Al Rajaan and/or any of the financial intermediaries were not void and PIFSS has failed to explain (by reference to any relevant applicable law) the basis for so asserting.

**G.    THE PICTET SCHEME**

108.    As to paragraph 168:

108.1.   As to the first sentence, to the best of Mr Al Rajaan's recollection and knowledge, before PIFSS invested with Pictet, Pictet had been in Kuwait on business on several occasions, during which visits Pictet met with PIFSS. Mr Al Rajaan ~~can~~ could not recall how the first meeting with PIFSS came about.

108.2.   The second sentence is admitted.

109.   Paragraph 169 is admitted, save that it is not admitted that The International Investor was a "*Kuwaiti bank*". To the best of Mr Al Rajaan's knowledge, The International Investor was an investment firm that provided and administered Islamic financial services and products.

110.   As to paragraph 170, it is admitted that Albait was retained by PIFSS to manage investment portfolios. Portfolios were managed for PIFSS through Albait in Kuwait. There was a genuine commercial relationship between PIFSS and Albait. It is not admitted that Pictet managed portfolios for PIFSS on behalf of Albait.

111.   Paragraph 171 is not admitted. Account number 99503 was opened by PIFSS in the second quarter of 1998.

**Alleged agreement to pay "*Secret Commissions*"**

112.   Paragraph 172 is denied. Further:

112.1.   Mr Al Rajaan did not have discussions with Mr Bertherat and Mr Amouzegar in the terms alleged at paragraph 172.

112.2.   Mr Al Rajaan did not receive "*Secret Commission*" from Pictet. Nor, to the best of Mr Al Rajaan's knowledge and recollection, did he receive any payments from Pictet.

112.3.   Following investment proposals from Pictet, PIFSS decided to invest through Pictet. Mr Al Rajaan did not authorise investments on behalf of PIFSS personally. Nor did Mr Al Rajaan influence PIFSS to agree to investments or accept the provision of financial services from Pictet. Paragraphs 9.1 to 9.12 above are repeated. Whilst Mr Al Rajaan signed account opening forms, and other account documents, as required in his capacity as Director General of PIFSS, a number of departments within PIFSS had to provide sign off and/or information before Mr Al Rajaan had authority to open an account.

112.4.   Mr Al Rajaan did not ask Pictet for payment in respect of PIFSS's investments with

Pictet or negotiate with them (or Mr Nasrallah) as to the amount of any payments that he would receive. After PIFSS's investment, it was suggested that payments be made to the benefit of Mr Al Rajaan. Mr Al Rajaan considered it to be standard market custom and practice in Switzerland and Kuwait for banks and financial institutions to make such payments and did not consider that this suggestion undermined his relationship with PIFSS (which it did not). Mr Al Rajaan therefore did not consider that it was improper or unlawful to accept the monies. Mr Al Rajaan further understood that institutions such as Pictet paid such sums through their intermediaries, in this case Mr Nasrallah. Mr Al Rajaan understood that Mr Nasrallah worked with Pictet as a financial intermediary and that Mr Nasrallah was entitled to any commissions that he received from Pictet. Mr Al Rajaan did not know the terms of Mr Nasrallah's arrangements with Pictet.

112.5.   Payments made by Mr Nasrallah to Mr Al Rajaan were not secret or concealed:

(1)   It is denied that an offshore corporate structure was put in place to conceal "*Secret Commissions*" as alleged or at all. Mr Al Rajaan did not have discussions with Pictet about putting in place an offshore corporate structure for "*him personally and Mr Nasrallah through Phoenix as intermediary*" through which "*Secret Commissions*" could be paid and concealed. The structure of Mr Nasrallah's businesses and accounts was a matter for him. Mr Al Rajaan had no interest in Mr Nasrallah's company Phoenix.

(2)   In fact, Mr Al Rajaan had offshore accounts and owned companies incorporated in a number of different jurisdictions. This is not unusual for wealthy individuals and was a product of advice and assistance that he received from Swiss financial institutions (including Pictet). Further, payments from Mr Nasrallah to Mr Al Rajaan were made to accounts in Mr Al Rajaan's name, his wife's name or in the name of his and his wife's companies.

(3)   The structure of Mr Nasrallah's businesses was a matter for him and Mr Al Rajaan does not plead to that matter. Mr Al Rajaan had no interest in Phoenix which was, to the best of his knowledge, Mr Nasrallah's company.

113.   As to paragraph 173:

113.1. For the reasons above it is denied that discussions took place as described at paragraph 172 and, therefore, that the matters in paragraph 173 were "*further to*" the discussions described at paragraph 172.

113.2. It is admitted that an internal Pictet memo dated 11 August 1998 recorded that Mr Al Rajaan would be paid 0.125% (being one third) of the administrative fees withheld by Pictet on PIFSS's account no. 99501. The same memo noted that 0.25% would be paid to an account held by Albait.

113.3. To the best of Mr Al Rajaan's recollection, there was no "*agreement*" with Pictet regarding the figure of 0.125%.

113.4. It is admitted that the 11 August 1998 memo stated that 0.125% was to be paid "*to an account that will be named later and whose economic beneficiary will be Mr Fahad Al Rajaan*". In those circumstances, there was nothing secret about the proposed recipient of the payment.

114. Paragraph 174 is not admitted.

115. Paragraph 175 is denied.

115.1. Mr Al Rajaan did not give an indication that he would authorise <u>or influence</u> PIFSS to <u>make investments</u> ~~open accounts with Pictet~~ on which fees were payable in return for extending the categories of services on which alleged "*Secret Commissions*" would be payable to encompass Global Custody, brokerage and net securities lending.

115.2. Further and in any event, Mr Al Rajaan did not authorise PIFSS to open accounts. This required the approval of several internal departments within PIFSS (paragraph 112.3 above is repeated).

### The Pictet Nasrallah Agreements and the Amouzegar Agreement

116. As to paragraph 176:

116.1. The reference to "*the above agreements*" is embarrassingly vague. On the assumption that PIFSS wishes to refer to the alleged agreements identified at paragraphs 172 to 175, paragraphs 112 to 115 above are repeated. It is denied that the facts and matters referred to in paragraph 176 took place further to those alleged agreements.

116.2.   It is admitted that an agreement entitled "*Framework Contract with Business Finders,*" entered into between Pictet and Mr Nasrallah and dated 11 March 1999, provided that commissions would be paid to Mr Nasrallah broadly as set out at paragraph 176. To the extent relevant, <u>the First Defendant</u> ~~Mr Al Rajaan~~ will rely on the Pictet Nasrallah Agreement at trial for its full terms, meaning and effect.

116.3.   Save as set out above, paragraph 176 is not admitted.

117.   Paragraph 177 is admitted.

118.   As to paragraph 178:

118.1.   PIFSS opened account no. 1007700.001 with Pictet in April 1999. ~~The account number in the Particulars of Claim (1000700.001) is incorrect.~~

118.2.   It is denied that Mr Al Rajaan "*authorised*" <u>or "*influenced*"</u> the opening of account no. 1007700.001. Paragraph 112.3 above is repeated.

118.3.   It is admitted that further accounts were opened by PIFSS with Pictet. Whether fees were payable, and if so the nature of the fees, in respect of each account is not admitted. <u>No admissions are made in respect of the claim that</u> other "*entities holding assets whose ultimate beneficiary was PIFSS*" <u>opened</u> accounts with Pictet; the assertion is insufficiently particularised and ~~is~~ <u>was</u> outside Mr Al Rajaan 's knowledge.

119.   As to paragraph 179:

119.1.   Paragraph 179(a) is denied. It is denied that the Pictet Nasrallah Agreement was a front to give effect to or conceal the alleged agreements pleaded at paragraphs 172 to 175 or to regulate the payment of "*Secret Commissions*" to Mr Al Rajaan. Paragraphs 112 to 115 above regarding the alleged agreements are repeated. Further, Mr Al Rajaan did not authorise investments or the opening of accounts (paragraph 112.3 above is repeated).

119.2.   Paragraph 179(b) is denied. Account 97519 was an account belonging to Mr Nasrallah and Mr Al Rajaan was not the "*economic beneficiary*" of that account (whatever that may mean).

120.   As to paragraph 180:

120.1.   It is admitted that the Pictet Group provided financial services to PIFSS. The

precise entities within the Pictet Group that were responsible for the administration of the various PIFSS accounts are not admitted.

120.2.   Mr Al Rajaan was <u>one</u> of the principal contacts for Pictet at PIFSS. The relevant heads and others within the Direct Investment Department at PIFSS (including Ms Al Dakheel and Mr Mauslem) were also principal contacts at PIFSS for Pictet. A number of PIFSS employees other than Mr Al Rajaan had signing authority on accounts held with Pictet. Further, Pictet provided PIFSS with access to an "intranet", such that the relevant departments and committees were able to access information concerning accounts and investments with Pictet.

120.3.   It is admitted that Mr Al Rajaan, in his capacity as Director General of PIFSS, signed account opening forms on behalf of PIFSS and had individual signing authority without limit. However, Mr Al Rajaan required authorisation from PIFSS to exercise his authority at Pictet to sign off on investments or to open accounts. Paragraph 112.3 above is repeated.

<span style="color:red">120.3A   Save as set out above, paragraph 180 is not admitted.</span>

121.   Paragraph 181 is not admitted.

122.   Save that it is denied that Mr Al Rajaan was party to agreements to amend the Pictet Nasrallah Agreement "*to ensure that Secret Commissions were paid in respect of the further accounts and/or investments*", paragraph 182 is not admitted. Mr Al Rajaan did not authorise investments by PIFSS (paragraph 112.3 above is repeated) and Mr Al Rajaan had no knowledge of the terms of, and/or amendments to, the Pictet Nasrallah Agreement.

123.   As to paragraphs 183 and 184:

123.1.   It is admitted that a version of the Pictet Nasrallah Agreement contains a hand-written amendment noting that 25% would be paid on annual earnings on Pictet funds and that this was said to be "*in agreement with P Bertherat and K Amouzegar*". The date on which the purported variation was made is not admitted.

123.2.   It is denied that the variation referred to in paragraph 183 was agreed with Mr Al Rajaan.

123.3.   In circumstances where the date of the purported variation ~~is~~ <u>was</u> unknown to Mr Al Rajaan, the allegation that it was made in circumstances and at a time when "*PIFSS had not invested in any such funds; but on Mr Al. Rajaan's recommendation*

*Pictet Group was about to assume management of a pre-existing fund whose ultimate beneficiary was held by PIFSS (the Mayur fFund) which was at the time managed by a third party (Lazard)"*, is not admitted.

123.4.    Save as set out above, paragraphs 183 and 184 are not admitted.

124.    As to paragraph 185:

124.1.    It is denied that Mr Al Rajaan procured the change of manager to the Pictet Group with the agreement of Mr Bertherat in order to provide a source of investment management fees from which further "*Secret Commissions*" could be paid and that the variation referred to in paragraphs 183 and 184 was part of that plan. It is further denied that the facts and matters relied on by PIFSS in paragraph 185 support that inference.

124.2.    As to paragraph 185(a), it is admitted that Ms Mahurkur moved from Lazard to Pictet in or around April 2001.

124.3.    Paragraph 185(b) is admitted.

124.4.    Paragraph 185(c) is denied. The relevant manager at PIFSS, Ms Al Dakheel, corresponded with the Mayur Fund and, to the best of Mr Al Rajaan's knowledge, met with the Mayur Fund representative on a regular basis.

124.5.    Paragraph 185(d) is not admitted.

124.6.    Further and in any event, the decision to move the funds to Pictet would have been made by the relevant PIFSS Investment Committee.

124.7.    Save as set out above, paragraph 185 is not admitted.

125.    As to paragraph 186:

125.1.    It is denied that Mr Al Rajaan signed a resolution contrary to the interests of MPIFSS in order to provide a further source of "*Secret Commissions*".

125.2.    Save as set out above, paragraph 186 is not admitted. Mr Al Rajaan did does not recall the specific resolution. Without prejudice to the foregoing non admission, it is was Mr Al Rajaan's position that if he signed the resolution, it would have been with the approval of PIFSS.

126.    As to paragraph 187:

126.1.    It is admitted that there was no provision for commissions on performance fees in the Pictet Nasrallah Agreement dated 11 March 1999. However, Mr Al Rajaan was not privy to discussions regarding the terms of the Pictet Nasrallah Agreement, including variations thereto, and therefore no admissions are made as to the terms of the agreement as at 2006.

126.2.    It is denied that Mr Al Rajaan procured the introduction of performance fees on the Mayur Fund in order to provide a further source of investment management fees from which "*Secret Commissions*" could be paid. The agreement by PIFSS to pay performance fees would have been approved by the Direct Investment Department at PIFSS. Paragraph 112.3 above is repeated.

126.3.    Mr Al Rajaan ~~does~~ did not recall being told about a 40% commission on performance fees for the Mayur fund.

126.4.    Save as set out above, paragraph 187 is not admitted.

127.    Save that it is denied that payments made to Mr Al Rajaan by Mr Nasrallah were "*Secret Commissions*" as alleged or at all, paragraph 188 is not admitted.

128.    Paragraph 189 is not admitted.

129.    As to paragraph 190:

129.1.  It is admitted that a "*Finder's Fee*" agreement dated 2 May 2011 between Pictet & Cie and Mr Nasrallah states that it exclusively governed the remuneration to be paid to Mr Nasrallah for his role as a "*business finder*".

129.2.    It is admitted that the 2 May 2011 agreement states that the finder's fee rates to be paid to Mr Nasrallah were 25% of global custody fees and 30% of brokerage and commission fees. To the extent relevant, the First Defendant ~~Mr Al Rajaan~~ will rely on the agreement at trial for its full terms, meaning and effect.

129.3.    Save as set out above, paragraph 190 is not admitted.

130.    As to paragraph 191:

130.1.    It is admitted that a "*business finder*" agreement dated 21 October 2003 between Pictet and Mr Amouzegar states that commission was to be paid to Mr Amouzegar at a rate of "*30% of earnings*" (the nature of those "*earnings*" is set out in the agreement) in respect of new funds or business of PIFSS, excluding Global

Custody, generated after 31 October 2003.

130.2. It is admitted that an agreement stated to have been made on 7 April 2006 (with a handwritten date of 2 May 2006) between Pictet and Mr Amouzegar states that the rate of commission in relation to all PIFSS accounts would be 5% irrespective of the date on which the account was opened.

130.3. Whilst Mr Al Rajaan was not aware of the 21 October 2003 or 7 April 2006 agreements, at or around the date of the October 2003 agreement, Mr Amouzegar left Pictet. It would therefore make commercial sense that Mr Amouzegar signed a business finder agreement to compensate him for his assistance to the bank in generating new business after leaving the bank's employment. Further, on the face of the agreements, neither agreement was limited to fees to be paid solely in respect of PIFSS accounts; rather they were general business finder agreements. To the extent relevant, the First Defendant Mr Al Rajaan will rely on the agreements at trial for their full terms, meaning and effect.

130.4. Save as set out above, paragraph 191 is not admitted.

**Knowledge**

131. Paragraph 192 is denied so far as it concerns Mr Al Rajaan:

131.1. Mr Al Rajaan had no knowledge of the terms of the Pictet Nasrallah Agreement or any amendments thereto.

131.2. As to paragraph 192(a), Mr Al Rajaan understood Mr Nasrallah to be an intermediary for Pictet and that he provided a service for which he was entitled to be remunerated. The value of that role and Mr Nasrallah's services to Pictet is was outside Mr Al Rajaan's knowledge.

131.3. As to paragraph 192(b), Mr Al Rajaan was not involved in discussions between Pictet and Mr Nasrallah concerning any agreements between them and had no intentions in relation to any such agreements.

131.4. As to paragraph 192(c), it is denied that Mr Al Rajaan received "*Secret Commissions*" or, therefore, that the Pictet Nasrallah Agreement was used as a "front" for such payments as alleged or at all. Paragraph 112 above is repeated.

131.5. The state of knowledge of Mr Nasrallah, Mr Bertherat and Mr Amouzegar is not admitted.

132.    As to paragraph 193:

132.1.    It is denied that Mr Al Rajaan received money as part of "*corrupt Secret Commission arrangements*". Paragraph 112 above is repeated.

132.2.    It is further denied that there was a "*gentleman's agreement*" between Mr Al Rajaan, Mr Nasrallah, Mr Amouzegar and/or Mr Bertherat to procure "*Secret Commission*".

132.3.    It is denied that Mr Al Rajaan had an agreement with Mr Amouzegar pursuant to which Mr Amouzegar was entitled to commission related to PIFSS investments.

132.4.    The assertion that any payment of commission to Mr Amouzegar was agreed by Mr Bertherat on behalf of Pictet is not admitted.

132.5.    Save as set out above, paragraph 193 is denied.

133.    As to paragraphs 194 and 195:

133.1.    It is admitted that approximately US$ 26.7 million was paid by Pictet to Mr Nasrallah and Mr Amouzegar, which comprised US$ 22.8 million paid to Mr Nasrallah and US$ 3.9 million paid to Mr Amouzegar. The funds to which these payments related is not admitted. Save for the foregoing, the contents of Appendix 3.1 are not admitted.

133.2.    It is denied that the monies were paid by way of "*Secret Commissions*". Paragraph 112 above is repeated.

133.3.    It is denied that the financial services provided by Pictet to PIFSS were procured or authorised <u>or influenced</u> by Mr Al Rajaan. Paragraph 112.3 above is repeated.

133.4.    Save as set out above, paragraphs 194 and 195 are denied.

134.    Paragraph 196 is denied. Further:

134.1.    To the best of Mr Al Rajaan's knowledge, sums paid to Mr Nasrallah and/or Mr Amouzegar by Pictet were paid to them for their sole benefit and they were free to use the monies as they wished. Mr Al Rajaan did not know the terms of their arrangements with Pictet.

134.2.    There was no agreement between Mr Nasrallah and Mr Al Rajaan as to the amount that Mr Al Rajaan would receive. Mr Al Rajaan did not receive

commission from Mr Amouzegar.

134.3.    In those circumstances, Mr Nasrallah and Mr Amouzegar did not require the authority or direction of Mr Al Rajaan to retain the monies paid to them by Pictet (for the avoidance of doubt it is denied that any such authority or direction was given by Mr Al Rajaan).

**Banking arrangements**

135.    As to paragraph 197:

135.1.    It is denied that Mr Al Rajaan instructed Pictet to set up offshore companies and to open bank accounts to facilitate the transfer of "*Secret Commissions*" or their proceeds.

135.2.    It is admitted that a number of companies were established and administered initially by Pictet and then by the Rhone Trust, which formed part of the Pictet Group.  Those companies were established at the instance of the Pictet Group.

135.3.    As to the particular companies and accounts identified in paragraphs 197(a) to (l):

(1)    The purpose of including names of individuals in paragraphs 197(a)-(g) is unclear and no admissions are made in respect of those names.

(2)    ~~As to paragraph 197(c), the company name is "*Northshore Properties*" and not "*Northwest Properties*" as alleged.~~

(3)    Save as set out above, it is admitted that the companies identified in paragraphs 197(a) to (g) were established and administered initially by Pictet and then by Rhone Trust.

(4)    It is admitted that there were accounts for Ms Al Wazzan as pleaded in paragraph 197(h). The account identified in paragraph 197(l) is an account in the name of Mr Al Rajaan.

(5)    Paragraphs 197(i), (j) and (k) concern accounts and companies that Mr Al Rajaan believeds belong to Mr Nasrallah.

135.4.    Save as set out above, paragraph 197 is not admitted.

136.    As to paragraph 198:

136.1.   It is admitted that Pictet provided the services described in paragraph 198. It is admitted that this included a loan to Chulani in 2009 (not 2008) of EUR 600,000 for one month.

136.2.   It is denied that Mr Al Rajaan received "*Secret Commissions*". Paragraph 112 above is repeated.

136.3.   Save as set out above, paragraph 198 is not admitted.

137.   As to paragraph 199:

137.1.   It is admitted that Mr Bertherat and Mr Amouzegar (until he left Pictet) were Mr Al Rajaan's primary senior contacts at Pictet. They were assisted by other Pictet employees who met with Mr Al Rajaan from time to time to discuss his accounts and investments.

137.2.   It is admitted that Mr Al Rajaan and Ms Al Wazzan had accounts with Pictet Asia (Singapore) and Pictet Bahamas (Nassau) and Pictet in Switzerland.

137.3.   The nature of Mr Bertherat's and Mr Amouzegar's responsibilities at Pictet and the level of their oversight internally in respect of the relationship with PIFSS, Mr Al Rajaan and Ms Al Wazzan are not admitted.

137.4.   It is denied that Mr Amouzegar was involved in the relationship with Mr Al Rajaan in the sense of having business interactions with Mr Al Rajaan after his departure in 2003. Whether Mr Amouzegar remained involved with Pictet was is outside Mr Al Rajaan's direct knowledge and is not admitted.

137.5.   Save as set out above, paragraph 199 is not admitted.

138.   As to paragraph 200:

138.1.   Mr Al Rajaan believed s that the Pictet accounts held for Mr Al Rajaan and Ms Al Wazzan were managed centrally and by the same personnel until around 2012, when their management and administration were transferred to be dealt with locally.

138.2.   It is admitted that Mr Bertherat and Mr Amouzegar (until he left the bank) were primary contacts for Mr Al Rajaan. Whether they had "*knowledge and overall supervision of all*" of Mr Al Rajaan's accounts is not admitted.

138.3.    Save as set out above, paragraph 200 is not admitted.

139.    Paragraph 201 is admitted.

**Alleged concealment of Mr Al Rajaan's identity and of "Secret Commissions"**

140.    Paragraph 202 is denied. Mr Al Rajaan did not have arrangements to receive "*Secret Commissions*". Paragraph 112 above is repeated.

141.    As to paragraph 203:

141.1.    The first sentence of paragraph 203 is not admitted. Without prejudice to that non-admission, Mr Al Rajaan did not consider that he was able to treat as his own money held in the accounts held by Mr Nasrallah (or his companies). He considered that any payment from those accounts required Mr Nasrallah's authorisation.

141.2.    Paragraphs 203(a) and (b) are too vague properly to be answered. Without prejudice to the foregoing:

(1)    It is admitted that transfers broadly in the amounts identified in paragraphs 203(b)(a), (b)(b), (b)(c), (b)(d) and (b)(e) were made. The payments alleged in Appendices 2.3B, 3.2C and 3.6 are admitted only to the extent set out in Annex 1 hereto.[4]

(2)    It is admitted that the Lipuno Foundation held an account at VP Bank.

(3)    It is admitted that money was paid into the account of Hogara Investments Limited and used to purchase a villa in Thailand.

(4)    It is admitted that money was paid to the account of Glenin and used to purchase a yacht from Sunseeker London Limited.

(5)    Mr Al Rajaan has set out his assets in his First Affidavit herein.

(6)    Save as set out above, paragraph 203(b) is not admitted.

141.3.    As to paragraph 203(c), the reference to debit/credit cards "*in respect of certain of those accounts*" is too vague properly to be answered. Without prejudice to the foregoing, to the best of Mr Al Rajaan's recollection, he did not have a credit or debit card for Mr Nasrallah's accounts.

74

142.    The central premise of paragraph 204 and its subparagraphs is denied: as pleaded above, no *"Secret Commissions"* were *"concealed"* from PIFSS.  Paragraph 204 and its subparagraphs are otherwise not admitted save as follows:

142.1.    As to paragraph 204(b), Mr Al Rajaan asked to be provided with paperwork in Switzerland because he spent a considerable amount of time in Switzerland and it was convenient for him to receive paperwork there, and he did not consider the postal system in Kuwait to be reliable. Mr Al Rajaan believed ~~s~~ that it ~~is~~ was common practice for Swiss banks to hold paperwork for their clients in this way. It is denied that Mr Al Rajaan told Pictet not to mention Mr Nasrallah's name on the phone. Mr Al Rajaan did not consider that he had any reason to conceal his relationship with Mr Nasrallah.

142.2. As to paragraph 204(d):

(1)    It is denied that Mr Al Rajaan informed Mr Bertherat in or around 7 May 2012 that he was the subject of a criminal investigation.

(2)    As to paragraph 204(d)(a), it is admitted that an internal Pictet email from Mr Bertherat on 11 May 2012 states that the Pictet Nasrallah Agreement was terminated with effect from the beginning of 2012.

(3)    As to paragraph 204(d)(b), it is admitted that accounts 190882 and 190890 were closed in or around May 2012.

(4)    As to paragraph 204(d)(c)(a), to the best of Mr Al Rajaan's knowledge, not all of Mr Al Rajaan and Ms Al Wazzan's accounts with Pictet were terminated. At the time of his death, Mr Al Rajaan still ~~holds~~ held the following accounts: Dryden Worldwide SA (number 888037); Northshore Properties SA (number 889812); Glenin International Limited (number 190684); and Chulani Investments Inc.

142.3.    Save that it is admitted that the transfers set out at paragraph 204(e) took place, paragraph 204(e) is not admitted.

143.    As to paragraph 205:

143.1.    It is admitted that Pictet Bahamas and Pictet Asia opened and operated bank accounts for Mr Al Rajaan.

143.2.    It is admitted that Mr Nasrallah held accounts with Pictet (either in his name or the name of his companies). No admissions are made as to the entities that opened and operated bank accounts for Mr Nasrallah.

143.3.    In respect of the sums set out in paragraph 205, it is denied that: (i) "*all such payments were for the ultimate benefit of Mr Al Rajaan*"; (ii) Mr Nasrallah acted as Mr Al Rajaan's nominee; (iii) the payments constituted "*Secret Commissions*" or the traceable proceeds thereof; and (iv) Phoenix and Ozak were Mr Al Rajaan's companies (if it is so alleged).

143.4.    As to paragraph 205(a), it is admitted that money was paid to Mr Nasrallah by Pictet but the precise amount of those payments is not admitted. The funds to which these payments relate is not admitted.

143.5.    As to paragraph 205(b)(b), it is admitted that sums were transferred to accounts beneficially held by Mr Al Rajaan from accounts at EFG in the names of Phoenix, Ozak and Thaxton (Thaxton being one of Mr Al Rajaan's own accounts). It is admitted that approximately US$ 20 million was transferred from Ozak. The precise amounts transferred from Phoenix and Thaxton are not admitted.

143.6.    As to paragraph 205(c), it is admitted that in the period 2005 to 2012 monies were paid into accounts held for Mr Al Rajaan from Mr Mombelli or by companies on his behalf. The precise amount is not admitted.

143.7.    Paragraph 205(d) is admitted only to the extent set out in Annex 1 hereto.[4] ~~Paragraph 205(d) is inadequately particularised. It is unclear from which companies the payments are alleged to have been made~~. In any event, Zetland Corporate Services Limited is not one of Mr Al Rajaan's companies, and no admission is made as to whether the entities identified in this paragraph are "*owned by or associated with Mr Amouzegar*".[4]

143.8.    Save as set out above, paragraph 205 is not admitted.

144.    As to paragraph 206, it is admitted that Mr Amouzegar received US $3.9 million from Pictet. The funds to which these payments relate is not admitted. It is denied that the payments were "*Secret Commissions*".

145.    Paragraph 207 is inadequately particularised. It is unclear which "*such sums*" are said to have been paid and the destination of all "*such sums*". Without prejudice to the foregoing, and on the assumption it refers to the amount of US$ 3.9 million paid to Mr Amouzegar, it

76

is denied that this amount was paid to, or for the benefit of, Mr Al Rajaan.

## Knowledge

146.     As to paragraph 208:

146.1.    To the best of Mr Al Rajaan's knowledge and recollection, until May 2012 the management and administration of his accounts was carried out centrally. The basis on which this responsibility was exercised within Pictet is not admitted.

146.2.    Save as set out above, paragraph 208 is not admitted.

147.     Paragraphs 211₀₉ to 213 concern the imputation of knowledge within, and alleged liability of, Pictet. Consequently, the First Defendant Mr Al Rajaan does not plead to paragraphs 209 to 213.

## Particulars of knowledge

148.     Paragraphs 214 to 217 concern allegations of knowledge on the part of "*at least*" Mr Berterat and Mr Amouzegar Pictet entities and are not admitted save that:

148.1.    Mr Al Rajaan did not consider himself to be a principal on the Bordertown account.

148.2.    It is denied that Mr Al Rajaan was part of a "*gentleman's agreement*" with Mr Amouzegar and Mr Nasrallah by which Mr Amouzegar received commission.

148.3.    It is denied that the true relationship between Pictet, Mr Al Rajaan, Mr Nasrallah and Mr Amouzegar was being concealed or that Mr Al Rajaan received "*Secret Commissions*". Paragraph 112.5 above is repeated.

## Mr Al Rajaan

149.     Paragraph 218 is denied:

149.1.    The law applicable to any claims against the Estate Mr Al Rajaan is Swiss law and the Particulars of Claim disclose no reasonable basis for any Swiss law claim. Paragraphs 21 and 23 above are repeated.

149.2.    Further or alternatively, any claim under or reliant upon Article 11 or Article 12[4] of the Public Property Law,[4] or[4] Article 35 of the Penal Code as amended by Law No. 31 of 1970, Article 2 of the Money Laundering Law No.35 of 2002 or Article 2

of the Money Laundering Law No.106 of 2013[4] represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait and is not justiciable in the Courts of England and Wales.

149.3. Further or alternatively, the allegation that Mr Al Rajaan breached his "Civil Service" duties is embarrassingly vague. Insofar as this is an allegation that Mr Al Rajaan breached the Civil Service Law (the terms of which are pleaded in paragraph 59), it is denied that the facts or matters relied on by PIFSS (or capable of being proved by PIFSS) constitute a breach by Mr Al Rajaan of that law.

149.4. The factual premises for the allegation that the Estate Mr Al Rajaan is liable to PIFSS in Kuwaiti law are in any event denied.

149A. Paragraph 218A is denied and paragraph 72A above is repeated.

150. Paragraph 219 is denied. There is no basis for any claim against the Estate Mr Al Rajaan under English law.

**Pictet, Pictet Europe, Mr Bertherat, Mr Amouzegar, Mr Nasrallah**

151. Paragraphs 220, 220A and 221 make claims against another Defendants and the First Defendant Mr Al Rajaan does not plead to them.

**Pictet Asia, Pictet Bahamas, Pictet Europe**

152. Paragraphs 222 and 223 make claims against other Defendants and Mr Al Rajaan does not plead to them.

**Secondary/Vicarious liability**

153. Paragraph 224 makes claims against other Defendants and the First Defendant Mr Al Rajaan does not plead to it.

**Generally**

154. Paragraph 225 is embarrassingly vague and is denied. The payments that were made to Mr Al Rajaan and/or any of the financial intermediaries were not void and PIFSS has failed to explain (by reference to any relevant applicable law) the basis for so asserting.

**H.    FURTHER NASRALLAH SCHEME**

155.    Paragraph 226 is denied.

155.1.    To the best of Mr Al Rajaan's knowledge, Mr Nasrallah was an intermediary with relationships with a number of financial institutions for which he performed services and received commission. Mr Al Rajaan ~~does~~ did not know all the institutions with which Mr Nasrallah had relationships or the details of Mr Nasrallah's arrangements with them. Mr Nasrallah acted for many financial institutions independently, and without the knowledge, of Mr Al Rajaan.

155.2.    Mr Nasrallah introduced new investment opportunities to PIFSS. Mr Al Rajaan ~~does~~ did not know the details of the commissions that Mr Nasrallah received in connection with PIFSS investments.

155.3.    Mr Al Rajaan did not authorise or influence investments. Paragraphs 9.1 to 9.12 above are repeated. In the circumstances, it is denied that Mr Al Rajaan "*procured*" the payment of commissions to Mr Nasrallah.

155.4.    From the 1990s until around 2014, Mr Al Rajaan had other business with Mr Nasrallah that had no connection to PIFSS or commissions. Therefore, it is not the case that all monies that Mr Al Rajaan received from Mr Nasrallah related to commissions or were connected to PIFSS.

155.4A    The penultimate sentence of paragraph 226, which concerns allegations in respect of Mr Nasrallah's son Nadim, is not admitted.[4]

155.4B    As to the final sentence, the payments alleged in Appendices 4.7A, B and C are admitted only to the extent set out in Annex 1 hereto but it is denied (for the reasons set out above) that these were "*Secret Commissions*".[4]

156.    Paragraph 227 is inadequately particularised and is not admitted.

157.    Paragraph 228 and the contents of Appendix 4 are not admitted, save that it is admitted that sums approximately in the amount set out in Appendix 4.6 were transferred.

158.    As to paragraph 229:

158.1.    It is denied that Mr Guerin was a "*friend*" of Mr Al Rajaan's. Mr Al Rajaan knew Mr Guerin socially through Mr Nasrallah. Subsequently Mr Guerin assisted Mr Al Rajaan with setting up an account at EFG.

158.2.    It is admitted that Mr Al Rajaan and Mr Nasrallah were in contact by at least the

1990s.

158.3.   Save as set out above, paragraph 229 is not admitted.

159.   As to paragraph 230:

159.1.   It is denied that Mr Al Rajaan had an agreement with Mr Nasrallah or Nadim Nasrallah[4] to share commissions on investments made by PIFSS pursuant to which Mr Al Rajaan "*authorised or influenced PIFSS to invest in funds which duly paid commissions to Mr Nasrallah*".

159.2.   Mr Al Rajaan did not "*authorise*" PIFSS to invest in funds, whether proposed by Mr Nasrallah or otherwise. Paragraph 155.3 above is repeated.

160.   Paragraph 231 is not admitted.

160A   As to paragraph 231A:[4]

160A.1   It is denied for the reasons set out above that there was any agreement between Mr Al Rajaan, Mr Nasrallah and Nadim Nasrallah which involved the receipt of shares (or proceeds) of "*Secret Commissions*".[4]

160A.2   The matters on the basis of which PIFSS infers that Mr Nasrallah and Nadim Nasrallah participated in said agreement (the existence of which is denied) are not admitted.[4]

161.   ~~Paragraph 232 is inadequately particularised in that the relevant accounts are not listed. It is not admitted. Without prejudice to the foregoing non admission, it~~ As to paragraph 232, it[4] is denied that ~~Mr Nasrallah's~~ the[4] Phoenix, Wynacre, PIB[4] and Ozak accounts "*operated as "gateway" accounts from which Secret Commissions were transferred to*" Mr Al Rajaan.

**Banking arrangements and alleged fund flows**

**Phoenix Consultants SARL**

162.   Paragraph 233 is not admitted.

163.   As to paragraph 234:

163.1.   It is not admitted that Mr Nasrallah opened accounts with EFG in 1995. It is admitted that at some time Mr Nasrallah held accounts with EFG, including an account in the name of Phoenix (530115) and Mr Nasrallah's personal account

(530109).

163.2. It is not admitted that the stated purpose was as set out at paragraph 234(a). It is admitted that the internal banking documentation contains the wording in paragraph 234(b).

163.3. Save as set out above, paragraph 234 is not admitted.

164. As to paragraph 235:

164.1. It is admitted that account number 542523 was opened in 2004 in the name of Fondation Antheya, a Liechtenstein entity, by Mr Nasrallah.

164.2. The second sentence is admitted.

164.3. Save as set out above, paragraph 235 is not admitted.

165. Paragraph 236 is denied. Mr Al Rajaan did not have an agreement with Mr Nasrallah to split commissions on the basis of a 65/35 split.

166. As to paragraph 237:

166.1. The first and third sentences are noted.

166.2. The second sentence is not admitted.

166.3. It is denied that Mr Al Rajaan received "*Secret Commissions*". The deletion of paragraph 237 is noted.[4]

167. Paragraph 238 is not admitted.

168. As to paragraph 239, it is denied that PIFSS is entitled to damages on the basis of an "*extrapolation of the incoming payments into Phoenix from 2000 onwards*". The deletion of paragraph 239 is noted.[4]

169. Paragraph 240 is not admitted, save that it is denied that the sums paid into the Phoenix account constituted "*Secret Commissions*". Paragraph 170.2 below is repeated.

169A  Paragraph 240A is admitted only to the extent set out in Annex 1 hereto.[4]

170. As to paragraph 241:

170.1. It is denied that Mr Al Rajaan received "*Secret Commissions*" in the amounts in

paragraph 241 or at all, or the traceable proceeds thereof.

170.2.    As to the monies received by Mr Nasrallah, Mr Al Rajaan believed that it was standard market custom and practice for intermediaries to be paid commission, including for introducer services. Mr Al Rajaan knew that Mr Nasrallah worked with a number of banks and funds and believed that he was entitled to be remunerated for his services.

170.3.    In respect of the amounts in paragraphs 240(c) and (d), for which no source is identified, paragraph 155.4 above is repeated.

## Payments from Phoenix to Mr Al Rajaan

171.    Paragraph 242 is ~~not[4]~~ admitted only to the extent set out in Annex 1 hereto.[4]

171A    ~~Paragraph 242A is not admitted.~~ The deletion of paragraph 242A is noted.[4]

172.    ~~As to paragraph 243~~:

172.1.    ~~It is denied that the sums received by Mr Al Rajaan were "*Secret Commissions*". It is further denied that Mr Al Rajaan had an agreement to split commissions with Mr Nasrallah on a "*35/65% split*".~~

172.2.    ~~It is denied that the facts and matters pleaded at paragraph 243 support the inference that Mr Al Rajaan received US$ 54 million from Phoenix before 2005. Mr Al Rajaan had his own independent wealth and separate business with Mr Nasrallah (paragraph 155.4 above is repeated).~~

172.3.    ~~Save as set out above, paragraph 243 is not admitted.~~ The deletion of paragraph 243 is noted.[4]

173.    Paragraph 244 is not admitted.

## Ozak Services Inc

174.    Paragraph 245 is not admitted, save that it is admitted that an EFG account with no. 541596 was held in the name of Ozak.

175.    Paragraph 246 is not admitted.

**Payments to Nasrallah/Ozak**

176.    Paragraph 247 is not admitted.

177.    As to paragraph 248:

    177.1.    As to paragraph 248(a) paragraph 94 above is repeated.

    177.2.    As to paragraph 248(c):

        (1)    It is denied that Mr Al Rajaan received a share of "*Secret Commissions*" or that he was party to an agreement to share "*Secret Commissions*" with Mr Amouzegar and Mr Nasrallah.

        (2)    Paragraph 248(c)(b) is admitted.

        (3)    As to paragraph 248(c)(c), it is admitted that PIFSS invested with Gapstow. The details relating to PIFSS's investment in Gapstow are not admitted.

        (4)    As to paragraph 248(c)(d), it is denied that Mr Al Rajaan "*procured*" <u>or "*influenced*"</u> PIFSS to invest in funds managed by Gapstow. Paragraph 155.3 above is repeated.

    177.3.    Paragraph 248(h) is embarrassingly vague.

    177.4.    Save as set out above, paragraph 248 is not admitted.

178.    As to paragraph 249:

    178.1.    It is denied that Mr Al Rajaan received "*Secret Commissions*" or the traceable proceeds thereof.

    178.2.    As to the monies received by Mr Nasrallah, Mr Al Rajaan believed that it was standard market custom and practice for intermediaries to be paid commission, including for introducer services. Mr Al Rajaan knew that Mr Nasrallah worked with a number of banks and funds and believed that he was entitled to be remunerated for his services.

    178.3.    In respect of the amounts in paragraph 248(h) (for which no source is identified), it is denied that it can be inferred that the amounts constitute "*Secret Commissions*" or the traceable proceeds. Paragraph 155.4 above is repeated.

178.4.    Save as set out above, paragraph 249 is noted as a summary of PIFSS's position.

**Payments from Ozak to Mr Al Rajaan**

179.    Paragraph 250 is not admitted.

180.    ~~Paragraph 251 is noted~~. The deletion of paragraph 251 is noted.[4]

181.    Paragraph 252 is not admitted.

**Wynacre Limited[4]**

181A    Paragraph 252A concerns the beneficial ownership of Wynacre and is not admitted.[4]

181B    The payments pleaded at paragraphs 252B and 252C are admitted only to the extent set out in Annex 1 hereto. For the reasons set out above, it is denied that any payments made into the Wynacre Account constituted "*Secret Commissions*" or that the obtaining of preference shares by Wynacre "*was a front for the making of payments to Mr Al Rajaan*". These paragraphs are otherwise not admitted.[4]

181C    As to paragraph 252D, the relevant payments to Mr Al Rajaan and Golgen are admitted only to the extent set out in Annex 1 hereto.[5]

**Golgen Properties SA**

182.    As to paragraph 253:

182.1.    The first sentence is admitted.

182.2.    The second sentence is not admitted.

183.    Paragraph 254 is not admitted, save that it is denied that the payments received by Phoenix pursuant to investments made by PIFSS constituted "*Secret Commissions*". Paragraph 155 above is repeated.

184.    Paragraph 255 is admitted. The payment to Suncoast in the sum of US$ 1.5 million forms part of the US$ 12.9 million pleaded at paragraph 298(d) in relation to the alleged UBP Scheme. PIFSS is plainly not entitled to double recovery.

**Thaxton**

185.    As to paragraph 256, it is admitted that Thaxton Foundation was established on 25 January 2008 as a Liechtenstein entity and that it was established and managed on behalf of Mr Al

Rajaan by EFG. Paragraph 256(b) is admitted. The amendment to paragraph 255 is not understood given that the total of the payments listed in the sub-paragraphs is US$ 27.4 million, as originally pleaded.

186.    Paragraph 257 is admitted.

187.    Paragraph 258 is not admitted, save that it is denied that the amounts received into Thaxton were "*Secret Commissions*" or the traceable proceeds thereof.

## Phoenix International Brokerage/PIB[4]

187A    Paragraphs 258A and 258B are not admitted.[4]

187B    Paragraphs 258C and 258D concern payments made to PIB and onward payments from PIB to other entities allegedly associated with the Nasrallah family and are admitted only to the extent set out in Annex 1 hereto.[4]

187C    Paragraph 258E is not admitted. It is denied that any payments to PIB constituted "*Secret Commissions*".[4]

187D    As to paragraph 258F:[4]

187D.1    It is admitted that Mr Al Rajaan was the beneficial owner of Balboa and Moolwurf; and[4]

187D.2    The alleged payments to Balboa and Moolwurf are admitted only to the extent set out in Annex 1 hereto.[4]

## EFG's role

188.    As to paragraph 259:

188.1.    It is admitted that EFG provided advice and brokering services for investments made by Mr Al Rajaan via the Thaxton accounts. Mr Al Rajaan ~~does~~ did not recall the details of the loans provided.

188.2.    It is denied that "*Secret Commissions*" passed through Mr Al Rajaan's EFG accounts. Paragraph 155 above is repeated.

188.3.    Save as set out above, paragraph 259 is not admitted.

189.    Paragraph 260 is not admitted.

**Banking Assistance**

190.    Paragraph 261 is not admitted save that it is admitted that Mr Guerin was a principal point of contact for Mr Al Rajaan at EFG.

191.    As to paragraphs[4] 262 and 262A[4]:

    191.1.    Mr Guerin's role at EFG is not admitted.

    191.2.    It is denied that Mr Al Rajaan and Mr Guerin were "*long-time friends*". Paragraph 158.1 above is repeated.

    191.3.    It is denied that Mr Al Rajaan knew Mr Guerin as someone who would show "*flexibility*". Mr Al Rajaan did not consider that he required any "*flexibility*" from Mr Guerin.

    191.4.    Save as set out above, paragraphs 262 and 262A[4] is are[4] denied.

192.    Paragraph 263 concerns alleged knowledge on the part of Mr Guerin and is not admitted, save that it is denied that sums paid from Mr Nasrallah's accounts to accounts held by Mr Al Rajaan constituted "*Secret Commissions*" or the proceeds thereof.

192A.    Paragraph 263A is not admitted.[4]

193.    Paragraph 264 concerns alleged knowledge on the part of Mr Guerin and is not admitted. As to the matters Mr Guerin is alleged to have known, these are not admitted save as follows:

    193.1A    In respect of the various sub-paragraphs to paragraph 264(b):[4]

        (1)    As to paragraph 264(b)(a), the account information document dated 16 August 2004 is admitted, with no admission as to its context, meaning or implication; [4]

        (2)    As to paragraph 264(b)(b), the note dated 12 February 2010 is admitted, with no admission as to its context, meaning or implication; [4]

        (3)    As to paragraphs 254(b)(c)-(e), the transcripts of telephone conversations dated 7 May 2010, 7 December 2010 and 28 April 2011 are admitted, with no admission as to their context, meaning or implication;[4]

        (4)    As to paragraph 264(b)(f), the email from Ms Likhotal dated 28 July 2007

is admitted, with no admission as to its context, meaning or implication; [4]

(5)     As to paragraph 264(b)(g), the transcript of the telephone conversation between Mr Guerin and Mr Nasrallah on 15 March 2013 is admitted, with no admission as to its context, meaning or implication; [4]

193.1B   As to paragraph 264(b)(a) and its sub-paragraphs, the documents dated 19 April 2007, 5 June 2007, 30 August 2007, 9 November 2007 and 6 December 2007 are admitted, with no admission as to their context, meaning or implication. [4]

193.1    As to paragraph 264(c)(a), it is admitted that there is a file note dated 2008 containing the wording in paragraph 264(c)(a). It is denied (if it be alleged) that the information referred to in paragraph 264(c)(a) was provided to Mr Guerin by Mr Al Rajaan.

193.2.   As to paragraph 264(c)(b):

(1)     It is admitted that the accounts of Chulani and Dryden were beneficially owned by Mr Al Rajaan, as stated on the Form As for both accounts.

(2)     To the extent that Mr Guerin signed off payments "*falsely*", it is denied (if it be alleged) that this was done on the instruction of Mr Al Rajaan or with Mr Al Rajaan's knowledge.

193.3.   As to paragraph 264(c)(b)(b):

(1)     It is admitted that on or around 5 March 2008 Mr Guerin received an instruction on the Thaxton account to pay EUR 2 million to the Chulani account at Pictet Nassau in the terms alleged in paragraph 264(c)(b)(b).

(2)     It is denied that the words "*as usual*" have the meaning asserted in paragraph 264(c)(b)(b). The use of the words is consistent with Mr Al Rajaan saying it should be transferred to the same Pictet Bahamas account as usual.

193.3A   Paragraph 264(c)(d) and its sub-paragraphs are not admitted, save that the payment order dated 1999 and the telephone conversation transcript dated 6 November 2008 between Mr Nasrallah and Mr Guerin are admitted, with no admission as to their meaning, context or implication. [4]

193.4.   As to paragraph 264(d):

87

(1) It is denied that the purpose of the Thaxton account was to share revenues received by the Phoenix and Ozak accounts. The account was used by Mr Al Rajaan for trading.

(2) It is denied that the file note referred to at paragraph 264(c)(a) states that the purpose of the Thaxton account was to share revenue.

(3) As to paragraph 264(d)(d), Mr Guerin had a power of management and administration in relation to the Thaxton account.

193.5. As to paragraph 264(e):

(1) It is admitted that the account opening document for Thaxton contained the wording set out in paragraph 264(e).

(2) It is denied (if it be alleged) that the wording was included on the account opening document on the instruction of Mr Al Rajaan or with Mr Al Rajaan's knowledge. Mr Al Rajaan did not inform Mr Guerin that the source of monies was "*dividends*".

193.5A As to paragraph 264(ea), it is denied that Mr Al Rajaan was aware that the payments to, between and from the various EFG accounts involved "*unlawful conduct*". Paragraph 155 above is repeated.[4]

193.5A Paragraphs 264(ea)(a)-(e) are not admitted, save that the relevant documents dated 29 May 2011, 23 May 2011, 6 June 2011 and 12 October 2011 are admitted, with no admission as to their context, meaning or implication.[4]

194. As to paragraph 265:

194.1. It is denied that the sums transferred to internal accounts held by Mr Al Rajaan constituted "*Secret Commissions*". Paragraph 155 above is repeated.

194.2. Mr Al Rajaan and Mr Nasrallah had business together that was not related to PIFSS.

194.3. As to paragraph 265(c), it is admitted that a letter, dated 8 January 2003, from Mr Guerin and Ms Stephanie Strub (on behalf of BEC) to Citco (Suisse) SA states: "*we regard him as financially reliable and of good moral standing…*"; and "*Mr Nasrallah deserve our complete trust*" (sic).

194.4.    Save as set out above, paragraph 265 is not admitted.

194A    Paragraph 265A concerns alleged knowledge on the part of Mr Diriberry and is not admitted, save that it is denied that Mr Al Rajaan was using his accounts at EFG to "*launder Secret Commissions*". As to the matters pleaded in the sub-paragraphs, these are not admitted save as follows:[4]

194A.1    It is admitted that Mr Al Rajaan was the beneficial owner of the sums held in the Thaxton Account (as pleaded in paragraph 265A(c)(a)).[4]

194A.2    The first sentence of paragraph 265A(c)(b) is admitted.[4]

194A.3    It is admitted that Mr Al Rajaan was the Director General of PIFSS, chairman of Wafra, and a board member of Ahli United Bank (as pleaded in paragraph 265A(c)(b).[4]

194A.4    It is admitted that PIFSS was a client of EFG (as pleaded in paragraph 265A(c)(c)).[4]

194A.5    Paragraph 265A(d)(a) is admitted.[4]

**Account closures/alleged dissipation**

195.    Save that it is denied that Mr Guerin and Mr Al Rajaan had the conversation cross-referred to in paragraph 267, paragraphs[4] ~~Paragraphs~~ 266 and 267 are admitted.

195A.    As to paragraphs 266A to 266C:[4]

195A.1    Mr Al Rajaan did not consider that he had done anything unlawful and had no reason to seek to avoid a potential investigation. As set out above, Mr Al Rajaan considered that the claims, investigations and proceedings pursued by the State of Kuwait were politically motivated.[4]

195A.2    The transcripts of telephone conversations on 7 May 2012 (to which Mr Al Rajaan was not a party) are admitted, with no admission as to their context, meaning or implication.[4]

195A.3    It is denied that Mr Al Rajaan told Mr Guerin or anyone else at EFG about the Swiss prosecutor's investigation into his accounts with Mirabaud.[4]

195A.4    It is denied that Mr Al Rajaan told Nadim Nasrallah about the Swiss prosecutor's investigation into his accounts with Mirabaud.[4]

195A.4   It is denied that Mr Rajaan knew or believed that he had "*been engaged in an unlawful scheme (or schemes)*".[4]

195A.5   These paragraphs are otherwise not admitted.[4]

196.   As to paragraph 268:

196.1.   It is admitted that a file note purportedly prepared by Mr Guerin and with a stated date of 10 May 2012 contains notes broadly in the terms set out in paragraph 268.

196.2.   It is denied that the file note contains an accurate record of any meeting with Mr Al Rajaan.

197.   Paragraph 269 is not admitted, save that it is admitted that there are letters in the terms set out in paragraph 269. As to the sub-paragraphs which follow, the documents dated 23 May, 24 May, 6 June, 13 June, 15 June, 21 June and 26 November 2012 are admitted, with no admission as to their context, meaning or implication.[4]

198.   As to paragraph 270:

198.1.   It is denied that Mr Al Rajaan gave the instructions to "*to mitigate the risk of further criminal investigation*". Mr Al Rajaan did not consider that he had done anything unlawful and had no reason to seek to avoid a potential investigation. As set out above, Mr Al Rajaan considered ~~s~~ that the claims, investigations and proceedings pursued by the State of Kuwait are politically motivated.

198.2.   Mr Nasrallah and/or Nadim Nasrallah[5]'s motives and reasons for giving any instructions are not admitted.

198A.   Paragraph 270A is not admitted.[4]

199.   As to paragraph 271:

199.1.   The first sentence is denied. Mr Al Rajaan did not speak with Mr Guerin or anyone else at EFG about the Swiss prosecutor's investigation into his accounts with Mirabaud. Mr Al Rajaan did not consider that there was any reason for him to inform EFG, given that it was not involved in the investigation.

199.2. The second sentence is not admitted.

200.   Paragraphs 272 and 273 concern alleged knowledge and conduct on the part of EFG, ~~and~~[4] Mr Guerin and Mr Diriberry[4] and are not admitted, save that it is denied that "*unlawful*

*Secret Commissions*" were paid to Mr Al Rajaan pursuant to the alleged "*Further Nasrallah Scheme*" or any other alleged scheme.

200A.   Paragraphs 273A to 273D concern alleged liability on the part of EFG for the actions of Mr Guerin and Mr Diriberry and are not admitted.[4]

**Liability**

**Mr Al Rajaan**

201.   Paragraph 274 is denied.

    201.1.   The law applicable to any claims against the Estate Mr Al Rajaan is Swiss law and the Particulars of Claim disclose no claim in Swiss law. Paragraphs 21 and 23 above are repeated.

    201.2.   Further or alternatively, any claim under or reliant upon Article 11 or Article 12[4] of the Public Property Law,[4] or[4] Article 35 of the Penal Code as amended by Law No. 31 of 1970 or Article 2 of the Money Laundering Law No.35 of 2002[4] represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait and is not justiciable in the Courts of England and Wales.

    201.3.   Further or alternatively, the allegation that Mr Al Rajaan breached his "Civil Service" duties is embarrassingly vague. Insofar as this is an allegation that Mr Al Rajaan breached the Civil Service Law (the terms of which are pleaded in paragraph 59), it is denied that the facts or matters relied on by PIFSS (or capable of being proved by PIFSS) constitute a breach by Mr Al Rajaan of that law.

    201.4.   The factual premises for the allegation that the Estate Mr Al Rajaan is liable to PIFSS in Kuwaiti law are in any event denied.

201A    Paragraph 274A is denied and paragraph 72A above is repeated.

202.   Paragraph 275 is denied. There is no basis for any claim against the Estate Mr Al Rajaan under English law.

**Mr Nasrallah and Phoenix**

203.   Paragraphs 276, 276A and 277 make claims against other Defendants and the First Defendant Mr Al Rajaan does not plead to them.

**EFG and Mr Guerin**

204.    Paragraphs 278, 278A and 279 make claims against other Defendants and the First Defendant ~~Mr Al Rajaan~~ does not plead to them.

**Secondary/Vicarious liability**

205.    Paragraph 280 makes claims against other Defendants and the First Defendant ~~Mr Al Rajaan~~ does not plead to it.

**Generally**

206.    Paragraph 281 is embarrassingly vague and is denied. The payments that were made to Mr Al Rajaan and/or any of the financial intermediaries were not void and PIFSS has failed to explain (by reference to any relevant applicable law) the basis for so asserting.

**H(2): THE NASRALLAH/PENSÉE SCHEME**

206A    Paragraph 281A is denied. As set out in this Defence, Mr Al Rajaan did not receive "*Secret Commissions*" from financial institutions prior to May 2012 and he did not take steps with Mr Nasrallah to procure that he could "*continue to receive Secret Commissions*". It is therefore denied that any payments under the "*Nasrallah/Pensée Scheme*" were the "*continuation of one or more of the Schemes identified*" or made pursuant to a new scheme.

206B    As to paragraph 281B:

206B.1    It is denied that the Pensée Foundation was created at Mr Al Rajaan's request.

206B.2    It is admitted (based on documents that have been disclosed to Mr Al Rajaan during these proceedings) that Mr Nasrallah commissioned Deltec to create a Bahamian Foundation pursuant to the Bahamas Foundations Act 2004 (as amended). Those documents include: (i) the Foundation Questionnaire dated 18 June 2013; (ii) the "General Terms and Conditions" for the Foundation dated 22 June 2013; (iii) the "Account Opening Form and Agreement" dated 22 June 2013; and (iv) the "Client Profile – Foundation Form" dated 22 June 2013.

206B.3    A document entitled "Authorised Signatories" for the Pensée Foundation contains only the name of Mr Nasrallah.

206B.4    It is denied that ~~the purpose of~~ the Pensée Foundation was created to receive Secret Commissions for the benefit of Mr Al Rajaan and to conceal Mr Al Rajaan's receipt

and ownership thereof. The stated purpose of the Pensée Foundation was set out in documents relating to the Foundation as follows:

206B.4.1    A letter entitled "Appointment of Beneficiaries" signed by Mr Nasrallah appointed Mr Nasrallah's son, Nadim Nasrallah, as the beneficiary of the Pensée Foundation. The "Foundation Questionnaire" dated 18 June 2013 states that Nadim Nasrallah is the beneficiary of the Pensée Foundation.

206B.34.2    A letter signed by Mr Nasrallah stated that the goal of the Pensée Foundation "*is mainly to provide for the educational and personal needs of [Mr Nadim Nasrallah (Mr Nasrallah's son)]*" and that the Foundation's assets should be held for the sole benefit of Mr Nadim Nasrallah. The letter further provided that the assets were only to be held for the benefit of Mr Al Rajaan in the event Mr Nadim Nasrallah died before receiving his part of the Foundation's assets.

206B.4    Save as set out above, paragraph 281B is denied.

206B.5    As to paragraphs 281B(a) to (d)

(1)    It is denied that Mr Al Rajaan agreed a mechanism with Mr Nasrallah by which '*Secret Commissions*' could be paid into accounts held at Deltec on behalf of Mr Al Rajaan whilst ensuring that such receipt and Mr Al Rajaan's interest therein was concealed, whether at the alleged Deltec Meeting or otherwise. Any assertions to the effect that there was such an arrangement (including paragraph 281B(b)) are denied. Paragraph 206A above is repeated.

(2)    As to the alleged Deltec Meeting, Mr Al Rajaan had s no recollection of attending a meeting in the terms described by the Claimant. Without prejudice to the foregoing, for the reasons set out in this paragraph 206B (and generally in section H(2) of this Re-Amended Defence), it is denied that a meeting took place at which (i) Mr Al Rajaan, Mr Nasrallah and Mr Chalopin discussed a mechanism for the payment of "*Secret Commissions*", and/or (ii) it was agreed that Mr Nasrallah would open a bank account in the name of Pensée on behalf of Mr Al Rajaan.

(3)    Save as set out above, paragraphs 281B(a) to (d) are not admitted.

206B.6    Save that the timing of Mr Nasrallah signing the documents identified by the Claimant is not admitted, paragraphs 281B(e) and (f) are admitted on the basis of documents disclosed to Mr Al Rajaan during these proceedings.

206B.8    As to paragraph 281B(g), the first sentence is admitted. The sentence is not admitted in circumstances where the form was signed by Mr Nasrallah and Mr Al Rajaan had no knowledge of it and Mr Al Rajaan had not seen the document prior to it being disclosed in these proceedings.

206B.9    As to paragraph 281B(h):

(1)    The first sentence is not admitted as it concerns the actions of third parties which are were outside Mr Al Rajaan's knowledge.

(2)    The second sentence is denied. Paragraphs 206A and 206B above are repeated.

206.10    Save as set out above, paragraph 281B(i) is denied as regards the allegation against Mr Al Rajaan.

206B.11    As to paragraph 281B(j):

(1)    The first sentence is noted.

(2)    The second sentence is not admitted as it concerns the state of the Claimant's knowledge and belief.

(3)    As to the third sentence, it is denied that Mr Nasrallah's account is '*more likely to be true*' and it is further denied that the Claimant's belief as to what is true or untrue is, in any event, relevant. Mr Nasrallah's account will be the subject of disclosure and cross-examination in due course.

206B.12    Save as set out above, paragraph 281B is denied.

206C    As to paragraph 281C:

206C.1    It is admitted that the Pensée Foundation was registered in accordance with the Bahamian Foundations Act 2004 on 3 July 2013.

206C.2    It is admitted that the Foundation Charter for the Pensée Foundation contains Mr Nasrallah's signature and is dated 18 June 2013.

206C.3    Save as set out above, paragraph 281C is not admitted.

206D    Paragraph 281D concerns the acts of third parties, which ~~are~~ were outside Mr Al Rajaan's knowledge, and is not admitted. Without prejudice to that position, it is admitted that a "Nominee Agreement" dated 20 June 2013 states that, "*the Founder [defined as Mr Nasrallah] has instructed [Deltec] to open an account with its bank for the custody, administration and management of the assets of the Foundation*".

206E    As to paragraph 281E:

206E.1    It is admitted that a document dated 20 June 2013 purports to record an agreement between Mr Al Rajaan and Mr Nasrallah relating to the Pensée Foundation. Mr Al Rajaan had ~~s~~ no recollection of signing that document and all references to or admissions in respect of the Pensée Agreement should be read as subject to the foregoing.

206E.2    It is admitted that paragraphs 281E(a) to (d) contain an accurate summary of various provisions contained in the Pensée Agreement.

206E1    Save as set out below, paragraph 281E.1 is not admitted for the reasons set out at paragraph 206B.5(2) above and/or because it concerns the acts of third parties, which were ~~are~~ outside Mr Al Rajaan's knowledge:

206E1.1  As to paragraph 281E1(c) it is admitted that there exists a typed Pensée Agreement which appears to contain the signatures of Mr Al Rajaan and Mr Nasrallah.

206E1.2  It is denied that there is any basis for the inference in paragraph 281E1(e).

206E1.3  As to paragraph 281E1(f), paragraph 206B.11 above is repeated.

206F    As to paragraph 281F:

206F.1   It is admitted that the financial statements for the Pensée Account contain entries that are (i) consistent with the amounts set out in Appendix 4.1 and (ii) broadly consistent with the amounts in the table in paragraph 281F, save that no admission is made in respect of the conversion rate used in the table.

206F.2  It is denied that the monies were received into the Pensée Account for the benefit of Mr Al Rajaan.

206F.3  Save as set out above, paragraph 281F is not admitted.

206G    As to paragraph 281G:

206G.1    It is denied that amounts were paid to Mr Nasrallah's Ozak and Bordertown accounts for the benefit of Mr Al Rajaan.

206G.2    It is admitted that the payers numbered 2 to 10 in the table in paragraph 281F paid monies into Mr Nasrallah's Ozak account at EFG Bank prior to 2013.

206G.3    It is admitted that the payers numbered 11 to 16 in the table in paragraph 281F paid monies into Mr Nasrallah's Bordertown account at Pictet Bahamas prior to 2013.

206H    Paragraph 281H is inadequately particularised (notwithstanding the yet further amendments made to the Particulars of Claim) in that it fails to state when Deltec is alleged to have acted on Mr Al Rajaan's instructions and/or reported to him. Without prejudice to this position, from time to time Mr Al Rajaan gave Deltec instructions concerning the Pensée Foundation's investments, which he did at Mr Nasrallah's request and/or with his authority. Mr Al Rajaan expected Deltec to obtain Mr Nasrallah's prior authorisation before executing his instructions. Further as to the alleged particulars:

206H.1    Save that it is admitted that in a letter from Deltec dated 13 October 2020, Deltec said that it understood Mr Al Rajaan to be the ultimate beneficial owner of the Pensée Foundation (in addition to stating that it understood Mr Nasrallah to be the legal owner), paragraph 281H(a) is not admitted. Mr Al Rajaan did does not know how Deltec has at all material times "*understood and described itself*" or the basis for that understanding and description.

206H.2    Paragraphs 281H(b) and 281H(c) are vague and insufficiently particularised in that it is unclear where or when it is said Deltec "*identified only Mr Al Rajaan*". In any event, paragraph 206H above is repeated. Consistent with the fact that Mr Al Rajaan from time to time gave Deltec instructions (as set out in paragraph 206H above), Deltec reported to Mr Al Rajaan from time to time, upon Mr Nasrallah's request, in respect of assets held by Pensée.

206H.3    As to paragraph 281H(d), the first half of the sentence concerns the actions of Mr Nasrallah and Mr Chalopin, of which Mr Al Rajaan had s no knowledge, and is not admitted. It is also not admitted that Mr Chalopin telephoned Mr Al Rajaan for instructions. As to the second sentence, paragraph 206B.11 above is repeated.

206H1    As to paragraph 281H1:

206H1.1 Paragraph 281H1(a) and the allegations in its sub-paragraphs in respect of the alleged falsity of the documents pleaded therein and/or Mr Al Rajaan's knowledge of that falsity are denied. Paragraph 206A above is repeated. No admissions are made in respect of the documents pleaded in paragraph 281H1(a) save as otherwise set out in section H(2) of this Re-Amended Defence.

206H1.2 As to paragraph 281H1(b), it is denied that the facts and matters in paragraph 281H1(a) justify the inference asserted by PIFSS.

206H1.3 The allegations ~~allegetions~~[4] against Mr Al Rajaan in paragraph 281H1(c) are denied for the reasons set out in section H(2) of this Re-Amended Defence. The First Defendant ~~Mr Al Rajaan~~ does not plead to the allegations of dishonesty against Mr Nasrallah and Mr Chalopin.

206H1.4 The allegations in subparagraph (d) are made against Mr Chalopin and Deltec only and Mr Al Rajaan does not plead thereto. [4]

206H2 As to paragraph 281H2, it is denied that Mr Al Rajaan participated in the "*Schemes*" in the manner alleged in the Particulars of Claim (as set out in this Re-Amended Defence) and, therefore, that PIFSS is entitled to rely on such alleged participation to support an allegation of dishonesty in the context of the alleged Nasrallah/Pensée scheme.

206I As to paragraph 281I:

206I.1 It is admitted that a Portfolio Report for the Pensée Foundation states that the closing value as at 8 May 2020 was USD 42,869,567.

206I.2 It is denied that the assets were held for the benefit of Mr Al Rajaan. Paragraph 206B above is repeated.

**The role of Pensée**

206I1 As to paragraph 281I1:

206I1.1 Paragraph 281I1(a) is admitted, save that, in respect of the final sentence, the First Defendant ~~Mr Al Rajaan~~ reserves ~~his~~ its position to the extent that the operation of English law in this case is affected by principles specific to Bahamian law as to Bahamian Foundations established pursuant to the Act.

206I1.2 Paragraph 281I1(b) is denied:

(1) To the extent that paragraph 281I1(b) asserts that (i) a level of control or direction short of being the '*directing mind and will*' and/or (ii) '*acting through*' Mr Al Rajaan in the absence of a relationship of agency are sufficient to attribute the knowledge and/or dishonesty of Mr Al Rajaan to Pensée, this is denied.

(2) Further and in any event, it is denied that (i) Pensée was controlled by, and/or acted through and/or at the direction of Mr Al Rajaan, and/or (ii) that the knowledge and/or alleged dishonesty (which dishonesty is denied for the reasons set out in this Re-Amended Defence) are to be attributed to Pensée in relation to the facts and matters in paragraphs 281A to 281I.

(3) As to PIFSS's reliance on paragraph 281H, paragraph 206H above is repeated. It is denied that Mr Al Rajaan's limited instructions in relation to the Pensée account from time to time demonstrate that in practice Mr Al Rajaan acted on behalf of Pensée.

206I1.3 As to paragraph 281I1(c), the first sentence is admitted. The remainder of the paragraph concerns the actions and state of mind of Pensée based on the actions of Mr Chalopin, and is not admitted.

206I.4 Paragraph 281I1(d) is denied for the reasons set out above.

206I.5 Save as set out above, paragraph 281I1 is denied.

**Liability**

**Mr Al Rajaan**

206.J Paragraph 281J is denied.

206J.1 The law applicable to any claims against the Estate Mr Al Rajaan is Swiss law and the Particulars of Claim disclose no claim in Swiss law under this alleged scheme. Paragraphs 21 and 23 above are repeated.

206J.2 Further or alternatively, any claim under or reliant upon Article 11 or Article 12[4] of the Public Property Law,[4] or[4] Article 35 of the Penal Code as amended by Law No. 31 of 1970, Article 2 of the Money Laundering Law No.35 of 2002 or Article 2 of the Money Laundering Law No.106 of 2013[4] represents an assertion of

foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait and is not justiciable in the Courts of England and Wales.

206J.3    Further or alternatively, the allegation that Mr Al Rajaan breached his "Civil Service" duties is embarrassingly vague. Insofar as this is an allegation that Mr Al Rajaan breached the Civil Service Law (the terms of which are pleaded in paragraph 59), it is denied that the facts or matters relied on by PIFSS (or capable of being proved by PIFSS) constitute a breach by Mr Al Rajaan of that law.

206J.4    The factual premises for the allegation that the Estate Mr Al Rajaan is liable to PIFSS in Kuwaiti law are in any event denied.

206K    Paragraph 281K is denied. There is no basis for any claim against the Estate Mr Al Rajaan under English Bahamian law for the reasons set out in section H(2) of this Re-Amended Defence.

206L    Paragraphs 281L and 281M are denied for the reasons at paragraphs 4.12, 206K and 307.3.

**Mr Nasrallah and the Pensée Foundation**

206M    Paragraphs 281N and 281O make claims against another Defendants and the First Defendant Mr Al Rajaan does not plead to them.

**The Pensée Foundation**

206N    Paragraphs 281P to S make claims against another Defendant and the First Defendant Mr Al Rajaan does not plead to them.

## I.    THE UBP SCHEME

207.    Paragraphs 282 and 283 are denied.

207.1.    Mr Al Rajaan did not have discussions with UBP SA regarding the payment of commissions (whether "*Secret Commissions*" or otherwise). Nor did Mr Al Rajaan receive payments from UBP.

207.2.    Mr Nasrallah introduced Mr Al Rajaan to UBP in or prior to 2003. Mr Nasrallah explained that UBP was very good with investments in gold and proposed that PIFSS should invest.

207.3.    Subsequently, representatives of UBP, including Mr Edgar de Picciotto, travelled

to Kuwait to present investment opportunities to PIFSS.

207.4.    After considering the proposal presented by UBP, PIFSS invested monies through UBP. However, Mr Al Rajaan did not "*authorise*" or "*influence*" the investments on behalf of PIFSS. Paragraphs 9.1 to 9.12 above are repeated.

207.5.    To the best of Mr Al Rajaan's knowledge, Mr Nasrallah received commission from a number of banks for his intermediary services. Mr Al Rajaan did not recall[4]~~had no knowledge of~~ the terms of Mr Nasrallah's arrangements with the banks, including his arrangement with UBP (albeit that he appears on the basis of documents that have been disclosed to the First Defendant to have been provided with documents showing those terms)[4]. There was no agreement between Mr Al Rajaan and Mr Nasrallah that Mr Nasrallah would give an agreed percentage of amounts he received to Mr Al Rajaan.

207.6.    Mr Al Rajaan considered it to be standard market custom and practice in Switzerland and Kuwait for intermediaries to give significant sums (and/or luxury items) to individuals and did not consider that this undermined his relationship with PIFSS (which it did not). On this basis, Mr Nasrallah gave money to Mr Al Rajaan. The amounts were given entirely at Mr Nasrallah's discretion. Mr Nasrallah had no obligation to give money to Mr Al Rajaan. Nor, therefore, was there any agreement that a certain amount would be paid.

207.7.    Separately, paragraph 155.4 above is repeated.

207.8.    Further, Mr Al Rajaan did not have discussions with UBP about putting in place an offshore structure for him personally, and for Mr Nasrallah and Phoenix as intermediary, through which "*Secret Commission*" could be paid and concealed. Further:

(1)    Mr Al Rajaan did not open any accounts with UBP until 2006 (three years after the UBP Nasrallah Agreement was signed between UBP and Mr Nasrallah and PIFSS first invested with UBP). When Mr Al Rajaan opened accounts with UBP they were in the names of Mr Al Rajaan personally and two of his companies (Suncoast Finance SA and Scopeset Ltd). UBP set up Suncoast.

(2)    The structure of Mr Nasrallah's businesses and accounts was a matter for him. Mr Al Rajaan had no interest in Mr Nasrallah's company Phoenix

> and no knowledge of, or beneficial interest in, any accounts Mr Nasrallah or Phoenix held with UBP.
>
> (3)   In the circumstances it is denied that payments received by Mr Al Rajaan were secret or concealed.

208.   Paragraph 284 is admitted.

209.   As to paragraph 285, it is denied that Mr Al Rajaan had an agreement with Edgar de Picciotto to receive "*Secret Commissions*" via Mr Nasrallah and/or Phoenix. Paragraph 207 above is repeated.  It is further denied that the facts and matters in Section I justify the inference that PIFSS seeks to draw in paragraph 285.

210.   Paragraph 286 concerns alleged actions by Mr Edgar de Picciotto and is not admitted save as follows:

210.1.   It is admitted that (i) there is an agreement between UBP and Phoenix, dated 30 January 2003, (ii) the UBP Nasrallah Agreement contains the term referred to at paragraph 286(b), and (iii) that correspondence for Phoenix was to be sent to UBP SA's address. No admission is made as to which UBP entity entered into the agreement.

210.2.   As to paragraph 286(c), the UBP Nasrallah Agreement provides that Phoenix would be paid "*a finder's fee on the value of each client's assets, provided that contributions are more than CHF 20 million… to the exclusion of other types of remuneration: 50% of the gross revenues on the management fees, incentive fees included*". To the extent relevant, the First Defendant ~~Mr Al Rajaan~~ will rely upon the UBP Nasrallah Agreement at trial for its full terms, meaning and effect.

211.   Save that paragraphs 287(a) to (c) are denied, paragraph 287 concerns the alleged knowledge of Mr de Picciotto and his family and is not admitted. Paragraph 207 above is repeated. To the best of Mr Al Rajaan's knowledge, sums paid to Mr Nasrallah and/or Phoenix pursuant to the UBP Nasrallah Agreement were paid for Mr Nasarallah's sole benefit and he was free to use the monies as he wished.

211A.   As to paragraph 287A, it is denied that Mr Al Rajaan knew or intended that Mr Nasrallah would perform no material services as introducer and/or intermediary. As to the "*examples*" set out in the sub-paragraphs which follow (in relation to which no admission is made as to whether, if proved, they establish the general proposition which they are intended to support): [4]

211A.1   Paragraph 287A(a) is denied. Paragraph 207.2 above is repeated.[4]

211A.2   Paragraph 287A(b) is not admitted, save that it is admitted that a letter from UBP to Mr Al Rajaan dated 17 December 2002 refers to him having attended UBP's offices on 9 December 2002. Documents disclosed by UBP suggest that Mr Nasrallah attended UBP's offices on the same day pursuant to a calendar invite entitled "*Projet Koweit*".[4]

211A.3   Save that the existence of the 13 January 2003 and 6 September 2013 memoranda is admitted (with no admission as to their context, meaning or implication), paragraph 287A(c) is not admitted.[4]

211A.4   Paragraph 287A(d) is denied. Paragraph 207 above is repeated.[4]

211A.5   Paragraph 287A(e) is not admitted.[4]

211A.6   Paragraph 287A(f) is not admitted.[4]

211A.7   Paragraph 287A(g) is not admitted.[4]

211A.8   Paragraph 287A(h) is not admitted.[4]

212.   As to paragraph 288:

212.1.   It is denied that there was an "*agreement to pay Secret Commissions*" and, therefore, that steps were taken pursuant thereto.

212.2.   It is admitted that from the time of PIFSS's first UBP investment, an investment relationship was established between UBP SA, UBP AM and PIFSS. The internal division of responsibility between UBP SA and UBP AM for the services and relationship with PIFSS is not admitted.

212.3.   As to paragraph 288(a), Mr Al Rajaan represented PIFSS in his capacity as Director General of PIFSS and correspondence from UBP was therefore addressed to him. However, Ms Al Dakheel was responsible for the day-to-day relationship with UBP, which included meeting with UBP representatives, assessing reports and discussing and analysing other potential investments.

212.4.   As to paragraph 288(b):

(1)   It is admitted that UBP set up funds known as the "Kuva Funds" in respect of which PIFSS was the sole beneficial investor. To the best of Mr Al

Rajaan's knowledge and recollection, there was one fund with a number of sub-funds. The number of funds or sub-funds is not admitted.

(2)     It is admitted that Mr Al Rajaan sat on the board of directors and investment committee for the Kuva Fund. It is further admitted that Mr Al Rajaan, Ms Al Dakheel and Ms Al Mulla were directors and members of the investment committee of Kuva Alternative until their resignation as directors (together with Mr Al Rajaan) in November 2004, and that Mr Al Rajaan remained a member of the investment committee after that date.[4] However, decisions as to whether to make further investments rested with PIFSS and followed the process set out at paragraphs 9.1 to 9.12 above.

(3)     As to paragraph 288(b)(a), the existence of the email correspondence between Ms Al Dakheel and Ms de Picciotto is admitted. No admission is made as to the context, meaning or implication of that correspondence.[4]

(4)     Paragraph 288(b)(b) is admitted.[4]

(5)     Paragraph 288(b)(c) is not admitted.[4]

(6)     Save that the emails dated 24 November 2005 and 20 April 2007 are admitted (with no admission as to their context, meaning or implication) and the inference pleaded in the first sentence is denied, paragraph 288(b)(d) is not admitted.[4]

(7)     Paragraph 288(b)(e) is not admitted.[4]

212.4A   Paragraph 288(c) is not admitted.[4]

212.4B   Save that it is denied that payments to Mr Al Rajaan constituted "*Secret Commissions*", paragraph 288(d) appears to relate to the actions of UBP and is not admitted. As to the "*examples*" set out in the sub-paragraphs which follow (in relation to which no admission is made as to whether, if proved, they establish the general proposition which they are intended to support):[4]

(1)     Save that the email dated 18 January 2011 is admitted (with no admission as to its context, meaning or implication), paragraph 288(d)(a) is not admitted.[4]

(2)     Save that the existence of the memorandum dated 2 May 2011 is

103

admitted (with no admission as to its context, meaning or implication), paragraph 288(d)(b) is not admitted.[4]

(3)     Paragraph 288(d)(c) is not admitted. Paragraph 207.4 above is repeated.[4]

(4)     Save that it is admitted that PIFSS was the only investor in the Kuva Funds, paragraph 288(d)(d) is not admitted.[4]

212.5. Save as set out above, paragraph 288 is not admitted.

212A    Save that it is admitted that a change in the basis on which UBP's management fees were calculated was agreed in or around 2004, paragraph 288A is not admitted.[4]

212B    Paragraph 288B is not admitted.[4]

213.    As to paragraph 289:

213.1.    It is admitted that there are documents purporting to be:

(1)     An amended version of the UBP Nasrallah Agreement, dated 30 January 2009.

(2)     A substitute agreement, dated 13 October 2009, which stated that UBP SA correspondence was to be a sent to Daniel de Picciotto.

(3)     An amended agreement, dated 14 June 2011.

213.2.    Save as set out above, paragraph 289 is not admitted.

213A    As to paragraph 289A, it is denied that Mr Nasrallah "*had no material role in negotiating the fees paid under the UBP Nasrallah Agreement*" or that Mr Al Rajaan "*was the true negotiating party in respect of fees and the beneficiary of payments under the UBP Nasrallah Agreement*". Paragraph 207 above is repeated.[4] As to the "*examples*" set out in the sub-paragraphs which follow (in relation to which no admission is made as to whether, if proved, they establish the general proposition which they are intended to support): [4]

213A.1    Save that the relevant emails dated 23 and 25 September 2008 are admitted (with no admission as to their context, meaning or implication), paragraph 289A(a) is not admitted.[4]

213A.2    Save that the existence of the November 2008 email correspondence is admitted (with no admission as to its context, meaning or implication), paragraph 289A(b)

104

is not admitted.[4]

213A.3    Save that the existence of the 24 November 2008 email from Ms Mondako to Ms Miskiewicz is admitted (with no admission as to its context, meaning or implication), paragraph 289A(c) is not admitted.[4]

213A.4    Save that it is admitted that in or around May 2009 Mr Al Rajaan sought copies of any documents which he had signed with UBP, paragraph 289A(d) is not admitted.[4]

213A.5    Save that the exchange of emails amongst UBP employees on 4 November 2009 is admitted (with no admission as to the context, meaning or implication thereof), paragraph 289A(e) is not admitted.[4]

213A.6    Save that that the existence of the email exchange dated 11 October 2010 is admitted (with no admission as to its context, meaning or implication), paragraph 289A(f) is not admitted. The basis upon which it is asserted that the word "*him*" in Mr Edgar de Picciotto's email was intended as a reference to Mr Al Rajaan (as opposed to Mr Nasrallah via Phoenix) is unparticularised and accordingly denied.[4]

213A.7    Save that the existence of the email exchange dated 15 October 2010 is admitted (with no admission as to its context, meaning or implication), paragraph 289A(g) is not admitted. The reference in Mr Edgar de Picciotto's email to 50% of the management fee to be shared "*with Nasrallah*" is inconsistent with the allegation that Mr Edgar de Picciotto was referring to Mr Al Rajaan (either in this email or in the email dated 11 October 2010 in the sub-paragraph referred to above).[4]

214.    Paragraph 290 is not admitted, save that:

214.1.    Paragraph 290(b) is admitted.

214.2.    It is admitted that a single payment of US$ 330,000 was made to Phoenix's EFG account in Geneva.

215.    Paragraph 291 is noted. The contents of Appendix 5 are not admitted (save as set out  at paragraph 214 above). It is denied that any payments were "*Secret Commissions*". Paragraph 207 above is repeated.

216.    As to paragraph 292:

216.1.    To the best of Mr Al Rajaan's knowledge and belief, he did not receive "*all or a substantial proportion of the commissions which were paid to Mr Nasrallah*". Mr Nasrallah was paid by UBP for his intermediary services. To the best of Mr Al Rajaan's knowledge and belief, the money Mr Nasrallah received was paid to him for his sole benefit and he was free to use the monies as he wished. Paragraphs 207.5 and 207.6 are repeated.

216.2.    Further, in respect of sums received by Mr Al Rajaan from Mr Nasrallah, paragraph 155.4 above is repeated.

216.3.    Paragraphs 292 (a) and (b) are not admitted, save that it is admitted that US$4.3 million was paid from Phoenix's EFG account to Suncoast Finance at UBP SA.

216.4.    As to paragraph 292(c), it is denied that Mr Al Rajaan received "*Secret Commissions*" from Mr Nasrallah pursuant to any alleged scheme, or that the payments were unlawful or improper so as to justify the inference in paragraph 292.

217.    Paragraph 293 is denied. Further:

217.1.    Payments made under the UBP Nasrallah Agreement were not made at the instance of or for the ultimate benefit of Mr Al Rajaan. To the best of Mr Al Rajaan's knowledge, sums paid to Mr Nasrallah and/or Phoenix pursuant to the UBP Nasrallah Agreement were paid for his sole benefit and Mr Nasrallah was free to use the monies as he wished.

217.2.    Mr Nasrallah had no obligation to give Mr Al Rajaan money and there was no agreement between them that Mr Al Rajaan would receive a particular amount.

217.3.    In those circumstances, Mr Nasrallah did not require the authority or direction of Mr Al Rajaan to retain the monies paid to him by UBP (for the avoidance of doubt it is denied that any such authority or direction was given by Mr Al Rajaan).

218.    As to paragraph 294:

218.1.    To the best of Mr Al Rajaan's knowledge and recollection, Edgar de Picciotto was the primary contact at UBP for PIFSS.

218.2.    The roles and responsibilities of Edgar, Anna, Guy[4] and Daniel de Picciotto, as well as Mr Jan Frogg, Ms Elaine Miskiewicz, Mr Roberto Joos and Ms Laurence

106

Mondako[4] within UBP are not admitted. Further, the details of investments and potential investments were discussed by UBP with the Direct Investment Department.

219.    Paragraph 295 is not admitted, save that it is admitted that a note from "A. de Picciotto", headed "*Account Opening – Phoenix International Consultant Sarl*" states that "*Mr Antoine Nasrallah is well known to the chairman of the bank and he will be responsible for all of the clients dealings*". The note is dated 22 (not 23) July 2003.

220.    Paragraph 296 concerns the alleged responsibilities of Edgar, Daniel and Anne de Picciotto within UBP for overseeing the relationships between UBP SA and each of Mr Nasrallah and his companies and Mr Al Rajaan and his companies and is not admitted save as follows:

220.1.    As to paragraph 296(e), it is admitted that the UBP Nasrallah Agreement names Daniel de Picciotto as the nominated contact for UBP SA.

220.2.    As to paragraph 296(g), it is admitted that the "*Signature Card*" in the account opening documents for Mr Al Rajaan's UBP SA account no. 201- 0254253 states that Edgar de Picciotto introduced Mr Al Rajaan. The date on the Signature Card appears to be 13 December 2006, rather than 13 February 2006.  Mr Edgar de Picciotto did in fact introduce Mr Al Rajaan as a banking client.

221.    As to paragraph 297:

221.1.    As to paragraph 297(a), it is admitted that a UBP account with no. 002- 2037038 was held in the name of Phoenix. To the best of Mr Al Rajaan's knowledge, Phoenix was Mr Nasrallah's company and Mr Nasrallah was the beneficial owner of any accounts in its name.

221.2.    Paragraphs 297(b) to (d) are admitted, save that the account opening dates for Accounts 201-0254253 and 201-0254255 ~~are~~ were not known to Mr Al Rajaan and are not admitted.

221.3.    As to paragraph 297(e), it is admitted that a UBP account with no. 6118409 was held in the name of Phoenix. To the best of Mr Al Rajaan's knowledge, Phoenix was Mr Nasrallah's company and Mr Nasrallah was the beneficial owner of any accounts in its name.

221.4.    Save as set out above, paragraph 297 is not admitted.

**Knowledge**

222.    Paragraph 298 concerns alleged knowledge on the part of UBP SA and is not admitted save as set out below:

    222.1.    It is denied that the accounts of Ozak, Phoenix and Golgen, and the sums in those accounts, were held beneficially for Mr Al Rajaan.

    222.2.    It is admitted that a transfer took place as set out in the first sentence of paragraphs 298(b) and 298(d).

    222.3.    It is denied that the source of the transfers was Mr Al Rajaan's "*personal wealth*".

223.    Save that it is denied that Mr Al Rajaan's UBP accounts were used for the purpose of receiving "*Secret Commissions*" under the UBP Nasrallah Agreement, paragraph 299 concerns alleged knowledge on the part of UBP SA and is not admitted. UBP accounts were used for trading and received monies unconnected to commissions.

224.    As to paragraph 300:

    224.1.    The first sentence is admitted.

    224.2.    The second sentence is not admitted.

225.    As to paragraph 301:

    225.1.    Paragraph 301(b) is inadequately particularised insofar as no particulars are given as to the "*other sources*".

    225.2.    It is denied that any payments to Mr Al Rajaan were "*Secret Commissions*" or the traceable proceeds thereof.

    225.3.    Save as set out above, paragraph 301 is not admitted.

**Account closures and alleged acts of dissipation**

226.    Paragraph 302 is admitted.

227.    As to paragraph 303:

    227.1.    It is admitted that Mr Al Rajaan orally instructed UBP SA to take the steps in paragraph 303(a) to (c). On the same call Mr Al Rajaan informed UBP that there was "*no urgency*" regarding liquidating funds, and that, in the meantime, the

Suncoast account would remain open.

227.2.    As to the ~~final~~ first[4] sentence of paragraph 303A, it is denied that the steps were taken to "*mitigate the threat of further criminal investigation*". Mr Al Rajaan did not consider that he had done anything unlawful and had no reason to seek to avoid a potential investigation. As set out above, Mr Al Rajaan consider~~ed s~~ that the claims, investigations and proceedings pursued by the State of Kuwait are politically motivated.

227A.    As to paragraph 303A:[4]

227A.1    It is denied that Mr Al Rajaan's instructions were intended to be "*urgent*". Paragraph 227.1 above is repeated.  The second sentence is not admitted.[4]

227A.1    Paragraph 303A(b) concerns the alleged responsibilities of individuals within UBP in respect of Mr Al Rajaan's instructions, and is not admitted.[4]

228.    Paragraph 304 is not admitted.

229.    As to paragraph 305:

229.1.    The assertion that Mr Nasrallah withdrew cash on 13 June 2012 is not admitted.

229.2.    It is admitted that a letter from Mr Nasrallah, dated 13 June 2012, and apparently signed by Mr Nasrallah, set out instructions to sell all bonds and shares in his portfolio, to convert them to US dollars and to send him the cash.

229.3.    The reference to an alleged "*discussion*" between Mr Al Rajaan and Mr Nasrallah without any particulars as to the nature of the "*discussion*" is too vague for the First Defendant ~~Mr Al Rajaan~~ properly to be able to plead to it. Without prejudice to the foregoing, it is denied that Mr Al Rajaan told Mr Nasrallah about the investigation in Switzerland. Mr Nasrallah had relationships with various banks in Switzerland, from which he could have become aware of the investigation when it commenced in May 2012. Mr Nasrallah's motives are not admitted.

229.4.    Save as set out above, paragraph 305 is not admitted.

230.    As to paragraph 306:

230.1.    It is denied that Mr Al Rajaan told Edgar de Picciotto or any other representatives of UBP SA about the Swiss criminal investigation. To the best of his knowledge

and recollection, when Mr Al Rajaan called UBP to request that his assets be liquidated and transferred, he did not speak to Edgar, Anne or Daniel de Picciotto, but rather to the UBP employee who managed his account on a day-to-day basis. Mr Al Rajaan gave the UBP employee the instructions referred to in paragraph 303 and did not refer to the criminal investigation.

230.2.    Mr Al Rajaan did not speak to UBP about liquidating Mr Nasrallah's assets.

230.3.    Save as set out above, paragraph 306 is not admitted.

231.    Paragraph 307 concerns alleged knowledge on the part of UBP and is not admitted, save that:

231.1.    It is denied that Mr Al Rajaan was the ultimate beneficiary of all or the majority of the commissions paid under the UBP Nasrallah Agreement and that the UBP Nasrallah Agreement was a front for the payment of "*Secret Commission*" to Mr Al Rajaan. Paragraph 207 above is repeated.

231.2.    As to paragraphs 307(b) and (c), UBP had a general business finder's agreement with Mr Nasrallah (in the sense that it was not exclusive to PIFSS). Mr Al Rajaan understood that the bank's terms and conditions provided that intermediary fees or commissions could be paid. Further, it is not asserted that the intermediary commission fees were passed on to PIFSS. In the circumstances, it is not understood on what basis it is asserted that the payments to Mr Nasrallah should have been disclosed to PIFSS.

232.    As to paragraph 308:

232.1.    It is denied that the monies given to Mr Al Rajaan constituted "*the unlawful promise and payment to Mr Al Rajaan (at his request) of Secret Commissions*". Paragraph 207 above is repeated.

232.2.    As to the second sentence, Mr Nasrallah's motives for giving money to Mr Al Rajaan are not admitted. In any event, Mr Al Rajaan did not authorise or influence PIFSS investments. Paragraph 207.4 above is repeated.

232.3.    Save as set out above, paragraph 308 is not admitted.

**Liability**

**Mr Al Rajaan**

110

233.     Paragraph 309 is denied:

   233.1.    The law applicable to any claims against the Estate ~~Mr Al Rajaan~~ is Swiss law ~~and the Particulars of Claim disclose no claim in Swiss law~~.  Paragraphs 21 and 23 above are repeated.

   233.2.    Further or alternatively, any claim under or reliant upon Article 11 or Article 12[4] of the Public Property Law,[4] ~~or~~[4] Article 35 of the Penal Code as amended by Law No. 31 of 1970, Article 2 of the Money Laundering Law No.35 of 2002 or Article 2 of the Money Laundering Law No.106 of 2013[4] represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait and is not justiciable in the Courts of England and Wales.

   233.3.    Further or alternatively, the allegation that Mr Al Rajaan breached his "Civil Service" duties is embarrassingly vague.  Insofar as this is an allegation that Mr Al Rajaan breached the Civil Service Law (the terms of which are pleaded in paragraph 59), it is denied that the facts or matters relied on by PIFSS (or capable of being proved by PIFSS) constitute a breach by Mr Al Rajaan of that law.

   233.4.    The factual premises for the allegation that the Estate ~~Mr Al Rajaan~~ is liable to PIFSS in Kuwaiti law are in any event denied.

233A.    Paragraph 309A is denied and paragraph 72A above is repeated.

234.     Paragraph 310 is denied.  There is no basis for any claim against the Estate ~~Mr Al Rajaan~~ under English law.

**UBP SA, Mr Nasrallah, Phoenix**

235.     Paragraphs 311, 311A, 312 and 312A make claims against other Defendants and the First Defendant ~~Mr Al Rajaan~~ does not plead to them.

**Mr Nasrallah/Phoenix**

236.     Paragraphs 313, 313A and 314 make claims against other Defendants and the First Defendant ~~Mr Al Rajaan~~ does not plead to them.

**UBP AM, Ms de Picciotto and Mr Daniel de Picciotto**

237.     Paragraphs 315 – 317 make claims against other Defendants and the First Defendant

111

~~Mr Al Rajaan~~ does not plead to them.

**Secondary/Vicarious liability**

238.    Paragraph 318 makes claims against other Defendants and <u>the First Defendant</u> ~~Mr Al Rajaan~~ does not plead to it.

**Generally**

239.    Paragraph 319 is embarrassingly vague and is denied. The payments made to Mr Al Rajaan and/or any financial intermediaries were not void and PIFSS fails to state (by reference to any relevant applicable law) the basis for so asserting.

**J.(1)   THE MOMBELLI SCHEME**

240.    Paragraph 320 is not admitted. Appendix 6.<u>1</u>[5] is noted; its contents are not admitted <u>save to the extent set out in Annex 1 hereto.</u>[5]

241.    Paragraph 321 is not admitted save that it is admitted that Mr Al Rajaan received monies from Mr Mombelli through accounts held for him at Pictet, in the names of Evelyn Assets (a company of which Ms Al Wazzan was named as the beneficial owner) and Dryden (a company of Mr Al Rajaan's), and at Mirabaud to the Overton account (a company of Mr Al Rajaan's). The amount alleged to have been <u>paid and</u>[5] received is not admitted <u>save to the extent set out in Annex 1 hereto.</u>[5] ~~As to the amendment to the second sentence, it is denied that it is to be inferred that payments received by Mr Al Rajaan from Mr Mombelli commenced shortly after the date of the earlier investment referred to in Appendix 6.1; the Claimant is put to strict proof of all payments relied on to bring its claim for damages.~~

242.    As to paragraph 322:

242.1.    The basis on which Mr Mombelli's commission was calculated is not admitted.

242.2.    It is denied that the monies received by Mr Al Rajaan constituted "*Secret Commissions*".

(1)    Mr Al Rajaan considered it to be standard market custom and practice in Kuwait and in Switzerland for intermediaries to give significant sums (and/or luxury items) to individuals and did not consider that this suggestion undermined his relationship with PIFSS (which it did not). On this basis, Mr Mombelli gave money to Mr Al Rajaan. The amounts were given entirely at Mr Mombelli's discretion. Mr Mombelli had no obligation

to give money to Mr Al Rajaan. Nor, therefore, was there any agreement that a certain amount would be paid.

(2)    Mr Al Rajaan received money into accounts in the name of his or his wife's companies and an account held for the benefit of his wife (as set out at paragraph 241 above). Consequently, the transfers were not secret or concealed.

242.3.    Save as set out above, paragraph 322 is denied.

243.    Paragraph 323 is not admitted. Mr Al Rajaan was is unable to recall when he first met Mr Mombelli or where Mr Mombelli was working when he first met him. Mr Al Rajaan was is unable to respond to the vague assertion that Mr Mombelli was introduced to him "*through two third parties*".

244.    As to paragraph 324:

244.1.    Mr Al Rajaan did does not recall a presentation by Mr Mombelli on risk arbitrage and acquisition strategy. However, it is admitted that Mr Mombelli made a proposal, which Mr Al Rajaan passed on to the relevant department for consideration.

244.2.    It is denied that:

(1)    Mr Al Rajaan showed an interest in being considered as a "*business introducer*" and in being paid part of Mr Mombelli's commissions.

(2)    A conversation took place between Mr Al Rajaan and Mr Mombelli as asserted in paragraphs 324 and 325.

245.    Paragraph 325 is denied.

245.1.    Mr Al Rajaan did not request payment in exchange for procuring that PIFSS invested in investment products proposed by Mr Mombelli. Mr Al Rajaan did not make investment decisions on behalf of PIFSS and did not authorise PIFSS's investments. Paragraphs 9.1 to 9.12 above are repeated. Mr Al Rajaan therefore could not confirm that PIFSS would invest in products proposed by Mr Mombelli.

245.2.    Rather, when Mr Mombelli approached Mr Al Rajaan with an investment proposal for PIFSS, Mr Al Rajaan told Mr Mombelli that he would pass the proposal to the relevant department for consideration and analysis.

113

245.3.   It is unclear who it is alleged that Mr Al Rajaan was referring to in respect of the assertion that Mr Al Rajaan told Mr Mombelli that, "*he would take care of it that nobody else had to get involved*". To the extent it refers to others within PIFSS, Mr Al Rajaan was not in a position to exclude the involvement of others. Paragraph 245.1 above is repeated.

246.   Paragraph 326 is denied, save that:

246.1.   It is admitted that there was no written contract between Mr Mombelli and Mr Al Rajaan. Paragraph 242.2(1) above is repeated.

246.2.   It is admitted that Mr Al Rajaan gave Mr Mombelli details of the Overton account.

246.3.   Mr Al Rajaan did (and does) not consider the arrangement with Mr Mombelli to be improper or to present a conflict of interests given his role at PIFSS (paragraphs 4.7 to 4.11 are repeated):

(1)   Mr Al Rajaan believed that it was standard market custom and practice for intermediaries to give substantial sums (and/or luxury items) to individuals.

(2)   Mr Al Rajaan did not control which investments PIFSS made (paragraph 245.1 above is repeated).

(3)   The monies received by Mr Al Rajaan had no effect on the investment decisions taken by PIFSS.

247.   Paragraph 327 is denied.

247.1.   There was no agreement to share commission based on an agreed split (paragraph 242.2(1) above is repeated).

247.2.   Mr Al Rajaan did not indicate that he required a "*further incentive*" to authorise or influence investments by PIFSS in Mr Mombelli's proposed investment products. Further, Mr Al Rajaan did not authorise PIFSS's investments (paragraph 245.1 above is repeated).

248.   Paragraph 328 is denied. Paragraph 245 above is repeated.

**Knowledge**

249.   As to paragraph 329:

249.1.   It is denied that Mr Al Rajaan was party to "*corrupt arrangements*" with Mr Mombelli or, therefore, that he knew that he was party to any such arrangements. It is further denied that the facts and matters relied on by PIFSS support the inference at paragraph 329.

249.2.   It is denied that the receipt of monies from Mr Mombelli placed Mr Al Rajaan in a position where his personal interests conflicted with his duty to PIFSS. As set out above, Mr Al Rajaan did not authorise or influence PIFSS's investments (paragraph 245.1 above is repeated) and the monies received by Mr Al Rajaan had no effect on the investment decisions made by PIFSS (paragraphs 4.7 to 4.11 are repeated).

249.3.   Paragraphs 329(a) and (b) concern the alleged motives and actions of Mr Mombelli and are not admitted.

249.4.   Save as set out above, paragraph 329 is denied.

250.   Paragraph 330 concerns matters that relate to claims against other Defendants and the First Defendant Mr Al Rajaan does not plead to it.

**Liability**

**Mr Al Rajaan**

251.   Paragraph 331 is denied:

251.1.   The law applicable to any claims against the Estate Mr Al Rajaan is Swiss law and the Particulars of Claim disclose no claim in Swiss law. Paragraphs 21 and 23 above are repeated.

251.2.   Further or alternatively, any claim under or reliant upon Article 11 or Article 12[4] of the Public Property Law,[4] or[4] Article 35 of the Penal Code as amended by Law No. 31 of 1970, Article 2 of the Money Laundering Law No.35 of 2002 or Article 2 of the Money Laundering Law No.106 of 2013[4] represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait and is not justiciable in the Courts of England and Wales.

251.3.   Further or alternatively, the allegation that Mr Al Rajaan breached his "Civil Service" duties is embarrassingly vague. Insofar as this is an allegation that Mr Al Rajaan breached the Civil Service Law (the terms of which are pleaded in

paragraph 59), it is denied that the facts or matters relied on by PIFSS (or capable of being proved by PIFSS) constitute a breach by Mr Al Rajaan of that law.

251.4.    The factual premises for the allegation that the Estate Mr Al Rajaan is liable to PIFSS in Kuwaiti law are in any event denied.

251A.    Paragraph 331A is denied. Paragraph 158A is denied and paragraph 72A above is repeated.

252.    Paragraph 332 is denied.  There is no basis for any claim against the Estate Mr Al Rajaan under English law.

**Mr Mombelli**

253.    Paragraphs 333, 333A and 334 make claims against another Defendant and the First Defendant Mr Al Rajaan does not plead to them.

**ICS, Sintesi, Methis**

254.    Paragraphs 335 to 337 make claims against other Defendants and the First Defendant Mr Al Rajaan does not plead to them.

**Generally**

255.    Paragraph 338 is embarrassingly vague and is denied.  The payments that were made to Mr Al Rajaan and/or any of the financial intermediaries were not void and PIFSS has failed to explain (by reference to any relevant applicable law) the basis for so asserting.

**J(2).    VP BANKING ASSISTANCE SCHEME**

256.    PIFSS does not allege that Mr Al Rajaan received commissions directly or indirectly from VP Bank in connection with PIFSS (or indeed at all). PIFSS did not invest or hold accounts with VP Bank. The allegations against Mr Al Rajaan in respect of the alleged "*VP Bank scheme*" arise out of the transfer of monies, alleged to be "*Secret Commissions*" from other alleged schemes, to and from accounts held by Mr Al Rajaan, Mr Nasrallah and Mr Amouzegar at VP Bank. It is denied that Mr Al Rajaan received corrupt or "*Secret Commissions*" to his accounts at VP Bank. Further, it is denied that all monies received into Mr Al Rajaan's VP Bank accounts related to commissions.

257.    The central premise of paragraph 338A and its subparagraphs is denied: no "*Secret Commissions*" were "*concealed*" from PIFSS.  Paragraph 338A and its subparagraphs are otherwise not admitted save as follows:

257.1.   As to paragraph 338A(a):

(1)   It is denied that any sums received by Mr Al Rajaan through accounts at VP Bank AG or VP Bank Switzerland constituted "*Secret Commissions*". It is further denied that accounts in the names of third parties referred to in paragraph 338A(a) were established and/or operated for his benefit or, therefore, that such accounts were operated to conceal the payment of "*Secret Commissions*".

(2)   It is admitted that Mr Al Rajaan held accounts at VP Bank in the names of Lipuno and Silvermoon and that Mr Al Rajaan was the beneficial owner of those accounts. Mr Al Rajaan had a further account in his own name.

(3)   To the extent it is implied that Mr Al Rajaan was responsible for, and deliberately procured that, Khaled Al Rajaan was incorrectly named as the beneficial owner of Silvermoon, this is denied. To the best of Mr Al Rajaan's knowledge and recollection, he did not instruct VP Bank Switzerland that his son, Khaled Al Rajaan, should be named as the beneficiary on the Silvermoon account. Further, Mr Al Rajaan had no knowledge of the internal account forms, including the form that states that Khaled Al Rajaan was the beneficial owner.

(4)   Accounts were opened in the names of Lipuno and Silvermoon by VP Bank. Silvermoon was set up for Mr Al Rajaan by VP Bank, who also arranged for the appointment of Mr Langenauer as director. Form A for the Silvermoon account designating Khaled Al Rajaan as beneficial owner was signed by Mr Langenauer and not by Mr Al Rajaan or Khaled Al Rajaan.

(5)   To the best of Mr Al Rajaan's knowledge and recollection, Ms Al Wazzan held one account with VP Bank Switzerland (account no. 10.204.768).

257.2.   As to paragraph 338A(c):

(1)   It is admitted that Mr Al Rajaan gave instructions to VP Bank Switzerland to make transfers between his accounts and to external accounts.

(2)   It is admitted that some of the transfers on Mr Al Rajaan's accounts were recorded as cash withdrawals or deposits. Mr Al Rajaan could cannot recall which transactions were cash transactions. To the extent any transactions

117

were incorrectly recorded as cash transactions: (i) this was not on Mr Al Rajaan's instruction, and (ii) Mr Al Rajaan was not aware at the relevant time that this was the case.

257.3.   As to paragraph 338A(d):

(1)   It is admitted that in May 2012 approximately US$24 million was transferred from the Silvermoon account at VP Bank Switzerland to Mr Al Rajaan's account at Fransabank in Lebanon.

(2)   Mr Al Rajaan did not inform Mr Ghittini about the investigations into his conduct.

258.   Paragraph 338B is not admitted, save that it is admitted that Mr Amouzegar introduced Mr Al Rajaan to Mr Ghittini, who introduced VP Bank.

259.   Paragraph 338C concerns alleged knowledge on the part of Mr Ghittini and VP Bank and is not admitted, save that it is denied that the sums transferred in and out of Mr Al Rajaan's accounts were "*Secret Commissions*" or were "*corrupt*".

## Banking arrangements and bank transfers

260.   Paragraph 338D is admitted, save that it is not admitted that the accounts were opened "*under the supervision*" of Mr Ghittini. Mr Ghittini was Mr Al Rajaan's primary contact at VP Bank; however, the allocation of responsibility within VP Bank is not admitted.

261.   Paragraph 338E is not admitted save that it is admitted that a Form A for account number 10.501.984 dated 15 February 2006 records Mr Amouzegar as the beneficial owner of the account.

262.   As to paragraph 338F:

262.1.   It is admitted that Mr Al Rajaan opened account no. 10.503.397 in the name of Silvermoon at VP Bank Switzerland with sub-accounts for different currencies.

262.2.   As to the beneficial ownership of the Silvermoon account, paragraphs 257.1(2), 257.1(3) and 257.1(4) above are repeated.

262.3.   It is not admitted that the account was opened "*under the supervision of Mr Ghittini*" (paragraph 260 above is repeated).

263.   As to paragraph 338G, it is admitted that Ms Al Wazzan opened a personal account at VP

Bank Switzerland in or around 18 December 2009 with account number 10.204.768 and that the purpose was recorded as being for Ms Al Wazzan's "Travel Cash Card".

264. Paragraph 338H is not admitted. Without prejudice to the foregoing non admission, the allegation that Mr Nasrallah held an account as nominee for Mr Al Rajaan is too vague properly to be answered in that it is unclear whether "*nominee*" is being used as a legal term of art and, if so, under what law.

265. As to paragraph 338I:

265.1. It is denied that Mr Al Rajaan's companies, Lipuno and Silvermoon, were established in order to facilitate the transfers and receipt, payment and concealment of "*Secret Commissions*". Mr Al Rajaan conducted trading activity through the Lipuno and Silvermoon accounts.

265.2. It is admitted that Lipuno was a Liechtenstein entity registered in Vaduz and that Silvermoon was an Anguillan company.

265.3. It is admitted that Mr Langenauer managed the affairs of Silvermoon and Lipuno. Mr Al Rajaan had limited knowledge of the companies and, to the extent he gave any instructions (excluding regarding transfers of his monies), he would have done so on the advice of VP Bank and/or Mr Langenauer.

265.4. It is admitted that Mr Langenauer was a director of Silvermoon. Mr Al Rajaan ~~does~~ did not recall the entity ATU and, therefore, whether ATU acted through Mr Langenauer.

265.5. Save as set out above, paragraph 338I is not admitted.

266. As to paragraph 338J:

266.1. It is denied that the sole purpose of the Silvermoon and Lipuno accounts was as a conduit for the payment of "*Secret Commissions*" or the proceeds thereof. Mr Al Rajaan used the accounts for personal trading activities.

266.2. Save as set out above, paragraph 338J is not admitted.

267. As to paragraph 338K:

267.1. As to paragraph 338K(a), it is admitted that approximately US$34.~~47~~ million was transferred to the Lipuno account from Bordertown. It is denied that the monies

were "*Secret Commissions*" or the proceeds thereof.

267.2. Paragraph 338K(b) is not admitted, save that it is admitted that Quadra paid sums into Bordertown's account at Pictet Bahamas.

267.3. Paragraph 338K(c) is not admitted. Mr Al Rajaan was not the legal or beneficial owner of the accounts between which the alleged transfers were made.

267.4. It is denied that any of the above transfers constituted "*Secret Commissions*".

268. Paragraph 338L is denied. Mr Al Rajaan did not receive "*Secret Commissions*" and the inference PIFSS seeks to draw is not supported by the matters relied on.

269. As to paragraph 338M:

269.1. As to paragraph 338M(a), it is admitted that sums approximately in the amount set out in paragraph 338M(a) were transferred to the Silvermoon account. It is not admitted that these transfers were "*in relation to the transfers into the Lipuno Account*".

269.2. Paragraph 338M(b) is not admitted.

270. Paragraph 338N is not admitted.

271. Paragraph 338O is not admitted.

272. Paragraph 338P is denied as regards the allegations against Mr Al Rajaan. Mr Al Rajaan did not consider that he had any reason to conceal his relationship with Mr Nasrallah as he did not consider (nor is it admitted) that he had engaged in conduct that was unlawful. Mr Al Rajaan did not have an arrangement with Mr Amouzegar by which Mr Amouzegar received commissions. It is denied that Mr Al Rajaan instructed Mr Ghittini not to effect direct transfers between any accounts. Save for the foregoing, paragraph 338P is not admitted.

273. As to paragraph 338Q:

273.1. The assertion that "*the majority of transactions at VP Bank Switzerland were booked as cash disbursements*" is too vague to be properly answerable.

273.2. As to the second and third sentences, it is admitted that there were cash disbursement entries in the Lipuno account at VP Bank Switzerland, including of around US$ 1 million. The number and frequency of such entries is not admitted.

273.3.    Regarding Mr Al Rajaan's knowledge of the cash entries, paragraph 257.2(2) above is repeated.

273.4.    Save as set out in this paragraph, paragraph 338Q is not admitted.

274.    Paragraph 338R makes further assertions regarding the cash entries. No admissions are made in relation thereto. Paragraphs 257.2(2) and 273 above are repeated.

**Account closures**

275.    As to paragraph 338S:

275.1.    Paragraph 338S(a) is admitted, save that it is not admitted that the individual Mr Al Rajaan spoke to was Mr Ghittini. Mr Al Rajaan could ~~can~~ not recall who he spoke to when he gave the instruction.

275.2.    The first sentence of paragraph 338S(b) is admitted. The ~~sentence~~ second sentence is not admitted.

275.3.    As to paragraph 338S(c), it is admitted that a letter from Silvermoon to Mr Pistolese of VP Bank Switzerland, dated 9 May 2012 and which appears to have been signed by Mr Langenauer on behalf of Silvermoon, requests the closure of the Silvermoon account and the transfer of the balance to Mr Al Rajaan's account at Fransabank. It is admitted that these instructions were given by Mr Al Rajaan.

276.    As to paragraph 338T:

276.1.    The first sentence is not admitted.

276.2.    The second sentence is admitted, save that the precise date on which the accounts were closed is not admitted.

277.    Paragraph 338U is not admitted.

278.    Paragraph 338V is denied as regards Mr Al Rajaan (paragraph 279.3 below is repeated) and is otherwise not admitted.

279.    As to paragraph 338W:

279.1.    It is denied that Mr Al Rajaan told Mr Ghittini about the criminal investigation. Mr Al Rajaan issued the instructions to VP Bank to make the relevant transfers without referencing the investigations.

279.2. It is denied that Mr Al Rajaan gave instructions regarding liquidation of Mr Amouzegar's account.

279.3. It is denied that Mr Al Rajaan took steps in respect of his assets "*to mitigate the risk of further criminal investigation*". Mr Al Rajaan did not consider that he had done anything unlawful and had no reason to avoid investigation. As set out above, Mr Al Rajaan considered s that the claims, investigations and proceedings pursued by the State of Kuwait are politically motivated.

279.4. Save as set out above, paragraph 338W is not admitted.

**Alleged  knowledge/dishonesty**

280. As to paragraph 338X:

280.1. As to the matters that it is alleged Mr Ghittini was told by Mr Al Rajaan:

(1) As to paragraph 338X(a), Mr Al Rajaan did does not recall discussing his position at PIFSS with Mr Ghittini. In any event, Mr Al Rajaan's position at PIFSS was public knowledge. It is denied that Mr Al Rajaan told Mr Ghittini that he "*had influence over the investment decisions at PIFSS*".

(2) It is denied that Mr Al Rajaan discussed the matters at paragraphs 338X(b) to (e) with Mr Ghittini. Further, it is denied that Mr Al Rajaan had an agreement with Mr Amouzegar.

(3) As to paragraph 338X(f), Mr Al Rajaan did does not recall VP Bank asking him about being a PEP.

280.2. Save as set out above, paragraph 338X is not admitted.

281. Paragraph 338Y contains further assertions regarding the state of Mr Ghittini's  knowledge and is not admitted save that:

281.1. Paragraph 338Y(a) is admitted. Paragraphs 257.1(2) and 257.1(3) above are repeated.

281.2. Paragraph 338Y(c) is denied as regards Mr Al Rajaan. Mr Al Rajaan did not require his arrangement with Mr Nasrallah to be dealt with in a discreet way. Paragraph 272 above is repeated.

281.3. Paragraph 338Y(d) is denied as regards Mr Al Rajaan. Mr Al Rajaan was not party

to a written contract with Mr Nasrallah and had no knowledge of the terms of Mr Nasrallah's contracts with banks.

281.4.    As to paragraph 338Y(e), paragraphs 257.2(2) and 272 above are repeated.

281.5.    As to paragraph 338Y(f), it is denied that the funds transferred into Mr Al Rajaan's accounts at VP Bank Switzerland were "*Secret Commissions*" or the proceeds thereof.

282.    As to paragraph 338Z:

282.1.    Paragraph 338Z(a) is inadequately pleaded insofar as PIFSS fails to specify the account entries and KYC and other notes on which it relies. In the circumstances, the allegation based on a general reference to internal documents is not admitted.

282.2.    As to paragraph 338Z(b):

(1)    It is admitted that a memo dated 28 May 2010 and an email on 30 May 2010 purport to contain a note of a meeting between the individuals described in paragraph 338Z(b).

(2)    It is admitted that Mr Al Rajaan met Mr Ghittini in Mr Al Rajaan's house Geneva. Mr Al Rajaan could can not recall whether a meeting took place on 28 May 2010 and the date of the alleged meeting is not admitted.

(3)    It is denied that the note and email are an accurate record of any meeting. Without making any admission in respect of any of the content of the email and memo,:

(a)    To the best of Mr Al Rajaan's knowledge and recollection, he did not discuss payments with VP Bank Switzerland  but he also did not seek to conceal his business relationship with Mr Nasrallah. Paragraph 272 above is repeated.

(b)    It is denied (if it be alleged that the comment described in the memo was made by Mr Al Rajaan) that Mr Al Rajaan made any  remarks about VP Bank Switzerland's "*flexibility*". Paragraph 272 above is repeated.

(c)    Mr Al Rajaan was is the president of the Bank of Bahrain in Kuwait; however, he did does not own the bank.

(d)  Mr Al Rajaan did ~~does~~ not recall a meeting at his house with anyone other than Mr Ghittini.

282.3.  As to paragraph 338Z(c):

(1)  It is admitted that a file note dated 10 November 2010 purports to contain a note of a meeting between the individuals described in paragraph 228Z(c). It is denied that the file note is an accurate record of a meeting.

(2)  Mr Al Rajaan met with Mr Ghittini in Zurich. On occasion, Mr Ghittini was accompanied by someone else who Mr Al Rajaan thought was from VP Bank (whose name Mr Al Rajaan did ~~does~~ not recall).

(3)  Mr Al Rajaan did not attend a meeting in Zurich with Mr Ghittini and Mr Nasrallah at which Mr Nasrallah showed Mr Ghittini his agreements with banks.

282.4.  As to paragraph 338Z(d), it is admitted there is a document purporting to be a memo prepared by Dr Beat Graf. The memo is undated. No admissions are made in relation thereto.

283.  Paragraph 338AA and its subparagraphs concern the alleged actions of VP Bank Switzerland and are not admitted.

284.  Paragraphs 338BB to 338EE are not admitted.

285.  As to paragraph 338FF:

285.1.  It is admitted that: (i) by an email dated 30 May 2010 Mr Ghittini asked Mr Sturzenegger whether he had time to have lunch with Mr Al Rajaan on 3 June 2010 with a view to seeking an opportunity for VP Bank to manage PIFSS funds; and (ii) the email states that those present at a meeting on 28 May 2010 were very satisfied with VP Bank's services and probably would not mind expanding their business with the bank and particularly appreciated VP Bank's "*flexibility*". It is not admitted that Mr Al Rajaan attended a meeting on 28 May 2010 with the individuals listed in the email. Paragraph 282.2 above is repeated.

285.2.  Further and without prejudice to the foregoing, it is denied that: (i) Mr Al Rajaan knew (if it was the case, which is not admitted) that VP Bank was not enforcing money-laundering obligations and/or was taking steps to conceal payments to

him; and (ii) that Mr Al Rajaan said that he appreciated the "*flexibility*" of VP Bank (as set out in paragraph 282.2(3)(b) above). Mr Al Rajaan did not consider that there was anything unlawful or improper about the payments he received into VP Bank and had no need of any "*flexibility*" from the bank.

285.3.   Save as set out above, paragraph 338FF is not admitted.

286.   As to paragraphs 338GG and 338HH:

286.1.   Paragraph 282.3(1) above is repeated.

286.2.   It is denied that Mr Al Rajaan showed Mr Langenauer copies of the UBP Nasrallah Agreement, Pictet Nasrallah Agreement or a similar contract with Cheyne Capital International Limited on 10 November 2010 (or at any other time). Mr Al Rajaan had never seen or had copies of these contracts.

286.2A   The sentence following "(ii)" in paragraph 338HH is noted.

286.3.   Save as set out above paragraphs 338GG and 338HH are not admitted.

287.   Paragraph⁴ 338II is not admitted, save that it is denied that Mr Al Rajaan had a conflict of interest as a result of receiving money from Mr Nasrallah. Mr Al Rajaan did not authorise PIFSS's investments and the payments received by Mr Al Rajaan had no effect on the investment decisions made by PIFSS.  Paragraphs 9.1 to 9.12 above are repeated. Mr Al Rajaan believed that it was standard market custom and practice for intermediaries to give significant sums (and/or luxury items) to individuals. Paragraphs 4.7 to 4.11 are repeated.

288.   Paragraphs 338JJ to LL are not admitted, save that it is denied that Mr Al Rajaan received "*Secret Commissions*".

289.   Paragraph 338MM is noted. The First Defendant Mr Al Rajaan relies on sections G, H and I above.

**Liability**

**Mr Al Rajaan**

290.   Paragraph 338NN is denied:

290.1.   The law applicable to any claims against the Estate Mr Al Rajaan is Swiss law and the Particulars of Claim disclose no claim in Swiss law.  Paragraphs 21 and 23 above are repeated.

290.2. Further or alternatively, any claim under or reliant upon Article 11 or Article 12[4] of the Public Property Law,[4] or[4] Article 35 of the Penal Code as amended by Law No. 31 of 1970, Article 2 of the Money Laundering Law No.35 of 2002 or Article 2 of the Money Laundering Law No.106 of 2013[4] represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait and is not justiciable in the Courts of England and Wales.

290.3. Further or alternatively, the allegation that Mr Al Rajaan breached his "Civil Service" duties is embarrassingly vague. Insofar as this is an allegation that Mr Al Rajaan breached the Civil Service Law (the terms of which are pleaded in paragraph 59), it is denied that the facts or matters relied on by PIFSS (or capable of being proved by PIFSS) constitute a breach by Mr Al Rajaan of that law.

290.4. The factual premises for the allegation that the First Defendant Mr Al Rajaan is liable to PIFSS in Kuwaiti law are in any event denied.

290A. Paragraph 338NNA is denied and paragraph 72A above is repeated.

291. Paragraph 338OO is denied. There is no basis for any claim against the Estate Mr Al Rajaan under English law.

**Mr Nasrallah, Mr Amouzegar**

292. Paragraphs 338PP, 338PPA and 338QQ make claims against other Defendants and the First Defendant Mr Al Rajaan does not plead to them.

**VP Bank Switzerland, VP Bank AG, Mr Ghittini**

293. Paragraphs 338RR and 338SS make claims against other Defendants and the First Defendant Mr Al Rajaan does not plead to them.

**Secondary/Vicarious liability**

294. Paragraph 338TT makes claims against other Defendants and the First Defendant Mr Al Rajaan does not plead to it.

**Generally**

295. Paragraph 338UU is embarrassingly vague and is denied. The payments made to Mr Al Rajaan and/or any of the financial intermediaries were not void and PIFSS has failed to

126

explain (by reference to any relevant applicable law) the basis for so asserting.

## J(3).    THE AERIUM SCHEME

### Alleged Secret Commissions paid by Mr Ruimy to Mr Al Rajaan

295A    Paragraphs 338VV and 338WW and the contents of Appendix 7.1 are not admitted as they concern investments made by PIFSS, which were ~~are~~ outside Mr Al Rajaan's knowledge.

295B    As to paragraph 338XX:

295B.1    It is admitted that an account at Mirabaud in the name of Ms Al Wazzan with account number 504976 received the payments listed in Appendix 7.2. The account with number 504976 was an account that Mr Al Rajaan used as his own. It is admitted that withdrawals broadly in the total amount of the deposits listed in Appendix 7.2 were made from Mr Ruimy's Mirabaud account 410510 between March 2008 and December 2010.

295B.2    It is admitted that Mr Ruimy made the two payments set out in paragraph 338XX.b from his account at Mirabaud to Gemcut SA and Hamilton Associates in relation to invoices addressed to Mr Al Rajaan. Mr Al Rajaan did ~~does~~ not recall discussing any such payments with Mr Ruimy.

295B.3    It is denied that any monies received by Mr Al Rajaan from Mr Ruimy were "*Secret Commissions*" paid pursuant to a corrupt arrangement between Mr Al Rajaan and Mr Ruimy in return for Mr Al Rajaan causing or influencing PIFSS to invest in funds managed and/or introduced by Aerium Group and/or the Aeriance Group. Mr Al Rajaan did not authorise or influence investments. Paragraphs 9.1 to 9.12 above are repeated.

295B.4    Save as set out above, paragraph 338XX is not admitted.

295C    Paragraphs 338YY, 338ZZ and 338AAA concern facts and matters relating to Mr Ruimy and/or Aerium Finance (including transfers to the accounts of Mr Ruimy); they were ~~are~~ outside Mr Al Rajaan's knowledge and are not admitted.

295D    As to paragraph 338BBB:

295D.1    It is denied that the payments received by Mr Al Rajaan from Mr Ruimy were "*Secret Commissions*" paid pursuant to a corrupt arrangement between Mr Ruimy and Mr Al Rajaan in return for Mr Al Rajaan causing or influencing PIFSS to invest

in funds managed or introduced by Aerium Group or the Aeriance Group. Mr Al Rajaan did not authorise or influence investments. Paragraphs 9.1 to 9.12 above are repeated.

295D.2    It is denied that the facts and matters set out in paragraphs 338BBB(a) to (i) justify an inference that the payments were made pursuant to a corrupt arrangement.

295D.3    As to the payments received by Mr Al Rajaan from Mr Ruimy, (i) Mr Ruimy offered to make payments to Mr Al Rajaan and they were not made at Mr Al Rajaan's request, (ii) Mr Al Rajaan did not, and does not know, on what basis Mr Ruimy decided what sums to transfer to him; (iii) Mr Al Rajaan was not aware of the source of the money used to make payments to him by Mr Ruimy; and (iv) Mr Al Rajaan provided Mr Ruimy with general investment advice and believed that the money he received from Mr Ruimy was related to the provision of that advice.

295D1.    Paragraphs 338BBB1 and 338BBB2 contain a series of complex cross-references to various other paragraphs of the much-amended Particulars of Claim and save where allegations have been admitted or denied in the corresponding paragraphs of this Defence, the paragraphs are not admitted save to the extent set out in Annex 1 hereto.[4]

295D2.  As to paragraph 338BBB3:[4]

295D2.1  Paragraphs 295B.3 and 295D above are repeated.[4]

295D2.3  It is denied that the facts and matters set out in paragraphs 338BBB3(a) to (i) justify the inference for which PIFSS contends.[4] Further as to those facts and matters, the First Defendant is hampered by the lateness of the Claimant's decision to advance the Aerium claims given Mr Al Rajaan's ill-health and subsequent death. Accordingly they are not admitted save as set out below:[4]

(1)    It is denied that there is any "*similar fact pattern*" as alleged in paragraph 338BBB3(a).[4]

(2)    Paragraph 338BBB3(b) contains a mixture of speculation and assertion. It is denied.[4]

(3)    It is denied that there were any "*Secret Commissions*" as alleged in paragraph 338BBB3(e).[4]

(4)    PIFSS has failed to plead the alleged contradiction in paragraph 338BBB3(h). In any event, it is denied that there is such a contradiction.[4]

295D3. Paragraphs 338BBB4 is denied.  There is no proper basis for the inferences that PIFSS has drawn.[4]

**Liability**

**Mr Al Rajaan**

295E        Paragraph 338CCC is denied:

295E.1    The law applicable to any claims against the Estate Mr Al Rajaan is Swiss law. Paragraphs 21 and 23 above are repeated.

295E.2    Further or alternatively, any claim under or reliant upon Article 11 or Article 12[4] of the Public Property Law,[4] or[4] Article 35 of the Penal Code as amended by Law No. 31 of 1970, Article 2 of the Money Laundering Law No.35 of 2002 or Article 2 of the Money Laundering Law No.106 of 2013[4] represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait and is not justiciable in the Courts of England and Wales.

295E.3    Further or alternatively, the allegation that Mr Al Rajaan breached his "Civil Service" duties is embarrassingly vague.  Insofar as this is an allegation that Mr Al Rajaan breached the Civil Service Law (the terms of which are pleaded in paragraph 59), it is denied that the facts or matters relied on by PIFSS (or capable of being proved by PIFSS) constitute a breach by Mr Al Rajaan of that law.

295E.4  The factual premises for the allegation that the Estate Mr Al Rajaan is liable to PIFSS in Kuwaiti law are in any event denied.

295F        Paragraph 338DDD is denied. There is no basis for any claim against the Estate Mr Al Rajaan under English law.

295G        Paragraph 338EEE is denied and paragraph 72A above is repeated.

**Mr Ruimy and Aerium Finance**

295H        Paragraphs 338FFF to III make claims against other Defendants and the First Defendant Mr Al Rajaan does not plead to them.

**Generally**

295I        Paragraph 338JJJ is embarrassingly vague and is denied. The payments made to Mr Al

Rajaan and/or any of the financial intermediaries were not void and PIFSS has failed to explain (by reference to any relevant applicable law) the basis for so asserting.

**Further Relief**

295J    Paragraph 338KKK sets out relief sought against Mr Ruimy and Aerium Finance and the First Defendant ~~Mr Al Rajaan~~ does not plead to it.

## K.    SUMMARY OF THE CLAIM AGAINST THE ESTATE ~~MR AL RAJAAN~~ AND MS AL WAZZAN

**Mr Al Rajaan**

296.    Paragraph 339 is denied for the reasons set out above.  In summary:

296.1.    The allegations of breaches by Mr Al Rajaan of duties owed in Kuwaiti law are denied.

296.2.    In any event, the law applicable to any claims against the Estate ~~Mr Al Rajaan~~ is Swiss law ~~and the Particulars of Claim disclose no claim in Swiss law~~. The claims against the Estate ~~Mr Al Rajaan~~ brought under Swiss law are denied for the reasons set out in this Defence.

296.3.    Further or alternatively, any claim by PIFSS on the basis of an alleged breach of Kuwaiti or Swiss criminal law or under or reliant upon the Penal Code or the Public Property Law or Law No. 31 of 1970 or any other provision of Kuwaiti or Swiss public or penal law represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait or Switzerland and is not justiciable in the Courts of England and Wales.

296.4.    Further or alternatively, any allegation that Mr Al Rajaan breached his "Civil Service" duties is embarrassingly vague.  Insofar as this is an allegation that Mr Al Rajaan breached the Civil Service Law (the terms of which are pleaded in paragraph 59), it is denied that the facts or matters relied on by PIFSS (or capable of being proved by PIFSS) constitute a breach by Mr Al Rajaan of that law.

**Ms Al Wazzan**

297.    Paragraph 340 makes claims against another Defendant and the First Defendant ~~Mr Al Rajaan~~ does not plead to it.

130

298.     Paragraph 341 is noted but denied.  Any amendment of PIFSS's claim would require the consent of the other parties or the permission of the Court: PIFSS has no '*right*' to amend its claim capable of reservation.

## L.     REMEDY

### Kuwaiti Civil Code

299.     Paragraph 342 is admitted as an approximate translation of Article 247(1) of the Kuwaiti Civil Code.

300.     Paragraph 343 is admitted as a partial summary of Article 246 of the Kuwaiti Civil Code.  In fact and materially for present purposes, Article 246(2) specifically provides for restitution "*of the case to its situation which existed prior to the damage*". Restitution is therefore not available for the payments, in that they were given by the financial institutions to Mr Al Rajaan from monies that were held and owned by those institutions and would not have been paid to PIFSS.

301.     Paragraph 344 is admitted as a partial summary of Article 230 of the Kuwaiti Civil Code.

302.     Save that, as a matter of Kuwaiti law, a legal person cannot claim for moral harm, paragraph 345 is admitted.

303.     As to paragraph 346:

   303.1.     The reference to Article 231 appears to be a mistake.

   303.2.     Without prejudice to the foregoing, paragraph 346 is admitted as a partial summary of Article 230 of the Kuwaiti Civil Code.

304.     As to paragraph 347:

   304.1.     The reference to Article 232 appears to be a mistake.

   304.2.     Without prejudice to the foregoing and as to the first sentence, Article 231(1) of the Kuwaiti Civil Code provides that "*Reparation of the unlawful act includes the harm, even if it is moral*".

   304.3.     Pending a proper explanation as to the source of the matters pleaded by PIFSS, paragraph 347 is not admitted.

305.     Pending a proper explanation as to the source of the matters pleaded by PIFSS, paragraph

348 is not admitted.

306.   Paragraph 349 is admitted, save that it is denied that Articles 16 and/or 22 of the Public Property Law provide a basis for claiming compensation. Article 16 does not refer to compensation. Article 22 merely provides that "*if [the victim] has a ground*" to claim compensation then the right to do so is "*not preclude[d]*" by the termination of criminal proceedings. In any event,[4] ~~Dd[4]ouble~~-counting or double recovery is not permitted.

307.   [Not used] ~~As to paragraph 350:~~

   307.1.   ~~Article 49 of the Penal Code was ruled as unconstitutional (by reason of the decisions identified in paragraph 24.7(4) above).~~

   307.2.   ~~Article 2 of the Public Property Law defines "*public property*" as property which is "*owned by or is subject to*" various public institutions. Neither Article 2 nor the other Articles relied on by PIFSS (Articles 11 and 22-25 and 28 of the Public Property Law) render any unauthorised benefit the property of the public institution.~~

   307.3.   ~~Accordingly, it is specifically denied that PIFSS would be entitled, even in the Kuwaiti courts, to assert any proprietary claim against~~ the Estate Mr Al Rajaan ~~as a matter of Kuwaiti law.[4]~~

**Limitation**

308.   By reason of the Rome II Regulation (which governs acts or omissions after 10 January 2009) and the Foreign Limitation Periods Act 1984 (which governs acts or omissions prior to 11 January 2009), the law applicable to PIFSS's claims applies also to issues of limitation.

309.   The law applicable to issues of limitation is therefore Swiss law. Paragraph 21 above is repeated. Pursuant to Articles 60 and 67 of the Swiss Code of Obligations, the ordinary rule of limitation is that claims for damages or restitution become time-barred:

   309.1.   One year from the date on which the injured party became aware of the loss or damage and of the identity of the person liable for it (Article 60) or from the date on which the injured party learned of his claim (Article 67).

   309.2.   In any event, ten years after the date on which the loss or damage is caused (Article 60) or the claim first arises (Article 67).

310.   It is a legitimate inference from the fact that Mr Al Rajaan's receipt of payments was widely

known by at least the early 2000s (as pleaded at paragraph 4.8 above) that PIFSS by its officers and employees had knowledge of such receipt. In the premises, PIFSS's claim is time-barred in its entirety (pursuant to the provisions of Swiss law set out in paragraph 309.1 above) or in part (pursuant to the provisions of Swiss law set out in paragraph 309.2 above).

311.    Alternatively, if which is denied the law applicable to PIFSS's claims is Kuwaiti law, the effect of Article 253(1) of the Kuwaiti Civil Code is that a claim arising out of an illicit act becomes time-barred three years after the date on which the claimant had knowledge of the damage and the person liable for it and in any event 15 years after the date of the commission of the illicit act. PIFSS's claims are in the premises time-barred, save to the extent that they are claims made under Article 22 of the Public Property Law, to which Article 253(1) does not apply (in which case they are an assertion of sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait).

312.    In the further alternative, to the extent that English law is applicable to PIFSS's claims (which is again denied), PIFSS is time-barred from any claim in respect of receipts of payments on or before the date six years before it issued the relevant Claim Form.

**Alleged application of the Kuwaiti Civil Code**

313.    Paragraph 351 is denied. As pleaded above:

313.1.    No wrong has been done by Mr Al Rajaan.

313.2.    PIFSS's reliance upon Article 22 of the Public Property Law and Article 42 of the Penal Code (or any other provision of Kuwaiti public or penal law) represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait; such claims for relief are not justiciable in the Courts of England and Wales.

313.3.    PIFSS is not entitled to compensation pursuant to Articles 246 or 247 or otherwise because PIFSS has suffered no loss.

313.4.    PIFSS is not entitled to restitution pursuant to Article 246 because the payments were given by the financial institutions to Mr Al Rajaan from monies that were held and owned by those institutions and would not have been given to PIFSS.

314.    Paragraph 352 is inadequately particularised and is in any event denied for the reasons set out above. PIFSS has no proprietary claim against the Estate ~~Mr Al Rajaan~~ or at all.

133

315.    Paragraph 353 is denied.  As pleaded above:

315.1.    Mr Al Rajaan has not acted unlawfully.

315.2.    PIFSS's reliance upon Article 11 or Article 12[4] of the Public Property Law and Article 35 of the Penal Code (or any other provision of Kuwaiti public or penal law) represents an assertion of foreign sovereign authority and an attempt to enforce directly or indirectly the penal and/or public laws of Kuwait; such claims for relief are not justiciable in the Courts of England and Wales.

315.3.    PIFSS is not entitled to compensation because it has suffered no loss.

316.    Paragraph 354 is denied:

316.1.    No wrong has been done by Mr Al Rajaan, as pleaded above.

316.2.    It is denied that loss is to be presumed as a matter of law, whether Kuwaiti law applies to the claim (as PIFSS alleges) or otherwise.

316.3.    PIFSS has in fact suffered no loss, as pleaded above.  The payments received by Mr Al Rajaan in no way inflated the fees paid by PIFSS.  If Mr Al Rajaan had not received the payments, the financial institutions and/or intermediaries would have had the benefit of those sums instead; PIFSS would not have received the benefit of those sums by way of reduced fees or waiver of fees or rebate of fees or otherwise.

316.4.    The matters pleaded in paragraphs 354(a) to 354(de) are not admitted but are incapable of sustaining any inference that Mr Al Rajaan's receipt of monies caused PIFSS any loss.  As to paragraphs 354(a) to (c) and (e), PIFSS does not allege, nor is there any basis to allege, that PIFSS would have sought to negotiate lower fees but for Mr Al Rajaan's receipt of the monies. As to paragraph 354(d), the fact of any waiver or reduction of fees in response to a criminal investigation of retrocessions is not probative of the fees that would have been charged but for giving of any retrocessions.

317.    Paragraph 355 is denied.  Paragraphs 302 and 304 above are repeated.  PIFSS is a legal person and is not entitled to moral or general damages.

Alleged application of Swiss Law principles

318A    Paragraph 355A is denied for the reasons at paragraphs 36O, 36L and 316 above.

134

**Alleged application of English law principles**

318.   It is denied that PIFSS is entitled to the relief claimed in paragraph 356 or any relief, for the reasons set above and for the following further or alternative reasons:

318.1.   PIFSS seeks remedies expressly on the basis of English law causes of action (namely bribery, unjust enrichment, breach of fiduciary duty and knowing receipt). That is inconsistent with PIFSS's own pleaded case and wrong in any event: English law is inapplicable to PIFSS's claims, as pleaded at paragraph 23 above.

318.2.   By reason of the Rome II Regulation (which governs acts or omissions after 10 January 2009), the existence, nature and assessment or damage or remedy claimed is to be determined by the governing law of the non-contractual obligation, namely Swiss law. PIFSS's pleading discloses no reasonable basis for any Swiss law claim or remedy.

318.3.   In respect of acts or omissions prior to 11 January 2009, English law remedies are available only if and to the extent that (i) the applicable substantive law gives PIFSS remedies in respect of a cause of action similar in character to a cause of action in English law and (ii) the English law remedies harmonise with the foreign law cause of action. To the extent that PIFSS intends to allege that either of these conditions is satisfied, its pleading discloses no reasonable basis for that allegation, which is accordingly denied.

318.4.   To the extent that PIFSS seeks equitable remedies from the Court, such remedies should in any event be denied as a matter of discretion in light of the politically motivated and abusive nature of these proceedings.

318.5.   As to paragraph 356(a), it is denied that PIFSS has in fact suffered any loss and damage, or that any irrebuttable presumption as to loss arises in the English law of bribery or otherwise. Alternatively, if there were any irrebuttable presumption as to loss in the English law of bribery, it would be a legal presumption forming part of substantive English law, which is inapplicable as pleaded at paragraph 23 above.

318.6.   As to paragraph 356(b), it is denied that the Estate ~~Mr Al Rajaan~~ is liable in the English law of unjust enrichment. PIFSS's pleading discloses no reasonable basis for any such claim. Without prejudice to that, Mr Al Rajaan ~~h~~was not ~~been~~ enriched

135

at PIFSS's expense, nor ~~hw~~as his enrichment ~~been~~ unjust by reference to any unjust factor known to the law of unjust enrichment. The First Defendant ~~Mr Al Rajaan~~ reserves ~~his~~ the right to seek to plead further to paragraph 356(b), including by advancing defences specific to the English law of unjust enrichment, in the event that PIFSS provides any particulars of a claim under that law.

318.7.   It is denied that Mr Al Rajaan owed any fiduciary duties to PIFSS as alleged in paragraphs 356(c) and (d) or at all.

318.8.   It is denied that there is or was any trust property which would give rise to the claims identified in paragraph 356(e) or that PIFSS's pleading discloses any reasonable basis for an allegation of knowing receipt by Mr Al Rajaan.

319.   It is denied that PIFSS is entitled to claim interest as alleged in paragraph 357 or at all.

320.   In the alternative, to the extent that the Estate ~~Mr Al Rajaan~~ is liable to PIFSS for any sum (which is denied), ~~he~~ it is entitled to set off sums owed to Mr Al Rajaan and/or the Estate ~~him~~ by way of unpaid pension (as set out in below) in diminution or extinction of such liability.

321.   As pleaded at paragraph 11, Mr Al Rajaan was appointed to the position of Director General of PIFSS by decree of the Finance Minister of Kuwait and served in that position from 1984 until 2014.

322.   In consequence of his service as a public employee, Mr Al Rajaan became entitled to a pension on leaving his position as Director General in January 2014 and remains so entitled. By letter dated 5 February 2017 from PIFSS to legal representatives of Mr Al Rajaan, PIFSS has admitted that Mr Al Rajaan ~~is~~ was entitled to a pension from PIFSS in the sum of KWD 3660.762 per month, referring to monthly payments by PIFSS to Mr Al Rajaan in that sum as *'his dues'*.

323.   In breach of its obligation to pay Mr Al Rajaan his pension entitlement, PIFSS ~~has~~ failed to pay Mr Al Rajaan any of his monthly pension entitlement since March 2015.

324.   In the premises, PIFSS is liable to pay the Estate ~~Mr Al Rajaan~~ the sum of KWD 219,645.72 which is due and owing as a debt, being his pension entitlement between March 2015 and the date of this Defence.

325.   Mr Al Rajaan's pension entitlement continue~~d~~s to accrue on a monthly basis in the amount of KWD 3660.762 up to the date of Mr Al Rajaan's death.

326.     As at 26 February 2020, £1 was worth approximately 0.397846 KWD; as a result,(a) the past unpaid pension of KWD 219,645.72 was worth £552,087.29 and (b) Mr Al Rajaan's monthly pension entitlement of KWD 3660.762 was worth £9,201.455.

**TOM WEISSELBERG QC**

**TOM RICHARDS**

**KENDRAH POTTS**

**MELODY IHUOMA**

**TOM WEISSELBERG QC**

**KENDRAH POTTS**

**TOM WEISSELBERG QC**

**KENDRAH POTTS**

**TOM WEISSELBERG KC**

**KENDRAH POTTS**

**TOM WEISSELBERG KC**[4]

**HARRY ADAMSON**[4]

**RAYAN FAKHOURY**[4]

## STATEMENT OF TRUTH

The First Defendant believes that the facts stated in this Defence are true.

Signed:

Name:

Dated:

Served this 28th day of February 2020 by Mishcon de Reya LLP, Africa House, 70 Kingsway, London WC2B 6AH, Solicitors for the First Defendant

## STATEMENT OF TRUTH

The First Defendant believes that the facts stated in this Amended Defence are true. The Defendant understands the proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:

Name:

Dated:

Served this day of August 2021 by Mishcon de Reya LLP, Africa House, 70 Kingsway, London WC2B 6AH, Solicitors for the First Defendant

## STATEMENT OF TRUTH

The First Defendant believes that the facts stated in this Amended Defence are true. The Defendant understands the proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:

Name:

Dated:

Served this  day of July 2022 by Greenberg Traurig LLP, TI1e Shard Level 8, 32 London Bridge St, London SE1 9SG, Solicitors for the First Defendant

## STATEMENT OF TRUTH

The First Defendant believes that the facts stated in this Amended Defence are true. The First Defendant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:

Name:        Muna Al-Rajaan Al-Wazzan

Dated:        25 July 2023

Served this 25 day of July 2023 by PCB Bvrne LLP, 1 Plough Place, London, EC4A 1DE, Solicitors for the Pirst Defendant.

## STATEMENT OF TRUTH[4]

The First Defendant believes that the facts stated in this Amended Defence are true. The First Defendant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:

Name:     Muna Al-Rajaan Al-Wazzan

Dated:     8 November 2024

Served this 8 day of November 2024 by PCB Bvrne LLP, 1 Plough Place, London, EC4A 1DE, Solicitors for the First Defendant.